UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIG. | Master Docket No. 3:12-CV-01893-MAS-TJB |
| | **CLASS ACTION** |
| | **JURY TRIAL DEMANDED** |

**PLAINTIFFS' CONSOLIDATED MASTER CLASS ACTION COMPLAINT**

I.      NATURE OF CLAIM ............................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................6

III.    PARTIES ...............................................................................................................7

        A.      Plaintiffs ....................................................................................................7

                1.      Gila Bauer (as Trustee for the Gila Bauer Revocable Trust)......................7

                2.      Arlene Davies...................................................................................7

                3.      Melissa Jacobs ................................................................................8

                4.      The Schmidt Plaintiffs ....................................................................8

                5.      Son, Inc. ..........................................................................................9

        B.      Defendants ................................................................................................9

                1.      The CCTS Defendants ....................................................................9

                2.      Plymouth Park ...............................................................................13

                3.      The Crusader Defendants ..............................................................14

                4.      The Mooring Defendants ...............................................................18

                5.      The M.D. Sass Defendants.............................................................20

                6.      Robert E. Rothman...........................................................................26

                7.      American Tax Funding Defendants ...............................................27

                8.      The BankAtlantic Defendants.........................................................29

                9.      The Wolfson Defendants ...............................................................32

                10.     Phoenix Funding  Funding Defendants...........................................34

                11.     Fountain of Life Defendants ..........................................................35

                12.     William A. Collins ..........................................................................38

                13.     Isadore H. May...............................................................................39

                14.     Richard J. Pisciotta, Jr....................................................................41

        C.      Unnamed Co-Conspirators........................................................................42

IV.     INTERSTATE TRADE AND COMMERCE ..................................................42

V.      FACTUAL ALLEGATIONS ......................................................................42

        A.      The TSC Market in New Jersey.....................................................42

        B.      Defendants' Conspiracy................................................................45

        C.      Examples of Rigged Auctions ......................................................47

        D.      Policing the Conspiracy ...............................................................51

        E.      The Conspiracy Breaks Down ......................................................51

        F.      National Tax Lien Association (NTLA) Trade Association................52

        G.      Conspirators Plead Guilty to Participating in Conspiracy ...............53

        H.      The Sass Defendants Have a History Collusion in Tax Lien Auctions in Other
                Jurisdictions ...............................................................................62

VI.     FRAUDULENT CONCEALMENT.............................................................64

VII.    EFFECTS OF THE DEFENDANTS' UNLAWFUL CONSPIRACY..............65

VIII.   CLASS ACTION ALLEGATIONS ............................................................66

        FIRST CLAIM FOR RELIEF ..................................................................68

                Violation of Section 1 of the Sherman Act 15 U.S.C. § 1 .........................68

        SECOND CLAIM FOR RELIEF ..............................................................70

                Violation of the New Jersey Antitrust Act N.J.S.A. § 56:9-3...................70

        THIRD CLAIM FOR RELIEF ..................................................................72

                Violation of the New Jersey Tax Lien Law: Excessive Fee in the
                Redemption of a Tax Sale Certificate N.J.S.A. § 5-63.1 ..............72

        FOURTH CLAIM FOR RELIEF ...............................................................74

                Violation of the New Jersey Tax Lien Law: Fraud in the Acquisition of
                TSCs N.J.S.A. § 54:5-52 Et Seq. ...................................................74

        FIFTH CLAIM FOR RELIEF ...................................................................75

                Unjust Enrichment ........................................................................75

SIXTH CLAIM FOR RELIEF ........................................................................ 75

    Declaratory Judgment ............................................................... 75

IX.   PRAYER FOR RELIEF ......................................................................... 76

X.    JURY DEMAND ................................................................................... 78

Plaintiffs Gila Bauer as Trustee for the Gila Bauer Revocable Trust, Arlene Davies, Melissa Jacobs, Frances A. Schmidt and Donald W. Schmidt, and Son, Inc. (collectively "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this action against Defendants CCTS, LLC; CCTS Tax Liens I, LLC; CCTS Tax Liens II, LLC; DSBD, LLC; Pro Capital LLC; CCTS Capital LLC; Crestar Capital, LLC; David Butler; David M. Farber; Plymouth Park Tax Services, LLC; M.D. Sass Investors Services, Inc.; M.D. Sass Tax Lien Management, LLC; M.D. Sass Municipal Finance Partners - I, L.P.; M.D. Sass Municipal Finance Partners – II, L.P.; M.D. Sass Municipal Finance Partners - III, LLC; M.D. Sass Municipal Finance Partners - IV, LLC; M.D. Sass Municipal Finance Partners - V, LLC; M.D. Sass Municipal Finance Partners - VI, LLC; Vinaya J. Jessani; Stephen E. Hruby; Robert E. Rothman; American Tax Funding, LLC; Anthony J. De Laurentis; BB&T Corporation; BBX Capital Corporation f/k/a BankAtlantic Bancorp, Inc.; Fidelity Tax, LLC; Michael Deluca; Gary I. Branse; Richard Simon Trustee; Betty Simon Trustee, LLC; Joseph Wolfson; Phoenix Funding Funding, Inc.; Benedict Caiola; Royal Bancshares of Pennsylvania, Inc.; Royal Bank America; Crusader Servicing Corporation; Royal Tax Lien Services, LLC; Robert W. Stein; Robert Jeffrey; William A. Collins; Isadore H. May; Mooring Tax Asset Group, LLC; MTAG Services, LLC; Burlington Assembly of God/Fountain of Life Center; Mercer S.M.E., Inc.; Susan M. Esposito; David B. Boudwin; and Richard J. Pisciotta, Jr. (collectively, "Defendants "), and allege as follows:

## I.     NATURE OF CLAIM

1.     This action arises from Defendants' overarching statewide conspiracy to unlawfully manipulate interest rates associated with tax sale certificates ("TSCs") sold at public auctions throughout the state of New Jersey from at least as early as January 1, 1998, through February 28, 2009 (the "Class Period"), in violation of Section 1 of the Sherman Act, 15 U.S.C.

§ 1, the New Jersey Antitrust Act, <u>N.J.S.A.</u> 56:9-3, and multiple provisions of the New Jersey Tax Lien Law, <u>N.J.S.A.</u> § 54:5-1 *et seq.*  The Defendants  – CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May and Pisciotta – entered into an unlawful agreement and/or understanding to rig tax lien auctions at which they and their co-conspirators attended.  The Defendants' unlawful agreement artificially raised, inflated, and/or manipulated the interest rates associated with tax liens auctioned at an interest rate above 0% throughout the state of New Jersey during the Class Period.  Defendants' actions harmed thousands of distressed homeowners throughout the state of New Jersey and caused them to pay or owe significantly higher interest rates on TSCs than they otherwise would have been required to pay in a market free of Defendants' collusion.

2.      The Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by and under the supervision of the Plaintiffs' Counsel and Interim Class Counsel. That investigation, included, but is not limited to, reviewing and analyzing information concerning the Defendants and public tax lien auctions in the State of New Jersey during the Class Period, which the Plaintiffs obtained from, among other sources:

  a.      Publicly available press releases, news articles and other
          media reports;

  b.      Filings that certain Defendants have made with the United
          States Securities and Exchange Commission;

  c.      The pleadings from the criminal proceedings of those 11
          defendants which have agreed to plead guilty to violating
          the Sherman Act in connection with their participation in
          the precise conspiracy alleged herein;

      d.      Documents received in response to New Jersey Open Records Act Requests;

      e.      Interviews with witnesses to the criminal activity alleged in this complaint; and

      f.      Review of business records of certain conspirators involved in the conspiracy alleged herein and which document the conspiracy alleged herein.

3.      These sources, considered collectively, demonstrate Plaintiffs' allegations that Defendants collusively manipulated the interest rates associated with TSCs auctioned in the State of New Jersey during the Class Period and that Plaintiffs and members of the Class were harmed in that the interest rates Plaintiffs owed on TSCs purchased by Defendants  at public auctions during the Class Period were higher than those that would have prevailed in a market free from the Defendants' collusive activities.

4.      Except as alleged in this Complaint, neither the Plaintiffs nor other members of the public have access to the underlying facts relating to Defendants' illegal activities. That information lies exclusively within the possession, custody, or control of Defendants and other insiders which prevent Plaintiffs from further detailing Defendants' misconduct. The Plaintiffs have been engaged in settlement discussions with several of the Defendants named herein and settlement agreements with such Defendants have just been concluded or will likely be concluded in the immediate future. Part of the consideration being offered in those settlement agreements is the settling Defendants' agreement to disclose to Plaintiffs all details concerning the conspiracy to the extent not inconsistent with their obligations to the ongoing Department of Justice investigation. This information will provide additional details concerning the conspiracy.

5.      As in many states, real property owners in New Jersey must pay property taxes and sewer and water charges to the municipality in which the real property is located.  If the owner fails to pay any taxes or charges owed, a lien arises on the property by operation of law.

Should the lien remain unpaid for a certain amount of time, New Jersey law requires that the lien be sold by the municipality at a live tax lien auction.

6.     At these auctions, the winning bidder must pay the outstanding lien, interest due, and any premium to the municipality at the time of sale.  As consideration, the winning bidder receives a TSC, which must be recorded with the clerk or register of deeds to preserve the lien holder's interest.  This TSC is also sent to the property owner notifying him or her of the change in ownership of the lien.

7.     TSCs entitle the lien holder to several benefits, including a first priority lien on the property, penalties ranging from two to 12%, interest on the delinquent tax obligation (up to the statutory maximum of 18%) and the right to collect the delinquent tax obligation.  The TSC also entitles its holder to foreclose on the property associated with the TSC after a certain period of time should the lien not be redeemed by the property owner.

8.     New Jersey state law sets forth the process by which municipal public lien auctions are conducted in New Jersey. The statutory process is set up in such a way that auctions for TSCs are intended to be competitive, with bidders aggressively reducing the amount of interest they are willing to accept in order to obtain a TSC on a property. This is done in order to provide the delinquent property owner with as favorable of an interest rate as possible.  The bidding on a lien at an auction in New Jersey opens with the interest rate associated with the lien at 18%.  Each successive bid will lower the interest rate potentially to 0%.  This process is known as a "reverse auction."

9.     The Defendants – CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May

and Pisciotta – were among the largest TSC purchasers in the State of New Jersey during the Class Period and together account for the vast amount of TSCs purchased in the State of New Jersey during the Class Period.  Rather than engage in a competitive bidding process for TSCs, however, Defendants secretly agreed to rig bids at TSC auctions throughout the State of New Jersey in order to eliminate or reduce competitive bidding – thereby guaranteeing that the interest rate would stay artificially high (often at the statutory maximum of 18%), and thus securing excessive (and illegal) returns on their TSC investments.  Each Defendant named above engaged in an overarching conspiracy during the Class Period that included allocating which TSC each conspirator would bid on, and hence "win" at an auction.  This process guaranteed Defendants that they would secure TSCs at a higher interest rate than would have occurred in a competitive market.  It also guaranteed that the Plaintiffs would receive the least favorable terms on their TSCs.

10.     Plaintiffs and members of the proposed Class are New Jersey taxpayers who became delinquent on their real property tax obligations, often as a result of disability and/or economic hardship.  Because of the unlawful conspiracy, Class members either paid or owe Defendants an inflated amount in order to redeem their TSCs, and keep their home or other property from falling into the possession of one of the Defendants.  Indeed, some class members have already lost their properties as a result of Defendants' illegal behavior.

11.     The Antitrust Division of the United States Department of Justice is currently conducting a criminal investigation into the activities alleged in this complaint.  Since its investigation began, and as further described herein, 11 individuals and entities have agreed to plead guilty to violating the Sherman Act, 15 U.S.C. § 1 and have admitted to participating in a statewide conspiracy to rig bids at public municipal tax lien auctions in the State of New Jersey

from at least 1998 through February 2009.  The criminal investigation remains active and, as further described below, a guilty plea has been entered as recently as December 19, 2012.  As part of their pleas, these Defendants are subject to criminal fines and/or prison.  They are not however, subject to restitution because of the pendency of *this* litigation.  For example, the Crusader plea agreement states, "[i]n light of the availability of civil causes of action, in the United States District Court for the District of New Jersey, which potentially provide for a multiple of actual damages, the recommended sentence does not include a restitution order for the offense charged in the Information."  As such, this litigation is the only vehicle by which many victims of this cartel will be able to recover damages as a result of the alleged conspiracy.

12.     As a direct and proximate result of Defendants' unlawful conspiratorial bid rigging scheme, Plaintiffs and other members of the Class have paid, or are required to pay, unlawfully inflated interest charges, in excess of what they otherwise would have paid in a competitive market and have therefore been injured.

## II.     JURISDICTION AND VENUE

13.     The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

14.     The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

15.     The Court also has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a).  The matter in controversy is greater than $75,000 and this matter is

between citizens of different states.  This Court has supplemental jurisdiction over Plaintiffs'

state law claims.

16.     Venue is proper because Defendants reside, are found, have agents and transact

business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of

the Clayton Act (15 U.S.C. §§ 15 and 22).

