# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIG. | Master Docket No. 3:12-CV-01893-MAS-TJB |

## CLASS PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS TO DISMISS

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Two Gateway Center, Suite 1201
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Email: bgreenberg@litedepalma.com

***Interim Liaison Counsel***
[Additional counsel on signature page]

360986.1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................vi

INTRODUCTORY STATEMENT ...........................................................1

STATEMENT OF FACTS .....................................................................1

    I.     Tax Lien Auctions in New Jersey Are Conducted Pursuant to the Tax Lien Law Which is Designed to Create a Competitive Bidding Process ...........................................................................2

    II.    The Parties .........................................................................4

    III.   The Defendants' Bid-Rigging Conspiracy Which Artificially Inflated Interest Rates Associated with Tax Liens ...............................5

          1.  Defendants Systematically Rigged Bids Before and During Auctions ........................................................................6

          2.  Both Large and Small Cartel Participants Conspired to Rig Bids ...7

          3.  Trade Association Meetings Provided Additional Opportunities to Conspire ........................................................................8

    IV.   Specific Allegations of Defendants' Participation in the Conspiracy ..9

    V.    Conspirators Plead Guilty Following Extensive and Ongoing Department of Justice Investigation .................................................11

ARGUMENT
DEFENDANTS' MOTIONS TO DISMISS SHOULD BE DENIED ....................12

    I.     Plaintiffs' Federal and State Antitrust Claims Easily Meet the Relevant Pleading Standards .................................................12

          A.  The Pleading Standards That Apply to Plaintiffs' Antitrust Claims .............................................................13

ii

1.      The Complaint Gives Fair Notice to the Defendants of What the Plaintiffs' Antitrust Claims Are and The Grounds Upon Which They Rest ....................................18

2.      Plaintiffs Need Not Satisfy Rule 9(b)............................21

3.      The Complaint Adequately Alleges that Each Defendant Joined the Conspiracy and Played Some Role in It........25

4.      At this Stage of the Proceedings Plaintiffs Are Not Required to Establish a Single Conspiracy Amongst Defendants ....................................................................30

5.      The existence of the Federal criminal investigation into the illegal activities alleged in the Complaint is Further Evidence of the Plausibility of the Plaintiffs' Allegations....................................................................33

II.     The Separate Motions to Dismiss Should be Denied.........................34

A.      The Sass Defendants' Motion to Dismiss [Dkt. 178-1] Should be Denied ...........................................................................35

B.      The Motion to Dismiss of ATF, the BankAtlantic Defendants, and Plymouth Park [Dkt. 173] Should be Denied ...............................38

1.      Defendant Plymouth Park ...............................................40

2.      The BankAtlantic Defendants .......................................41

3.      Defendant ATF...............................................................42

C.      Bank America's Motion to Dismiss [Dkt. 185] Should be Denied.......................................................................42

1.      The Complaint Contains Sufficient Allegations as to RTLS, RBP, and RBA That Plausibly Establish Their Participation in the Conspiracy ......................................43

360986.1

2.  The Royal Bank Defendants as To Piercing the Veil Are Premature Without Discovery .........................................45

D.  Mooring Tax Asset Group, LLC's Motion to Dismiss .................46

E.  Phoenix Funding's Motion to Dismiss [Dkt. 180-1] Should be Denied ..........................................................................................47

III.  PLAINTIFFS HAVE ANTITRUST STANDING..............................48

IV.  PLAINTIFFS' STATE LAW CLAIMS SHOULD BE SUSTAINED....................................................................................55

A.  N.J.S.A. 54:5-52 Permits a Private Cause of Action ....................55

B.  Where the Heightened Standard is Applicable, Plaintiffs' State Law Allegations Satisfy Rule 9(b)..................................................57

C.  The Third Count States a Claim for Violation of N.J.S.A. 54:5-63.1...............................................................................................62

D.  Plaintiffs Have Adequately Alleged Their Unjust Enrichment Claim..............................................................................................65

V.  PLAINTIFFS' ANTITRUST CLAIMS ARE TIMELY....................66

A.  Defendants Have Not Met The Heavy Burden Associated With The Statute of Limitations Defense On A Motion to Dismiss .....66

B.  Plaintiffs' Antitrust Claims Are Not Time Barred Given The Continuing Nature of the Conspiracy ...........................................67

C.  Alternatively, The Tolling Statute and Defendants' Fraudulent Concealment Tolled the Running of the Statute of Limitations...68

1.  Statutory Tolling...........................................................68

2.  Fraudulent Concealment................................................69

iv

3.   Mooring's Relation-Back Argument is Without Merit ................................................................................. 75

VI.   THE FILED RATE DOCTRINE DOES NOT APPLY ..................... 76

A.   The Filed Rate Doctrine ............................................................. 76

B.   The Filed Rate Doctrine Does Not Apply Here Where There is Neither a "Rate" Nor A "Filing" ................................................. 78

VII.  THE FIRST AND SIXTH COUNTS ARE NOT DUPLICATIVE ..... 80

CONCLUSION ..................................................................................... 81

# TABLE OF AUTHORITIES

*AT&T Corp. v. Central Office Tel.*
  524 U.S. 214 (1998) ................................................................ 77

*AT&T Corp. v. JMC Telecom, LLC Steel, Inc.*
  470 F.3d 525, 531-32 (3d Cir. 2006) ......................................... 79

*Alston v. Country Wide Fin. Corp.*
  585 F.3d 753, 763 (3d Cir. 2009) ....................................... 77, 78

*American Home Assurance Co. v. Sunshine Supermarket, Inc.*
  753 F.2d 321, 325 (3d Cir. 1985) ............................................. 44

*Anderson News, L.L.C. v. Am. Media, Inc.*
  680 F.3d 162 (2d. Cir. 2012 ..................................................... 16

*Animal Sci. Prods., Inc., v. China Nat'l Metals & Minerals Imp. & Exp. Corp.*
  596 F. Supp. 2d 842 (D.N.J. 2008) ............................................ 23

*Animal Science Products, Inc. v. China Minmetals Corp.*
  654 F.3d 462 (3d Cir. 2011) ..................................................... 52

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
  599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) ........................... 27

*Ashcroft v. Iqbal*
  129 S. Ct. 1937 (2009) ............................................................. 15

*Assoc. Gen. Contractors of California, Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983) ................................................................ 50

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ......................................................... *passim*

*BCS Servs. v. Heartwood 88, LLC*
  637 F.3d 750, 759 (7th Cir. 2011) ............................................ 59

*Babyage.com, Inc. v. Toys "R" Us, Inc.*
  558 F. Supp. 2d 575 (E.D. Pa. 2008) ....................................... 16

*Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*
  118 F.3d 178 (3d Cir. 1997) .............................................. 50, 54

*Beltz Travel Serv., Inc. v. Int'l. Air Transp. Ass'n,*

620 F.2d 1360, 1367 (9th Cir. 1980) ........................................................ 27

*Bethlehem Steel Corp. v. Fischbach and Moore, Inc.*

    641 F. Supp. 271, 275 (E.D. Pa.1986) ...................................................... 73

*Borough of Lansdale v. PP&L, Inc.*

    426 F. Supp. 2d 264 (D. Pa. 2006) ............................................................ 77

*Broadcom Corp. v. Qualcomm, Inc.*

    501 F.3d 297, 317 (3d Cir. 2007) ............................................................. 22

*Broadcom Corp. v. Qualcomm, Inc.*

    501 F.3d 297 (3d Cir. 2007) ...................................................................... 18

*Cf. Brinkley v. Western World, Inc.*

    275 N.J. Super. 605 (Ch. Div. 1994) .................................................. 61, 65

*CarOne LLC v. Burris*

    2011 U.S. Dist. LEXIS 695594 (D.N.J. June 25, 2011) ............................ 22

*Carnation Co. v. Pacific Westbound Conference*

    383 U.S. 213 (1996) .................................................................................. 78

*Comm. of Pennsylvania v. Milk Industry Man. Corp.*

    812 F. Supp. 500 (E.D. Pa. 1992) ............................................................. 72

*Community Dev. Co., Inc. v. Seaside Gardens, Inc.*

    7 N.J. 152 (1951) ...................................................................................... 55

*Continental Ore Co. v. Union Carbide and Carbon Corp.*

    370 U.S. 690 (1962) .................................................................................. 29

*Davis v. Grusemeyer*

    996 F.2d at 624 (3d Cir. 1993) .................................................................. 74

*In re Ductile Iron Pipe Fittings Antitrust Litig.*

    No. 12-711, 2013 U.S. Dist. LEXIS 29865 (D.N.J. Mar. 5. 2013) ....... 16, 35

*Dworman v. Mayor and Bd. Of Aldermen, Governing Body of Town of Morristown*, 370 F. Supp. 1056 (D.N.J. 1974) .......................................... 80

*Erickson v. Pardus*

    551 U.S. 89 (2007).............................................................................. 14, 18

*Ethypharm S.A. France v. Abbott Laboratories*

    707 F.3d 223 (3d Cir. 2013) ................................................. 49, 50, 53, 54

360986.1

*Forbes v. Eagleson*
    228 F.3d 471 (3d Cir. 2000) ...................................................................... 73

*Gallo v. PHH Mortgage Corp.*
    No. 12-1117, 2012 U.S. Dist. LEXIS 182954 (D.N.J. Dec. 31, 2012) ....... 78

*Gennari v. Weichert Co. Realtors*
    148 N.J. 582 (1997) ................................................................................... 60

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*
    392 U.S. 481 (1968) ................................................................................... 67

*Harrington Co. v. Horster*
    89 N.J. Eq. 270 (Ch. 1918) ....................................................................... 57

*Haskins v. First Am. Title Ins. Co.*
    866 F.2d 343 (D.N.J. 2012) ....................................................................... 77

*Hemy v. Perdue Farms*
    No. 11-888, 2013 U.S. Dist. LEXIS 46593 (D.N.J. Mar. 31, 2013) ........... 58

*New York v. Hendrickson Bros.*
    840 F.2d 1065 (2d Cir. 1988) .................................................................... 73

*Hinchliffe v. Loughlin*
    126 N.J.L. 132 (Sup. 1941) ....................................................................... 55

*Hyland v. Kirkman*
    204 N.J. Super. 345 (Ch. Div. 1985) ......................................................... 56

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*
    425 U.S. 738 (1976) ................................................................................... 17

*Ice Cream Liquidation Inc. v. Land O'Lakes, Inc.*
    253 F. Supp. 2d 262 (D. Conn. 2003) ....................................................... 26

*Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*
    653 F.3d 225 (3d Cir. 2011) ...................................................................... 62

*In re Advanta Corp. Securities Litig.*
    180 F.3d 525 (3d Cir. 1999) ...................................................................... 23

*In re Aspartame Antitrust Litig.*
    No. 06-1732, 2007 U.S. Dist. LEXIS 16995 (E.D. Pa.,Jan. 18, 2007) . 71, 72

*In re Blood Reagents Antirust Litig.*
    756 F. Supp. 2d 623 (E.D. Pa. 2010) ..................................................... 16, 33

*In re Cathode Ray Tube (CRT) Antitrust Litig.*
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..................................................... 26

*In re Chocolate Confectionary Antitrust Litig.*
    602 F. Supp. 2d 538 (M.D. Pa. 2009) ......................................................... 16

*In re Copper Antitrust Litig.*
    98 F.Supp. 2d 1039 (W.D. Wis. 2000) ........................................................ 31

*In re Craftmatic Sec. Litig.*
    890 F.2d 628 (3d Cir. 1989)) ...................................................................... 70

*In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*
    No. 12-711, 2013 U.S. Dist.LEXIS 29865 (D.N.J. Mar. 5, 2013).............. 14

*In re Elevator Antitrust Litig.*
    502 F.3d 47 (2d Cir. 2007) .......................................................................... 32

*In re Elec. Books Antitrust Litig.*
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ....................................................... 16

*In re Fasteners Antitrust Litig.*
    No. 08- 1912, 2011 U.S. Dist. LEXIS 90076 (E.D. Pa., Aug. 12, 2011) .... 71

*In re Fasteners Antitrust Litig.*,
    No. 08-1912, 2012 U.S. Dist. LEXIS 110513
    (E.D. Pa. Aug. 6, 2012) ....................................................................... 74, 75

*In re Fertilizer Antitrust Litig.*,
    No. 75-1,1983 U.S. Dist. LEXIS 17042 (E.D. Wash. Sept. 14, 1979) ....... 74

*In re Flat Glass Antitrust Litig.*
    385 F.3d 350 (3d Cir. 2004) ................................................................. 16, 30

ix

*In re Graphics Processing Units Antitrust Litig.*
    527 F. Supp. 2d  1011 (N.D. Cal. 2007) ...................................................... 17

*In re High Fructose Corn Syrup Antitrust Litig.*
    295 F.3d 651 (7th Cir. 2002) .................................................................... 44

*In re Hypodermic Products Antitrust Litig.*
    No. 1730, 2007 U.S. Dist. LEXIS 47438 (D.N.J. June 29, 2007) ............. 17

*In re Ins. Brokerage Antitrust Litig.*
    618 F.3d 300 (3d Cir. 2010) .................................................................. 14, 16

*In re Ins. Brokerage Antitrust Litig.*,
    No. 04-5184, 2006 U.S. Dist. LEXIS 73055 (D.N.J., Oct. 3, 2006) .......... 32

*In re K-Dur Antitrust Litig.*
    338 F. Supp. 2d 517 (D.N.J. 2004) ........................................................... 27

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*
    No. 07-01891, 2008 U.S. Dist. LEXIS 111722 (C.D. Cal. June 25, 2008)   33

*In re Linerboard Antitrust Litig.*,
    No. 1261 2000 U.S. Dist. LEXIS 14433 (E.D. Pa. Oct. 4, 2000) ............... 67

*In re Lower Lake Erie Iron Ore Litig.*
    No. 84-2722, 1987 U.S. Dist. LEXIS 2932 (E.D. Pa. Apr. 13, 1987) ........ 69

*In re Lower Lake Erie Iron Ore Antitrust Litig.*
    998 F.2d 1144 (3d Cir. 1993) ......................................................50, 51, 67, 74

*In re Magnesium Oxide Antitrust Litig.*
    No. 10-5943, 2011 U.S. Dist. LEXIS 121373 (D.N.J. Oct. 20, 2011).. 16, 17, 49 81

*In re Magnesium Oxide Antitrust Litig.*
    No. 10-5943, 2012 U.S. Dist. LEXIS 48427 (D.N.J. April 5, 2012)  .... 70, 71

*In re Magnetic Audiotape Antitrust Litig.*
    No. 99-1580, 2002 U.S. Dist. LEXIS 8366 (S.D.N.Y. May 9, 2002) ........ 26

*In re Mercedes-Benz Antitrust Litig.*
    157 F. Supp. 2d 355 (D.N.J. 2001) ...................................... 26, 70, 71, 73, 74

*In re Mercedes-Benz Tele Aid Contract Litig.*
    267 F.R.D. 113 (D.N.J. 2010) ................................................................... 61

x

*In re Municipal Derivatives Antitrust Litig.*

    700 F. Supp. 2d 378 (S.D.N.Y. 2010) ................................. 23, 28, 31, 33, 39

*In re Neurontin Antitrust Litig.*

    2009 U.S. Dist. Lexis 77475 (D.N.J. Aug 28, 2009) .................................. 17

*In re New Jersey Title Insurance Litig.*

    683 F.3d 451 (3d Cir. 2012) ....................................................................... 79

*In re OSB Antitrust Litig.*

    No. 06-826, 2007 U.S. Dist. LEXIS 56617(E.D. Pa. Aug. 3, 2007) ..... 16, 30

*In re Packaged Ice Antitrust Litig.*

    723 F. Supp. 2d 987 (E.D. Mich. 2010) ................................................ 16, 25

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*

    764 F. Supp. 2d 991 (N.D. Ill. 2011) .......................................................... 16

*In re Pressure Sensitive Labelstock Antitrust Litig.*

    566 F. Supp. 2d 363 (M.D. Pa. 2008) ............................................. 16, 18, 30

*In re Processed Egg Prods. Antitrust Litig.*

    851 F. Supp. 2d 867 (E.D. Pa. 2012) ..................................................... 25, 57

*In re Processed Egg Prods. Antitrust Litig.*

    2011 U.S. Dist. LEXIS 139995 (E.D. Pa., Nov. 30, 2011) .......................... 71

*In re Rubber Chems. Antitrust Litig.*

    504 F. Supp. 2d 777 (N.D. Cal. 2007) ........................................................ 27

*In re Static Random Access Memory Antitrust Litig.*

    580 F. Supp. 2d 896 (N.D. Cal. 2008) ........................................................ 28

*In re Southeastern Milk Antitrust Litig.*

    555 F. Supp. 2d 934 (E.D. Tenn. 2008) ................................................ 25, 30

*In re Vitamins Antitrust Litig.*

    No. Misc. No. 99-197 (TFH), 2000 U.S. Dist. LEXIS 7397

    (D.D.C. May 9, 2000)................................................................................. 26

*Jeselsohn, Inc. v. Atlantic City*

    70 N.J. 238 (1976) ..................................................................................... 61

*Kahn v. Twp. of Moorestown*

243 N.J. Super. 328 (Ch. Div. 1990) ........................................................... 55

*Keogh v. Chicago & N. W. Ry. Co.*
   260 U.S. 156, 163 (1922) ..................................................................... 76

*Klehr v. A.O. Smith Corp.*
   521 U.S. 179 (1997) .................................................................... 67, 75

