

**Dilworth
Paxson** LLP

DIRECT DIAL NUMBER:
215-575-7354

Jay E. Kagan
JKagan@dilworthlaw.com

September 27, 2013

**Via ECF**

The Honorable Michael A. Shipp
United States District Judge for the District of New Jersey
Clarkson S. Fisher Building & US Courthouse
402 East State Street, Room 7W
Trenton, NJ 08608

RE:      **In Re New Jersey Tax Sales Certificates Antitrust Litigation,
Master Docket No.:  12-cv-1893-MAS-TSB**

Dear Judge Shipp:

We represent CCTS Capital, LLC and Crestar Capital, LLC, defendants in the above-captioned putative class action. I write today to bring Your Honor's attention to what we believe to be the Plaintiffs' end-run around both the Federal Rules of Civil Procedure, as well as a prior consolidation Order entered in this case.

As the Court is aware, on June 11, 2012, Judge Freda L. Wolfson issued an Order that, *inter alia*, established a master file and docket for the several pending actions related to the auction of tax sale certificates in the State of New Jersey, consolidated those several actions for pretrial purposes, and named those actions *In re: New Jersey Tax Sales Certificates Antitrust Litigation.*  [Docket at entry no. 55, ¶¶ 1-3].  That Order also contemplated that, after consolidation, the plaintiff would filed a Consolidated Master Class Action Complaint, which was subsequently filed on December 21, 2012.  [Docket at entry no. 113].

After filing an answer to the Consolidated Master Class Action Complaint on March 8, 2013, our clients CCTS Capital, LLC and Crestar Capital, LLC then moved for judgment on the pleadings pursuant to Federal Rule 12(c) on September 12, 2013.  [Docket at entry nos. 165 and 279].  Prior to responding to the Motion for Judgment on the Pleadings, the Plaintiffs initiated a new civil action against William S. Green, the owner of CCTS Capital, LLC and Crestar Capital, LLC, and other defendants, captioned *Bauer v. Green,* 13-CV-5541-MAS-TJB.  We now also represent Mr. Green in those proceedings.  While that matter has also been assigned to Your Honor, for Your Honor's convenience I am attaching a copy of the complaint (the "New Complaint") with this correspondence.  As Your Honor will see, with the exception of adding one more named plaintiff and a handful of slightly changed paragraphs, that New Complaint is a mirror image of the Consolidated Master Class Action Complaint.

Dilworth Paxson LLP
To: The Honorable Michael Shipp
Page 2

Plaintiffs' filing of parallel litigation frustrates both the Federal Rules of Civil Procedure applicable to amending pleadings and the terms of the Consolidation Order.  Because the Consolidated Master Class Action Complaint was, itself, an amended pleading and because CCTS Capital, LLC and Crestar Capital, LLC have already answered the Consolidated Master Class Action Complaint, if Plaintiffs now wish to further amend their pleadings to add additional defendants and/or augment their factual allegations, Rule 15(a)(2) clearly requires Plaintiffs to seek either written consent or leave of Court to do so.  Further, the Consolidation Order operates on the explicit presumption that all parties aware of the Order – and, obviously, the putative class action plaintiffs and their counsel – will file all subsequent pleadings and other documents in the *In re: New Jersey Tax Sales Certificates Antitrust Litigation* master file.

It is quite clear that the Plaintiffs have filed the New Complaint in an attempt to gain a tactical advantage in negotiations with our clients by purporting to allege claims, personally, against Mr. Green, the owner of the corporate entities CCTS Capital and Crestar.  As a case in point, Plaintiffs even had the temerity to refer to the existence of the *Bauer* case as a reason for denying the Motion for Judgment on the Pleadings in the *In re: New Jersey Tax Sales Certificates Antitrust Litigation* case [Docket at entry no. 284, pp. 5-6].

Consistent with the terms of the consolidation Order, we would respectfully request that Your Honor direct the Clerk to close the file in *Bauer v. Green*, 13-CV-5541-MAS-TJB, and to direct the Plaintiffs to make the appropriate motion to amend their pleadings in the above-captioned case, should they so desire.

We remain available should Your Honor with to discuss this matter in more detail.

Respectfully,

Jay E. Kagan

Attachment
JEK/ronni
cc:    Bruce D. Greenberg, Esquire (via email and ECF)
       All Counsel (via ECF)

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

GILA BAUER AS TRUSTEE FOR THE GILA
BAUER REVOCABLE TRUST, ET AL.,
*Plaintiff*

V.                                    **SUMMONS IN A CIVIL CASE**

WILLIAM S. GREEN, ET AL.,
*Defendant*

CASE NUMBER: **3:13–CV–05541–MAS–TJB**

TO: *(Name and address of Defendant):*

    William S. Green
    1932 Panama Street
    Philadephia, PA 19103

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) –– or 60 days if you are the United States or a United States Agency, or an office or employee of the United States described in Fed. R. civ. P. 12 (a)(2) or (3) –– you must serve on the plaintiff an answer to the attached complaint or a motion under rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**WILLIAM T. WALSH**
CLERK



**Marlene Kalbach**
_____
(By) DEPUTY CLERK

ISSUED ON **2013-09-18 16:04:10.0.** Clerk
USDC NJD

## RETURN OF SERVICE

| | DATE |
|---|---|
| Service of the Summons and complaint was made by me [1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____
_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and
discretion then residing therein.

☐ Name of person with whom the summons and complaint were left:_____

☐ Returned unexecuted:_____
_____
_____

☐ Other (specify) :_____
_____
_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                    *Date*                              *Signature of Server*

                                            _____
                                            *Address of Server*

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Steven J. Greenfogel
Two Gateway Center, Suite 1201
Newark, New Jersey 07102-5003
Tel: (973) 623-3000

*Counsel for Plaintiffs*
(Additional counsel on signature page)

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GILA BAUER AS TRUSTEE FOR THE GILA BAUER REVOCABLE TRUST; MELISSA JACOBS; FRANCES A. SCHMIDT AND DONALD W. SCHMIDT; and SON, INC., <br><br> Plaintiffs, <br><br> V. <br><br> WILLIAM S. GREEN; NORMAN T. REMICK; ISAAC MORADI; MICHAEL MASTELLONE; PAT CARABELLESE; PAM INVESTORS; HEARTWOOD 55, LLC; ROBERT U. DEL VECCHIO; and ROBERT U. DEL VECCHIO PENSION TRUST, <br><br> Defendants. | Civil Action No. 13-CV-5541-MAS-TJB <br><br><br> **CLASS ACTION COMPLAINT** <br> **JURY TRIAL DEMANDED** |

Plaintiffs Gila Bauer as Trustee for the Gila Bauer Revocable Trust, Melissa Jacobs,

Frances A. Schmidt and Donald W. Schmidt, and Son, Inc. (collectively "Plaintiffs"), on behalf

of themselves and all others similarly situated, bring this action against Defendants William S.

Green, Norman T. Remick, Isaac Moradi, Michael Mastellone, Pat Carabellese, PAM Investors,

Heartwood 55, LLC, Robert U. Del Vecchio, and Robert U. Del Vecchio Trust (collectively,

"Defendants "), and allege as follows:

- 1 -

388369.1

## I.    NATURE OF CLAIM

1.    This action arises from an overarching statewide conspiracy to unlawfully manipulate interest rates associated with tax sale certificates ("TSCs") sold at public auctions throughout the state of New Jersey from at least as early as January 1, 1998, through February 2009 (the "Class Period"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the New Jersey Antitrust Act, N.J.S.A. 56:9-3, and multiple provisions of the New Jersey Tax Lien Law, N.J.S.A. § 54:5-1 *et seq.*  The Defendants -- William S. Green, Norman T. Remick, Isaac Moradi, Michael Mastellone, Pat Carabellese, PAM Investors, Heartwood 55, LLC, Robert U. Del Vecchio, and Robert U. Del Vecchio Trust  - entered into an unlawful agreement and/or understanding to rig tax lien auctions at which they and their co-conspirators[1] attended.  The Defendants' unlawful agreement artificially raised, inflated, and/or manipulated the interest rates associated with tax liens auctioned at an interest rate above 0% throughout the state of New Jersey during the Class Period.  Defendants' conspiracy harmed thousands of distressed homeowners throughout the state of New Jersey and caused them to pay or owe significantly

---

[1]    The Defendants' co-conspirators include, but are not limited to: CCTS, LLC; CCTS Tax Liens I, LLC; CCTS Tax Liens II, LLC; DSBD, LLC; Pro Capital LLC; CCTS Capital LLC; Crestar Capital, LLC; David Butler; David M. Farber; Plymouth Park Tax Services, LLC; M.D. Sass Investors Services, Inc.; M.D. Sass Tax Lien Management, LLC; M.D. Sass Municipal Finance Partners - I, L.P.; M.D. Sass Municipal Finance Partners – II, L.P.; M.D. Sass Municipal Finance Partners - III, LLC; M.D. Sass Municipal Finance Partners - IV, LLC; M.D. Sass Municipal Finance Partners - V, LLC; M.D. Sass Municipal Finance Partners - VI, LLC; Vinaya J. Jessani; Stephen E. Hruby; Robert E. Rothman; American Tax Funding, LLC; Anthony J. De Laurentis; BBX Capital Corporation f/k/a BankAtlantic Bancorp, Inc.; Fidelity Tax, LLC; Michael Deluca; Gary I. Branse; Richard Simon Trustee; Betty Simon Trustee, LLC; Joseph Wolfson; Phoenix Funding, Inc.; Benedict Caiola; Royal Bancshares of Pennsylvania, Inc.; Royal Bank America; Crusader Servicing Corporation; Royal Tax Lien Services, LLC; Robert W. Stein; William A. Collins; Isadore H. May; Mooring Tax Asset Group, LLC; MTAG Services, LLC; Burlington Assembly of God/Fountain of Life Center; Mercer S.M.E., Inc.; Susan M. Esposito; David B. Boudwin; and Richard J. Pisciotta, Jr.  (collectively "Co-Conspirators")

- 2 -

388369.1

higher interest rates on TSCs than they otherwise would have been required to pay in a market free of Defendants' collusion.

