# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIG. | Master Docket No. 3:12-CV-01893-MAS-TJB |

## CLASS PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO MOVING DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS TO DISMISS AND TO STAY PROCEEDINGS
### [DKT. NOS. 340, 341, 342, 345, & 347]

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg
Two Gateway Center, Suite 1201
Newark, NJ 07102-5003
Telephone: (973) 623-3000
Email: bgreenberg@litedepalma.com

***Interim Liaison Counsel***
[Additional counsel on signature page]

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ...........................................................................1

STATEMENT OF FACTS ......................................................................................4

I.    TAX LIEN AUCTIONS ARE DESIGNED TO BE COMPETITIVE ..........4

II.    THE PARTIES .................................................................................................6

      A.    The Plaintiffs ..........................................................................................6

      B.    The Moving Defendants ..........................................................................6

            1.    BankAtlantic Defendants. .........................................................7

            2.    Crestar Defendants. ...................................................................8

            3.    Defendant Mooring. ................................................................10

            4.    PAM Defendants. ....................................................................11

            5.    Wolfson Defendants. ...............................................................12

III.    CRIMINAL INVESTIGATION AND GUILTY PLEAS ...........................14

ARGUMENT ........................................................................................................15

POINT I ................................................................................................................15

PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE SUSTAINED ...................15

      A.    The Relevant Pleading Standards under *Twombly* ..............................15

      B.    The Allegations against the Moving Defendants Must be Viewed as a Whole and Not Piecemeal or in a Vacuum ...................19

      C.    The Complaint Plausibly Alleges the Existence of a Conspiracy to Rig Bids at Tax Lien Auctions in New Jersey ............20

            1.    The existence of the conspiracy. ..............................................20

            2.    The nature of the conspiracy. ...................................................23

      D.    The Complaint Adequately Alleges that Each Moving Defendant Joined the Conspiracy and Played Some Role in It ..........30

            1.    Plaintiffs allege the conspiratorial role that each moving Defendant played. ....................................................30

2.      At the pleading stage Plaintiffs are not required to specify the details of each Defendants' participation. ..............33

3.      Plaintiffs are not required to identify the source of each of their allegations at this stage of the litigation. ......................35

E.     The Existence of the Federal Criminal Investigation into the Illegal Activities Alleged in the Complaint is Further Evidence of the Plausibility of Plaintiffs' Allegations .........................................36

IV.     PLAINTIFFS HAVE SUFFERED INJURY-IN-FACT, TRACEABLE TO THE CONSPIRATORIAL CONDUCT OF MOVING DEFENDANTS, AND THUS HAVE STANDING TO  PURSUE THESE CLAIMS ..................................................................................37

V.      THE SEPARATE BRIEFS OF THE CRESTAR AND PAM DEFENDANTS ARE EQUALLY WITHOUT MERIT ...............................41

A.     The Separate Brief from the Crestar Defendants .................................41

B.     The Separate Brief from the PAM Defendants .....................................44

POINT II ...............................................................................................................46

PLAINTIFFS' TAX SALE LAW CLAIM SHOULD BE SUSTAINED ..............46

A.     Plaintiffs' Claims are Authorized By and Consistent With the Purpose of the Tax Sale Law ..........................................................46

B.     Plaintiffs Have Alleged that Defendants Charged or Exacted Excessive or Unlawful Fees Which Obstructed Plaintiffs' Clearly Established Redemption Rights...........................................50

C.     Plaintiffs Have Alleged the Moving Defendants' Fraudulent Conduct With Sufficient Particularity Under Rule 9(b) ....................56

POINT III .............................................................................................................60

PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE SUSTAINED .............................................................................................60

POINT IV .............................................................................................................63

IF NECESSARY, PLAINTIFFS SHOULD BE GIVEN LEAVE TO AMEND................................................................................................63

POINT V ...............................................................................................................64

DEFENDANT MASTELLONE'S STAY MOTION SHOULD BE DENIED.................................................................................................64

A.     Overlap of Issues .................................................................................65

B.     Status of Criminal Case.......................................................................66

413820.1

C.      Prejudice to Plaintiffs ........................................................................67

D.      Burden on Defendant ..........................................................................68

E.      Interests of the Court ..........................................................................69

F.      Public Interest.....................................................................................69

VI.     CONCLUSION............................................................................................70

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Adelphia Comm'cns Sec. Litig.*,
No. 02-1781, 2003 WL 22358819 (E.D. Pa. May 13, 2003) ......................69, 70

*American Home Assurance Co. v. Sunshine Supermarket, Inc.*,
753 F.2d 321 (3d Cir. 1985) ..............................................................45

*Anderson News, L.L.C. v. Am. Media, Inc.*,
680 F.3d 162 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013).....................18

*Arden Way Assocs. v. Boesky*,
660 F. Supp. 1494 (S.D.N.Y. 1987) ....................................................66

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................................................................16, 17

*B. Jeselshon, Inc. v. Atlantic City*,
70 N.J. 238 (1976) ..........................................................................58

*Babyage.com, Inc. v. Toys "R" Us, Inc.*,
558 F. Supp. 2d 575 (E.D. Pa. 2008)....................................................18

*Barry L. Kahn Defined Ben. Pension Plan v. Moorestown*,
243 N.J. Super. 328 (Ch. Div. 1990) ....................................................49

*In re Bath & Kitchen Fixtures Antitrust Litig.*,
No. 05-cv-00510, 2006 WL 2038605 (E.D. Pa. July 19, 2006)...................22, 28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................*passim*

*Beltz Travel Serv., Inc. v. International Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980) .......................................................34, 39

*Bizzarro v. Ocean Cnty.*,
No. 07-5665, 2014 WL 980659 (D.N.J. Mar. 13, 2014) ...................................63

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010).................................................18, 36

*Caput Mortuum, L.L.C. v. S & S Crown Serv., Ltd.*,
   366 N.J. Super. 323 (App. Div. 2004) ................................................................49

*In re Chocolate Confectionary Antitrust Litig.*,
   602 F. Supp. 2d 538 (M.D. Pa. 2009) ...............................................................18

*Community Dev. Co. v. Seaside Gardens, Inc.*,
   7 N.J. 153 (1951) ...............................................................................................58

*In re Continental Airlines, Inc.*,
   279 F.3d 226 (3d Cir. 2002) ...............................................................................38

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)............................................................................................19

*In re Copper Antitrust Litig.*,
   98 F. Supp. 2d 1039 (W.D. Wis. 2000) ..............................................................25

*County of Essex v. First Union Nat'l Bank*,
   186 N.J. 46 (2006) ..............................................................................................61

*Cox v. Sears, Roebuck & Co.*,
   138 N.J. 2 (1994) ................................................................................................54

*Crusader Servicing Corp. v. Boyer, et al.*,
   No. HNT-F-40780-08, slip op. (Ch. Div. July 25, 2013) .......................14, 46, 55

*D'Agostino v. Maldonado*,
   216 N.J. 168 (2013) ............................................................................................54

*D'Ippolito v. Castoro*,
   51 N.J. 584 (1968) ..............................................................................................61

*De'Omilia Plastic Surgery, P.C. v. Sweeton*,
   No. 12-06415, 2013 WL 6070037 (D.N.J. Nov. 18, 2013)........................*passim*

*DKM Residential Props. Corp. v. Twp. of Montgomery*,
   182 N.J. 296 (2005) ......................................................................................53, 55

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012) ................................................................18

*Erickson v. Pardus*,
    551 U.S. 89 (2007).............................................................................16

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) .....................................................18, 20

*Frederico v. Home Depot*,
    507 F.3d 188 (3d Cir. 2007) ..............................................................57

*Gennari v. Weichert Co. Realtors*,
    148 N.J. 582 (1997) ...........................................................................58

*Gonzales v. Harrington Co.*,
    2 N.J. Misc. 311 (Ch. 1923)..............................................................53

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007)............................................18

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ............................................................44

*Hospital Bldg. Co. v. Trustees of Rex Hosp.*,
    425 U.S. 738 (1976)...........................................................................18

*Hyland v. Kirkman*,
    204 N.J. Super. 345 (Ch. Div. 1985) ...............................................56

*In re Hypodermic Prods. Antitrust Litig.*,
    MDL No. 1730, 2007 Wl 1959225 (D.N.J. June 29, 2007) ..............19

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010) ......................................................16, 17

*Jung v. Ass'n of Am. Med. Colleges*,
    300 F. Supp. 2d 119 (D.D.C. 2004)..................................................20

*In re K-Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004)........................................39, 41, 42

*In re Korean Air Lines Co., Ltd. Antitrust Litig.*,
    MDL No. 07-01891, 2008 U.S. Dist. LEXIS 111722 (C.D. Cal.
    June 25, 2008)............................................................................32, 37

413820.1

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   710 F. Supp. 152 (E.D. Pa. 1989) ....................................................................42

*In re Magnesium Oxide Antitrust Litig.*,
   No. 10-5943 (DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011)...........18, 19, 20

*Malinowski v. Jacobs*,
   189 N.J. 345 (2007) ........................................................................................50

*Matrixx Initiatives, Inc. v. Siracusano*,
   131 S. Ct. 1309 (2011)....................................................................................16

*Max's Seafood Café by Lou-Ann v. Quinteros*,
   176 F.3d 669 (3d Cir. 1999) ...........................................................................38

*In re Mercedes-Benz Antitrust Litig.*,
   157 F. Supp. 2d 355 (D.N.J. 2001) .................................................................57

*In re Mercedes-Benz Tele Aid Contract Litig.*,
   267 F.R.D. 113 (D.N.J. 2010)..........................................................................59

*Merewood, Inc. v. Denshaw*,
   139 N.J. Eq. 182 (Ch. 1947) ...........................................................................48

*Minard v. Iazzetti*,
   No. 06-645 (MLC), 2007 WL 4208836 (D.N.J. Nov. 26, 2007) ......................63

*Montich v. Miele USA, Inc.*,
   No. 11-2725, 2013 WL 5523689 (D.N.J. Sept. 30, 2013)................................63

*In re Municipal Derivatives Antitrust Litig.*,
   700 F. Supp. 2d 378 (S.D.N.Y. 2010) .......................................................*passim*

*In re Neurontin Antitrust Litig.*,
   No. 02-1390, 2009 WL 2751029 (D.N.J. Aug 28, 2009)..................................18

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*,
   394 U.S. 700 (1969)........................................................................................17

*In re Optical Disc Drive Antitrust Litigation*,
   No. 3:10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ....................40

*In re OSB Antitrust Litig.*,
No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007)....................................18

*In re Packaged Ice Antitrust Litig.*,
723 F. Supp. 2d 987 (E.D. Mich. 2010) .......................................................18, 35

*Paper Sys. v. Nippon Paper Indus., Co.*,
281 F.3d 629 (7th Cir. 2002) ...............................................................................39

*In re Pharmacy Benefit Managers Antitrust Litig.*,
582 F.3d 432 (3d Cir. 2009) ................................................................................38

*Phillips v. County of Allegheny*,
515 F.3d 224 (3d Cir. 2008) ................................................................................19

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
764 F. Supp. 2d 991 (N.D. Ill. 2011).....................................................................18

*Polanco v. Omnicel, Inc.*,
No. 13-1417, 2013 WL 6823265 (D.N.J. Dec. 26, 2013) ....................................39

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
566 F. Supp. 2d 363 (M.D. Pa. 2008).............................................................18, 20

*In re Processed Egg Prods. Antitrust Litig.*,
821 F. Supp. 2d 709 (E.D. Pa. 2011)...................................................................43

*In re Processed Egg Prods. Antitrust Litig.*,
851 F. Supp. 2d 867 (E.D. Pa. 2012)...................................................................58

*Rolo v. City Investing Co. Liquidating Trust*,
155 F.3d 644 (3d Cir. 1998) ...........................................................................57, 59

*Rowen Petroleum Properties, LLC v. Hollywood Tanning Sys.*,
No. 08-4764, 2010 WL 936217 (D.N.J. Mar. 12, 2010) .....................................63

*In re Rubber Chems. Antitrust Litig.*,
504 F. Supp. 2d 777 (N.D. Cal. 2007).................................................................35

*In re Schering Plough Intron/Temodar Consumer Class Action*,
678 F.3d 235 (3d Cir. 2012) ................................................................................39

413820.1

*Schwartz v. Avis Rent A Car Sys., LLC*,
No. 11-4052, 2013 WL 2182078 (D.N.J. May 20, 2013) ...................................63

*Sidan v. Orleans Cnty.*,
180 F.R.D. 226 (W.D.N.Y. 1997) ......................................................................67

*Simon v. Cronecker*,
189 N.J. 304 (2007) .............................................................................47, 50, 54

*Simon v. Rando*,
189 N.J. 339 (2007) ........................................................................................50

*In re Southeastern Milk Antitrust Litig.*,
555 F. Supp. 2d 934 (E.D. Tenn. 2008)..............................................................20

*Starr v. Sony BMG Music Entm't*,
592 F.3d 314 (2d Cir. 2010) ......................................................................18, 36

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008)................................................................34

*Stewart v. Beam Global Spirits & Wine, Inc.*,
877 F. Supp. 2d 192 (D.N.J. 2012)....................................................................62

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ...........................................................................60

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981)........................................................................................38

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009)..............................................................34

*Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*,
530 F.3d 204 (3d Cir. 2008) ...........................................................................17

*Travelers Cas. & Sur. Co. v. Vanderbilt Grp., LLC*,
No. 01 CIV 7927 (DLC), 2002 WL 844345 (S.D.N.Y. May 2,
2002) .............................................................................................................71

*United States v. Kordel*,
397 U.S. 1 (1970)............................................................................................64

