**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| IN RE NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIG. | Civil Action No. 12-1893 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

Plaintiffs bring this putative class action against participants in an alleged bid-rigging conspiracy involving municipal auctions of tax liens in the state of New Jersey. Plaintiffs' 131-page First Amended Consolidated Master Class Action Complaint ("FACC") alleges that Defendants have engaged in an unlawful conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the New Jersey Antitrust Act, N.J.S.A. § 56:9-3, the New Jersey Tax Lien Law, N.J.S.A. § 54:5-63.1, and New Jersey common law. (FACC ¶ 1, ECF No. 320.)

This matter comes before the Court on several of Defendants' motions to dismiss the FACC or stay the Action. (ECF Nos. 340, 341, 345, 347.) Defendants BBX Capital Corp., Fidelity Tax, LLC, Heartwood 55, LLC, Michael G. Deluca, Gary I. Branse, David Jelley (collectively, "BankAtlantic Defendants"), PAM Investors, Patrick Caraballese (collectively, "PAM Defendants"), Crestar Capital LLC ("Crestar"), CCTS Capital LLC ("CCTS"), William S. Green ("Green") (collectively, "Crestar Defendants"), and Mooring Tax Asset Group, LLC ("Mooring") (collectively, "Joint Defendants") have filed a joint motion to dismiss. (ECF No. 341.) Defendants Joseph Wolfson, Richard Simon Trustee, and Betty Simon Trustee, LLC ("Wolfson Defendants") (collectively, with Joint Defendants, "Moving Defendants") have moved to join in certain arguments asserted by the Joint Defendants. (ECF No. 345.) The Crestar Defendants have also submitted their own motion to dismiss. (ECF No. 340.) Last, unrelated to the motions to dismiss,

Defendant Michael Mastellone has moved to stay the Action pending his sentencing in a related criminal matter.  (ECF No. 347.)[1]

The Court has carefully considered the parties' submissions and decided the matter without oral argument pursuant to Local Civil Rule 78.1.  For the reasons set forth below, and other good cause shown, Defendants' motions are granted in part and denied in part.

## I.  **Background**

This case results from the consolidation of five separate and related actions involving alleged bid rigging in the conduct of public auctions of tax liens, or tax sale certificates ("TSCs"). On June 8, 2012, the Court consolidated the five separate actions under this docket.  (ECF No. 55.) Following consolidation, Plaintiffs filed a Consolidated Master Class Action Complaint ("Consolidated Complaint").  (ECF No. 113.)  A majority of Defendants subsequently moved to dismiss the Consolidated Complaint.  (ECF Nos. 173, 174, 177, 178, 180, 182, 185, 186, 187, 188, 193.)  On October 23, 2013, the Court granted the pending motions to dismiss and held that, while Plaintiffs had adequately pleaded antitrust standing, the Consolidated Complaint did not include sufficient allegations of a contract, combination, or conspiracy to maintain a claim under Section 1 of the Sherman Act or under the New Jersey Antitrust Act.  (Tr. of Mot. Hr'g 75-90, ECF No. 309; Order, ECF No. 301.)  The Court also dismissed Plaintiffs' other state law claims.  (Tr. of Mot. Hr'g 85-87; Order, ECF No. 301.)

With leave of the Court, Plaintiffs filed an amended pleading.  On January 6, 2014, Plaintiffs filed the FACC, including four counts: (1) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) violation of the New Jersey Antitrust Act, N.J.S.A. § 56:9-3; (3) violation of the

---

[1] For simplicity's sake, the Court has adopted the grouping convention used by Plaintiffs in the FACC.  Accordingly, there are a total of fifty-five Defendants (many of which have settled) and a total of twelve defendant-groups (Moving Defendants represent five of those groups). (FACC 1.)

New Jersey Tax Lien Law, N.J.S.A. § 54:5-63.1; and (4) a claim of unjust enrichment. (ECF No. 320.) Plaintiffs are property tax debtors in New Jersey. (FACC ¶ 7.) Plaintiffs allege that Defendants, some of "the largest TSC purchasers in New Jersey," engaged in a statewide conspiracy "to rig TSC auctions in New Jersey." (*Id.* ¶¶ 1, 6.)

The New Jersey Legislature has adopted a comprehensive statutory scheme governing the existence and sale of tax liens for unpaid property taxes, N.J.S.A. 54:5-1 to -137 (the "Tax Sale Law"). (*Id.* ¶ 89.) When a property owner in New Jersey fails to pay property taxes, "the municipality in which the property is located auctions the lien through a bidding process authorized by the [Tax Sale Law]."[2] (*Id.* ¶ 92.) Municipalities in New Jersey typically hold these auctions once a year, and the auctions are open to the public. (*Id.* ¶¶ 94-95.) In a process designed to be competitive, the auction for each tax lien opens with an 18% interest rate, which represents the interest that the property owner must pay on the tax debt. (*Id.* ¶¶ 96, 98.) Any subsequent bid is at a lower interest rate, and if bidding reaches 0%, bidders can bid an additional premium in order to win the auction and obtain the title to the lien. (*Id.* ¶ 96.) The successful purchaser "receives a TSC as evidence of the lien." (*Id.* ¶ 93.) The successful purchaser can also opt to pay subsequent unpaid taxes on the property, and these amounts are tacked on to the total lien and are subject to interest at a statutory rate of 18%. (*Id.* ¶ 98.) In addition to interest payments, the successful purchaser obtains a first priority lien on the property, and if the debt is not repaid, or "redeemed," in the parlance of the Tax Sale Law, the purchaser of the TSC can foreclose on the property after a statutory number of years. (*Id.* ¶ 97.)

