# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIGATION | Master Docket<br><br>No. 3:12-CV-01893-MAS-TJB |

## OBJECTION AND OPPOSITION TO MOTION FOR
## PRELIMINARY APPROVAL OF THE CLASS SETTLEMENT BY OBJECTORS
## ARLENE M. DAVIES, TODD R. ZAHN, AND LAURA S. ZAHN

Dennis J. Drasco
LUM, DRASCO & POSITAN, LLC
103 Eisenhower Pkwy.
Roseland, NJ 07068
(973) 228-6770 (telephone)
(973) 403-9021 (facsimile)
ddrasco@lumlaw.com

Hays Gorey, Jr.
GEYER & GOREY, LLP
1220 L St., NW, Ste. 100
Washington, DC 20005
(202) 644-8732 (telephone)
hays.gorey@geyergorey.com
*pro hac vice pending*

Steven F. Molo
Thomas J. Wiegand
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
*pro hac vice pending*

Martin V. Totaro
MOLOLAMKEN LLP
600 New Hampshire Ave. NW
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
mtotaro@mololamken.com
*pro hac vice pending*

*Attorneys for Objectors Arlene M. Davies, Todd R. Zahn, and Laura S. Zahn*

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

BACKGROUND ................................................................................................2

I.   Defendants Conspired To Fix New Jersey Tax Lien Auctions ............................... 2

II.  Criminal and Civil Litigation Against the Co-Conspirators ................................. 3

III. Class Counsels' Settlements with Defendants ..................................................... 4

IV.  Attorneys' Fees ............................................................................................. 5

V.   Background of the Objectors ............................................................................ 5

ARGUMENT ................................................................................................6

I.   The Amount of the Settlement Is Inadequate ..................................................... 7

II.  The Settlement Provides Inequitable, Discriminatory Distribution of Benefits
     Among Class Members ............................................................................... 10

     1.   Class Members with an Outstanding Tax Sale Certificate Receive
          Preferential Treatment ........................................................................ 10

     2.   Class Members Whose Liens Were Sold to Certain Defendants Receive
          Preferential Treatment ........................................................................ 11

III. The Settlement Bears Indicia of a Non-Arm's-Length Bargain .......................... 12

     A.   Class Counsel Took No Discovery......................................................... 13

     B.   At Least Some Class Representatives Had No Input Into the Settlements ............... 14

     C.   Class Counsel May Claim a Fee Award in Excess of $3 Million ............................ 15

IV.  Class Counsel Fail To Provide Sufficient Information To Accurately Assess the
     Reasonableness of the Settlements ..................................................................... 16

V.   The Class Notice Is Deficient ............................................................................ 17

CONCLUSION................................................................................................19

i

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 184 N.J. 161 (N.J. 2005) ...................................12

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011)...................................15

*In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3d Cir. 2005) ................................................................13

*Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136 (E.D. Pa. 2000) ...................................................9

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)........................................................................17

*Eisen v. Carlisle & Jacquelin*, 52 F.R.D. 253 (S.D.N.Y. 1971) ...................................................18

*In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389 (D.N.J. 2006) .........................8, 9

*Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014)......................................................................6

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768
   (3d Cir. 1995)............................................................................................................ *passim*

*Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975)................................................................................6

*Larson v. AT&T Mobility, LLC*, 687 F.3d 109 (3d Cir. 2012)...................................................17, 18

*In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619 (E.D. Pa. 2004)........................................9

*Martin v. Cargill, Inc.*, 295 F.R.D. 380 (D. Minn. 2013) ..............................................................16

*Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455 (E.D. Pa. 2008)....................................................9

*In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708
   (E.D. Pa. 2014)..........................................................................................................7, 10

*Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340 (1978).........................................................18

*In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333 (3d Cir. 2010)....................................................6

*In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697 (M.D. Pa. 2008)...........9

*Sullivan v. DB Invs., Inc.*, 667 F.3d 273 (3d Cir. 2011)..................................................................8

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006)..........................16

*Zimmerman v. Zwicker & Assocs., P.C.*, Civ. No. 09-3905-RMB-JS,
    2011 WL 65912 (D.N.J. 2011) ................................................................................6, 7, 9

**STATUTES AND RULES**

15 U.S.C. §15(a) ................................................................................................................8

15 U.S.C. §15b ................................................................................................................14

Fed. R. Civ. P. 23(a)(4) ..................................................................................................15

Fed. R. Civ. P. 23(c)(2)(B) ............................................................................................17

Fed. R. Civ. P. 23(e) ........................................................................................................6

