# Lum, Drasco & Positan LLC

COUNSELORS AT LAW

**103 Eisenhower Parkway**
**Roseland, NJ 07068-1049**
(973) 403-9000

———

DENNIS J. DRASCO

———

ALSO ADMITTED IN NEW YORK
CERTIFIED CIVIL TRIAL ATTORNEY

NEW YORK OFFICE
460 PARK AVENUE – 21st FLOOR
NEW YORK, NY 10022
(212) 775-9002

———

FAX  (973) 403-9021

———

www.lumlaw.com

WRITER'S DIRECT LINE:
(973) 228-6770

———

DDRASCO@LUMLAW.COM

October 14, 2015

**VIA CM/ECF FILING**

Honorable Michael A. Shipp
United States District Court for the
    District of New Jersey
Clarkson S. Fisher Building
402 E. State Street, Room 7W
Trenton, New Jersey  08608

      **Re:**    *In re New Jersey Tax Sale Certificates Antitrust Litigation*,
              **No. 3:12-CV-01893-MAS-TJB**

Dear Judge Shipp:

    Lum, Drasco & Positan, LLC, along with MoloLamken LLP and GeyerGorey LLP, represents objectors Arlene Davies, Todd Zahn, and Laura Zahn ("Objectors").  We write in response to the October 8, 2015 letter submitted by Interim Liaison Counsel Lite DePalma Greenberg, LLC.  *See* Dkt. No. 422 ("Greenberg Letter") (Oct. 8, 2015).

    The Greenberg Letter reports that the jury in *United States v. Wolfson*, Criminal Action No. 13-0748 (SDW), found one defendant guilty and four defendants not guilty of fixing municipal tax lien auctions in New Jersey.  The defendant that was found guilty, James Jeffers, Jr., worked for Crusader Servicing Corp. ("Crusader").  Crusader is a defendant in this action.  Dkt. No. 319-1 at 1 (Dec. 23, 2013).  Robert Jeffrey, who also worked for Crusader, was found not guilty.

    The other defendants in the criminal action were Joseph Wolfson; Betty Simon, Trustee, LLC; and Richard Simon, Trustee (collectively, the "Wolfson Defendants").  The Wolfson Defendants are also defendants in this action.  Dkt. No. 113 at 32-34 (Dec. 21, 2012) ("Complaint").  They were found not guilty.

    The pending motion in this action for preliminary approval concerns settlements with not only the Wolfson Defendants, but also with six other groups of Defendants: the Crestar Defendants, the Mooring



# LUM, DRASCO & POSITAN LLC

October 14, 2015
Page 2

Defendants, Michael Mastellone, the Del Vecchio Defendants, the BankAtlantic Defendants, and the PAM Defendants (collectively, the "Recent Settling Defendants"). *See* Dkt. No. 399 (Mar. 27, 2015). This Court previously granted preliminary approval to a settlement concerning the Crusader Defendants. *See* Dkt. No. 376 (Oct. 31, 2014).

Contrary to Liaison Counsel's argument in the Greenberg Letter, the criminal verdict does not justify granting the pending motion to preliminarily approve the settlements with the Recent Settling Defendants.

First, the recent acquittals of the four defendants do not establish a lack of conspiracy. Of course, the criminal charges require a higher burden of proof. Moreover, 15 defendants have pled guilty.[1] The acquittal of the Wolfson Defendants has *no* impact on the cases against defendants that have already pled guilty to fixing tax lien auctions. Two of the Recently Settling Defendants – Michael Mastellone and Robert Del Vecchio – already pled guilty. Dkt. 320 ¶¶ 36, 50 (Jan. 6, 2014). David Butler and David Farber, respectively the CEO and President of Crestar Capital, LLC, from November 2008 to July 2009, also already pled guilty. *Id*. at ¶ 34.

Moreover, the trial evidence confirms that the settlements with the Recently Settling Defendants are inadequate. Mr. Farber testified that Crestar (then called CCTS Capital, LLC) was backed by $50 million of capital. Test. of David Farber (9/18), 11 at 10-14. The company invested in nothing but tax liens. *Id*., 11 at 17-19. Clearly, Crestar bought millions of dollars in tax liens. Yet, the proposed settlement with Crestar is only $80,000. Dkt. No. 399 at 6.