### III.     PARTIES

**A.     Plaintiffs**

**1.     Gila Bauer (as Trustee for the Gila Bauer Revocable Trust)**

17.     The Gila Bauer Revocable Trust is the fee owner of real property located at 14

Lesko Terrace, Ogdensburg, New Jersey in the County of Sussex (the "Bauer Property").

Defendant Robert E. Rothman purchased a TSC associated with the Bauer Property at a public

auction on December 30, 2005, in the Borough of Ogdensburg for $1,048.26.  Plaintiff Bauer's

lien was purchased by defendant Rothman at 18% interest pursuant to the conspiracy alleged

herein.  The TSC associated with the Bauer Property was issued because of delinquent water

charges totaling $1,027.71.  As of November 13, 2012, Bauer estimates that the lien is currently

at $21,284.

18.     As a result of the Defendants' anticompetitive conduct, the interest rate associated

with the TSC on the Bauer Property was artificially inflated, and Plaintiff Bauer has been

damaged thereby.

**2.     Arlene Davies**

19.     Plaintiff Arlene Davies is the fee owner of real property located at 412 Second

Avenue, West Cape May, New Jersey (the "Davies Property").  Defendant Sass Municipal

Finance Partners V, LLC purchased a TSC associated with the Davies Property at a public

auction on December 3, 2008, in the Borough of West Cape May.  The lien was purchased with an 18% interest rate pursuant to the conspiracy alleged herein.

20.      As a result of the Defendants' anticompetitive conduct, the interest rate associated with the TSC on the Davies Property was artificially inflated, and Plaintiff Davies has been damaged thereby.

**3.      Melissa Jacobs**

21.      Plaintiff Melissa Jacobs was the fee owner of real property located at 307 Rosemont Avenue, Newfield, New Jersey (the "Jacobs Property").  Defendant Sass Municipal Finance Partners V, LLC purchased a TSC associated with the Jacobs Property at a public auction on June 25, 2008, in Newfield Borough.  The lien was purchased with an 18% interest rate pursuant to the conspiracy alleged herein.

22.      As a result of the Defendants' anticompetitive conduct, the interest rate associated with the TSC on the Jacobs Property was artificially inflated, and Plaintiff Jacobs has been damaged thereby.

**4.      The Schmidt Plaintiffs**

23.      Plaintiffs Frances A. Schmidt and Donald W. Schmidt ("the Schmidts") owned two parcels of land adjacent to their home.  The addresses of the properties are (1) 555 Woodstown Road, Woolwich Township, NJ ("Schmidt Property 1") and (2) 566 Woodstown Road, Woolwich Township, NJ ("Schmidt Property 2").

24.      The Schmidts failed to pay 2006 property taxes totaling $626.51 for Schmidt Property 1 and $3,697.73 for Schmidt Property 2.  At a public auction on October 19, 2007, in Woolwich Township, defendant CCTS Tax Liens I, LLC purchased the TSC associated with Schmidt Property 1, and defendant M.D. Sass Municipal Finance Partners V, LLC purchased the TSC associated with Schmidt Property 2.  The interest rate associated with both TSCs is 18%

8

and the liens were purchased pursuant to the conspiracy alleged herein.  The price to redeem the lien on Schmidt Property 1 has increased to $38,721.70 while the price to redeem Schmidt Property 2 has increased to $36,297.85.

25.     As a result of the Defendants' anticompetitive conduct alleged herein, the interest rate associated with the TSCs on the Schmidt Property was artificially inflated and Plaintiffs have been damaged thereby.

**5.     Son, Inc.**

26.     Son, Inc. ("Son") is a New Jersey corporation headquartered in Newark, New Jersey.  Son was the owner of property located at 711-717 21st Avenue, Paterson, NJ (the "Son Property").  Defendant Crusader Servicing Corporation was the winning bidder at a public auction in the City of Paterson, New Jersey on two TSCs associated with the Son Property, one dated June 29, 2004, and one dated June 29, 2006.  The interest rates associated with both TSCs is 18% and the liens were purchased by defendant Crusader pursuant to the conspiracy alleged herein.  Plaintiff Son redeemed both TSCs on August 15, 2009, from defendant Crusader.  The June 29, 2004, TSC was redeemed for $25,321.70, of which only $12,736.74 was for taxes.  The June 29, 2006, TSC was redeemed for $34,797.969, of which only $21,515.27 was for taxes.

27.     As a result of the Defendants' anticompetitive conduct, the interest rate associated with the TSCs on the Son Property were artificially inflated, forcing Plaintiff Son to pay an inflated price to redeem the TSCs, and Plaintiff was damaged thereby.

**B.     Defendants**

**1.     The CCTS Defendants**

28.     Defendant CCTS, LLC ("CCTS") is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.  Defendants David Butler and David M. Farber were executives of CCTS, LLC during the Class Period.  Defendant CCTS

purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

29.     Defendant CCTS Capital LLC ("CCTS Capital") is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.  During the Class Period, Defendants Butler and Farber were Chief Executive Officer and President respectively of CCTS Capital and have admitted to participating in the conspiracy alleged herein while they were executives of CCTS Capital.  Defendant CCTS Capital purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

30.     Defendant CCTS Tax Liens I, LLC ("CCTS I") is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.  Defendants David Butler and David M. Farber were executives of CCTS I during the Class Period.  Defendant CCTS I purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

31.     Defendant CCTS Tax Liens II, LLC ("CCTS II") is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.  Defendants David Butler and David M. Farber were executives of CCTS II during the Class Period.  Defendant CCTS II purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

32.     Defendant Pro Capital LLC ("Pro Capital") is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.  Defendants David Butler and David M. Farber were executives of Pro Capital during the Class Period.  Defendant Pro Capital was co-founded by defendant Farber.  Defendant Pro Capital purchased TSCs at

public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

33.     Defendant DSBD, LLC ("DSBD") is a New Jersey limited liability company with its principal place of business in Voorhees, New Jersey.  Defendants David Butler and David M. Farber were executives of DSBD during the Class Period.  Defendant DSDB purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

34.     Defendant Crestar Capital, LLC ("Crestar") is a New Jersey limited liability company.  Defendant Crestar is the successor in interest to defendant CCTS Capital, LLC. Defendant Crestar purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

35.     Defendants CCTS, CCTS Capital, CCTS I, CCTS II, DSBD, Pro Capital, and Crestar shall be referred to herein collectively as the "CCTS Defendants" or "CCTS."

36.     Defendant David Butler ("Butler") resides in Cherry Hill, New Jersey.  Defendant Butler was one of the limited partners of defendant DSBD, and was an executive of CCTS, CCTS Capital, CCTS I, CCTS II, DSBD, and Pro Capital.  Defendant Butler purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

37.     Defendant David M. Farber ("Farber") resides in Cherry Hill, New Jersey. Defendant Farber, like defendant Butler, was one of the limited partners of DSBD, and was an executive of CCTS, CCTS Capital, CCTS I, CCTS II, DSBD, and Pro Capital.  Defendant Farber purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

38.     Specifically, CCTS, Farber, and Butler, participated in an illegal agreement and/or understanding with Defendants Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  While not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, the largest Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

39.     As a result of this agreement and/or understanding, the Defendants, including CCTS, Farber and Butler, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

40.     As further described herein, defendants DSBD, Butler and Farber, have pleaded guilty to violating the Sherman Act and admitted to participating in the conspiracy alleged herein.  Further, witnesses to the conspiracy who have plead guilty have further identified Defendants CCTS, Farber and Butler as participating in the conspiracy alleged herein.

### 2.     Plymouth Park

41.     Defendant Plymouth Park Tax Services, LLC d/b/a Xspand ("Plymouth Park") is a Delaware corporation with its headquarters at New York, New York.  Plymouth Park is currently a wholly owned subsidiary of J.P. Morgan Chase & Co.  Defendant Plymouth Park purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

42.     Defendant Plymouth Park's tax lien acquisition operations were overseen by co-conspirators Steve Morrison, John Garzone, Neil Harreveld, Noah Noonan and Jim Purcell.  John Garzone was the former President of Plymouth Park.  Each of these co-conspirators was an employee of Plymouth Park during the Class Period.  Some or all of these employees were terminated by Plymouth Park as a result of their participation in the conspiracy alleged herein.

43.     Specifically, Plymouth Park participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  While not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, the largest Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

44.     As a result of this agreement and/or understanding, the Defendants, including Plymouth Park, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  The Plymouth Park employees which engaged in such discussions and agreements and/or

understandings with the other Defendants were Steve Morrison, John Garzone, Neil Harreveld, Noah Noonan and Jim Purcell.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

45.     Co-conspirator John Garzone was past president of the National Tax Lien Association and regularly attended meetings of the National Tax Lien Association and engaged in meetings and conversations with other Defendants in furtherance of the conspiracy at such conferences.

46.     Defendant Plymouth Park is currently the subject of a criminal investigation being conducted by the United States Department of Justice for its participation in the conspiracy alleged herein.  Defendant Plymouth Park has publicly acknowledged that it has been subpoenaed by a Federal grand jury investigating the conspiracy alleged in this complaint. Further, witnesses to the conspiracy have identified defendant Plymouth Park as participating in the conspiracy alleged herein.

### 3.     The Crusader Defendants

47.     Defendant Royal Bancshares of Pennsylvania, Inc. ("RBPI") is a publicly traded Pennsylvania corporation with its principal place of business in Narbeth, Pennsylvania. Defendant RBPI, through its wholly owned subsidiary defendant Royal Bank America, owned a 60 percent equity interest in defendants Crusader and RTLS, and dominated and controlled the finances and decision making processes of both entities.  Defendant RBPI, directly or through a

14

subsidiary and/or affiliate under its control, purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

48.     Defendant Royal Bank America ("Royal Bank") is a Pennsylvania corporation with its principal place of business in Narbeth, Pennsylvania.  Defendant Royal Bank is a subsidiary of defendant RBPI, and its chairman and board members are also respectively the chairman and board members of defendant RBPI.  Defendant Royal Bank, directly or through a subsidiary and/or affiliate under its control, purchased TSCs in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

49.     Defendant Crusader Servicing Corporation ("Crusader") is a Pennsylvania corporation with its headquarters at Narbeth, Pennsylvania.  Defendant Crusader is majority-owned (60 percent) by defendant Royal Bank.  The remaining 40 percent interest is owned by defendant Robert W. Stein and/or co-conspirator Gary Snyder, both of whom are former employees of Crusader.  During the Class Period, Crusader was a valuable subsidiary of Defendants Royal Bank and RBPI.  Defendant Crusader purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

50.     Defendant Royal Tax Lien Services, LLC ("RTLS") is a Pennsylvania limited liability company with its principal place of business in Pennsylvania.  Defendant RTLS is majority-owned (60 percent) by defendant Royal Bank.  The remaining 40 percent interest is owned by defendant Robert W. Stein.  RTLS was formed in late 2006 to purchase and service delinquent tax liens.  Defendant RTLS purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

51.     Defendants RBPI, Crusader, Royal Bank, and RTLS shall be referred to collectively herein as the "Crusader Defendants" or "Crusader."

52.     Defendant Robert W. Stein ("Stein") resides in Huntingdon Valley, Pennsylvania. During the Class Period, defendant Stein attended public TSC auctions in the State of New Jersey and bid on and acquired TSCs pursuant to the conspiracy alleged herein.

53.     Defendant Robert Jeffrey ("Jeffrey") resides in New Jersey. Defendant Jeffrey has over 15 years of experience in the tax lien business, and worked for numerous large institutional tax lien companies, including defendant Crusader.  According to testimony from another case involving tax lien investors, defendant Jeffrey asserted that he "worked for most of the major players in the tax lien industry."  Memorandum Opinion, at 9 *Greetham, et al. v. Sogima L-A, LLC*, C.A. No. 2084-VCL (Del. Ch. Nov. 3, 2009).  During the Class Period, defendant Jeffrey attended public TSC auctions in the State of New Jersey and bid on and acquired TSCs pursuant to the conspiracy alleged herein.

54.     All major tax lien purchasing decisions of Crusader and/or RTLS needed the approval of the Board of Royal Bank and RBPI.  RBPI and Royal Bank dominated and controlled all aspects of the business of Crusader and RTLS and authorized and funded Crusader's participation in the conspiracy alleged herein.  Defendant Stein, along with defendants RBPI and Royal Bank America, jointly directed and controlled the activities, finances and decision making process of Defendants Crusader and RTLS.  Defendants Crusader and RTLS, under joint direction and control of Defendants RBPI, Royal Bank and Stein, purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

55.     Until he was terminated in approximately November 2010 for his participation in the conspiracy alleged herein, Defendant Stein served as Chief Executive Officer and President of both Defendants Crusader and RTLS, known internally at Royal Bank and RBPI as the "Tax

Lien Operation." In addition to Robert Stein, Crusader employees and co-conspirators Jim Jeffers and Gary Snyder also participated in the conspiracy alleged herein. Either all or some of these individuals were terminated by Crusader and/or RTLS as a result of their participation in the conspiracy alleged herein.