*Lum v. Bank of America*
   361 F.3d 217 (3d Cir. 2004) ............................................................ 23, 38

*Maislin Industries, U.S. Inc. v. Primary Steel, Inc.*
   497 U.S. 116 (1990) ............................................................................. 77

*Matrixx Initiatives, Inc. v. Siracusano*
   131 S. Ct. 1309 (2011) ........................................................................ 15

*Meijer, Inc. v. 3M*
   No. 04-5871, 2006 U.S. Dist. LEXIS 56744 (E.D. Pa. July 13, 2005) ....... 67

*Merewood, Inc. v. Denshaw*
   139 N.J. Eq. 182 (Ch. 1947) ............................................................... 57

*Metric Inv., Inc., v. Patterson*
   101 N.J. Super. 301 (App. Div. 1968) .................................................. 60

*Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*
   331 F.3d 406 (3d Cir. 2003) ................................................................ 62

*Novell, Inc. v. Microsoft Corp.*
   505 F.3d 302 (4th Cir. 2007) ............................................................... 52

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*
   394 U.S. 700 (1969) ............................................................................. 16

*Pension Benefit Guar. Corp. v. White Consol. Indus.*
   998 F.2d 1192 (3d Cir. 1993) .............................................................. 44

*Phillips v. Cnty. of Allegheny*
   575 F.3d 224 (3d Cir. 2008) ................................................................ 18

*Powell v. McCormack*
   395 U.S. 486 (1969) ............................................................................. 80

xii

*Robinson v. Johnson*
    313 F.3d 128 (3d Cir. 2002) ....................................................................... 67

*Sec. Servs., Inc. v. Kmart Corp.*
    511 U.S. 431 (1994) ................................................................................. 78

*Shaw v. Hous. Auth. of Camden*
    No. 11-4291, 2012 U.S. Dist. LEXIS 112655 (D.N.J. Aug 10, 2012) ........ 28

*Sigmapharm, Inc. v. Mutual Pharm. Co.*
    454 Fed. Appx. 64 (3d Cir. 2011) ............................................................. 54

*Simon v. Deptford Twp.*
    272 N.J. Super. 21 (App. Div. 1994) ......................................................... 56

*Smajlaj v. Campbell Soup Co.*
    782 F. Supp. 2d 84 (D.N.J. 2011) .............................................................. 70

*Starr v. Sony BMG Music Entm't*
    592 F.3d 314 (2d Cir. 2010) ........................................................ 16, 25, 33

*State Capital Title & Abstract Co. v. Pappas Bus. Servs., LLC*
    646 F. Supp. 2d 668 (D.N.J. 2009) ............................................................ 46

*State of N.Y. v. Hendrickson Bros., Inc.*
    840 F.2d 1065 (2d Cir.1988) ..................................................................... 72

*Sunset Financial Res., Inc. v. Redevelopment Group V, LLC*
    417 F. Supp. 2d 632 (D.N.J. 2006) ............................................................ 70

*Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*
    530 F.3d 204 (3d Cir. 2008) ...................................................................... 16

*United States Steel Corp. v. Lumbermens Mut. Cas. Co.*
    No.02-2108, 2005 U.S. Dist. LEXIS 18705 (W.D. Pa. Aug. 31, 2005) ..... 77

*Utilimax.com, Inc. v. PPL Energy Plus, LLC*
    378 F.3d 303 (3d Cir. 2004) ...................................................................... 79

*US Wats, Inc., v. AT&T Co.*
    No. 93-1038, 1994 U.S. Dist. LEXIS 4074 (E.D. Pa. April 5,1994) ......... 77

*VRG Corp. v. GKN Realty  Corp.*
    135 N.J. 539 (1994) ................................................................................. 65

*Van Buskirk v. Care Canadian Mines, Ltd.*
    760 F.2d 481 (3d Cir. 1985) ....................................................................... 67

*Varsolona v. Breen Capital Servs. Corp.*
    360 N.J. Super. 292 (App. Div. 2003) ...................................................... 61

*Varsolona v. Breen Capital Servs. Corp.*
    180 N.J. 605 (2004) ..................................................................................... 63

*W. Penn. Allegheny Health Sys. Inc. v. UPMC*
    627 F.3d 85 (3d Cir. 2010) ........................................................... 21, 52, 53

*Wallach v. Eaton Corp.*
    814 F. Supp. 2d 428 (D. Del. 2011) .......................................................... 16

*Woodbridge v. Allen*
    43 N.J.L. 262 (E. & A. 1881) .................................................................... 57

*Zenith Radio Crop. v. Hazeltine Research, Inc.*
    401 U.S. 321 (1971) ..................................................................................... 67

## RULES

Fed. R. Civ. P. 8(a) .............................................................................................. 14

Fed. R. Civ. P. 9(b) ........................................................................... 21, 22, 23, 24

Fed. R. Civ. P. 15 ................................................................................................ 75

## STATUTES

N.J.S.A. 54:5-1 et seq. ("Tax Lien Law") ........................................................... 3

N.J.S.A. 54:5-32 ................................................................................................. 64

N.J.S.A. 54:5-52 ........................................................................ 4, 55, 56, 58, 60

N.J.S.A. 54:5-63.1 ............................................................................. 4, 62, 63, 64

N.J.S.A. 56:8-1 et seq. ("CFA") ....................................................................... 60

N.J.S.A. 56:9-15 ................................................................................................. 68

N.J.S.A. § 54:5-52 ............................................................................................. 57

15 U.S.C. § 16(a) (2006) .................................................................................... 34

15 U.S.C. § 16(i) (2006) .............................................................................. 68, 69

360986.1

## INTRODUCTORY STATEMENT

Eleven Defendants (and one additional individual) have pled guilty to violating section 1 of the Sherman Act.  As part of those pleas, those Defendants have admitted to the illegal bid-rigging scheme alleged in Plaintiffs' Consolidated Master Class Action Complaint ("Complaint" or "Compl.").  Eleven Defendants have also already entered into settlement agreements with Plaintiffs to resolve this matter providing monetary compensation as well as full cooperation against the non-settling Defendants.

The Defendants who now move to dismiss attended the very same auctions as those who have pled guilty and, as the Complaint details, participated in the same illegal scheme.  Indeed, while those Defendants who move to dismiss argue that the Complaint does not state "plausible" claims, based on what is alleged in the Complaint and the history of what has already occurred, it is the *moving Defendants'* contentions that are implausible.  As detailed herein, Defendants' numerous motions to dismiss, though lengthy, are without merit.  Plaintiffs respectfully submit that this Court should deny those motions in their entirety, and permit discovery to proceed.[1]

---

[1] Defendants filed seven largely duplicative motions to dismiss.  This brief responds to all but the motion to dismiss filed by Defendant MTAG Services, LLC [Dkt. 182], which raised unique successor liability issues and to which Plaintiffs respond separately.

1

## STATEMENT OF FACTS

**I.    Tax Lien Auctions in New Jersey Are Conducted Pursuant to the Tax Lien Law Which is Designed to Create a Competitive Bidding Process**

Each year, New Jersey municipalities hold tax lien auctions to recoup funds associated with delinquent property, water, and sewer taxes.  At these auctions, bidders pay for the right to purchase tax liens on properties where taxes or charges are owed.[2]  The municipality receives immediate payment of the outstanding lien, interest due, and, in some cases, a premium from the winning bidder.[3]  In return, the winning bidder receives a tax sale certificate ("TSC"), which evidences the lienholder's ownership of the lien.[4]

By purchasing the TSC, the winning bidder obtains benefits in excess of simply owning the lien.  Those benefits include the right to collect penalties ranging from 2 to 12%, interest on the delinquent tax obligation up to the statutory maximum of 18%, and the right to collect the delinquent tax obligation.  If the property owner is unable to redeem the lien after a certain period of time, the TSC

---

[2]    Compl., ¶ 3.

[3]    *Id*. ¶ 6.

[4]    *Id*.  A sample TSC is attached to the Defendants' March 8, 2013 Memorandum of Law in Support of the Defendants' Joint Motion to Dismiss [Dkt. 174-1] ("Omnibus Brief").

holder retains the right to foreclose on the property altogether.[5]  The lien enjoys priority over all other liens on the property, including mortgage liens.[6]

The New Jersey Tax Lien Law, N.J.S.A. 54:5-1 *et seq.* ("Tax Lien Law") is designed to foster competition at TSC auctions.  The fundamental objective of the Tax Lien Law is to provide property owners with as favorable an interest rate as possible on their delinquent obligation, increasing the odds that the property owner will be able to pay the costs associated with redeeming the lien.[7]  Bidding at an auction starts at the statutory maximum of 18% interest on its delinquent obligations.[8]  In a competitive bidding process, however, each successive bid lowers the interest rate, in some cases to 0% interest.[9]  Even with a winning bid of 0%, the purchase of a TSC remains valuable because the purchaser is entitled to priority on subsequent year tax liens and can institute foreclosure proceedings at the appropriate time.[10]

---

[5]   *Id.* ¶¶ 7, 144, 145.

[6]   *Id.* ¶ 138.

[7]   *Id.* ¶ 8.

[8]   *Id.* ¶ 143.

[9]   *Id.*

[10]   *Id.* ¶ 144.

## II.    The Parties

Plaintiffs are property owners who became delinquent in their municipal tax obligations, often because of financial hardship.[11]  Due to Defendants' anticompetitive activity, most of the interest rates associated with Plaintiffs' TSCs were at 18%, rather than a lower rate that would have prevailed had auctions at which their liens were sold been competitive.  Class members, like Plaintiff Son, Inc., were forced to redeem their TSCs, and thus clear their property of the lien, at an inflated cost as a result of Defendants' conspiracy.[12]

Defendants include large bank subsidiaries, publicly traded companies, limited liability companies, not-for-profit religious corporations, and savvy individual investors.[13]  All Defendants have been investigated by the U.S. Department of Justice, Antitrust Division ("DOJ") and face criminal charges in connection with the unlawful bid-rigging scheme alleged in this Complaint. Eleven of these Defendants have already pled guilty to those charges.[14]  Those Defendants who have not pled guilty, remain under investigation by the DOJ and may very well be criminally charged and/or are in the process of pleading.  The

---

[11]   *Id.* ¶ 10.

[12]   *Id.*; Compl., ¶ 144.

[13]   *Id.* ¶¶  28, 33, 34, 36, 37, 41, 47, 48, 49, 50, 52, 53, 60, 61, 67, 76, 77, 82, 86, 93, 95, 96, 100, 107, 112.

[14]   *Id.* ¶¶ 11, 180.

investigation remains active and as recently as April 25, 2013, the Department of

Justice obtained its twelfth guilty plea.[15]

### III.   The Defendants' Bid-Rigging Conspiracy Which Artificially Inflated Interest Rates Associated with Tax Liens

Beginning no later than January 1, 1998 and continuing through February

2009, Defendants engaged in a statewide conspiracy to eliminate competition by

rigging municipal tax lien auctions throughout New Jersey.  Defendants'

conspiracy included the systematic allocation of liens and an agreement to refrain

from bidding against each other.[16]  Prior to each auction, Defendants were able to

determine every lien up for bid because auction lists identifying the available

properties are published 30 days before the auction.[17]  With this information,

Defendants then would meet and/or communicate in advance of each auction to

discuss the available liens and agree to an allocation amongst themselves.[18]

---

[15]   *New Jersey Investor Pleads Guilty for Role in Bid-Rigging Scheme at Municipal Tax Lien*, DEPARTMENT OF JUSTICE, (Apr. 25, 2013), Auctionshttp://www.justice.gov/atr/public/press_releases/2013/296272.htm.

[16]   Compl., ¶ 147.

[17]   *Id.* ¶ 148.

[18]   *Id.* ¶ 149.

360986.1

## 1. Defendants Systematically Rigged Bids Before and During Auctions.

The Sass Defendants and the Crusader Defendants,[19] the two largest lien purchasers in New Jersey, often organized other Defendant bidders and coordinated the process by which Defendants decided which conspirator would win which liens.[20] Before each auction, Defendants had conversations to allocate liens and otherwise discuss the conspiracy on the telephone, in person outside the building where the auction was set to take place, and elsewhere.[21]

Once bidding started, the Defendant assigned a particular lien pursuant to the conspiracy would bid for that lien, while other Defendants refrained from bidding.[22] With no competing bids, the pre-ordained Defendant would "win" the auction.[23] Some participants referred to this process as "round robin" bidding, as Defendants took turns bidding on different TSCs previously allocated pursuant to the cartel.[24]

Since any cheating on the cartel by bidding against the pre-destined "winner" would have been evident to the other conspirators, deviations from the

---

[19]   The "Crusader Defendants" shall refer collectively to Defendants Royal Bancshares of Pennsylvania, Inc., Royal Bank America, Crusader Servicing Corporation, and Royal Tax Lien Services, LLC.

[20]   *Id.* ¶ 149.

[21]   *Id*.

[22]   *Id.*

[23]   *Id*.

[24]   *Id.* ¶ 150.

conspiracy rarely, if ever, occurred.[25]  To ensure that conspirators were bidding on – and "winning" – the same liens that were assigned pursuant to the conspiracy, Defendants documented the conspiracy by making contemporaneous notes in "bid books" as the auction unfolded.[26]

### 2.  Both Large and Small Cartel Participants Conspired to Rig Bids.

Every Defendant participated in municipal tax lien auctions in New Jersey during the Class Period, but larger institutional investors such as the Sass Defendants, the Crusader Defendants, Plymouth Park Tax Services, LLC ("Plymouth Park"), the BankAtlantic Defendants,[27] and American Tax Funding, LLC ("ATF") played leading roles in organizing and concealing the conspiracy.[28] Those larger Defendants would first select among themselves the liens that they would each "win" at a given auction.[29]  They would pass that information along to smaller cartel participants, who would then allocate the remaining liens among themselves.[30]

---

[25]  *Id.* ¶ 151.

[26]  *Id.*

[27]  The "BankAtlantic Defendants" shall refer collectively to Defendants BBX Capital Corporation f/k/a BankAtlantic Bancorp, Inc. and Fidelity Tax, LLC.

[28]  *Id.* ¶ 38, 63, 79.

[29]  *Id.* ¶ 156.

[30]  *Id.* ¶¶ 156, 157.

The smaller participants dubbed themselves the "breakfast club."[31]  In order to determine the order in which the members of the "breakfast club" would select the remaining available liens, they picked cards from a deck or drew lots, with the conspirator holding the lowest number getting first choice of his preferred TSC.[32]

When bidders who were not part of the conspiracy showed up at auctions, cartel participants would use intimidation and verbal threats to stop them from bidding on certain liens already allocated to members of the conspiracy.[33]  Several Defendants joined the conspiracy when they were invited by other Defendants to participate in the bid-rigging process rather than continue to bid competitively.[34]

### 3.  Trade Association Meetings Provided Additional Opportunities to Conspire.

Defendants also had the opportunity to conspire through meetings and symposiums offered by the National Tax Lien Association ("NTLA"), an organization that purports to advance the interests of the tax lien industry.[35] NTLA's leadership includes employees and executives of Defendants and Jim Meeks, the current president and CEO of Defendant Mooring, serves as its

---

[31]  *Id.* ¶ 156.

[32]  *Id.* ¶ 157.

[33]  *Id.* ¶ 160.

[34]  *Id.* ¶¶ 160, 161.

[35]  *Id.* ¶¶ 164, 165.

8

treasurer.[36]  NTLA typically holds a spring meeting, often in Miami, Florida.[37]  At this annual meeting, Defendants have attended sessions and have had the opportunity to, and did, conspire and share information about ways to rig bids at future auctions.[38]

### IV.  Specific Allegations of Defendants' Participation in the Conspiracy.

In paragraph 154 of the Complaint, Plaintiffs provide specific examples of how the conspiracy operated, describing Defendants' unlawful bid-rigging conduct in connection with seven auctions.  These exemplars, prior to the initiation of any discovery, cover different geographic areas of New Jersey, and reflect the cartel's operations at different points during the Class Period.  In each instance, all or most of the TSC's were auctioned off at the statutory maximum of 18% interest and all were "won" by the Defendant to whom that respective TSC was allocated pursuant to the conspiracy:

| Auction date/location | TSCs auctioned | Defendants participating | Participating defendants who pled guilty and/or settled with Plaintiffs |
|---|---|---|---|
| June 28, 2000 Lincoln Park | 15; all TSCs auctioned off at | Sass, Crusader, Phoenix Funding, | **Guilty pleas:** Rothman and Crusader; **Settled with** |

---

[36]  *Id.* ¶ 164.

[37]  *Id*. ¶ 165.