2.     The Plaintiffs' claims are made on information and belief (except as to allegations specifically pertaining to Plaintiffs and their counsel, which are made on personal knowledge) based on the investigation conducted by and under the supervision of the Plaintiffs' Counsel and Interim Class Counsel. That investigation, included, but is not limited to, reviewing and analyzing information concerning the Defendants and public tax lien auctions in the State of New Jersey during the Class Period, which the Plaintiffs obtained from, among other sources:

    a.   Publicly available press releases, news articles and other media reports;

    b.   Filings that certain Co-Conspirators have made with the United States Securities and Exchange Commission;

    c.   The pleadings from the criminal proceedings of those 12 Defendants and Co-Conspirators which have agreed to plead guilty to violating the Sherman Act in connection with their participation in the precise conspiracy alleged herein;

    d.   Documents received in response to New Jersey Open Records Act Requests;

    e.   Interviews with witnesses to the criminal activity alleged in this complaint; and

    f.   Review of business records of certain Co-Conspirators involved in the conspiracy alleged herein and which document the conspiracy alleged herein.

3.     These sources, considered collectively, demonstrate Plaintiffs' allegations that Defendants and their Co-Conspirators collusively manipulated the interest rates associated with TSCs auctioned in the State of New Jersey during the Class Period and that Plaintiffs and members of the Class were harmed in that the interest rates Plaintiffs owed on TSCs purchased

- 3 -

by Defendants and their Co-Conspirators at public auctions during the Class Period were higher than those that would have prevailed in a market free from the collusive activities alleged herein.

4.      Except as alleged in this Complaint, neither the Plaintiffs nor other members of the public have access to the underlying facts relating to the illegal activities alleged herein. That information lies exclusively within the possession, custody, or control of Defendants and their Co-Conspirators and other insiders which prevent Plaintiffs from further detailing Defendants' misconduct.  The Plaintiffs have reached settlements with several Co-Conspirators. Part of the consideration being offered in those settlement agreements is an agreement by the settling Co-Conspirator to disclose to Plaintiffs all details concerning the conspiracy to the extent not inconsistent with their obligations to the ongoing Department of Justice investigation.  This information will provide additional details concerning the conspiracy.

5.      As in many states, real property owners in New Jersey must pay property taxes and sewer and water charges to the municipality in which the real property is located.  If the owner fails to pay any taxes or charges owed, a lien arises on the property by operation of law. Should the lien remain unpaid for a certain amount of time, New Jersey law requires that the lien be sold by the municipality at a live tax lien auction.

6.      At these auctions, the winning bidder must pay the outstanding lien, interest due, and any premium to the municipality at the time of sale.  As consideration, the winning bidder receives a TSC, which must be recorded with the clerk or register of deeds to preserve the lien holder's interest.  This TSC is also sent to the property owner notifying him or her of the change in ownership of the lien.

7.      TSCs entitle the lien holder to several benefits, including a first priority lien on the property, penalties ranging from 2%-12%, interest on the delinquent tax obligation (up to the

- 4 -

statutory maximum of 18%) and the right to collect the delinquent tax obligation. The TSC also entitles its holder to foreclose on the property associated with the TSC after a certain period of time should the lien not be redeemed by the property owner.

8.      New Jersey state law sets forth the process by which municipal public lien auctions are conducted in New Jersey. The statutory process is set up in such a way that auctions for TSCs are intended to be competitive, with bidders aggressively reducing the amount of interest they are willing to accept in order to obtain a TSC on a property. This is done in order to provide the delinquent property owner with as favorable of an interest rate as possible. The bidding on a lien at an auction in New Jersey opens with the interest rate associated with the lien at 18%. Each successive bid will lower the interest rate potentially to 0%. This process is known as a "reverse auction."

9.      The Defendants and their Co-Conspirators were among the largest TSC purchasers in the State of New Jersey during the Class Period and together account for the vast amount of TSCs purchased in the State of New Jersey during the Class Period. Rather than engage in a competitive bidding process for TSCs, however, Defendants and their Co-Conspirators secretly agreed to rig bids at TSC auctions throughout the State of New Jersey in order to eliminate or reduce competitive bidding thereby guaranteeing that the interest rate would stay artificially high (often at the statutory maximum of 18%), and thus securing excessive (and illegal) returns on their TSC investments. Each Defendant named above engaged in an overarching conspiracy during the Class Period that included allocating which TSC each conspirator would bid on, and hence "win" at an auction. This process guaranteed Defendants and their Co-Conspirators that they would secure TSCs at a higher interest rate than would have

- 5 -

occurred in a competitive market. It also guaranteed that the Plaintiffs would receive the least favorable terms on their TSCs.

10.     Plaintiffs and members of the proposed Class are New Jersey tax payers who became delinquent on their real property tax obligations, often as a result of disability and/or economic hardship. Because of the unlawful conspiracy, Class members either paid or owe Defendants and their Co-Conspirators an inflated amount in order to redeem their TSCs, and keep their home or other property from falling into the possession of one of the Defendants or their Co-Conspirators. Indeed, some class members have already lost their properties as a result of the illegal behavior alleged herein.

11.     The Antitrust Division of the United States Department of Justice is currently conducting a criminal investigation into the activities alleged in this complaint. Since its investigation began, and as further described herein, 12 individuals and entities have agreed to plead guilty to violating the Sherman Act, 15 U.S.C. § 1 and have admitted to participating in a statewide conspiracy to rig bids at public municipal tax lien auctions in the State of New Jersey from at least 1998 through February 2009. The criminal investigation remains active and, as further described below, a guilty plea has been entered as recently as April 25, 2013. As part of their pleas, these Defendants and Co-Conspirators are subject to criminal fines and/or prison. They are not however, subject to restitution because of the pendency of *this* litigation. For example, the Crusader plea agreement states, "[i]n light of the availability of civil causes of action, in the United States District Court for the District of New Jersey, which potentially provide for a multiple of actual damages, the recommended sentence does not include a restitution order for the offense charged in the Information." The Remick plea agreement

- 6 -

contains substantially identical language. As such, this litigation is the only vehicle by which many victims of this cartel will be able to recover damages as a result of the alleged conspiracy.

12.  As a direct and proximate result of the unlawful conspiratorial bid rigging scheme of Defendants and their Co-Conspirators, Plaintiffs and other members of the Class have paid, or are required to pay, unlawfully inflated interest charges, in excess of what they otherwise would have paid in a competitive market and have therefore been injured.

## II.   JURISDICTION AND VENUE

13.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), because this action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

14.  The Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d), in that this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed class are citizens of a state different from some Defendants.

15.  The Court also has diversity jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1332(a). The matter in controversy is greater than $75,000 and this matter is between citizens of different states. This Court has supplemental jurisdiction over Plaintiffs' state law claims.

16.  Venue is proper because Defendants reside, are found, have agents and transact business in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22).

388369.1

### III.   PARTIES

**A.   Plaintiffs**

**Gila Bauer (as Trustee for the Gila Bauer Revocable Trust)**

17.   The Gila Bauer Revocable Trust is the fee owner of real property located at 14 Lesko Terrace, Ogdensburg, New Jersey in the County of Sussex (the "Bauer Property").  Co-Conspirator Robert E. Rothman purchased a TSC associated with the Bauer Property at a public auction on December 30, 2005, in the Borough of Ogdensburg for $1,048.26.  Plaintiff Bauer's lien was purchased by Co-Conspirator Rothman at 18% interest pursuant to the conspiracy alleged herein.  The TSC associated with the Bauer Property was issued because of delinquent water charges totaling $1,027.71.  As of November 13, 2012, Bauer estimates that the lien is currently at $21,284.

18.   As a result of the anticompetitive conduct of Defendants and their Co-Conspirators, the interest rate associated with the TSC on the Bauer Property was artificially inflated, and Plaintiff Bauer has been damaged thereby.

**Melissa Jacobs**

19.   Plaintiff Melissa Jacobs was the fee owner of real property located at 307 Rosemont Avenue, Newfield, New Jersey (the "Jacobs Property").  Co-Conspirator Sass Municipal Finance Partners V, LLC purchased a TSC associated with the Jacobs Property at a public auction on June 25, 2008, in Newfield Borough.  The lien was purchased with an 18% interest rate pursuant to the conspiracy alleged herein.

20.   As a result of the anticompetitive conduct of Defendants and their Co-Conspirators, the interest rate associated with the TSC on the Jacobs Property was artificially inflated, and Plaintiff Jacobs has been damaged thereby.

**The Schmidt Plaintiffs**

388369.1

21.    Plaintiffs Frances A. Schmidt and Donald W. Schmidt ("the Schmidts") owned two parcels of land adjacent to their home.  The addresses of the properties are (1) 555 Woodstown Road, Woolwich Township, NJ ("Schmidt Property 1") and (2) 566 Woodstown Road, Woolwich Township, NJ ("Schmidt Property 2").

22.    The Schmidts failed to pay 2006 property taxes totaling $626.51 for Schmidt Property 1 and $3,697.73 for Schmidt Property 2.  At a public auction on October 19, 2007, in Woolwich Township, Co-Conspirators CCTS Tax Liens I, LLC purchased the TSC associated with Schmidt Property 1, and Co-Conspirator M.D. Sass Municipal Finance Partners V, LLC purchased the TSC associated with Schmidt Property 2.  The interest rate associated with both TSCs is 18% and the liens were purchased pursuant to the conspiracy alleged herein.  The price to redeem the lien on Schmidt Property 1 has increased to $38,721.70 while the price to redeem Schmidt Property 2 has increased to $36,297.85.

23.    As a result of the anticompetitive conduct of Defendants and their Co-Conspirators alleged herein, the interest rate associated with the TSCs on the Schmidt Property was artificially inflated and Plaintiffs have been damaged thereby.