*Varsolona v. Breen Capital Servs. Corp.*,
 180 N.J. 605 (2004) ...................................................................47, 48

*Wallach v. Eaton Corp.*,
 814 F. Supp. 2d 428 (D. Del. 2011)...................................................18

*Walsh Secs., Inc. v. Cristo Props. Mgmt.*,
 No. 97-3496, 2009 WL 1883988 (D.N.J. June 30, 2009) ..................63

*Walsh Sec., v. Cristo Prop. Mgmt.*,
 7 F. Supp. 2d 523 (D.N.J. 1998)...........................................63, 64, 65

*In re WorldCom, Inc. Sec. Litig.*,
 Nos. 02 Civ 3288, 02 Civ. 4816, 2002 WL 31729501 (S.D.N.Y.
 Dec. 5, 2002)..........................................................................................67

## STATUTES AND RULES

15 U.S.C. § 16(a) ..............................................................................67

15 U.S.C. § 1692e .............................................................................54

N.J.S.A. 54:5-1 *et seq* .......................................................................4

N.J.S.A. 54:5-32...........................................................................49, 51

N.J.S.A. 54:5-52...............................................................................47

N.J.S.A. 54:5-54...............................................................................47

N.J.S.A. 54:5-63.1....................................................................*passim*

N.J.S.A. 54:5-89.1........................................................................49, 50

Fed. R. Civ. P. 8(a).............................................................................15

Fed. R. Civ. P. 9(b) ......................................................................56, 57

Fed. R. Civ. P. Rule 12(b)(6) ...........................................................16

L. Civ. R. 7.1....................................................................................38

413820.1

## INTRODUCTORY STATEMENT

At the October 23, 2013 hearing on Defendants' motions to dismiss Plaintiffs' initial complaint, a complaint which was far less detailed than Plaintiffs' First Amended Consolidated Master Class Action Complaint ("Complaint")[1] that Defendants now seek to have dismissed, the Court held:

> Plaintiffs have met their burden and pled adequate facts indicating that defendants generally entered into a conspiracy affecting tax sale certificate auctions in New Jersey during the proposed class period.[2]

Thus, this issue of whether Plaintiffs have pled a plausible conspiracy is now in the rearview mirror. There is now only one real question for the Court to decide: Does the current Complaint, which provides dozens of detailed paragraphs as to each Moving Defendant's participation in the conspiracy – much of which was provided by those who have admitted to conspiring with the Moving Defendants[3] –

---

[1] *See* Dkt. No. 320.

[2] *See* Transcript of Hearing, October 23, 2013, at 83:11-15.

[3] The Moving Defendants, as defined herein, are: (a) BBX Capital Corp., Fidelity Tax, LLC, Heartwood 55, LLC, Michael G. DeLuca, Gary I. Branse, and David Jelly (collectively, the "BankAtlantic Defendants"); (b) PAM Investors and Patrick Caraballese (collectively, the "PAM Defendants"); (c) Crestar Capital LLC, CCTS Capital LLC, and William S. Green (collectively, the "Crestar Defendants"); (d) Mooring Tax Asset Group, LLC ("Mooring"); (e) Richard Simon, Trustee LLC, Betty Simon, Trustee LLC, and Joseph Wolfson (the "Wolfson Defendants"); and (f) Michael Mastellone.

adequately connect each Moving Defendant to the conspiracy that the Court has already found to be adequately pled?

The Complaint plausibly connects Moving Defendants to the conspiracy through specific, non-conclusory allegations of each Moving Defendants' conspiratorial conduct. The Complaint specifically identifies over 70 auctions at which Moving Defendants conspired to and did manipulate interest rates associated with tax sale certificates ("TSCs"). As this Court has already found, "mere presence at an exemplar auction does not meet Rule 8(a)'s requirements."[4] However, the allegations concerning the auctions go far beyond "mere presence." Each alleged auction is one in which other conspirators, who have admitted to the conspiracy, have stated that they explicitly conspired with Moving Defendants. These types of allegations are galaxies removed from being conclusory and boilerplate. Quite simply, Moving Defendants' arguments about being unfairly "tarred" by Plaintiffs' Complaint, as well as their attempts to characterize those who have pled guilty as "rogue" actors,[5] while they are model citizens, is specious. As the Complaint lays bare, Moving Defendants are equally intertwined with the conspiracy as are those that have pled guilty.

---

[4] *See* October 23, 2013 Hearing Transcript, at 83:21-25.

[5] *See* Memorandum of Law in Support of Defendants' Joint Motion to Dismiss dated March 14, 2014 [Dkt. No. 341-1] ("Joint Memo of Law"), at 2.

- 2 -

Moving Defendants seek dismissal of the Complaint based on three faulty arguments, at least one of which the Court has already squarely rejected:

*First*, Moving Defendants contend that Plaintiffs have failed to state a plausible claim against each of them. The specific allegations tying each Moving Defendant to the conspiracy belie such arguments. While Moving Defendants argue that the Complaint does not allege that every Moving Defendant was a large conspirator, or participated in the conspiracy for a long time, they do not address how the long-standing principle of joint and several liability in all civil conspiracy cases fails to apply here. It does apply, of course, and each Moving Defendant is jointly and severally liable for the entire harm of the conspiracy, irrespective of the specific role of each such participant.

*Second*, Moving Defendants argue that Plaintiffs lack standing to challenge Defendants' unlawful conduct. As explained below, the Court has already rejected this exact argument and should reject it again now.

*Third*, Moving Defendants seek dismissal of Plaintiffs' claim under New Jersey's Tax Sale Law based on the erroneous presumption that the legislative scheme for TSCs is somehow meant to protect them rather than property owners and municipalities. As Plaintiffs show below, Moving Defendants are wrong again.

In short, Plaintiffs plausibly allege a conspiracy that, by its nature, necessarily affected tax lien auctions in New Jersey during the Class Period.

- 3 -

Moving Defendants' participation in that conspiracy is sufficiently alleged, with detailed recitations of specific conduct at specific auctions on specific dates at specific places by each Moving Defendant. These allegations are further buttressed by the fact that cooperating witnesses have identified each Moving Defendant as conspiring at these exemplar auctions and others. Accordingly, Plaintiffs respectfully request that the Court deny the Moving Defendants' motions to dismiss, and the stay defendant Mastellone seeks.

## STATEMENT OF FACTS

## I.   TAX LIEN AUCTIONS ARE DESIGNED TO BE COMPETITIVE

New Jersey municipalities auction tax liens on real property at least once a year.[6] In exchange for paying the overdue property taxes or other municipal charges for a given property, the winner of the auction for a particular tax obligation receives a TSC, which represents a first-priority lien on the delinquent taxpayer's property.[7] If the lien is not redeemed within a period of time, the lienholder may foreclose on the property.[8]

The New Jersey Tax Sale Law, N.J.S.A. 54:5-1 *et seq.* ("Tax Sale Law") is designed to foster competitive bidding at auctions in order to drive the interest rate

---

[6] Complaint, ¶¶ 2, 3, 95.

[7] *Id.* at ¶¶ 4, 97

[8] *Id.*

- 4 -

down, thereby minimizing the liability for delinquent homeowners.[9] In a fully competitive auction free of collusion, the interest rates will typically be bid down, because TSC purchasers can achieve high returns on their investment through various fees they can collect, even if they purchase a tax lien at 0%.[10]

In the early to mid-1990s, the prospect of high returns presented by New Jersey tax liens gave rise to aggressive competitive bidding amongst tax lien buyers.[11] Beginning no later than January 1, 1998, and continuing through February 2009, however, Defendants conspired to eliminate competition by rigging tax lien auctions throughout New Jersey.[12]  Defendants systematically conspired to refrain from bidding against one another by allocating, among themselves, the liens being auctioned.[13] Prior to each auction, Defendants were able to identify each and every lien available for bid.[14] Conversations allocating the liens would then take place on the telephone or by email prior to the auction and in person prior to the

---

[9] *Id.* at ¶¶ 4, 5, 96, 98.

[10] *Id.* at ¶ 4.

[11] *Id.* at ¶¶ 100-101.

[12] *Id.* at ¶ 102.

[13] *Id.*

[14] *Id.* at ¶ 103.

413820.1

beginning of the auction, often outside the municipal building or in parking lots behind the building where the auction was being held.[15]

## II.    THE PARTIES

### A.    The Plaintiffs

Plaintiffs are New Jersey property owners who became delinquent in their municipal tax obligations.[16] Because of defendants' illegal behavior, the interest rates associated with the TSCs of Plaintiffs and the Class were higher than they should have been, often reaching the statutory maximum of 18%. As a result of Defendants' conspiracy, certain class members, like plaintiff Son, Inc., were forced to redeem their TSCs, and thus clear their property of the lien at an inflated cost.[17] Other class members have suffered the same harm, or will be forced to suffer the same harm, as they will have to redeem their TSCs at an artificially high price.

### B.    The Moving Defendants

Despite Moving Defendants' assertions to the contrary, the Complaint contains detailed allegations with respect to each Moving Defendant, all of which allegations have been developed prior to discovery. Based on information uncovered in Plaintiffs' investigation, including information obtained from

---

[15] *Id.* at ¶ 104.

[16] *Id.* at ¶¶ 18-26.

[17] *Id.* at ¶¶ 25-26.

- 6 -

cooperating witnesses, the Complaint specifically details: (1) how the conspiracy began; (2) how Moving Defendants participated in rigging bids prior to auctions; (3) how Moving Defendants upheld those agreements during the auctions by ensuring that the defendant previously allocated the TSC was able to "win" the bid; (4) when Moving Defendants stopped participating in the conspiracy (usually as a result of the investigation by the Department of Justice ("DOJ")); and (5) the fact that each Moving Defendant has been indicted, or is under criminal investigation.

The following summarizes the Complaint's allegations as to each Moving Defendant, which, for purposes of this motion, must be accepted as true and viewed in totality and in context of the entire Complaint.

1. **BankAtlantic Defendants.**

- The Complaint identifies the relevant BankAtlantic subsidiaries, and the individuals, such as Michael DeLuca, Gary Branse and David Jelley, who furthered BankAtlantic's participation in the conspiracy, as well as each of their roles in furthering BankAtlantic's participation in the conspiracy.[18]

- The Complaint identifies 24 specific instances when the BankAtlantic Defendants colluded with other Defendants in furtherance of the

---

[18] *Id.* at ¶¶ 113, 115.

conspiracy. At least seven cooperating witnesses have admitted that they colluded with the BankAtlantic Defendants, at these auctions and others.[19]

- The Complaint identifies when the BankAtlantic Defendants ceased participating in the conspiracy and why.[20]

- The Complaint states that the BankAtlantic Defendants were subpoenaed by a federal grand jury investigating the illegal conduct alleged in the Complaint.[21]

## 2. Crestar Defendants.

- The Court has previously held that a plausible conspiracy has already been pled against those defendants who have either pled guilty, or who have had an employee plead guilty. As Crestar's executives have pled guilty, Plaintiffs have pled a plausible conspiracy against the Crestar Defendants.

- Two Defendants – David Farber and David Butler – have admitted to participating in the conspiracy while they were the highest ranking officers of Crestar Defendant CCTS Capital. In their guilty pleas,

---

[19] *Id.* at ¶¶ 117-140.

[20] *Id.* at ¶ 141.

[21] *Id.* at ¶ 142.

- 8 -

Farber and Butler admitted that, in addition to participating in the conspiracy from 2005 through November 2008 at CCTS Capital's predecessor company, while they were President and CEO of "Company-1," they participated in the conspiracy through February 2009. The Crestar Defendants admit that Defendant Crestar is the "Company-1" referenced in the plea agreements.[22] This fact alone dooms the Crestar Defendants' motion.

- Defendant William S. Green also personally participated in the conspiracy and knowingly authorized and supported Farber and Butler's participation in the conspiracy on Crestar's behalf.[23] Green attended at least one auction – the December 16, 2008 Egg Harbor City auction – at which, according to at least two witnesses, Green colluded with other auction attendees.[24]

- The Complaint also details when the Crestar Defendants ceased participating in the conspiracy and why – namely, the commencement

---

[22] *Id.* at ¶ 143.

[23] *Id.*

[24] *Id.* at ¶ 146

- 9 -

of the criminal investigation into the New Jersey tax lien industry generally and the Crestar Defendants specifically.[25]

### 3.  Defendant Mooring.

- The Complaint identifies the relevant individuals – Lambros Xethalis,[26] Teresa Hasson, Isabella Legut, and Karsten Hilpert – who furthered Mooring's participation in the conspiracy, as well as each of their roles in furthering Mooring's participation in the conspiracy.[27]

- Cooperating witnesses have identified nearly 30 TSC auctions, including the precise date, place, and other Defendant attendees, at which these cooperating witnesses have stated that they colluded with Mooring in the conspiracy and, as a result of that collusion, Mooring was able to purchase, unlawfully, more than 90 TSC's.[28]

- Mooring stopped participating in the conspiracy on or about February 2009, after learning of the DOJ's criminal investigation into collusion

---

[25] *Id.* at ¶¶ 148-149.

[26] Plaintiffs recently executed a cooperation-only settlement agreement with defendant Xethalis, through which Plaintiffs expect that further details of Mooring's participation will emerge, including the identities of additional individuals at Mooring who participated in the conspiracy.

[27] *Id.* at ¶ 152.