---

[2] "By authorizing the sale of liens in a commercial market, the Tax Sale Law gives rise to 'a municipal financing option that provides a mechanism to transform a non-performing asset into cash without raising taxes.'" *Princeton Office Park, LP v. Plymouth Park Tax Servs., LLC*, 218 N.J. 52, 62 (2014) (quoting *Varsolona v. Breen Cap. Servs. Corp.*, 180 N.J. 605, 610 (2004)).

Plaintiffs allege that Defendants engaged in a statewide scheme to allocate liens auctioned at municipal tax sales amongst themselves in order to reduce or eliminate competition and obtain possession of tax liens with "artificially and/or inflated . . . interest rates." (*Id.* ¶ 1.) Starting in or around 1998, Plaintiffs allege that Defendants, in response to vigorous competition in the TSC auction market, "reached an understanding to allocate the liens up for auction amongst themselves and refrain from bidding on liens which were allocated to other auction attendees." (*Id.* ¶ 102.) In order to facilitate this bid-rigging, or bid-allocation, conspiracy, Defendants would obtain auction lists prior to auction and would communicate either via phone, email message, or in person prior to the auction, "often outside the municipal building or in parking lots behind the building where the auction was to be held." (*Id.* ¶ 104.) In order to keep track of the allocation scheme, Defendants maintained "bid books" that detailed which lien was to be allocated to which conspirator. (*Id.*) If a conspirator deviated from the planned allocation, the other conspirators policed the conspiracy by bidding down liens allocated to that company or individual; Defendants also used threats and intimidation to police the conspiracy. (*Id.* ¶¶ 106, 214.) In support of this statewide conspiracy, Plaintiffs have set forth allegations of instances of collusion at individual auctions throughout New Jersey. In all, Plaintiffs have described forty-nine auctions at which more than one Defendant spoke or met before the auction and allocated liens. (*Id.* ¶¶ 117-211.) In addition, several Defendants have been indicted or investigated by the Department of Justice in connection with their roles in the alleged conspiracy. (*Id.* ¶¶ 220-246.)

Moving Defendants seek to dismiss the FACC for failure to state a valid conspiracy for purposes of the antitrust laws, failure to state a claim under the Tax Sale Law, N.J.S.A. 54:5-63.1, and for failure to state a claim of unjust enrichment. Moving Defendants also assert that Plaintiffs

lack standing to assert their claims against the Moving Defendants.[3]  Separately, Defendant Mastellone has moved for a stay of the Action until he is sentenced in a related criminal proceeding.

## II.  Discussion

### A. Motions to Dismiss

#### 1.  Failure to State a Claim Under Sherman Act and New Jersey Antitrust Act[4]

When considering a motion to dismiss for failure to state a claim, a district court conducts a three-part analysis. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).  "First the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)).  Second, the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  Last, once the well-pleaded facts have been identified and the conclusory allegations disregarded, a court must determine whether the "facts alleged in the complaint are sufficient to show the plaintiff has a 'plausible claim for relief.'"  *Id.* at 211 (quoting *Iqbal*, 556 U.S. at 679).  A complaint must contain sufficient facts to "put the defendant on notice of the nature of the plaintiff's claim."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 320 n.18 (3d Cir. 2010) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007)).  "This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."

---

[3] Moving Defendants have moved for dismissal for lack of standing under 12(b)(6); however, "[a] motion to dismiss for want of standing is . . . properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007).
[4] Because standing is "an indispensable part of the plaintiff's case," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), review of a standing challenge typically precedes the substantive analysis of a Rule 12(b)(6) motion.  However, the adequacy of Plaintiffs' allegations of a statewide conspiracy bear on their standing to assert their claims.  Accordingly, the Rule 12(b)(6) analysis anticipates the standing determination.

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). It is a defendant's burden to show that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. In order to establish a Section 1 claim, a plaintiff must show that (1) "the defendant was a party to a 'contract, combination . . . [,] or conspiracy'" and (2) "the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). While Section 1 only prohibits unreasonable restraints of trade, "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958). Bid-rigging agreements are *per se* illegal under Section 1. *In re Ins. Brokerage*, 618 F.3d at 336; *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 316 (4th Cir. 1982); *see also* 12 Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* § 2005b, at 74 (3d ed. 2012) ("Bid-rigging schemes are commonly thought to be more harmful than ordinary price fixing . . . ."). Thus, Moving Defendants' alleged agreement, if established, is in violation of Section 1.