**OTHER AUTHORITIES**

Aaron Vehling, *Tax Lien Co.'s Ex-Exec Cops to NJ Bid-Rigging Scheme* (May 12, 2014),
    http://www.law360.com/articles/536918/tax-lien-co-s-ex-exec-cops-to-nj-bid-rigging-
    scheme.............................................................................................................................3

*Manual for Complex Litigation* (4th ed. 2004) ......................................................7, 10

## INTRODUCTION

Arlene Davies, Laura Zahn, and Todd Zahn ("Objectors") object and oppose the motion for preliminary approval of the last six settlements in this class action. *Fifteen* defendants in this civil antitrust case have admitted to fixing prices at tax lien auctions, pleading guilty in criminal enforcement actions by the Department of Justice. The complaint in this case alleges that this conspiracy lasted 11 years and involved $100-$200 million in tax liens auctioned annually. But in this latest round of settlements, Class Counsel proposes to accept only $1,255,000 from seven Defendants to end this case – which would result in a final total of only $9,585,000 from all Defendants.

The proposed settlements cannot be approved, even preliminarily, for five reasons. *First*, the compensation to the class is inequitably inadequate – a small fraction of the total damages caused by the Defendants' 11-year, multimillion dollar criminal conspiracy. *Second*, the settlements provide preferential treatment to some class members at the expense of other class members: Class members with a current tax lien can get a discount for redeeming the lien now – a benefit that class members without an outstanding lien do not receive. *Third*, the negotiations lack indicia of an arm's-length bargain: Class representatives had little participation in the negotiations and Class Counsel took no formal discovery. *Fourth*, Class Counsel fails to provide adequate evidence to justify the fairness of the settlements. *Fifth*, the plan for notice fails to provide individual notice to every class member, despite the fact that their names and addresses are easily ascertained by Defendants.

This Court should deny preliminary approval.

## BACKGROUND

**I.     Defendants Conspired To Fix New Jersey Tax Lien Auctions**

This is a straightforward case of price fixing.  Defendants conspired to rig New Jersey municipal tax lien auctions.  In New Jersey, property owners pay property taxes and sewer and water charges to municipalities.  Dkt. No. 320 ¶2.  When a property owner fails to pay, the municipality obtains a lien on the property.  *Id*.  Municipalities auction these liens to the public. *Id*.  Winning bidders pay the municipality the amount of the outstanding lien.  *Id*. ¶3.  In return, winning bidders receive Tax Sale Certificates, which entitle them to collect on the lien and charge penalties and interest.  *Id*. ¶¶3-4.  Holders of Tax Sale Certificates also have the right to foreclose on a property under certain conditions.  *Id* ¶97.

Tax Sale Certificates are sold in "reverse auctions."  Participants bid on the interest rate that they would charge to the property owner on the outstanding lien.  Dkt. No. 320 ¶92. Bidding starts at a statutory maximum of 18% and participants bid down the rate.  *Id*. ¶96. "[H]onest competition among bidders in a truly competitive market should drive down the winning bid far below 18%, and often as low as 0%."  *Id*.  If bidding reaches 0% interest, participants then may offer a "premium" – a payment to the municipality for the right to purchase the Certificate.  *Id*.

From 1998 to 2009, Defendants conspired to fix the auctions for Tax Sale Certificates. Before each auction, municipalities circulate a list of liens to be sold.  Dkt. No. 320 ¶103. Defendants allocated those liens among themselves.  *Id*. ¶102.  When one lien was allocated to a particular Defendant, all other Defendants refrained from bidding on that lien.  *Id*.  Through this conspiracy, Defendants artificially inflated the interest rate at which liens sold.  *Id*. ¶¶104, 109. Many sold with a single bid at the statutory maximum interest rate of 18%.  *Id*.

## II.      Criminal and Civil Litigation Against the Co-Conspirators

Starting in 2009, the United States Department of Justice began investigating the conspiracy.  Dkt. No. 320 ¶148.  To date, 15 individuals and entities have pleaded guilty to conspiring to rig auctions, and a number of others are under indictment.  *See id.* ¶8; Dkt. No. 399 at 4 n.5.[1]

Property owners whose liens had been sold to Defendants filed civil actions against Defendants starting in March 2012.  Dkt. No. 266-1 at 5.  On June 11, 2012, the cases were consolidated before this Court.  Dkt. No. 55.  On October 22, 2012, this Court appointed Hausfeld, LLP and Hagens Berman Sobol Shapiro, LLP as interim lead co-counsel, and Lite DePalma Greenberg, LLC, as interim liaison counsel.  Dkt. No. 109.