The trial evidence also suggests that the settlement with Mr. Wolfson and the two entities on whose behalf he purchased tax liens, the Simon trustees, is inadequate.[2] Witnesses identified the Wolfson Defendants as "right below the large banks and large investors" and "some of those bidders that got to pick first" because "[t]hey had the most money and could dictate what happened at a sale." Test. of David Hasson (9/25), 156 at 21-22; Test. of David Farber (9/18), 40 at 22-25, 41 at 1-3. One of the top three purchasers of liens in New Jersey during the class period, M.D. Sass, was purchasing $75-100 million per year in liens. Test. of Steven Hruby (9/24), 63 at 13-14, 65 at 13-21. If the Wolfson Defendants were indeed "right below" these large investors, then they were purchasing tens of millions of dollars in liens per year. If these liens were held on average for a single year at an 18% mark-up over the competitive price, *see* Dkt. No. 402 at 8-9 (Objectors' Opposition), the portion of damages attributed to Mr. Wolfson and the Simon Trustees over the 11-year class period could be in the tens of millions of dollars. Yet, the settlement covering Mr. Wolfson and the Simon Trustees is only for $125,000.

Moreover, discovery – which has yet to occur in this case – could provide additional evidence of liability and the scope of the Wolfson Defendants' conspiracy.

---

[1] Defendants in this civil class action who have pled guilty are: William A. Collins; Isadore H. May; Richard J. Pisciotta, Jr.; David M. Farber; Robert W. Stein; Robert E. Rothman; Steven H. Hruby; David Butler; DSBD, LLC; Crusader Servicing Corp.; Mercer, S.M.E., Inc.; Michael Mastellone; Robert U. Del Vecchio; Norman T. Remick; and Vinaya K. Jessani.
[2] All cited testimony is included in Exhibit A, attached.

# LUM, DRASCO & POSITAN LLC

October 14, 2015
Page 3

      For these reasons as well as those in Objectors' opposition, this Court should deny preliminary approval.  We appreciate the Court's consideration of this letter and the opposition brief.


Respectfully submitted,


*/s/ Dennis J. Drasco*
DENNIS J. DRASCO
A Member of the Firm


cc:  All counsel of record

# EXHIBIT A

Excerpts from Trial Transcript

*United States v. Wolfson*
Criminal Action 13-0748 (D.N.J.)

September 18 2015
September 24, 2015
September 25, 2015

```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF NEW JERSEY
2                    CRIMINAL ACTION 2:13-cr-748-SDW

3        UNITED STATES OF AMERICA,     : TRANSCRIPT OF PROCEEDINGS
                                       :
4                                      :          T R I A L
               -vs-                    :
5                                      :
         JOSEPH WOLFSON, GREGG GEHRING, :      Pages 1 - 236
6        JAMES JEFFERS, JR., ROBERT    :
         JEFFREY, BETTY SIMON TRUSTEE  :
7        LLC, RICHARD SIMONE TRUSTEE,  :     Newark, New Jersey
                                       :     September 18, 2015
8                 Defendants.          :
         - - - - - - - - - - - - - - - - -
9
         B E F O R E:   HONORABLE SUSAN D. WIGENTON,
10                      UNITED STATES DISTRICT JUDGE
                        And a Jury
11
         A P P E A R A N C E S:
12
             DEPARTMENT OF JUSTICE
13           BY:  STEVEN TUGANDER, ESQ.
             GRACE PYUN, ESQ.
14           BRYAN BUGHMAN, ESQ.
             STEPHANIE ANNE RANEY, ESQ.
15           Attorneys for the Government

16           JACOBS & BARBONE
             BY:  EDWIN JOSEPH JACOBS, JR., ESQ.
17           MICHAEL F. MYERS, ESQ.
             Attorneys for the Defendant Wolfson, Betty Simon Trustee
18           and Richard Simon Trustee

19
         _____
20       Pursuant to Section 753 Title 28 United States Code, the
         following transcript is certified to be an accurate record as
21       taken stenographically in the above entitled proceedings.

22
                                    S/Carmen Liloia
23                                  CARMEN LILOIA
                                    Official Court Reporter
24                                  (973) 477-9704

25
```

```
1              A P P E A R A N C E S - continued
2
3          OLEJAR & OLEJAR, ESQS.
           BY:  ROBERT JOSEPH OLEJAR, ESQ.
4          LINDA OLEJAR, ESQ.
           Attorneys for Defendant Jeffers
5
6          OFFICE OF THE FEDERAL PUBLIC DEFENDER
           BY:  KEVIN F. CARLUCCI, ESQ.
7          LISA MACK, ESQ.
           Attorneys for Defendant Jeffrey
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

3