56.      Specifically, Defendants Crusader, Jeffrey and Stein participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Mooring, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding, Caiola, Fountain of Life, Esposito, Boudwin, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period. Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

57.      As a result of this agreement and/or understanding, the Defendants , including Crusader and Stein, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated. The Crusader employees which engaged in such discussions and agreements and/or understandings with the other Defendants were Robert Stein, Gary Snyder, Jim Jeffers, and Robert Jeffrey. Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction. The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined

winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with

TSCs sold at the auction because of the illegal agreement alleged herein.

58.     Defendant Stein regularly attended meetings of the National Tax Lien Association

and engaged in meetings and conversations with other Defendants in furtherance of the

conspiracy at such conferences.

59.     As further described below, Defendants Crusader and Stein have pled guilty to

violating the Sherman Act and have admitted to participating in the conspiracy alleged herein.

Further, witnesses to the conspiracy have identified Defendants Crusader and Stein as

participating in the conspiracy alleged herein.

**4.     The Mooring Defendants**

60.     Defendant Mooring Tax Asset Group, LLC ("Mooring") is a limited liability

company based in Vienna, Virginia.  During the Class Period, Mooring's President was James

Meeks and Lambrose Xethalis was Mooring's director of acquisitions with responsibilities for

selecting and purchasing tax liens for Mooring. Mr. Xethalis has been terminated by Mooring for

his participation in the conspiracy alleged herein.  Defendant Mooring purchased TSCs at public

auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged

herein.

61.     Defendant MTAG Services, LLC ("MTAG"), is limited liability company based

in Vienna Virginia.  Defendant MTAG was organized in 2010 as the successor of, and to acquire

the tax lien servicing business and related assets of defendant Mooring, and for all intents and

purposes is the alter ego of defendant Mooring.  As such, defendant MTAG has successor

liability for the acts of defendant Mooring.

62.     Defendants Mooring and MTAG shall be referred to collectively herein as the

"Mooring Defendants" or "Mooring."

63.     Specifically, defendant Mooring participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants  – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

64.     As a result of this agreement and/or understanding, the Defendants , including Mooring, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  The Mooring employees which engaged in such discussions and agreements and/or understandings with other Defendants were Jim Meeks and Lambrose Xethalis.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

65.     During the Class Period, Meeks and Xethalis also regularly attended meetings of the National Tax Lien Association and engaged in meetings and conversations with other Defendants in furtherance of the conspiracy at such conferences.

66.     Defendant Mooring is currently the subject of a criminal investigation being conducted by the United States Department of Justice for its participation in the conspiracy alleged herein.  Defendant Mooring has publicly acknowledged that it has been subpoenaed by a Federal grand jury investigating the conspiracy alleged in this complaint.  Further, witnesses to the conspiracy have identified defendant Mooring as participating in the conspiracy alleged herein.

### 5.     The M.D. Sass Defendants

67.     Defendant MD. Sass Investor Services, Inc. ("M.D. Sass") is a Delaware Corporation with its principal place of business in New York, New York.  The firm is named after its founder, Martin D. Sass.  Defendant M.D. Sass is an investment management firm which makes various investments for itself and its investors including in municipal tax liens such as the TSCs at issue in this case.  During the Class Period, the Sass Defendants were one of the largest purchasers of tax liens in the country as well as in the State of New Jersey.  Since it began purchasing tax liens in or around 1993, M.D. Sass has purchased approximately $1.1 billion of tax liens throughout the country, with a majority of its purchases coming from tax liens in the State of New Jersey.  Defendant M.D. Sass participated in tax lien auctions in New Jersey through various subsidiaries, primarily the other Sass Defendants named and described below.  At all times relevant hereto, officers and employees of M.D. Sass either personally participated in, had knowledge of, and/or specifically authorized M.D. Sass' participation in the conspiracy alleged herein.  Further, certain of M.D. Sass' employees, such as Defendants Jessani and Hruby, personally attended public tax lien auctions in the State of New Jersey and colluded with other

20

bidders at these auctions during the Class Period.  Defendant M.D. Sass, directly or through a subsidiary and/or affiliate under its control, purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

68.     Defendant M.D. Sass Tax Lien Management, LLC ("M.D. Sass Tax Lien Management") is a New York limited liability company with its principal place of business in New York, New York.  Defendant M.D. Sass Tax Lien Management was formed in or around 1996 and was created by M.D. Sass to acquire and/or manage tax liens it purchased.  Defendant M.D. Sass Tax Lien Management acts as a general partner to the various defendant M.D. Sass funds that were formed in connection with M.D. Sass' acquisition of tax liens, such as M.D. Sass I, M.D. Sass II, M.D. Sass III, M.D. Sass IV, M.D. Sass V, and M.D. Sass VI.  Each of these funds was formed to meet specific investment objectives.  Defendant M.D. Sass Tax Lien Management purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

69.     Defendant M.D. Sass Municipal Finance Partners - I, L.P. ("M.D. Sass I") is a Delaware limited partnership with its principal place of business in New York, New York. Defendant M.D. Sass I purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

70.     Defendant M.D. Sass Municipal Finance Partners - II, L.P. ("M.D. Sass II") is a Delaware limited partnership with its principal place of business in New York, New York. Defendant M.D. Sass II purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

71.     Defendant M.D. Sass Municipal Finance Partners - III, LLC ("M.D. Sass III") is a Delaware limited liability company with its principal place of business in New York, New York.

This entity, like M.D. Sass' others limited liability companies, was formed specifically to acquire tax liens and to deliver returns to investors.  M.D. Sass III, like the other entities created by M.D. Sass to acquire tax liens, would raise capital from private investors (both institutions and high net worth individuals) and also in the form of debt borrowed from large financial institutions (such as Westdeutsche Landesbank), and then acquire tax liens.  Defendant M.D. Sass III purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

72.     Defendant M.D. Sass Municipal Finance Partners - IV, LLC ("M.D. Sass IV") is a Delaware limited liability company with its principal place of business in New York, New York. This entity began with approximately $18 million in private equity from outside investors, and $60 million in bank financing.  Since its inception, M.D. Sass IV has invested approximately $400 million in tax liens throughout the country.  Defendant M.D. Sass IV purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

73.     Defendant M.D. Sass Municipal Finance Partners - V, LLC ("M.D. Sass V") is a Delaware limited liability company with its principal place of business in New York, New York. This entity was formed in or around 2005 and began with $30 million in private equity financing and $130 million in bank financing primarily from Madison Capital, a Bear Stearns subsidiary. Since its inception, M.D. Sass V has invested approximately $700 million in tax liens throughout the country.  Currently, this entity is valued at approximately $100 million.  Defendant M.D. Sass V purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

74.    Defendant M.D. Sass Municipal Finance Partners - VI, LLC ("M.D. Sass VI") is a Delaware limited liability company with its principal place of business in New York, New York. Defendant M.D. Sass VI purchased TSCs in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

75.    Defendants  M.D. Sass, M.D. Sass Tax Lien Management, M.D. Sass I, M.D. Sass II, M.D. Sass III, M.D. Sass IV, M.D. Sass V, and M.D. Sass VI shall be referred to collectively herein as the "Sass Defendants " or "Sass."

76.    Defendant Vinaya J. Jessani ("Jessani") is an individual residing in New York, New York.  Jessani was employed by defendant M.D. Sass from sometime in 1993 until July 16, 2010.  Jessani, along with the current President of M.D. Sass, started M.D. Sass' tax lien business in or around 1993.  Throughout his entire tenure at M.D. Sass, Jessani had primary responsibility for M.D. Sass' tax liens business.  When Jessani was first hired by M.D. Sass in 1993, he joined as a financial analyst working primarily in the tax liens area.  In 1994, he became a portfolio manager in the tax liens area, a position he held until the late 1990's when he became a Vice President at M.D. Sass responsible for M.D. Sass' tax lien business.  Finally, in 2004, he became a Senior Vice President at M.D. Sass responsible for M.D. Sass' tax lien business. Jessani held the position of Senior Vice President until July 16, 2010, at which point he was terminated by M.D. Sass for cause in connection with his participation in the illegal activities alleged in this complaint.  During the Class Period, Jessani attended tax sale auctions throughout the State of New Jersey and personally participated in the conspiracy alleged herein.

77.    Defendant Stephen E. Hruby ("Hruby") resides in Hainesport, New Jersey. During the conspiracy period, defendant Hruby was an executive and later officer at M.D. Sass. His primary role at M.D. Sass was director of acquisitions of tax liens.  In this capacity,

defendant Hruby oversaw, supervised and directed the purchase of TSCs by M.D. Sass in the State of New Jersey (as well as other jurisdictions) during the Class Period, pursuant to the conspiracy alleged herein.  The conspiracy charge to which Hruby pled guilty was a based on the fact that in his job at Sass he "oversaw the purchase of tax liens [by Sass]. . .," and, *inter alia*, "instructed other bidders under his supervision" to submit collusive bids.

78.     In addition to Defendants Jessani and Hruby, other M.D. Sass employees who participated in the conspiracy alleged herein include co-conspirators John deGuzman and Anthony Potenza.  These M.D. Sass employees reported to defendant Jessani and regularly attended public TSC auctions for M.D. Sass in New Jersey (and other jurisdictions) and participated in the conspiracy alleged herein.

79.     Specifically, defendants Sass, Jessani and Hruby participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Rothman, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants  –  Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period.

80.     As a result of this agreement and/or understanding, the Defendants , including Sass, Jessani, and Hruby, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  The Sass employees which engaged in such discussions and agreements and/or

understandings with other Defendants  were primarily, but not limited to, Vinaya J. Jessani, Stephen E. Hruby, John deGuzman, and Anthony Potenza.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.  During the Class Period, Defendants Jessani and Hruby also regularly attended meetings of the National Tax Lien Association and Jessani also served as an officer of the National Tax Lien Association, and both Jessani and Hruby engaged in meetings and conversations with other Defendants in furtherance of the conspiracy at such conferences.

81.     As further described herein, defendant Hruby has pled guilty to violating the Sherman Act and admitted to participating in the conspiracy alleged in the complaint while he was an employee and executive of Sass, including while he was a Vice President and Director of Acquisitions responsible for selecting and purchasing tax liens.  Further, on July 16, 2010, defendant Jessani was terminated by Sass for cause for his participation in the conspiracy alleged herein.  It has also been publicly acknowledged that Sass is the subject of a criminal investigation being conducted by the United States Department of Justice for its participation in the conspiracy alleged herein and that Sass has been subpoenaed by a Federal grand jury investigating the conspiracy alleged in this complaint.  Further, witnesses to the conspiracy have identified Defendants Sass, Jessani, and Hruby as participating in the conspiracy alleged herein. Finally, as further described herein, Sass' conduct alleged in this complaint is merely part of a

pattern of collusion it engaged in with respect to tax lien auctions.  Just last year, Sass was found

guilty by a jury and ordered to pay millions of dollars in compensatory and punitive damages, for

colluding at tax lien auctions in Illinois.

**6.    Robert E. Rothman**

82.    Defendant Robert E. Rothman ("Rothman") is an individual residing in New

York, New York.  Defendant Rothman purchased TSCs at public auctions in the State of New

Jersey during the Class Period pursuant to the conspiracy alleged herein.  In addition to Rothman

himself, defendant Rothman also sent an employee, Art Rittenhouse, Jr., to auctions in New

Jersey and Mr. Rittenhouse also participated in the meetings and communications in furtherance

of the conspiracy alleged herein and is under investigation by the Department of Justice.

83.    Specifically, defendant Rothman participated in an illegal agreement and/or

understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey,

Mooring, Sass, Jessani, Hruby, ATF, De Laurentis, BankAtlantic, Branse, Deluca, Simon,

Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May, and

Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of

New Jersey which they attended during the Class Period.  Not every Defendant attended every

tax lien auction in the State of New Jersey during the Class Period, although the largest

Defendants  – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all

auctions during the Class Period and the illegal scheme existed despite who was present.

84.    As a result of this agreement and/or understanding, the Defendants , including

Rothman, would, among other things, agree prior to the beginning of the auctions at which they

were present, which liens each of the Defendant auction attendees would be allocated.  Such

representatives of defendant Rothman who would engage in such discussions and agreements

and/or understandings were Rothman and Art Rittenhouse, Jr.  Often, the largest bidders –

26

Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens

up for auction.  The Defendants also agreed not to bid against the Defendant which had been

allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien

which had been allocated was sold at the highest interest rate possible to the cartelist who had

been designated as the pre-determined winner of that lien. The Defendants' conspiracy

artificially raised interest rates associated with TSCs sold at the auction because of the illegal

agreement alleged herein.

85.     As further described herein, defendant Rothman has pled guilty to violating the

Sherman Act and admitted to participating in the conspiracy alleged in the complaint.