[38]  *Id.*

|  | 18% interest | Rothman | **Plaintiffs:** Rothman |
|---|---|---|---|
| June 28, 2006 Cherry Hill | All or most TSCs auctioned off at 18% interest | ATF, CCTS, Simon, Sass, Collins | **Guilty plea and settled with Plaintiffs:** Collins; and CCTS |
| December 20, 2006 Egg Harbor | All or most TSCs auctioned off at 18% | Mooring, Fountain of Life, Plymouth Park, May, Simon, ATF, Sass, Crusader, CCTS | **Guilty pleas:** CCTS, Fountain of Life, May, Crusader; **Settled with Plaintiffs:** CCTS, Fountain of Life, May |
| March 5, 2007 Newfield | 59; all TSCs auctioned off at 18% | Currently unknown | Currently unknown; The Department of Justice is investigating this auction, and has subpoenaed the Borough of Newfield for additional information. |
| June 6, 2007 Plumsted | All or most TSCs auctioned off at 18% | CCTS, Fountain of Life, Crusader, Collins and Sass; | **Guilty pleas:** Fountain of Life, Collins, CCTS, and Crusader; **Settled with Plaintiffs:** Fountain of Life, Collins, and CCTS |
| June 11, 2008 Somerdale | All TSCs auctioned off at 18% | CCTS I, Crusader, Sass, Plymouth, May | **Guilty pleas:** CCTS I, its principals, Defendants Farber and Butler, and related entities, May, Crusader; **Settled with Plaintiffs:** CCTS, and |

| | | | May |
|---|---|---|---|
| December 10, 2008<br><br>Maywood | All or most TSCs auctioned off at 18% | Crusader, Sass, CCTS, Rothman | **Guilty pleas:** CCTS, its principals, Defendants Farber and Butler, and related entities, Crusader and Rothman; **Settled with Plaintiffs**: CCTS, its principals, Defendants Farber and Butler, and related entities, and Rothman |

### V.      Conspirators Plead Guilty Following Extensive and Ongoing Department of Justice Investigation.

The first guilty pleas occurred in August 2011, when Defendants Collins, May, and Pisciotta – all of whom have since settled with Plaintiffs and agreed to provide full cooperation – admitted to their roles in the conspiracy, which included attending meetings and engaging in discussions regarding TSC bids, agreeing to allocate which TSCs each would bid on, submitting bids in accordance with the agreements reached, and purchasing TSCs pursuant to those agreements.[39]  Early in 2012, Defendants Farber, Stein, Rothman, Hruby, Butler and DSBD also pled guilty to violating the Sherman Act by engaging in the same unlawful conduct as

---

[39]  *Id*. ¶¶ 170-172.

Collins, May and Pisciotta.[40]  Farber, Butler, DSBD, and Rothman have also

settled with Plaintiffs and agreed to cooperate.

Defendant Crusader pled guilty in September 2012, and Defendant Mercer,

S.M.E., Inc. pleaded guilty on December 19, 2012.[41]  It has been publicly disclosed

that grand jury subpoenas related to the DOJ's criminal investigation have been

received by the Sass Defendants, Plymouth Park, Mooring, and the Crusader

Defendants.[42]  Further, the BankAtlantic Defendants, Phoenix, ATF, and Simon,

have also been subpoenaed by the grand jury.  The criminal investigation is

ongoing, and additional indictments and guilty pleas are expected.[43]

## ARGUMENT

## DEFENDANTS' MOTIONS TO DISMISS SHOULD BE DENIED

### I.  Plaintiffs' Federal and State Antitrust Claims Easily Meet the Relevant Pleading Standards

As the Complaint details, eleven Defendants have plead guilty and admitted

to participating in the very conduct alleged in the Complaint.  Thus, Plaintiffs have

not only alleged a "plausible" conspiracy – they have alleged a conspiracy that

*actually happened* and has been admitted to.  Those that have not yet admitted

---

[40]  *Id*. ¶¶ 173-178.

[41]  *Id*. ¶¶ 179-180.

[42]  *Id*. ¶¶ 89, 181.

[43]  *Id*. ¶ 166.

their role in the conspiracy attended the very same auctions that those who pled guilty attended and admitted to rigging. They have also been subpoenaed by the federal grand jury, which continues to actively investigate this case, and those Defendants may ultimately be charged and plead guilty.

The Complaint more than adequately apprises each Defendant of what Plaintiffs' claim is and the grounds upon which it rests. Nothing more is required. Therefore, Defendants' motions should be denied.

In the face of these stark allegations of conspiracy, Defendants – largely by cobbling together citations to numerous quotes taken out of context from cases outside this Circuit involving inapposite factual situations – are left to argue for an incorrect pleading standard that would guarantee virtually no antitrust complaint could withstand a motion to dismiss. Because the Defendants have failed to provide the Court with the appropriate pleading standards to be used in evaluating their motions to dismiss, Plaintiffs do so here.

### A. The Pleading Standards That Apply to Plaintiffs' Antitrust Claims

As the Supreme Court emphasized in *Bell Atlantic Corp. v. Twombly,*[44] Rule 8 of the Federal Rules of Civil Procedure prescribes the appropriate pleading standard when evaluating motions to dismiss antitrust claims. Under Rule 8(a),

---

[44]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

"[a] pleading that states a claim for relief must contain: a short and plain statement of the claim showing that the pleader is entitled to relief."[45]

Post-*Twombly*, courts, including those in this Circuit, have made clear that Rule 8(a)(2) merely requires that the complaint give "fair notice of what the . . . claim is and the grounds upon which it rests."[46]  The touchstone of Rule 8(a)(2) remains whether a complaint puts defendants on "fair notice" of plaintiffs' claim.[47] On a motion to dismiss, defendants bear the burden of showing that *no* claim has been presented.[48]

Contrary to Defendants' characterizations of *Twombly* as setting a high bar, *Twombly* explained that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does *not need* detailed factual allegations."[49]  The factual allegations must simply "be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in

---

[45]   Fed. R. Civ. P. 8(a).

[46]   *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (quoting *Twombly*, 550 U.S. at 555).

[47]   *Ins. Brokerage Antitrust Litig.*, 618 F.3d at 320 n.18.

[48]   *In re Ductile Iron Pipe Fittings Direct Purchaser Antitrust Litig.*, No. 12-711, 2013 U.S. Dist. LEXIS 29865, at *17 (D.N.J. Mar. 5, 2013) (citing *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005)).

[49]   *Twombly*, 550 U.S. at 555 (emphasis added).

14

fact)."[50]  The Supreme Court has made clear that, "we do not require heightened fact pleading of specifics," and instead the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."[51]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[52]  As the Supreme Court explained in *Twombly*:

> Asking for plausible grounds to infer an agreement *does not impose a probability requirement at the pleading stage*; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.  And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'[53]

Determining whether a complaint states a "plausible" claim for relief is a context-specific task for which the court is to draw on its judicial experience and common sense.[54]

With regard to claims under section one of the Sherman Act, a plaintiff must properly allege that a defendant was a party to a contract, combination or

---

51    *Id*. at 570 (plaintiffs must "nudge[ ]" their claims across the line from "conceivable to plausible").

52    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009); *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011).

53    *Twombly*, 550 U.S. at 556 (emphasis added) (citation omitted).

54    *Iqbal*, 129 S. Ct. at 1949.

conspiracy.[55]  Courts have interpreted these terms to require plaintiffs to allege "some form of concerted action,"[56] in other words, a "'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme.'"[57]  To establish the conspiracy, it is not necessary that such a combination be established by direct proof of oral or written agreements; it may be proven by inferences drawn from circumstantial evidence, including the acts and conduct of the alleged conspirators.[58]

Since *Twombly* was decided, numerous district courts, including several courts in this District, have applied its holding and rejected motions to dismiss antitrust complaints.[59]  As these cases have recognized, *Twombly* does not require

---

[55]  *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008).

[56]  *Ins. Brokerage*, 618 F.3d at 315 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999)) (internal quotation marks omitted).

[57]  *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

[58]  *See Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 704 (1969).

[59]  *See, e.g.*, *Anderson News, L.L.C.* v. *Am. Media, Inc.,* 680 F.3d 162 (2d. Cir. 2012); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010); *Ductile Iron Pipe Fittings*, 2013 U.S. Dist. LEXIS 29865; *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 U.S. Dist. LEXIS 121373 (D.N.J. Oct. 20, 2011); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012); *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428 (D. Del. 2011); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011); *In re Blood Reagents Antirust Litig.*, 756 F. Supp. 2d 623 (E.D. Pa. 2010); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010); *In re Chocolate*

16

plaintiffs to do the impossible and plead the complaint as if they were actual

observers of the conspiracy or were present whenever defendants met to facilitate

the conspiracy.[60]   Finally, in antitrust cases, where the proof is largely in the hands

in the conspirators, dismissal should be granted sparingly.[61]

On a motion to dismiss an antitrust case such as this one, a court is required

to adhere to three principles (each of which is further discussed *infra*) in evaluating

an antitrust complaint:

---

*Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538 (M.D. Pa. 2009); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363 (M.D. Pa. 2008); *In re OSB Antitrust Litig.*, No. 06-826, 2007 U.S. Dist. LEXIS 56617(E.D. Pa. Aug. 3, 2007); *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F. Supp. 2d 575 (E.D. Pa. 2008).

[60]   *See In re Graphics Processing Units Antitrust Litig*, 527 F. Supp. 2d  1011, 1028 (N.D. Cal. 2007); *Magnesium Oxide Antitrust Litig.*, 2011 U.S. Dist. LEXIS 121373, at *46 ("Requiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden because 'in antitrust cases, [] the proof is largely in the hands of the alleged conspirators'") (quoting *In re Neurontin Antitrust Litig.*, No. 02-13902009 U.S. Dist. LEXIS 77475, at *35-36 (D.N.J. Aug. 28, 2009)).

[61]   *See, e.g.*, *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976); *In re Neurontin Antitrust Litig.*, 2009 U.S. Dist. Lexis 77475, at *35-36 (D.N.J. Aug 28, 2009) ("The liberal approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all details and specific facts cannot properly be set forth as part of the pleadings."); *In re Hypodermic Products Antitrust Litig.*, No. 1730, 2007 U.S. Dist. LEXIS 47438, *42 (D.N.J. June 29, 2007) (Court upholds complaint as providing Defendant with adequate notice of the particular grounds upon which Plaintiffs' claims rest, particularly given the fact that Plaintiffs have not yet had the benefit of discovery).

- All well pleaded allegations must be accepted as true and any inferences must be drawn in plaintiffs' favor.[62]

- Unless the underlying antitrust claim "sounds in fraud," the heightened pleading requirements of Rule 9(b) do not apply.[63]

- When evaluating the sufficiency of a complaint, the complaint must be examined as a whole and not dismembered.[64]

Under the foregoing proper pleading standards and principles, the Complaint provides the Defendants "fair notice of what the . . . claim is and the grounds upon which it rests."[65] Defendants have not met their burden to demonstrate otherwise.

1.    **The Complaint Gives Fair Notice to the Defendants of What the Plaintiffs' Antitrust Claims Are and The Grounds Upon Which They Rest**

The Complaint alleges that 14 Defendants[66] participated in a statewide scheme to rig public auctions for TSCs during the period from at least 1998 through February 2009. The Complaint identifies, among other things:

---

[62]  *See, e.g.*, *Phillips v. Cnty. of Allegheny,* 575 F.3d 224, 228 (3d Cir. 2008); *Magnesium Oxide*, 2011 U.S. Dist. LEXIS 121373, at *12,13

[63]  *See, e.g.*, *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 317 (3d Cir. 2007).

[64]  *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d at 373.

[65]  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam).

[66]  Defendants try to portray Plaintiffs as alleging an extremely complicated conspiracy involving as many as forty eight defendants. That representation is disingenuous. While there are forty eight Defendants named in the Complaint, there are only fourteen *groups* of Defendants, many of whom used various entities and individuals while participating in the scheme. For example, there are eleven

- the conspirators (*i.e.*, Defendants), as well as the individuals from each of the Defendants who participated in the conspiracy.[67]

- the auction process in New Jersey, and the object of the conspiracy – to allocate tax liens at tax lien auctions in order to keep the interest rate levels associated with tax liens artificially inflated to the benefit of Defendants and the detriment of Plaintiffs.[68]

- specific mechanics of how the conspiracy operated, including how Defendants obtained information about each auction in advance from vendors who supply that information, and how Defendants used that information to create and maintain "bid books" in which they documented the conspiracy by recording which TSCs each Defendant was allocated pursuant to the conspiracy.[69]

- how Defendants would determine the order in which they would "pick" tax liens at an auction by selecting a card from a deck or drawing lots.[70]

- detailed information concerning certain specific auctions that were rigged, and the identities of those Defendants who participated in those bid-rigged auctions.[71]  Those representative auctions involve every Defendant named in the Complaint, with one exception.[72]

---

related Sass Defendants (*see* Compl., ¶¶ 67-77).  Besides, of the fourteen groups of Defendants, six of those defendant groups have already settled, leaving only eight groups of Defendants at this time.

[67]  Compl., ¶¶ 28-131.

[68]  *Id.* ¶¶ 136-147.

[69]  *Id.* ¶¶ 148-151.

[70]  *Id.* ¶ 157.

[71]  *Id.* ¶¶ 154(a)-(g).

[72]  The BankAtlantic Defendants note that the representative auctions listed at ¶ 154(a)-(g) of the Complaint do not identify them.  This is of little substantive import, however, because the BankAtlantic Defendants indeed attended that auction and acquired liens pursuant to the conspiracy there.  Plaintiffs do not believe that this inadvertent omission renders the allegations against the

- catalogues the guilty pleas that have been entered by 11 Defendants in which they admit to participating in the conspiracy. In each and every one of these guilty pleas, the pleading Defendant admitted to participating, "in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey."[73]

Thus, the Complaint is not simply a "threadbare recital" of the elements of Plaintiffs' antitrust claims. The Complaint contains "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*.[74]

Although the Defendants claim that Plaintiffs' allegations are insufficient, nowhere in their extensive briefs do they actually assert that they lack an understanding of the allegations against them, nor would such an assertion hold any weight. Most of the Defendants are small operations, in some cases, sole proprietorships. Even the larger Defendants' operations with regard to the New Jersey TSC market are small. Moreover, each Defendant has been subpoenaed by the Federal grand jury investigating the allegations made in the Complaint. They

---

BankAtlantic defendants insufficient. If the Court determined that the allegations were insufficient, however, Plaintiffs would seek to leave to amend to add the BankAtlantic Defendants to the December 2006 Egg Harbor Township auction, as well as other auctions in which they participated in the illegal conduct.

[73]  Compl., ¶¶ 166-180.

[74]  *Twombly*, 550 U.S. at 556.

likely have already conducted a full investigation and gathered and produced relevant documents to the grand jury.  All Defendants know what is going on here.

The Defendants' arguments in the Omnibus Brief towards the sufficiency of the Plaintiffs' antitrust claims can generally be categorized as follows: 1) Plaintiffs do not satisfy the "heightened pleading requirements" of Fed. R. Civ. P. 9(b); 2) Plaintiffs do not differentiate between Defendants and/or sufficiently allege how each Defendant participated in the conspiracy; 3) There are insufficient allegations as to Plaintiffs; 4) Plaintiffs fail to allege a single conspiracy; and 5) Plaintiffs reference to guilty pleas "do not rescue their pleading defects."  As further explained *infra*, each of these arguments is without merit.

## 2.   <u>Plaintiffs Need Not Satisfy Rule 9(b)</u>

Any assertion that the Plaintiffs' *antitrust* allegations must meet the heightened pleading requirements of Rule 9(b) should be rejected.  *Twombly* itself held that there are no heightened pleading requirements in antitrust cases.[75]  In *West Penn Allegheny Health System, Inc. v. UPMC, et al.*,[76] the Third Circuit likewise reversed a district court's holding that "judges presiding over antitrust and other complex cases must act as 'gatekeepers,' and must subject pleadings in such cases to heightened scrutiny," finding it "squarely at odds with Supreme Court

---

[75]   Twombly, 550 U.S. at 570.

[76]   *W. Penn Allegheny Health Sys., Inc., v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

21

precedent."[77]  Thus, the heightened pleading standards of Rule 9(b) do not apply to Plaintiffs' antitrust claims.

Defendants' argument that heightened pleading standards apply because Plaintiffs allege "fraudulent concealment" to toll the statute of limitations, or because Plaintiffs allege a cause of action under the New Jersey Tax Lien Law which "sounds in fraud" is also unavailing.  Fraudulent concealment is an equitable doctrine that simply acts to toll applicable statutes of limitations.  *See infra* at 68-74.  In no way is it part of Plaintiffs' substantive antitrust claim.  Further, Plaintiffs do not allege any fraudulent conduct underlying or forming the basis of their antitrust claims.

The mere fact that Plaintiffs made a separate claim under the New Jersey Tax Lien Law does not transform the antitrust claim from one that does not sound in fraud, to one that does.  The Court must make the specific determination as to whether the antitrust claim "sounds in fraud."[78]  Rule 9(b) does not apply to the antitrust claims simply because of the existence of a separate and distinct fraud-based claim.  The fraudulent elements of Plaintiffs' Tax Lien Law claims are not

---

[77]   *Id.*; *see also Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 317 (3d Cir. 2007) ("Antitrust claims, at least those not akin to fraud, . . . are subject to the notice-pleading standard of Federal Rule of Civil Procedure 8(a)(2), which requires only 'a short and plain statement of the claim showing the pleader is entitled to relief.'").

[78]   *See CarOne LLC v. Burris*, 2011 U.S. Dist. LEXIS 695594, at *26-27 (D.N.J. June 25, 2011).