**Son, Inc.**

24.    Son, Inc. ("Son") is a New Jersey corporation headquartered in Newark, New Jersey.  Son was the owner of property located at 711-717 21st Avenue, Paterson, New Jersey (the "Son Property").  Co-Conspirator Crusader Servicing Corporation was the winning bidder at a public auction in the City of Paterson, New Jersey on two TSCs associated with the Son Property, one dated June 29, 2004, and one dated June 29, 2006.  The interest rates associated with both TSCs is 18% and the liens were purchased by Co-Conspirator Crusader pursuant to the conspiracy alleged herein.  Plaintiff Son redeemed both TSCs on August 15, 2009. from Co-

- 9 -

Conspirator Crusader. The June 29, 2004, TSC was redeemed for $25,321.70, of which only $12,736.74 was for taxes. The June 29, 2006, TSC was redeemed for $34,797.969, of which only $21,515.27 was for taxes.

25.     As a result of the anticompetitive conduct of Defendants and their Co-Conspirators, the interest rate associated with the TSCs on the Son Property were artificially inflated, forcing Plaintiff Son to pay an inflated price to redeem the TSCs, and Plaintiff was damaged thereby.

**B.     Defendants**

26.     Defendant William S. Green is a resident of Cherry Hill, New Jersey. Defendant Green is currently the Chief Executive Officer of Co-Conspirators CCTS Capital, LLC and Crestar Capital, LLC, an entity formed by Defendant Green in or around 2008 and which began purchasing tax sale certificates in the State of New Jersey that same year. Defendant Green is currently a member of the Board of Directors of the National Tax Lien Association, and has been involved in the NTLA for many years. Defendant Green attended numerous meetings of the NTLA, which provided opportunities for Defendant Green to engage in meetings and conversations pursuant to the conspiracy alleged herein. Defendant Green is currently under investigation by the U.S. Department of Justice for his involvement in the conspiracy alleged herein. Defendant Green personally attended tax sale auctions in the State of New Jersey during the Class Period, participated in the conspiracy alleged herein, and through CCTS and Crestar, purchased TSCs at artificially inflated interest rates pursuant to the conspiracy alleged herein.

27.     Defendant Norman T. Remick is an individual residing in Barnegat, New Jersey. On April 25, 2013, Defendant Remick agreed to plead guilty to a one count information charging him with violations of the Sherman Act in connection with his participation in the conspiracy alleged herein. Defendant Remick personally attended tax sale auctions in the State of New

Jersey during the Class Period, participated in the conspiracy alleged herein, and purchased TSCs at artificially inflated interest rates during the Class Period pursuant to the conspiracy alleged herein.

28.    Defendant Isaac Moradi is an individual residing in Kearny, New Jersey. Defendant Moradi personally attended tax sale auctions in the State of New Jersey during the Class Period, participated in the conspiracy alleged herein, and purchased TSCs at artificially inflated interest rates pursuant to the conspiracy alleged herein.

29.    Defendant Michael Mastellone is an individual residing in Mountain Lakes, New Jersey.  Defendant Mastellone's office is located in Montville, New Jersey.  Defendant Mastellone personally attended tax sale auctions in the State of New Jersey during the Class Period, participated in the conspiracy alleged herein, and purchased TSCs at artificially inflated interest rates pursuant to the conspiracy alleged herein.

30.    Defendant Pat Carabellese is an individual residing in Cresskill, New Jersey. Defendant Carabellese purchased tax sale certificates in the State of New Jersey on behalf of PAM Investors, an entity of which he serves as president and managing partner. Defendant Carabellese personally attended tax sale auctions in the State of New Jersey during the Class Period, participated in the conspiracy alleged herein, and through PAM Investors, purchased TSCs at artificially inflated interest rates pursuant to the conspiracy alleged herein.

31.    Defendant PAM Investors ("PAM") is a partnership involved in acquisitions and management of real estate with its principal place of business at 127 S. Washington Avenue, Bergenfield, New Jersey.  Defendant Carabellese serves as president and managing partner of PAM.  Defendant PAM, through bidders such as Defendant Carabellese and other executives,

388369.1

purchased and/or acquired TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

32.     Defendant Heartwood 55, LLC ("Heartwood 55") is a Florida limited liability company with its principal place of business at 401 East Las Olas Boulevard, Suite 800, Fort Lauderdale, Florida.  Defendant Heartwood 55 is a wholly-owned subsidiary of BBX Capital Corporation f/k/a BankAtlantic Bancorp, Inc. ("BankAtlantic").  BankAtlantic is a defendant in the federal class action captioned *In re New Jersey Tax Sales Certificates Antitrust Litigation*, 12-1893 (D.N.J.) (MAS)(TJB).  BankAtlantic was one of the largest purchasers of tax liens in the State of New Jersey during the Class Period.  BankAtlantic, through its wholly-owned subsidiaries (such as Fidelity Tax, LLC, also a defendant in the above referenced class action) and defendant Heartwood 55, purchased and/or acquired TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.  BankAtlantic participated in the conspiracy through certain executives and subsidiaries.  Two of its executives, Co-Conspirators Gary Branse and Michael Deluca, attended tax sale auctions throughout New Jersey during the Class Period, and participated in meetings and discussions in furtherance of the conspiracy alleged herein, and reached understandings and/or agreements with the other defendants and Co-Conspirators named in this complaint.  Branse and Deluca would cause BankAtlantic subsidiaries such as Fidelity or defendant Heartwood 55 to acquire tax sale certificates pursuant to the conspiracy alleged herein.  In addition to being executives of BankAtlantic, Branse and Deluca were also executives of the relevant BankAtlantic subsidiaries, Fidelity and defendant Heartwood 55.  Branse and Deluca were terminated by BankAtlantic for their participation in the conspiracy alleged herein, and were also named as defendants in *In re*

- 12 -

388369.1

*New Jersey Tax Sales Certificates Antitrust Litig.*, 12-1893 (D.N.J.)(MAS)(TJB).  Defendant Heartwood 55 currently owns tax sale certificates that were acquired pursuant to the conspiracy.

33.     In the Plaintiffs' Consolidated Master Class Action Complaint filed in *In re New Jersey Tax Sales Certificates Antitrust Litig.*, 12-CV-1893 (D.N.J.)(MAS)(TJB) [Dkt. No. 113] ("Consolidated Complaint"), plaintiffs alleged that Fidelity Tax LLC was the "only entity used by BankAtlantic to purchase tax liens in the State of New Jersey during the Class Period." *See* Consolidated Complaint, ¶ 93.  Plaintiffs have since discovered information in their ongoing investigation which indicates that this allegation is incorrect, and that at least defendant Heartwood 55, LLC also purchased and/or acquired TSCs purchased pursuant to the conspiracy alleged herein.  It is possible that plaintiffs may uncover additional information in their investigation which implicates other BankAtlantic subsidiaries in the conspiracy alleged herein, and plaintiffs reserve their rights to name additional BankAtlantic subsidiaries as defendants.

34.     Defendant Robert U. Del Vecchio Pension Trust is a trust formed under the laws of the State of New Jersey and located in Hawthorne, New Jersey.  Defendant Robert U. Del Vecchio Pension Trust purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

35.     Defendant Robert U. Del Vecchio is an individual residing at Hawthorne, New Jersey.  Defendant Del Vecchio attended public TSC auctions in the State of New Jersey and participated in the conspiracy alleged herein.  Defendant Del Vecchio, through the Robert U. Del Vecchio Pension Trust, purchased TSCs at public auctions in the State of New Jersey during the Class Period pursuant to the conspiracy alleged herein.

388369.1

C.   **Named Co-Conspirators**

36.   Various other entities and individuals not named as Defendants in this complaint participated as co-conspirators in the acts complained of, and performed acts and made statements that aided and abetted and was in furtherance of the unlawful conduct alleged herein.

37.   Whenever in this complaint reference is made to any act, deed or conduct of a corporate defendant, the allegation means that defendant engaged in the act, deed or conduct by or through one or more of its officers, directors, agents, employees or representatives who was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of such corporate defendant.

## IV.   INTERSTATE TRADE AND COMMERCE

38.   The business activities of Defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

39.   During the Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.  Further, several Defendants used funds received from outside New Jersey to purchase tax liens in New Jersey during the Class Period.

## V.   FACTUAL ALLEGATIONS

A.   **The TSC Market in New Jersey**

40.   The New Jersey Tax Sale Law contains a number of statutes which, collectively, govern the "[c]reation, enforcement and collection of liens for unpaid [real property] taxes and other municipal liens on real property."  *See New Jersey Revised Taxes*, N.J.S.A. 54:5-1, *et seq*.

41.   Pursuant to these statutes, the Tax Sale Law establishes municipal tax liens as a legal restriction on real property, whether commercial, residential, industrial, or land.  Such tax liens arise automatically as a charge against the fee title interest of the owner upon the accrual of

- 14 -

real estate taxes or such other charges the New Jersey municipality in which the real property is located imposes. Municipalities may only collect these unpaid revenues by means provided by the Tax Sale Law.

42.     N.J.S.A. 54:5-6 states that delinquent taxes on real property operate as a continuous lien on the property, and all subsequent taxes, interest, penalties and costs of collection shall be added to and become part of such lien. This lien is superior to all other interests on the real property, including any mortgage lien.

43.     If a real property owner in New Jersey has a lien connected with his property for failure to pay real property, water, or sewage taxes, the municipality in which the property is located may auction the lien through a bidding process authorized by the New Jersey Tax Sale law.

44.     The winner of an auction acquires the municipality's lien, and receives a TSC as evidence of the lien. The TSC holder is entitled to collect the amount of the lien from the delinquent taxpayer, along with the winning interest rate, in addition to any subsequent taxes paid by the winning bidder and applicable interest and penalties. Further, the winning bidder can foreclose on the property and take title to the property if the taxes owed on the property, accrued interest or any applicable costs or penalties remain unpaid for a period of time.