[28] *Id.* at ¶¶ 153-180.

at tax lien auctions outside New Jersey.[29] Mooring remains under criminal investigation by the U.S. Attorney's office in New York for its participation in the conspiracy alleged herein.[30]

### 4.    PAM Defendants.

➤ The Complaint identifies the relevant individuals – Defendants Patrick Caraballese and Gary Valenti – who furthered the PAM Defendants' participation in the conspiracy, as well as each of their roles in furthering PAM's participation in the conspiracy.[31]

➤ Multiple witnesses to the conspiracy have stated that they agreed with PAM and Caraballese to allocate liens up for auction and to refrain from bidding on liens not assigned to the PAM Defendants, in furtherance of the conspiracy.[32] These cooperating witnesses have identified four auctions, detailed in the Complaint, at which the PAM Defendants participated in and advanced the conspiracy, pursuant to

---

[29] *Id.* at ¶ 181.

[30] *Id.* at ¶ 182.

[31] *Id.* at ¶ 189.

[32] *Id.* at ¶ 191.

which the PAM Defendants unlawfully acquired 12 TSCs. The dates, locations and other attendees at these auctions are also provided.[33]

➤ The PAM Defendants ceased their participation in the conspiracy in or about February 2009, after learning that the DOJ was pursuing a criminal investigation into collusion at tax lien auctions in other jurisdictions.[34] Defendant PAM is currently under criminal investigation being conducted by the New York U.S. Attorney's office for participating in the conspiracy alleged herein.[35]

## 5.   **Wolfson Defendants.**

➤ On November 19, 2013, all three Wolfson Defendants were indicted by a grand jury for their participation in the conspiracy.[36] This is sufficient in and of itself to make the allegations against the Wolfson Defendants plausible, as the Court has previously found.

➤ Defendant Joseph Wolfson can be heard on audio tapes, which were recorded by a government informant, in which he participates in

---

[33] *Id.* at ¶¶ 192-195.

[34] *Id.* at ¶ 196.

[35] *Id.* at ¶ 197.

[36] *Id.* at ¶ 213.

conversations and reaches understandings with other Defendants in furtherance of the conspiracy.[37]

➢ The Complaint details 11 auctions, by particular date and location, at which the Wolfson Defendants participated with other Defendants in the illegal activity, and at which the Wolfson Defendants successfully acquired 15 TSC's as a result of their role in the conspiracy.[38] Witnesses to the conspiracy who are cooperating with Plaintiffs' counsel have identified the Wolfson Defendants as participating in illegal conduct alleged in the Complaint, including the 11 exemplar auctions in the Complaint.[39]

➢ The Wolfson Defendants ceased their participation in the conspiracy in or about February 2009, after learning that the DOJ was pursuing a criminal investigation into collusion at tax lien auctions in other jurisdictions.[40]

---

[37] *Id.*

[38] *Id.* at ¶¶ 201-211.

[39] *Id.* at ¶ 200.

[40] *Id.* at ¶ 196.

### III.   CRIMINAL INVESTIGATION AND GUILTY PLEAS

At least as early as June 2009, the DOJ began investigating criminal conduct at New Jersey TSC auctions.[41] As a result of this investigation, 14 individuals and entities, all Defendants here, have pled guilty to participating in a conspiracy to rig public TSC auctions in New Jersey during the Class Period, in violation of Section 1 of the Sherman Act. These Defendants are: 1) William Collins; 2) Isadore May; 3) Richard Pisciotta; 4) Robert Stein; 5) David Farber; 6) Robert Rothman; 7) Stephen Hruby; 8) David Butler; 9) DSBD, LLC; 10) Crusader Servicing Corporation; 11) Mercer S.M.E., Inc.; 12) Norman Remick; 13) Michael Mastellone; 14) and Robert U. Del Vecchio, Sr.[42]

On November 19, 2013, a federal grand jury in Newark returned an indictment against six individuals and entities in connection with their participation in the conspiracy (most of which are Defendants here): Robert Jeffrey; James Jeffers (a Crusader bidder); Gregg Gehring (an executive of defendant Plymouth Park Tax Services, LLC);[43] and all three Wolfson Defendants.[44] Antitrust Division

---

[41] *Id.* at ¶ 220.

[42] *Id*. at ¶¶ 224-237.

[43] A default judgment was entered against Defendant Jeffrey on May 24, 2013. [*See* Dkt. No. 246]. Jeffers and Gehring are both released from liability obligations pursuant to the settlement agreements with the Crusader Defendants and Defendant Plymouth Tax Services, LLC, respectively. [*See* Dkt. Nos. 278; 310].

[44] Complaint, ¶¶ 244-245.

- 14 -

413820.1

Deputy Attorney General Leslie C. Overton stated in a press release announcing these indictments that: "The individuals and entities charged today demonstrated a blatant disregard for the competitive process by allocating the purchase of certain municipal tax liens by . . . flipping a coin, drawing numbers out of a hat or drawing from a deck of cards."[45] Though Moving Defendants may wish the contrary, those Defendants who have not pled guilty, including Moving Defendants, remain under investigation by the DOJ, and none have been cleared of wrongdoing.[46]

## ARGUMENT

## POINT I

## PLAINTIFFS' ANTITRUST CLAIMS SHOULD BE SUSTAINED

### A.    The Relevant Pleading Standards under *Twombly*

As the Supreme Court emphasized in *Bell Atl. Corp. v. Twombly*,[47] and as this Court recognized in ruling on Defendants' initial motion to dismiss,[48] Fed. R. Civ. P. 8(a) prescribes the test for evaluating motions to dismiss antitrust claims. Rule 8(a), provides that "[a] pleading that states a claim for relief must contain: a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a) merely requires that the complaint give "fair notice of what the . . . claim

---

[45] *Id.* at ¶ 246.

[46] *Id.* at ¶¶ 142, 149, 182, 197, 213.

[47] 550 U.S. 544 (2007).

[48] October 23, 2013 Hearing Transcript, at 80.

- 15 -

is and the grounds upon which it rests."[49] The touchstone of Rule 8(a) remains whether a complaint puts defendants on "fair notice" of plaintiffs' claim.[50]

Contrary to Moving Defendants' characterizations of *Twombly*, that decision does not impose heightened pleading requirements. *Twombly* expressly provides that "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations."[51] Instead, the plaintiff must simply allege "enough facts to state a claim to relief that is plausible on its face."[52] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[53] As the Supreme Court explained in *Twombly*:

> Asking for plausible grounds to infer an agreement *does not impose a probability requirement at the pleading stage*; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. And, of course, a well-pleaded complaint may proceed even if it strikes a savvy

---

[49] *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) (both quoting *Twombly*, 550 U.S. at 555).

[50] *Insurance Brokerage*, 618 F.3d at 320 n.18.

[51] 550 U.S. at 555 (emphasis added).

[52] *Id.* at 570.

[53] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Matrixx Initiatives*, *Inc. v. Siracusano*, 131 S. Ct. 1309, 1323 (2011).

> judge that actual proof of those facts is improbable, and
> 'that a recovery is very remote and unlikely.'[54]

Determining whether a complaint states a plausible claim for relief is a context-specific task for which the Court draws on its experience and common sense.[55]

In pleading claims under Section 1 of the Sherman Act, a plaintiff must properly allege that a defendant was a party to a contract, combination, or conspiracy.[56] In this regard, pleading a formal agreement is not required. Rather, courts have required plaintiffs to allege "some form of concerted action,"[57] in other words, a "'unity of purpose or a common design and understanding or a meeting of minds' or 'a conscious commitment to a common scheme.'"[58] It is not necessary that such a conspiracy or combination be established by direct proof of oral or written agreements; it may be proven by inferences drawn from circumstantial evidence, including the acts and conduct of the alleged conspirators.[59]

---

[54] *Twombly*, 550 U.S. at 556 (emphasis added) (citation omitted).

[55] *Iqbal*, 556 U.S. at 663-664.

[56] *Toledo Mack Sales & Serv. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008).

[57] *Insurance Brokerage*, 618 F.3d at 315 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999)) (internal quotation marks omitted).

[58] *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

[59] *See Norfolk Monument Co. v. Woodlawn Mem'l Gardens, Inc.*, 394 U.S. 700, 704 (1969).

413820.1

Post-*Twombly*, numerous district courts, including courts in this District, have rejected motions to dismiss antitrust complaints with far less detail than what is included in Plaintiffs' Complaint.[60] As these decisions recognize, *Twombly* does not require plaintiffs to do the impossible and plead the complaint as if they were actual observers of the conspiracy or were present whenever defendants met to facilitate the conspiracy.[61] Where the proof is largely in the hands of the conspirators, as it is in an antitrust case, dismissal should be granted sparingly.[62]

---

[60] *See, e.g.*, *Anderson News*, *L.L.C. v. Am. Media*, *Inc.*, 680 F.3d 162 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010); *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943 (DRD), 2011 WL 5008090 (D.N.J. Oct. 20, 2011); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671 (S.D.N.Y. 2012); *Wallach v. Eaton Corp.*, 814 F. Supp. 2d 428 (D. Del. 2011); *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623 (E.D. Pa. 2010); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987 (E.D. Mich. 2010); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538 (M.D. Pa. 2009); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363 (M.D. Pa. 2008); *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253419 (E.D. Pa. Aug. 3, 2007); *Babyage.com*, *Inc. v. Toys "R" Us*, *Inc.*, 558 F. Supp. 2d 575 (E.D. Pa. 2008). These are but a few examples.

[61] *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1028 (N.D. Cal. 2007); *Magnesium Oxide*, 2011 WL 5008090, at *13 ("Requiring Plaintiffs to set forth the full details of an antitrust conspiracy at this stage of the litigation would present an onerous burden because 'in antitrust cases, [] the proof is largely in the hands of the alleged conspirators.'") (quoting *In re Neurontin Antitrust Litig.*, No. 02-1390, 2009 WL 2751029, at *7 (D.N.J. Aug. 28, 2009)).

[62] *See, e.g.*, *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976); *In re Neurontin Antitrust Litig.*, No. 02-1390, 2009 WL 2751029, at *7 (D.N.J. Aug. 28, 2009) ("The liberal approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all details

- 18 -

On a motion to dismiss an antitrust case such as this one, all well-pleaded allegations must be accepted as true and any inferences must be drawn in Plaintiffs' favor.[63] Under that and the other pleading standards described above, the Complaint provides Moving Defendants "fair notice of what the . . . claim is and the grounds upon which it rests" and alleges "enough facts to state a claim to relief that is plausible on its face."

## B. The Allegations against the Moving Defendants Must be Viewed as a Whole and Not Piecemeal or in a Vacuum

When making the determination as to whether the Complaint meets the requirements of Rule 8(a), the Court is to view the allegations against Moving Defendants as a whole, and in context, not in isolation. In *Continental Ore Co. v. Union Carbide & Carbon Corp.*,[64] in reversing a complaint's dismissal, the Supreme Court made this point:

> It is apparent from the foregoing that the Court of Appeals approached [plaintiff's] claims as if they were five completely separate and unrelated lawsuits. We

---

and specific facts relied upon cannot properly be set forth as part of the pleadings."); *In re Hypodermic Prods. Antitrust Litig.*, MDL No. 1730, 2007 WL 1959225, at *12 (D.N.J. June 29, 2007) (upholding complaint as providing adequate notice of the particular grounds upon which plaintiffs' claims rest, particularly given that plaintiffs have not yet had the benefit of discovery).

[63] *See, e.g.*, *Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *Magnesium Oxide*, 2011 WL 5008090, at *4.

[64] 370 U.S. 690, 698-99 (1962).

- 19 -

> think this was improper. In cases such as this, plaintiffs
> should be given the full benefit of their proof without
> tightly compartmentalizing the various factual
> components and wiping the slate clean after scrutiny of
> each. The character and effect of a conspiracy are not to
> be judged by dismembering it and viewing its separate
> parts, but only by looking at it as a whole.

The law remains that defendants may not compartmentalize allegations in a complaint alleging conspiracy, as Moving Defendants try to do here.[65] Viewing the Complaint as a whole, Plaintiffs have alleged that each Moving Defendant joined the conspiracy and played a role in it; nothing more is required at this stage.

## C. The Complaint Plausibly Alleges the Existence of a Conspiracy to Rig Bids at Tax Lien Auctions in New Jersey

### 1. The existence of the conspiracy.

As set forth above, at 1, this Court has already concluded that Plaintiffs have pled the *existence* of a plausible conspiracy with sufficient detail to withstand a

---

[65] *See, e.g.*, *In re Flat Glass*, 385 F.3d at 369 ("A court must look to the evidence as a whole and consider any single piece of evidence in the context of other evidence.") (citation omitted); *Magnesium Oxide*, 2011 WL 5008090, at *11; *In re Southeastern Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 943-44 (E.D. Tenn. 2008) ("'[T]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quotation omitted); *In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d at 373 (rejecting "dismemberment" approach to assessing the sufficiency of a complaint); *Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 164 n.27 (D.D.C. 2004) (plaintiff must plead that "an individual defendant was a participant in the conspiracy in the first instance," but "need not allege overt acts committed by each defendant in furtherance of a conspiracy").

- 20 -

motion to dismiss.[66] The only question remaining after that ruling, then, is whether Plaintiffs' allegations adequately plead that Moving Defendants participated in that conspiracy.  Those allegations unquestionably do that.

The Complaint alleges with specificity that 20 defendant groups participated in a scheme to rig public auctions for TSCs during the period from at least 1998 through February 2009. The Complaint identifies, among other things:

- The conspirators (*i.e.*, Defendants), as well as the individuals from each of Moving Defendant, who participated in the conspiracy.[67]

- The auction process in New Jersey, and the object of the conspiracy – to allocate tax liens at tax lien auctions in order to keep the interest rate levels associated with tax liens artificially inflated.[68]

- The specific mechanics of how the conspiracy operated, including, how Moving Defendants obtained information about each auction in advance from vendors who supply that information, and how Moving Defendants used that information to create and maintain "bid books" in which they documented the conspiracy by recording which TSCs each defendant was allocated pursuant to the conspiracy.[69]

---

[66] October 23, 2013 Hearing Transcript, at 83.