Even in the context of *per se* illegal conduct, a plaintiff must still establish the existence of concerted action.[5] "The existence of an agreement is the hallmark of a Section 1 claim." *In re*

---

[5] "The term 'concerted action' is often used as shorthand for any form of activity meeting the [S]ection 1 'contract, combination or conspiracy' requirement." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 n.1 (3d Cir. 1994).

*Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999). "A [Section] 1 agreement may be found when 'the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (quoting *Am. Tobacco Corp. v. United States*, 328 U.S. 781, 810 (1946)). A plaintiff may depend on either direct or circumstantial evidence of concerted action, or a blend of both, in establishing a Section 1 claim. *W. Penn Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99 (3d Cir. 2010) ("A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two.").[6]   Notably, because Plaintiffs have asserted a bid-rigging conspiracy, which is *per se* prohibited by the antitrust laws, it is critical that standards involving the reasonableness of an alleged restriction not be conflated with standards for evaluating the existence of a conspiracy.   "Context matters in notice pleading.  Fair notice under Rule 8(a)(2) depends on the type of case . . . ." *Phillips*, 515 F.3d at 232; *see also W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 98 ("It is, of course, true that judging the sufficiency of a pleading is a context-dependent exercise.") (citing *Iqbal*, 556 U.S. at 679)).

The Third Circuit has prescribed standards for pleading direct evidence. "After *Twombly*, if a plaintiff expects to rely exclusively on direct evidence of conspiracy, its complaint must plead 'enough fact to raise a reasonable expectation that discovery will reveal' this direct evidence." *In re Ins. Brokerage*, 618 F.3d at 324 (quoting *Twombly*, 550 U.S. at 556). "Direct evidence of a conspiracy is 'evidence that is explicit and requires no inferences to establish the proposition or

---

[6] Competing concerns related to discovery play an important role in the evaluation of the factual particularity of pleadings on a 12(b)(6) motion in an antitrust case.  While "antitrust discovery can be expensive," *Twombly*, 550 U.S. at 558, "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly," *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976).

conclusion being asserted.'" *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (quoting *In re Ins. Brokerage*, 618 F.3d at 324 n.23).[7]  Direct evidence alone may be sufficient. *W. Penn Allegheny*, 627 F.3d at 99 ("If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled.").  With respect to direct evidence, the Third Circuit, seizing on language used by the Supreme Court in a footnote in *Twombly*, has considered allegations of the time and place of a conspiracy, as well as the persons involved, to be significant allegations towards establishing a conspiracy. *See Burtch*, 662 F.3d at 225 ("Yet, none of these allegations specify a time or place that any actual agreement . . . occurred, nor do they indicate that any particular individuals . . . made such an agreement.") (citing *Twombly*, 550 U.S. at 565 n.10); *see also In re Ins. Brokerage*, 618 F.3d at 324 n.23; *McCullough v. Zimmer*, 382 F. App'x 225, 230 n.6 (3d Cir. 2010).  *But see Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is also incorrect.").

A plaintiff is not required to use direct evidence alone: a plaintiff need not "commit to a single method of proof at the pleading stage" and may employ circumstantial evidence in aid of establishing a Section 1 claim. *In re Ins. Brokerage*, 618 F.3d at 324 n.24.  Yet, circumstantial evidence of interdependent conduct, standing alone, is not sufficient. *See Twombly*, 550 U.S. at 553-54. Proffered allegations of circumstantial evidence "must tend to rule out the possibility that the defendants were acting independently." *Id.* at 554.  In any event, "regardless of whether the

---

[7] Although this definition of direct evidence of conspiracy comes from a case discussing the standard for proving a conspiracy on summary judgment, *see In re Baby Food*, 166 F.3d at 118, the standard has been applied in cases involving a motion to dismiss. *See In re Ins. Brokerage*, 618 F.3d at 324 n.23; *Burtch*, 662 F.3d at 225.

plaintiff expects to prove the existence of a conspiracy directly or circumstantially, it must plead 'enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'" *In re Ins. Brokerage*, 618 F.3d at 324 (quoting *Twombly*, 550 U.S. at 556).

### a.  Assessing Plaintiffs' Allegations

The alleged conspiracy at issue can most accurately be described as "an overarching and statewide conspiracy" (FACC ¶ 100) to rig auctions of TSCs, accomplished through Defendants' engagement in a large number of discrete conspiracies at individual auctions.  Plaintiffs primarily allege "an overarching and statewide conspiracy to ensure that the TSCs auctioned in New Jersey carried as high an interest rate as possible."  (*Id.*)  In support of the existence of this overarching conspiracy, Plaintiffs offer allegations regarding the general nature and objects of the conspiracy, allegations regarding criminal investigations and indictments obtained by the government in connection with the conspiracy, and specific allegations of collusion in advance of specifically identified auctions. (*See id.* ¶¶ 110-213.)