On January 6, 2014, Class Counsel filed the First Amended Consolidated Complaint, the operative complaint in this case.  Dkt. No. 320.  Certain Defendants moved to dismiss, but on October 31, 2014, the Court denied dismissal of Plaintiffs' antitrust claims.  Dkt. No. 375 at 2.  This Court found that "Plaintiffs [had] set forth sufficient allegations in support of the existence of a ***statewide conspiracy***."  Dkt No. 374 at 13 (emphasis added).  In particular, this Court found "Plaintiffs' specific allegations regarding each Moving Defendants' participation ***in a multitude of individual collusive auctions***" to be "critical to establishing the overarching, statewide conspiracy."  *Id.* at 14 (emphasis added).  No discovery schedule has ever been entered in this case.  To date, Class Counsel appears to have taken no formal discovery.

---

[1] *See also* Aaron Vehling, *Tax Lien Co.'s Ex-Exec Cops to NJ Bid-Rigging Scheme*, Law360 (May 12, 2014), http://www.law360.com/articles/536918/tax-lien-co-s-ex-exec-cops-to-nj-bid-rigging-scheme (noting that 12 people and three companies have pleaded guilty as of May 2014, and four people and two businesses were under indictment at that time).

### III.    Class Counsels' Settlements with Defendants

Even before this Court denied the motion to dismiss, Class Counsel began negotiating settlements with Defendants.  Dkt. No. 399-1 at 1.  From January 2013 through June 2014, Class Counsel negotiated and moved for preliminary approval of 14 settlements.  *Id*.  The monetary compensation to the class from those settlements totals $8.33 million.  *Id*.  The Court has granted preliminary approval of each of those settlements, but deferred notice to the class and a final fairness hearing while Class Counsel negotiated with the remaining Defendants.  Dkt. Nos. 276 at 4; 277 at 4; 376 at 1; 394.

Class Counsel did not keep the named class representatives informed during settlement negotiations.  Davies Decl. ¶4.  Indeed, the ***only*** update that the class representatives received was when a settlement had been reached.  *Id*.  And after the settlements were reached, some class representatives did not even understand the basics of how the settlements would work, thinking that they would divide the settlement amounts amongst themselves without sharing the distribution with the class.  *Id*. ¶5.

Now, Class Counsel move for preliminary approval of settlements with the seven remaining groups of Defendants.  Dkt. No. 399-1 at 1.  Each settlement proposes a class of "all persons and/or entities who owned real property in the State of New Jersey and who had a Tax Sale Certificate issued with respect to their property that was purchased by a Defendant during the Class Period at a public auction in the State of New Jersey at an interest rate above 0%."  *See, e.g.*, Dkt. No. 399-2 Ex. A at 4-5.  The remaining Defendants have agreed to pay an additional $1.255 million into a Settlement Fund.  Five Defendants also agreed to let class members redeem their Tax Sale Certificates at a discount of 10-15%.  *See, e.g.*, *id.* Ex. A at 9-10.[2]

---

[2] Two of the defendants did not agree to discounts.  Dkt. No. 399-3 at 1.

The distribution plan for the money in the Settlement Fund is complex.  Class members do not receive compensation from the Settlement Fund as a whole.  Dkt. No. 399-3 at 12. Instead, each class member may draw a *pro rata* share of the settlement of the individual Defendant who owns his or her lien.  *Id*.  The *pro rata* share is proportional to the product of each class member's initial lien value and the interest rate at which his or her Tax Sale Certificate was auctioned.  *Id*.  Class members must file a claim form within a certain date, yet to be decided, to claim their *pro rata* share.  *Id*. at 2.  A class member who fails to make a claim for his share receives nothing.  *Id.* at 18.

## IV.    Attorneys' Fees

Class Counsel have not disclosed how large a fee award they intend to seek.  But the settlements provide that attorneys' fees shall be paid entirely out of settlement proceeds.  *See, e.g.*, Dkt. No. 399-2 Ex. A at 8, 11-12.  The proposed notice also discloses that Class Counsel intend to request a fee award in an amount "not to exceed one-third of the monetary total of all the Settlements."  Dkt. No. 399-3 Ex. 1 at 15.  Based on the aggregate monetary total of all settlements, Class Counsels' maximum fee award exceeds $3 million.

## V.    Background of the Objectors

Objector Arlene Davies owned a home in West Cape May, New Jersey.  Dkt. No. 113 ¶19.  Her property was subject to a tax lien of $4,776.69 relating to unpaid 2007 taxes. Defendant Sass Municipal Finance Partners V, LLC purchased her lien at a public auction on December 3, 2008.  *Id*.  Sass purchased the lien at the 18% statutory maximum.  *Id*.  Ms. Davies was originally a named plaintiff in this action and represented by Liaison Counsel Bruce Greenberg and Michael Perle.  Dkt. No. 266-1 at 20; Dkt. No. 271.  Ms. Davies, however, objected to the settlements reached by her attorneys, and so counsel withdrew from representing her.  Dkt. No. 364.