```
1                              I N D E X
2
       WITNESS              DIRECT     CROSS    REDIRECT    RECROSS
3
       DAVID FARBER
4
       By Mr. Bughman          5                   175
5      By Mr. Jacobs                     66
       By Mr. Olejar                    167                   184
6      By Mr. Carlucci                  171
7
       JESSICA WEISMAN
8
       By Mr. Tugander       186
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1     A    Yes, we each funded it with $25,000.

2     Q    Twenty-five thousand?

3     A    Yes.

4     Q    Okay.  And during what period, did you bid for this club?

5     A    The club was in existence bidding active from 2002 through

6     July, 2005.

7     Q    Okay.  And during the period that you bid for this club,

8     where in the state of New Jersey did you attend auctions?

9     A    We primarily bid Camden County and the upper part of the

10    Gloucester County.

11    Q    Okay.  And after you bid for the club, where did you go

12    next?

13    A    That club, we ended up each putting up another $75,000.  We

14    borrowed 600,000 from one of the investors, and then in August,

15    2005, we started a company called CCTS Tax Liens One, where we

16    went out and we raised about 2.8 million dollars, friends and

17    families.

18    Q    Okay.  And what is CCTS stand for?

19    A    It stood for Camden County Tax Sales.

20    Q    Okay.  And so what was the period that you bid for, CCTS

21    One?

22    A    August, 2005 to the end of July, 2008.

23    Q    Okay.  And what happened in 2008?

24    A    In 2008, a few months earlier that we knew that the

25    investment period was coming to an end, we were trying to find

1     a large finance partner to grow the company, or to start

2     another one.

3     Q    And did you form a new company in that period of time?

4     A    Yes.  Between -- well, we were doing that between August,

5     2008 and November, 2008, we created CCTS Tax Liens Two.

6     Q    And how long did they purchase auctions -- or purchase

7     liens?

8     A    They stopped the week before Thanksgiving of 2008.

9     Q    Okay.

10          And so after they stopped, where did you bid?

11    A    We created -- we formed a partnership with a wealthy

12    individual from Cherry Hill who invested 10 million dollars.

13    We had a bank line of credit for 40 million and we created a

14    company called CCTS Capital.

15    Q    Okay.  And how long did you bid for them?

16    A    I was terminated in July, 2009.

17    Q    Okay.  Now, did any of these companies, these CCTS

18    companies, did they invest in anything other than tax liens?

19    A    No.

20    Q    Okay.  Now, let's take the companies one at a time, okay?

21    And I'd like to start with CCTS One, and you testified that

22    they were in existence between 2005 and 2008.  Is that right?

23    A    Yes.

24    Q    Okay.  So focusing on CCTS One.  What was your role with

25    them?

Farber-direct                                    12

1    A    I was the managing partner and I did the primarily most of

2         the bidding.

3    Q    Okay.

4              Were there any other employees?

5    A    It was run inside another business that I had, so we had a

6         secretary that put a few hours a week into it.

7    Q    Okay.

8    A    But most of the work was done by myself.

9    Q    Small business?

10   A    Small business.

11   Q    And did you also have an ownership interest in CCTS One or

12        any of its affiliated companies?