### 7.     American Tax Funding Defendants

86.     Defendant American Tax Funding, LLC ("ATF") is a Florida limited liability

company with its principal place of business in Jupiter, Florida.  According to its website, "ATF

is one of the industry's leading purchaser and servicer of delinquent municipal real estate tax lien

sales."  ATF was originally formed in 1997 as Transamerica Municipal Finance ("TMF"), a

division of Transamerica Corporation.  In or around August 2000 the founders completed a form

of a management buyout of TMF, creating ATF.  Since its founding, ATF and its predecessors

have purchased more than $1 billion in tax liens in over 14 states.  ATF touts itself as having a

strong balance sheet and an affiliation with one of the top 10 largest banks.  During the Class

Period, ATF's primary representative at auctions was defendant Anthony J. De Laurentis, an

agent of ATF.  Defendant ATF purchased TSCs at public auctions in the State of New Jersey

during the Class Period pursuant to the conspiracy alleged herein.

87.     Defendant Anthony J. De Laurentis is an individual residing in Crofton,

Maryland.  During the Class Period, De Laurentis attended public tax lien auctions throughout

the State of New Jersey on behalf of defendant ATF and possibly other Defendants.  Defendant

De Laurentis has admitted to participating in a conspiracy in another jurisdiction concerning tax liens.  For example, Mr. De Laurentis and his company (DRT Fund) received conditional amnesty from the United States Department of Justice in connection with their participation in bid rigging with respect to tax sale auctions in Maryland.  In order to receive conditional amnesty from the DOJ, one must provide evidence to the DOJ that a crime has been committed, and agree to cooperate fully in the DOJ's investigation.  Defendant De Laurentis was an attorney admitted to practice law in the State of Maryland and District of Columbia, but was disbarred on December 5, 2011, as a result of his admission to participating in a conspiracy to rig bids at tax lien auctions.  Defendant De Laurentis participated in the conspiracy alleged herein.

88.      Specifically, Defendants ATF and De Laurentis participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudiwn, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants  – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

89.      As a result of this agreement and/or understanding, the Defendants , including ATF and De Laurentis, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Such representatives of ATF who would engage in such discussions and agreements and/or understandings with other Defendants  were Defendants  Anthony J. De Laurentis and

ATF's President Justin Wiesenbacher. Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants  also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

90.    Witnesses to the conspiracy have identified Defendants ATF and De Laurentis as participating in the conspiracy alleged herein.

### 8.    The BankAtlantic Defendants

91.    Defendant BB&T Corporation ("BB&T") is a bank with its principal place of business in Winston-Salem, North Carolina.  On or about July 31, 2012, defendant BB&T acquired all of the outstanding stock of defendant BankAtlantic Bancorp, Inc. ("BankAtlantic") and, BankAtlantic was merged into BB&T.  Therefore, BB&T acquired the relevant liabilities of BankAtlantic with respect to BankAtlantic's participation in the conspiracy alleged herein. Defendant BankAtlantic invested in tax liens throughout the entire country, but primarily in Florida and New Jersey.  Defendant BankAtlantic was one of the largest purchasers of tax liens in the State of New Jersey during the Class Period.

92.    Defendant BBX Capital Corporation f/k/a BankAtlantic Bancorp, Inc. ("BankAtlantic") is a Florida corporation with its principal place of business in Fort Lauderdale, Florida.  On or about July 31, 2012, defendant BB&T acquired all of the outstanding stock of BankAtlantic Bancorp, Inc. and, BankAtlantic was merged into BB&T.  Therefore, BB&T acquired the relevant liabilities of BankAtlantic with respect to BankAtlantic's participation in the conspiracy alleged herein.  However, to the extent that BB&T did not assume the relevant

liabilities of BankAtlantic Bancorp in connection with the merger, BankAtlantic Bancorp is named as a defendant in this action.  BankAtlantic's tax lien business was run primarily by Defendants  Gray I. Branse and Michael G. Deluca.  Defendant BankAtlantic invested in tax liens throughout the entire country, but primarily in Florida and New Jersey.  Defendant BankAtlantic was one of the largest purchasers of tax liens in the State of New Jersey during the Class Period.  Defendant BankAtlantic, through its wholly owned subsidiary defendant Fidelity, purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

93.     Defendant Fidelity Tax, LLC ("Fidelity") is a Florida limited liability company formed in or around November 2001 with its principal place of business in Fort Lauderdale, Florida.  Fidelity Tax, LLC is a wholly owned subsidiary of defendant BankAtlantic and is one of at least a hundred subsidiaries used by defendant BankAtlantic to purchase tax liens throughout the country, although Fidelity was the only entity used by BankAtlantic to purchase tax liens in the State of New Jersey during the Class Period.  Defendant Fidelity purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

94.     Defendants BB&T, BankAtlantic, and Fidelity shall be collectively referred to herein as "BankAtlantic."

95.     Defendant Michael G. Deluca is an individual residing in Boca Raton, Florida. During the Class Period, defendant Deluca was Senior Vice President of Business Development and Operations at defendant BankAtlantic.  Defendant Deluca, along with defendant Gary Branse, was directly responsible for acquiring and overseeing defendant BankAtlantic's over $1 billion tax lien portfolio.  Defendant Deluca was terminated by defendant BankAtlantic for

his participation in the conspiracy alleged herein.  Following his termination from defendant BankAtlantic, Deluca was employed for a period by defendant American Tax Funding.  During the Class Period, Deluca attended public tax sale auctions throughout the State of New Jersey and personally participated in the conspiracy alleged herein.  During the Class Period, Deluca also regularly attended meetings of the National Tax Lien Association and engaged in meetings and conversations in furtherance of the conspiracy at such conferences.

96.     Defendant Gary I. Branse is an individual residing in Fort Lauderdale, Florida. During the Class Period, defendant Branse was a Senior Vice President at defendant BankAtlantic.  Defendant Branse, along with defendant Deluca, was directly responsible for acquiring and overseeing defendant BankAtlantic's over $1 billion tax lien portfolio.  Defendant Branse was terminated by defendant BankAtlantic for his participation in the conspiracy alleged herein.  During the Class Period, Branse attended public tax sale auctions throughout the State of New Jersey and personally participated in the conspiracy alleged herein.  During the Class Period, Branse also regularly attended meetings of the National Tax Lien Association and engaged in meetings and conversations in furtherance of the conspiracy at such conferences.

97.     Specifically, Defendants BankAtlantic, Branse and Deluca, participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, ATF, De Laurentis, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest

Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

98.     As a result of this agreement and/or understanding, the Defendants , including BankAtlantic, Deluca and Branse, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Such representatives of Bank Atlantic who would engage in such discussions and agreements and/or understandings with other Defendants were primarily Defendants Michael Deluca and Gary I. Branse.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien. The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

99.     Witnesses to the conspiracy have identified Defendants BankAtlantic, Deluca and Branse as participating in the conspiracy alleged herein.

**9.     The Wolfson Defendants**

100.     Defendant Richard Simon Trustee is a trust formed under the laws of the State of New Jersey and located in Northfield, New Jersey.  Defendant Richard Simon Trustee purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

101.     Defendant Betty Simon Trustee, L.L.C. is a New Jersey limited liability company with its principal place of business located at Atlantic City, New Jersey.  Defendant Betty Simon

Trustee, L.L.C. purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

102.    Defendants Richard Simon Trustee and Betty Simon Trustee, L.L.C. shall be collectively referred to as "Simon."

103.    Defendant Joseph Wolfson ("Wolfson") is an individual residing at Margate City, New Jersey.  Defendant Wolfson attended public TSC auctions in the State of New Jersey and participated in the conspiracy alleged herein.  Defendant Wolfson, through Richard Simon Trustee and Betty Simon Trustee, LLC, purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

104.    Specifically, defendants Simon and Wolfson participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, ATF, De Laurentis, Phoenix Funding, Caiola, Fountain of Life, Esposito, Boudwin, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

105.    As a result of this agreement and/or understanding, the Defendants , including Simon and Wolfson, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  One such representative of Simon who would engage in such discussions and agreements and/or understandings with Defendants was defendant Joseph Wolfson.  Often, the

largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

106.     Witnesses to the conspiracy have identified Defendants Simon and Wolfson as participating in the conspiracy alleged herein.

**10.    Phoenix Funding Defendants**

107.     Defendant Phoenix Funding, Inc. ("Phoenix Funding") is a New Jersey corporation with its principal place of business at 191 Glen Road, Mountainside, New Jersey. Phoenix Funding's president is defendant Benedict Caiola.  Defendant Phoenix Funding purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

108.     Defendant Benedict Caiola is an individual residing at 191 Glen Road, Mountainside, New Jersey.  Defendant Caiola is the President of Phoenix Funding.  Defendant Caiola attended public TSC auctions throughout the State of New Jersey during the Class Period and participated in the conspiracy alleged herein.

109.     Specifically, Defendants Phoenix Funding  and Caiola participated in an illegal agreement and/or understanding with Defendants  CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, ATF, De Laurentis, Simon, Wolfson, Fountain of Life, Esposito, Boudwin, Collins, May, Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of

New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

110.    As a result of this agreement and/or understanding, the Defendants , including Phoenix Funding and Caiola, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Such representatives of Phoenix Funding who would engage in such discussions and agreements and/or understandings with other Defendants were defendant Benedict Caiola and Phoenix Funding employee Geza Eckert.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien. The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

111.    Witnesses to the conspiracy have identified Defendants Phoenix Funding  and Caiola as participating in the conspiracy alleged herein.

**11.    Fountain of Life Defendants**

112.    Defendant Burlington Assembly of God/Fountain of Life Center ("Fountain of Life Center") is a New Jersey not-for-profit corporation with its headquarters in Burlington, New Jersey.  According to its website, Fountain of Life Center is a "'Spiritual Oasis' for all people to worship, to learn, to encourage and to be encouraged, to fellowship and to reach out to others." Defendant Fountain of Life Center would purchase tax liens at public auctions pursuant to the

conspiracy herein, and then assign the liens it purchased to a shell corporation such as defendant Mercer S.M.E., Inc. (as well as Camden, S.M.E., Inc. and Ferry Plaza S.M.E., Inc.).  Defendant Fountain of Life Center would assign the liens to a shell corporation in order to hide from the public the fact that it was involved in the purchase of tax liens in New Jersey and the foreclosure of those who failed to redeem their TSCs.  Defendant Fountain of Life Center would be represented at auctions in New Jersey primarily by defendants Susan M. Esposito and David B. Boudwin and both participated in discussions and agreements and/or understandings with other Defendants concerning the conspiracy alleged herein.  Occasionally, the head of the Fountain of Life Center, Paul Graban, would also attend auctions on behalf of Fountain of Life Center. Defendant Fountain of Life Center purchased TSCs at public auctions throughout the State of New Jersey during the Class Period and participated in the conspiracy alleged herein.

113.    Defendant Mercer S.M.E., Inc. ("Mercer") is a New Jersey corporation with its principal place of business in Burlington, New Jersey.  Defendant Mercer was organized in 2001 to act as the assignee of tax liens that were purchased by defendant Fountain of Life Center at tax lien auctions in the State of New Jersey during the Class Period.  The President of Mercer is Susan M. Esposito.  Its Vice President is Patricia Miller and its Secretary is Debra Bercaw. Defendant Mercer attended public TSC auctions throughout the State of New Jersey during the Class Period and participated in the conspiracy alleged herein.

114.    Defendants Fountain of Life Center and Mercer shall be collectively referred to herein as "Fountain of Life."

115.    Defendant Susan M. Esposito ("Esposito") is an individual residing in Burlington, New Jersey.  Defendant Esposito is the President of defendant Mercer, and regularly attended tax lien auctions in New Jersey during the Class Period, and participated in discussions and

agreements and/or understandings with other Defendants concerning the conspiracy alleged herein.  Defendant Esposito attended public TSC auctions throughout the State of New Jersey during the Class Period and participated in the conspiracy alleged herein.

116.    Defendant David B. Boudwin ("Boudwin") is an individual residing in Burlington, New Jersey.  Defendant Boudwin regularly attended tax lien auctions in New Jersey during the Class Period, and participated in discussions and agreements and/or understandings with other Defendants concerning the conspiracy alleged herein.  Defendant Boudwin is an executive of defendant Fountain of Life Center.  Defendant Boudwin attended public TSC auctions throughout the State of New Jersey during the Class Period and participated in the conspiracy alleged herein.

117.    Specifically, Defendants Fountain of Life, Esposito, and Boudwin, participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, ATF, De Laurentis, Simon, Wolfson, Collins, May, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

118.    As a result of this agreement and/or understanding, the Defendants, including Fountain of Life, Esposito, and Boudwin, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Such representatives of Fountain of Life who would engage in

such discussions and agreements and/or understandings with other Defendants were Defendants Esposito and Boudwin.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

119.    As further described herein, defendant Mercer has pled guilty to violating the Sherman Act and admitted to participating in the conspiracy alleged herein.  Further, witnesses to the conspiracy have identified Defendants Fountain of Life, Esposito, and Boudwin as participating in the conspiracy alleged herein.