22

part of Plaintiffs' antitrust claims and the viability of the antitrust claims in *no* way depends on those elements.  Plaintiffs' antitrust claims do not remotely "sound in fraud" and therefore, Plaintiffs need not meet the requirements of Rule 9(b).[79]

Defendants' cited Rule 9(b) cases – *Lum v. Bank of America, et al.*,[80] *Animal Science Products, Inc., v. China National Metals & Minerals Import & Export Corp., et al.*,[81] and *In re Advanta Corp. Securities Litig.*,[82] – are all distinguishable. *Lum*, held that that in general, antitrust cases are not subject to heightened pleading requirements, but the antitrust allegations in that case, which were actually based on *misrepresentations* made by defendants, were subject to Rule 9(b) because "defendants carried out their antitrust conspiracy through fraud."[83]  *Advanta*, a securities fraud case, likewise applied Rule 9(b) to allegations that were based on actual fraudulent misrepresentation or omission.[84]

While the Court in *Animal Science Products, Inc.* appears to have required the plaintiffs to meet the pleading standards of Rule 9(b), the case is

---

[79]   *See In re Municipal Derivatives Antitrust Litig.*,700 F. Supp. 2d 378, 391-92 (S.D.N.Y. 2010) (rejecting defendants' attempt to impose heightened pleading requirements on plaintiffs' bid-rigging antitrust allegations as plaintiffs' allegations did not sound in fraud).

[80]   *Lum v. Bank of America*, 361 F.3d 217 (3d Cir. 2004).

[81]   *Animal Sci. Prods., Inc., v. China Nat'l Metals & Minerals Imp. & Exp. Corp.*, 596 F. Supp. 2d 842 (D.N.J. 2008).

[82]   *In re Advanta Corp. Securities Litig.*, 180 F.3d 525 (3d Cir. 1999).

[83]   *Id.* at 228.

[84]   *Id.* at 530-31.

distinguishable in that the Court found that the prices that the defendants communicated to plaintiffs, and the defendants' failure to inform plaintiffs that such prices were the product of a conspiracy, was akin to fraud.[85]  No such allegations are present here.  Plaintiffs allege that the interest rates associated with their TSCs were artificially high because of Defendants' illegal behavior at auctions.  Moreover, to the extent not distinguishable, the case is an outlier inconsistent with the holdings of a myriad of courts both before and after. Plaintiffs are not aware of any other case in which a Court imposed Rule 9(b)'s heightened pleading requirements on their substantive antitrust allegations, where the equitable tolling doctrine of fraudulent concealment is also included in a complaint.[86]  Indeed, all cases of which Plaintiffs are aware hold the opposite.  *See supra*.

In any event, given the detailed allegations in the Complaint, Defendants' insistence on applying the wrong standard is of little moment because the Complaint meets the Rule 9(b) standards that Courts have articulated in any case that could be described as an analogous situation.  To satisfy Rule 9(b), a complaint "may either describe 'the circumstances of the alleged fraud with precise allegations of date, time, or place' or may use 'some [other] means of injecting

---

[85]  *Animal Sci. Prods.*, 596 F. Supp. 2d at 878-79.

[86]  Plaintiffs separately address the issue of whether Rule 9(b) applies to their allegations specifically concerning fraudulent concealment *infra* at 57.

precision and some measure of substantiation into their allegations of fraud."[87]
Further, courts "should . . . apply the rule with some flexibility and should not
require plaintiffs to plead issues that may have been concealed by the defendants . .
. Accordingly the particularity rule is somewhat relaxed when key factual
information remains within the defendant's control."[88]  For the reasons set forth
above, Plaintiffs have adequately met this standard.

### 3.   The Complaint Adequately Alleges that Each Defendant Joined the Conspiracy and Played Some Role in It

In a disguised attempt to improperly dismember the Complaint, Defendants
complain that the Complaint does not adequately allege that each Defendant
participated in the conspiracy and the role played by each.  As described *supra* at
16-18, however, *Twombly* and its progeny do not require that level of specificity at
the pleading stage.[89]

Because Plaintiffs are not required to offer every detail of every
conspiratorial meeting, the argument that Defendants should be exempt from

---

[87]   *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 880 (E.D.
Pa. 2012).

[88]   *Id.*

[89]   *See Twombly*, 550 U.S. at 570; *Starr*, 592 F.3d at 325  (rejecting defendant's
assertion that *Twombly* requires plaintiffs to specifically identify the person, time
and place in connection with the conspiracy), *cert. denied*, __ U.S. __, 131 S. Ct.
901 (2011); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d at 1007 (plaintiffs
need not answer all questions of who, what, when and where with respect to each
conspiratorial meeting); *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d
934, 943-44 (E.D. Tenn. 2008).

liability because the Complaint does not mention their names often enough should be rejected.[90]

The fact that the some Defendants may have participated in the conspiracy longer than others, or played larger or less extensive roles, does not render the conspiracy any less plausible and does not absolve such Defendant of liability. It is not necessary that each member of the conspiracy participate in "every detail in the execution of the conspiracy … to establish liability, for each conspirator may

---

[90] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (stating that courts "do not require" plaintiffs in complex antitrust actions "to plead detailed, defendant-by-defendant allegations."). *See also Ice Cream Liquidation Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 278 (D. Conn. 2003) (plaintiffs not required to "specify individual acts of each defendant" where the complaint identified the co-conspirators and described nature and effect of conspiracy); *In re Magnetic Audiotape Antitrust Litig.*, No. 99-1580, 2002 U.S. Dist. LEXIS 8366, at *14-15 (S.D.N.Y. May 9, 2002) ("[R]eviewing the claim against [the moving defendants] in the Amended Complaint as a whole as the Court is required to do, and not, as defendants would like, on the one specific allegation mentioning those defendants, the Court concludes that plaintiffs have sufficiently alleged that [the moving defendants] were participants in the price-fixing conspiracy.") (internal citation omitted); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 375 (D.N.J. 2001) ("The short answer is that plaintiffs have alleged that all of the named defendants were participants in the conspiracy" and whether a "particular defendant may or may not have joined in a specific overt act in furtherance of the conspiracy, such as attending a meeting, does not affect its status as a conspirator."); *In re Vitamins Antitrust Litig., No. Misc. No. 99-197 (TFH), 2000 U.S. Dist. LEXIS 7397, at *53 (D.D.C. May 9, 2000) ("[A]n overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits") (citation omitted).*

be performing different tasks to bring about the desired result."[91]  Furthermore, even if a Defendant participated in the conspiracy for a longer or shorter time than others, once it made the decision to join the conspiracy, it became liable for the entire conspiracy.[92]

In post-*Twombly* antitrust cases, district courts have repeatedly rejected the "defendant-by-defendant allegation" arguments Defendants make here.  For example, in *In re TFT-LCD (Flat Panel) Antitrust Litig.*,[93] the court rejected defendants' argument that the complaint was insufficient because it did not differentiate between related corporate entities and lumped 26 named defendants together simply as "defendants" and also referred to them by country and corporate family.  The court held that in large, complex antitrust cases where evidence is

---

[91]   *Beltz Travel Serv., Inc. v. Int'l. Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("If Beltz can establish the existence of a conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy, appellees will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of appellees' own actions."); *see In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007) (allegations of defendant's involvement in agreement to implement price increases and other allegation of general participation in alleged conspiracy were sufficient to state an antitrust claim).

[92]   *See, e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy.").

[93]   *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009).

largely in the hands of the conspirators, *Twombly* does not require elaborate fact pleading.[94]

Defendants' arguments here also mirror the argument nearly a dozen defendants advanced in *In re Static Random Access Memory (SRAM) Antitrust Litig.*[95]  Once again the court rejected defendants' attempt to require the complaint to allege with particularity how each individual defendant participated in the conspiracy.  "Defendants' arguments fail because they rely upon the standard for a motion for summary judgment … [plaintiffs] now only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy."[96]

Defendants' authority for the proposition that a complaint must detail, defendant by defendant, their precise role in the conspiracy is razor thin.  *Shaw v. Housing Authority of Camden*,[97] Defendants' primary authority, is a civil rights case brought against the Camden Housing Authority and several of its employees.

---

[94]  *Id.*

[95]  *In re Static Random Access Memory (SRAM) In re Static Random Access MemoryAntitrust Litig.*, 580 F. Supp. 2d 896 (N.D. Cal. 2008).

[96]  *Id.* at 904; *see also Municipal Derivatives Antitrust Litig.*,700 F. Supp. 2d at 395-96 ("Named Plaintiffs must make allegations, taken as true, supporting a plausible inference that Morgan Stanley participated in the alleged conspiracy.  To do this, Named Plaintiffs need not necessarily provide any particular details about conduct undertaken by Morgan Stanley in furtherance of the conspiracy.").

[97]  *Shaw v. Hous. Auth. of Camden*, No. 11-4291 , 2012 U.S. Dist. LEXIS 112655 (D.N.J. Aug 10, 2012).

The court granted the motion to dismiss of several individual employees who were listed only in the "parties" section of the complaint, and never mentioned again, finding that they were not on notice of the claims against them.[98]  In contrast, the Complaint here does not just list Defendants' names; it identifies, among other things, the nature of the conspiracy, each Defendant as having joined the conspiracy, and the employees of Defendants who participated in the conspiracy.

Defendant's argument that the Court should analyze whether there are sufficient allegations as to each Defendant, in addition to being incorrect, is nothing more than an attempt to improperly dismember the Complaint.  In antitrust conspiracy cases, a plaintiff's complaint is to be viewed as a whole, and allegations must not be viewed in isolation.  In *Continental Ore Co. v. Union Carbide & Carbon Corp.*,[99] in reversing a complaint's dismissal, the Supreme Court made this point clear:

> It is apparent from the foregoing that the Court of Appeals approached [plaintiff's] claims as if they were five completely separate and unrelated lawsuits.  We think this was improper.  In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.  The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.

---

[98]  *Id.* at *2.

[99]   *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 698-699 (1962).

The law remains that defendants may not compartmentalize allegations in a complaint alleging conspiracy.[100]

Viewing the Complaint as a whole, Plaintiffs have alleged that each Defendant joined the conspiracy and played some role in it. Nothing more is required of Plaintiffs at this stage.

### 4. At this Stage of the Proceedings Plaintiffs Are Not Required to Establish a Single Conspiracy Amongst Defendants

The Defendants argue that Plaintiffs have failed to allege either an overarching statewide conspiracy, or even a smaller conspiracy.[101] This is simply untrue. As fully discussed above, Plaintiffs' Complaint clearly alleges an overarching conspiracy to bid-rig throughout the State of New Jersey.

---

[100] *See e.g., In re OSB Antitrust Litig., No. Master File No. 06-826, 2007 U.S. Dist. LEXIS 56573, at \*13 (E.D. Pa. Aug. 3, 2007)* (holding that "an antitrust complaint should be viewed as a whole, and the plaintiff must allege that each individual defendant joined the conspiracy and played some role in it") (citing *Jung v. Ass'n of Am. Med. Colleges,* 300 F. Supp. 2d 119, 164 n.27 (D.D.C. 2004)) (plaintiff must plead that "an individual defendant was a participant in the conspiracy in the first instance," but "need not allege overt acts committed by each defendant in furtherance of a conspiracy")); *Southeastern Milk,* 555 F. Supp. 2d at 943-44 ("'[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quotation omitted); *Flat Glass,* 385 F.3d at 369 ("A court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence.") (citation omitted); *In re Blood Reagents Antitrust Litig.,* 2010 U.S. Dist. LEXIS, at \*11 (E.D. Pa. Aug. 23, 2010) ("[T]he allegations in the Complaint must be viewed as a whole"); *In re Pressure Sensitive Labelstock Antitrust Litig.,* 566 F. Supp. 2d 363, 373 (M.D. Pa. 2008) (rejecting "dismemberment" approach to assessing the sufficiency of a complaint).

[101] *See* Omnibus Brief, pp. 16-17.

Even if it did not, however, there is no requirement that, at this stage, Plaintiffs are required to set out and plead the precise contours of the conspiracy. The issue of whether there was a single overarching conspiracy here, or whether there were individual conspiracies, is an issue for the jury and cannot be resolved at the motion to dismiss stage before any discovery have been taken.  In *In re Copper Antitrust Litig.*,[102] the court rejected a motion to dismiss concluding that "[w]hether a conspiracy is single or multiple is a question of fact appropriately determined by a jury.  At this stage . . . plaintiff has met its burden . . . ."  At this stage of the proceedings, the Plaintiffs are required only to plead enough to *suggest* that there was a plausible conspiracy among the Defendants to engage in anticompetitive conduct, whether it be a single conspiracy or multiple conspiracies.

In *Hinds County, Miss. v. Wachovia Bank N.A.*,[103] a massive bid-rigging case, on a motion to dismiss the defendants made the precise argument being made by Defendants here – the plaintiffs "fail[ ]  to allege any facts showing a single conspiracy among all the defendants, or among any subset of defendants regarding the entire municipal derivatives industry."  In that case, more than 40 distinct corporate defendants were alleged to have engaged in a bid rigging scheme for

---

[102]   *In re Copper Antitrust Litig.*, 98 F.Supp. 2d 1039, 1055 (W.D. Wis. 2000).

[103]   *Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 391-92.

municipal investment contracts over an extended period of time.[104]   In response to

defendants' arguments that plaintiffs failed to allege a single conspiracy, or even

smaller conspiracies, the Court held that, "for pleading purposes, plaintiffs are not

required to prove the existence of an alleged industry-wide conspiracy . . . at this

stage, plaintiffs must plead only 'enough factual matter (taken as true) to suggest

that an agreement [to engage in anticompetitive conduct] was made.'"[105]   Finally,

the Court held that, "a complaint must adequately allege the plausible involvement

of each defendant and put defendants on notice of the claims against them, but it

need not be detailed with overt acts by each defendant."[106]

    Defendants' citation to *In re Ins. Brokerage Antitrust Litig.*,[107] is also

unavailing as it involved inapposite facts.  In *Ins. Brokerage*, plaintiffs alleged a

bid rigging conspiracy involving "more than a hundred defendants, other unnamed

brokers and insurers as well as 'other entities.'"[108]  The Court found that the

plaintiffs had pled, "no facts positively establishing collusion between the

members of the purported conspiracy . . . The only allegations of concerted activity

---

[104]   *Id.* at 385.

[105]   *Id.* at 394.

[106]   *Id.* (citing *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 556.)).

[107]   *In re Ins. Brokerage Antitrust Litig.*, No. 04-5184, 2006 U.S. Dist. LEXIS 73055 (D.N.J., Oct. 3, 2006).

[108]   *Id.* at *77.

are Plaintiffs' general assertions that the defendants have communicated and

shared information through various trade groups and conferences." *Id.* Thus, the

court found that plaintiffs simply did not adequately allege a plausible conspiracy

among over 100 different defendants. Unlike in *Ins. Brokerage*, (1) Plaintiffs do

allege a plausible conspiracy, and (2) many of the Defendants here have already

pled guilty and admitted to participating in the alleged conspiracy.

5.   **The existence of the Federal criminal investigation into the illegal activities alleged in the Complaint is Further Evidence of the Plausibility of the Plaintiffs' Allegations**.

The plausibility of the conspiracy allegations in this case is further supported

by the eleven (now twelve) guilty pleas in this case. Government *investigations*

into an antitrust conspiracy can properly be "used to bolster the plausibility of § 1

claims."[109] Here, there is more than simply an investigation: there are a dozen

guilty pleas in which the defendants have admitted to the conduct alleged in the

---

[109] *Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 394. *See also Blood Reagents*, 756 F. Supp. 2d at 628, 632 (government criminal investigation demonstrating "that the government believes a crime may have occurred," in combination with other allegations, raised "'a reasonable expectation that discovery will reveal evidence of illegal agreement'"); *Starr*, 592 F.3d at 324 (allegation of pending investigation by New York State Attorney General and two separate investigations by the Department of Justice, were part of context raising a plausible suggestion of illegal agreement); *In re Korean Air Lines Co., Ltd. Antitrust Litig.*, No. 07-01891, 2008 U.S. Dist. LEXIS 111722, at *33-34 (C.D. Cal. June 25, 2008) (citing ongoing investigation and one Defendant's guilty plea as evidence rendering allegations against other conspirators plausible).

Complaint.  Defendants' guilty pleas are *prima facie* evidence of their culpability in the alleged conspiracy.[110]

Thus, utilizing the proper pleading standards on a motion to dismiss, the Complaint adequately meets the relevant pleading standards embodied in Rule 8(a)(2) and the Defendants motion to dismiss the Complaint's antitrust counts should be denied.

## II.   The Separate Motions to Dismiss Should be Denied

In addition to the Defendants' joint motion to dismiss Plaintiffs' antitrust claims, certain defendants made additional motions to dismiss.  These motions repeat and rehash many of the same arguments addressed above.  Although separate motions to dismiss have been filed, in evaluating the allegations against these separate moving Defendants, the allegations against each Defendant must be examined in the context of the entire complaint, and not in isolation.  Viewing the Complaint as a whole, the Complaint alleges that each of the Defendants which have separately moved to dismiss, joined the conspiracy and played some role in it. Thus, for the reasons discussed above, and the further reasons discussed below, these motions should also be denied.[111]

---

[110]  *See* 15 U.S.C. § 16(a) (2006)).

[111]  In addition to the individual motions to dismiss addressed in this section, Defendants Crusader Servicing Corporation [Dkt. No. 187], Vinaya Jessani [Dkt. No. 177], Gary I. Branse and Michael Deluca [Dkt. No. 188] also filed individual motions to dismiss.  These motions merely incorporate by reference the arguments

34

## A.   <u>The Sass Defendants' Motion to Dismiss [Dkt. 178-1] Should be Denied</u>

The Sass Defendants[112] argue that Plaintiffs have not alleged how *each* of the Sass Defendants have injured *each* of the Plaintiffs and that Plaintiffs have failed to allege the precise role of *each* Sass Defendant in the conspiracy.  The Sass Defendants have not met their burden in showing *no* claim has been presented.[113] and the Complaint adequately puts the Sass Defendants on notice of the claims made against them.