45.     The auctions are open to the public. Although individuals are permitted to bid for the right to purchase TSCs at these auctions, bidders are often sophisticated financial institutions that acquire TSCs as part of an investment strategy. Bidders from outside of New Jersey regularly bid on TSCs at public auctions in New Jersey, including Co-Conspirators Sass, Crusader, BankAtlantic, Plymouth Park, and ATF. Individuals and entities who have a lien on their property (i.e. the Plaintiffs and members of the Class) did not attend such auctions.

- 15 -

388369.1

46.     Each of New Jersey's 566 municipalities must hold auctions for outstanding liens on real property at least once a year, assuming the municipality contains properties that are delinquent in their tax obligations. *See* N.J.S.A. 54:5-19. New Jersey municipalities auction approximately $100 million to $200 million in delinquent tax obligations every year.

47.     The Tax Sale Law thus mandates that there be competitive bidding for outstanding tax liens. Under the Tax Sale Law, bidding at the auctions opens up at 18% interest and each subsequent bid lowers the interest rate. This is known as a reverse auction. The presumption, therefore, is that honest competition among bidders should drive down the winning bid far below 18%, and often as low as 0%. The auction can even result in the bidders paying an extra amount, or "premium," to obtain the lien.

48.     Because a purchaser can collect penalties from the property owner, can secure a first priority lien on the property, is entitled to priority for subsequent year tax liens on the property and can institute foreclosure proceedings at an appropriate time, the purchase of a TSC with a winning bid of zero percent interest is still extremely valuable.

49.     The tax lien auction process in New Jersey is designed to engender competitive bidding in an effort to try and help the delinquent tax payer who is already likely experiencing financial difficulty and because the statutory tax lien process, even in the absence of collusion, can often lead to harsh results for the property owner. For example, once a property owner has a TSC auctioned off with respect to their property, by statute, the TSC acquirer may elect to pay any subsequent delinquent property taxes and/or municipal charges. These subsequent taxes and interest are added to the lien. Any subsequent taxes and charges by statute carry an 18% interest rate. As a result, numerous stories exist of those who failed to pay several hundred dollars in property taxes or other municipal charges, and end up owing tens of thousands of dollars in taxes

- 16 -

and interest to redeem the TSC. Thus, the statutory tax lien auction process in New Jersey can be quite punitive to the property owner. The conspiracy alleged herein acted to make it even more punitive by colluding and artificially raising the interest rate associated with the property owner's delinquent obligation. Quite simply, the conspiracy was akin to pouring salt in the wounds of Plaintiffs and the members of the Class.

**B.    Defendants' Conspiracy**

50.    Although tax sale auctions in New Jersey are intended to result in competitive bidding for tax liens, thereby lowering the interest rate associated with the delinquent tax obligation to the benefit of the property owner, the Defendants and their Co-Conspirators entered into a conspiracy to ensure that the TSCs auctioned in New Jersey carried as high an interest rate as possible. The Defendants and their Co-Conspirators entered into a combination and/or conspiracy to rig auctions for tax liens throughout the State of New Jersey during the Class Period so that competition at auctions would be reduced and/or eliminated thereby keeping interest rates on tax liens artificially high.

51.    Beginning at least as early as 1998, the Defendants and their Co-Conspirators entered into an overarching understanding and/or agreement to allocate the liens being sold at auctions amongst themselves, and to refrain from bidding against one another, in order to ensure that the interest rate associated with a lien did not go below the statutory maximum of 18%. This agreement and/or understanding applied to auctions throughout the entire state of New Jersey during the Class Period where the Defendants and their Co-Conspirators were present.

52.    Auction lists identifying the property associated with the lien were published approximately 30 days in advance of the auction by the municipality on the Internet or in certain publications. Vendors, such as LienSource, retrieve these auction lists from every municipality in New Jersey, and assemble such information in a comprehensive database along with other

- 17 -

information concerning the property. The Defendants and their Co-Conspirators purchase such information from these vendors, or simply retrieve the information themselves from a newspaper or the Internet. Thus, prior to each auction, the Defendants and their Co-Conspirators were able to determine every lien that would be up for auction.

53.     Possessing such information in advance of each auction permitted the Defendants and their Co-Conspirators to agree upon the liens each would be allocated in advance of the auction. The Defendants and their Co-Conspirators would discuss the liens in the auction lists and agree upon which lien would be allocated to a particular Defendant. Co-Conspirators Sass and Crusader often organized other bidders before each auction and coordinated the process by which Defendants and their Co-Conspirators decided which conspirator would win which lien or liens. Conversations allocating the liens would take place on the telephone prior to the auction and in person at the auction prior to the beginning of the auction, often outside the municipal building or in parking lots behind the building where the auction was to be held. The Defendant or Co-Conspirator allocated a particular lien would then bid on its allocated lien at 18% interest, while the other conspirators refrained from bidding at all on that particular lien. The conspirator which bid would then "win" the auction since there were no competing bids. The conspirators often kept detailed "bid books" in which they would notate each lien up for auction, and also which liens such conspirator was allocated pursuant to the conspiracy.

54.     Some participants referred to this process as "round robin" bidding as conspirators took turns bidding on different TSCs pursuant to the cartel.

55.     Once the bidding began, Defendants and their Co-conspirators did not deviate from the previously allocated bids or cheat on the cartel by bidding against each other. Defendants and their Co-Conspirators also often tracked the bidding on their bid books as it

- 18 -

unfolded, to ensure that fellow conspirators were bidding on – and "winning" – the agreed-upon liens.  As a result, cheated within the cartel did not occur.

56.     As a direct result of the conspiracy of Defendants and their Co-Conspirators, interest rates associated with the tax liens that were sold at public auctions in New Jersey during the Class Period were artificially inflated, often at 18%.

**C.     Examples of Rigged Auctions**

57.     While the overarching statewide conspiracy of Defendants and their Co-Conspirators impacted liens that were auctioned at municipalities throughout the State of New Jersey during the Class Period, the following representative auctions demonstrate the way the conspiracy functioned and impacted the market for TSCs in the state.  While these exemplars are by no means comprehensive, and each Defendant herein participated in numerous rigged auctions like those listed below, the full details of every auction at issue in this case will not be available until discovery is undertaken:

a.     Conspirators and Defendants attended an auction in Cliffside Park, New Jersey on December 7, 2000, where nearly all of the winning bids for liens were "won" at 18 percent interest rates. Conspirators Crusader and Rothman, and Defendants Del Vecchio and Carabellese (who was bidding on behalf of Defendant PAM) all selected certain liens. Del Vecchio "won" one lien at 18 percent interest, and Carabellese "won" two liens at 18 percent interest.

b.     Conspirators and Defendants attending an auction in Hampton Township, New Jersey on April 7, 2004, agreed, prior to the auction, to allocate the liens on which they would each bid.  This allocation of liens occurred in the hallway of the auction building. Defendants Mastellone, PAM Investors, and Del Vecchio all selected certain liens, and each such bid was ultimately "won" by the selecting defendant despite the presence of other attendees at the auction. Additionally, conspirators Sass, Crusader, Rothman, Plymouth Park, ATF, Fidelity, and Phoenix also

- 19 -

selected certain liens prior to the auction pursuant to the conspiracy and "won" the liens during the auction.

c.    Conspirators attending an auction in Cherry Hill, New Jersey on June 28, 2006 agreed, prior to the auction, to "pick" the liens on which they would each bid. Conspirators ATF, BankAtlantic, CCTS, Simon, Sass, Collins and Defendant Remick all selected certain liens, and each such bid was ultimately "won" by selecting conspirator despite the presence of other attendees at the auction. Most, if not all such "winning" bids were won at 18% interest.

d.    On April 27, 2006, conspirators attending an auction in Somers Point, New Jersey, agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Conspirators Sass, Wolfson, Collins, Crusader, Pisciotta, May and Defendant Remick all selected certain liens, and each such bid was ultimately "won" by selecting conspirator despite the presence of other attendees at the auction. Most, if not all such "winning" bids were won at 18% interest.

e.    On June 12, 2006, conspirators attending an auction in Upper Deerfield Township, New Jersey, agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Conspirators Collins, Sass, Mooring, Crusader, and Defendant Remick all selected certain liens, and each such bid was ultimately "won" by selecting conspirator despite the presence of other attendees at the auction. Most, if not all such "winning" bids were won at 18% interest.

f.    Conspirators attending an auction in Egg Harbor, New Jersey on December 20, 2006 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Conspirators Mooring, Fountain of Life, Plymouth Park, May, Simon, ATF, Sass, Crusader, and CCTS all selected certain liens, and each such bid was ultimately "won" by selecting conspirator despite the presence of other attendees at the auction. Most, if not all such "winning" bids were won at 18% interest.

g.    On March 5, 2007 an auction in Newfield, New Jersey resulted in all 59 TSCs that were up for auction being sold at the statutory maximum bid of 18 percent each, all on a single bid, despite the presence of seven bidders. Of those

- 20 -

388369.1

seven bidders, three have already pleaded guilty to participating in the conspiracy alleged herein.   The Department of Justice has also subpoenaed the Borough of Newfield for information concerning the March 5, 2007 auction.

h.    Conspirators attending an auction in Plumsted, New Jersey on June 6, 2007 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Conspirators CCTS, Fountain of Life, Crusader, Collins, and Sass all selected certain liens, and each such bid was ultimately "won" by selecting conspirator despite the presence of other attendees at the auction. Most, if not all such "winning" bids were won at 18% interest.

i.    On June 7, 2007, an auction in Rutherford, New Jersey was attended by conspirators Sass, Crusader, and Rothman, and Defendants Mastellone and Del Vecchio. Conspirators and Defendants, agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Nearly every lien at this auction was sold at 18 % interest. Defendant Mastellone "won" two liens at this auction. Defendant Del Vecchio "won" three liens, all at 18 % interest.

j.    On June 5, 2008, an auction in Ridgefield, New Jersey was attended by conspirators Sass and Crusader and Defendant Mastellone, among other bidders. All bidders met before the auction and decided who would receive which liens, with Conspirator Crusader deciding who would "win" each lien.  Defendant Mastellone was awarded the largest lien before the auction and "won" the lien at 18% interest.

k.    On June 11, 2008, an auction in Somerdale, New Jersey was attended by many of the conspirators.  Defendants Sass, Crusader, Plymouth, CCTS I and May each selected multiple liens at the auction – each of these conspirators "won" the bidding on the liens they were allocated and all were auctioned off carrying an 18% interest rate.

l.    Conspirators and Defendants attending an auction in Lincoln Park, New Jersey on June 25, 2008 agreed, prior to the auction, to "pick" the liens on which they would each bid. Bidders drew lots in the parking area behind the building in which the auction was being held to determine the order of "picking" and who would "win" the best lot. Defendants Moradi and Mastellone, as well as Conspirators

- 21 -

Sass and Crusader, attended the auction. Defendant Moradi won at least six liens and Defendant Mastellone won at least two liens at this auction.

m. Conspirators attending an auction in Maywood, New Jersey on December 10, 2008 agreed, prior to the auction, to "pick" the liens on which they would each bid prior to the auction. Conspirators Crusader, Sass, CCTS and Rothman all selected certain liens, and each such bid was ultimately "won" by selecting conspirator despite the presence of other attendees at the auction. Most, if not all, of such "winning" bids were won at 18 % interest.