[67] Complaint, ¶¶ 27-84.

[68] *Id.* at ¶¶ 89-99.

[69] *Id.* at ¶¶ 100-108.

- 21 -

- How Defendants would determine the order in which they would "pick" tax liens at an auction by selecting a card from a deck, flipping a coin or drawing lots.[70]

- Detailed information concerning certain specific auctions that were rigged, and the specific Defendants – including all Moving Defendants – who participated in those bid-rigged auctions.[71]

As the Complaint details, 14 defendants have pled guilty and admitted to participating in the very conduct alleged in the Complaint – an illegal conspiracy to rig bids at tax lien auctions throughout New Jersey. Moving Defendants attended the very same auctions that those who pled guilty attended, and Moving Defendants were among those who agreed to rig bids and who acquired tax liens at those auctions at supra-competitive rates. All Moving Defendants have been subpoenaed by the federal grand jury, and are the subject of a criminal investigation in this case. The Wolfson Defendants have been indicted, yet have moved to dismiss the Complaint.

Thus, the Complaint is far from "threadbare" or "bare bones." It contains much more than "enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement"[72] involving Moving Defendants.

---

[70] *Id*. at ¶ 246.

[71] *Id*. at ¶¶ 113-211.

[72] *Twombly*, 550 U.S. at 556.

413820.1

### 2.     The nature of the conspiracy.

Moving Defendants also argue that Plaintiffs have failed to plausibly allege a statewide conspiracy.[73] This is simply untrue. While Plaintiffs may not yet know the precise contours of the conspiracy, a detail that they are not required to know and plead at this stage of the case, the Complaint amply and plausibly alleges a conspiracy to rig bids throughout New Jersey.

Moving Defendants repeatedly seize upon one word to insist that Plaintiffs' allegations regarding the 14 guilty pleas to date do not support the existence of a statewide conspiracy. The criminal informations accompanying those pleas assert that the guilty parties:

> [e]ntered into and engaged in a combination and conspiracy to suppress and eliminate competition by submitting non-competitive and collusive bids at *certain* public auctions for tax liens[.][74]

Moving Defendants insist that the word "certain" means that the conspiracy was not an overarching or statewide conspiracy.[75] However, the informations refer to time periods spanning several years and always refer to the conspiracy in the

---

[73] Joint Memo of Law, at 21-27.

[74] Complaint, ¶¶ 224-237 (emphasis added).

[75] Joint Memo of Law, at 12, 22 n.8, 33.

- 23 -

singular.[76]  Many of the informations also describe the conspiracy as a "*continuing*

*agreement, understanding and concert of action.*"[77]

A more logical, and more plausible, reading of the informations is that *the*

*Defendant pleading guilty* (who could not possibly have attended all of the tax lien

auctions during the years that Defendant was involved in the conspiracy), "entered

into and engaged in" the overarching conspiracy by submitting collusive bids at

*some* of the auctions during that period.  The word "certain" clearly describes the

auctions at which the guilty Defendant "submitted non-competitive and collusive

bids," not the conspiracy itself. Further, as discussed below, each Moving

Defendant need not have attended each auction or played the same role in the

conspiracy.

There is no requirement that, at the very beginning of a case, Plaintiffs must

know and plead the precise contours of the conspiracy. The issue of whether there

was a single overarching conspiracy, or whether there were multiple individual

conspiracies, will be an issue for the jury. In *In re Copper Antitrust Litig.*, in

denying a motion to dismiss, the court concluded that "[w]hether a conspiracy is

single or multiple is a question of fact appropriately determined by a jury. At this

---

[76] *See* Complaint, ¶¶ 224-237 (quoting the informations accompanying the
numerous guilty pleas to date).

[77] *See id.* at ¶¶ 224-230 (emphasis added).

- 24 -

stage . . . plaintiff has met its burden . . . ."[78] Similarly, here, Plaintiffs must plead

only enough to *suggest* that there was a plausible conspiracy among Defendants,

including Moving Defendants, to engage in anticompetitive conduct.

As this Court has already found,[79] the allegations in the Complaint resemble

those in *In re Municipal Derivatives Antitrust Litig*.[80] That case involved a massive

bid-rigging conspiracy that took place over an extended period of time, where the

defendants made the precise argument being made by Moving Defendants here –

that plaintiffs "fail[ed] to allege any facts showing a single conspiracy existed

among all the defendants, or among any subset of defendants regarding the entire

municipal derivatives industry." The court disagreed, holding that, "for pleading

purposes, plaintiffs are not required to prove the existence of an alleged industry-

wide conspiracy . . . [a]t this stage, plaintiffs must plead only 'enough factual

matter (taken as true) to suggest that an agreement [to engage in anticompetitive

conduct] was made.'"[81] That meant that, the "complaint must adequately allege the

plausible involvement of each defendant and put defendants on notice of the claims

---

[78] 98 F. Supp. 2d 1039, 1055 (W.D. Wis. 2000).

[79] *See* October 23, 2013 Hearing Transcript, at 79.

[80] 700 F. Supp. 2d 378, 393-94 (S.D.N.Y. 2010).

[81] *Id.* at 394.

against them, but it need not be detailed with overt acts by each defendant."[82] Plaintiffs here have done that.

Moving Defendants complain that Plaintiffs have not described the "nature and scope" of each alleged conspirator's role, nor explained "how such a large and diverse group of Defendants acted, combined or conspired as part of a single conspiracy."[83] In doing so, Moving Defendants recycle the erroneous contention that there is an unwieldy number of defendants here. While there may be 53 individuals and entities named in the Complaint, there are only 20 *groups* of Defendants, many of whom participated in the scheme through various entities and individuals. Moreover, of the 20 Defendant groups, 13 have already settled[84] and one has defaulted. That leaves only the six Moving Defendants, one of which (Mastellone) has pled guilty, and another of which (the Wolfson Defendants) consists of three entities that are under criminal indictment. In reality, Plaintiffs have alleged the mechanics of the conspiracy in detail. Moreover, as discussed below, Plaintiffs have also linked each Moving Defendant to the conspiracy not

---

[82] *Id.* (citing cases).

[83] Joint Memo of Law, at 26-27.

[84] Defendants incorrectly state that Plaintiffs have settled only with entities and individuals which have pled guilty. Joint Memo of Law, at 10. In fact, Plaintiffs have settled with defendants Phoenix Funding, Benedict Caiola, American Tax Funding, and Lambros Xethalis. None of these parties pled guilty or were indicted, and the same can be said with respect to employees of each of these entities.

only through identification by cooperating witnesses, and descriptions of acts in furtherance of the conspiracy, but through the 14 guilty pleas as well.

Moving Defendants contend that Plaintiffs do not allege the presence of an overall agreement to rig bids at any *future* auction, but cite no case imposing such a requirement. Moving Defendants also fault Plaintiffs for not alleging how the conspiracy began. But the Complaint does allege how the conspiracy began.[85] Even if it did not, however, Defendants' sole authority for the notion that Plaintiffs are required to allege how the conspiracy began does not support that proposition.

In *In re Bath & Kitchen Fixtures Antitrust Litig.*,[86] the court discussed how the conspiracy was "formed" in the context of the complaint in that case, which the court found, "devoid of even a minimal factual background that gives the defendants fair notice of the grounds upon which that claim is based."[87] The plaintiffs had not identified the specific agents carrying out the conspiracy for the defendants, much less specific dates, locations, or mechanisms.[88] Here, Plaintiffs have alleged the approximate start date of the conspiracy, how the conspiracy began and how it was accomplished. The Complaint offers more than the "minimal

---

[85] *See* Complaint, ¶¶ 101-102.

[86] No. 05-cv-00510, 2006 WL 2038605 (E.D. Pa. July 19, 2006).

[87] *Id*. at *3.

[88] *Id*.

factual background regarding how [the] alleged conspiracy was formed" –
precisely what was lacking in *Bath & Kitchen Fixtures*.

Moving Defendants also claim that Plaintiffs do not adequately allege how
Defendants coordinated and policed the conspiracy.[89] The Complaint describes in
detail how Defendants coordinated the conspiracy, however, by, for example,
reviewing published lists of liens in advance of auctions, meeting before auctions
(often in the parking lots of facilities where the auctions were conducted) to
allocate the liens on the list, and refraining from bidding on liens allocated to other
conspirators.[90]

Moreover, the Complaint not only specifies intimidation and verbal threats
as methods of enforcing the conspiracy, it also specifically alleges that new bidders
who posed a threat to the conspiracy were asked to join forces with the cartelists,
and that several Defendants joined the conspiracy that way.[91] Moving Defendants
ignore the latter allegation, since it sets forth a common-sense, plausible method of
maintaining the conspiracy over time and from auction to auction. Given the
allegations that purchasing tax liens was "a niche business" where participants had

---

[89] Joint Memo of Law, at 23.

[90] Complaint, ¶¶ 111, 103-04 (generally), 114, 144, 151, 190 (each Moving Defendant).

[91] *Id.* at ¶¶ 214-215.

"camaraderie among each other" because, in their view, there was "enough for everybody,"[92] the allegations that conspirators simply invited others to the table, thereby increasing the interest-rate pie for everyone, are inherently plausible allegations of both coordination and control of the conspiracy.

Finally, Plaintiffs allege that "Defendants did not deviate from the previously allocated bids or cheat on the cartel by bidding against each other" because "any cheaters would have had their own liens bid down, which acted as an incentive to bid only on the agreed-upon allocation."[93] Defendants also often tracked the bidding on their bid books as bidding unfolded, to ensure that fellow conspirators were bidding on – and "winning" – the agreed-upon liens, and not cheating. Plaintiffs further allege that the conspirators often allocated liens to each other in roughly the same value, so that they would profit equally from the conspiracy and not gain a financial advantage over each other.[94] For all of these reasons, Moving Defendants' suggestion that the Complaint does not adequately allege how the conspiracy began, was coordinated and maintained, and ended, fail.

---

[92] *Id.* at ¶ 108.

[93] *Id.* at ¶ 106.

[94] *Id.*

**D.** **The Complaint Adequately Alleges that Each Moving Defendant Joined the Conspiracy and Played Some Role in It**

    **1.** **Plaintiffs allege the conspiratorial role that each moving Defendant played.**

Plaintiffs have not only described the conspiracy in great detail, but also provided specific allegations of the manner in which each Moving Defendant participated in the conspiracy. Contrary to the Moving Defendants' claim that Plaintiffs allege nothing more than attendance at the same auctions also attended by defendants who have pled guilty, Plaintiffs directly allege that, prior to auctions, each Moving Defendant, not just those defendants that have pled guilty, agreed with the other conspirators present as to which liens each defendant would bid on, and how the liens would be allocated.[95] Plaintiffs also allege that each of the Moving Defendants agreed not to bid on the liens that had been allocated to others in the meetings held among conspirators prior to the auctions.[96] Further, Plaintiffs identify the specific individuals who carried out the collusive bidding for each Moving Defendant.[97]

Perhaps most importantly, the Complaint also alleges that numerous cooperating witnesses have identified each Moving Defendant as a participant in

---

[95] Complaint, ¶¶ 114, 144, 151, 190.

[96] *Id.*

[97] *Id.* at ¶¶ 114, 143-44, 150, 189.

413820.1

the conspiracy.[98] These allegations were made based on accounts from individuals who have admitted to participating in the conspiracy through their guilty pleas. Where a conspiracy participant has identified another conspiracy participant, and admitted to engaging in meetings and conversations with such defendant in furtherance of the conspiracy, that is not "boilerplate." Those allegations supply a direct link to the conspiracy that goes far beyond mere attendance at auctions where collusion is known to have occurred.

In attempting to diminish the overwhelming amount of allegations as to each Moving Defendant, Moving Defendants complain that Plaintiffs use similar language in the allegations regarding more than 70 exemplar auctions.[99] However, Moving Defendants cannot demand that Plaintiffs provide specific detail as to their participation in the conspiracy, and also, when Plaintiffs demonstrate Moving Defendants' numerous conspiratorial acts, fault Plaintiffs for being repetitive. And the fact that the conspiracy was carried out in essentially the same manner at every auction does not require dismissal. Indeed, it reflects a unified conspiracy.

---

[98] *See id.* at ¶¶ 116, 145, 152, 191 (alleging that cooperating witnesses have identified the BankAtlantic Defendants, the Crestar Defendants, the Mooring Defendants, and the PAM Defendants as participants in the conspiracy who took steps in furtherance of the conspiracy).

[99] Joint Memo of Law, at 24.

Finally, other allegations, taken together, bolster the plausibility of the allegations that each Moving Defendant joined and participated in the conspiracy. For example, the related criminal investigation lends context that makes it plausible that attendees at such auctions, like Moving Defendants, were participants in the conspiracy.[100] Second, the nature of the alleged conspiracy, coupled with the allegations that the liens purchased by Moving Defendants at those auctions carried artificially inflated rates of interest, strongly suggests that Moving Defendants participated in the conspiracy. If Moving Defendants attended auctions where admitted conspirators had allocated liens among themselves, yet were innocent of the conspiracy, they would have bid competitively on the liens allocated among the admitted conspirators and brought down the interest rates on those liens. Moving Defendants do not suggest that this happened, and in fact the Complaint alleges the opposite: according to cooperating witnesses, the liens "won" by Moving Defendants at those auctions all carried illegal and artificially inflated interest rates.[101] While Plaintiffs do not detail the precise interest rate at which each particular lien may have been acquired, that is not a detail that

---

[100] *See In re Korean Air Lines Co.*, *Ltd. Antitrust Litig.*, MDL No. 07-01891, 2008 U.S. Dist. LEXIS 111722, at *33-34 (C.D. Cal. June 25, 2008) (citing ongoing investigation and one Defendant's guilty plea as evidence rendering allegations against *other* conspirators plausible).