Plaintiffs' allegations are sufficient to establish a Section 1 claim.  Setting aside any legal conclusions, Plaintiffs' specific allegations of direct evidence of conspiracy regarding the individual auctions, combined with allegations of statewide collusion, set forth "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement" among the Defendants, including Moving Defendants. *See Twombly*, 550 U.S. at 556.  Plaintiffs allege more than a sufficient amount of factual material tending to show the existence of collusion on the local level.  Significantly, Plaintiffs have cured deficiencies identified by the Court in the previously filed Consolidated Complaint. (*See* Tr. of Mot. Hr'g 83:1-25, Oct. 23, 2013, ECF No. 309.)  Where the Consolidated Complaint merely provided "exemplars" of auctions in which there was collusion between vaguely identified Defendants (Consolidated Compl. ¶ 154), the FACC provides the date

and location of each alleged instance of collusion, as well as the identities of the conspirators. Plaintiffs have alleged collusion on the part of Defendants in connection with nearly fifty municipal auctions and, for each, have alleged sufficient facts regarding each party's conduct in advancing the conspiracy. Furthermore, Plaintiffs have included allegations sufficient to establish the larger, statewide conspiracy. Plaintiffs have proffered a variety of allegations in support of the existence of a large-scale conspiracy, which will be discussed in greater detail below.

As the individual conspiracies provide support for the large-scale conspiracy, allegations specific to each Moving Defendant, including the allegations regarding specific auctions, will be reviewed first. Following review of the individualized allegations, the Court will assess the allegations of the statewide conspiracy.

### i.   BankAtlantic Defendants

The FACC provides sufficient allegations to demonstrate BankAtlantic Defendants' participation in individual bid-rigging conspiracies. The FACC alleges the nature of BankAtlantic Defendants' participation and the identities of individuals who acted on behalf of BankAtlantic Defendants. (*E.g.* FACC ¶ 115 ("Prior to the auctions . . . , defendants Branse and Deluca would instruct their bidders to participate in the conspiracy by informing them which liens they should bid on and which liens they should refrain from bidding on . . . ."); *see also* ¶ 32.) These same employees of the BankAtlantic Defendants, Defendants Branse and Deluca, have both been terminated from their employment due to their participation in the alleged conspiracy. (*Id.* ¶¶ 29-30.) In addition, the FACC identifies twenty-four TSC auctions at which BankAtlantic Defendants or their agents participated and allocated liens. (*Id.* ¶¶ 117-40.) At any given auction at which the BankAtlantic Defendants were present, no less than five of the defendant-groups were represented, and all represented Defendants conspired to rig the auction. (*See id.*) At all of the listed auctions,

10

the BankAtlantic Defendants or their representatives met prior to the auction with other Defendants and allocated liens among themselves. (*Id.*) In connection with their participation in the bid-rigging scheme, BankAtlantic Defendants obtained title to TSCs at all auctions at which they participated. (*See, e.g.*, *id.* ¶ 117 ("As a direct result of the BankAtlantic Defendants' participation in the conspiracy, they 'won' at least four liens at this auction, all of which carried illegal and artificially inflated interest rates.").) BankAtlantic Defendants stopped all participation in the conspiracy in 2008, and according to the FACC, "BankAtlantic Defendants have been, and remain, under criminal investigation for their participation in the conspiracy alleged." (*Id.* ¶¶ 141-142.)[8]

### ii.   PAM Defendants

The FACC similarly provides particularized allegations as to PAM Defendants' participation in collusion with respect to certain auctions. PAM Defendants participated in four auctions at which at least three defendant-groups were present. (*Id.* ¶¶ 192-195.) At all, the Defendants met and allocated the TSCs to be auctioned, and PAM Defendants acquired TSCs at each one. (*Id.*) Having "learned of the United States Department of Justice's criminal investigation into collusion at tax lien auctions," the PAM Defendants ceased participation in the conspiracy. (*Id.* ¶ 196.) PAM Defendants are being investigated by "the U.S. Attorney's office in New York." (*Id.* ¶ 197.)

### iii.   Crestar Defendants

Plaintiffs also set forth sufficiently detailed allegations as to Crestar Defendants'

---

[8] Allegations of criminal investigations into anticompetitive conduct support the plausibility of antitrust conspiracy. *Starr*, 592 F.3d at 324; *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 632 (E.D. Pa. 2010) ("Add to this the existence of a parallel criminal investigation—an allegation demonstrating that the government believes a crime may have occurred—and the result is 'enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement.'" (quoting *Twombly*, 550 U.S. at 556)).

participation in the bid-rigging conspiracy.  Crestar Defendants' participation in the conspiracy occurred once "[Defendants] [David] Butler and [David M.] Farber began working for defendants Crestar and William S. Green, [and] they continued their participation in the conspiracy." (*Id.* ¶ 143.)  Defendants Butler and Farber have both pleaded guilty to criminal antitrust charges while employed by "Company-1," and the "Crestar Defendants admit that the "Company-1" referenced . . . is defendant Crestar." (*Id.* ¶ 143.)  Crestar Defendants participated in two auctions at which they participated in collusion prior to the auctions.  (*Id.* ¶¶ 146-147.)  Similar to the PAM Defendants, Crestar Defendants ceased their participation in the conspiracy upon learning of the Department of Justice's investigation and are under criminal investigation. (*Id.* ¶¶ 35, 148-149.)