5

Objectors Laura Zahn and Todd Zahn own a home in Glen Gardner, New Jersey.  Drasco Decl. Ex. A at 1.  They had two tax liens in the amount of $9,508.88 and $13,494.24.  *Id*. at 1, 4.  On October 28, 2004, and July 28, 2011, Defendant M.D. Sass purchased the Zahn's liens from the Borough of Glen Gardner, at the maximum 18% interest rate.  *Id*. at 1, 4.

## ARGUMENT

The motion for preliminary approval and class certification should be denied.  This Court has a "fiduciary responsibility, as the guardian of the rights of the absentee class members." *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) ("Rule 23(e) places a duty on district courts to safeguard the interests of class members.")  That responsibility arises because, in class actions, class counsel have "the incentive . . ., in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for the class but generous compensation for the lawyers." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (denying approval of settlement in part because of conflicts of interest).  The importance of that fiduciary responsibility is magnified where, as here, class counsel petition the court to approve settlements where no class has been yet certified. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805, 818 (3d Cir. 1995) ("*GM Trucks*") (disapproving a settlement where the case "simply settled too quickly with too little development on the merits").  Under such circumstances, courts must "be even more scrupulous than usual in approving settlements." *Id*. at 805.

Preliminary approval is only appropriate where "the proposed settlement is the result of parties' good faith negotiations, there are no obvious deficiencies, and the settlement falls within the range of reason." *Zimmerman v. Zwicker & Assocs., P.C.*, Civ. No. 09-3905-RMB-JS, 2011 WL 65912, at *3 (D.N.J. 2011) (denying preliminary approval where the settlement had

deficiencies such as an overbroad class definition, a "phantom benefit" to the class, and an over-inclusive release); *see also* Manual for Complex Litigation § 21.632 (4th ed. 2004).   Conversely, if "the proposed settlement discloses grounds to doubt its fairness . . . such as unduly preferential treatment of class representatives or segments of the class, or excessive compensation of attorneys," and does not "appear[] to fall within the range of possible approval," preliminary approval will be denied.   *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) (quotation marks omitted) ("*NFL Concussion*").   The Court must also find that "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."   *Id.* (quotation marks omitted).

## I.   The Amount of the Settlement Is Inadequate

Class Counsel failed to obtain adequate compensation in the proposed settlements.   Even at the preliminary approval stage, courts should reject settlements with "obvious deficiencies." *Zimmerman*, 2011 WL 65912, at *2.   Here, the amount of compensation afforded to the class is facially deficient.   Despite a strong case and a vast conspiracy, the latest proposed settlements with seven Defendants provide just over $1 million in compensation to the class.[3]

Allegations from the First Amended Consolidated Complaint – largely omitted from the motion for preliminary approval – show that the proposed settlements are inadequate.   The scope of the conspiracy was vast.   New Jersey municipalities auction "approximately $100-$200 million in delinquent tax obligations every year."   Dkt. No. 320 ¶ 95.   It is reasonable to infer that

---

[3] Most of the settlements also include a provision allowing class members to redeem outstanding Tax Sale Certificates at discounts of 10-15%.   Class Counsel, however, provide no estimate of the relief that this discount will provide.   Class Counsel asserts that the discounts "will result in relief that likely exceeds a Settlement Class Member's single damages on his, her, or its antitrust claim," but offers no way of verifying that assertion.   Dkt. No. 399-1 at 8.   There is no estimate of the number of class members who have outstanding Tax Sale Certificates.

Defendants fixed the auctions of many of these liens. Defendants engaged in a "***statewide*** conspiracy" over an 11-year period. *Id.* ¶100. Defendants fixed auctions "throughout New Jersey" to keep "interest rates on tax liens artificially high." *Id.* Moreover, "the largest Defendants attended most, if not all, auctions in New Jersey during the Class Period." *Id.* ¶110. Defendants "together account for the vast amount of TSCs purchased in New Jersey" over this period. *Id.* ¶6.

In the absence of the conspiracy, interest rates would have been far lower. According to the First Amended Consolidated Complaint, in a competitive market, winning bids should be "far below 18%." Dkt. No. 320 ¶96. In fact, because Tax Sale Certificate holders are entitled to pay future taxes on the property, and collect interest thereon at a statutory rate, the auctions can result in rates "often as low as 0%" on the face value of the lien. *Id.* Yet, because of the collusion, liens were auctioned at inflated rates, "often at 18%." *Id.* ¶109.

The class's best possible recovery is accordingly large. One year's interest at 18% on $200 million of Tax Sale Certificates each year amounts to $36 million annually. That is ***$432 million*** over the Class Period. Trebling this number yields damages over $1.2 billion, and the class would be entitled to prejudgment interest from 1998-2009 to present.[4] *See* 15 U.S.C. § 15(a).