13   A    Yes, I had 40 percent of CCTS One.

14   Q    Okay.  And where was CCTS One1 located?

15   A    Barrington, New Jersey.

16   Q    And where did they purchase tax liens?

17   A    Primarily below exit 7A, 195, so the bottom part of the

18        state.

19   Q    Now, Mr. Farber, how did CCTS One get its funding?

20   A    We went out to friends and family.  We raised 2.8 million

21        dollars and then we were able to secure a bank line of credit

22        from Roma Bank based in Robbinsville, New Jersey.

23   Q    And a line of credit is that like a loan?

24   A    Yes.

25   Q    And did you have a bank account for this funding?

Farber-direct                                          39

1    Q    Now, Mr. Farber, can you please tell the jury in your own

2         words what you did to cause you to plead guilty.

3    A    I received a subpoena from your office in May of 2009.  We

4         reached out to legal counsel.  We complied with that.  We had

5         interviews with your office.  And we realized that we violated

6         the law and we admitted to what we do was wrong.

7    Q    And what specifically did you do when you realized you

8         violated the law, what specifically did you do?

9    A    I pled guilty.

10   Q    And what was it that caused you to violate the law?

11   A    Picking the liens.  Predetermining an auction before it

12        happened.

13   Q    Now, you've mentioned that you met with attorneys for the

14        Government?

15   A    Yes.

16   Q    Approximately how many times?

17   A    Through what time period?

18   Q    Through the time period that you began cooperating.

19   A    Till today?

20   Q    Till today.

21   A    Seven or eight times.

22   Q    And during these meetings, what did you do?

23   A    I reviewed bid books.  I reviewed the industry.  I spoke

24        about individuals that picked and how -- what kind of behavior

25        that happened.

1    Q    And, Mr. Farber, did you make any recordings as part of

2    your cooperation?

3    A    I did.  I recorded a sale in Woodbridge, New Jersey.

4    Q    Just one?

5    A    Just one.

6    Q    And Mr. Farber, had you been sentenced?

7    A    I have not.

8    Q    And do you know what your sentence will be?

9    A    I do not.

10   Q    And do you know who decides your sentence?

11   A    I do.

12   Q    Who's that?

13   A    The Judge.

14   Q    Mr. Farber, do you hope to receive a reduced sentence

15   because you're testifying today?

16   A    Yes.  But not because of my testimony today, because of all

17   of my cooperation with the Government.

18   Q    Now, Mr. Farber, let's go back to those instances where you

19   picked liens at auctions in New Jersey.  Okay?  Did certain

20   bidders generally get to pick first?

21   A    Yes, the large institutional buyers picked first.

22   Q    Can you again tell us who some of those bidders that got to

23   pick first?

24   A    Mr. Wolfson, Mr. Jeffers from Crusader, M.D. Sass, American

25   Tax Funding, Mooring.

Farber-direct                                                41

1    Q    And why is it that they got to pick first?

2    A    They had the most money and could dictate what happened at

3    a sale.

4    Q    And did these larger companies generally take larger liens?

5    A    Yes.

6    Q    And were those also often the better liens at the sale?

7    A    Yes.

8    Q    Mr. Farber, how did you learn what they picked, the bigger

9    companies?

10   A    Mr. Collins, who was a member of our group, would approach

11   a member of the large group, traditionally either Mr. Jeffers

12   or Mr. Hassen, and ask them what liens they wanted, and if they

13   were willing to work out the sale in advance.

14   Q    And would they in fact tell Mr. Collins what liens --

15   A    Yes.

16   Q    -- they wanted?  And how would they get conveyed to you?

17   A    The smaller group would huddle with Mr. Collins.  He would

18   tell us what the large companies picked.  As a group, we would

19   determine if there was enough left for the smaller companies

20   that were present.  If there was, we would each pick normally

21   by picking cards.  Mr. Collins normally had a deck of cards.

22   And then Mr. Collins would go back to either Mr. Jeffers or Mr.

23   Hassen and tell them what we picked.

24   Q    Okay.  Now, can you please explain the purpose of the

25   cards.