**12.    William A. Collins**

120.    Defendant William A. Collins ("Collins") is an individual residing in Medford, New Jersey.  Defendant Collins participated in tax lien auctions in New Jersey, and the conspiracy alleged herein, through an entity called "Independent Investors."  This entity was an informal partnership among Collins, his mother Ethel Roerdomp, and his wife Julianne.  Defendant Collins, individually or doing business as "Independent Investors" purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

121.    Specifically, defendant Collins participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, ATF, De Laurentis, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, May, and

Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants  – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

122.    As a result of this agreement and/or understanding, the Defendants, including Collins, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

123.    As further described herein, defendant Collins has pled guilty to violating the Sherman Act and admitted to participating in the conspiracy alleged herein.  Further, witnesses to the conspiracy have identified defendant Collins as participating in the conspiracy alleged herein.

### 13.    Isadore H. May

124.    Defendant Isadore H. May ("May") is an individual residing in Margate City, New Jersey.  Defendant May, individually or doing business as "Garden State Investment",

purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

125.    Specifically, defendant May participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, ATF, De Laurentis, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, and Pisciotta, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants  – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

126.    As a result of this agreement and/or understanding, the Defendants, including May, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.  The Defendants' conspiracy artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

127.    As further described herein, defendant May has pled guilty to violating the Sherman Act and admitted to participating in the conspiracy alleged herein.  Further, witnesses to the conspiracy have identified defendant May as participating in the conspiracy alleged herein.

**14.    Richard J. Pisciotta, Jr.**

128.    Defendant Richard J. Pisciotta, Jr. ("Pisciotta") is an individual residing in Long Beach Township, New Jersey.  Defendant Pisciotta purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

129.    Specifically, defendant Pisciotta participated in an illegal agreement and/or understanding with Defendants CCTS, Farber, Butler, Plymouth Park, Crusader, Stein, Jeffrey, Mooring, Sass, Jessani, Hruby, Rothman, BankAtlantic, Branse, Deluca, ATF, De Laurentis, Simon, Wolfson, Phoenix Funding,  Caiola, Fountain of Life, Esposito, Boudwin, Collins, and May, to rig bids for municipal tax liens at public tax lien auctions throughout the State of New Jersey which they attended during the Class Period.  Not every Defendant attended every tax lien auction in the State of New Jersey during the Class Period, although the largest Defendants  – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – attended most, if not all auctions during the Class Period and the illegal scheme existed despite who was present.

130.    As a result of this agreement and/or understanding, the Defendants, including Pisciotta, would, among other things, agree prior to the beginning of the auctions at which they were present, which liens each of the Defendant auction attendees would be allocated.  Often, the largest bidders – Plymouth Park, Sass, Crusader, BankAtlantic, and ATF – would have first picks over the liens up for auction.  The Defendants also agreed not to bid against the Defendant which had been allocated a particular lien in order to reduce or eliminate competitive bids and ensure that the lien which had been allocated was sold at the highest interest rate possible to the cartelist who had been designated as the pre-determined winner of that lien.   The Defendants' conspiracy

artificially raised interest rates associated with TSCs sold at the auction because of the illegal agreement alleged herein.

131.     As further described herein, defendant Pisciotta has pled guilty to violating the Sherman Act and admitted to participating in the conspiracy alleged herein.  Further, witnesses to the conspiracy have identified defendant Pisciotta as participating in the conspiracy alleged herein.

**C.     Unnamed Co-Conspirators**

132.     Various other entities and individuals not named as Defendants in this Complaint participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and was in furtherance of the unlawful conduct alleged herein.

133.     Whenever in this complaint reference is made to any act, deed or conduct of a corporate defendant, the allegation means that defendant engaged in the act, deed or conduct by or through one or more of its officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of such corporate defendant.

**IV.     INTERSTATE TRADE AND COMMERCE**

134.     The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

135.     During the Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.  Further, several Defendants used funds received from outside New Jersey to purchase tax liens in New Jersey during the Class Period.

**V.     FACTUAL ALLEGATIONS**

**A.     The TSC Market in New Jersey**

136.    The New Jersey Tax Sale Law establishes a comprehensive scheme to govern the "[c]reation, enforcement and collection of liens for unpaid [real property] taxes and other municipal liens on real property."  *See New Jersey Revised Taxes*, N.J.S.A. 54:5-1, *et seq*.

137.    Pursuant to this comprehensive scheme, the Tax Sale Law establishes municipal tax liens as a legal restriction on real property, whether commercial, residential, industrial, or land.  Such tax liens arise automatically as a charge against the fee title interest of the owner upon the accrual of real estate taxes or such other charges the New Jersey municipality in which the real property is located imposes.  Municipalities may only collect these unpaid revenues by means provided by the Tax Sale Law.

138.    N.J.S.A. 54:5-6 states that delinquent taxes on real property operate as a continuous lien on the property, and all subsequent taxes, interest, penalties and costs of collection shall be added to and become part of such lien.  This lien is superior to all other interests on the real property, including any mortgage lien.

139.    If a real property owner in New Jersey has a lien connected with his property for failure to pay real property, water, or sewage taxes, the municipality in which the property is located may auction the lien through a bidding process authorized by the New Jersey Tax Sale law.

140.    The winner of an auction acquires the municipality's lien, and receives a TSC as evidence of the lien.  The TSC holder is entitled to collect the amount of the lien from the delinquent taxpayer, along with the winning interest rate, in addition to any subsequent taxes paid by the winning bidder and applicable interest and penalties.  Further, the winning bidder can foreclose on the property and take title to the property if the taxes owed on the property, accrued interest or any applicable costs or penalties remain unpaid for a period of time.

141.    The auctions are open to the public.  Although individuals are permitted to bid for the right to purchase TSCs at these auctions, bidders are often sophisticated financial institutions that acquire TSCs as part of an investment strategy.  Bidders from outside of New Jersey regularly bid on TSCs at public auctions in New Jersey, including Defendants Sass, Crusader, BankAtlantic, Plymouth Park, and ATF.  Individuals and entities who have a lien on their property (i.e. the Plaintiffs and members of the Class) did not attend such auctions.

142.    Each of New Jersey's 566 municipalities must hold auctions for outstanding liens on real property at least once a year, assuming the municipality contains properties that are delinquent in their tax obligations.  *See* N.J.S.A. 54:5-19.  New Jersey municipalities auction approximately $100 million to $200 million in delinquent tax obligations every year.

143.    The Tax Sale Law thus mandates that there be competitive bidding for outstanding tax liens.  Under the Tax Sale Law, bidding at the auctions open up at 18% interest and each subsequent bid lowers the interest rate.  This is known as a reverse auction.  The presumption, therefore, is that honest competition among bidders should drive down winning bid far below 18%, and often as low as 0%.  The auction can even result in the bidders paying an extra amount, or "premium," to obtain the lien.

144.    Because a purchaser can collect penalties from the property owner, can secure a first priority lien on the property, is entitled to priority for subsequent year tax liens on the property and can institute foreclosure proceedings at an appropriate time, the purchase of a TSC with a winning bid of zero percent interest is still extremely valuable.  Indeed, in a competitive bidding process untainted by collusive conduct, bidders often drive the bids down to zero percent, at which point the bidders may even pay a premium – an additional sum the winning bidder pays in addition to the lien amount.

145.    The tax lien auction process in New Jersey is designed to engender competitive bidding in an effort to try and help the delinquent tax payer who is already likely experiencing financial difficulty and because the statutory tax lien process, even in the absence of collusion, can often lead to harsh results for the property owner.  For example, once a property owner has a TSC auctioned off with respect to their property, by statute, the TSC acquirer may elect to pay any subsequent delinquent property taxes and/or municipal charges.  These subsequent taxes and interest are added to the lien.  Any subsequent taxes and charges by statute carry an 18% interest rate.  As a result, numerous stories exist of those who failed to pay several hundred dollars in property taxes or other municipal charges, and end up owing tens of thousands of dollars in taxes and interest to redeem the TSC.  Thus, the statutory tax lien auction process in New Jersey can be quite punitive to the property owner.  The Defendants' conspiracy alleged herein acted to make it even more punitive by colluding and artificially raising the interest rate associated with the property owner's delinquent obligation.  Quite simply, the Defendants' conspiracy was akin to pouring salt in the wounds of Plaintiffs and the members of the Class.

**B.    Defendants' Conspiracy**

146.    Although tax sale auctions in New Jersey are intended to result in competitive bidding for tax liens, thereby lowering the interest rate associated with the delinquent tax obligation to the benefit of the property owner, the Defendants entered into a conspiracy to ensure that the TSCs auctioned in New Jersey carried as high an interest rate as possible.  The Defendants entered into a combination and/or conspiracy to rig auctions for tax liens throughout the State of New Jersey during the Class Period so that competition at auctions would be reduced and/or eliminated thereby keeping interest rates on tax liens artificially high.

147.    Beginning at least as early as 1998, the Defendants entered into an overarching understanding and/or agreement to allocate the liens being sold at auctions amongst themselves,

and to refrain from bidding against one another, in order to ensure that the interest rate associated with a lien did not go below the statutory maximum of 18%.  This agreement and/or understanding applied to auctions throughout the entire state of New Jersey during the Class Period where the Defendants were present.

148.    Auction lists identifying the property associated with the lien were published approximately 30 days in advance of the auction by the municipality on the Internet or in certain publications.  Vendors, such as LienSource, retrieve these auction lists from every municipality in New Jersey, and assemble such information in a comprehensive database along with other information concerning the property.  The Defendants purchased such information from these vendors, or simply retrieved the information themselves from a newspaper or the Internet.  Thus, prior to each auction, the Defendants were able to determine every lien that would be up for auction.

149.    Possessing such information in advance of each auction permitted the Defendants to agree upon the liens each would be allocated in advance of the auction.  The Defendants would discuss the liens in the auction lists and agree upon which lien would be allocated to a particular Defendant.  Defendants Sass and Crusader, two of the largest lien purchasers in New Jersey, often organized other Defendant bidders before each auction and coordinated the process by which Defendants decided which conspirator would win which lien or liens.  Conversations allocating the liens would take place on the telephone prior to the auction and in person at the auction prior to the beginning of the auction. The in-person meetings were often held outside the municipal building or in parking lots behind the building where the auction was to be held. Sometimes the meeting would take place in the actual auction room. The Defendant allocated a particular lien would then bid on its allocated lien at 18% interest, while the other Defendants

refrained from bidding at all on that particular lien.  The Defendant which bid, pursuant to the pre-ordained scheme, would then "win" the auction since there were no competing bids.  The Defendants often kept detailed "bid books" in which they would notate each lien up for auction, and also which liens such Defendant was allocated pursuant to the conspiracy.

150.    Some participants referred to this process as "round robin" bidding as Defendants took turns bidding on different TSCs pursuant to the cartel.

151.    Once the bidding began, Defendants did not deviate from the previously allocated bids or cheat on the cartel by bidding against each other.   Defendants also often tracked the bidding on their bid books as it unfolded, to ensure that fellow conspirators were bidding on – and "winning" – the agreed-upon liens.  As a result, cheating within the cartel rarely, if ever, occurred.

152.    Defendants also worked to bring additional lien purchasers into the conspiracy. Whenever a purchaser was identified who might be bidding on a significant volume of liens, the Defendants (particularly Sass and Crusader) would approach that purchaser to bring them into the conspiracy.

153.    As a direct result of the Defendants' conspiracy, interest rates associated with the tax liens that were sold at public auctions in New Jersey during the Class Period were artificially inflated, often at 18%.

## C.    Examples of Rigged Auctions

154.    While the Defendants' overarching statewide conspiracy impacted liens that were auctioned at municipalities throughout the State of New Jersey during the Class Period, a few representative auctions demonstrate the way the conspiracy functioned and impacted the market for TSCs in the state.  While these exemplars are by no means comprehensive, and every named

Defendant herein participated in numerous rigged auctions like those listed below, the full details of every auction at issue in this case will not be available until discovery is undertaken:

a.   Defendants attending an auction in Lincoln Park, New Jersey on June 28, 2000 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Defendants Sass, Crusader, Phoenix Funding and Rothman all selected certain liens, and each such bid was ultimately "won" by the selecting Defendant despite the presence of other attendees at the auction. At least 15 TSCs were up for auction, and all were sold at the statutory maximum bid of 18 percent.

b.   Defendants attending an auction in Cherry Hill, New Jersey on June 28, 2006 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Defendants ATF, CCTS, Simon, Sass, and Collins all selected certain liens, and each such bid was ultimately "won" by selecting Defendant despite the presence of other attendees at the auction.  Most, if not all such "winning" bids were won at 18% interest.

c.   On March 5, 2007 an auction in Newfield, New Jersey resulted in all 59 TSCs that were up for auction being sold at the statutory maximum bid of 18 percent each, all on a single bid, despite the presence of seven bidders.  Of those seven bidders, five are Defendants in this case and three have already pleaded guilty to participating in the conspiracy alleged herein.   The Department of Justice has also subpoenaed the Borough of Newfield for information concerning the March 5, 2007 auction.

d.   Defendants attending an auction in Plumsted, New Jersey on June 6, 2007 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Defendants CCTS, Fountain of Life, Crusader, Collins, and Sass all selected certain liens, and each such bid was ultimately "won" by selecting Defendant despite the presence of other attendees at the auction.  Most, if not all such "winning" bids were won at 18% interest.

e.   Defendants attending an auction in Egg Harbor, New Jersey on December 20, 2006 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction.  Defendants Mooring, Fountain of Life, Plymouth Park, May, Simon, ATF, Sass, Crusader, and

CCTS all selected certain liens, and each such bid was ultimately "won" by selecting Defendant despite the presence of other attendees at the auction.  Most, if not all such "winning" bids were won at 18% interest.

f.      On June 11, 2008, an auction in Somerdale, New Jersey was attended by many of the Defendants. Defendants  Sass, Crusader, Plymouth, CCTS I and May each selected multiple liens at the auction – each of these Defendants "won" the bidding on the liens they were allocated and all were auctioned off carrying an 18% interest rate.

g.      Defendants attending an auction in Maywood, New Jersey on December 10, 2008 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Defendants Crusader, Sass, CCTS and Rothman all selected certain liens, and each such bid was ultimately "won" by selecting Defendant despite the presence of other attendees at the auction. Most, if not all, of such "winning" bids were won at 18 % interest.