During the Class Period, the Sass Defendants were one of the largest purchasers of tax liens in the country as well as in New Jersey.[114]  Since 1993, the Sass Defendants have purchased approximately $1.1 billion in tax liens, a large portion of which were New Jersey TSCs.[115]

Defendant Vinaya Jessani (who is under criminal investigation for his participation in the alleged conspiracy) was employed by Defendant M.D. Sass

---

addressed *supra*, for the reasons set forth herein, Plaintiffs also respectfully request these motions be denied.

[112] "Sass Defendants" refers collectively to Defendants M.D. Sass Investor Services, Inc.; M.D. Sass Tax Lien Management, LLC; M.D. Sass Municipal Finance Partners – I, L.P.; M.D. Sass Municipal Finance Partners – II, L.P.; M.D. Sass Municipal Finance Partners – III, LLC; M.D. Sass Municipal Finance Partners – IV, LLC; M.D. Sass Municipal Finance Partners – V, LLC; M.D. Sass Municipal Finance Partners – VI, LLC.

[113]   *Ductile Iron Pipe*, 2013 U.S. Dist. LEXIS 29865, at *17.

[114]   Compl., ¶ 67.

[115]   *Id*.

Investor Services, Inc. from approximately 1993 through July 16, 2010, at which point he was terminated for cause because of his participation in the conspiracy alleged in the Complaint.[116]  Defendant Stephen Hruby was an officer of Defendant M.D. Sass Investor Services, Inc., and was director of acquisitions of tax liens.[117]  In that capacity, Hruby oversaw, supervised, and directed the purchase of TSCs by M.D. Sass Investor Services, Inc.[118]  Hruby has pled guilty to participating in the conspiracy while director of acquisitions of tax liens of M.D. Sass Investor Services, Inc.[119]  Thus, of the two individuals primarily responsible for the M.D. Sass Investor Services, Inc.'s tax lien business in New Jersey during the Class Period, one has already pled guilty to participating in the alleged conspiracy, and the other is under investigation and is widely expected to be criminally charged.

Defendant M.D. Sass Tax Lien Management, LLC was formed in or around 1996 and was created by M.D. Sass Investor Services, Inc. to act as a general partner to acquire and/or manage the other Sass Funds that were formed to raise capital and acquire title to tax liens: M.D. Sass I, M.D. Sass II, M.D. Sass III, M.D. Sass IV, M.D. Sass V, and M.D. Sass VI (collectively the "Sass Funds").[120]  Each

---

[116]  *Id.* ¶ 76.

[117]  *Id.* ¶ 77.

[118]  *Id.*

[119]  *Id.* ¶¶ 77, 176.

[120]  *Id.* ¶ 68.

of the individual Sass Funds operated at different times during the Class Period, and purchased tax liens throughout New Jersey during the Class Period pursuant to the conspiracy alleged herein.

In addition to these general allegations concerning how the Sass Defendants operated in the acquisition of TSCs in New Jersey, the Complaint also contains specific allegations regarding Sass' participation in the conspiracy.  For example, "[d]efendants Sass and Crusader . . . often organized other Defendant bidders before each auction and coordinated the process by which Defendants decided which conspirator would win which lien or liens."[121]  Further, the Complaint contains six sample auctions where Plaintiffs have learned that the Sass Defendants purchased liens pursuant to the conspiracy.[122]  Finally, the Complaint describes the Sass Defendants' history of collusion at tax lien auctions.[123]  In a 2007 federal RICO action in Illinois, the Sass Defendants and two of its executives were found guilty on charges related to collusive tax lien auctions in Illinois from 2002 through 2007, and ordered to pay millions of dollars in damages.[124]  One of the Sass Defendants' executives sued in that action was Defendant Jessani.[125]

---

[121]    *Id*. ¶ 149.

[122]    *See Id.* ¶¶ 154(a)-(g).

[123]    *Id*. ¶¶ 182-186.

[124]    *Id*. ¶¶ 182-184, 186.

[125]    *Id*. ¶ 186.

Plaintiffs are not obligated to connect each of Plaintiffs' auctions to each of the M.D. Sass Defendants.  As further set forth *infra*, as to the Plaintiffs, they need only allege they were injured by Defendants' conduct.  As to the allegations against the Sass Defendants, they adequately put these Defendants on notice of the claims against them.  Nothing more is required now.  Thus, Plaintiffs' allegations regarding the Sass Defendants are more than sufficient.  The Sass Defendants' Motion to Dismiss should be denied its entirety.

Finally, the Sass Defendants improperly attempt to argue a factual issue on which no discovery has been taken.   The Sass Defendants argue that the involvement of M.D. Sass I and M.D. Sass III in the New Jersey tax liens market was limited by time and geographic scope, which is contrary to what is alleged in the Complaint.[126]  On a motion to dismiss, evaluation of the sufficiency of a Complaint is generally limited to the four corners of the complaint.[127]  And the four corners of the Complaint make clear that M.D. Sass I and M.D. Sass III joined the conspiracy and played some role in it.  Thus, the Court should disregard the Sass Defendants' arguments with regard to M.D. Sass I and M.D. Sass III.

**B.** **The Motion to Dismiss of ATF, the BankAtlantic Defendants, and Plymouth Park [Dkt. 173] Should be Denied**

---

[126]  Sass Br. at 5 n.2.

[127]  *Lum*, 361 F.3d at 222 n.3.

These Defendants pretend that Plaintiffs have sued them only because "several other defendants have pleaded guilty to bid rigging," and because Plaintiffs have a "hunch" that they did something wrong.[128]  These Defendants are wrong.

As detailed in the Complaint (which is based on information received from cooperating Defendants who have settled with Plaintiffs and other witnesses), these Defendants attended the very same auctions that several Defendants have already admitted to rigging, thus, it is simply not plausible that they did not participate in the alleged conspiracy.  Defendants seek to downplay these allegations as "indiscriminate."[129]  However, the allegations explain in detail the method by which the conspiracy was carried out and ATF's involvement.

Finally, while they have not yet been charged or plead guilty, each of these Defendants is under investigation by the U.S. DOJ for participating in the conspiracy.  Though the fact that they are under investigation does not in and of itself establish their guilt, it does "bolster the plausibility of § 1 claims."[130] Viewing the allegations against these Defendants in the context of the entire Complaint, the Complaint contains sufficient allegations against each of these

---

[128]   *See* ATF Brief, at 1.

[129]   *See* ATF Brief, at 4-5.

[130]   *Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 394.

Defendants, providing them sufficient notice of their participation in the alleged conspiracy.  Thus, their motion to dismiss should be denied.

### 1.  **Defendant Plymouth Park**

Defendant Plymouth is currently a wholly-owned subsidiary of J.P. Morgan Chase & Co.[131]  There were only a limited number of Plymouth employees who were involved in its tax lien operations in New Jersey including: Steve Morrison, John Garzone, Neil Harreveld, Noah Noonan, and Jim Purcell.[132]  Some or all of these employees were terminated by Plymouth as a result of their participation in the alleged conspiracy.[133]  Plymouth is currently under criminal investigation for their participation in the conspiracy.[134]  The Complaint identifies two specific auctions in which Plymouth rigged bids.[135]  Witnesses have identified Plymouth as participating in the conspiracy.[136]  Plymouth takes Plaintiffs to task for not being able to state, at this stage of the proceedings, which of these employees were terminated by Plymouth.[137]  Plaintiffs need not, at this stage, tell Plymouth what they already well know.

---

[131]  Compl., ¶ 41.

[132]  *Id.* ¶ 42.

[133]  *Id.*

[134]  *Id.* ¶ 46.

[135]  *Id.* ¶ 154 (e)-(f).

[136]  *Id.*

[137]  ATF Br., pp. 9-10 n. 4.

## 2.  **The BankAtlantic Defendants**

Defendant Fidelity Tax LLC was Defendant BBX Capital Corporation's single subsidiary involved in the New Jersey tax liens market.[138]  Defendants Michael G. Deluca and Gary I. Branse were employees of BBX Capital Corporation during the Class Period and both men attended tax lien auctions in New Jersey during the Class Period.[139]

Defendants Branse and Deluca are not named as Defendants merely because they ran the BankAtlantic's tax lien business as the BankAtlantic Defendants contend.[140]  The Complaint specifically alleges that both men participated in meetings and conversations with other Defendants in order to allocate tax liens in New Jersey pursuant to the conspiracy alleged in the Complaint.[141]  Further, witnesses to the conspiracy identified both men as having directly participated in the conspiracy,[142] and both men were also terminated by BBX Capital as a result of their participation in the conspiracy alleged in the Complaint.[143]  Although employees of BBX Capital attended the auctions in New Jersey, Defendant Fidelity Tax was the entity that actually purchased the lien pursuant to the

---

[138]   Compl., ¶ 93.

[139]   *Id.* ¶¶ 95, 96.

[140]   ATF Brief, p. 9 n. 3.

[141]   *Id.*

[142]   *Id.*

[143]   *Id.*

41

conspiracy, and Defendants Branse and Deluca would represent Fidelity at the New Jersey auctions.[144]

### 3.  **Defendant ATF**

Defendant ATF is based in Florida, and since its founding, has purchased over $1 billion in tax liens, including in New Jersey.[145]  During the Class Period, ATF attended numerous tax lien auctions throughout New Jersey.[146]  ATF was represented at these auctions by Anthony DeLaurentis and ATF's President, Justin Wiesenbacher.[147]  The Complaint also identifies two specific New Jersey tax lien auctions as to which ATF attended and agreed with other Defendants, to allocate the liens among themselves pursuant to the conspiracy.[148]  Witnesses to the conspiracy also identified ATF as having participated in the conspiracy.[149]

### C.   **Royal Tax Lien Services, LLC, Royal Bancshares of Pennsylvania and Royal Bank America's Motion to Dismiss [Dkt. 185] Should be Denied**

The central argument of Defendants Royal Tax Lien Services, LLC ("RTLS"), Royal Bancshares of Pennsylvania ("RBP"), and Royal Bank America ("RBA") (collectively "Royal Bank Defendants") in their separate motion to

---

[144]   *Id.*

[145]   *Id.* ¶ 86.

[146]   *Id.*

[147]   *Id.* ¶¶ 87, 89.

[148]   *Id.* ¶¶ 154(b),(e); *see also id.* at ¶¶ 44, 88, 97.

[149]   *Id.* ¶ 90.

dismiss is that the Complaint offers no allegations against the Royal Bank

Defendants, and that Plaintiffs are simply using the guilty pleas of others to tar the

Royal Bank Defendants.  The Royal Bank Defendants employ a revisionist reading

of the Complaint.  The Complaint's allegations with respect to the Royal Bank

Defendants plausibly allege that they joined a conspiracy, played a role in it, and

sufficiently apprises these Defendants of the claims being asserted against them.

1. **The Complaint Contains Sufficient Allegations as to RTLS, RBP, and RBA That Plausibly Establish Their Participation in the Conspiracy.**

With regard to RTLS, the Complaint alleges that Defendant Robert W. Stein

owned 40% of Defendant Crusader and 40% of RTLS, the other 60% was owned

by Defendants RBP and RBA.[150]  In addition to being an owner of Crusader and

RTLS, Stein was also the President of both entities.[151]  Stein has pled guilty to

violating the Sherman Act during the period 1998 through February 2009.[152]  Thus,

RTLS's part owner and President has admitted to participating in the conspiracy

during the time he was RTLS' highest ranking officer.

Further, the Complaint cites to the February 23, 2012 criminal information to

which Defendant Robert W. Stein has pled guilty.[153]  Thus, the Court may take

---

[150]   *Id.* ¶¶ 49-50.

[151]   *Id.* ¶ 174.

[152]   *Id.*

[153]   Compl., ¶ 174.

43

judicial notice of the plea.[154]  The criminal information does not mention Crusader or RTLS by name, but instead refers to Stein's participation in the conspiracy while he was President of "Company 1."[155]  The information defines Company 1 collectively as "Company 1 and its successor Company 2, [which] were Pennsylvania corporations located in Pennsylvania."[156]  There is no serious dispute that Company 1 is Crusader and that Company 2 is RTLS.

The Royal Bank Defendants' argument that Crusader's guilty plea undermines Plaintiffs' claims as to RTLS because the plea states that the DOJ will not bring any criminal charges against RTLS is deservedly relegated to the back of those Defendants' brief.  The fact that the DOJ does not bring criminal charges against an entity has *no* bearing on whether that entity participated in a conspiracy.[157]

---

[154]  *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)

[155]  *See* ¶ 4, February 23, 2012 Criminal Information in United States of America v. Robert W. Stein, 12-CR-140 (D.N.J.) attached as Exhibit A to the Certification of Bruce D. Greenberg.

[156]  *Id.* ¶ 2.

[157]  *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664 (7th Cir. 2002) (In holding that non-prosecution of an antitrust conspiracy could not be used to show there was not a conspiracy since "[t]he Justice Department has limited resources . . . [t]he Department may have felt there was little to be gained . . . It may also have felt that the antitrust class action bar had both the desire and the resources to prosecute such a suit vigorously, as indeed it has done."); *American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir. 1985) (admission of evidence of non-prosecution constitutes reversible error, since

The Complaint also plausibly states a claim against RBP and RBA.  The Complaint alleges, among other things, that all major purchasing decisions of Crusader and RTLS were authorized and approved by Defendants RBP and RBA.[158]  The Complaint further alleges that RBP and RBA dominated and controlled all aspects of Crusader and RTLS.[159]  While Plaintiffs concede that RBP and RBA did not attend auctions in New Jersey, there is no requirement that they perform the same role as other Defendants, or that they even communicate with any conspirators outside of the Royal Bank Defendants.[160]

Thus, the Plaintiffs plausibly allege, viewing the Complaint as a whole, that RBA, RBP and RTLS joined the conspiracy, and played some role in it.

2.  **The Royal Bank Defendants as To Piercing the Veil Are Premature Without Discovery**

The Royal Bank Defendants' assertions regarding alter ego liability or piercing the corporate veil, at this stage, fail without additional discovery.  The Third Circuit has determined that Plaintiffs are entitled to additional discovery following the pleading stage to determine whether piercing the corporate veil requirements

---

"evidence of non-prosecution is of very limited probative value in showing that there was no [crime] because of the higher burden of persuasion in a criminal case,"; "prosecutorial discretion may take into account many other factors not relevant in a civil suit").

[158]  Compl., ¶ 54.

[159]  *Id.*

[160]  *See supra* pp. 25-27.

have been met.[161]  Thus, Plaintiffs are entitled to additional discovery before this

Court can determine whether RBP or RBA serves as an alter ego to Crusader or

RTLS.

### D.   Mooring Tax Asset Group, LLC's Motion to Dismiss

In its motion to dismiss, Defendant Mooring Tax Asset Group LLC

("Mooring") argues that there are insufficient allegations as to Plaintiffs (which is

addressed *infra* at 49-55) and that statutes of limitations bars Plaintiffs' claims

(addressed *infra* at 66-76).  To the extent Mooring argues that there are insufficient

allegations against Mooring, it is simply rehashing the core argument made in the

Omnibus Brief and, for the reasons already discussed, Mooring's motion should be

denied.

Viewed as a whole, the Complaint adequately puts Mooring on notice of the

claims against it.  Mooring purchased tax liens at public auctions in the State of

New Jersey during the Class Period.[162]  During the Class Period, the individuals at

Mooring that participated at tax lien auctions in New Jersey, were its President,

---

[161]   *See State Capital Title & Abstract Co. v. Pappas Bus. Servs.*, LLC, 646 F.
Supp. 2d 668, 676 (D.N.J. 2009) ("The Supreme Court's *Twombly* formulation of
the pleading standard can be summed up thus: 'stating . . . a claim requires a
complaint with enough factual matter (taken as true) to suggest' the required
element. This 'does not impose a probability requirement at the pleading stage,'
but instead 'simply calls for enough facts to raise a reasonable expectation that
discovery will reveal evidence of' the necessary element." (quoting *Twombly*, 550
U.S. at 545)).

[162]   Compl., ¶ 60.

Jim Meeks, and its director of tax lien acquisitions, Lambrose Xethalis.[163]

Witnesses have identified Mooring as having participated in the conspiracy.[164]

Mooring's President, Meeks, was also President of the National Tax Lien

Association during the Class Period, regularly attended NTLA meetings (as did

Xethalis) at which other Defendants were present, and participated in meetings and

communications in furtherance of the conspiracy.[165]   Mooring has also publicly

acknowledged that it is under investigation by the DOJ in connection with their

investigation into the allegations in the Complaint.[166]   Mr. Xethalis has also been

terminated by Mooring for his participation in the conspiracy.[167]

Such allegations are sufficient to plausibly allege Mooring joined the

conspiracy and played some role in it, and put Mooring on notice of the claims

against it.  Thus, its motion to dismiss should also be denied.

### E.   **Phoenix Funding's Motion to Dismiss [Dkt. 180-1] Should be Denied**

Defendants Phoenix Funding and Benedict Caiola's (collectively "Phoenix")

motion to dismiss repeats the same arguments made in the Omnibus Brief.

Namely, that the allegations specifically against the Phoenix Defendants are not

---

[163]   *Id.* ¶ 60.

[164]   *Id.* ¶ 66.

[165]   *Id.* ¶¶ 65, 164, 165.

[166]   *Id.* ¶ 66.