58. In another instance, Co-Conspirators Crusader and Sass divided TSCs related to land in northern New Jersey that was only valuable if one company held all the TSCs, thus permitting that holder of the TSCs to foreclose on the entire property. Instead of bidding against each other to try to obtain all of the TSCs on the property, these Co-Conspirators colluded. As a result, Sass won the bids on approximately half of the TSCs, Crusader won the bids on the other half of the TSCs - all at the statutory maximum of 18%.

59. At several auctions, Co-Conspirator Collins acted as a conduit of information from the larger institutional investors (like Crusader, Sass, Plymouth Park, BankAtlantic, and ATF) to the smaller cartel participants such as Co-Conspirators Farber and Butler. After the larger cartelists divided the liens that they would each "win" at a given auction, they would relay the information to Collins. Collins would then share this information with other Co-Conspirators who were present at the auction. These smaller participants in the conspiracy referred to themselves as the "breakfast club."

60. In order to determine the order in which the members of the "breakfast club" would divvy up the auctions, they sometimes selected cards from a deck. Other conspirators drew lots to determine the order of picking, with the Co-Conspirator that drew the lowest number getting the first opportunity to choose a lien at the particular auction.

388369.1

61.     As Vincent Belluscio, the executive director of the state tax collectors and treasurers association, stated, "[T]hese [tax lein] investors have a tendency to meet . . . and divvy up the [property] list." Gopal, P., "JPMorgan Unit Subpoenaed in U.S. Tax-Lien Inquiry," (hereafter, "JPMorgan Unit Subpoenaed "), Bloomberg (April 20, 2010), available at http://originwww.bloomberg.com/apps/news?pid=conewsstory&tkr=RBPAA:US&sid=aRC1Q6y1dKtE. That is, "[t]hey say, 'We'll buy these properties, and you buy those.' And the interest rate holds at 18 percent." *Id.* Tellingly, according to a participant, "It's a niche business" where participants "have camaraderie among each other" because, in their view, there was "enough for everybody." *See* Glovin, D. & Vareacos, D,. "New Jersey 'Round Robin' Tax Lien Auction Spurs Probe," Bloomberg (March 21, 2012), available at http://www.bloomberg.com/news/2012-03-21/m-d-sass-participated-in-tax-lien-sale-being-probed-by-u-s-.html

62.     In addition to these examples, witnesses who pleaded guilty to the conspiracy have identified, among others, Defendants Green, Remick, Moradi, Mastellone, Carabellese, PAM Investors and Del Vecchio as directly participating in the allocation of tax liens at similar public auctions in New Jersey and bidding on liens at such auctions in furtherance of the overarching conspiracy alleged herein. These witnesses personally participated in the discussions and agreements reached with these Co-Conspirators during the Class Period.

**D.     Policing the Conspiracy**

63.     In order to enforce the conspiracy, cartel participants would bully participants and non-participants into refraining from bidding on particular liens. This conduct included, but was not limited to, intimidation and verbal threats.

64.     Oftentimes, new bidders who posed a threat to the conspiracy were asked to join forces with the cartelists rather than continue to bid competitively. Several Co-Conspirators joined the conspiracy this way.

388369.1

### E.   The Conspiracy Breaks Down

65.   Certain other states and municipalities outside New Jersey conduct tax lien auctions in a similar manner as in New Jersey and several of the Co-Conspirators herein participate in tax lien auctions in multiple jurisdictions.  One such jurisdiction is Maryland.  In or around the end of 2008, or the beginning of 2009, it became publicly known that the United States Department of Justice had begun an investigation into collusion with respect to bid rigging at tax lien auctions in the State of Maryland.  Co-Conspirator Anthony J. De Laurentis, along with his partners and an affiliated corporate entity (DRT Fund), were granted conditional amnesty from the Department of Justice in connection with their participation in the conspiracy in Maryland.   In order to be granted conditional amnesty, one must disclose to the Department of Justice the commission of a crime of which it had been previously unaware, and agree to cooperate fully with any investigation.

66.   As a result of the publicity that the Maryland investigation garnered in the press in late 2008-early 2009, and the similarity of the auction processes in New Jersey and Maryland as well as the overlap of conspiracy participants, the Defendants and their Co-Conspirators herein became concerned about their further participation in the conspiracy alleged and decided to discontinue their collusive activities with respect to tax lien auctions in New Jersey by around February 2009.

### F.   National Tax Lien Association (NTLA) Trade Association

67.   Certain Defendants and several Co-Conspirators belonged to the National Tax Lien Association ("NTLA"), an organization that purports to advance the interests of the tax lien industry including the New Jersey tax lien industry.  In addition, employees and executives of Defendants' and their Co-Conspirators have served in leadership positions at the NTLA.  For example, Jim Meeks, the president and chief executive officer of Co-Conspirator Mooring,

- 24 -

388369.1

currently serves as treasurer of NTLA's Board of Directors. Further, as stated above, Defendant William S. Green is also a member of the NTLA's board of directors.

68.     The NTLA regularly holds symposiums and meetings. For example, in March of each year, the NTLA held an annual meeting, usually in Florida, at which many of the Co-Conspirators attended. In 2006, the March meeting took place in Las Vegas, and in 2007, 2008 and 2009, the March meeting took place in Miami, Florida. The conspirators regularly attended these sessions, which offered an opportunity for members to meet, conspire, and share information about rigging bids at future municipal auctions.

**G.     Defendant Remick and Co-Conspirators Plead Guilty to Participating in Conspiracy**

69.     The Antitrust Division of the United States Department of Justice began an investigation into criminal conduct at TSC auctions in New Jersey at least as early as 2009. As a result of the federal investigation, nine individuals and three entities – all Defendants or Co-Conspirators here – have pleaded guilty to participating in a conspiracy to rig bids and allocate TSCs at public tax lien auctions throughout New Jersey, in violation of Section 1 of the Sherman Act. The investigation remains active and additional pleas and/or indictments are expected. Indeed, as recently as April 25, 2013, Defendant Remick pled guilty.

70.     In announcing certain guilty pleas on February 23, 2012, the Department of Justice made clear that "the primary purpose of the conspiracies was to suppress and restrain competition to obtain selected municipal tax liens offered at public auctions at non-competitive interest rates."

71.     Moreover, "[b]ecause the conspiracies permitted the conspirators to purchase tax liens with limited competition, each conspirator was able to obtain liens which earned a higher interest rate." As a result, "[p]roperty owners were therefore made to pay higher interest on their

- 25 -

tax debts than they would have paid had their liens been purchased in open and honest competition."

72.      As Sharis A. Pozen, then-Acting Assistant Attorney General in charge of the Department of Justice's Antitrust Division stated, the "guilty pleas demonstrate that the Antitrust Division will not tolerate those who manipulate the competitive process in order to harm home and property owners."

73.      On August 23, 2011, Co-Conspirator Collins pleaded guilty to violating the Sherman Act for his role in the conspiracy. *See United States of America v. William A. Collins*, 11-CR-563 (D.N.J.) (DMC).  The information accompanying his guilty plea states:

> From at least as early as the beginning of 2003 to until approximately February 2009 . . . Collins and his co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among COLLINS and his coconspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, Collins and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

74.      Also on August 24, 2011, Co-Conspirator May pleaded guilty to violating the Sherman Act for his role in the conspiracy. *See United States of America v. Isadore H. May*, 2:11-CR-00562 (D.N.J.) (DMC).  The information accompanying his guilty plea states:

388369.1

> From at least as early as the beginning of 2003 to until approximately February 2009 . . . May and his co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among May and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, May and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements.

75.    Co-Conspirator Pisciotta was the third person to plead guilty to violating the

Sherman Act for his role in the conspiracy on August 24, 2011. *See United States of America v.*

*Richard J. Pisciotta, Jr.*, 11-CR-561 (D.N.J.) (DMC).  The information accompanying his guilty

plea states:

> From at least as early as the beginning of 2003 to until approximately February 2009 . . . Pisciotta and his co-conspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Pisciotta and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, Pisciotta and his co-conspirators . . . attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to

- 27 -

388369.1

compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

76.     On February 24, 2012, Co-Conspirator Farber pleaded guilty to violating the

Sherman Act for his role in the conspiracy. *See United States of America v. David M. Farber*,

12-CR-139 (D.N.J.) (DMC).  From about the beginning of 2005 until approximately November

2008, according to the criminal information, Farber held a limited partnership interest in Co-

Conspirator DSBD.  Farber bid and purchased municipal tax liens in the State of New Jersey on

behalf of DSBD, which were held as investments by Co-Conspirators CCTS I and CCTS II.