[101] Complaint, ¶¶ 117-140, 146-147, 153-180, 192-195.

Plaintiffs are required to provide at this juncture, where Plaintiffs have not had access to formal discovery.

In sum, Plaintiffs not only identify numerous specific auctions attended by Moving Defendants and parties who have pled guilty, but also directly allege that each Moving Defendant participated in pre-auction meetings and communications to allocate liens and refrained from bidding on liens allocated to others. These allegations are more than plausible given the backdrop of guilty pleas and additional allegations that the interest rates on the liens acquired by Moving Defendants at the exemplar auctions were inflated. Plaintiffs further allege that cooperating witnesses have identified each Moving Defendant as an active participant in the conspiracy. Plaintiffs have more than sufficiently alleged that each Moving Defendant participated in the conspiracy and how each Moving Defendant did so.

### 2. At the pleading stage Plaintiffs are not required to specify the details of each Defendants' participation.

In post-*Twombly* antitrust cases, district courts have repeatedly rejected the "defendant-by-defendant allegation" arguments that Moving Defendants make here – as did this Court when it held that the heightened pleading standards of Rule 9(b) do not apply to Plaintiffs' antitrust claims.[102] For example, in *In re TFT-LCD*

---

[102] October 23, 2013 Hearing Transcript, at 79:4-80:16.

*(Flat Panel) Antitrust Litig.*,[103] the court rebuffed the defendants' argument that the complaint was insufficient because it did not differentiate between related corporate entities and lumped 26 named defendants together simply as "defendants," and also referred to them by country and corporate family. The court held that in large, complex antitrust cases where evidence is largely in the hands of the conspirators, *Twombly* does not require elaborate fact pleading.[104]

Nor does the fact that some defendants may have participated in the conspiracy for a longer period of time than others, or played larger or less extensive roles, render the conspiracy any less plausible, or absolve any Moving Defendant of liability. It is not necessary that each member of the conspiracy participate in "every detail in the execution of the conspiracy . . . for each conspirator may be performing different tasks to bring about the desired result."[105]

---

[103] 599 F. Supp. 2d 1179, 1184-85 (N.D. Cal. 2009).

[104] *Id.*; *see also In re Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 395-96 ("Named Plaintiffs must make allegations, taken as true, supporting a plausible inference that Morgan Stanley participated in the alleged conspiracy. To do this, Named Plaintiffs need not necessarily provide any particular details about conduct undertaken by Morgan Stanley in furtherance of the conspiracy."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008) (rejecting demand that plaintiffs allege with particularity how each individual defendant participated in the conspiracy).

[105] *Beltz Travel Serv.*, *Inc. v. International Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980) ("If Beltz can establish the existence of a conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy, appellees will be liable for the acts of all members of the conspiracy in furtherance

- 34 -

### 3.   Plaintiffs are not required to identify the source of each of their allegations at this stage of the litigation.

Moving Defendants complain that Plaintiffs have not identified the sources of the allegations in the Complaint, or the confidential witnesses referred to in the Complaint, which directly implicate the Moving Defendants in the conspiracy. One Moving Defendant has even characterized the Plaintiffs' Complaint as "McCartheysque" [sic].[106] Moving Defendants offer no authority for that objection. Courts routinely consider allegations based on information from confidential and undisclosed witnesses at the pleading stage.[107]

In addition, Moving Defendants' complaints must be viewed in context. As the Court knows, Plaintiffs have settled with 14 defendant groups. Many, but not all of those settlements, are with Defendants who have pled guilty and admitted to

---

of the conspiracy, regardless of the nature of appellees' own actions."); *see In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 790 (N.D. Cal. 2007) (allegations of defendant's involvement in agreement to implement price increases and other allegation of general participation in alleged conspiracy were sufficient to state an antitrust claim).

[106] *See* PAM Br. at 3.

[107] *See In re Packaged Ice*, 723 F. Supp. 2d at 1014 (accepting as true the anticipated testimony of confidential witnesses listed in a complaint at the pleading stage); *Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 396 n.5 (where plaintiffs described a confidential witness as having cooperated with their antitrust investigation, court accepted averments regarding the confidential witnesses as true, and rejected argument that confidential witnesses' identification had to be pled with "sufficient particularity" in an antitrust case).

- 35 -

the conspiracy. With some exception, each of those settlement agreements provides for the settling defendant to provide full cooperation to Plaintiffs. It is reasonable to conclude that much of the information cited in the Complaint comes from these sources. Thus, Moving Defendants' contentions that they do not know the source of this information are baseless.

## E.     The Existence of the Federal Criminal Investigation into the Illegal Activities Alleged in the Complaint is Further Evidence of the Plausibility of Plaintiffs' Allegations

The 14 guilty pleas entered in the criminal case further support the plausibility of the conspiracy. Contrary to Moving Defendants' assertions to the contrary,[108] government *investigations* into an antitrust conspiracy can properly be "used to bolster the plausibility of § 1 claims."[109] Here, there is more than simply an investigation: there are 14 guilty pleas in which Defendants have admitted to the conduct alleged in the Complaint. Several of the admittedly guilty Defendants have specifically identified Moving Defendants as participants in the illegal scheme.

---

[108] *See* Joint Memo of Law, at 31-34.

[109] *Municipal Derivatives Antitrust Litig.*, 700 F. Supp. 2d at 394. *See also Blood Reagents*, 756 F. Supp. 2d at 628, 632 (government criminal investigation demonstrating "that the government believes a crime may have occurred," in combination with other allegations, raised "'a reasonable expectation that discovery will reveal evidence of an illegal agreement'"); *Starr*, 592 F.3d at 324 (allegation of pending investigation by New York Attorney General and two separate investigations by the Department of Justice were part of context raising a plausible suggestion of illegal agreement).

This combination of factors adds context and plausibility to Plaintiffs' allegations that Moving Defendants participated in the conspiracy.[110]

## IV.   PLAINTIFFS HAVE SUFFERED INJURY-IN-FACT, TRACEABLE TO THE CONSPIRATORIAL CONDUCT OF MOVING DEFENDANTS, AND THUS HAVE STANDING TO PURSUE THESE CLAIMS

The Court has already held that "Plaintiffs have adequately pled antitrust standing."[111] Defendants nevertheless argue (as they did in their prior motions to dismiss)[112] that Plaintiffs lack standing "to assert their claims against the Moving Defendants because they fail to plead any facts connecting their injuries to the alleged conduct of the Moving Defendants."[113]

First, because this Court has already rejected Moving Defendants' standing argument,[114] the law of the case doctrine bars Moving Defendants from raising it

---

[110] *See In re Korean Air Lines Co.*, *Ltd. Antitrust Litig.*, 2008 U.S. Dist. LEXIS 111722, at *33-34 (citing ongoing investigation and one Defendant's guilty plea as evidence rendering allegations against *other* conspirators plausible).

[111] October 23, 2013 Hearing Transcript, at 78.

[112] *See* Omnibus Brief at 28 (Dkt. No. 174-1) ("Plaintiffs have not plausibly alleged collusion or wrongdoing at the particular auctions at which their liens were sold.  That alone defeats standing.").

[113] Joint Memo of Law at 12.

[114] S*ee* Dkt. No. 301.

yet again here.[115] And to the extent Moving Defendants' standing arguments can be understood to be some sort of motion for reconsideration, it is defective.[116]

Second, the fact that Plaintiffs do not allege that any Moving Defendants purchased Plaintiffs' liens, or were present at the auctions at which Plaintiffs' liens were purchased, is of no moment, since Plaintiffs allege a conspiracy in which all Defendants participated. It is axiomatic that each member of a conspiracy is jointly and severally liable to *all* plaintiffs for *all* harm caused by the conspiracy.[117] As a consequence, each plaintiff injured by a conspiracy has standing to sue and can

---

[115] *In re Continental Airlines, Inc*., 279 F.3d 226, 233 (3d Cir. 2002) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues."); *see also In re Pharmacy Benefit Managers Antitrust Litig*., 582 F.3d 432, 439 (3d Cir. 2009) (noting that the doctrine has been "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit").

[116] *See Max's Seafood Café by Lou-Ann v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (to prevail on a reconsideration motion, the moving party must demonstrate "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court [issued its order]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice"); L. Civ. R. 7.1 (stating that motions seeking reconsideration must be made within 14 days of entry of the Court's initial Order and must also specifically address "the matter or controlling decisions" that the movant believes the Court "overlooked").

[117] *Texas Indus*., *Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646-47 (1981) (refusing to allow a defendant in an antitrust action a right to contribution from other participants in the unlawful conspiracy).

- 38 -

recover from any or all members of the conspiracy for the harm inflicted whether or not the plaintiff dealt directly with every defendant.[118]

The cases cited by Moving Defendants are irrelevant to the standing issues here. In *In re Schering Plough Intron/Temodar Consumer Class Action*,[119] for example, the plaintiff lacked standing because it "was pure conjecture" that the defendants' illegal off-label marketing of two prescription drugs to certain doctors caused other doctors to write prescriptions for off-label uses of a third drug that the plaintiff purchased. That case has no force here, where Plaintiffs allege that they were directly harmed by a conspiracy in which Moving Defendants participated.

Similarly, in *Polanco v. Omnicel, Inc.*,[120] the court found that plaintiff lacked standing to sue Sentara, a defendant operator of Virginia hospitals, because that entity had no involvement in the conduct (a breach of data security) that caused

---

[118] *See also Paper Sys. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632-34 (7th Cir. 2002) (co-conspirator jointly and severally liable to each plaintiff injured by the conspiracy, even though co-conspirator did not deal directly with any of the plaintiffs); *Beltz*, 620 F.2d at 1367 ("If Beltz can establish the existence of a conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy, appellees will be liable for the acts of all members of the conspiracy in furtherance of the conspiracy, regardless of the nature of appellees' own actions."); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy").

[119] 678 F.3d 235, 248 (3d Cir. 2012).

[120] No. 13-1417, 2013 WL 6823265 (D.N.J. Dec. 26, 2013).

- 39 -

injury to plaintiffs. Importantly, Sentara was not alleged to be a co-conspirator with the other defendants or to have any legal relationship with those defendants.

*In re Optical Disc Drive Antitrust Litigation*[121] is also inapposite. That decision stands for the limited proposition that isolated acts of bid-rigging "among a small subset of defendants" were insufficient under *Twombly* to support the industry-wide scheme alleged in the complaint. As demonstrated above, however, the Complaint adequately alleges a statewide conspiracy to rig bids, the Moving Defendants' participation in that scheme, and harm to Plaintiffs as a result.

Finally, Moving Defendants also argue that Plaintiffs cannot base standing on injuries suffered by other members of the class.[122] This assertion has no bearing on the issues here, as Plaintiffs seek to recover for injuries they themselves suffered as a consequence of Moving Defendants' participation in the conspiracy.

In short, the Complaint adequately and plausibly alleges that Plaintiffs were injured by a conspiracy in which all Defendants, including Moving Defendants, participated. Plaintiffs have suffered injury-in-fact, traceable to the conduct of Moving Defendants, and have standing to pursue these claims against them.

---

[121] No. 3:10-md-2143, 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011).

[122] Joint Memo of Law, at 17.

## V.   THE SEPARATE BRIEFS OF THE CRESTAR AND PAM DEFENDANTS ARE EQUALLY WITHOUT MERIT

Viewing the Complaint as a whole, Plaintiffs adequately allege that the Crestar and PAM Defendants acted in furtherance of a conspiracy to which they belonged. The separate briefs of these Moving Defendants do nothing to change this conclusion.

### A.   The Separate Brief from the Crestar Defendants

The Crestar Defendants argue that holding them liable for a conspiracy that began nearly 11 years before they began operations would be "bizarre and unsupported by existing law."[123] To the contrary, it is black letter antitrust law that a conspirator is liable for all harm caused by a conspiracy regardless of whether it joined early or late in the life of the conspiracy, and regardless of the role played in the conspiracy.[124] The Crestar Defendants' argument ignores the most important fact: the conspiracy (as admitted in 14 guilty pleas) was still in operation during the time period when Crestar Capital LLC was being run by defendants Butler and Farber, President and CEO of Crestar respectively, both of whom have pled guilty

---

[123] *See* Crestar Capital LLC, CCTS Capital, LLC, and William S. Green's Memorandum of Law in Support of their Motion to Dismiss dated March 14, 2014 [Dkt. No. 340-1], at 1.

[124] *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d at 538 ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy").

- 41 -

to participating in the scheme during that time period.[125] Indeed, as this Court has already held, the allegations that the Crestar Defendants employed individuals who have pled guilty to the conspiracy are alone sufficient to tie them to the conspiracy and defeat dismissal.[126]

The Crestar Defendants claim that the Third Circuit has not "directly approved" of use of the late-joinder theory of liability in civil cases.  However, in *In re Lower Lake Erie Iron Ore Antitrust Litig.*,[127] the court concluded that "there is nothing in the jurisprudence of the Third Circuit which would warrant rejection of the view prevailing in other circuits, namely, that the 'late joinder' rule applies in civil as well as criminal cases." Courts in this District continue to apply the rule in civil cases.[128]

---

[125] *See* Complaint, ¶ 34 (noting that Butler and Farber ran Crestar Capital LLC from November 2008 to July 2009); ¶¶ 227, 231 (quoting the informations accompanying the Butler and Farber guilty pleas, which state that each of those individuals participated in the conspiracy "at least as early as the beginning of 2005 until approximately February 2009").