### iv.   Defendant Mooring

Plaintiffs provide particularized allegations as to Mooring's extensive involvement in the conspiracy, as well as the identities of Mooring's agents in the conspiracy. (*Id.* ¶¶ 150-180.)  The FACC includes specific allegations regarding the conduct and involvement of specific employees of Defendant Mooring in the overarching conspiracy; one of those employees was terminated as a result of his participation in the conspiracy.  (*Id.* ¶¶ 37-39.)  Defendant Mooring colluded with other Defendants at twenty-eight separate auctions at which at least three other Defendants were present. (*Id.* ¶¶ 153-180.) Defendant Mooring ceased participation in the conspiracy following the Department of Justice's investigation and is currently under investigation. (*Id.* ¶¶ 40, 181-182.)

### v.   Wolfson Defendants

The Wolfson Defendants' participation in the conspiracy and resulting culpability is alleged with sufficient particularity.  The Wolfson Defendants participated in eleven collusive auctions. (*Id.* ¶¶ 201-211.)  Significantly, "all three Wolfson Defendants were indicted by a grand jury for their participation in the conspiracy on November 19, 2013." (*Id.* ¶ 213.)  Further,

Plaintiffs allege the existence of audiotapes containing recorded conversations between Defendant Joseph Wolfson and other conspirators discussing the conspiracy. (*Id.*)

### vi.    Statewide Conspiracy

Plaintiffs have set forth sufficient allegations in support of the existence of a statewide conspiracy.[9] As a starting point, the FACC includes allegations regarding the general nature of the statewide conspiracy, including approximately when and how the conspiracy formed (*Id.* ¶ 102), methods for accomplishing the objects of the conspiracy (*Id.* ¶¶ 103-107), methods for policing the conspiracy (*Id.* ¶¶ 214-215), and individual instances of collusion (*Id.* ¶¶ 113-213). The FACC also provides extensive allegations regarding criminal investigations by the Department of Justice and other law enforcement agencies, including resulting indictments, into the statewide conspiracy. (*E.g. id.* ¶¶ 8, 220-246.) In addition to the specific allegations regarding investigations and indictments connected to the Moving Defendants (discussed above), the FACC includes allegations regarding the criminal indictments and guilty pleas entered by other Defendants in this action, who the Moving Defendants allegedly conspired with at the individual auctions and on an ongoing basis. (*See, e.g.*, *id.* ¶¶ 8-9, 220-246.)   And, although not definitive evidence of conspiracy, BankAtlantic Defendants, Crestar Defendants, and Mooring were all involved in and participated in meetings associated with the National Tax Lien Association (*Id.* ¶¶ 29, 35, 218-219), an industry trade association, which lends support to Plaintiffs' allegations of collusion. *See In re Blood Reagents*, 756 F. Supp. 2d at 632.

---

[9] As Plaintiffs correctly assert, other courts have not required antitrust plaintiffs to allege a conspiracy connecting all defendants in question. *See In re Mun. Derivatives Antitrust Litig.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("[F]or pleading purposes, plaintiffs are not required to prove the existence of an alleged industry-wide conspiracy.") While not deciding whether such a requirement must always be met when a plaintiff asserts a large-scale conspiracy, the Court holds that Plaintiffs, here, have alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement" among the Defendants. *Twombly*, 550 U.S. at 556.

Most critical to establishing the overarching, statewide conspiracy, Plaintiffs' specific allegations regarding each Moving Defendants' participation in a multitude of individual collusive auctions provides the necessary facts and circumstantial evidence needed to establish their claim. The allegations of collusion at the individual auctions can be considered in establishing the larger overarching conspiracy. *See Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1003 n.5 (3d Cir. 1994) (holding that evidence of prior anticompetitive conduct could be considered in determining existence of subsequent conspiracy); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992) (evidence of conspiracy should be considered in its totality). Indeed, the Third Circuit has held that allegations of bid rigging among defendants can provide the necessary support in establishing a larger horizontal conspiracy. *See In re Ins. Brokerage*, 618 F.3d at 336-37.