The $1 million cash value of the latest settlements is a tiny fraction of these damages. Even including the $8.33 million in settlements that have been preliminarily approved, the total

---

[4] This Court may but is not required to consider treble damages in evaluating the fairness of the settlement. *See, e.g.*, *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006) (calculating value of settlement as 18% of treble damages and 55% of single damages); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 324 (3d Cir. 2011) (noting that "disagreement exists in the case law as to whether the reasonableness of a settlement amount should be evaluated by comparison to the potential single damages of a class or the trebled damages" and leaving the choice to the District Court's discretion).

8

settlement amount ($9.59 million) is 2.3% of potential damages, and just 0.8% of treble damages. That is far below typical recoveries. *See e.g.*, *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (approving settlements amounting to 55% of damages within limitations period); *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d at 401 (approving settlement totaling 18% of treble damages recovery and 55% of single damages recovery); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144 (E.D. Pa. 2000) (approving settlement totaling 17% of potential damages); *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 462 (E.D. Pa. 2008) (approving settlement representing 20% of best possible recovery "if all theories of recovery and damages were accepted by the Court").

The settlements are especially low in light of the strength of Plaintiffs' case. Fifteen Defendants entered guilty pleas, which are strong evidence of liability. *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 701 (M.D. Pa. 2008) (conclusion of criminal investigation without issuance of indictments decreased probability of establishing liability and damages). The First Amended Complaint includes 50 examples of auctions rigged by Defendants during the class period. Dkt. 320 ¶¶113-213. Plaintiffs have already prevailed against motions to dismiss their Sherman Act claims. Dkt. No. 375 at 2. And most Defendants have already admitted to violating the Sherman Act by pleading guilty to criminal antitrust charges. Dkt. No. 320 ¶8.

In sum, the settlements fall far short of the "range of reason" required for preliminary approval, especially given the potential damages and strength of the case. *Zimmerman*, 2011 Wl 65912, at *3. Preliminary approval should be denied.

II.     **The Settlement Provides Inequitable, Discriminatory Distribution of Benefits Among Class Members**

The proposed settlements provide benefits to some class members that are not available to the rest of the class.  Settlements that provide preferential treatment to a subset of the class cannot be approved, even preliminarily.  *See* Manual for Complex Litigation § 21.632 (4th ed. 2004) (concerns such as "unduly preferential treatment of . . . segments of the class" might require parties to renegotiate to remove "obstacles to court approval"); *NFL Concussion*, 961 F. Supp. 2d at 714 ("unduly preferential treatment of . . . segments of the class" is a bar to preliminary approval) (quotation marks omitted).  The proposed settlements treat class members preferentially in two different ways.  *First*, they give additional and separate relief to a subset of class members.  Under the settlements, all class members are entitled to claim a monetary award from the various settlement funds, but those with outstanding Tax Sale Certificates are also entitled to a discount on redeeming their certificates.  *Second*, even though all class members can claim monetary awards, class members with identical damages will not get identical compensation.  A class member can only claim from a settlement fund associated with the Defendant that purchased his Tax Sale Certificate – even though settlement amounts for the Defendants and the number of participating class members for each Defendant can vary significantly.  So class members with identical damages will receive different compensation based on arbitrary distinctions.

1.      **Class Members with an Outstanding Tax Sale Certificate Receive Preferential Treatment**

The proposed settlements differentiate between class members who have already paid Defendants to redeem their Tax Sale Certificates and those who have not.  The settlements provide two kinds of compensation.  First, Defendants agreed to pay just over $1 million into separate funds – one fund for each settlement.  Dkt. No. 399-1 at 2.  Second, Defendants agreed

10

to offer 10-15% discounts off the redemption amount for class members who have yet to redeem their Tax Sale Certificates.  *Id.* at 2, 7-8.  Class members with outstanding Tax Sale Certificates will benefit both from the redemption discount and the monetary award, while class members without outstanding Tax Sales Certificates can only receive the monetary award.  Dkt. No. 399-3 Ex. 1 at 12.  The settlements do not compensate for this inequity by, for example, giving those without outstanding Certificates a larger monetary award.   Thus, class members with unredeemed Tax Sale Certificates will get a better deal than other class members.