Farber-direct                                               42

1    A    It was to decide which order the breakfast club that we
2    picked our lien.
3    Q    And how would the cards determine that?
4    A    Ace was high and two was low.  So if I pulled the ace and
5    there were four members of the breakfast club, I got the first
6    pick out of that group.
7    Q    Mr. Farber, did you do anything to keep track of the liens
8    that everybody picked?
9    A    Yes.  I would write them down in my bid book.
10   Q    You would write them down?
11   A    Yes.
12   Q    And why did you need to do this?
13   A    So I wouldn't bid during the sale on a lien that was
14   already chosen by somebody.
15   Q    Okay.  And did you have a particular system for how you
16   took down notes of what everybody picked?
17   A    I did.
18   Q    And can you please describe that system?
19   A    Yeah, the property location, area of my bid book, which was
20   left center of the bid sheets, I would write down whatever
21   everybody's picks were.
22   Q    And can you tell from looking at your bid books whether you
23   picked liens at particular sales?
24   A    I did, yes.
25   Q    How can you be so sure?

```
 1                    IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF NEW JERSEY
 2                     CRIMINAL ACTION 2:13-cr-748-SDW

 3     UNITED STATES OF AMERICA,      : TRANSCRIPT OF PROCEEDINGS
                                      :
 4                                    :        T R I A L
                    -vs-             :
 5                                    :
       JOSEPH WOLFSON, GREGG GEHRING, :    Pages 1 - 160
 6     JAMES JEFFERS, JR., ROBERT     :
       JEFFREY, BETTY SIMON TRUSTEE   :
 7     LLC, RICHARD SIMONE TRUSTEE,   :    Newark, New Jersey
                                      :    September 24, 2015
 8                    Defendants.     :
       - - - - - - - - - - - - - - - -

 9
       B E F O R E:     HONORABLE SUSAN D. WIGENTON,
10                       UNITED STATES DISTRICT JUDGE
                         And a Jury
11
       A P P E A R A N C E S:
12
            DEPARTMENT OF JUSTICE
13          BY:  STEVEN TUGANDER, ESQ.
            GRACE PYUN, ESQ.
14          BRYAN BUGHMAN, ESQ.
            STEPHANIE ANNE RANEY, ESQ.
15          Attorneys for the Government

16          JACOBS & BARBONE
            BY:  EDWIN JOSEPH JACOBS, JR., ESQ.
17          MICHAEL F. MYERS, ESQ.
            Attorneys for the Defendant Wolfson, Betty Simon Trustee
18          and Richard Simon Trustee

19
       _____
20     Pursuant to Section 753 Title 28 United States Code, the
       following transcript is certified to be an accurate record as
21     taken stenographically in the above entitled proceedings.

22
                              S/Carmen Liloia
23                            CARMEN LILOIA
                              Official Court Reporter
24                            (973) 477-9704

25
```

```
 1
            A P P E A R A N C E S - continued
 2

 3          OLEJAR & OLEJAR, ESQS.
            BY:  ROBERT JOSEPH OLEJAR, ESQ.
 4          LINDA OLEJAR, ESQ.
            Attorneys for Defendant Jeffers
 5

 6          OFFICE OF THE FEDERAL PUBLIC DEFENDER
            BY:  KEVIN F. CARLUCCI, ESQ.
 7          LISA MACK, ESQ.
            Attorneys for Defendant Jeffrey
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

                          I N D E X

2

    WITNESSES              DIRECT    CROSS    REDIRECT    RECROSS

3

    For the Government

4

    JESSICA WEISMAN

5

    By Mr. Tugander                             4
6   By Mr. Jacobs                                          28
    By Mr. Carlucci                                        56

7

    STEVEN HRUBY

8

    By Mr. Bughman         59                             102
9   By Mr. Carlucci                 85
    By Mr. Olejar                   94
10  By Mr. Jacobs                   96

11  ROBERT ROTHMAN

12  By Ms. Raney           104
    By Mr. Carlucci                 149

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A    Tax lien business.

 2    Q    Do you recall when you first met Mr. Wolfson?

 3    A    Mid nineties.

 4    Q    Do you know who he works for?

 5    A    Betty Simon Trust and Richard Simon Trust.

 6    Q    And do you know what his role was with Betty Simon Trust

 7    and Richard Simon Trust?

 8    A    I'm not sure.  They had other investments, but I think he

 9    was in charge of the entire tax lien business.

10    Q    Mr. Hruby, let's go back to when you started in this

11    industry.  When you first attended tax lien auctions in New

12    Jersey, who did you bid for?

13    A    Breen, B-R-E-E-N.

14    Q    And can you tell us what years did you work at Breen?

15    A    I started in 1993, and left at the end of 2002.

16    Q    What was your role with them?

17    A    I started as a bidder and worked my way of to Director of

18    Acquisitions.

19    Q    And what does that mean, Director of Acquisitions?

20    A    I was in charge of scheduling all the action auctions,

21    hiring the bidders, scheduling the bidders, training the

22    bidders.  Also sales myself, keeping track of what we

23    purchased.

24    Q    And what type of business was Breen?

25    A    Strictly tax liens.
```