155.    In another instance, Defendants Crusader and Sass divided TSCs related to land in northern New Jersey that was only valuable if one company held all the TSCs, thus permitting that holder of the TSCs to foreclose on the entire property.  Instead of bidding against each other to try to obtain all of the TSCs on the property, Defendants colluded.  As a result, defendant Sass won the bids on approximately half of the TSCs, while defendant Crusader won the bids on the other half of the TSCs - all at the statutory maximum of 18%.

156.    At several auctions, defendant Collins acted as a conduit of information from the larger institutional investors (like Crusader, Sass, Plymouth Park, BankAtlantic, and ATF) to the smaller cartel participants such as Defendants Farber and Butler.  After the larger cartelists divided the liens that they would each "win" at a given auction, they would relay the information to Collins.  Collins would then share this information with other conspirators who were present at the auction.  These smaller participants in the conspiracy referred to themselves as the "breakfast club."

157.    In order to determine the order in which the members of the "breakfast club" would divvy up the auctions, they sometimes selected cards from a deck.  Other conspirators drew lots to determine the order of picking, with the conspirator that drew the lowest number getting the first opportunity to choose a lien at the particular auction.

158.    As Vincent Belluscio, the executive director of the state tax collectors and treasurers association, stated, "[T]hese [tax lien] investors have a tendency to meet . . . and divvy up the [property] list."[1] That is, "[t]hey say, 'We'll buy these properties, and you buy those.'

---

[1] Gopal, P., "JPMorgan Unit Subpoenaed in U.S. Tax-Lien Inquiry," (hereafter, "JPMorgan Unit Subpoenaed "), Bloomberg (April 20, 2010), available at http://origin-www.bloomberg.com/apps/news?pid=conewsstory&tkr=RBPAA:US&sid=aRC1Q6y1dKtE.

And the interest rate holds at 18 percent."[2] Tellingly, according to a participant, "It's a niche business" where participants "have camaraderie among each other" because, in their view, there was "enough for everybody."[3]

159.   1.   In addition to these examples, witnesses who pleaded guilty to the conspiracy have identified Caiola, Richard Simon, Betty Simon, Joseph Wolfson, and Mooring as directly participating in the allocation of tax liens at similar public auctions in New Jersey and bidding on liens at such auctions in furtherance of the overarching conspiracy alleged herein. These witnesses personally participated in the discussions and agreements reached with these Defendants during the Class Period.

## D.   Policing the Conspiracy

160.   In order to enforce the conspiracy, cartel participants would bully participants and non-participants into refraining from bidding on particular liens. This conduct included, but was not limited to, intimidation and verbal threats.

161.   Oftentimes, new bidders who posed a threat to the conspiracy were asked to join forces with the cartelists rather than continue to bid competitively.  Several Defendants joined the conspiracy this way. They believed that if they did not join the conspiracy, they would not be allowed to purchase certain liens.

## E.   The Conspiracy Breaks Down

162.   Certain other states conduct tax lien auctions in a similar manner as in New Jersey and several of the Defendants herein participate in tax lien auctions in multiple jurisdictions. One such jurisdiction is Maryland.  Near the end of 2008, the United States Department of

---

[2] *Id.*

[3] *See* Glovin, D. & Vareacos, D,. "New Jersey 'Round Robin' Tax Lien Auction Spurs Probe," Bloomberg (March 21, 2012), available at http://www.bloomberg.com/news/2012-03-21/m-d-sass-participated-in-tax-lien-sale-being-probed-by-u-s-.html.

Justice began an investigation into collusion with respect to bid rigging at tax lien auctions in the

State of Maryland.  Defendant Anthony J. De Laurentis, who, as described in this complaint,

attended auctions in the State of New Jersey pursuant to the conspiracy alleged herein, confessed

to his participation in the collusion in Maryland.  It has been publicly reported that De Laurentis,

along with his partners and an affiliated corporate entity (DRT Fund), were granted conditional

amnesty from the Department of Justice in connection with their participation in the conspiracy

in Maryland.   In order to be granted conditional amnesty, one must disclose to the Department

of Justice the commission of a crime of which it had been previously unaware, and agree to

cooperate fully with any investigation.

163.    As a result of the publicity that the Maryland investigation garnered in the press in

early 2009, and the similarity of the auction processes in New Jersey and Maryland as well as the

overlap of conspiracy participants, the Defendants herein became concerned about their further

participation in the conspiracy alleged herein and decided to discontinue their collusive activities

with respect to tax lien auctions in New Jersey by around February 2009.

**F.    National Tax Lien Association (NTLA) Trade Association**

164.    Several Defendants belonged to the National Tax Lien Association ("NTLA"), an

organization that purports to advance the interests of the tax lien industry including the New

Jersey tax lien industry.  In addition, employees and executives of Defendants have served in

leadership positions at the NTLA.  For example, Jim Meeks, the president and chief executive

officer of defendant Mooring, currently serves as treasurer of NTLA's Board of Directors.

165.    The NTLA regularly holds symposiums and meetings.  For example, in March of

each year, the NTLA held an annual meeting, usually in Florida, at which many of the

Defendants attended.  In 2006, the March meeting took place in Las Vegas, and in 2007, 2008

and 2009, the March meeting took place in Miami, Florida.  Defendants regularly attended these

sessions, which offered an opportunity for members to meet, conspire, and share information about rigging bids at future municipal auctions.

**G.       Conspirators Plead Guilty to Participating in Conspiracy**

166.     The Antitrust Division of the United States Department of Justice began an investigation into criminal conduct at TSC auctions in New Jersey at least as early as 2009.  As a result of the federal investigation, eight individuals and three entities – all Defendants here – have pleaded guilty to participating in a conspiracy to rig bids and allocate customers at public tax lien auctions throughout New Jersey, in violation of Section 1 of the Sherman Act.  The investigation remains active and additional pleas and/or indictments are expected.  Indeed, as recently as December 19, 2012, two days before this complaint was filed, defendant Mercer S.M.E., Inc. pled guilty.

167.     In announcing certain guilty pleas on February 23, 2012, the Department of Justice made clear that "the primary purpose of the conspiracies was to suppress and restrain competition to obtain selected municipal tax liens offered at public auctions at non-competitive interest rates."

168.     Moreover, "[b]ecause the conspiracies permitted the conspirators to purchase tax liens with limited competition, each conspirator was able to obtain liens which earned a higher interest rate."  As a result, "[p]roperty owners were therefore made to pay higher interest on their tax debts than they would have paid had their liens been purchased in open and honest competition."

169.     As Sharis A. Pozen, then-Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division stated, the "guilty pleas demonstrate that the Antitrust Division will not tolerate those who manipulate the competitive process in order to harm home and property owners."

170.     On August 23, 2011, defendant Collins pleaded guilty to violating the Sherman

Act for his role in the conspiracy.  *See United States of America v. William A. Collins*, 11-CR-

563 (D.N.J.) (DMC).  The information accompanying his guilty plea states:

> From at least as early as the beginning of 2003 to until
> approximately February 2009 . . . Collins and his co-conspirators
> entered into and engaged in a combination and conspiracy to
> suppress and eliminate competition by submitting non-competitive
> and collusive bids at certain public auctions for tax liens conducted
> by municipalities within the District of New Jersey . . . The
> charged combination and conspiracy consisted of a continuing
> agreement, understanding, and concert of action among COLLINS
> and his coconspirators, the substantial terms of which were to rig
> bids for and allocate tax liens being auctioned by municipalities
> within the District of New Jersey.
>
> For the purpose of forming and carrying out the charged
> combination and conspiracy, Collins and his co-conspirators . . . a.
> attended meetings and engaged in discussions regarding bids for
> tax liens being auctioned by municipalities within the District of
> New Jersey; b. agreed during those meetings and discussions not to
> compete at certain tax lien auctions by allocating which tax liens
> each would bid on or refrain from bidding; c. submitted bids in
> accordance with the agreements reached; and d. purchased tax
> liens pursuant to those agreements at collusive and non-
> competitive interest rates.

171.     Also on August 24, 2011, defendant May pleaded guilty to violating the Sherman

Act for his role in the conspiracy.  *See United States of America v. Isadore H. May*, 2:11-CR-

00562 (D.N.J.) (DMC).  The information accompanying his guilty plea states:

> From at least as early as the beginning of 2003 to until
> approximately February 2009 . . . May and his co-conspirators
> entered into and engaged in a combination and conspiracy to
> suppress and eliminate competition by submitting non-competitive
> and collusive bids at certain public auctions for tax liens conducted
> by municipalities within the District of New Jersey . . . The
> charged combination and conspiracy consisted of a continuing
> agreement, understanding, and concert of action among May and
> his co-conspirators, the substantial terms of which were to rig bids
> for and allocate tax liens being auctioned by municipalities within
> the District of New Jersey.

> For the purpose of forming and carrying out the charged
> combination and conspiracy, May and his co-conspirators . . . a.
> attended meetings and engaged in discussions regarding bids for
> tax liens being auctioned by municipalities within the District of
> New Jersey; b. agreed during those meetings and discussions not to
> compete at certain tax lien auctions by allocating which tax liens
> each would bid on or refrain from bidding; c. submitted bids in
> accordance with the agreements reached; and d. purchased tax
> liens pursuant to those agreements.

172.     Defendant Pisciotta was the third person to plead guilty to violating the Sherman

Act for his role in the conspiracy on August 24, 2011.  *See United States of America v. Richard*

*J. Pisciotta, Jr.*, 11-CR-561 (D.N.J.) (DMC).  The information accompanying his guilty plea

states:

> From at least as early as the beginning of 2003 to until
> approximately February 2009 . . . Pisciotta and his co-conspirators
> entered into and engaged in a combination and conspiracy to
> suppress and eliminate competition by submitting non-competitive
> and collusive bids at certain public auctions for tax liens conducted
> by municipalities within the District of New Jersey . . . The
> charged combination and conspiracy consisted of a continuing
> agreement, understanding, and concert of action among Pisciotta
> and his co-conspirators, the substantial terms of which were to rig
> bids for and allocate tax liens being auctioned by municipalities
> within the District of New Jersey.
>
> For the purpose of forming and carrying out the charged
> combination and conspiracy, Pisciotta and his co-conspirators . . .
> attended meetings and engaged in discussions regarding bids for
> tax liens being auctioned by municipalities within the District of
> New Jersey; b. agreed during those meetings and discussions not to
> compete at certain tax lien auctions by allocating which tax liens
> each would bid on or refrain from bidding; c. submitted bids in
> accordance with the agreements reached; and d. purchased tax
> liens pursuant to those agreements at collusive and non-
> competitive interest rates.

173.     On February 24, 2012, defendant Farber pleaded guilty to violating the Sherman

Act for his role in the conspiracy.  *See United States of America v. David M. Farber*, 12-CR-139

(D.N.J.) (DMC).  From about the beginning of 2005 until approximately November 2008,

according to the criminal information, Farber held a limited partnership interest in defendant DSBD.  Farber bid and purchased municipal tax liens in the State of New Jersey on behalf of DSBD, which were held as investments by defendants CCTS I and CCTS II.   Moreover, from about December 2008 through July 2009, Farber served as president of a company identified as "Company 1", overseeing the purchase of TSCs in the State of New Jersey.  "Company 1" is defendant CCTS Capital, the predecessor entity to defendant Crestar Capital.  The information accompanying his guilty plea also states:

> From at least as early as the beginning of 2005 until approximately February 2009 . . . David M. Farber, the Defendant, and his coconspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among David M. Farber, the Defendant, and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.
>
> For the purpose of forming and carrying out the charged combination and conspiracy, David M Farber, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

174.    On February 23, 2012, defendant Stein pleaded guilty to violating the Sherman Act for his role in the conspiracy.  *See United States of America v. Robert W. Stein*, 12-CR-140 (D.N.J.) (DMC).  As president of defendant Crusader and its successor, defendant RTLS, defendant Stein oversaw the purchase of TSCs on behalf of "Company 1" – presumably

defendants Crusader and RTLS – from at least 1996 through 2010, according to the criminal

information.  Further:

> From at least as early as 1998 until approximately spring 2009 . . .
> Robert W. Stein, the Defendant, and his co-conspirators, including
> Company 1, entered into and engaged in a combination and
> conspiracy to suppress and eliminate competition by submitting
> non-competitive and collusive bids at certain public auctions for
> tax liens conducted by municipalities within the District of New
> Jersey . . . The charged combination and conspiracy consisted of a
> continuing agreement, understanding, and concert of action among
> Robert W. Stein, the Defendant, and his co-conspirators, the
> substantial terms of which were to rig bids for and allocate tax
> liens being auctioned by municipalities within the District of New
> Jersey.
>
> For the purpose of forming and carrying out the charged
> combination and conspiracy, Robert W. Stein, the Defendant, and
> his co-conspirators, including Company 1 . . . attended meetings
> and engaged in discussions regarding bids for tax liens being
> auctioned by municipalities within the District of New Jersey; b.
> agreed during those meetings and discussions not to compete at
> certain tax lien auctions by allocating which tax liens each would
> bid on or refrain from bidding; c. submitted bids in accordance
> with the agreements reached; and d. purchased tax liens pursuant
> to those agreements at collusive and non-competitive interest rates.