[167]   *Id.* ¶ 60.

sufficient.  The Phoenix Defendants improperly attempt to persuade the Court to assess only those allegations which specifically relate to the Phoenix Defendants.[168]  However, as set forth above, this is improper.

Viewed as a whole, the Complaint adequately puts Phoenix on notice of the claims against them.  Phoenix purchased tax liens at public auctions in the State of New Jersey during the Class Period.[169]  During the Class Period, the individuals at Phoenix that participated at tax lien auctions in New Jersey, were its President, Defendant Benedict Caiola, and Geza Eckert.[170]  Witnesses have identified Phoenix as having participated in the conspiracy.[171]  When examined as a whole, it is evident that the allegations against the Phoenix Defendants are sufficient and their Motion should be denied.

### III.  PLAINTIFFS HAVE ANTITRUST STANDING

Plaintiffs have standing to pursue the antitrust claims alleged in the Complaint.  There is a direct causal connection between the violation alleged – a bid-rigging scheme that inflated the interest rates on TSCs – and the injuries suffered by Plaintiffs – being forced to redeem TSCs at these inflated rates and, if not, facing foreclosure.  That injury is *precisely* the type of injury that the antitrust

---

[168]    *See*, Phoenix Defendants Br., pp. 2-3.

[169]    Compl., ¶ 107.

[170]    *Id.* ¶¶ 108, 110.

[171]    *Id.* ¶ 111.

laws were designed to prevent.  Plaintiffs are directly injured by the alleged misconduct, there are no other victims who whose injuries are more direct, and there is no potential for duplicative recovery or complicated apportionment problems arising from allowing Plaintiffs to sue.[172]

All of the factors that the courts are required to consider in evaluating a plaintiff's antitrust standing support Plaintiffs' standing to assert antitrust claims here.  Defendants' arguments to the contrary should be rejected.

Defendants also argue that Plaintiffs have failed to allege Article III standing because Plaintiffs have not alleged particularized wrongdoing by each Defendant at an auction at which Plaintiffs' liens were sold.[173]  As demonstrated *supra*, however, the Complaint plausibly and adequately describes the scheme, each Defendant's involvement in it, and the resulting injuries to Plaintiffs.[174]  Plaintiffs have alleged Article III standing.

Standing is often examined on a case-by-case basis.  As the Supreme Court has stated, "the infinite variety of claims that may arise make it virtually

---

[172]   *See, e.g.*, *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 232-33 (3d Cir. 2013) (articulating the several factors to be considered when deciding whether plaintiffs have antitrust standing) (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1165-66 (3d Cir. 1993)).

[173]   *See* Omnibus Br. at 28 ; Sass Br. at 4-6; ATF Br. at 16-17.

[174]   *See also Magnesium Oxide Antitrust Litig.*, 2011 U.S. Dist. LEXIS 121373, at *13-14 (D.N.J., Oct. 20, 2011) (plaintiffs' allegations that they would have paid more for [magnesium oxide] than they would have paid absent defendants' unlawful conduct is sufficient for pleading purposes).

49

impossible to announce a black-letter rule that will dictate the result in every case."[175]   Instead, courts must consider a variety of factors to determine whether "the plaintiff has suffered an injury which bears a causal relation to an alleged antitrust violation."[176]   The Third Circuit has synthesized these into five criteria:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.[177]

None of the factors is dispositive, although the second factor – the requirement of antitrust injury – "is a necessary but insufficient condition of antitrust standing."[178]

Just as in *Lower Lake Erie*, Plaintiffs here satisfy each of the factors considered in determining antitrust standing.  First, as alleged in the Complaint, Plaintiffs are directly affected by Defendants' unlawful scheme because Plaintiffs are or will be required to purchase (that is, redeem) their tax liens in a market that

---

[175]   *Assoc. Gen. Contractors of California, Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 536 (1983).

[176]   *Lower Lake Erie*, 998 F.2d at 1165.

[177]   *Id*. at 1165-66.

[178]   *See Ethypharm*, 707 F.3d at 233 (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 182 (3d Cir. 1997)).

has been tainted by Defendants' collusion or face foreclosure.[179]  Thus, they (and

no one else) "[bear] the brunt of the increased costs" attributed to Defendants'

misconduct.[180]  Second, as in *Lower Lake Erie*, Plaintiffs have suffered antitrust

injury.  They have been deprived of the benefits of price competition, which is the

very injury "that Congress sought to redress in providing a private remedy for

violations of the antitrust laws."[181]  Third, there are "no missing links in the

causation chain,"[182] and no victims who are more directly injured (or injured at all)

other than Plaintiffs.  Finally, there is no potential for duplicative recovery, and no

complicated apportionment problems arising here.  All of the *Lower Lake Erie*

criteria, including the factor of "antitrust injury," are unquestionably present.

While Defendants cite the *Lower Lake Erie* factors, they decline to apply

them, arguing instead that Plaintiffs lack standing because they are "neither

consumers nor competitors in the market alleged in the complaint."[183]  But neither

status is a necessary condition for antitrust standing, particularly in a bid-rigging

---

[179]   *See, e.g.*, Compl. ¶ 211 (alleging generally that due to Defendants' conduct, Plaintiffs have paid, or will have to pay, more interest than they otherwise would have had to pay in a market free from Defendants' illegal behavior).

[180]   *See Lower Lake Erie*, 998 F.2d at 1168.

[181]   *Id.*

[182]   *Id.*

[183]   *See* Omnibus Br. at 31.

case like the case at bar.[184]  Instead, the only prerequisite to establishing antitrust standing is a showing of antitrust injury, that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful."[185]  Plaintiffs have adequately done so.

Further, as purchasers (that is, redeemers) of their TCSs directly from Defendants at a cost that has been artificially inflated by Defendants' wrongful scheme, Plaintiffs are "consumers" in the relevant market.  They are transacting business within the area of the commerce that is endangered by the breakdown of competitive conditions.  Plaintiffs have suffered antitrust injury and have standing to pursue these claims.

---

[184]  *See Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 76-77 & n.12 (3d Cir. 2000), *overruled on other grounds*, *Animal Science Products, Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011) ("The [Third Circuit's] conclusion in *Barton* that in order to suffer antitrust injury, one must be either in competition with the defendant or a consumer of its goods or services, if construed as an absolute (which arguably it need not be), may in some circumstances lead to results that conflict with Supreme Court and other precedent."); *Novell*, 505 F.3d at 311 (declining to adopt a "bright-line rule that only consumers or competitors in the relevant market have antitrust standing to bring private treble-damages claims under §4"); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Calif.*, 190 F.3d 1051, 1058 (9th Cir.1999) (limiting antitrust standing to consumers and competitors would contravene Supreme Court precedent).

[185]  *W. Penn. Allegheny Health Sys. Inc. v. UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

360986.1

Moreover, Plaintiffs' overpayment for the redemption of their tax liens also satisfies the antitrust injury requirement because their injuries are "inextricably intertwined" with the violation alleged.  As the Third Circuit explained:

> The "inextricably intertwined" antitrust injury originated in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).  There, the Court recognized that antitrust injury may be suffered by those other than competitors when the "injury alleged is so integral an aspect" of the alleged anticompetitive conduct that "the loss was precisely the type of loss that the claimed violations ... would be likely to cause."  *Id.* at 479, 102 S.Ct. 2540 (omission in original) (internal quotation marks omitted).  It went on to conclude that that test had been met because "the injury [the plaintiff] suffered was inextricably intertwined with the injury the conspirators sought to inflict."  *Id.* at 484, 102 S.Ct. 2540.  Thus, an "inextricably intertwined" antitrust injury is limited to plaintiffs "whose injuries are the essential means by which defendants' illegal conduct brings about its ultimate injury to the marketplace."  IIA Philip E. Areeda, *et al., Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 339, at 123 (3d ed. 2007). [186]

Defendants claim that the Third Circuit has narrowed the "inextricably intertwined" test set forth in *McCready* to situations where both plaintiffs and defendants "are in the business of selling goods and services in the same relevant

---

[186] *Ethypharm*, 707 F.3d at 237 n.21.  *See also W. Penn.*, 627 F.3d at 102 ("As a general matter, the class of plaintiffs capable of satisfying the antitrust-injury requirement is limited to consumers and competitors in the restrained market, and to those whose injuries are the means by which the defendants seek to achieve their anticompetitive ends.") (citations omitted).

market."[187]  *Ethypharm* says no such thing.  In fact, in *McCready*, the Supreme

Court case establishing the doctrine, plaintiff McCready was not "in the business

of selling goods and services in the same relevant market" as the defendants there.

In any event, here Plaintiffs must purchase their inflated tax liens *directly* from the

defendants.  Thus, unlike in *Ethypharm*, Plaintiffs and Defendants are transacting

business directly with one another in the same market.

The facts at issue in the cases cited by Defendants bear no resemblance to

the facts alleged here.  Each case addressed a factual situation where allegedly

anticompetitive conduct impaired a plaintiff's contractual relationships and

therefore its profits.[188]  Unlike the cases cited by Defendants, Plaintiffs' injury is

exactly the type of injury that Congress intended to prevent and redress in enacting

the federal antitrust laws.  Plaintiffs have standing to assert these claims.

---

[187]   *See* Omnibus Br. at 32.

[188]   *Compare Ethypharm*, 707 F.3d at 226 (foreign company, which chose not
to enter the U.S. market itself, but instead licensed its product to a U.S. company
that bore all the risk and expense of market entry, lacked standing to sue when its
licensee was excluded); *Barton*, 118 F.3d at 182 (company that offered marketing
services for a vaccine, but did not sell the vaccine itself, did not suffer antitrust
injury when its marketing agreement was terminated); *Sigmapharm, Inc. v. Mutual
Pharm. Co.*, 454 Fed. Appx. 64, 70 (3d Cir. 2011) (loss of a  contractually agreed-
upon profit share in a product manufactured and sold by a market participant is not
a loss that Congress intended to redress under antitrust law).

## IV.  PLAINTIFFS' STATE LAW CLAIMS SHOULD BE SUSTAINED

### A. N.J.S.A. 54:5-52 Permits a Private Cause of Action

The Defendants argue that N.J.S.A. 54:5-52 creates only an evidentiary presumption, and not a private right of action.[189]  Defendants are wrong.  Under established precedent, Plaintiffs may bring a claim under N.J.S.A. 54:5-52.

Even Defendants' own cases hold that N.J.S.A. 54:5-52 confers a private right of action on property owners.  Defendants' authorities recognized that claims under section 52 exist, but held, on the specific and inapposite facts of those cases, that the property owners had not made out such claims.[190] The dissenting opinion in *Seaside Gardens*, upon which Defendants rely, not only recognized that the plaintiff *could make* a claim under the statute, but stated that he *had in fact made* "a plausible case of fraud" and should not have been "deprived of his day in court" on that issue.[191]

Defendants' reliance on *Barry L. Kahn Defined Benefit Plan v. Moorestown Tp.*[192] is likewise misplaced.  That case stated that N.J.S.A. 54:5-52 protects a TSC

---

[189]   Omnibus Br. at 33-35.

[190]   *See, e.g.*, *Community Dev. Co., Inc. v. Seaside Gardens, Inc.*, 7 N.J. 152, 156-57 (1951) (property owner plaintiff did not allege fraud); *Hinchliffe v. Loughlin*, 126 N.J.L. 132, 133 (Sup. 1941) ("Fraud is not established by the evidence.").

[191]   *Community Dev.*, 7 N.J. at 159.

[192]   *Kahn v. Twp. of Moorestown*, 243 N.J. Super. 328 (Ch. Div. 1990).

purchaser, "not the municipality."[193]  It did not say that the statute protects a TSC purchaser against a property owner's claim of fraud.

Defendants' other citations to cases from other jurisdictions, in contexts far removed from the New Jersey Tax Lien Law,[194] do nothing to overcome the consistent view of New Jersey courts that N.J.S.A. 54:5-52 provides a private right of action.  Beyond Defendants' authorities discussed above, several other New Jersey cases have recognized private claims similar to those that Plaintiffs seek to enforce here.[195]

Recognition of a private right of action under section 52 based on the facts of this case is also consistent with New Jersey public policy.  As was recognized over sixty years ago, "[i]t has been frequently stated that the courts will seize upon the slightest flaw of substance in tax sales to restore property to the owner, on the principle that the sale of land for default in the payment of taxes is such an extreme interference with private property that the law guards the rights of the owner with

---

[193]   *Id*. at 341.

[194]   *See* Omnibus Br. at 35 & n.7.

[195]   *See e.g.*, *Hyland v. Kirkman*, 204 N.J. Super. 345, 375 (Ch. Div. 1985) (holding that read together with other provisions of the Tax Lien Law, N.J.S.A. 54:5-52 "unmistakeably allow[s] a collateral attack on a tax sale proceeding"); *Simon v. Deptford Twp.*, 272 N.J. Super. 21, 30 (App. Div. 1994) ("Nothing about a tax sale *per se*, or about the fact that it is a speculative venture, in any way undercuts the potential viability of a documented fraud claim.").

56

the utmost care."[196]  Thirty years before that, in *Harrington Co. v. Horster*,[197] the court explained that "[t]he due performance of every step in the proceedings, *even in the most minute particulars*, is a condition precedent to the validity of the sale, and the deed to the purchaser must contain all the statutory requirements."[198]  As such, Plaintiffs' claims should proceed.

### B. Where the Heightened Standard is Applicable, Plaintiffs' State Law Allegations Satisfy Rule 9(b)

While the bulk of Plaintiffs' claims, including their antitrust claims, are not subject to Rule 9(b)'s heightened pleading requirements, Plaintiffs acknowledge that their claims under N.J.S.A. § 54:5-52 are subject to this standard.  To satisfy Rule 9(b), a complaint "must either describe 'the circumstances of the alleged fraud with precise allegations of date, time, or place' or may use 'some [other] means of injecting precision and some measure of substantiation into their allegations of fraud."[199]  Further, courts "should . . . apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants. Accordingly, the particularity rule is somewhat

---

[196]   *Merewood, Inc. v. Denshaw*, 139 N.J. Eq. 182, 184 (Ch. 1947).

[197]   *Harrington Co. v. Horster*, 89 N.J. Eq. 270 (Ch. 1918).

[198]   *Id.* at 273 (emphasis added); *accord Woodbridge v. Allen,* 43 N.J.L. 262, 270 (E. & A. 1881).

[199]   *Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d at 880.

relaxed when key factual information remains within the defendant's control."[200]
Plaintiffs have adequately alleged their claim under N.J.S.A. 54:5-52.

The Complaint provides "all the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue."[201]  The allegations include particularized details as to the conspirators, the precise mechanisms through which they allocated TSCs among themselves, specific information as to the Defendants who purchased each of Plaintiffs' TSCs, and more.

Given the ongoing investigation by the Department of Justice, which protects certain information from disclosure (as well as the Court's denial of Plaintiffs' request to engage in discovery), it would be unreasonable to require that Plaintiffs provide more.  Defendants' contention that Plaintiffs' state law claims do not satisfy Rule 9(b) should be denied.

Defendants complain that the allegations as to the auctions involving Plaintiffs' TSCs, though very detailed, are not detailed enough.  But Defendants cite no case in support of the notion that Rule 9(b) requires Plaintiffs to allege "who attended the auction other than the TSC purchaser, what other liens were

---

[200]   *Id.*

[201]   *Hemy v. Perdue Farms*, No. 11-888, 2013 U.S. Dist. LEXIS 46593, at *11 (D.N.J. Mar. 31, 2013) (citation omitted).

sold at the auction and at what rate(s)."[202]  That is because it is wholly unrealistic

to demand that Plaintiffs to have in hand, at this stage, all details as to each and

every auction during the entire conspiracy.  Defendants' articulation of what is

required is all the more mistaken because it demands that activities unrelated to the

Defendants' actions be pled, prior to discovery and without any indication of its

relevance.  That is simply not the standard, under Rule 8 or Rule 9.  As Judge

Posner highlighted in In *BCS Servs. v. Heartwood 88, LLC*:[203]

> In this case, for example, the plaintiffs do not have good
> records of which tax liens they bid for unsuccessfully.
> The only reason they would have needed such records
> was to prove damages in a lawsuit. Since they didn't
> know they were victims of fraud, they had no reason to
> think they needed good records of their unsuccessful
> bids—for of what use would such records have been had
> there been no fraud?

Defendants' assertion that Plaintiffs have not alleged the "who, what and where" of

any misrepresentations is debunked by Plaintiffs' identification of the specific

Defendants who purchased the TSCs relating to Plaintiffs' properties.[204]

Moreover, Defendants misrepresented to the local Collectors of Taxes that

Defendants had purchased TSCs "pursuant to the Revised Statutes of New Jersey,

---

[202]   Omnibus Br. at 38.

[203]   *BCS Servs. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011).

[204]   Compl., ¶¶ 17-27.

1937, Title 54, Chapter 5, and the amendments and supplements thereto,"[205] when

in fact they bought those TSCs in violation of Title 54.  The municipalities then

transmitted that misrepresentation to the property owners, by virtue of the TSCs

themselves, as the TSC buyers knew and intended that the municipalities would.

      This creates liability for fraud.  "[W]here false representations are made to

one person with the intent that they be communicated to others for the purpose of

inducing those others to rely upon them, they may form the basis of an action for

fraud by those others."[206]  Plaintiffs necessarily felt bound by the official TSC.