Moreover, from about December 2008 through July 2009, Farber served as president of a

company identified as "Company 1", overseeing the purchase of TSCs in the State of New

Jersey.  "Company 1" is Co-Conspirator CCTS Capital, the predecessor entity to Co-Conspirator

Crestar Capital, which Defendant Green is now CEO of.  The information accompanying

Farber's guilty plea also states:

> From at least as early as the beginning of 2005 until approximately
> February 2009 . . . David M. Farber, the Defendant, and his
> coconspirators, entered into and engaged in a combination and
> conspiracy to suppress and eliminate competition by submitting
> non-competitive and collusive bids at certain public auctions for
> tax liens conducted by municipalities within the District of New
> Jersey . . . The charged combination and conspiracy consisted of a
> continuing agreement, understanding, and concert of action among
> David M. Farber, the Defendant, and his co-conspirators, the
> substantial terms of which were to rig bids for and allocate tax
> liens being auctioned by municipalities within the District of New
> Jersey.
>
> For the purpose of forming and carrying out the charged
> combination and conspiracy, David M Farber, the Defendant, and
> his co-conspirators . . . a. attended meetings and engaged in
> discussions regarding bids for tax liens being auctioned by
> municipalities within the District of New Jersey; b. agreed during
> those meetings and discussions not to compete at certain tax lien

- 28 -

auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

77.     On February 23, 2012, Co-Conspirator Stein pleaded guilty to violating the

Sherman Act for his role in the conspiracy. *See United States of America v. Robert W. Stein*, 12-

CR-140 (D.N.J.) (DMC).  As president of Co-Conspirator Crusader and its successor, Co-

Conspirator RTLS, Stein oversaw the purchase of TSCs on behalf of "Company 1" – which is

Crusader and RTLS – from at least 1996 through 2010, according to the criminal information.

Further:

> From at least as early as 1998 until approximately spring 2009 . . . Robert W. Stein, the Defendant, and his co-conspirators, including Company 1, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Robert W. Stein, the Defendant, and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, Robert W. Stein, the Defendant, and his co-conspirators, including Company 1 . . . attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

78.     On March 27, 2012, Co-Conspirator Rothman pleaded guilty to violating the

Sherman Act for his role in the conspiracy. *See United States of America v. Robert E. Rothman*,

12-CR-210 (D.N.J.) (DMC).  The information accompanying his guilty plea states:

388369.1

> From in or about the Spring of 2000 until approximately February 2009 . . . Robert E. Rothman, the Defendant, and his co-conspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Robert E. Rothman, the Defendant, and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax liens being auctioned by municipalities within the District of New Jersey.
>
> For the purpose of forming and carrying out the charged combination and conspiracy, Robert E. Rothman, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

79.     On April 17, 2012, Co-Conspirator Hruby pleaded guilty to violating the Sherman

Act for his role in the conspiracy. *See United States of America v. Stephen E. Hruby*, 12-CR-263

(D.N.J.) (D.M.C.). As the Director of Acquisitions for various M.D. Sass entities from

December 2002 until early 2009, Hruby participated in, and oversaw and directed the

participation of agents and representatives of M.D. Sass at auctions for TSCs on behalf of the

Sass entities. The information accompanying his guilty plea states:

> From at least as early as December 2002 to until approximately February 2009 . . . Stephen E. Hruby, the Defendant, and his coconspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey . . . The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Stephen E. Hruby, the Defendant, and his co-conspirators, the substantial terms of which were to rig bids for and allocate tax

liens being auctioned by municipalities within the District of New Jersey.

For the purpose of forming and carrying out the charged combination and conspiracy, Stephen E. Hruby, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. instructed other bidders under his supervision to attend meetings and engage in discussions regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; c. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; d. submitted bids in accordance with the agreements reached; and e. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

80.     On April 23, 2012, Co-Conspirator Butler pleaded guilty to violating the Sherman Act for his role in the conspiracy. *See United States v. David Butler*, 12-CR-273 (D.N.J.) (D.M.C.). According to the criminal information, Butler held a limited partnership interest in Co-Conspirator DSBD. Pursuant to his partnership interest, he bid on and purchased TSCs, which were then held as investments by Co-Conspirators CCTS I and CCTS II. Moreover, from about December 2008 through July 2009, Butler served as Chief Executive Officer of a company identified as "Company 1", overseeing the purchase of TSCs in the State of New Jersey. "Company 1" is Co-Conspirator CCTS Capital, the predecessor entity to Co-Conspirator Crestar Capital. The information accompanying his guilty plea also states:

From at least as early as the beginning of 2005 until approximately February 2009, the exact dates being unknown to the United States, David Butler, the Defendant, and his co-conspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey.

For the purpose of forming and carrying out the charged combination and conspiracy, David Butler, the Defendant, and his co-conspirators . . . a. attended meetings and engaged in discussions or conversations regarding bids for tax liens being

- 31 -

> auctioned by municipalities within the District of New Jersey b.
> agreed during those meetings and discussions not to compete at
> certain tax lien auctions by allocating which tax liens each would
> bid on or refrain from bidding; c. submitted bids in accordance
> with the agreements reached; and d. purchased tax liens pursuant
> to those agreements at collusive and non-competitive interest rates.

81.    Co-Conspirator DSBD also pleaded guilty to violating the Sherman Act for its

role in the conspiracy on April 23, 2012.  *See United States v. DSBD, LLC*, 12-CR-00274

(D.N.J.) (D.M.C.).  The information accompanying DSBD's guilty plea states:

> From at least as early as the beginning of 2005 until approximately
> February 2009 . . . DSBD and its co-conspirators entered into and
> engaged in a combination and conspiracy to suppress and eliminate
> competition by submitting non-competitive and collusive bids at
> certain public auctions for tax liens conducted by municipalities
> within the District of New Jersey.

> For the purpose of forming and carrying out the charged
> combination and conspiracy, DSBD and its co-conspirators . . . a.
> attended meetings and engaged in discussions or conversations
> regarding bids for tax liens being auctioned by municipalities
> within the District of New Jersey; b. agreed during those meetings
> and discussions not to compete at certain tax lien auctions by
> allocating which tax liens each would bid on or refrain from
> bidding; c. submitted bids in accordance with the agreements
> reached; and d. purchased tax liens pursuant to those agreements at
> collusive and non-competitive interest rates.

82.    Co-Conspirator Crusader also pleaded guilty to violating the Sherman Act for its

role in the conspiracy on September 26, 2012.  *See United Stated v. Crusader Servicing Corp.*,

12-cr-00644 (D.N.J.) (D.M.C.).  The information accompanying Crusader's guilty plea states:

> Beginning at least as early as 1998 and continuing until September
> 2006, the exact dates being unknown to the United States, in the
> District of New Jersey and elsewhere, the defendant and co-
> conspirators entered into and engaged in a combination and
> conspiracy to suppress and eliminate competition by submitting
> non-competitive and collusive bids at certain public auctions for
> tax liens conducted by municipalities within the District of New
> Jersey.

- 32 -

> For the purpose of forming and carrying out the charged combination and conspiracy, the defendant and co-conspirators did those things that it combined and conspired to do, including, among other things: a. attended meetings and engaged in discussions or conversations regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

83.     On December 19, 2012, Co-Conspirator Mercer also pleaded guilty to violating the Sherman Act for its role in the conspiracy. *See United Stated v. Mercer, S.M.E.*, 12-cr-00832 (D.N.J.) (D.M.C.). The information accompanying Mercer's guilty plea states:

> From at least as early as the beginning of 2003 until approximately February 2009, the exact dates being unknown to the United States, MERCER, CC-1 and their co-conspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey.

> For the purpose of forming and carrying out the charged combination and conspiracy, MERCER, CC-1, and their co-conspirators did those things that they combined and conspired to do, including, among other things: a. attended meetings and engaged in discussions or conversations regarding bids for tax liens being auctioned by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at certain tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates; and e. transferred from CC-1 to Mercer, by way of assignment and for consideration, certain municipal tax liens which CC-1 and MERCER understood were purchased in accordance with agreements reached.

84.     Defendant Remick also pleaded guilty to violating the Sherman Act for his role in the conspiracy on April 25, 2013. *See United States v. Norman T. Remick*, 13-cr-282 (D.N.J.) (D.M.C.). The information accompanying defendant Remick's guilty plea states:

- 33 -

388369.1

From in or about the beginning of 2007 until approximately February 2009, the exact dates being unknown to the United States, NORMAN T. REMICK, the defendant, and his co-conspirators, entered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at certain public auctions for tax liens conducted by municipalities within the District of New Jersey.

For the purpose of forming and carrying out the charged combination and conspiracy, NORMAN T. REMICK, the defendant, and co-conspirators, did those things that they combined and conspired to do, including, among other things:  a. attended meetings and engaged in discussions or conversations at certain auctions regarding bids for tax liens being sold by municipalities within the District of New Jersey; b. agreed during those meetings and discussions not to compete at those tax lien auctions by allocating which tax liens each would bid on or refrain from bidding; c. submitted bids in accordance with the agreements reached; and d. purchased tax liens pursuant to those agreements at collusive and non-competitive interest rates.

85.     In addition, at least Co-Conspirators Plymouth Park, Mooring and RBPI each confirmed in public filings and/or news articles that they received grand jury subpoenas related to the Department of Justice's investigation.  RBPI confirmed that it has produced to the Department of Justice documents responsive to the subpoenas from RBPI, Crusader and RTLI. Fidelity Tax LLC was also served with a grand jury subpoena dated June 1, 2009, which requested that it testify before a grand jury, and also, produce documents to the grand jury.

**H.     The Sass Co-Conspirators Have a History Collusion in Tax Lien Auctions in Other Jurisdictions**

86.     In addition to the Sass entities' participation in the collusive activities with respect to TSC auctions in New Jersey, Sass has colluded with other persons and entities at tax lien auctions in other jurisdictions and has been ordered to pay millions of dollars for its participation in such activities.