[126] October 23, 2013 Hearing Transcript, at 83 ("Regarding the settling defendants, and those that have either pled guilty or had an employee so plead, plaintiffs have met their burden and pled adequate facts indicating that defendants generally entered into a conspiracy affecting tax sale certificate auctions in New Jersey during the proposed class period.").

[127] 710 F. Supp. 152, 154 (E.D. Pa. 1989).

[128] *See, e.g.*, *K-Dur*, 338 F. Supp. 2d at 538 n.31.

Crestar's plea that it not be held liable for the acts of its co-conspirators is also highly disingenuous when viewed in context. When Crestar was formed, Crestar hired Farber and Butler as its highest ranking officers. Defendant Green had knowledge of Butler and Farber's prior participation in the conspiracy, and authorized their further participation in it.[129] Farber and Butler, who have admitted to beginning their participation in the conspiracy in 2005, were merely continuing their participation in the conspiracy, under a different name – Crestar.

The Crestar Defendants also object to being "lumped together," relying exclusively on *In re Processed Egg Prods. Antitrust Litig.*[130] But *Egg Products* analyzed whether conduct alleged in connection with one company could be imputed to another company with overlapping ownership,[131] – a situation wholly inapplicable here. The Crestar Defendants (Crestar Capital LLC, CCTS Capital LLC and William S. Green) are actually the *same entity*, along with Defendant Green serving as the entity's founding officer.[132]

---

[129] Complaint, ¶ 143.

[130] 821 F. Supp. 2d 709, 717 (E.D. Pa. 2011).

[131] *Egg Prods.*, 821 F. Supp. 2d at 745-50.

[132] *See* Complaint, ¶ 34 (alleging that CCTS Capital LLC changed its name to Crestar Capital, LLC); ¶ 35 (alleging that Green formed Crestar Capital LLC in or around 2008 and remains its CEO).

Thus, the motion to dismiss should be denied with respect to the Crestar Defendants.

## B.    The Separate Brief from the PAM Defendants

The PAM Defendants concede, as they must, that certain bidders violated the law at New Jersey TSC auctions, and that some wrongdoers have been indicted and pled guilty for their participation in the conspiracy to rig TSC auctions.[133] The PAM Defendants mistakenly claim, however, that because *they* have not yet been indicted, the Justice Department "has concluded the PAM Defendants have done nothing wrong."[134] Even if the current state of the DOJ's investigation could be interpreted as a conclusion that the PAM Defendants are innocent (which it cannot be), it would not call for dismissal. There is no indication that the DOJ has closed its investigation of the PAM Defendants, nor would such an inquiry be relevant here. There are many factors associated with prosecutorial discretion beyond whether the prosecutor believes a potential defendant has committed a crime; a prosecutor's failure to bring charges cannot be regarded as innocence.[135] Absence

---

[133] Dkt. No. 342 at 2.

[134] PAM Br. at 2.

[135] *See, e.g., In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002) (non-prosecution of an antitrust conspiracy could not be used to show there was not a conspiracy since "[t]he Justice Department has limited resources . . . [t]he Department may have felt that there was little to be gained . . . It may also have felt that the antitrust class action bar had both the

of evidence (in this case – criminal charges) is not evidence of absence from the conspiracy. What matters here is whether the Complaint plausibly alleges PAM's participation in the conspiracy.  It does.

Nor is the PAM Defendants' suggestion that the Complaint's failure to include an exemplar auction during a given interval relevant to determining whether PAM participated in the conspiracy at all. First, it assumes that by identifying some exemplar auctions in which the PAM Defendants are currently known to have participated in the conspiracy, Plaintiffs concede that those are the only such auctions. Plaintiffs allege no such thing. They are called "exemplar auctions" because they are just that: merely examples, not exhaustive lists of auctions. Second, as discussed above, the timing of a conspirator's participation in an anticompetitive scheme does not affect the conspirator's liability. By joining in the conspiracy at any point, a participant becomes jointly and severally liable for any damages flowing from the conspiracy.

---

desire and the resources to prosecute such a suit vigorously, as indeed it has done."); *American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir. 1985) (admission of evidence of non-prosecution constitutes to be reversible error, since "evidence of non-prosecution is of very limited probative value in showing that there was no [crime] because of the higher burden of persuasion in a criminal case"; "prosecutorial discretion may take into account many other factors not relevant in a civil suit").

- 45 -

The Complaint contains specific allegations not only that the PAM

Defendants entered into and participated in the conspiracy by meeting to allocate

liens and refraining from bidding on the liens allocated to others – resulting in

purchases of liens at inflated interest rates – but also that the PAM Defendants

have been identified by cooperating witnesses as conspirators who took action in

furtherance of the conspiracy. Neither their wholly ungrounded assertion that the

Justice Department has concluded they did nothing wrong, nor their supposed

"vacation" from the conspiracy, warrant dismissal.  The motion to dismiss should

be denied with respect to the PAM Defendants.

## POINT II

## PLAINTIFFS' TAX SALE LAW CLAIM SHOULD BE SUSTAINED

### A.    Plaintiffs' Claims are Authorized By and Consistent With the Purpose of the Tax Sale Law

This Court previously found that Section 54:5-63.1 of the Tax Sale Law

"clearly allows a cause of action seeking the forfeiture of a tax sale certificate

when the redemption rate is 'excessive or unlawful.'"[136] The Court also noted that

the Plaintiffs had "adequately alleged that the manner in which the tax sale

---

[136] October 23, 2013 Hearing Transcript, at 85 (citing *Crusader Servicing Corp. v. Boyer, et al.*, No. HNT-F-40780-08, unpublished slip op. (Ch. Div. July 25, 2013), attached to ECF No. 288).

- 46 -

certificates at issue were unlawfully obtained,"[137] but that Plaintiffs were required to allege fraud in order to overcome the evidentiary presumption of validity under N.J.S.A. 54:5-52.[138] The Complaint does that. It properly alleges that Moving Defendants violated N.J.S.A. 54:5-63.1 by charging unlawful fees in direct connection with the fraudulent and anticompetitive scheme that resulted in financial detriment to the Plaintiffs.

The underlying purposes of the Tax Sale Law provide a lens through which the Court should evaluate Plaintiffs' Tax Sale Law claim. As explained by the New Jersey Supreme Court, the Tax Sale Law "creates two rights: a municipality's right to develop innovative ways to collect delinquent property taxes and the delinquent property owner's right to fair treatment in the collection of those taxes."[139]

The most fundamental protection provided to property owners under the Tax Sale Law is the right to redeem their property following a tax sale pursuant to N.J.S.A. 54:5-54. The New Jersey Supreme Court has found that "the interest of the holder of the tax sale certificate is entirely subordinate to the statutory right of

---

[137] *Id.* at 85.

[138] *Id*. at 86.

[139] *Varsolona v. Breen Capital Servs. Corp.*, 180 N.J. 605, 621-22 (2004); *see also Simon v. Cronecker*, 189 N.J. 304, 315 (2007) (noting the statute's "two competing public policy goals," the second of which is "to protect property owners from the devastating consequences of foreclosure").

redemption by the property owner."[140] Thus, the court in *Merewood, Inc. v. Denshaw* noted that "courts will seize upon the slightest flaw of substance in tax sales to restore property to the owner, on the principle that the sale of land for default in the payment of taxes is such an extreme interference with private property that the law guards the rights of the owner with the utmost care." [141]

By alleging that Moving Defendants conspired to artificially inflate the interest rates on TSCs, Plaintiffs contend that Moving Defendants grossly interfered with their private property by infringing their redemption rights. Accordingly, "the challenge here is not to the transaction itself, but rather concerns the impact of the transaction on the affected property owners."[142] In enacting the Tax Sale Law, the Legislature stated that one of the law's purposes was "to 'prevent frauds in connection with the redemption of tax sale certificates,' . . . and to make 'certain that delinquent taxpayers shall not, on redemption, be required to pay more than the statute requires.'"[143]

---

[140] *Varsolona*, 180 N.J. at 617 (internal citations and quotations omitted).

[141] 139 N.J. Eq. 182, 184 (Ch. 1947).

[142] *Varsolona*, 180 N.J. at 611.

[143] *Id.* at 622 (quoting Statement attached to *S.* 87, *S.* 88 (introduced Feb. 10, 1941)).

Notably absent from the salutary purposes of the Tax Sale Law is any special treatment for TSC purchasers.[144] Contrary to Moving Defendants' claims, they have no protected interest in receiving a "default" rate of 18%,[145] particularly when the Tax Sale Law specifically contemplates a competitive bidding process with interest rates as low as 0%,[146] and "subject to redemption *at the lowest rate of interest* bid at the sale."[147]

In addition to the clearly stated protections for property owners underlying the Tax Sale Law, the Legislature and Supreme Court have sharply criticized the interference of investors in the tax sale process seeking to make a profit to the detriment of financially distressed property owners. When enacting N.J.S.A. 54:5-89.1, which relates to property transfers following the institution of tax sale foreclosure proceedings, the Legislature stated its intention to prohibit "intermeddlers" from intervening in tax sale foreclosure actions when they have only provided the property owners "nominal consideration" for their property

---

[144] *Barry L. Kahn Defined Ben. Pension Plan v. Moorestown*, 243 N.J. Super. 328, 336 (Ch. Div. 1990) ("Purchasers of tax sale certificates in New Jersey buy at their own risk.").

[145] Joint Memo of Law, at 4-5.

[146] N.J.S.A. 54:5-32.

[147] *Caput Mortuum, L.L.C. v. S & S Crown Serv., Ltd.*, 366 N.J. Super. 323, 335 (App. Div. 2004) (citing N.J.S.A. 54:5-32) (emphasis added).

- 49 -

interests.[148] The Supreme Court recently found that the purpose of this statutory provision is "to ensure that the third-party investors do not exploit vulnerable owners by offering only nominal consideration for their property interests."[149] Although N.J.S.A. 54:5-89.1 applies to tax sale foreclosures, the same level of scrutiny should be applied to Moving Defendants' exploitative conduct here, as both types of interference result in the same devastating loss of the property owner's equity.[150]

## B.   Plaintiffs Have Alleged that Defendants Charged or Exacted Excessive or Unlawful Fees Which Obstructed Plaintiffs' Clearly Established Redemption Rights

To state a claim under N.J.S.A. 54:5-63.1, Plaintiffs must show that Moving Defendants "knowingly charged or exacted" any "excessive or unlawful fee" in connection with the redemption of any tax sale certificate.[151] The Tax Sale Law provides that tax sales "shall be made in fee to such person as will purchase the

---

[148] *Simon*, 189 N.J. at 326-27 (quoting Statement Accompanying *S*. 291, *L*. 1967, c. 149).

[149] *Simon*, 189 N.J. at 328; *see also Simon v. Rando*, 189 N.J. 339, 343-44 (2007); *Malinowski v. Jacobs*, 189 N.J. 345, 350 (2007).

[150] *Compare Simon*, 189 N.J. at 323 (characterizing transfer of $20,000 in property rights for $400 as "egregious") *with* Complaint, ¶ 18 (delinquent taxes of $1,027.71 now subject to redemption price of $21,284.00), ¶ 23 (delinquent taxes of $3,697.73 now subject to redemption price of $36,297.85), ¶ 25 (redemption of $25,321.70 of which only $12,736.74 was for taxes, redemption of $34,797.96 of which only $21,515.27 was for taxes).

[151] N.J.S.A. 54:5-63.1; *see also* October 23, 2013 Hearing Transcript, at 85.

- 50 -

property, subject to redemption *at the lowest rate of interest*, but in no case in excess of 18% per annum."[152]

The Complaint alleges that as a result of Moving Defendants' anticompetitive conduct, the interest rates associated with the TSCs on Plaintiffs' properties were artificially inflated[153] and, therefore, such interest rates were not "the lowest rate of interest" within the meaning of the Tax Sale Law. As a result, Plaintiffs "had the equity in their property unlawfully diminished and/or had an artificially inflated interest rate associated with the tax or other obligation they are required to repay in order to maintain ownership over their property."[154] The Complaint further alleges that because the inflated interest rates on the TSCs were the direct result of unlawful collusion by Moving Defendants, the interest charges themselves are "unlawful" and/or "excessive" within the meaning of N.J.S.A. 54:5-63.1.[155]

Moving Defendants argue that Plaintiffs have failed to allege an excessive or unlawful fee paid in connection with a "redemption" by a Moving Defendant.[156] This assertion fails to meet the substance of Plaintiffs' claim, which concerns the

---

[152] N.J.S.A. 54:5-32 (emphasis added).

[153] Complaint, ¶¶ 19, 21, 24.

[154] *Id.* at ¶ 284.

[155] *Id.* at ¶ 283.

[156] Joint Memo of Law, at 36.

- 51 -

imposition of unlawful charges interfering with *Plaintiffs'* rights to redeem, not

Defendants'.  In addition, Moving Defendants fail to acknowledge that one of the

named Plaintiffs (Son, Inc.) did pay excessive and unlawful fees in connection

with redemption.[157]

Moving Defendants' contention is contrary to the text of the statute and New

Jersey case law on this very subject. The Tax Sale Law provides for a cause of

action against any holder of tax sale certificates that "charges or exacts" any

excessive or unlawful fee "in connection with the redemption of any tax sale

certificate owned by him."[158] Accordingly, all that is required to demonstrate a

violation of the statute is that the excessive or unlawful fee was *charged*, not that it

was exacted (*i.e.*, collected).