Moving Defendants, in arguing for dismissal, place great emphasis on the fact that, as alleged in the FACC, not all Defendants were present at all auctions and none of the Moving Defendants were present at the auctions at which the liens tied to Plaintiffs' properties were sold. The implication is that the potential for anticompetitive conduct is lessened as Moving Defendants could not have conspired where they were not present. Yet, Plaintiffs allege a conspiracy involving bid-rotation or bid allocation. As a result, it is equally plausible, under the terms of the alleged conspiracy, that a Defendant's absence from a particular auction was a direct result of the understanding reached among the Defendants that certain liens were to be allocated and not to be bid upon by co-conspirators. Moving Defendants rely on *United States v. Sargent Electric Co.*, 785 F.2d 1123 (3d Cir. 1986), in support of this contention. Setting aside that *Sargent* dealt with the appeal of the dismissal of criminal charges on double jeopardy grounds, and thus the defendants

there were asserting *the existence* of an overarching conspiracy,[10] this case is of little help to Moving Defendants. There, the Third Circuit held that alleged bid-rigging at separate steel manufacturing facilities constituted discrete conspiracies. *Id.* at 1129-30. This holding, however, was based on "the undisputed evidence" that the defendants were constrained by the bid lists maintained at each facility and thus could not of their own effort participate in the auctions at each facility. *Id.* Here, there is no indication from the allegations in the FACC that Defendants were regulated in their attendance of TSC auctions. Rather, New Jersey's TSC auctions were generally open to the public and could be attended by anyone who may have sought to purchase a TSC. (FACC ¶ 94.) Thus, the facts supporting the court's conclusion in *Sargent* are not present here, and Moving Defendants' absence from certain auctions is consistent with the terms of the alleged conspiracy.

Crestar Defendants separately argue that (1) their alleged limited participation in the conspiracy and (2) the FACC's lack of particularized allegations as to each of the Crestar Defendants[11] requires the dismissal of the claims asserted against them. Crestar Defendants assert that "the Crestar Defendants did not even begin operations 'until November 2008'" (Crestar Defs.' Opp. Br. 3), approximately only four months prior to the end of the conspiracy in February 2009 (FACC ¶ 217), and as a result, Crestar Defendants could not plausibly have been involved in the

---

[10] In *Sargent*, the district court granted dismissal for the criminal defendants on double jeopardy grounds based on a finding that the conspiratorial conduct alleged was part of a single overarching conspiracy and thus defendants could not be found guilty a second time for the same conspiracy. *See* 785 F.2d at 1124-26. There, in both the trial court and on appeal, *defendants* were tasked with proving a single large-scale conspiracy, and *the government* argued the existence of separate conspiracies. *Id.* at 1127-28.

[11] Crestar Defendants are CCTS, Crestar, and Green, current CEO of Crestar. (FACC ¶¶ 34-35.) According to the allegations of the FACC, which the Court must accept as true, CCTS and Crestar are the same entity—"[f]ollowing the Class Period, [CCTS] changed its name to [Crestar]." (*Id.* ¶ 34.)

alleged conspiracy. While the short time frame during which the Crestar Defendants participated in the conspiracy, combined with the relatively small number of auctions at which the Crestar Defendants colluded (two), may detract from their relative culpability, the FACC's allegations plausibly connect *all* of the Crestar Defendants to the conspiracy. Crestar Defendants cannot avoid the allegation that Defendant Green, Crestar's current CEO, in late 2008, colluded with other Defendants prior to an auction in Egg Harbor City and agreed to allocate liens. (*Id.* ¶ 146.) Moreover, Crestar Defendants cannot avoid the alleged fact that Defendants Farber and Butler, the former President and CEO, respectively, of Crestar (then-CCTS), pleaded guilty to involvement in the conspiracy up until February 2009 while purportedly employed by CCTS. (*Id.* ¶¶ 143, 227.)

PAM Defendants separately argue that the approximate seven-year hiatus in their alleged participation in the conspiracy renders their participation implausible. The Court disagrees. As with all of the alleged instances of collusion at the individual auctions, Plaintiffs have set forth specific time, place, and person detail as to each Defendant's participation, including the PAM Defendants. The PAM Defendants' alleged relative inactivity in the conspiracy for a number of years does not erase their prior and subsequent alleged participation in the conspiracy.

In sum, Plaintiffs have set forth allegations supporting the existence of nearly fifty TSC auctions in the state of New Jersey at which there was collusive conduct involving different iterations of the Defendants. In addition, the FACC includes a vast amount of alleged facts in support of a statewide conspiracy. Taking into consideration all of the direct and circumstantial evidence alleged, Plaintiffs have carried their burden of establishing an overarching, statewide conspiracy. While discovery may reveal otherwise, at this stage of the litigation, the allegations of the FACC "tend to rule out the possibility that the defendants were acting independently." *See Twombly*, 550 U.S. at 554.

## 2. Failure to State a Claim Under the Tax Sale Law

Moving Defendants also seek dismissal of Plaintiffs' claim under N.J.S.A. 54:5-63.1. This provision of the Tax Sale Law prescribes certain penalties, including forfeiture, for TSC holders that "charge[ ] or exact[ ] any fee or charge in connection with the redemption of any [TSC] owned by him, in excess of the amounts permitted by [the Tax Sale Law]." N.J.S.A. 54:5-63.1.