By Class Counsel's own account, this is a substantial difference.  Class Counsel assert that "the discounts, if accepted by the Settlement Class Members, will result in relief that likely exceeds a Settlement Class Member's single damages on his, her, or its antitrust claim."  Dkt. No. 399-1 at 8.  There is no justification for providing this substantial benefit to only those class members who happen to still have an outstanding Tax Sale Certificate.  Indeed, favoring class members with outstanding Tax Sale Certificates is especially inequitable.  Tax Sale Certificates are often redeemed when a home is sold in foreclosure.  Dkt. No. 320 ¶256.  Class members without outstanding Tax Sale Certificates are thus more likely to be those whose homes were foreclosed on. [5]

### 2. Class Members Whose Liens Were Sold to Certain Defendants Receive Preferential Treatment

Under the settlements, class members with identical damages will recover different monetary awards depending on which Defendant purchased their Tax Sale Certificates.  Defendants face joint and several liability for the antitrust conspiracy – each Defendant is liable

---

[5] The distribution plan also contemplates a *cy pres* distribution in the event that "there are still monies left over in the Settlement Fund" after distribution to the class.  Dkt. No. 399-3 Ex. 1 at 13.  But because class members are to receive a *pro rata* share of the Fund after submitting their claim, it is unclear under what circumstances any money could be left in the Fund.

to every Plaintiff, whether or not that Defendant purchased any particular Plaintiff's lien.  *See Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263, 184 N.J. 161, 178 (N.J. 2005) ("Civil conspirators are jointly liable for the underlying wrong and resulting damages.")  Accordingly, the settlements should be structured as a common fund, from which class members can draw depending on the extent of their damages.

Class Counsel, however, structured these settlements such that each Defendant creates a separate compensation fund.  Dkt. No. 399-3 at 12.  Class members may only draw from the fund created by the Defendant who owns their tax liens.  *Id*.  Class members receive a *pro rata* share of money from that fund.  But the size of each fund is not based on a calculation of the damages caused by each Defendant or the number of class members each Defendant injured – it is based on how much each Defendant paid in settlement.  So, for example, M.D. Sass might be responsible for 50% of all damages, but the Sass fund might account for only 33% of the total settlement amount.  Class members with a Sass Tax Sale Certificate are disadvantaged, because their share of the compensation is disproportionately low relative to their share of the damage. Class members with identical damages will thus be compensated differently just because some Defendants negotiated harder than others.  Further, the percentage of class members whose liens were purchased by one Defendant and who claim a class settlement might be much higher than the percentage of class members whose tax lien certificates were purchased by another Defendant and who claim a settlement payment.  Combined with the fact that some Defendants presumably drove better bargains at settlement, a great disparity exists in how class members with identical harms would be compensated by the proposed class settlement.

### III.   The Settlement Bears Indicia of a Non-Arm's-Length Bargain

Because class counsel and defendants have strong incentives to collude in crafting a settlement, *see, e.g., GM Trucks*, 55 F.3d at 787-89, a proposed settlement must arise from an

arm's-length negotiation to receive preliminary approval.  Class Counsel claim in their motion that they struck arm's-length bargains.  Dkt. No. 399-1 at 15.  The facts suggest otherwise.  *First*, Class Counsel took ***no*** discovery.  The negotiations for the proposed settlements were thus one-sided.  Defendants had substantially more information, and thus substantially more leverage, than Class Counsel.  *Second,* Class Counsel apparently made no effort to involve the class representatives in the negotiations and the class representatives did not even appear to understand the mechanics of class actions.  As a result, the class representatives have not played any role in safeguarding the interests of absent class members.  *Third*, Class Counsel intend to pay themselves a fee of up to one-third the value of the settlement, raising concerns that Class Counsel are treating themselves well at the expense of absent class members.

## A.    Class Counsel Took No Discovery

Class Counsel have apparently conducted no discovery.  That failure is inexcusable in light of the minute compensation that Class Counsel accepted in the settlements.  "[A]chieving a settlement after little or no discovery . . . raise[s] a red flag."  *GM Trucks*, 55 F.3d at 806.  When counsel submit a settlement for preliminary approval where, as here, "no formal discovery was conducted whatsoever . . . it is questionable whether class counsel could have negotiated in [the class's] best interests."  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307, 308 (3d Cir. 2005) (rejecting settlement and remanding to establish a "more developed record").

Without discovery, Class Counsel had no basis to discount the substantial class-wide damages here.  The First Amended Consolidated Complaint pleads an 11-year "overarching and statewide" conspiracy to fix prices in a market worth hundreds of millions of dollars each year.  Dkt. No. 320 ¶¶ 95, 100.  Yet, Class Counsel settled for a scintilla of the damages caused to that market.  Class Counsel asserts that, in the course of negotiations, they discussed with Defendants "the economic harm inflicted . . . on the proposed settlement class and the monies that

[Defendants] reaped from their alleged wrongful scheme." Dkt. No. 266-1 at 14.  This Court should not "place such dispositive weight on the parties' self-serving remarks."  *GM Trucks*, 55 F.3d at 804.  Without discovery, there is no indication that Class Counsel adequately assessed the economic harm to the class.