Hruby-direct                                                          63

1    Q    Purchase anything-- do they invest in anything other than

2    tax liens?

3    A    No.

4    Q    And did they invest in tax liens outside of the State of

5    New Jersey?

6    A    Yes.

7    Q    Can you tell us some of the places where they invested

8    outside New Jersey?

9    A    Florida, Illinois, Indiana, South Carolina, probably 25

10   states.

11   Q    Okay.  And after Breen, where did you work after Breen?

12   A    I went to M.D. Sass in Manhattan.

13   Q    And for what years did you work for M.D. Sass?

14   A    Started the end of the 2002, through 2009.

15   Q    Now, Mr. Hruby, what type of business is M.D. Sass?

16   A    They're a large investment firm.

17   Q    Did they offer other investments besides tax liens?

18   A    Yes.

19   Q    What was the size of their tax lien portfolio relative to

20   the other investments that they offered?

21   A    Taxing portfolio, maybe 200 million dollars, but that was

22   very small compared to the rest of the firm.

23   Q    And, Mr. Hruby, how did M.D. Sass get money to invest in

24   tax liens?

25   A    They raised money from outside institutions and wealthy

Hruby-direct                                                    64

1       investors, and then they used that money to buy tax liens and

2       then with those tax liens, they leveraged, they borrowed money

3       using their tax liens as collateral.

4   Q    Did M.D. Sass bid in states other than New Jersey?

5   A    Yes.

6   Q    Could you name a few?

7   A    Illinois, Indiana, Florida, South Carolina, Arizona.

8   Q    Now, Mr. Hruby, was M.D. Sass already in the tax lien

9       industry in New Jersey when you joined them in 2002?

10  A    Yes.

11  Q    Do you know approximately when they started investing in

12      New Jersey?

13  A    Maybe 1994, '95.

14  Q    Did you see bidders from M.D. Sass at auctions in New

15      Jersey while you were employed at Breen?

16  A    Yes.  Um -- yes.

17  Q    Mr. Hruby, what was your title while you were with M.D.

18      Sass?

19  A    I was Director of Acquisitions and then promoted to Vice

20      President and Director of Acquisitions.

21  Q    And can you please tell us what some of your

22      responsibilities were.

23  A    At Breen, I hired the bidders, trained the bidders,

24      scheduled the auctions, decided what auctions we're going to.

25      I was in charge of all the due diligence, which is the property

Hruby-direct                                                    65

1     research, deciding which liens we're going to buy.

2     Q    While at M.D. Sass, who did you report to?

3     A    Vinay Jessani.

4     Q    What was his role?

5     A    Portfolio manager.

6     Q    And can you just tell us what that means?

7     A    He was in charge of the tax lien department.

8     Q    And while at Sass, did anyone report to you?

9     A    Yes, all my bidders.

10    Q    Can you approximate how many bidders reported to you?

11    A    At one given time, probably 15.  But over the course of my

12    time there, I probably had 40 bidders, 50 bidders.

13    Q    Now, during your time at M.D. Sass, could you estimate the

14    average yearly investment that M.D. Sass made in New Jersey for

15    tax liens?