175.    On March 27, 2012, defendant Rothman pleaded guilty to violating the Sherman

Act for his role in the conspiracy.  *See United States of America v. Robert E. Rothman*, 12-CR-

210 (D.N.J.) (DMC).  The information accompanying his guilty plea states:

> From in or about the Spring of 2000 until approximately February
> 2009 . . .  Robert E. Rothman, the Defendant, and his co-
> conspirators, entered into and engaged in a combination and
> conspiracy to suppress and eliminate competition by submitting
> non-competitive and collusive bids at certain public auctions for
> tax liens conducted by municipalities within the District of New
> Jersey . . . The charged combination and conspiracy consisted of a
> continuing agreement, understanding, and concert of action among
> Robert E. Rothman, the Defendant, and his co-conspirators, the
> substantial terms of which were to rig bids for and allocate tax
> liens being auctioned by municipalities within the District of New
> Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, Robert E. Rothman, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

176.    On April 17, 2012, defendant Hruby pleaded guilty to violating the Sherman Act for his role in the conspiracy.  *See United States of America v. Stephen E. Hruby*, 12-CR-263 (D.N.J.) (D.M.C.).  As the Director of Acquisitions for various M.D. Sass Defendants from December 2002 until early 2009, defendant Hruby participated in, and oversaw and directed the participation of agents and representatives of M.D. Sass at auctions for TSCs on behalf of the Sass Defendants.  The information accompanying his guilty plea states:

> From at least as early as December 2002 to until approximately February 2009 . . . Stephen E. Hruby, the Defendant, and his coconspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Stephen E. Hruby, the Defendant, and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, Stephen E. Hruby, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. instructed other bidders under his supervision to attend meetings and engage in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; c. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; d. submitted bids in accordance with the agreements

reached; and e. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

177.    On April 23, 2012, defendant Butler pleaded guilty to violating the Sherman Act

for his role in the conspiracy.  *See United States v. David Butler*, 12-CR-273 (D.N.J.) (D.M.C.).

According to the criminal information, defendant Butler held a limited partnership interest in

Defendant DSBD.  Pursuant to his partnership interest, he bid on and purchased TSCs, which

were then held as investments by Defendants CCTS I and CCTS II.  Moreover, from about

December 2008 through July 2009, Butler served as Chief Executive Officer of a company

identified as "Company 1", overseeing the purchase of TSCs in the State of New Jersey.

"Company 1" is Defendant CCTS Capital, the predecessor entity to Defendant Crestar Capital.

The information accompanying his guilty plea also states:

> From at least as early as the beginning of 2005 until approximately February 2009, the exact dates being unknown to the United States, David Butler, the Defendant, and his co-conspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, David Butler, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions or conversations regarding bids for tax liens being auctioned by municipalities within the District of New Jersey b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

178.     Defendant DSDB also pleaded guilty to violating the Sherman Act for its role in

the conspiracy on April 23, 2012.  *See United States v. DSBD, LLC*, 12-CR-00274 (D.N.J.)

(D.M.C.).  The information accompanying defendant DSDB's guilty plea states:

> From at least as early as the beginning of 2005 until approximately
> February 2009 . . . DSBD and its co-conspirators entered into and
> engaged in a combination and conspiracy to suppress and eliminate
> competition by submitting non-competitive and collusive bids at
> certain public auctions for tax liens conducted by municipalities
> within the District of New Jersey.
>
> For the purpose of forming and carrying out the charged
> combination and conspiracy, DSBD and its co-conspirators . . . a.
> attended meetings and engaged in discussions or conversations
> regarding bids for tax liens being auctioned by municipalities
> within the District of New Jersey; b. agreed during those meetings
> and discussions not to compete at certain tax lien auctions by
> allocating which tax liens each would bid on or refrain from
> bidding; c. submitted bids in accordance with the agreements
> reached; and d. purchased tax liens pursuant to those agreements at
> collusive and non-competitive interest rates.

179.     Defendant Crusader also pleaded guilty to violating the Sherman Act for its role

in the conspiracy on September 26, 2012.  *See United Stated v. Crusader Servicing Corp.*, 12-cr-

00644 (D.N.J.) (D.M.C.).  The information accompanying defendant Crusader's guilty plea

states:

> Beginning at least as early as 1998 and continuing until September
> 2006, the exact dates being unknown to the United States, in the
> District of New Jersey and elsewhere, the defendant and co-
> conspirators entered into and engaged in a combination and
> conspiracy to suppress and eliminate competition by submitting
> non-competitive and collusive bids at certain public auctions for
> tax liens conducted by municipalities within the District of New
> Jersey.
>
> For the purpose of forming and carrying out the charged
> combination and conspiracy, the defendant and co-conspirators did
> those things that it combined and conspired to do, including,
> among other things:  a. attended meetings and engaged in
> discussions or conversations regarding bids for tax liens being
> auctioned by municipalities within the District of New Jersey; b.

agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

180.     On December 19, 2012, the Department of Justice announced that defendant Mercer, S.M.E., Inc. had agreed to plead guilty to the conspiracy alleged herein.  Specifically, the press release announcing the guilty plea stated, in relevant part, "from at least 2003 until approximately February 2009, Mercer, in conjunction with a nonprofit corporation and others participated in a conspiracy to rig bids at auctions for the sale of municipal tax liens in New Jersey.  As part of the conspiracy, the co-conspirators agreed to allocate the liens on which each would bid.  Among other things, Mercer was assigned tax liens it understood were purchased in accordance with the unlawful agreement."  The press release further stated, "Mercer, along with the nonprofit corporation which assigned some of its liens to Mercer, was involved in a conspiracy with others not to bid against one another at municipal tax lien auctions in New Jersey.  Since the conspiracy permitted the conspirators to purchase tax liens with limited, competition, each conspirator was able to obtain liens which earned a higher interest rate.  Property owners were therefore made to pay higher interest on their tax debts than they would have paid had their liens been purchased in open and honest competition."

181.     In addition, at least Defendants Plymouth Park, Mooring and RBPI each confirmed in public filings and/or news articles that they received grand jury subpoenas related to the Department of Justice's investigation.  RBPI confirmed that it has produced to the Department of Justice documents responsive to the subpoenas from RBPI, Crusader and RTLI.

## H.     The Sass Defendants Have a History Collusion in Tax Lien Auctions in Other Jurisdictions

182.     In addition to the Sass Defendants' participation in the collusive activities with respect to TSC auctions in New Jersey, Sass has colluded with other persons and entities at tax lien auctions in other jurisdictions and has been ordered to pay millions of dollars for its participation in such activities.

183.    For example, in 2007, MD Sass Investors Services, Inc., MD Sass Tax Lien Mgmt., LLC, Sass-Muni IV, LLC, Sass-Muni V, LLC, as well as two Sass executives, defendant Vinaya Jessani and Kirk Allison, were sued in a federal RICO action in United States District Court for the Northern District of Illinois, captioned *BCS Services, Inc. and Phoenix Funding Indemnity Co. v. Heartwood 88, LLC, et al.*, 07-1367 (N.D. Ill.) ("BCS Services").  Messrs. Jessani and Allison were Vice Presidents at Sass in New York, and were responsible for Sass' tax lien purchases nationwide, including in the State of New Jersey.  Messrs. Allison, as well as defendant Jessani, were terminated from their employment with M.D. Sass as a result of their participation in the conspiracy alleged herein as well as the conspiracy alleged in *BCS Services*.

184.    In *BCS Services*, the plaintiffs alleged that the Sass Defendants and other persons and entities colluded at annual tax lien auctions in Cook County, Illinois during the period 2002 through 2007.  The complaint filed against the Defendants alleged, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1962 *et seq*.

185.    Specifically, the plaintiffs alleged that the Defendants, including the Sass Defendants, Jessani and Messr. Allison, conspired in an effort to undermine the integrity of the tax lien auction process in Cook County.  Sass and the other Defendants falsely certified their compliance with Cook County auction requirements, and also created a number of sham entities to bid at auctions in Cook County in order to obtain as many tax liens as possible.   Like the Sass Defendants did here, prior to each auction, Sass would collude with other persons and entities by divvying up the liens to be auctioned and deciding in advance which liens each auction attendee would bid on.

186.    Following a jury trial, the jury found the Defendants, including the Sass Defendants, guilty of violating in RICO in connection with its activities at the Cook County

auctions.  The Sass Defendants were ordered to pay the plaintiffs $2.5 million as compensatory damages and approximately $2 million in punitive damages.

## VI.    FRAUDULENT CONCEALMENT

187.    Defendants deliberately hid their anticompetitive practices from Plaintiffs and the members of the Class, engaging in affirmative and fraudulent concealment of their unlawful scheme, conspiracy and course of conduct from Plaintiffs and the Class.

188.    Defendants have also engaged in an elaborate series of affirmative acts, including secret bid-rigging, to create the illusion of a competitive market where none existed.

189.    Defendants failed to disclose their unlawful practices of rigging bids at municipal tax lien auctions in New Jersey in any documents provided to Plaintiffs and the Class as to the public.  Further, Plaintiffs and members of the Class would not be among the attendees and/or bidders at public tax lien auctions and thus, would not have observed any collusion among the Defendants.  In addition, Defendant Mooring denied the existence of the conspiracy, and as recently as 2010, Defendants Mooring and Xspand were touting their rigorous antitrust training practices.[4]

190.    Plaintiffs and members of the Class therefore could not have reasonably discovered Defendants' deceptive and anticompetitive practices until the Department of Justice's investigation into the conspiracy in New Jersey was made public in or around mid-2011.

191.    Defendants continued to engage in and conceal their fraudulent scheme since the conspiracy began at least as early as 1998 through at least February 2009.

---

[4] *See* JPMorgan Unit Subpoenaed.

192.    Plaintiffs and the Class did not and could not have discovered their causes of action until the time at which an investigation was made, thereby tolling any applicable statute of limitations.

193.    In addition, Defendants and their co-conspirators engaged in a successful bid-rigging conspiracy that they affirmatively concealed by meeting secretly (including through the use of private, in-person communications) to discuss auctions for tax liens throughout the State of New Jersey, and by agreeing among themselves at meeting and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their alleged scheme

194.    As a result of Defendants' fraudulent concealment of their bid-rigging scheme, any applicable statute of limitations related to any claims which Plaintiffs or other Class members have brought or could bring have been tolled.

## VII.    EFFECTS OF THE DEFENDANTS' UNLAWFUL CONSPIRACY

195.    Defendants' conspiracy to rig bids and allocate the market for TSCs auctioned in New Jersey during the Class Period harmed Plaintiffs and members of the proposed class.  The unlawful scheme resulted in an artificially inflated interest being associated with liens that have been placed on properties owned Plaintiffs and members of the class.  This inflated interest: 1) forced Class members to pay artificially inflated interest on delinquent tax obligations; and/or 2) resulted in an artificially inflated interest being associated with the delinquent tax obligation which encumbers the property of Plaintiffs and members of the Class and which Class members are legally required to repay in order to maintain ownership over the property.

196.    As a direct and proximate result of Defendants' and their co-conspirators unlawful contract, combination and conspiracy, Plaintiffs and members of the Class were injured and financially damaged in their business and property by having to pay more interest with

respect to their delinquent tax obligation than they would have absent Defendants' and their co-conspirators' unlawful activities, and having the equity in their property impaired, and in some cases, losing title to their properties in tax sale foreclosures they were unable to prevent due to the impairment of their creditworthiness resulting from the tax lien foreclosures.  The total amount of damages is presently undetermined but is in the millions of dollars.

## VIII.   CLASS ACTION ALLEGATIONS

197.     Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on their own behalf and on behalf of the following class (the "Class"):

> All persons who owned real property in the State of New Jersey and who had a Tax Sale Certificate issued with respect to their property that was purchased by a Defendant during the Class Period at a public auction in the State of New Jersey at an interest rate above 0%.