      Plaintiffs need not have alleged that they "detrimentally relied" on

Defendants' misrepresentations or omissions.[207]  The "fraud" contemplated by

N.J.S.A. 54:5-52 should be construed, like the fraud covered by the Consumer

Fraud Act, N.J.S.A. 56:8-1 *et seq*. ("CFA"), as not importing the reliance element

of common law fraud.[208] Just as the CFA is designed to protect consumers,[209] one

of the purposes of the Tax Lien Law is "to protect the delinquent taxpayer from

---

[205]   Omnibus Br., Exhibit A (TSC) (emphasis added).

[206]   *Metric Inv., Inc., v. Patterson*, 101 N.J. Super. 301, 306 (App. Div. 1968).

[207]   *See* Omnibus Br. at 40 n.10.

[208]   *See*, *e.g.*, *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607 (1997)
(CFA, unlike common law fraud, does not require reliance).

[209]   *Id*. at 604.

unfair treatment by the TSC holder."[210]  Like the CFA, therefore, the Tax Lien Law

uses "fraud" "in the broad sense,"[211] not in the more restrictive sense of common

law fraud.  Thus, there is no requirement to allege, or prove, actual reliance.[212]

It is also well established that (1) "plaintiffs asserting fraud claims involving

primarily failure to disclose material information need not demonstrate positive

proof of reliance in order to recover," and (2) "[t]he presumption or inference of

reliance and causation, where omissions of material fact are common to the class,

has been extended in the context of both common law and statutory fraud."[213]

(citations and internal quotations omitted).  Dismissal of the Complaint based on a

lack of reliance pleading is inappropriate.

Certain Defendants have publicly acknowledged that they have been

subpoenaed by the grand jury investigating the allegations of the Complaint.[214]

Those admissions, and the breadth and detail of Defendants' briefs on these Rule

12(b)(6) motions, show that Defendants fully understand the precise nature of this

---

[210]   *Varsolona v. Breen Capital Servs.*, 360 N.J. Super. 292, 310 (App. Div. 2003), *aff'd on this point, aff'd and mod. on other grounds*, 180 N.J. 605, 621-22 (2004).

[211]   *See Jeselsohn, Inc. v. Atlantic City*, 70 N.J. 238, 243 (1976) (discussing public auction sales)

[212]   *Cf. Brinkley v. Western World, Inc.*, 275 N.J. Super. 605, 610 (Ch. Div. 1994) (rejecting strict construction of the time limitation of N.J.S.A. 54:5-52).

[213]   *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 132 (D.N.J. 2010).

[214]   *See, e.g.*, Compl., ¶¶ 46, 66.

360986.1

action.  That is all that Rule 9(b) requires.[215]

## C.  The Third Count States a Claim for Violation of N.J.S.A. 54:5-63.1

The Third Count of the Complaint adequately alleges that Defendants exacted "excessive charge[s] or fee[s] in connection with the redemption or assignment of a tax sale certificate."[216]  In full, N.J.S.A. 54:5-63.1 provides as follows:

> Any holder of a tax sale certificate, excepting any municipal corporation, his agent, servant, employee or representative, who knowingly charges or exacts any fee or charge in connection with the redemption of any tax sale certificate owned by him, in excess of the amounts permitted by chapter five of Title 54 of the Revised Statutes, shall forfeit such tax sale certificate to the person who was charged such excessive or unlawful fee and the person paying such unlawful charge shall become vested with all the right, title and interest of such tax sale certificate holder in and to such tax lien. In addition thereto the person aggrieved shall have a right of action to recover back the full amount paid by him to such tax lien holder, by an action at law in any court of competent jurisdiction.

Defendants argue that since they did not charge more than the 18% permitted by the Tax Lien Law, their bid-rigging and collusion is allowed.  This contravenes the very policy of the law, which was designed to protect property

---

[215]  *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 653 F.3d 225, 233 (3d Cir. 2011) ("Rule 9(b) exists to insure adequate notice so that defendants can intelligently respond."); *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 n.2 (3d Cir. 2003) ("The purpose of Rule 9(b) is to provide notice, not to test the factual allegations of the claim.").

[216]  N.J.S.A. 54:5-63.1.

360986.1

owners from TSC purchasers' unfair conduct.[217]  Furthermore, the actual *language*

of N.J.S.A. 54:5-63.1 does not, as Defendants contend, limit its application to cases

"when the TSC holder charges interest [not] permitted on the face of the TSC."[218]

Exacting redemption charges inflated through collusion unquestionably results in

"charges" not "permitted [under the TSL] in connection with redemption by. . . [a

taxpayer of a TSC]."

        In addition, the actual *language* of N.J.S.A. 54:5-63.1 does not, as

Defendants contend, limit its application to cases "when the TSC holder charges

interest [not] permitted on the face of the TSC" for at least two reasons.[219]  First,

exacting redemption charges inflated through collusion unquestionably results in

"charges" not "permitted [under the TSL] in connection with redemption by. . . [a

taxpayer of a TSC]."  Second, the Defendants' argument that Plaintiffs' claims fail

because they have not alleged that Defendants "charged any fees in excess of

amounts permitted by chapter five" is incorrect.[220]  The inflated interest rates

resulting from the Defendants' collusion is not permitted by chapter 5 of Title 54.

The Tax Sale Law provides that "[t]he sale shall be made . . . subject to redemption

---

        [217]   *See Varsolona*, 180 N.J. at 621-22 ("[t]he TSL thus creates two rights . . .
and the delinquent property owner's right to fair treatment in the collection of
those taxes [enforced by the forfeiture provisions] . . . .").

        [218]   Omnibus Br. at 42.

        [219]   Omnibus Br. at 42.

        [220]   Omnibus Br., at 41.

*at the lowest rate of interest*, but in no case in excess of 18% per annum."[221]

Because Defendants' illegal activities stifled the competitive process and artificially inflated interest rates at public auctions, such certificates do not carry "the lowest rate of interest" and therefore, such artificially inflated interest is "in excess of the amounts permitted by chapter five of Title 54."

Unsurprisingly, Defendants offer no authority for their novel position. The fact that there has not been any reported case to date involving allegations of criminal bid-rigging, as here,[222] does not mean that Plaintiffs' allegations cannot state a claim under N.J.S.A. 54:5-63.1. The Complaint alleges in great detail that Defendants' conduct resulted in charges or fees that are excessive by comparison to what they would have been absent Defendants' wrongful conduct. That is a fact-intensive issue that cannot be resolved in the Rule 12(b)(6) context.

Defendants mistakenly seek to invoke the doctrine that forfeitures are disfavored.[223] The Tax Lien Law expressly contemplates that a TSC purchaser who engages in fraud will lose the TSC. Plaintiffs' invocation of the statute does not create an improper "forfeiture." On the contrary, in the context of foreclosure-related matters, courts disfavor forfeitures of properties by their owners, here,

---

[221]   N.J.S.A. 54:5-32 (emphasis added).

[222]   Omnibus Br. at 43-44 & n.14.

[223]   Omnibus Br. at 43 & n.13.

Plaintiffs and cases cited, not the loss of TSCs by wrongdoing purchasers such as Defendants.[224]

Based on the foregoing, Defendants' motions should be denied.

### D.  Plaintiffs Have Adequately Alleged Their Unjust Enrichment Claim

Defendants' only argument against the Fifth Count of the Complaint, which alleges unjust enrichment, is that Plaintiffs supposedly have not adequately pleaded claims under the Sherman Act or the Tax Lien Law, and that an unjust enrichment claim is derivative of those claims.[225]  In fact, as demonstrated *supra*, Plaintiffs have more than amply alleged their antitrust and Tax Lien Law claims and thus their unjust enrichment claim must stand, as well.

In any event, Plaintiffs' unjust enrichment claim is valid as a stand-alone cause of action.  Unjust enrichment requires only allegations that "defendant received a benefit [at the expense of plaintiff, or to the detriment of plaintiff] and that retention of that benefit without payment would be unjust."[226]  Thus, the Fifth Count should be sustained.

---

[224]  *See*, *e.g.*, *Brinkley*, 275 N.J. Super. at 610 and cases cited.

[225]  Omnibus Br. at 44-45.

[226]  *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).  Plaintiffs have alleged that and more.

## V. PLAINTIFFS' ANTITRUST CLAIMS ARE TIMELY

This action was commended in March 2012, well within the four year statute of limitations period applicable to Plaintiffs' antitrust claims, which did not begin to run until, at the earliest, February 2009, when the Defendants' conspiracy alleged herein ceased.  However, as fully discussed below, the statute of limitations on Plaintiffs' antitrust claims did not begin to run until June 2011, when the Department of Justice disclosed, for the first time, its investigation into the conspiracy in New Jersey.[227]  Before that date, no one other than the members of the conspiracy knew of its existence, nor could anyone else have discovered the bid-rigging conspiracy or its impact on TSC auctions in New Jersey.

### A.  Defendants Have Not Met The Heavy Burden Associated With The Statute of Limitations Defense On A Motion to Dismiss

The statute of limitations is a fact-intensive affirmative defense, and is disfavored in the Rule 12 context.[228]  "Since the applicability of the statute of limitations usually involves questions of fact for the jury, [Defendants] bear a

---

[227]   Compl., ¶ 190.

[228] *See* Fed. R. Civ. P. 8(c) (designating statute of limitations as an affirmative defense, making dismissal appropriate pursuant to Rule 12(b)(6) only if it appears on the face of the complaint that the limitation period has expired).

66

heavy burden in seeking to establish as a matter of law that the challenged claims are barred."[229]  Defendants' have not carried that heavy burden.

Further, Defendants' case citations are inapposite.  For example, contrary to Defendants' suggestion,[230] *Robinson v. Johnson*,[231] holds only that a party may raise a statute of limitations defense by motion if the bar is apparent on the face of the complaint, not that dismissal is required.

### B.  Plaintiffs' Antitrust Claims Are Not Time Barred Given The Continuing Nature of the Conspiracy

In a continuing antitrust conspiracy, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to [it] to recover the damages caused by that act and . . . as to those damages, the statute of limitations runs from the commission of the act."[232]  Here, the claims were filed within four years of February 2009 - the end of the conspiracy period.

---

[229]   *Van Buskirk v. Care Canadian Mines, Ltd.*, 760 F.2d 481, 498 (3d Cir. 1985); *Meijer, Inc. v. 3M,* No. 04-5871, 2006 U.S. Dist. LEXIS 56744, *2 (E.D. Pa. July 13, 2005) (similar); *In re Linerboard Antitrust Litig.*,No. 1261 2000 U.S. Dist. LEXIS 14433 (E.D. Pa. Oct. 4, 2000) (denying motion to dismiss based on statute of limitations).

[230]   *See* Omnibus Br. at 47.

[231]   *Robinson v. Johnson*, 313 F.3d 128, 135 n. 3 (3d Cir. 2002).

[232]   *Zenith Radio Crop. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971) (suit may be brought more than four years after the events that initially created the cause of action if the action is commenced within four years after the defendant commits (1) an overt act in furtherance of the antitrust conspiracy or (2) an act that by its very nature constitutes a "continuing antitrust violation."); *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 502 n.15, (1968); *Lower Lake Erie*,

The Complaint alleges continuing acts in furtherance of the conspiracy throughout the entire Class Period.[233]  Plaintiffs and class members were harmed and continue to be harmed, and illegal interest continues to accrue on the liens associated with their properties.  Because this was a continuing conspiracy, and Plaintiffs filed their claims within four years of the last wrongful act in February 2009, Plaintiffs' claims are timely.

### C. Alternatively, The Tolling Statute and Defendants' Fraudulent Concealment Tolled the Running of the Statute of Limitations

Even if the Court determined that the continuing conspiracy doctrine was inapplicable, Plaintiffs' claims are tolled under both statutory and equitable grounds.

### 1.  Statutory Tolling

Congress and the New Jersey Legislature have provided for the tolling of statutes of limitations in private antitrust actions that are based on prior government proceedings.[234]  The tolling operates "during the pendency of [the government proceedings] and for one [1] year thereafter."[235]  The purpose of the

---

998 F.2d at 1172 ("[A]n injurious act within the limitations period may serve as a basis for an antitrust suit."); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189-90 (1997).

[233]  *See* Compl., ¶¶ 1, 60-66, 154, 159, 163, 170-173, 175-178, 180, 191, 207.

[234]  15 U.S.C. § 16(i) (2006); N.J.S.A. 56:9-15.

[235]  *Id*.

tolling provision is, "primarily to enable private litigants to have the benefit of the final judgment in the government's case . . . [and] to enable the private litigants to have the benefit of whatever clarification of either the facts or the law the government's litigation may provide."[236]

Although Plaintiffs do not know the precise date, the federal investigation here began in 2009.[237]  The alleged conspiracy is based in whole on the same subject matter in the DOJ's criminal proceedings.  Contrary to Defendants' claim, 15 U.S.C. § 16(i) applies to the federal claims as well as to Plaintiffs' state law claims, Plaintiffs' antitrust claims have been tolled since the investigation began in 2009.  Accordingly, all claims going back to 2005 are timely based on statutory tolling.

### 2.  Fraudulent Concealment

The equitable doctrine of fraudulent concealment also tolls the Plaintiffs' statute of limitations.  Plaintiffs have properly plead each of the elements of fraudulent concealment: (1) defendants' fraudulent concealment; (2) which

---

[236]  *In re Lower Lake Erie Iron Ore Litig.,* No. 84-2722, 1987 U.S. Dist. LEXIS 2932, at *4  (E.D. Pa. Apr. 13, 1987).

[237]  Compl., ¶ 166.

misleads or relaxes the plaintiff's inquiry, who 3) exercised due diligence in investigating the action.[238]

Rule 9(b) does not require a plaintiff to allege every conceivable detail in order to plead fraudulent concealment and does not require specificity just for specificity's sake.[239]  Contrary to Defendants' assertions, Rule 9 also does not require facts that, by the nature of the alleged fraud, are within Defendants' control.[240]  As discussed *supra*, a court should apply the standards of Rule 9(b) in accordance with its underlying purpose of putting defendants on notice of the allegations against them.[241]  The Complaint unquestionably does that.  Finally, the fraudulent concealment doctrine must remain true to its "roots and its overarching rationale, that 'sophisticated defrauders' not be permitted to profit by their own misconduct and an inflexible application of the statute of limitations."[242]

---

[238]   *Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2012 U.S. Dist. LEXIS 48427, at *16 (D.N.J. April 5, 2012); *Mercedes Benz Antitrust Litig.*, 157 F. Supp. 2d at 368

[239]   *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 104-05 (D.N.J. 2011)

[240]   *Mercedes Benz Antitrust Litig.*, 157 F. Supp. 2d at 368

[241]   *Sunset Financial Res., Inc. v. Redevelopment Group V, LLC*, 417 F. Supp. 2d 632, 644 (D.N.J. 2006) (citing *Seville Indus. Machinery v. Southmost Machinery*, 742 F.2d 786, 791 (3d Cir. 1984) (plaintiffs may use alternative means of injecting precision and some measure of substantiation into their allegations of fraud)).

[242]   *Id.* (citing *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 645 (3d Cir. 1989)).

70

When the underlying cause of action involves a conspiracy, fraudulent concealment generally "embodies the concept that 'if the defendant conceals *any* element of the offense, including, but not limited to, the injury itself, the four-year period will be tolled.'"[243]   Courts in this Circuit have held that the Plaintiffs must plead ***either*** a self-concealing conspiracy in which the concealment is so "intertwined with the conspiracy as a whole that the equitable foundations of the fraudulent concealment doctrine require the limitations period to be tolled" ***or*** affirmative acts of concealment, regardless of whether such acts are separate and apart from the acts of concealment involved in the antitrust violation.[244]

Plaintiffs have sufficiently pled that Defendants deliberately concealed their illegal practices and acts, as well as the harm to Plaintiffs, in order to create the false illusion of a competitive market.[245]   Moreover, since the conspiracy was inherently self-concealing, pleading affirmative acts as Defendants suggest, is not necessary; indeed Defendants' purported conspiracy would have been fruitless

---

[243]   *Processed Egg Prods. Antitrust Litig.*, 2011 U.S. Dist. LEXIS 139995, at *13(E.D. Pa., Nov. 30, 2011) (quoting *Mathews v. Kidder, Keabody & Co.*, 260 F.3d 239, 256 n.26 (3d Cir. 2001) (emphasis in original)).

[244] *Mercedes Bendz*, 157 F. Supp. 2d at 371. *See also Magnesium Oxide*, 2012 U.S. Dist. LEXIS 48427; *In re Fasteners Antitrust Litig.*, No. 08- 1912, 2011 U.S. Dist. LEXIS 90076, at *14-15 (E.D. Pa., Aug. 12, 2011) (plaintiffs sufficiently alleged self- concealing conspiracy through surreptitious meetings and communications and satisfied the first requirement of their fraudulent concealment argument); *In re Aspartame Antitrust Litig.*, No. 06-1732, 2007 U.S. Dist. LEXIS 16995, at *16 (E.D. Pa., Jan. 18, 2007).