- 34 -

388369.1

87.     For example, in 2007, MD Sass Investors Services, Inc., MD Sass Tax Lien Mgmt., LLC, Sass-Muni IV, LLC, Sass-Muni V, LLC, as well as two Sass executives, co-conspirator Vinaya Jessani and Kirk Allison, were sued in a federal RICO action in United States District Court for the Northern District of Illinois, captioned *BCS Services, Inc. and Phoenix Indemnity Co. v. Heartwood 88, LLC, et al.*, 07-1367 (N.D. Ill.) ("BCS Services"). Messrs. Jessani and Allison were Vice Presidents at Sass in New York, and were responsible for Sass' tax lien purchases nationwide, including in the State of New Jersey. Messrs. Allison, as well as Co-Conspirator Jessani, were terminated from their employment with M.D. Sass as a result of their participation in the conspiracy alleged herein as well as the conspiracy alleged in *BCS Services*.

88.     In *BCS Services*, the plaintiffs alleged that the Sass entities and other persons and entities colluded at annual tax lien auctions in Cook County, Illinois during the period 2002 through 2007. The complaint filed against the defendants alleged, *inter alia*, violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. 1962 *et seq.*

89.     Specifically, the plaintiffs alleged that the defendants, including the Sass entities, Jessani and Messr. Allison, conspired in an effort to undermine the integrity of the tax lien auction process in Cook County. Sass and the other defendants falsely certified their compliance with Cook County auction requirements, and also created a number of sham entities to bid at auctions in Cook County in order to obtain as many tax liens as possible. Like the Sass entities did here, prior to each auction, Sass would collude with other persons and entities by divvying up the liens to be auctioned and deciding in advance which liens each auction attendee would bid on.

388369.1

90.    Following a jury trial, the jury found the defendants, including the Sass entities, guilty of violating in RICO in connection with its activities at the Cook County auctions.  The Sass entities were ordered to pay the plaintiffs $2.5 million as compensatory damages and approximately $2 million in punitive damages.

## VI.    FRAUDULENT CONCEALMENT

91.    Defendants and their Co-Conspirators deliberately hid their anticompetitive practices from Plaintiffs and the members of the Class, engaging in affirmative and fraudulent concealment of their unlawful scheme, conspiracy and course of conduct from Plaintiffs and the Class.

92.    Defendants and their Co-Conspirators have also engaged in an elaborate series of affirmative acts, including secret bid-rigging, to create the illusion of a competitive market where none existed.

93.    Defendants and their Co-Conspirators failed to disclose their unlawful practices of rigging bids at municipal tax lien auctions in New Jersey in any documents provided to Plaintiffs and the Class as to the public.  Further, Plaintiffs and members of the Class would not be among the attendees and/or bidders at public tax lien auctions and thus, would not have observed any collusion among the Defendants and their Co-Conspirators.  In addition, Co-Conspirator Mooring denied the existence of the conspiracy, and as recently as 2010, Co-Conspirators Mooring and Xspand were touting their rigorous antitrust training practices.  *See* JPMorgan Unit Subpoenaed.

94.    Plaintiffs and members of the Class therefore could not have reasonably discovered the deceptive and anticompetitive practices of Defendants and their Co-Conspirators until the Department of Justice's investigation into the conspiracy in New Jersey was made public in or around mid-2011.

388369.1

95.     Defendants and their Co-Conspirators continued to engage in and conceal their fraudulent scheme since the conspiracy began at least as early as 1998 through at least February 2009.

96.     Plaintiffs and the Class did not and could not have discovered their causes of action until the time at which an investigation was made, thereby tolling any applicable statute of limitations.

97.     In addition, Defendants and their Co-Conspirators engaged in a successful bid-rigging conspiracy that they affirmatively concealed by meeting secretly (including through the use of private, in-person communications) to discuss auctions for tax liens throughout the State of New Jersey, and by agreeing among themselves at meeting and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their alleged scheme

98.     As a result of the fraudulent concealment of Defendants and their Co-Conspirators of their bid-rigging scheme, any applicable statute of limitations related to any claims which Plaintiffs or other Class members have brought or could bring have been tolled.

VII.     **EFFECTS OF THE DEFENDANTS' UNLAWFUL CONSPIRACY**

99.     The conspiracy to rig bids and allocate the market for TSCs auctioned in New Jersey during the Class Period harmed Plaintiffs and members of the proposed class.  The unlawful scheme resulted in an artificially inflated interest being associated with liens that have been placed on properties owned Plaintiffs and members of the class.  This inflated interest: 1) forced Class members to pay artificially inflated interest on delinquent tax obligations; and/or 2) resulted in an artificially inflated interest being associated with the delinquent tax obligation which encumbers the property of Plaintiffs and members of the Class and which Class members are legally required to repay in order to maintain ownership over the property.

- 37 -

100.    As a direct and proximate result of Defendants' and their Co-Conspirators

unlawful contract, combination and conspiracy, Plaintiffs and members of the Class were injured

and financially damaged in their business and property by having to pay more interest with

respect to their delinquent tax obligation than they would have absent Defendants' and their co-

conspirators' unlawful activities, and having the equity in their property impaired, and in some

cases, losing title to their properties in tax sale foreclosures they were unable to prevent due the

impairment of their creditworthiness resulting from the tax lien foreclosures.  The total amount

of damages is presently undetermined but is in the millions of dollars.

## VIII.    CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(2) and

23(b)(3) on their own behalf and on behalf of the following class (the "Class"):

> All persons who owned real property in the State of New Jersey
> and who had a Tax Sale Certificate issued with respect to their
> property that was purchased by a Defendant or one of the Co-
> Conspirators during the Class Period at a public auction in the
> State of New Jersey at an interest rate above 0%.

102.    Excluded from the Class are government entities or any person or entity in which

any Defendant or Co-Conspirator holds a controlling interest, the officers, directors, employees,

affiliates, subsidiaries, legal representatives, heirs, successors and assigns of any such person or

entity, as well as any immediate family member of any officer, director or employees of any

named Defendant or Co-Conspirator that is not a natural person, and any judge or magistrate

involved in this matter, as well as members of their immediate family.

103.    Plaintiffs reserve the right to modify the definition of the Class, including but not

limited to the use of subclasses, as this Action progresses.

104.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that at least several thousand class members were victims of the unlawful bid-rigging scheme.

105.    Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and members of the Class sustained damages arising out of Defendants' and their Co-Conspirator's common course of conduct in violation of laws as complained herein.  The injuries and damages of each member of the Class were directly caused by Defendants' and their Co-Conspirators' wrongful conduct in violation of the antitrust laws alleged herein.

106.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

107.    Common questions of law and fact exist as to all members of the Class that predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    Whether Defendants and their Co-Conspirators conspired with others to fix bids and allocate TSCs at auctions in New Jersey, in violation of the Sherman Act and New Jersey's Antitrust Act;

b.    Whether Defendants' and their Co-Conspirator's conduct had the anticompetitive effect of reducing and unreasonably restraining the market for the purchase of TSCs;

c.    The names of the individuals and entities who participated in the anticompetitive scheme;

d.    The duration of the anticompetitive scheme;

e.    The effect of Defendants' and their Co-Conspirators' conduct and the extent of injuries sustained by Plaintiffs and Class members;

- 39 -

388369.1

> f.   The amount of damages the anticompetitive scheme caused members of the Class; and
>
> g.   Whether Plaintiffs and the Class are entitled to an award of attorneys' fees and expenses against Defendants and their Co-Conspirators.

108.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create the risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

109.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for Class members, while substantial in the aggregate, are not great enough to individually enable them to maintain separate suits against Defendants and their Co-Conspirators. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### Violation of Section 1 of the Sherman Act
### 15 U.S.C. § 1

110.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

- 40 -

388369.1

111.    Beginning as early as January 1998 and continuing through February 2009, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants and their Co-Conspirators, Defendants and their Co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the State of New Jersey at public tax lien auctions.

112.    Defendants and their Co-Conspirators have combined and conspired to rig bids and allocate markets with respect to the sale of TSCs in the State of New Jersey during the Class Period.

113.    As a result of the unlawful conduct of Defendants and their Co-Conspirators, interest rates associated with delinquent municipal tax obligations auctioned by municipalities in New Jersey, have been set at artificially inflated levels.

114.    The contract, combination or conspiracy among Defendants and their Co-Conspirators consisted of a continuing agreement, understanding and concerted action among Defendants and their Co-Conspirators. For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their Co-Conspirators did those things they contracted, combined or conspired to do, including:

      a.    exchanged information on auctions for TSCs in the State of New Jersey prior to auctions;

      b.    agreed to rig bids and allocate TSCs sold in the State of New Jersey during the Class Period;

      c.    submitted bids and refrained from submitting bids in accordance with the agreements reached among the Defendants' and their Co-Conspirators; and

      d.    purchased TSCs auctioned in the State New Jersey during the Class Period pursuant to the conspiracy alleged herein.

- 41 -

115.     Plaintiffs and the other members of the Class have been injured in their businesses and property as a result of the unlawful conspiracy of Defendants and their Co-Conspirators in that they have paid more interest associated with their delinquent tax obligation than they should have, or are required to pay artificially inflated interest levels associated with their delinquent tax obligation, than they otherwise would have paid, or be required to pay, in the absence of the unlawful conduct of Defendants and their Co-Conspirators.

### SECOND CLAIM FOR RELIEF

**Violation Of The New Jersey Antitrust Act**
**N.J.S.A. § 56:9-3**

116.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

117.     Beginning as early as January 1998 and continuing through the present, the exact dates being unknown to Plaintiffs and exclusively within the knowledge of Defendants and their Co-Conspirators, Defendants and their Co-Conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the New Jersey Antitrust Act (N.J.S.A. § 56:9-3) by artificially reducing or eliminating competition in the State of New Jersey.

118.     Defendants and their Co-Conspirators have combined and conspired to rig bids and allocate markets with respect to the sale of TSCs in the State of New Jersey during the Class Period.

119.     As a result of the unlawful conduct of Defendants and their Co-Conspirators, interest rates associated with delinquent municipal tax obligations auctioned by municipalities in New Jersey, have been set at artificially inflated levels.