This plain reading of N.J.S.A. 54:5-63.1 is further supported by the statutory

provision that "the *collection* of any excessive charge or fee in connection with the

redemption or assignment of a tax sale certificate shall be deemed *prima facie*

evidence" that the holder of the tax sale certificate knowingly charged the unlawful

fee.[159] An interpretation of the statute requiring a showing of redemption and

payment in all cases would render the latter provision meaningless, as the

---

[157] Complaint, ¶¶ 25-26.

[158] N.J.S.A. 54:5-63.1.

[159] *Id.* (emphasis added).

- 52 -

collection of the unlawful or excessive fee would serve as a prerequisite to all actions as opposed to *prima facie* evidence of a violation.[160]

In addition, New Jersey courts have long recognized the right of an individual or entity with an interest in property subject to a tax lien to bring an action challenging the amount demanded by the tax lien holder. In *Gonzales v. Harrington Co.*,[161] the court found that a mortgagee had standing to bring a claim to determine the correct amount due to redeem property following a tax sale where the owner of the tax lien "demanded that complainant pay an excessive and illegal amount."[162] The court held that even though "no sum of money was ever offered" by the mortgagee to the tax lien owner, the mortgagee had the right to a judicial determination of the correct amount due for taxes, interest, costs, and charges.[163] More recently, both New Jersey and federal law have recognized that the demand

---

[160] *See DKM Residential Props. Corp. v. Township of Montgomery*, 182 N.J. 296, 307 (2005) ("When interpreting a statute or regulation, we endeavor to give meaning to all words and to avoid an interpretation that reduces specific language to mere surplusage.") (citations omitted).

[161] 2 N.J. Misc. 311 (Ch. 1923).

[162] *Id.* at 311.

[163] *Id.* at 314.

for an unlawful debt in connection with the placing of a lien on real property gives rise to an immediate cause of action by the property owner.[164]

The artificially high interest rates associated with the tax liens on Plaintiffs' properties have diminished the equity in their property, and constitute an ongoing demand for payment that Plaintiffs must satisfy in order to avoid a foreclosure. The New Jersey Supreme Court recently held that the unlawful stripping of a homeowner's equity constitutes an immediate and actionable loss.[165] The reduction of equity due to unscrupulous investment practices was also a major concern of the Supreme Court when examining the protections afforded by the Tax Sale Law to property owners in the context of tax sale foreclosures.[166]

Moving Defendants also argue that they did not charge excessive or unlawful fees because the 18% interest rate on the tax sale certificates is permitted by the Tax Sale Law. This same argument was considered and rejected by Judge

---

[164] *Cox v. Sears, Roebuck & Co.*, 138 N.J. 2, 23 (1994) ("We conclude that an improper debt or lien against a consumer-fraud plaintiff may constitute a loss under the [Consumer Fraud] Act [N.J.S.A. 56:8-1, *et seq.*], because the consumer is not obligated to pay an indebtedness arising out of conduct that violates the Act."); Fair Debt Collection Practices Act, 15 U.S.C. § 1692e (prohibiting misrepresentations concerning the threatened attachment or sale of a debtor's property).

[165] *D'Agostino v. Maldonado*, 216 N.J. 168, 175 (2013) ("We agree with the trial court that the transfer of plaintiffs' equity in their home to defendant constituted an ascertainable loss for purposes of N.J.S.A. 56:8-19. . . .").

[166] *Simon*, 189 N.J. at 326.

Ciccone of the New Jersey Chancery Division in *Crusader Servicing Corp. v. Boyer, et al.*, a case involving several of the original parties to this action and which the Court previously relied on in connection with the defendants' initial motions to dismiss.[167] In that case, as here, the tax sale purchaser denied charging excessive or unlawful fees "because the 18% figure is authorized by statute."[168] The court disagreed, and found that "the statute clearly delineates amongst fees that are excessive, unlawful, or both . . .  Here, it is alleged that the fee was unlawfully obtained and artificially inflated."[169] Judge Ciccone rightly perceived the statute's distinction between "excessive" and "unlawful" fees, and avoided a reading of the statute that would render one of the two terms "mere surplusage."[170]

The fact that the TSCs purchased by Moving Defendants do not on their face evince fraudulent conduct also does not relieve Moving Defendants from liability for the unlawful conduct in connection with the purchase of those certificates. Plaintiffs allege the fraudulent misuse of the municipal tax sale auction process,

---

[167] October 23, 2013 Hearing Transcript, at 85.

[168] *Crusader Servicing Corp. v. Boyer*, *supra*, slip op. at 7.

[169] *Id.*

[170] *See DKM Residential Props. Corp.*, 182 N.J. at 307.

and that Moving Defendants deliberately failed to disclose their unlawful conduct in documents provided to government officials, Plaintiffs, and the public.[171]

In *Hyland v. Kirkman*, the plaintiffs presented a challenge to the alleged fraudulent misuse of land title recording, in which the perpetrators recorded documents to make it appear as though their transactions were lawful, but the plaintiffs uncovered facts demonstrating a fraudulent scheme.[172] The court found that notwithstanding the facial validity of the recorded documents, the plaintiffs had pleaded sufficient facts to proceed with their claims.[173]

Plaintiffs therefore have adequately pleaded facts that, if proven, will show that Defendants charged excessive or unlawful fees that resulted in an immediate and ongoing reduction in Plaintiffs' equity in their properties, and substantially obstructed Plaintiffs' fundamental redemption rights, in violation of the Tax Sale Law, N.J.S.A. 54:5-63.1.

## C. Plaintiffs Have Alleged the Moving Defendants' Fraudulent Conduct With Sufficient Particularity Under Rule 9(b)

The Complaint alleges that Moving Defendants participated in the conspiracy alleged by Plaintiffs, which resulted in the TSCs of Plaintiffs and the class being acquired with artificially inflated interest rates. These allegations

---

[171] Complaint, ¶ 249.

[172] 204 N.J. Super. 345, 578 (Ch. Div. 1985).

[173] *Id*. at 584.

connect the Moving Defendants' fraud to the harm suffered by Plaintiffs with sufficient particularity under Fed. R. Civ. P. 9(b).[174]

To satisfy the requirements of Rule 9(b), the Complaint must "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation."[175] However, "Rule 9 does not require plaintiffs to plead facts that, by the nature of the alleged fraud, are within the defendants' control."[176] Similarly, courts "should . . . apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants."[177] Courts in this District have determined that "the particularity rule is somewhat relaxed when key factual information remains

---

[174] Moving Defendants' assertion that Plaintiffs have "admitted" that their claims under the Tax Sale Law are not based on fraud is contrary to Plaintiffs' express arguments in briefing and at oral argument. *See Plaintiffs' Memorandum of Law in Opposition to Defendants' Joint and Individual Motions to Dismiss*, Dkt. No. 242, at 57 ("Plaintiffs acknowledge that their claims under N.J.S.A. 54:5-52 are subject to" Rule 9(b)); October 23, 2013 Hearing Transcript, at 60 ("Rule 9(b) does apply to the Section 52 claims that we've alleged.").

[175] *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007).

[176] *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 368 (D.N.J. 2001).

[177] *Rolo v. City Investing Co. Liquidating Trust*, 155 F.3d 644, 658 (3d Cir. 1998).

within the defendant's control,"[178] as is the case here, where discovery into the "self-concealing" conspiracy has not yet begun.

In light of the clear remedial purpose of the New Jersey Tax Sale Law to protect property owners from unfair treatment resulting from fraud in the purchase of tax sale certificates, the requirement for pleading fraud under N.J.S.A. 54:5-63.1 should be viewed "in the broad sense."[179] Similar to the statutory fraud claims brought under the New Jersey Consumer Fraud Act, another statute designed to protect consumers against unscrupulous business practices, claims under the Tax Sale Law do not require a showing of reliance.[180] The Court should avoid "shutting out a litigant who presents a plausible case of fraud and is deprived of his day in court where he may complete evidence on that difficult subject."[181]

---

[178] *In re Processed Egg Prods. Antitrust Litig.*, 851 F. Supp. 2d 867, 880 (E.D. Pa. 2012) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

[179] *B. Jeselshon*, *Inc. v. Atlantic City*, 70 N.J. 238, 243 (1976) (interpreting public auction ordinance, finding that "The remedial provisions of the ordinance are a prophylactic device directed at these abuses and serve to protect the public from this kind of 'fraud.'").

[180] *See, e.g.*, *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607 (1997) (The Consumer Fraud Act, unlike common law fraud, "does not require proof of reliance.").

[181] *Community Dev. Co. v. Seaside Gardens*, *Inc.*, 7 N.J. 153, 159 (1951) (Case, J., dissenting).

As this Court has already found, Plaintiffs have properly alleged that Defendants fraudulently concealed their unlawful activities from Plaintiffs, municipal officials, and the general public.[182] Defendants' deliberate concealment of their fraudulent activity further removes Plaintiffs' obligation to prove and plead detrimental reliance.[183] Notwithstanding this concealment, Plaintiffs have still pled facts that connect Moving Defendants to the TSCs sold on Plaintiffs' properties.[184]

By identifying the time, date, and place of the auctions at which Moving Defendants successfully purchased tax liens, the other persons and entities attending and bidding on tax liens at the auctions at which Moving Defendants purchased liens, the relationship of these other entities to the auction of tax liens sold on Plaintiffs' properties, and the manner by which bids on tax liens were allocated between the Moving Defendants and these other entities from one auction

---

[182] Complaint, ¶¶ 247-254; October 23, 2013 Hearing Transcript, at 88 ("the Court has determined that plaintiffs have sufficiently alleged that defendants' actions were self-concealing").

[183] *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 132 (D.N.J. 2010) (stating well-established rule that "plaintiffs asserting fraud claims 'involving primarily failure to disclose' material information need not demonstrate 'positive proof of reliance' in order to recover") (quoting *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972)).

[184] *See Rolo*, 155 F.3d at 659 ("To link their own injuries to the alleged RICO enterprise, plaintiffs must allege what happened to them.").

to another, Plaintiffs have adequately pleaded the "who, what, when, where and how" of the fraudulent activity.[185] Their Tax Sale Law claim should be upheld.

**POINT III**

**PLAINTIFFS' UNJUST ENRICHMENT CLAIM SHOULD BE SUSTAINED**

In seeking to dismiss Plaintiffs' unjust enrichment claim, the Moving Defendants argue that: (i) this "parasitic claim" cannot survive "where the underlying federal law and state law claims *should* be dismissed"; and (ii) Plaintiffs cannot allege a "direct relationship" between themselves and Defendants.[186] Both arguments fail.

*First*, Moving Defendants' argument *assumes* that this Court will dismiss Plaintiffs' other claims. But Plaintiffs have shown that their other claims should be upheld. Thus, even if the unjust enrichment claim were merely "parasitic" of those other claims (and it is not, as discussed below), the unjust enrichment claim should stand. In addition, Plaintiffs' unjust enrichment is also distinct from their antitrust claims in at least one very significant way – the remedy sought with respect to their unjust enrichment claim.

---

[185] *In re Suprema Specialties*, *Inc. Sec. Litig.*, 438 F.3d 256, 276-77 (3d Cir. 2006) (citations omitted).

[186] Joint Memo of Law, at 42-44 (emphasis added).

In that regard, the Plaintiffs seek the imposition of a constructive trust on their unjust enrichment claim. A constructive trust is a remedy pertaining to property or the proceeds thereof where the retention of the property or proceeds would result in the unjust enrichment of the person retaining it.[187] As the Appellate Division has held, the purpose of a constructive trust with regard to unjust enrichment is to "deny the wrongdoer any profit from the transaction and to deter such conduct."[188] An important aspect of the remedy of imposition of a constructive trust is that, if the Plaintiffs demonstrate wrongdoing on the part of the Moving Defendants, the burden would then shift to Moving Defendants to demonstrate they *did not* receive any proceeds from their illegal activities, and if they did, they will be required to demonstrate what amount and to disgorge such proceeds.[189] Because this remedy effectively relieves Plaintiffs of quantifying their

---

[187] *D'Ippolito v. Castoro*, 51 N.J. 584, 589 (1968).

[188] *County of Essex v. First Union Nat'l Bank*, 186 N.J. 46, 53 (2006).

[189] *Id.* at 60 ("As noted earlier, the trial court erred when it placed the burden of proof on the County to show any division of fees. The burden should have been on the Bank. Our decisions have recognized that the party with greater expertise and access to relevant information should bear those evidentiary burdens . . . Once the County presented evidence of the amount of the fees and its entitlement to disgorgement, the burden should have shifted to the Bank to establish that it did not receive the entirety of the fees. It is for the Bank to prove its defense that it did not retain the fees or that the fees were subsequently earned and received by a third party.").

damages and, in effect, shifts that burden to Moving Defendants, it is an important distinction between the antitrust claims and unjust enrichment claims.

*Second*, Moving Defendants' argument that Plaintiffs have not alleged "a direct relationship" between Plaintiffs and Moving Defendants overstates that requirement.[190] The "recognition that 'some direct relationship' should exist between the parties to an unjust enrichment claim simply reflects the need to curtail the reach of this equitable remedy . . . to prevent a finding of liability in cases where the defendant had absolutely no course of dealings with, and no other demonstrated connection to, the plaintiff."[191]

Here, the Complaint demonstrates the collusive and unlawful nature of Moving Defendants' conduct, and the strong connection of that conduct to Plaintiffs, who suffered damage as a direct result of the conspiracy in the form of artificially inflated interest rates. As identified parties to an admitted conspiracy, Moving Defendants cannot be heard to assert, in connection with an unjust enrichment claim that is equitable in nature, that Moving Defendants do not have at least "some direct relationship" to their victims.

The Court should sustain the Plaintiffs' unjust enrichment claims.