Upon examination of the allegations supporting this claim, as set forth in the FACC, the Court determines that Plaintiffs have not pleaded a valid claim under the Tax Sale Law against the Moving Defendants. Plaintiffs have failed to allege a redemption supporting their claim under the Tax Sale Law. Under the Tax Sale Law, "redemption" refers to the right held by the owner of the property connected to the lien (as evidenced by the TSC). *See Bron v. Weintraub*, 79 N.J. Super. 106, 111-12 (App. Div. 1963), *rev'd on other grounds*, 42 N.J. 87 (1964). Here, based on the allegations of the FACC, only one of the Plaintiffs, Son, Inc., exercised the right of redemption in connection with TSCs associated with its properties. (FACC ¶ 25.) Defendant Crusader Servicing Corporation, an entity that has settled with Plaintiffs (ECF No. 278), was the holder of the TSCs redeemed by Son, Inc. (FACC ¶ 25.) Accordingly, a claim based on redemption cannot be brought against any of the Moving Defendants, as none of the Moving Defendants owned a TSC that was redeemed. While the Court previously held that "Section 54:5-63.1 . . . clearly allows a cause of action seeking the forfeiture of a [TSC] when the redemption rate is 'excessive or unlawful,'" (Tr. of Mot. Hr'g 85:16-19, Oct. 23, 2013, ECF No. 309), without a redemption, there can be no such claim. *See In re Princeton Office Park, L.P.*, 504 B.R. 382, 395 (D.N.J. 2014) (requiring that a overcharge or fee be exacted in connection with a redemption, in order to state a claim under Section 54:5-63.1 as an affirmative defense in bankruptcy).

Plaintiffs argue, unpersuasively, that a redemption is not required in order to state a claim under Section 54:5-63.1. All that is necessary to state a valid claim under this provision, Plaintiffs argue, is that a TSC holder charge more than what is permitted under the Tax Sale Law. Such a reading of the statute—which states that a TSC holder may not "charge[ ] or exact[ ] any fee or charge *in connection with the redemption of any [TSC]*"—effectively reads out the qualification placed expressly in the statute, which ties any overcharge to redemption. *See* N.J.S.A. 54:5-63.1. The intention of the state legislature in drafting the provision also belies such a reading. *Varsolona v. Breen Cap. Servs. Corp.*, 360 N.J. Super. 292, 311 (App. Div. 2003) ("[Section 54:5-63.1] was enacted to 'prevent frauds in connection with the redemption of [TSCs],' and to make 'certain that delinquent tax payers shall not, *on redemption*, be required to pay more than the statute requires." (quoting *Statement attached to S.88* (Introduced Feb. 10, 1941)) (emphasis added)), *aff'd*, 180 N.J. 605 (2004). Indeed, redemption is a highly regulated process, "generally effectuated through the office of the municipal tax collector," or in other statutorily defined methods. *In re Princeton Office Park*, 504 B.R. at 395; *see also* N.J.S.A. 54:5-54 to -76 (governing the process of redemption under the Tax Sale Law). The state legislature's reference to redemption in Section 54:5-63.1 should not be disregarded.

### 3. Failure to State a Claim for Unjust Enrichment

Moving Defendants also seek dismissal of Plaintiffs' claim for unjust enrichment. "Generally, to claim unjust enrichment, a plaintiff must allege that (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." *Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 723-24 (D.N.J. 2011) (internal quotations omitted). "Further, New Jersey law requires that a plaintiff have

conferred a direct benefit on the defendant." *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 459 (D.N.J. 2012) (citing *VRG Corp. v. GKN Realty*, 135 N.J. 539, 554 (1994)).

Here, the relationship between Plaintiffs and the Moving Defendants is not sufficiently direct to maintain a claim of unjust enrichment. Moving Defendants highlight that the tax lien auction process requires that purchasers of tax liens, such as Defendants, must purchase the liens from the municipality and not the owner of the property to which the lien is tied. (FACC ¶ 3.) Even more importantly, none of Plaintiffs' liens were purchased by the Moving Defendants. As a result, Plaintiffs cannot maintain a claim for unjust enrichment.

### 4. Article III Standing

Moving Defendants assert that Plaintiffs lack Article III standing to pursue their claims against the Moving Defendants. Although the Court has already determined that Plaintiffs' claims satisfy requirements of antitrust standing, "[s]tatutory standing is distinct from jurisdictional standing." *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 307 (3d Cir. 2011); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014) (explaining that antitrust standing is a form of statutory standing). The more fundamental Article III standing is a necessary predicate towards a justiciable case or controversy. *Sullivan*, 667 F.3d at 307. In evaluating a pleading to determine standing, courts apply the standard for reviewing a complaint under Rule 12(b)(6); that is, a court must accept all allegations and construe the pleading in favor of the nonmoving party. *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012).

To possess standing to bring suit, "[t]he plaintiff must have suffered . . . a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l*, 134 S. Ct. at 1386 (citing

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Standing must be established between each named plaintiff and defendant regardless of the existence of a purported class action. *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943, 2011 WL 5008090, at *7 (D.N.J. Oct. 20, 2011) (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("It is well-settled that a named plaintiff in a class action lawsuit is required to establish Article III standing.")).