Merits discovery would be particularly helpful here, because the First Amended Consolidated Complaint alleges fraudulent concealment.  This evidence is critical to establishing liability beyond the four-year statute of limitations in the Sherman Act.  *See* 15 U.S.C. § 15b. And Defendants are likely the only source of this evidence.  Investigation of the internal documents of Defendants could yield crucial evidence of concerted efforts to conceal the conspiracy over its 11-year history.  Yet Class Counsel settled this case without taking a single deposition and without formally requesting a single document.

**B.     At Least Some Class Representatives Had No Input Into the Settlements**

The lack of involvement by the class representatives suggests that the settlement negotiations were not truly arm's-length.  "[T]he mere fact that negotiations transpired does not tend to prove that the class's interests were pursued."  *GM Trucks*, 55 F.3d at 814.  Objector Arlene Davies was at one time a named class representative.  According to Ms. Davies' declaration, class representatives were kept in the dark throughout settlement negotiations. Davies Decl. ¶4.  During her time as a class representative, Class Counsel did not even inform Ms. Davies of settlements reached with individual Defendants until after they were concluded and filed with the Court, much less keep her informed of progress during settlement negotiations. *Id*. ¶4.  Further, after negotiations were concluded, and perhaps due to their lack of involvement in the process, class representatives expressed fundamental misunderstandings of how the settlements worked, believing that they personally would divide the settlement amounts.  *Id*. ¶5. Although Ms. Davies was not a class representative when the current proposed settlements were

reached, Class Counsel have offered no reason to suggest that these discussions proceeded differently.

The negotiation of the proposed settlements thus bears little resemblance to arm's-length bargaining.  Without the input and direction of all class representatives, there is no "basis on which to conclude that counsel adequately developed the claims before deciding to settle."  *GM Trucks*, 55 F.3d at 814.  As outsiders at the bargaining table, the class representatives could not opine whether the bargain Class Counsel struck was good or bad for the class.  Likewise, Class Counsel negotiated the settlements without input from their clients – the class representatives who are supposed to be proxies for the class.  Under the circumstances, the proposed settlements cannot be approved.

To hold otherwise would vitiate one of the core requirements of Rule 23: adequacy.  Rule 23 provides that "[o]ne or more members of a class may sue . . . as representative parties on behalf of all members ***only if*** . . . the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4) (emphasis added).  The adequacy requirement provides assurance "that the negotiations satisfactorily vindicated the interests of all the absentees."  *GM Trucks*, 55 F.3d at 797.  It is ***impossible*** for the class representatives to have adequately vindicated the interests of absentee class members when the representatives themselves were, in effect, absent.

### C.    Class Counsel May Claim a Fee Award in Excess of $3 Million

"Collusion" between class counsel and defendants "may not always be evident on the face of a settlement."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).  Accordingly, courts have a duty to scrutinize settlements for "subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect negotiations."  *Id*.  To avoid this sort of collusion, "fee negotiations [should] be postponed

until the settlement [is] judicially approved, not merely until the date the parties allege to have reached an agreement." *GM Trucks*, 55 F.3d at 804.  The potential fee here is an additional indicator of a bargain that was not well struck.

To be sure, these settlements do not contain a "final" fee agreement.  But they do state that Class Counsel may claim a fee "not to exceed one-third of the monetary total of all the Settlements" to be drawn from the settlement funds.  Dkt. No. 399-3 Ex. 1 at 15.  That fee is unreasonable.  Class Counsel took pennies on the dollar in a case with ***15 criminally liable defendants*** that survived a motion to dismiss.  They took no discovery and disclosed no expert opinions.  In exchange, they may pay themselves over $3 million.  For $3 million, the class deserves more.

## IV. Class Counsel Fail To Provide Sufficient Information To Accurately Assess the Reasonableness of the Settlements

Class Counsels' motion for preliminary approval contains almost nothing to justify the reasonableness of the settlements to either the Court or the class.  Courts must "insist[] that the parties present evidence that would enable . . . possible outcomes to be estimated, so that the court can at least come up with a 'ballpark valuation.'"  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quotation marks omitted) (vacating approval of settlement where the district court "did not attempt to quantify the value of plaintiff's case or even the overall value of the settlement offer to class members.").  That is true even at the preliminary approval stage.  *See Martin v. Cargill, Inc.*, 295 F.R.D. 380, 384 (D. Minn. 2013) (denying preliminary approval where "the parties' submissions . . . provide[d] almost no information enabling the Court to gauge the value of the proposed class's claims and, hence, the fairness and adequacy of the settlement").