16    A    Seventy-five to a hundred million dollars.

17    Q    How does that compare to others in the industry during that

18    time?

19    A    It's in the top two or three.

20    Q    How do you know that?

21    A    Just from experience.

22    Q    Did that mean that M.D. Sass could be more competitive than

23    other bidders at auctions?

24    A    Yes.

25    Q    Now, Mr. Hruby, are you testifying today that you have a

  1        plea agreement with the Government?

  2        A    Yes.

  3        Q    And as part of that plea agreement, did you plead guilty to

  4        a felony?

  5        A    I did.

  6        Q    Approximately when did you plead guilty?

  7        A    2011, '12 -- 2012.

  8        Q    And when you entered into this plea agreement with the

  9        Government, did you have an attorney represent you?

 10        A    I did.

 11        Q    Do you still have an attorney representing you?

 12        A    Yes.

 13        Q    Do you know what the maximum penalty you face is?

 14        A    Yes, a million dollar fine and approximately ten years in

 15        jail.

 16        Q    Mr. Hruby, can you please tell the jury in your own words

 17        what you did to cause you to plead guilty to this crime.

 18        A    I was involved with bid rigging in the State of New Jersey

 19        for 15 years.

 20        Q    Mr. Hruby, have you met with attorneys for the Government?

 21        A    Yes.

 22        Q    Can you approximate how many times you met with attorneys

 23        from the Government?

 24        A    Six or eight.

 25        Q    And what did you do during these meetings?

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
 2               CRIMINAL ACTION 2:13-cr-748-SDW

 3    UNITED STATES OF AMERICA,    : TRANSCRIPT OF PROCEEDINGS
                                   :
 4                                 :        T R I A L
              -vs-                 :
 5                                 :
      JOSEPH WOLFSON, GREGG GEHRING, :     Pages 1 - 218
 6    JAMES JEFFERS, JR., ROBERT    :
      JEFFREY, BETTY SIMON TRUSTEE  :
 7    LLC, RICHARD SIMONE TRUSTEE,  :     Newark, New Jersey
                                   :      September 25, 2015
 8              Defendants.        :
      - - - - - - - - - - - - - - - - -

 9
      B E F O R E:    HONORABLE SUSAN D. WIGENTON,
10                    UNITED STATES DISTRICT JUDGE
                      And a Jury
11
      A P P E A R A N C E S:
12
           DEPARTMENT OF JUSTICE
13         BY:  STEVEN TUGANDER, ESQ.
           GRACE PYUN, ESQ.
14         BRYAN BUGHMAN, ESQ.
           STEPHANIE ANNE RANEY, ESQ.
15         Attorneys for the Government

16         JACOBS & BARBONE
           BY:  EDWIN JOSEPH JACOBS, JR., ESQ.
17         MICHAEL F. MYERS, ESQ.
           Attorneys for the Defendant Wolfson, Betty Simon Trustee
18         and Richard Simon Trustee

19    _____
20    Pursuant to Section 753 Title 28 United States Code, the
      following transcript is certified to be an accurate record as
21    taken stenographically in the above entitled proceedings.

22                              S/Carmen Liloia
23                              CARMEN LILOIA
                                Official Court Reporter
24                              (973) 477-9704

25
```

```
 1
            A P P E A R A N C E S - continued
 2

 3          OLEJAR & OLEJAR, ESQS.
            BY:  ROBERT JOSEPH OLEJAR, ESQ.
 4          LINDA OLEJAR, ESQ.
            Attorneys for Defendant Jeffers
 5