198.     Excluded from the Class are government entities or any person or entity in which any Defendant holds a controlling interest, the officers, directors, employees, affiliates, subsidiaries, legal representatives, heirs, successors and assigns of any such person or entity, as well as any immediate family member of any officer, director or employees of any named Defendant that is not a natural person, and any judge or magistrate involved in this matter, as well as members of their immediate family..

199.     Plaintiffs reserve the right to modify the definition of the Class, including but not limited to the use of subclasses, as this Action progresses.

200.     The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that at least several thousand class members were victims of the unlawful bid-rigging scheme.

201.     Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' common

course of conduct in violation of laws as complained herein.  The injuries and damages of each

member of the Class were directly caused by Defendants' wrongful conduct in violation of the

antitrust laws alleged herein.

202.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class action litigation, including

antitrust class action litigation.

203.    Common questions of law and fact exist as to all members of the Class that

predominate over any questions affecting solely individual members of the Class.  Among the

questions of law and fact common to the Class are:

> a.    Whether Defendants conspired with others to fix bids and
>       allocate TSCs at auctions in New Jersey, in violation of the
>       Sherman Act and New Jersey's Antitrust Act;
>
> b.    Whether Defendants' conduct had the anticompetitive
>       effect of reducing and unreasonably restraining the market
>       for the purchase of TSCs;
>
> c.    The names of the individuals and entities who participated
>       in the anticompetitive scheme;
>
> d.    The duration of the anticompetitive scheme;
>
> e.    The effect of Defendants' conduct and the extent of injuries
>       sustained by Plaintiffs and Class members;
>
> f.    The amount of damages the anticompetitive scheme caused
>       members of the Class; and
>
> g.    Whether Plaintiffs and the Class are entitled to an award of
>       attorneys' fees and expenses against Defendants.

204.    A class action is superior to other available methods for the fair and efficient

adjudication of this controversy because joinder of all Class members is impracticable.  The

prosecution of separate actions by individual members of the Class would impose heavy burdens

upon the courts and Defendants, and would create the risk of inconsistent or varying

adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

205.    The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical.  The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable.  The amounts at stake for Class members, while substantial in the aggregate, are not great enough to individually enable them to maintain separate suits against Defendants.  Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

206.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

207.    Beginning as early as January 1998 and continuing through February 2009, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the State of New Jersey at public tax lien auctions.

208.    Defendants have combined and conspired to rig bids and allocate markets with respect to the sale of TSCs in the State of New Jersey during the Class Period.

209.    As a result of Defendants' unlawful conduct, interest rates associated with delinquent municipal tax obligations auctioned by municipalities in New Jersey, have been set at artificially inflated levels.

210.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their coconspirators.  For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined or conspired to do, including:

    a.    exchanged information on auctions for TSCs in the State of New Jersey prior to auctions;

    b.    agreed to rig bids and allocate TSCs sold in the State of New Jersey during the Class Period;

    c.    submitted bids and refrained from submitting bids in accordance with the agreements reached among the Defendants' and their co-conspirators; and

    d.    purchased TSCs auctioned in the State New Jersey during the Class Period pursuant to the conspiracy alleged herein.

211.    Plaintiffs and the other members of the Class have been injured in their businesses and property as a result of Defendants' unlawful conspiracy in that they have paid more interest associated with their delinquent tax obligation than they should have, or are required to pay artificially inflated interest levels associated with their delinquent tax obligation, than they otherwise would have paid, or be required to pay, in the absence of Defendants' unlawful conduct.

**SECOND CLAIM FOR RELIEF**

**Violation of the New Jersey Antitrust Act**
**N.J.S.A. § 56:9-3**

212.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

213.    Beginning as early as January 1998 and continuing through the present, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the New Jersey Antitrust Act (N.J.S.A. § 56:9-3) by artificially reducing or eliminating competition in the State of New Jersey.

214.    Defendants have combined and conspired to rig bids and allocate markets with respect to the sale of TSCs in the State of New Jersey during the Class Period.

215.    As a result of Defendants' unlawful conduct, interest rates associated with delinquent municipal tax obligations auctioned by municipalities in New Jersey, have been set at artificially inflated levels.

216.    As a result of Defendants' unlawful conduct, the interest rates of TSCs sold throughout New Jersey during the operation of the conspiracy were set at artificially inflated levels.

217.    The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding and concerted action among Defendants and their coconspirators.  For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did, inter alia, the following:

   a.    exchanged information on auctions for TSCs in the State of New Jersey prior to auctions;

   b.    agreed to rig bids and allocate TSCs sold in the State of New Jersey during the Class Period;

   c.    submitted bids and refrained from submitting bids in accordance with the agreements reached among the Defendants' and their co-conspirators; and

   d.    purchased TSCs auctioned in the State New Jersey during the Class Period pursuant to the conspiracy alleged herein.

218.    Plaintiffs and the other members of the Class have been injured in their businesses

and property as a result of Defendants' unlawful conspiracy in that they have paid more interest

associated with their delinquent tax obligation than they should have, or are required to pay

artificially inflated interest levels associated with their delinquent tax obligation, than they

otherwise would have paid, or be required to pay, in the absence of Defendants' unlawful

conduct.

### THIRD CLAIM FOR RELIEF

### Violation of the New Jersey Tax Lien Law: Excessive Fee in the Redemption of a Tax Sale Certificate N.J.S.A. § 5-63.1

219.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this

Complaint as though fully set forth herein.

220.    The New Jersey Tax Lien Law ("NJTSL"), N.J.S.A. § 54:5-1 et seq., protects

delinquent taxpayers from unfair treatment by TSC holders through the exacting of unlawful or

illegal charges.

221.    Open and competitive bidding in tax lien auctions serves to ensure that "the

delinquent property owner's right to fair treatment" by driving down the interest owed to TSC

holders.

222.    The NJTSL thus provides that:

> Any holder of a tax sale certificate, excepting any municipal
> corporation, his agent, servant, employee or representative, **who**
> **knowingly charges or exacts any fee or charge in connection**
> **with the redemption of any tax sale certificate owned by him**,
> in excess of the amounts permitted by chapter five of Title 54 of
> the Revised Statutes, **shall forfeit such tax sale certificate to the**
> **person who was charged such excessive or unlawful fee** and the
> person paying such unlawful charge shall become vested with all
> the right, title and interest of such tax sale certificate holder in and
> to such tax lien. In addition thereto **the person aggrieved shall**
> **have a right of action to recover back the full amount paid by**

**him to such tax lien holder, by an action at law in any court of
competent jurisdiction.**

The collection of any excessive charge or fee in connection with
the redemption or assignment of a tax sale certificate shall be
deemed prima facie evidence of the fact that such tax sale
certificate holder did knowingly charge and exact such excessive
fee or charge within the intent of this act.

*See* N.J.S.A. § 54:5-63.1 (emphasis added).

223.    As a result of Defendants' unlawful collusive bidding, Defendants (1) acquired

TSCs and (2) knowingly charged or attempted to charge unlawful fees in connection with the

redemption process for the TSCs in excess of the amount permitted.

224.    Plaintiffs were thereby damaged by Defendants because they had to pay excessive

and unlawful fees to redeem the TSCs associated with their property, or had an artificially

inflated and unlawful interest associated with the tax obligation they are legally required to repay

in order to maintain ownership over the property.

225.    As a result of Defendants' knowingly charging unlawful and excessive fees,

Defendants must forfeit any such tax sale certifications to the Class Members and/or refund the

full amounts of any liens paid.

## FOURTH CLAIM FOR RELIEF

**Violation of the New Jersey Tax Lien Law: Fraud in the Acquisition of TSCs N.J.S.A. §
54:5-52 et Seq.**

226.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this

Complaint as though fully set forth herein.

227.     The NJTSL, N.J.S.A. § 54:5-1 et seq., protects delinquent taxpayers from unfair

treatment by TSC holders through the exacting of unlawful or illegal charges.

228.     The NJTSL provides that a right of action for fraud in the acquisition of a TSC

exists when plaintiffs can show that Defendants procured a TSC by fraud. See N.J.S.A. § 54:5-

52.

229.     By participating in the collusive bid rigging conspiracy, Defendants:

    a. Made material misrepresentations that were false with the intent to deceive that
they were bidding competitively, as statutorily required, at the auctions for
municipal tax liens;

    b. Made material omissions by failing to state that the interest rate on the municipal
tax liens was obtained through collusion;

    c. Knew that the material misrepresentations, and the impressions created by the
material omissions, were false and misleading;

    d. Knowingly made the misrepresentations and omissions in order to procure
redemption of the TSC or foreclosure on the property associated therewith at a
higher percentage than they otherwise would have been able to obtain; and

    e. Intended that the homeowners and the judicial system relied on the falsity of those
misrepresentations to garner an excessive fee to redeem the TSC, or gain the
property on which the TSC was issued.

230.     Plaintiffs were not aware of the omissions or that Defendants' representations were false and misleading, and Plaintiffs justifiably relied on the representations made by Defendants. As a direct and proximate result of their reliance upon Defendants' misrepresentations and omissions, Plaintiffs suffered damages.

231.     As a result of the unlawful conduct described above, Defendants must forfeit all TSCs acquired during the Class Period that have not been previously redeemed.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

232.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

233.     As a result of the unlawful conduct described above, Defendants have been unjustly enriched by collecting unlawfully inflated interest amounts associated with each purchase a TSC.

234.     Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains

235.     Plaintiffs and members of the Class are entitled to recover the amount of Defendant's ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.

## SIXTH CLAIM FOR RELIEF

### Declaratory Judgment

236.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

237.     Pursuant to 28 U.S.C. § 2201, Plaintiffs, on their own behalf and on behalf of each member of the Class described above, seeks the following declaratory judgments:

a.     That the Defendants' conduct alleged herein constituted a *per se* violation of the Sherman Act, 15 U.S.C. § 1;

b.     That the Defendants acquisition of TSCs in furtherance of the conspiracy resulted in their acquisition of TSCs at an artificially high level of interest.

238.    Pursuant to 28 U.S.C. § 2201, Plaintiffs, on their own behalf and on behalf of each member of the Class described above, seeks a declaratory judgment that the Defendants' conduct alleged herein violates the Sherman Act.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, appointing Plaintiffs as the class representative and designating Plaintiffs' counsel as counsel for the Class;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators, be adjudged to have been a violation of the New Jersey Antitrust Act, N.J.S.A. § 56:9-3.

D.    That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and members of the class as allowed by law, together with the costs of this action, including reasonable attorneys' fees;

E.      That, pursuant to N.J.S.A. § 54:5-63.1, judgment be entered for Plaintiffs and members of the Class against Defendants for the forfeiture to each member of the Class of each TSC on the property of such member of the Class that was purchased collusively and is currently held by, or under the control of, any Defendant;

F.      That, pursuant to N.J.S.A. § 54:5-63.1, judgment be entered for Plaintiffs and members of the Class against Defendants for the amount of damages sustained by Plaintiffs, including the full amount paid to redeem a TSC on a Class member's property, because of the excessive charges or fees Defendants charges in connection with the redemption of Class member TSCs;

G.      That, pursuant to N.J.S.A. § 54:5-52, judgment be entered for Plaintiffs and members of the Class against Defendants declaring that the sale of TSC to Defendants at each municipal auction during the Class Period is invalid because of Defendants' fraud in procuring the TSCs, and that Defendants must forfeit any TSCs currently held as a result;

H.      That judgment be entered for Plaintiffs and members of the Class against Defendants for an order transferring title to any real property held by any Defendant as the result of the foreclosure of any TSC acquired by any Defendant through collusive bidding to the member of the Class who lost title through foreclosure.

I.      That judgment be entered for Plaintiffs and members of the Class against Defendants for an award restitution and/or disgorgement of Defendant's ill-gotten gains

J.      That the Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the complaint to the extent provided by law;

K.      An injunction enjoining, preliminarily and permanently, Defendants from enforcing the artificially inflated and illegal rate of interest associated with the TSCs purchased by Defendants; and

L.      That plaintiffs and members of the class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances

## X.      JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiffs on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

**LITE DEPALMA GREENBERG, LLC**
    */s/ Bruce D. Greenberg*
        Bruce D. Greenberg
Steven J. Greenfogel
Two Gateway Center, Suite 1201
Newark, New Jersey 07102-5003
(973) 623-3000

*Interim Liaison Counsel*

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Steve W. Berman *(admitted pro hac vice)*
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Jason A. Zweig *(admitted pro hac vice)*
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
Email: jasonz@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**

Jennifer F. Connolly *(admitted pro hac vice)*
629 K St., NW, Suite 300Washington, DC 20006
Telephone: (202) 355-6435
Facsimile: (202) 355-6455
Email: jenniferc@hbsslaw.com

**HAUSFELD LLP**

Michael D. Hausfeld *(admitted pro hac vice)*
James Pizzirusso *(admitted pro hac vice)*
Seth R. Gassman *(admitted pro hac vice)*
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: 202-540-7200
Fax: 202-540-7201

*Interim Class Counsel*