[245]   Compl., ¶¶ 187-189.

without a deliberate effort to conceal its substance.[246]  "Plaintiffs were unable, and

thus not required, to provide the inner workings of the conspiracy because,

according to the complaint, that information was deliberately concealed from

plaintiffs and the public."[247]  Until the government investigation was made public,

in June, 2011, Plaintiffs did not and could not have reasonably discovered the

conspiracy, even in the exercise of reasonable diligence, as the bid-rigging scheme

was, by its very nature, self-concealing.[248]  Furthermore, at least one Defendant

affirmatively denied the existence of the conspiracy, which denial was made in

furtherance of the secret scheme.[249]

Defendants' argument as to whether bid-rigging is inherently self-concealing

is not accurate.  In *Comm. of Pennsylvania v. Milk Industry Man. Corp.*,[250]

Defendants' sole cited case, the court denied summary judgment against plaintiffs

on this issue and noted that "under some circumstances, the fraud may be self-

concealing or the conspiracy of such a character that its successful operation

---

[246]   *See also, State of N.Y. v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084 (2d Cir.1988) (a bid-rigging conspiracy is designed to endure over a period of time and, in order to do so, it must remain concealed from the victims of the collusive bids otherwise conspiracy would fail).

[247]   *Aspartame Antitrust Litig.*, 2007 U.S. Dist. LEXIS 16995, at *20.

[248]   *See* Compl., ¶¶ 192-193.

[249]   Compl., ¶ 189.

[250]   *Comm. of Pennsylvania v. Milk Industry Man. Corp.*, 812 F. Supp. 500 (E.D. Pa. 1992).

conceals itself.  In such cases, evidence of a self-concealing conspiracy may satisfy the wrongful concealment element of the fraudulent concealment doctrine."[251] The court then said only that big rigging conspiracies are "not necessarily self-concealing in and of themselves."[252]  However, many courts recognize that big-rigging conspiracies, such as the one at issue here, are self-concealing.[253]

The second part of the fraudulent concealment test requires a plaintiff to "show that he actually was 'mis[led] ... into thinking that he d[id] not have a cause of action[.]'"[254]  As discussed *supra*, Plaintiffs have alleged enough facts (besides Defendants' failure to disclose their illegal acts) to show they were not aware, nor should they have been aware, of the facts supporting their claim until a time within four years measured backwards from when the plaintiffs filed their complaint.[255]

---

[251]   *Id*. at 504.

[252]   *Id*.

[253]   *See, e.g., Hendrickson Bros.,* 840 F.2d at 1084; *Mercedes Benz*, 157 F. Supp. 2d at 370-71; *Bethlehem Steel Corp. v. Fischbach and Moore, Inc.*, 641 F. Supp. 271, 275 (E.D. Pa.1986) (bid-rigging conspiracy was self-concealing conspiracy, which could satisfy the wrongful concealment element of the fraudulent concealment doctrine).

[254]   *Forbes v. Eagleson*, 228 F.3d 471, 487 (3d Cir. 2000) (quoting *Davis v. Grusemeyer*, 996 F.2d 617, 624 (3d Cir. 1993)).

[255]   *Forbes*, 228 F.3d at 487.  *See* Compl., ¶¶ 4, 9, 146-153, 155-159, 188, 189, 192-193.

Defendants' citation to *In re Fertilizer Antitrust Litig.*[256] is misplaced.  As noted by the Defendants, the court's conclusion that the submission of bids was not in and of itself an affirmative act of concealment in that case rested in part on the sophisticated nature of the plaintiffs (Alaska, Idaho, Oregon, Washington, and Montana) and the fact that they would not be overly influenced by simple denials of wrongdoing.[257]  Here, Plaintiffs do not merely allege that Defendants failed to disclose their illegal acts, but rather engaged in affirmative acts of concealment.

With respect to the third element of the test, "the exercise of due diligence must be shown in the antitrust context."[258]  Accordingly, this element ensures "that [plaintiff's] continuing ignorance was not attributable to lack of diligence on his part."[259]  As set forth *supra*, Plaintiffs could not have determined the existence of the conspiracy until at least June 2011, even with reasonable diligence.[260]

On all these bases, the Court should reject Defendants' limitations argument.

---

[256] *In re Fertilizer Antitrust Litig.*, No. 75-1,1983 U.S. Dist. LEXIS 17042 (E.D. Wash. Sept. 14, 1979).

[257] *Id.* at *8.

[258] *See Lower Lake Erie*, 998 F.2d at 1179.

[259] *Davis*, 996 F.2d at 624 n.3 (citation omitted) (bracket in original).

[260] *See Mercedes Benz*, 157 F. Supp. 2d at 373-74; *In re Fasteners*, 2012 U.S. Dist. LEXIS 110513.

### 3.  **Mooring's Relation-Back Argument is Without Merit**

Mooring contends that Plaintiffs' claims against it under (only) the Clayton Act and the New Jersey Antitrust Act are time-barred by the four-year statute of limitations because the antitrust claims of Plaintiffs extend only to December 21, 2008 – four years before Mooring was named as a defendant in the Complaint.[261] Mooring also contends that Plaintiffs cannot sustain a relation-back argument pursuant to Fed. R. Civ. P. 15 because Mooring was not named in the original complaint filed on March 13, 2012 (not March 18, as Mooring mistakenly says[262]). In fact, relation back has no place here.  Thus, Mooring's arguments fail.

The Complaint expressly alleges that Mooring took part in a conspiracy that operated throughout the Class Period, ending in February 2009.[263]  Since the Complaint naming Mooring was filed in December 2012, within the four year limitations period, it was timely filed under the continuing conspiracy doctrine.[264]

---

[261] *See* Mooring Br. at 4-5, citing Compl., ¶ 19.

[262] Mooring Br. at 4.

[263]  Compl., ¶¶ 1, 60-66, 154, 159, 163, 170-173, 175-178, 180, 191, 207.

[264] *See Klehr*, 521 U.S. at 189 (explaining that under antitrust law, "each sale to the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times'") (citation omitted); *cf. In re Fasteners Antitrust Litig.*, No. 08-1912, 2012 U.S. Dist. LEXIS 110513, at *8 (E.D. Pa. Aug. 6, 2012) (denying interlocutory review on refusal to shorten proposed class period because even if statute of limitations were not tolled, plaintiffs were still entitled to pursue damages for post-limitations period where they alleged the antitrust conspiracy continued).

Second, as discussed above, Plaintiffs get the benefit of statutory and equitable tolling of the statutes of limitations on their antitrust claims. Thus, relation back never comes into play. Mooring's arguments should be rejected.

## VI.  THE FILED RATE DOCTRINE DOES NOT APPLY

Defendants' arguments that Plaintiffs' antitrust claims are barred by the filed rate doctrine because they are "rates filed with a government agency,"[265] though creative, are groundless. The illegal interest resulting from Defendants' illegal activities is neither a "rate" nor "filed with a government agency" within the meaning of the filed rate doctrine. Defendants cite to no case like the facts here, where the "rate" at issue (*i.e.* the interest rates that were colluded on) resulted from a public auction and which the purported "regulatory agency" had no authority to review or change the relevant "rate." No such case exists. Under the facts of this case, the doctrine simply does not apply. Therefore, Defendants' motion to dismiss based on the filed rate doctrine should be rejected.

### A.    The Filed Rate Doctrine

The filed rate doctrine emanates from *Keogh v. Chicago & N. W. Ry. Co.,*[266] which barred plaintiffs from challenging a "legal rate" authorized and approved by a rate regulator. The doctrine's purpose is to ensure that rates filed with and

---

[265]   Omnibus Br. at 24.

[266]   *Keogh v. Chicago & N. W. Ry. Co.*, 260 U.S. 156, 163 (1922).

approved by a regulatory agency are applied in a reasonable and nondiscriminatory manner.[267]

The doctrine bars only claims contesting "rates" or "tariffs" filed with and subject to *regulatory agency oversight*, in order to preserve the integrity of regulatory regimes that *set prices for services rendered*.[268]

The filed rate doctrine advances the policy of preserving an agency's primary jurisdiction over the setting of reasonable rates and the need to insure that regulated companies charge only those rates which the regulatory agency has approved.[269]   The doctrine has been narrowly construed and applied only when the policy rationale for it is clearly advanced.[270]

---

[267]   *Maislin Industries, U.S. Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 127 (1990).

[268]   *Alston v. Country Wide Fin. Corp*., 585 F.3d 753, 763 (3d Cir. 2009); *Haskins v. First Am. Title Ins. Co.*, 866 F.2d 343 (D.N.J. 2012); *see United States Steel Corp. v. Lumbermens Mut. Cas. Co.*, No.02-2108, 2005 U.S. Dist. LEXIS 18705, at *27(W.D. Pa. Aug. 31, 2005) (filed rate doctrine generally provides that "where regulated companies are required by federal or state law to file proposed rate or charges with a regulatory agency, any rate approved by the agency is *per se* reasonable and unassailable in judicial proceedings brought by ratepayers")

[269]   *Borough of Lansdale v. PP&L, Inc.*, 426 F. Supp. 2d 264, 283-84 (D. Pa. 2006); *AT&T Corp. v. Central Office Tel.*, 524 U.S. 214 (1998).

[270]   *US Wats, Inc., v. AT&T Co.*, No. 93-1038, 1994 U.S. Dist. LEXIS 4074, at *8-9 (E.D. Pa. April 5,1994).

360986.1

The Supreme Court has often held that the filed rate doctrine does not apply where there is no validly filed rate at issue.[271]  The doctrine applies only where the plaintiff challenges the "reasonableness or propriety of the rate[s]" themselves set by a regulatory agency.[272]  It "'simply does not apply' in circumstances where plaintiffs 'challenge [the defendant's] allegedly wrongful conduct, not the reasonableness or propriety of the rate that triggered that conduct.'"[273]

## B.   The Filed Rate Doctrine Does Not Apply Here Where There is Neither a "Rate" Nor A "Filing"

The filed rate doctrine does not apply here for the simple reason that the interest rates here are unrelated to a regulated service and therefore are not "rates" or "tariffs."   In addition, they are not "filed" with any regulatory agency.  The statutory framework of the Tax Lien Law that governs the auction of the TSCs does not provide for oversight by any governing *regulatory* state agency.  Unlike most, if not all of Defendants' cited cases, the law governing the auction of TSCs in New Jersey is entirely statutory.  There are no state regulations as to TSC auctions.  As a result, interest rates on TSCs are not "filed."

---

[271]   *Sec. Servs., Inc. v. Kmart Corp.*, 511 U.S. 431, 444-45 (1994)); *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 216 (1996).

[272]   *Alston*, 585 F.3d at 763-65 (citing *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994)).

[273]   *Gallo v. PHH Mortgage Corp.*, No. 12-1117, 2012 U.S. Dist. LEXIS 182954 (D.N.J. Dec. 31, 2012) (quoting *Alston*, 585 F.3d at 765).

Defendants' own authorities demonstrate the necessity of agency oversight of rates/tariffs imposed for services rendered in order for the filed rate doctrine to apply. For example, in *In re New Jersey Title Insurance Litig.*,[274] plaintiffs alleged that title insurers were fixing the rates of title insurance in violation of the antitrust laws. In dismissing plaintiffs' complaint under the filed rate doctrine, the court noted that the regulatory regime required title insurers to file their rates with the New Jersey Department of Banking and Insurance ("DBI")), and mandated that DBI review and approve or disapprove the filed rates.[275]

Here, the rate was set purely by auction. No "regulator" reviewed the rate or had authority to approve or disapprove of it.[276] The public auction set the rate.

Defendants seek immunity under a doctrine premised upon regulatory review and approval of rate structures, for actions taken in violation of state and federal law that were unknown and would never have been approved by any agency. Tellingly, Defendants seek to apply the filed rate doctrine despite the fact

---

[274]    *In re New Jersey Title Insurance Litig.*, 683 F.3d 451 (3d Cir. 2012).

[275]    *Id.* at 453.

[276]    *See also Utilimax.com, Inc. v. PPL Energy Plus, LLC*, 378 F.3d 303, 306-308 (3d Cir. 2004) (filed rate doctrine barred claims pertaining to market based utility service rates regulated by and in conformity with the Federal Energy Regulatory Commission); *AT&T Corp. v. JMC Telecom, LLC Steel, Inc.*, 470 F.3d 525, 531-32 (3d Cir. 2006) (common law claims asserting breach of tariff for services provided by AT&T to prepaid telephone card holders barred by the filed rate doctrine, where statute required that common carriers such as AT&T file schedules showing all charges for itself and its connecting carriers, and carriers were additionally subject to Federal Communication Commission oversight.)

that, upon the government's discovery of Defendants' scheme, it criminally

prosecuted the participants.  The filed rate doctrine has no application here.

In addition, Plaintiffs do not attack the reasonableness of any rate structure

here.  Rather, Plaintiffs seek redress from Defendants' *wrongful conduct* that

triggered the imposition of excess interest costs upon property owners, conduct to

which the filed rate doctrine simply does not apply, as described *supra*.

## VII.  THE FIRST AND SIXTH COUNTS ARE NOT DUPLICATIVE

Defendants argue that Plaintiffs' claim for declaratory judgment (Sixth

Count) should be dismissed because it is duplicative of their Sherman Act claim

(First Count).[277]  The Counts are not duplicative.  The Sixth Count should stand.

"[A] request for declaratory relief may be considered independently of

whether other forms of relief are appropriate."[278]  The fact that Plaintiffs have

sought damages under the Sherman Act does not prevent them from also seeking a

declaratory judgment to establish their rights and remedies under the Act.[279]

The second declaration Plaintiffs seek is that Defendants' acquisition of

TSCs in furtherance of the conspiracy resulted in their acquisition of TSCs at an

---

[277]   Omnibus Br. 33

[278]   *Powell v. McCormack*, 395 U.S. 486, 518 (1969); *see also* Fed. R. Civ. P.
57 ("[t]he existence of another adequate remedy does not preclude a declaratory
judgment that is otherwise appropriate").

[279]   *See Dworman v. Mayor and Bd. Of Aldermen, Governing Body of Town of
Morristown*, 370 F. Supp. 1056, 1077 (D.N.J. 1974) (claim for declaratory
judgment is not inappropriate despite the existence of another appropriate remedy).

artificially high level of interest.  This is not duplicative of Count I either.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that

Defendants' motions to dismiss the Complaint should all be denied.  Alternatively,

should the Court conclude that any of Plaintiffs' allegations fail to state a claim,

Plaintiffs request leave to amend.[280]

Dated:  May 15, 2013                **LITE DEPALMA GREENBERG, LLC**


                                    By:  /s/ *Bruce D. Greenberg*
                                         Bruce D. Greenberg
                                         Two Gateway Center, Suite 1201
                                         Newark, NJ 07102-5003
                                         Telephone: (973) 623-3000
                                         Email: bgreenberg@litedepalma.com

---

[280]   *See*, *e.g.*, *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 U.S. Dist. LEXIS 121373, at *15 (D.N.J. Oct. 20, 2011) ("When a claim is dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), leave to amend and reassert that claim is ordinarily granted").

**LITE DEPALMA GREENBERG, LLC**
Steven J. Greenfogel
1521 Locust Street
Philadelphia, PA 19102
Telephone: (215) 564-5182
sgreenfogel@litedepalma.com

*Interim Liaison Counsel*

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman (admitted *pro hac vice*)
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Jason A. Zweig (admitted *pro hac vice*)
555 Fifth Avenue, 17th Floor
New York, NY 10017
Telephone: (212) 752-5455
Email: jasonz@hbsslaw.com

**HAUSFELD LLP**
Michael D. Hausfeld (admitted *pro hac vice*)
James J. Pizzirusso (admitted *pro hac vice*)
Seth R. Gassman (admitted *pro hac vice*)
1700 K Street, NW, Suite 650
Washington, DC 20006
Telephone: (202) 540-7200
mhausfeld@hausfeldllp.com
jpizzirusso@hausfeldllp.com
sgassman@hausfeldllp.com

*Interim Class Counsel*

**WILLIAMS, CUKER & BEREZOFSKY**
Mark R. Cuker
Woodland Falls Corporate Center
210 Lake Drive East
Suite 101
Cherry Hill, NJ 08002-1163
Telephone: (856) 667-0500

**MICHAEL R PERLE**
1265 Paterson Plank Road
Suite 3A
Secaucus, NJ 07094
Telephone: (201) 377-5957
Fax: (212) 864-0423
Email: m.perle@earthlink.net

82

360986.1

Email: mcuker@wcblegal.com

**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL LLP**
Bryan L. Clobes
Ellen Meriwether
1101 Market Street
Suite 2650
Philadelphia, PA 19107
Telephone: (215) 864-2800
Email: bclobes@caffertyclobes.com

**TRUJILLO RODRIGUEZ &**
**RICHARDS, LLC**
Lisa J. Rodriguez
258 Kings Highway East
Haddonfield, NJ 08033
Telephone: (856) 795-9002
Email: lisa@trrlaw.com

**PARIS ACKERMAN &**
**SCHMIERER**
Bryan H. Mintz
101 Eisenhower Parkway
Roseland, NJ 07068
Telephone: 973-228-6667
Fax: (973) 629-1246
Email: bryan@paslawfirm.com

**POULOS LOPICCOLO PC**
John N. Poulos
1305 South Roller Road
Ocean, NJ 07712
Telephone: (732) 673-6264
Email: poulos@pllawfirm.com

**SHEPHERD, FINKELMAN,**
**MILLER & SHAH, LLP**
Natalie Finkelman Bennett
475 White Horse Pike
Collingswood, NJ 08107-1909
Telephone: (856) 858-7012
Email: nfinkelman@sfmslaw.com

**STARR, GERN, DAVISON &**
**RUBIN, P.C.**
Amos Gern
Jonathan J. Lerner
105 Eisenhower Parkway
Roseland, NJ 07068
Telephone: (973) 403-9200
Email: agern@starrgern.com
jlerner@starrgern.com

*Additional Plaintiffs' Counsel on the Brief*

360986.1