- 42 -

120.    As a result of the unlawful conduct of Defendants and their Co-Conspirators, the interest rates of TSCs sold throughout New Jersey during the operation of the conspiracy were set at artificially inflated levels.

121.    The contract, combination or conspiracy among Defendants and their Co-Conspirators consisted of a continuing agreement, understanding and concerted action among Defendants and their Co-Conspirators.  For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their Co-Conspirators did, *inter alia*, the following:

     a.    exchanged information on auctions for TSCs in the State of New Jersey prior to auctions;

     b.    agreed to rig bids and allocate TSCs sold in the State of New Jersey during the Class Period;

     c.    submitted bids and refrained from submitting bids in accordance with the agreements reached among the Defendants' and their Co-Conspirators; and

     d.    purchased TSCs auctioned in the State New Jersey during the Class Period pursuant to the conspiracy alleged herein.

122.    Plaintiffs and the other members of the Class have been injured in their businesses and property as a result of the unlawful conspiracy of Defendants and their Co-Conspirators in that they have paid more interest associated with their delinquent tax obligation than they should have, or are required to pay artificially inflated interest levels associated with their delinquent tax obligation, than they otherwise would have paid, or be required to pay, in the absence of the unlawful conduct of Defendants and their Co-Conspirators.

388369.1

**THIRD CLAIM FOR RELIEF**

**Violation Of The New Jersey Tax Lien Law Excessive Fee In The Redemption Of A Tax Sale Certificate N.J.S.A. § 5-63.1**

123.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

124.    The New Jersey Tax Lien Law ("NJTSL"), N.J.S.A. § 54:5-1 *et seq.*, protects delinquent taxpayers from unfair treatment by TSC holders through the exacting of unlawful or illegal charges.

125.    Open and competitive bidding in tax lien auctions serves to ensure that "the delinquent property owner's right to fair treatment" by driving down the interest owed to TSC holders.

126.    The NJTSL thus provides that:

> Any holder of a tax sale certificate, excepting any municipal corporation, his agent, servant, employee or representative, **who knowingly charges or exacts any fee or charge in connection with the redemption of any tax sale certificate owned by him,** in excess of the amounts permitted by chapter five of Title 54 of the Revised Statutes, **shall forfeit such tax sale certificate to the person who was charged such excessive or unlawful fee** and the person paying such unlawful charge shall become vested with all the right, title and interest of such tax sale certificate holder in and to such tax lien. In addition thereto **the person aggrieved shall have a right of action to recover back the full amount paid by him to such tax lien holder, by an action at law in any court of competent jurisdiction.**

> The collection of any excessive charge or fee in connection with the redemption or assignment of a tax sale certificate shall be deemed prima facie evidence of the fact that such tax sale certificate holder did knowingly charge and exact such excessive fee or charge within the intent of this act.

*See* N.J.S.A. § 54:5-63.1 (emphasis added).

- 44 -

127.    As a result of the unlawful collusive bidding of Defendants and their Co-Conspirators, Defendants (1) acquired TSCs and (2) knowingly charged or attempted to charge unlawful fees in connection with the redemption process for the TSCs in excess of the amount permitted.

128.    Plaintiffs were thereby damaged by Defendants and their Co-Conspirators because they had to pay excessive fees to redeem the TSCs associated with their property, or had an artificially inflated interest associated with the tax obligation they are legally required to repay in order to maintain ownership over the property.

## FOURTH CLAIM FOR RELIEF

### Violation Of The New Jersey Tax Lien Law Fraud In The Acquisition Of Tscs N.J.S.A. § 54:5-52 Et Seq.

129.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

130.    The NJTSL, N.J.S.A. § 54:5-1 et seq., protects delinquent taxpayers from unfair treatment by TSC holders through the exacting of unlawful or illegal charges.

131.    The NJTSL provides that a right of action for fraud in the acquisition of a TSC exists when plaintiffs can show that Defendants procured a TSC by fraud. See N.J.S.A. § 54:5-52.

132.    By participating in the collusive bid rigging conspiracy, Defendants:

   a.   Made material misrepresentations that were false with the intent to deceive that they were bidding competitively, as statutorily required, at the auctions for municipal tax liens;

   b.   Made material omissions by failing to state that the interest rate on the municipal tax liens was obtained through collusion;

   c.   Knew that the material misrepresentations, and the impressions created by the material omissions, were false and misleading;

- 45 -

    d.   Knowingly made the misrepresentations and omissions in order to procure redemption of the TSC or foreclosure on the property associated therewith at a higher percentage than they otherwise would have been able to obtain; and

    e.   Intended that the homeowners and the judicial system relied on the falsity of those misrepresentations to garner an excessive fee to redeem the TSC, or gain the property on which the TSC was issued.

133.    Plaintiffs were not aware of the omissions or that Defendants' representations were false and misleading, and Plaintiffs justifiably relied on the representations made by Defendants.  As a direct and proximate result of their reliance upon Defendants' misrepresentations and omissions, Plaintiffs suffered damages.

134.    As a result of the unlawful conduct described above, Defendants must forfeit all TSCs acquired during the Class Period that have not been previously redeemed.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

135.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

136.    As a result of the unlawful conduct described above, Defendants have been unjustly enriched by collecting unlawfully inflated interest amounts associated with each purchased TSC.

137.    Defendants have benefited from their unlawful acts and it would be inequitable for Defendants to be permitted to retain any of their ill-gotten gains

138.    Plaintiffs and members of the Class are entitled to recover the amount of Defendants' ill-gotten gains resulting from their unlawful, unjust and inequitable conduct.

388369.1

## SIXTH CLAIM FOR RELIEF

### Declaratory Judgment

139.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

140.   Pursuant to 28 U.S.C. § 2201, Plaintiffs, on their own behalf and on behalf of each member of the Class described above, seeks the following declaratory judgments:

   a.   That the conduct of Defendants and their Co-Conspirators alleged herein constituted a *per se* violation of the Sherman Act, 15 U.S.C. § 1;

   b.   That the Defendants acquisition of TSCs in furtherance of the conspiracy resulted in their acquisition of TSCs at an artificially high level of interest.

141.   Pursuant to 28 U.S.C. § 2201, Plaintiffs, on their own behalf and on behalf of each member of the Class described above, seeks a declaratory judgment that the conduct alleged herein violates the Sherman Act.

## SEVENTH CLAIM FOR RELIEF

### Imposition of Constructive Trust under New Jersey Law

142.   Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

143.   Equity and good conscience require that the defendants and their Co-Conspirators, not be allowed to maintain ownership of the tax sale certificates illegally acquired pursuant to the conspiracy alleged herein.

144.   In order to prevent the defendants from retaining what in equity and good conscience should not belong to them, the imposition of a constructive trust is required as to: (1) all TSCs which defendants hold on the real properties owned by plaintiffs and members of the class; (2) all amounts received by said defendants from each class member which represents the

- 47 -

interest on TSCs which have been redeemed by class members; (3) all real property formerly belonging to members of the class which defendants acquired through tax sale foreclosure; (4) all profits gained by said defendants through the sale of TSCs on real property owned by plaintiffs and class members, or through the sale or disposition of real property formerly owned by class members to which defendants gained title through foreclosure of TSCs.

145.    Plaintiffs request, under New Jersey state law concerning constructive trusts, that defendants be required to demonstrate that the proceeds they received in connection with their activities in the New Jersey tax sale certificates market were not derived from their illegal activities.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants and in favor of Plaintiffs and the Class and award the following relief:

A.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23, appointing Plaintiffs as the class representative and designating Plaintiffs' counsel as counsel for the Class;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their Co-Conspirators, be adjudged to have been a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their Co-Conspirators, be adjudged to have been a violation of the New Jersey Antitrust Act, N.J.S.A. § 56:9-3;

D.    That judgment be entered for Plaintiffs and members of the Class against Defendants for three times the amount of damages sustained by Plaintiffs and members of the

- 48 -

K.     That the Plaintiffs and the Class be awarded pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the complaint to the extent provided by law;

L.     An injunction enjoining, preliminarily and permanently, Defendants from enforcing the artificially inflated and illegal rate of interest associated with the TSCs purchased by Defendants; and

M.     That plaintiffs and members of the class have such other, further or different relief as the case may require and the Court may deem just and proper under the circumstances.

## X.     JURY DEMAND

Pursuant to Fed. R. Civ. P, 38, Plaintiffs on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

Dated:  September 17, 2013

**LITE DEPALMA GREENBERG, LLC**
*/s/ Bruce D. Greenberg*
Bruce D. Greenberg
Steven J. Greenfogel
Two Gateway Center, Suite 1201
Newark, New Jersey 07102-5003
(973) 623-3000

*Counsel for Plaintiffs*

- 50 -

388369.1

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Steve W. Berman *(admitted pro hac vice)*
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

**HAGENS BERMAN SOBOL SHAPIRO LLP**
Jason A. Zweig *(admitted pro hac vice)*
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (212) 856-7227
Facsimile: (917) 210-3980
Email: jasonz@hbsslaw.com

**HAUSFELD LLP**
Michael D. Hausfeld *(admitted pro hac vice)*
James Pizzirusso *(admitted pro hac vice)*
Seth R. Gassman *(admitted pro hac vice)*
1700 K Street, NW, Suite 650
Washington, DC 20006
Tel: 202-540-7200
Fax: 202-540-7201

*Counsel for Plaintiffs*

- 51 -

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to *In Re New Jersey Tax Sales Certificates Antitrust Litigation*, Civil Action No. 12-cv-1893-MAS-TJB, currently pending in this court.

Dated: September 17, 2013                    **LITE DePALMA GREENBERG, LLC**

                                                   */s/ Bruce D. Greenberg*
                                                   Bruce D. Greenberg
                                                   Two Gateway Center, Suite 1201
                                                   Newark, New Jersey 07102-5003
                                                   (973) 623-3000

                                                   *Counsel for Plaintiffs*

388369.1