---

[190] Joint Memo of Law, at 45.

[191] *Stewart v. Beam Global Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 200 (D.N.J. 2012).

## POINT IV

## IF NECESSARY, PLAINTIFFS SHOULD BE GIVEN LEAVE TO AMEND

Even where plaintiffs have already been granted leave to amend their complaint previously, courts in this District "favor a liberal policy in granting amendments to pleadings."[192] This tenet has particular salience here, where Plaintiffs continue to gather information from settling Defendants. Indeed, several large settling Defendants have not yet begun to cooperate with Plaintiffs, almost guaranteeing that additional information on the contours of the conspiracy – and the actions of the conspirators – will be disclosed to Plaintiffs. Thus, should the Court dismiss any claims here, Plaintiffs should be "freely given" the opportunity to amend to incorporate any additional information and ensure that they are afforded every reasonable opportunity to present their claims on the merits.[193]

---

[192] *Schwartz v. Avis Rent A Car Sys., LLC*, No. 11-4052, 2013 WL 2182078, at *5 (D.N.J. May 20, 2013) (granting motion to file third amended complaint); *see Bizzarro v. Ocean Cnty.*, No. 07-5665, 2014 WL 980659, at *5-6 (D.N.J. Mar. 13, 2014) (granting leave to file fourth amended complaint); *Montich v. Miele USA, Inc.*, No. 11-2725, 2013 WL 5523689, at *7 (D.N.J. Sept. 30, 2013) (permitting third amended complaint); *Minard v. Iazzetti*, No. 06-645 (MLC), 2007 WL 4208836, at *2 (D.N.J. Nov. 26, 2007) (granting leave to reopen case to file third amended complaint); *see also Walsh Secs., Inc. v. Cristo Props. Mgmt.*, No. 97-3496, 2009 WL 1883988, at *2 (D.N.J. June 30, 2009) (granting plaintiffs' motion for leave to file a fourth amended complaint adding three additional claims).

[193] *See Rowen Petroleum Props., LLC v. Hollywood Tanning Sys.*, No. 08-4764, 2010 WL 936217, at *4 (D.N.J. Mar. 12, 2010) ("The Third Circuit has shown a strong liberality in allowing amendments under Rule 15 in order to ensure that claims will be decided on the merits rather than on technicalities.").

## POINT V

## DEFENDANT MASTELLONE'S STAY MOTION SHOULD BE DENIED

On September 30, 2013, Defendant Michael Mastellone pled guilty to violating Section 1 of the Sherman Act and admitted to the illegal scheme alleged in Plaintiffs' Complaint. Unlike other Moving Defendants, however, he has not moved to dismiss the Complaint or filed an answer. Instead, nearly six months after being named as a Defendant, and without the endorsement of the government, Mastellone demands a stay of all proceedings against him. Because Mastellone has not satisfied the applicable legal standards, the Court should deny his motion.

A stay of civil proceedings when there is a parallel criminal proceeding is an "extraordinary remedy,"[194] to be granted, in a court's discretion, only where "the interests of justice . . . require such action."[195] Courts consider six factors when deciding whether to grant such a stay: (1) the extent to which the issues in the criminal and civil case overlap; (2) the status of the case, including whether the defendant has been indicted; (3) the plaintiff's interest in proceeding expeditiously weighed against the prejudice to the plaintiff caused by a delay; (4) the private

---

[194] *Walsh Sec. v. Cristo Prop. Mgmt.*, 7 F. Supp. 2d 523, 526-27 (D.N.J. 1998) (citing *Weil v. Markowitz*, 829 F.2d 166, 174 n.17 (D.C. Cir. 1987)).

[195] *United States v. Kordel*, 397 U.S. 1, 12 n.27 (1970).

- 64 -

interests of and burdens on the defendants; (5) the interests of the court; and (6) the public interest.[196] All of those factors weigh against granting Mastellone's motion.

## A.    Overlap of Issues

As discussed in *De'Omilia Plastic Surgery, P.C. v. Sweeton*,[197] the more overlap between issues in the criminal and civil cases, the greater the risk that a defendant will incriminate himself in the civil case if it proceeds. *De'Omilia* denied a defendant's stay application where that defendant had already pled guilty, noting that in light of the guilty plea, "there will be no criminal trial, and thus no concern that the government may be unfairly advantaged by any admissions [the defendant] makes in the course of the civil action."[198] Further, because the defendant "'may have already pled guilty to specific allegations in the criminal matter' in order to obtain her plea agreement, she should not be able to benefit further from such admissions by delaying the civil case against her."[199]

Similar to the defendant in *De'Omilia*, Mastellone has already pled guilty. There will be no criminal trial, which eliminates any concern regarding any perceived unfair advantage for the U.S. Attorney in the criminal case or concerns

---

[196] *Walsh*, 7 F. Supp. 2d at 527 (citation omitted).

[197] No. 12-06415, 2013 WL 6070037, at *2 (D.N.J. Nov. 18, 2013).

[198] *Id.*

[199] *Id.*

regarding Mastellone's Fifth Amendment rights. Finally, Mastellone should not be allowed to benefit further from his guilty plea by delaying this civil case.[200] Consequently, the "overlap" factor weighs against granting a stay.

## B.    Status of Criminal Case

The posture of the criminal case also weighs against a stay. *De'Omilia* held that, due to the defendant's guilty plea, "it is unlikely that any answers she provides in the civil case against her would affect her liability in the criminal matter, and, in any event, the likelihood of further prosecution is small."[201]

Mastellone argues that, although there will be no criminal trial and although he is cooperating with the U.S. Attorney, statements he makes in this action might be used against him at the sentencing phase of the criminal case.  However, as noted in his own cited case, by entry of his guilty plea, Mastellone has "already sacrificed his ability to contest liability."[202] As in *De'Omilia*, Mastellone's

---

[200] *Arden Way Assocs. v. Boesky*, 660 F. Supp. 1494, 1497 (S.D.N.Y. 1987) (noting that the defendant's guilty plea and arrangement with the government should not prejudice plaintiff by staying the civil proceeding).

[201] 2013 WL 6070037, at *3 (citing *Arden Way Assocs.*, 660 F. Supp. at 1499) (denying stay; "it is extremely dubious whether [defendant's] Answer could affect the liability in the criminal proceedings," and, defendant, by pleading guilty, had "thereby substantially decreas[ed] if not extinguish[ed] the risk of his further prosecution").

[202] *In re WorldCom, Inc. Sec. Litig.*, Nos. 02 Civ. 3288, 02 Civ. 4816, 2002 WL 31729501, at *5-6 (S.D.N.Y. Dec. 5, 2002).

- 66 -

reasoning is "extremely dubious" since he has already "negotiated and cooperated with the Government and entered a plea of guilty as part of an arrangement."[203]

To refute this common sense notion, Mastellone relies on inapposite authority. Mastellone cites *In re WorldCom, Inc. Sec. Litig.*, for example, to support the notion that the right against self-incrimination survives until sentencing.[204] In *WorldCom*, however, the court had no reason to address the risk of self-incrimination because "other reasons" favored a stay.[205] Moreover, the Government supported the stay application in *WorldCom*, unlike here where the Government has taken no position, and apparently will not be taking a position.[206] Thus, this factor too weighs against granting Mastellone's motion to stay.

## C.    Prejudice to Plaintiffs

Courts have recognized that a delay may lead to the loss of evidence and frustrate a plaintiff's ability to put on an effective case.[207] Likewise, "with the

---

[203] 2013 WL 6070037, at *3.

[204] 2002 WL 31729501, at *7.

[205] *Id.*

[206] *Id.* at *5.

[207] *Sidan v. Orleans Cnty.*, 180 F.R.D. 226, 230 (W.D.N.Y. 1997) (denying defendant's motion to stay in part, considering plaintiffs' concern with the adverse effects that continued delay might have had on their ability to conduct discovery).

passage of time, witnesses become unavailable, memories of conversations and dates fade, and documents can be lost or destroyed."[208]

Mastellone declares that prejudice to Plaintiffs will be minimal, but does not explain why. The fact is a stay will prejudice Plaintiffs. This case is already two years old, and it involves a complex bid-rigging scheme that dates back many more years. Thus, the longer this goes on, the greater the chance evidence will be lost. For those reasons, the "prejudice to Plaintiffs" factor also calls for denial of a stay.

## D.   Burden on Defendant

This element considers the implication of the civil case on the defendant's Fifth Amendment rights. As discussed above, however, since Mastellone has already pled guilty, there is little or no effect on his Fifth Amendment rights.

Mastellone argues that expending time and resources on a simultaneous civil case is a "substantial burden."[209] But Mastellone need expend little energy on the criminal matter, since he long ago pled guilty. And this civil case and discovery will proceed against Mastellone whether a stay is granted or not, since he has admitted to the conduct alleged in the Complaint, and he has not moved to dismiss.

---

[208] *De'Omilia*, 2013 WL 6070037, at *4 (citing S*EC v. Brown*, 2007 WL 4192000, at *2 (D. Minn. July 16, 2007)).

[209] *See* Mastellone Br. at 8.

## E.    Interests of the Court

"The Court has an obligation to move its docket, and not to let cases languish before it."[210] Mastellone contends that this Court's desire for efficiency should be outweighed by his Fifth Amendment concerns. In the same breath, however, he argues that the uncertainty of his sentencing date "should be of minimal concern" because he cannot contest matters to which he admitted in his guilty plea.  For that reason, and as discussed above, because Mastellone has already pled guilty, any Fifth Amendment concerns are inconsequential, and do not outweigh the interests of the Court in proceeding with this matter.

## F.    Public Interest

"[T]he public has an interest in the efficient resolution of disputes with minimal delay,"[211] particularly here, where Plaintiffs and class members have been damaged over a long period by the unlawful actions of Mastellone and his co-conspirators. Mastellone's admitted wrongful conduct corrupted the TSC process, a process in which the public has a strong interest. The vindication of that interest, and the provision of compensation to victims, should not be delayed further.

---

[210] *De'Omilia*, 2013 WL 6070037, at *5 (citing *In re Scrap Metal Antitrust Litig.*, 2002 WL 31988168, at *7 (N.D. Ohio Nov. 7, 2002)); *see also In re Adelphia Comm'cns Sec. Litig.*, No. 02-1781, 2003 WL 22358819, at *4 (E.D. Pa. May 13, 2003) (the court has an interest in efficiently managing its caseload).

[211] *De'Omilia*, 2013 WL 6070037, at *5 (citing *Diamond v. Borough of Peapack Gladstone*, 2011 WL 4950169, at *7 (D.N.J. Oct. 18, 2011)).

- 69 -

Citing *Adelphia*, Mastellone argues that the criminal and civil proceedings both advance the same public interest, such that a stay of the civil matter will not harm the public interest.[212] Even if that were so, the criminal case will not advance compensation to Mastellone's victims. Mastellone's other contention – that the U.S. Attorney has an interest in preserving the usefulness of cooperating Defendants – is undone by the fact that, unlike in other cases, the Government has not supported Mastellone's application for a stay. And, the fact that the government has not supported the stay request weighs heavily against the granting of Mastellone's motion.[213]

Thus, the public interest, like all the other factors, weighs against the grant of a stay. Defendant Mastellone's motion should be denied, and he should be directed to file an Answer to the Complaint or submit to default.

## VI.   CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that Defendants' motions to dismiss the Complaint, and Defendant Mastellone's motion for a stay, should all be denied.

---

[212] *See* Mastellone Br. at 11 (citing *Adelphia*, 2003 WL 22358819, at *16).

[213] *See Travelers Cas. & Sur. Co. v. Vanderbilt Grp., LLC*, No. 01 CIV 7927 (DLC), 2002 WL 844345, at *4 (S.D.N.Y. May 2, 2002) (specifically noting the failure of the State to join in the request for a stay as a factor in denying the stay).

- 70 -

413820.1

Dated:  April 25, 2014                    **LITE DEPALMA GREENBERG, LLC**

                                          By:   /s/ *Bruce D. Greenberg*
                                                Bruce D. Greenberg
                                                Two Gateway Center, Suite 1201
                                                Newark, NJ 07102-5003
                                                Telephone: (973) 623-3000
                                                Email: bgreenberg@litedepalma.com
                                                **LITE DEPALMA GREENBERG, LLC**
                                                Steven J. Greenfogel
                                                1521 Locust Street
                                                Philadelphia, PA  19102
                                                Telephone:  (215) 564.5182
                                                Facsimile:  (215) 569.0958
                                                sgreenfogel@litedepalma.com

**HAGENS BERMAN SOBOL**              **HAUSFELD LLP**
**SHAPIRO LLP**                      Michael D. Hausfeld (admitted *pro hac*
Steve W. Berman (admitted *pro hac*  *vice*)
*vice*)                              James J. Pizzirusso (admitted *pro hac*
1918 Eighth Avenue, Suite 3300       *vice*)
Seattle, WA  98101                   Seth R. Gassman (admitted *pro hac vice*)
Telephone:  (206) 623-7292           1700 K Street, NW, Suite 650
Facsimile:   (206) 623-0594          Washington, DC  20006
Email: steve@hbsslaw.com             Telephone:  202-540-7200
                                     Facsimile:  202-540-7201
                                     mhausfeld@hausfeldllp.com
**HAGENS BERMAN SOBOL**              jpizzirusso@hausfeldllp.com
**SHAPIRO LLP**                      sgassman@hausfeldllp.com

Jason A. Zweig (admitted *pro hac*
*vice*)
555 Fifth Avenue, 17th Floor
New York, NY  10017
Telephone:  (212) 752-5455
Facsimile:  (917) 210-3980
Email: jasonz@hbsslaw.com

*Interim Class Counsel*