Moving Defendants assert that Plaintiffs' injury is not "fairly traceable" to the conduct of Moving Defendants. More specifically, Moving Defendants argue that Plaintiffs do not allege a "causal connection" between their injuries and the conduct of Moving Defendants because none of the Moving Defendants purchased a TSC connected to the property of the named Plaintiffs, nor were they present at the auctions where those TSCs were sold. Without having plausibly pleaded a statewide conspiracy, Moving Defendants contend, Plaintiffs cannot claim that Moving Defendants' conduct caused their alleged harm. However, as discussed *supra*, Plaintiffs have adequately alleged a statewide conspiracy implicating Moving Defendants. Because Plaintiffs have sufficiently alleged a statewide conspiracy involving all Defendants, it is of no consequence that the Moving Defendants did not purchase any lien connected to property owned by Plaintiffs or were not present at the auction where those liens were purchased. *See Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir. 1955) (relief under antitrust laws "is not confined to persons in privity with the wrongdoer"). "[A] co-conspirator is liable for all acts committed in furtherance of a conspiracy . . . ." *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) (citing *Lefco v. United States*, 74 F.2d 66, 68-69 (3d Cir. 1934) (holding, in criminal matter, that defendant was culpable for conduct of other co-conspirators)). As a result, Plaintiffs' claimed injury is traceable to the conduct of the Moving Defendants, *i.e.*, participation in a statewide conspiracy to rig auctions of TSCs, and Plaintiffs have standing to bring suit.

20

**B. Motion to Stay**

Last, Defendant Mastellone has moved for a stay of the proceedings in the Action. Mastellone argues that a stay of this civil action is necessary to protect his Fifth Amendment privilege against self-incrimination in parallel criminal proceedings.  Currently, Mastellone has pleaded guilty to a one-count Information charging a violation of Section 1.  "A stay of a civil case is an 'extraordinary remedy.'"  *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.*, 7 F. Supp. 2d 523, 526 (D.N.J. 1998) (quoting *Weil v. Markowitz*, 829 F.2d 166, 174 n.17 (D.C. Cir. 1987)); *see also Landis v. United States*, 299 U.S. 248, 254-55 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.").  While the stay of a civil action in advance of the disposition of a criminal case may be warranted in some cases, there is no absolute rule mandating such a result.  *De Vita v. Sills*, 422 F.2d 1172, 1181 (3d Cir. 1970); *see, e.g.*, *Texaco, Inc. v. Borda*, 383 F.2d 607 (3d Cir. 1967) (affirming stay of civil antitrust suit pending resolution of related criminal matter).  Courts have considered several factors in determining whether a stay of a civil matter is appropriate in light of an ongoing criminal matter:

> (1) the extent to which the issues in the criminal and civil cases overlap; (2) the status of the case, including whether the defendant[ ] [has] been indicted; (3) the plaintiff[s'] interest in proceeding expeditiously weighed against the prejudice to plaintiff caused by a delay; (4) the private interests of and burden on defendant[ ]; (5) the interests of the court; and (6) the public interest.

*Walsh*, 7 F. Supp. 2d at 527; *accord Trs. of Plumbers & Pipefitters Nat. Pension Fund v. Transworld Mech., Inc.*, 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995).

Here, taking all of these factors into consideration, the Court finds that a stay is unwarranted.  Currently, Mastellone has pleaded guilty and is awaiting sentencing.  Mastellone

21

"does not lose [his Fifth Amendment] protection by reason of his conviction of a crime," *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984), and the Supreme Court has expressly held that Fifth Amendment protections extend into the sentencing phase, *Mitchell v. United States*, 526 U.S. 314, 325 (1999). Yet, Mastellone's Fifth Amendment protections do not mandate a stay. *See Walsh*, 7 F. Supp. 2d at 526-27. Indeed, the Court in *Mitchell*, in announcing that self-incrimination concerns continued into sentencing, acknowledged that a defendant's right to invoke the privilege "accommodates the right not to be a witness against oneself while still permitting civil litigation to proceed." 526 U.S. at 328. Mastellone can invoke the privilege if he believes the information sought in this matter may be used in a subsequent criminal proceeding. *See United States v. Balsys*, 524 U.S. 666, 672 (1998). In addition, while the facts underlying both the civil and criminal matters overlap, the issue most relevant to Defendant's sentencing, according to Mastellone—the scope of his cooperation—has little to do with the issues most relevant in this matter, such as whether Mastellone conspired with Defendants to rig TSC auctions. Finally, the interests of Plaintiffs, the public, and this Court weigh in favor of denying a stay. Accordingly, Defendant Mastellone's motion to stay this matter is denied.

## III.   Conclusion

For the reasons set forth above, and for other good cause shown, Moving Defendants' motions to dismiss are granted with respect to Counts Three and Four, which are dismissed with prejudice. Moving Defendants' motions to dismiss are denied with respect to Counts One and Two. Defendant Mastellone's motion to stay is denied.

**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated:** October 31st, 2014

22