Class Counsel does not even attempt to show that the settlements are within the range of reason. Their motion contains only bare assertions of the reasonableness of the settlement. Dkt. No. 399-1 at 2 ("These settlements . . . fall within the range of reasonableness."); *id.* at 3 ("Plaintiffs believe that the proposed settlements with the Recent Settling Defendants are fair, reasonable, [and] adequate."); *id.* at 15 ("The proposed settlement agreements . . . are fair, reasonable, and adequate."). In the motion for preliminary approval, Class Counsel provide no estimate of the size of the class, the scope of the conspiracy, the damages caused by the conspiracy, or the best possible recovery in the case. The Court thus has no basis on which to grant approval other than Class Counsels' say-so. The law requires more.

## V.     The Class Notice Is Deficient

Class members are entitled to "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). "[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 175-76 (1974) (rejecting plaintiff's contention that the Court "should dispense with the requirement of individual notice in this case . . . [because of] the prohibitively high cost of providing individual notice to 2,250,000 class members"); *see also Larson v. AT&T Mobility, LLC*, 687 F.3d 109, 128-29 (3d Cir. 2012) (overturning approval of notice plan where defendants argued individual notice could not be provided because it would be costly and burdensome to search defendants' records).

Every member of the class is individually identifiable with reasonable effort. Defendants, being sophisticated financial entities and businesspeople, certainly know what Tax Sale Certificates they purchased during the Class Period and the associated properties and property owners.

17

Despite the ready availability of the identifying information for each Class Member in the hands of the Defendants, the settlements propose a notice plan that does not provide individualized notice to all class members.  Dkt. No. 399-1 at 9-10.  Class Counsel hired an outside vendor that "made a comprehensive effort to contact all 566 New Jersey municipalities to gather relevant information on affected property owners."  Dkt. No. 399-1 at 10.  That effort yielded poor results – "LienSource was able to capture full data" for just "234 of the 566 municipalities in New Jersey."  *Id.*

Instead of providing individualized notice, Class Counsel "propose[s] a notice program that employs direct mail notice where mailing address information is available, and other forms of notice to supplement the direct mail notice."  Dkt. No. 399-1 at 10.  That is not good enough.  *See Larson*, 687 F.3d at 124 ("the costs required to actually deliver notice should not easily cause a court to permit the less satisfactory substitute of notice by publication.")   In *Larson*, for example, one of the defendants argued that "it would be unreasonable to require it to search its billing records so that individual notice can be sent to more people."  *Id.* at 126.  The Third Circuit rejected this argument and highlighted several examples where courts required extensive searches of company records to vindicate the individual notice requirement.  *Id.* at 129 (citing *Eisen v. Carlisle & Jacquelin*, 52 F.R.D. 253, 257 (S.D.N.Y. 1971) (identifying two million individuals by searching records on tape); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 345 (1978) (requiring a manual search through a large volume of paper records)).

Class Counsel offer no justification for the deficient notice plan here.  They do not even contend, as the defendants did in *Larson*, that it would be burdensome for Defendants to search their records to identify eligible class members.  Nor could they credibly make that argument.  The 1998-2009 Class Period is recent enough and Defendants are sophisticated enough where

18

these records are likely readily available in electronic form.  While the municipalities queried by LienSource may not have kept detailed records, it would be incredible if Defendants, being in the business of buying and selling Tax Sale Certificates as investments, did not do so.  The notice plan cannot be approved.

## **CONCLUSION**

Preliminary approval and preliminary class certification must be denied.

Dated: April 15, 2015

Respectfully submitted,

*/s/ Dennis J. Drasco*

Dennis J. Drasco
LUM, DRASCO & POSITAN,
LLC
103 Eisenhower Pkwy.
Roseland, NJ 07068
(973) 228-6770 (telephone)
(973) 403-9021 (facsimile)
ddrasco@lumlaw.com

Hays Gorey, Jr.
GEYER & GOREY, LLP
1220 L St., NW, Ste. 100
Washington, DC 20005
(202) 644-8732 (telephone)
hays.gorey@geyergorey.com
*pro hac vice pending*

Steven F. Molo
Thomas J. Wiegand
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com
*pro hac vice pending*

Martin V. Totaro
MOLOLAMKEN LLP
600 New Hampshire Ave. NW
Washington, DC 20037
(202) 556-2000 (telephone)
(202) 556-2001 (facsimile)
mtotaro@mololamken.com
*pro hac vice pending*

*Attorneys for Objectors Arlene M. Davies, Todd R. Zahn, and Laura S. Zahn*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2015, I caused the foregoing objection and opposition to motion for preliminary approval to be filed with the United States District Court for the District of New Jersey via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties.

<u>/s/ Dennis J. Drasco</u>