 6          OFFICE OF THE FEDERAL PUBLIC DEFENDER
            BY:  KEVIN F. CARLUCCI, ESQ.
 7          LISA MACK, ESQ.
            Attorneys for Defendant Jeffrey
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                             I N D E X
 2
       WITNESSES            DIRECT    CROSS    REDIRECT    RECROSS
 3
       For the Government
 4
       ROBERT ROTHMAN
 5
       By Mr. Carlucci                5                     65
 6     By Mr. Jacobs                 28                     67
       By Mr. Olejar                 52                     67
 7     By Ms. Raney                             57
 8
       ROBERT STEIN
 9
       By Mr. Bughmn        69
10     By Mr. Jacobs                 98
       By Mr. Carlucci              132
11     By Mr. Olejar                145
12
       DAVID HASSON
13
       By Ms. Raney        147
14     By Mr. Jacobs                181
       By Mr. Olejar                204
15     By Mr. Carlucci              207
16
17
18
19
20
21
22
23
24
25
```

1    A    At a tax sale, although we could have met -- he's from the

2    same area as me.  Our first real friendship evolved from tax

3    sales.

4    Q    Do you know who you were bidding for at the time?

5    A    He was bidding for Crusader Bank.

6    Q    Who were you bidding for?

7    A    I was bidding, I believe I was bidding for Sass at that

8    time.  It could have been the end years of Breen, though, but

9    I'm not positive about that.

10   Q    Did you see Mr. Jeffers in any particular geographic area?

11   A    Yes.

12   Q    Where was that?

13   A    Jim would typically bid in the southern portion of the

14   state or as we call it, Trenton south, all the way to Cape May.

15   Q    Now, I'd like to focus your attention on a time period

16   between 1998 and 2009.  During those years you were bidding for

17   Breen and then M.D. Sass.  Do I have that right?

18   A    Correct.

19   Q    And you testified that you went to over one hundred

20   auctions per year with both companies; is that correct?

21   A    Yes.

22   Q    Now, were there different types of investors at these

23   auctions?

24   A    Yes, there were.

25   Q    And how would you characterize or describe those different

1          types?

2          A    Well, there were several banks, several investment

3          companies that borrowed money from banks to bid.  There were

4          several independent type of investors.  It's pretty much the

5          mix of what they were.

6          Q    And what kind of investor was M.D. Sass?

7          A    M.D. Sass was a larger, multi-facetted investor.

8          Q    And what kind of investor was Crusader?

9          A    Crusader was a bank that I presume had a tax lien

10         portfolio.

11         Q    Did you always see Crusader at auctions?

12         A    Just about every auction I went to I saw Crusader, yes.

13         Q    And who were some of the other large institutional

14         investors that you saw?

15         A    Well, there was Fidelity, Bank Atlantic, Mooring Tax Asset

16         Group, Crusader, Plymouth Financing, JP Morgon Chase, Life

17         Center Academy, PAM Investors, J&H, Staples Investors.  There

18         were a slew of investors and then small independent investors.

19         Q    Where did Mr. Wolfson and Simon Trust fit into the scheme

20         of things?

21         A    I would say he was right below the large banks and large

22         investors.  I would consider him right below that, but above a

23         lot of the small independent investors.

24         Q    Let's talk about the small independent investors that you

25         mentioned.  Who were they?

Hasson-direct                                    157

1      A   Bill Collins, Norm Remnick, Joe Hofmann, Rich Pisciotta,
2      Charles Graziano, just several.  I mean, there were actually
3      hundreds, I guess.
4      Q   Okay.  Now, in general, how did you prepare for auctions
5      before you would attend one in advance, how would you prepare?
6      A   I would receive a bid book that was prepared by whatever
7      company I was working for.  And I would go to the tax sale an
8      hour in advance of the scheduled sale.  And I would get an
9      updated tax list from the tax collector.  And I would mark on
10     my bid sheet what was available to be bid at the sale because
11     several items could have come off because the property owner
12     paid their taxes before the sale.
13     Q   How did you receive the bid book that you just mentioned?
14     A   At sometimes it was Fed Exed to me and on most occasions,
15     the bid books were given to me from -- we're talking about the
16     period from '98 through 2009; correct?
17     Q   Yes.
18     A   They were Fed Exed or given to me by Steven Hruby.
19     Q   And when you were at Sass, which I believe you said was
20     located in New York City, if they were Fed Exed to you, were
21     they Fed Exed from New York to you in New Jersey?
22     A   Yes, they would have been Fed Exed from the office in New
23     Jersey to me.  But Steve Hruby would give me my bid books, he
24     lived close by.
25     Q   What information generally is contained in a bid book?