**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

_____

IN RE: NEW JERSEY TAX SALES
CERTIFICATES,
                                        CIVIL ACTION NUMBER:
JEANNE VAN DUZER LANG BOYER, et
al
           Plaintiffs,               3:12-cv-01893-MAS-TJB

              -vs-
                                     PRELIMINARY APPROVAL
ROBERT W. STEIN, et al,               HEARING/ DECISION

           Defendants.
_____

        Clarkson S. Fisher United States Courthouse
        402 East State Street
        Trenton, New Jersey 08608
        October 29, 2015

**B E F O R E**:        HONORABLE MICHAEL A. SHIPP
                        UNITED STATES DISTRICT JUDGE


**A P P E A R A N C E S**:

LITE, DEPALMA, GREENBERG, LLC
BY:  BRUCE D. GREENBERG, ESQUIRE
Attorneys for the Class Plaintiffs.

HAUSFELD, LLP
BY:  BRADEN BEARD, ESQUIRE
Attorneys for the Class Plaintiffs.

HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
BY:  JASON A. ZWEIG, ESQUIRE
Attorneys for the Class Plaintiffs.

CONNELL FOLEY, LLP
BY:  CHRISTOPHER HEMRICK, ESQUIRE
Attorneys for the Defendants, Branse and DeLuca.

DILWORTH PAXSON, LLP
BY:  JAY KAGAN, ESQUIRE
Attorneys for the Defendants, Crestar Capital.

1 | A P P E A R A N C E S

2 | ROETZEL & ANDRESS, ESQUIRES
  | BY:  DONALD SCHERZER, ESQUIRE
3 | Attorneys for the Defendants, American Tax Funding, LLC.

4 | JACOBS & BARBONE, P.A.
  | BY:  MICHAEL F. MYERS, ESQUIRE
5 | Attorneys for the Defendants, Wolfson, Simon and Simon,
  | Trustee.
6 |
  | GOLDBERG & MACKLER, ESQUIRES
7 | BY:  KEITH BONCHI, ESQUIRE
  | Attorneys for the Defendants, Del Vecchio and May.
8 |
  | COOPER LEVENSON, ESQUIRES
9 | BY:  WILLIAM J. HUGHES, ESQUIRE
  | Attorneys for the Defendants, M.D. Sass.
10 |
  | MORGAN LEWIS, ESQUIRES
11 | BY:  STEVEN REED, ESQUIRE
  | Attorneys for the Defendants, Crusader.
12 |
  | GARY WOLINETZ, ESQUIRE
13 |         and
  | EMILY KALLER, ESQUIRE
14 | Attorneys for the Defendants, Carabellese & PAM Investors.

15 | OBJECTORS

16 | LUM, DRASCO & POSITAN, ESQUIRES
  | DENNIS J. DRASCO, ESQUIRE
17 |
  | MOLOLAMKEN LLP
18 | BY:  THOMAS WIEGAND, ESQUIRE

19 | GEYER & GOREY, ESQUIRE
  | A. HAYS GOREY, JR.
20 |

21 |
  | Certified as True and Correct as required by Title 28, U.S.C.,
22 | Section 753
  |       /S/ Cathy J. Ford, CCR, CRR, RPR
23 |

24 |

25 |

1        THE DEPUTY COURT CLERK:  All rise.

2        (Open court begins at 10:10 a.m.)

3        THE COURT:  Please be seated.  Good morning.

4        COUNSELS:  Good morning, your Honor.

5        THE COURT:  So we are here today, and we are on the

6    record, in the matter of in re: New Jersey Tax Sales

7    Certificates, Docket Number 12-1893.

8        I'm going to ask for appearances of counsel.  I know

9    we have a number of folks today so when you give your

10   appearances, as well as any time you rise to speak subsequent

11   to this, please, for our court reporter's sanity and sake,

12   please state your name so that we have a clean record as to

13   who is speaking.

14       Mr. Greenberg.

15       MR. GREENBERG:  Good morning, your Honor.  Bruce

16   Greenberg, Lite DePalma and Greenberg in Newark, on behalf of

17   the Plaintiffs in the Class.  Appearing with me is Jason Zweig

18   who has already been admitted *pro hac vice* and will give his

19   own appearance.  We also moved yesterday, your Honor, for the

20   admission of Braden Beard who is a member of the Illinois bar

21   and who is associated with the Hausfeld firm, one of the

22   other -- the other co-lead counsel.

23       We don't anticipate that Mr. Beard will speak today,

24   but he's seated behind us or now he's standing behind us and

25   we would respectfully ask that he be allowed to participate in

1  the hearing today while his motion for *pro hac vice* is

2  pending.

3          THE COURT:  Thank you very much.  Counsel.

4          MR. ZWEIG:  Good morning, your Honor.  As Mr.

5  Greenberg said, Jason Zweig from Hagens Berman for the Class

6  Plaintiffs.

7          MR. WOLINETZ:  Good morning, your Honor.  Gary

8  Wolinetz and Emily Kaller on behalf of the Defendants Pat

9  Carabellese and PAM Investors Corp.  We are Defendants.  We

10  are not Objectors.

11          MR. DRASCO:  Good morning, Judge.  I am here for the

12  Objectors.  Dennis J. Drasco, Lum, Drasco and Positan.  We

13  represent the Davies Objectors.

14          And with me are counsel who have been admitted *pro*

15  *hac vice*.  To my right, Thomas Wiegand who is a member of the

16  New York bar; and to his right, Hays Gorey who is a member of

17  the D.C. bar.

18          THE COURT:  Welcome.  Anyone else?  You can

19  certainly, if you want to stand from there.  I don't need

20  everyone to walk up.

21          MR. BONCHI:  Your Honor, my name is Keith Bonchi from

22  the Goldberg Mackler law firm.  I represent Defendants

23  Non-objectors Del Vecchio and May.

24          MR. KAGAN:  And, your Honor, my name is Jay Kagan

25  with Dilworth Paxson.  I represent the Crestar Defendants.  We

1   are not objecting.  We're in support of the proposed

2   settlement.

3        MR. HEMRICK:  Good morning, your Honor.  Christopher

4   Hemrick from Connell Foley on behalf of Defendants Gary Branse

5   and Michael Deluca.  We support the settlement.

6        MR. SCHERZER:  Your Honor, Donald Scherzer with the

7   law firm of Roetzel and Andress in Ohio.  I've been admitted

8   *pro hac vice*.  I represent American Tax Funding.  We do not

9   object to the settlement.

10        MR. HUGHES:  Good morning, your Honor.  William J.

11   Hughes, Jr. from the law firm of Cooper Levenson, Atlantic

12   City, New Jersey.  I'm here on behalf of the M.D. Sass

13   Defendants and we are not objecting.

14        MR. REED:  Good morning, your Honor.  Steve Reed from

15   Morgan Lewis.  I represent the Crusader Defendants.  Our

16   settlement has already been preliminarily approved so I appear

17   simply as an observer today.

18        THE COURT:  Anyone else?  Okay.  Just by way of

19   background:  On March 27th, the Plaintiffs filed a motion for

20   preliminary approval of the settlements with the Crestar

21   Defendants, Mooring, Mastellone, the Del Vecchio Defendants,

22   the Bank Atlantic Defendants, the PAM Defendants, and the

23   Wolfson Defendants.

24        Also, a motion for a preliminary class certification,

25   appointment of Interim Class Counsel as Settlement Class

1    Counsel, appointment of Interim Liaison Counsel as Liaison

2    Counsel and approval of Class notice and plan of distribution.

3    So those were the motions that were filed.

4         Thereafter, three Plaintiffs:  Arlene Davies, Laura

5    Zahn and Todd Zahn, through counsel, filed an untimely

6    opposition.  These three Plaintiffs will be referred to as the

7    "Objectors."  Plaintiffs replied to the Objector's opposition,

8    and then without leave of Court, Objectors filed a sur-reply.

9    Thereafter, Plaintiffs filed an amendment to the settlement

10   agreement with the Wolfson Defendants.

11        So, as I have it stated here, the objections to the

12   proposed settlement are (1) that the compensation is

13   inadequate; (2) that it provides preferential treatment to

14   Class members with outstanding tax liens; (3) the negotiations

15   lack an indicia of arms' length bargaining because Class reps

16   had little involvement and Class Counsel did not take any

17   formal discovery; (4) Class Counsel fails to provide adequate

18   evidence to justify fairness of settlement; and (5) the plan

19   for distribution of notice does not provide for individual

20   notice to every Class member.

21        So, I'm going to start by asking Plaintiff's counsel

22   to please place on the record the terms of the settlement

23   agreement and the proposed class notice and plan of

24   distribution.  I'll then hear from the Objectors' counsel, and

25   then, finally, Plaintiffs will have an opportunity to do a

1   brief reply to the Objectors' counsel.

2           So, with that, I'm going to ask Plaintiff's counsel

3   to come forward and set forth the terms, but I'm going to

4   just, as a matter of a checklist, make sure that Plaintiff's

5   counsel include the nature of the lawsuit, the underlying

6   claims, the terms of the proposed settlement, the estimated

7   amount that each plaintiff will ultimately receive from the

8   settlement, how and when the notices will be sent to the

9   proposed Class, how counsel responds to the Objectors'

10  argument that the settlement agreement provides for

11  preferential treatment to Class members with current liens,

12  and also the reply brief states that although there has been

13  no formal discovery, the Class Counsel have engaged in

14  extensive investigation and obtained significant cooperation

15  from the Defendants.  I'd like you to describe these efforts

16  and the information that was obtained through these efforts as

17  well as any compensation for the Class Counsel pursuant to the

18  agreement and how the fees will be paid, will they be paid out

19  of the settlement proceeds, counsel services and what they

20  included, and the hours spent on the matter, as well as the

21  attorney's hourly rates and the costs and expenses incurred as

22  a result of counsels' representation.

23          So, with that as a checklist, I'm going to turn the

24  floor over to Plaintiff's counsel and let you set forth the

25  terms.

1          MR. ZWEIG:  Good morning, your Honor.  Again, Jason

2   Zweig from the firm of Hagens, Berman for the Class

3   Plaintiffs.  And I think I got most of your checklist.  I took

4   notes as furiously as I could, but if there is anything I

5   miss, please let me know.

6          THE COURT:  We'll circle back.

7          MR. ZWEIG:  Okay.  Good.

8          Your Honor, as you know we are here today on the

9   preliminary approval of the seven settlements you've

10   mentioned.  There are about 15 settlements that your Honor has

11   already preliminarily approved.  Those aren't at issue in

12   today's motion.  I say that only because there were some

13   arguments raised with respect to those prior settlements, but

14   those issues shouldn't be on the table for today.

15          The settlements, if they are approved, would add

16   another $1.2 million in compensation to the class which would

17   bring the total compensation for all settlements to about

18   $9.585 million.  Those settlements have been sitting in an

19   escrow account at Hunting Bank and earning some interest so

20   the total now is about $9.6 million.

21          In terms of the points of the settlements, each of

22   the settlements -- the six settlement agreements with the

23   seven defendants provides both cash consideration and also

24   discount offers on tax certificates which are still

25   outstanding which were acquired by the Defendants during the

1    relevant period of time and which, as I said, are still

2    outstanding.  Those discount offers would provide for a

3    15 percent discount off of the amount the property owners

4    still owes that particular defendant.  And, again, that would

5    just be for those tax certificates that are still outstanding

6    that a defendant acquired during the Class period.

7         With regards to the cash components of the

8    settlement, there are different amounts for each of the seven

9    defendants they've agreed to pay.  Mr. Del Vecchio has agreed

10   to pay $135,000.  And that money has been paid and is in an

11   escrow account.  Mr. Mastellone has agreed to pay $115,000.

12   And that money has been placed -- has been paid and placed

13   into an escrow account.  Crestar has agreed to pay $80,000

14   and has paid that amount.  That amount also is in an escrow

15   account.  The Mooring Defendants have agreed to pay and have

16   paid $300,000.  That money is also in an escrow account.  The

17   Bank Atlantic Defendants $400,000 also been paid in an escrow

18   account.  PAM Defendants $100,000 also been paid and put into

19   an escrow account.  And the Wolfson Defendants have agreed to

20   pay $120,000.

21        As your Honor noted, we did make an application

22   earlier to amend the Wolfson's settlement agreement to provide

23   some additional time for Mr. Wolfson to make his settlement

24   payment; unfortunately, he's still been unable to make the

25   payment.  He believes the payment can be made in January.  He

1   recently was involved in a criminal trial related to this

2   matter which he was acquitted on.  He probably has a number of

3   financial obligations relating to that in terms of lawyers and

4   other things.  And what he has agreed to do is give the Class

5   a mortgage, first mortgage, on a property that is going to be

6   liquidated in January.  And at that time he will make his

7   settlement payment to us, he's represented.  We're in the

8   process of documenting all of that.

9           So, those are the primary terms of the settlements.

10  The settlements don't provide as robust of cooperation as some

11  of the earlier settlements primarily because this would

12  resolve the case as to all defendants.  So there was no point

13  in obtaining significant cooperation or significant as some of

14  the earlier settlements because of the fact that this would

15  have resolved the entire case as to all of the defendants.

16          Now, in terms of the actual cash consideration, one

17  of the things the Objectors -- actually, before I get to that,

18  one of the items on your checklist was the nature of this

19  lawsuit.  This lawsuit is an antitrust case that has been

20  brought in connection with a conspiracy amongst certain tax

21  lien buyers in the State of New Jersey to collude with respect

22  to the interest rate on a particular tax lien.

23          In New Jersey, if you or I don't pay our property

24  taxes, a lien arises on the real property in favor of the

25  municipality, the law requires that each year the municipality

1  auction off that tax lien to investors, people who would buy

2  the liens.  The law also provides that that tax lien auction

3  will be a reverse auction.  In other words, the interest rate

4  associated with the tax lien will start at 18 percent interest

5  and each subsequent bidder at the auction will bid that

6  interest rate down.  That interest rate can go all the way

7  down to zero, depending on how badly the various buyers at the

8  auction want that particular lien.

9       These buyers do a lot of different research with

10  respect to each lien.  They may not want a lien because the

11  fact that the house isn't worth very much, they may think it's

12  in a good area and they may be willing to take less interest

13  on it.  There is a whole variety of considerations that these

14  buyers take into account when they're purchasing a tax lien.

15       What happened here is certain of the investors that

16  go to these auctions during the period of 1988 through

17  February of 2009 got together with regards to certain

18  auctions, not every auction, certain auctions, to collude with

19  respect to the interest rate only.  They decided that they

20  would be better off in certain cases by not competing with one

21  another on the interest rate, to not bid that interest rate

22  down so that they can get that 18 percent interest rate.  They

23  did that with respect to certain auctions.  A number of people

24  have admitted to doing that.  A number of people have pled

25  guilty to doing that.  But this case only involves that

 1   interest rate.  It doesn't involve the underlying lien.

 2   Nobody colluded to make the people who didn't pay their

 3   property taxes not pay their property taxes.  There is nothing

 4   illegal about the tax lien itself.  The only component of this

 5   case, the only thing we're seeking damages on, is the interest

 6   rate itself.  And I say that, and I think it's important to

 7   say that, because the Objectors have said, Oh, well, this is a

 8   market that is worth 100 to $200 million a year, and you take

 9   a certain percentage of that and the damages are $430 million.

10   Well, that frankly is totally irrelevant to the damages

11   calculation here.  $100 to $200 million a year may be the

12   amount of liens that are auctioned every year, but that has no

13   bearing whatsoever on this case.  That isn't this case.  This

14   case is about the interest component only, not the underlying

15   lien.  So to say that the $430 million is what the damages

16   should be is just incorrect, that's not what this case is

17   about.  That's not what this case could ever be about.

18          So that's the nature of this lawsuit.  And the claims

19   are -- the only claims that we have left in this case are an

20   antitrust claim, a claim for a conspiracy to collude on the

21   interest rate itself.

22          We had brought state law claims, which, in theory, if

23   they were successful might have allowed for us to go after the

24   full amount of the tax sale certificate.  Your Honor dismissed

25   those claims with prejudice.

1        In terms of the notice program, the Objectors have

2   made some arguments that the notice program is inadequate.

3   They do so primarily by misquoting what we have said the

4   notice plan is.

5        With regards to providing notice, the actual process

6   of providing notice, we have hired a firm Gilardi.  Gilardi

7   has 25 years of experience in claims, sending out notice, and

8   claims administration.  In working with them, what we've

9   decided to do - and this is laid out in my declaration that

10  I've submitted in support of preliminary approval of these

11  settlements.  In working with Gilardi what we did is we hired

12  a vendor to go out and issue foil requests to each

13  municipality in New Jersey to try and acquire all of the tax

14  sale information that each municipality in New Jersey had

15  during the relevant period of time.  They were able to do that

16  only for about 250 or so municipalities.  So, recognizing that

17  that probably wasn't sufficient, we then went to each of

18  the -- primarily, the big defendants in this case whose

19  settlements have already been approved: Crusader, Sass,

20  Plymouth Park, and we've got the names and addresses for every

21  tax lien that they purchased during the Class period.  That's

22  probably with all the names and addresses we got, probably

23  about 85 percent of the Class is my guess between that and the

24  database we put together, we then crossed the database with

25  the information we got from the Defendants to eliminate

1   duplicates so we have a robust database that's going to be

2   able to send out notice to most of the Class.  We're not

3   required, and the law doesn't require us, to send individual

4   notice to every single Class member, it merely requires the

5   notice be the best practicable under the circumstances.

6           Between the fact that we have names and addresses for

7   most of the Class, the fact that we're going to publish notice

8   in several, I think three newspapers that have statewide

9   circulation in New Jersey, that we are going to engage in a

10  number of internet related activities, so if somebody puts

11  "tax lien" in a Google search, "a New Jersey tax lien" or

12  something like that, an ad will pop up that will say, Hey, did

13  you have a tax lien that was bought by such and such during

14  this period of time?  If so, click on this link and that will

15  then take them to our dedicated website so they can learn more

16  information.  So we think we're going to be able to easily

17  provide notice that satisfies due process.

18          The Objectors, of course, only focused on the

19  database.  They totally did not mention the fact that we also

20  have the names and addresses from all of the major defendants

21  and even some of the smaller ones.  The only reason why we

22  didn't get that information from everyone is because it just

23  wouldn't be feasible.  Some of the, particularly the smaller

24  investors, they have their records essentially in like a

25  garage.  Some of them don't even have the records anymore.

1    Some of the bigger entities who were sophisticated banks like

2    that, they have sophisticated recordkeeping practices so they

3    did have that information.  But some of the smaller investors,

4    you know, really didn't have that information or it wasn't

5    very accessible and we didn't think the cost of trying to go

6    through boxes to get a few additional names and addresses was

7    justifiable in light of how much we already had.

8            In terms of the actual timing of the notice, in our

9    order we provide a proposed schedule, in our proposed order,

10   we provide a proposed schedule for notice.  And that notice

11   schedule provides that notice would -- upon preliminary

12   approval we would establish our dedicated website

13   www.njtaxliensettlements.com that would provide all of the

14   documents in the case, explain what the case is about, give a

15   toll free number for Class members to call which would be

16   staffed with people from Gilardi that can answer any

17   questions.  Obviously, if it's a question they can't answer,

18   they can come to us, we'd provide them with the assistance to

19   answer such questions.  There's an e-mail address, people can

20   e-mail questions to.  Following 60 days after preliminary

21   approval, we would then do our mail and publication notice,

22   that would be the notice that actually goes out to the Class

23   and the notice that is published in the paper.

24           What we've proposed here is to send postcards to

25   every name and address that we have and that we received from

 1    the Defendants and from our database.  And the reason why we

 2    would do a postcard versus a full notice - and this is

 3    becoming more commonplace - particularly for a case which

 4    doesn't, you know, have hundreds of millions of dollars in

 5    settlements.  But it would cost maybe a half a million dollars

 6    if we decided to send a full long form notice that consists of

 7    10 or 15 pages to each member of the Class.  This will just

 8    give them a brief summary of what the case is about, where

 9    they can get the long notice, where they can get the claim

10    form, all of that, of course, would be on the dedicated

11    website we have.

12          We just, we felt, the claims administrator feels

13    that's the more efficient way to do it in light of the nature

14    of the case and the amounts at issue because ultimately those

15    amounts come out of the common class fund.  We thought it was

16    more efficient for the Class to do it this way and still

17    satisfy due process.

18          So, 60 days following preliminary approval, notice

19    would go out that would then provide -- after 60 days of the

20    notice, that period where notice goes out, there would be a

21    deadline, 60 days thereafter, anybody who wants to exclude

22    themselves from the Class may do so, 60 days after preliminary

23    approval, anybody who wants to object to the settlement can do

24    so within 60 days after that deadline, the 60-day notice

25    period for deadlines to go out.  We would then, within 30 days

1　after that 60-day period to get notice out, we would file our

2　motions and supporting papers seeking final approval and for

3　reimbursement of Plaintiffs' counsel expenses and payment of

4　attorney fees.  And then within two weeks prior to the final

5　approval hearing, the class administrator would file a report

6　which basically identifies the extensive efforts that they

7　have taken in terms of disseminating notice, how many

8　objections there are, how many opt outs there are, that sort

9　of thing.  They would file an affidavit attesting to all of

10　that.

11　　　　　And then our proposed order calls for about 100 days

12　out from the date to send out notice to try to have a final

13　approval hearing.  Of course, all of those dates are proposed

14　and subject to Court approval and your Honor's schedule.

15　　　　　Your Honor, one of the items on your Honor's

16　checklist was the issue of preferential treatment that was

17　raised by the Objectors.  The issue really is this: there are

18　some Class members who have already paid off whatever amount

19　they owed on their lien that was acquired during the Class

20　period.  Then there are also some, as I mentioned before, that

21　are going to be eligible to receive a discount of up to

22　15 percent on the amount that they owe.

23　　　　　In our proposed notice and plan of distribution, we

24　stated that those who have the discount offers will also be

25　eligible to receive the cash consideration.  The Objectors'

 1   argument is, That's not fair, that group of people will

 2   essentially be getting more than the group of people who

 3   already paid.

 4        We think there's a justification for doing it that

 5   way.  The justification being they are, for better or worse,

 6   suffered more damages.  Their liens are still outstanding.

 7   Their liens are still accruing interest.  They're still

 8   accruing penalties.  And so the longer that lien remains

 9   outstanding, the more damage, not damage, but the more their

10   lien will increase in the amount owed.

11        Within our Class we have named Plaintiffs who have

12   redeemed already, and we have named Plaintiffs who haven't

13   redeemed.  Two different groups of people.  We've explained

14   this to them.  They feel comfortable with the process -- the

15   process we set up and we think that's justified.  We said this

16   in our reply to their objection.

17        If the Court were uneasy about this in any way, we

18   think a simple fix would be to adjust the plan of distribution

19   so that those who take advantage of the discount offer are

20   essentially -- don't get as much cash.  It would essentially

21   adjust the amount of cash they get, reduce the amount of cash

22   to account for the fact that they're also getting value in

23   getting the discount offers.  So that would be an easy fix.

24   We don't think it's totally necessary, but certainly willing

25   to do it that way.

1          I would note the objections, unfortunately, in this

2     case have the effect of because of the discount offers,

3     increasing the amount of money that people are going to owe

4     that still have their liens outstanding.  The longer this

5     takes, the longer it is until those people can realize those

6     discount offers because they're tied to final approval.  So

7     the faster we get to the final approval stage, when those

8     discount offers can kick in, the better it is for those people

9     that are going to be eligible to take part in the discount

10    offers.

11         Another item on the checklist, your Honor, the

12    investigation we did and the cooperation that we received from

13    the settling defendants, you know, one of the objections

14    obviously they make is that we did no discovery here.  How

15    could we settle for what we settled.  And that's wrong because

16    we have received extensive cooperation from many of the

17    settling defendants.

18         The first settlement we entered into, the Farber

19    settlement, we have been receiving cooperation since shortly

20    after filing this case.  Mr. Farber has provided us extensive

21    information about the conspiracy.  He's provided, as well as

22    many of the other Defendants, have provided what really is

23    only the documentary evidence that exists to prove this case.

24    And that is what they call the bid books.  These are the books

25    that some of the conspirators would take to the auctions and

```
 1  note which lien they were supposed to get as part of the
 2  allocation.  We've reviewed all of those.  We can see that not
 3  all of the -- not even close to all of the auctions in New
 4  Jersey were rigged.  Some of them only had one bidder.  Some
 5  of them may have had only two bidders: one of which was in the
 6  conspiracy, one of which was not.  So we've received what
 7  really is the only documentary evidence of this conspiracy.
 8  And that's the bid books.  We've reviewed those.  We've taken
 9  the bid book from one defendant, compared it to the bid book
10  of another and tried to match up the auctions they were at so
11  we can see what kind of evidence they had with regard to each
12  auction.  So we've gotten - I don't know offhand how many -
13  but we probably have somewhere around 10,000 pages or more of
14  documents that we've received from the cooperating defendants.
15          We've conducted, I would say, 15 to 20 interviews,
16  both in person and by telephone with certain of the
17  cooperating defendants to ask questions about the bid books,
18  how they're to be interpreted, what happened at this auction,
19  what happened at that auction.  We did a lot of that in
20  connection with our amended complaint that we filed which your
21  Honor upheld and found to have quite a bit of allegations to
22  support the conspiracy.  We listed I think about 100, closer
23  to -- I'd say closer to 50 auctions that we allege to have
24  been rigged in the State of New Jersey based on some of that
25  cooperation.  That cooperation continued after the complaint
```

 1    was filed.  We had settlement discussions with other

 2    defendants.  We'd then go back to the cooperating witnesses

 3    and say, How much evidence is there on this guy?  How big a

 4    participant in the market were they?  We'd get information on

 5    the other defendants' culpability in this.

 6          We would then, from each Defendant we settled with

 7    prior to even discussing settlement, we would get the amount

 8    of business they did in the state and be able to make an

 9    informed judgment about whether the settlement amount that we

10    were willing to accept was reasonable in light of their

11    involvement in the activities alleged in this case.  We didn't

12    settle with any defendant without that information.  In fact,

13    we would wouldn't even talk to any defendant without that

14    information.  We can't just pick a number out of the air.  We

15    have to ground a number in something.  So, we got all that

16    information from them prior to even discussing settlement.

17          Your Honor asked about the compensation of Class

18    Counsel and the services we've provided and our hourly rates

19    that sort of thing.  I don't have the precise numbers in front

20    of me in terms of how much time we put into the case or

21    expenses.  I know our expenses are very low.  Offhand,

22    certainly, I would say probably around $50,000 or so.  No more

23    than $100,000 at this point.  Obviously, there'll be costs for

24    notice.  There have been some costs in terms of tax

25    preparation that we've had to incur, but the costs are very

1    low.

2            When we, as I mentioned in terms of the schedule,

3    when we -- I think it was 30 days after the date by which

4    notice has to go out, we would file a motion which would -- a

5    separate motion on attorney's fees and costs.  We would detail

6    all of the services that we've provided to the Class.  We

7    would detail the amount of time we expended.  We would detail

8    the hourly rates.  And all of that typically -- it comes in at

9    that stage.  We've said in our papers that we would seek a fee

10   of no larger than 33 percent.  I can't tell you today, your

11   Honor, what our fee request will be.  That's something we have

12   to consider.  It certainly won't be larger than that.  The

13   Objectors have assumed it would be 33.  I don't think that's a

14   safe assumption, but I'm not prepared today to say what we

15   would seek in terms of fees.  Other than it certainly won't be

16   higher than 33 percent which is something we've represented

17   and we put in the notice as well.

18           If I can just go back for a moment to some of the

19   settlement amounts that are up for approval today as part of

20   the settlements.  One of the things that the Objectors failed

21   to account for in any way is the financial condition of those

22   Defendants -- some of those Defendants that have settled as

23   part of this round of settlements.

24           Let's start with Mr. Mastellone.  Mr. Mastellone, as

25   I had said, has agreed to pay $115,000.  How did he get that

1  money?  He took a home equity line of credit.  That settlement

2  was arrived after a day long mediation session with Bruce

3  Goldstein, who your Honor might be familiar with, he's a

4  well-regarded lawyer I think by everyone in the State of New

5  Jersey whose integrity is beyond reproach.  And he mediated a

6  day long settlement between Plaintiff's counsel and Mr.

7  Mastellone's counsel.  Mr. Mastellone was there with his wife,

8  and ultimately he agreed to pay the settlement by taking out a

9  home equity line of credit.

10        I would also note that he did plead guilty to this

11  conspiracy, and he has not been sentenced yet so it's not

12  clear what his fine will be; but the government believes he

13  only had $116,000 worth of liens that were at issue in the

14  conspiracy that he was involved with.  And I underscore the

15  word "liens" because that's the total amount of liens that he

16  purchased that were subject to the conspiracy not that one

17  component, the interest.  That would be a much smaller piece

18  of that 116,000.  So we got 115,000.  And the government

19  believes only $116,000 worth of liens were at issue in his

20  case.

21        Crestar, the Objectors make much of the fact that Mr.

22  Farber testified at the trial of Mr. Wolfson that Crestar was

23  started in the end of 2008 with $50 million of capital.

24  That's totally irrelevant to what Crestar's participation in

25  this case was.

1       Your Honor might remember we had a settlement

2  conference before your Honor, myself, Mr. Kagan, Mr. Kagan's

3  client, in connection with the first motion to dismiss.  You

4  heard the position of Crestar.  They were in this for only

5  three months.  They were in this from November or December of

6  2008 and the conspiracy ended in February of 2009.  That's it.

7  And they believe firmly that they shouldn't pay more than a

8  couple thousand dollars for this and they were not criminally

9  charged.  And the fact that we got $80,000, we think, is very

10  fair in relation to what their actual participation was in

11  this market during that short window of time.

12       Mooring, Mooring agreed to pay $300,000.  Mooring has

13  almost no assets.  They gave us detailed financial statements

14  which showed that they have no assets.  Your Honor ruled that

15  we can't go after their sister company, MTAG, because of a

16  written contract in connection with the first motion to

17  dismiss.  We couldn't name them in our amended complaint

18  because your Honor dismissed them with prejudice.  So all we

19  had is Mooring.  And they have maybe a million dollars of

20  assets and that was about a year and a half ago.  They're in

21  wind-down mode.  I don't know if they have any assets today.

22  So even if we got a bigger judgment against them, it would be

23  worthless.  So the fact that we got $300,000 we think is a

24  very fair resolution.  They also weren't criminally charged

25  and won't be criminally charged.

1          Wolfson, although he hasn't paid up yet, we think he

2    will, he was just acquitted at trial.  He went to trial.  They

3    played wiretaps of him communicating with other people who

4    have pled guilty.  The jury heard those.  They still acquitted

5    him.

6          THE COURT:  The amount for Wolfson, was it 125 or

7    120?

8          MR. ZWEIG:  I have in my notes 120, but you might be

9    right.  I might have wrote that incorrectly.  It's -- I have

10   the settlement agreement here.

11         THE COURT:  Mr. Zweig, I have two different numbers.

12         MR. ZWEIG:  Sure.  As I said, I have the agreement.

13   Let me find it quickly.  Sorry, your Honor, I should have had

14   my notes correct.

15         THE COURT:  Is counsel for Wolfson here?

16         MR. ZWEIG:  I don't believe he is.  Your Honor, it is

17   125.  My apologies.

18         But again, he went to trial and he was acquitted,

19   even after the jury heard wiretaps.

20         Bank Atlantic, they agreed to pay $400,000.  They're

21   not going to be criminally charged.  We think that's a very

22   fair settlement.

23         And Mr. Del Vecchio, he did plead guilty.  He agreed

24   to pay $135,000.  His criminal fine, $20,000.  So we think

25   $135,000 is a pretty good recovery in light of the fact that

1   his criminal fine, which of course is based on the amount of

2   commerce that was at issue in his criminal case, was only

3   $20,000 in terms of his criminal fine.

4         So we think the amounts are very fair.  We think the

5   Objectors don't take that into account.  It has to be taken

6   into account.  You can't be expected and nor does it make

7   sense to go after a defendant when you know at the end of the

8   day there is nothing to get.  So that has to be taken into

9   account in any settlement.  We don't think these Defendants

10  could have misunderstood - most of these Defendants at least

11  could have withstood a bigger judgment.

12        Another issue I wanted to raise with the Court is the

13  Objectors themselves.  First of all, Mr. Davies, you might

14  remember, your Honor, he is somebody who repeatedly contacted

15  your Honor *ex parte*.  Your Honor had asked us to communicate

16  with Mr. Davies to cease doing that.  We did that.  He then

17  decided to go to Judge Bongiovanni instead of you.  He issued

18  a number of written communications accusing us of all kinds of

19  illegal behavior, *ex parte* written communications.

20        Judge Bongiovanni had a hearing on that.  Judge

21  Bongiovanni rejected all of his arguments.  He was there.  He

22  made his statements, his contentions.  Those were all rejected

23  by the judge.  We don't think any of those arguments are

24  different today than they were then, and we think they should

25  be rejected today.

1       The other thing is, Mr. Davies and the Zahns, both

2   had their liens purchased by Sass, one of the Defendants here.

3   Mr. Davies, at least -- and, actually, I think this is true of

4   Mr. and Mrs. Zahn as well, they were in foreclosure as a

5   result of the fact that they had did not pay their property

6   tax lien.

7       Under the law, I frankly think this is sort of

8   putative, but that's neither here nor there, the lienholder

9   has the right to foreclose on a property owner if they don't

10  pay their lien, the statute gives them that right.

11      Sass decided to foreclose on them.  They had a trial

12  before Judge Batten in Cape May County, I believe it is, and

13  presented evidence that their lien was subject to the

14  conspiracy because it was purchased at 18 percent.

15      Judge Batten heard argument on that, rejected it, and

16  granted summary judgment in favor of Sass.  The same thing

17  happened essentially with the Zahns.  So, one of the key

18  underpinnings of the Objectors' arguments is, this a slam dunk

19  case.  You have 15 defendants that have pled guilty.  It's a

20  no-brainer.  But Mr. Davies, himself, tried on an individual

21  basis to prove the conspiracy and couldn't.  And because the

22  fact is even if there are liens at 18 percent, that's what the

23  statute provides.  That doesn't prove anything.  That doesn't

24  prove there was a conspiracy.  That's what we were up against

25  in terms of this case.  And they couldn't prove it on their

1    own individual case.  Now you factor in that this a class

2    action, we have to prove that each auction was subject to the

3    conspiracy.  How are you going to do that when you only have

4    bid books and evidence and testimony -- what would be

5    testimony showing that only a very small percentage of the

6    auctions were rigged.  How are we going to show that on a

7    class wide basis all of 6,000 plus auctions in the State of

8    New Jersey are rigged.  They couldn't even do it on one.  And

9    they ignore that.

10          They also make objections about the Class reps not

11   being informed.  They were not -- the Zahns were never a Class

12   rep.  Mr. Davies was not a Class rep with regards to these

13   settlements so I don't think I need to address that.  He has

14   no basis to assert that.

15          Your Honor, I think I've touched on -- I touched on

16   at least all the points that I was able to write down.  Is

17   there anything I missed?

18          THE COURT:  I don't think you have, Counsel.  I think

19   you have everything.  And if you have, after we hear from your

20   colleagues, we'll circle back.

21          MR. ZWEIG:  Thank you, your Honor, very much.

22          THE COURT:  Defense counsel, having heard from the

23   Plaintiff with the preliminary terms, I know some of you, when

24   you entered an appearance, indicated there was no objection or

25   that you were in agreement with the proposal.  I would like

     1   for you to go on the record now that you've been placed on the

     2   record to do the same.

     3          For those who are here, let me hear from counsel for

     4   the Crestar Defendants.

     5          MR. KAGAN:  Thank you, your Honor.  Again Jay Kagan

     6   for the Crestar Defendants.  We do support the settlement.

     7   Our position is, we should have paid nothing.  This is quite a

     8   windfall for the Plaintiffs so, reluctantly, we do support it.

     9          THE COURT:  Thank you, Mr. Kagan.

    10          Mooring.  Counsel for Mooring?  Okay.  Mastellone?

    11   The Del Vecchio Defendants?  Please state your name before you

    12   speak.

    13          MR. BONCHI:  Good morning, your Honor.  Keith Bonchi.

    14   I represent both the Del Vecchio Defendants and Garden State,

    15   Isadore May Defendant.  We support the settlement in this

    16   matter as to Del Vecchio.

    17          Again, it's important, Mr. Zweig tried to explain to

    18   you the small portion, actually, it goes even smaller than he

    19   said.  It's only the initial certificate that the interest

    20   rate is at issue.  All subsequent taxes above $1,500 run at 18

    21   percent.  Only the initial certificate, it's a very small

    22   piece of it.

    23          Again, the negotiations, your Honor, here were done

    24   at arms' length.  We did not want to pay what the Class action

    25   attorneys exacted in this case.  We went back and forth.  My

1   clients were required to prove all kinds of documentations,

2   copies of every tax sale certificate, everything that they

3   considered to be in these rigged auctions.  It did not just

4   happen in two or three minutes.  We went back and forth in

5   both matters over a period of time.  We were required to

6   produce information and documentation before we even could

7   start negotiating numbers.

8       The numbers were higher as you would expect than we

9   settled at.  And if I brought my client in here, he would tell

10  you that he overpaid, but, again, you settle for many reasons,

11  the cost of litigation and everything else, but these were in

12  fact arms' length settlements in both cases.  And this one -

13  and you can call me back up with Garden State - we both

14  support these settlements.

15      But, again, as said by my prior counsel here, my

16  clients believed they paid too much.

17      THE COURT:  The Bank Atlantic Defendants.

18      MR. ZWEIG:  Your Honor, I don't represent Bank

19  Atlantic, but I did get a call from Mr. Cecchi, their counsel

20  this morning, who was forced to respond to an Order to Show

21  Cause that came in last night, and he wanted me to inform the

22  court that of course they support the settlement they entered

23  into and that I had authority to say this to you.

24      THE COURT:  The PAM Defendants.

25      MR. WOLINETZ:  Good morning, your Honor.  Gary

1    Wolinetz from Greenbaum Rowe on behalf of the PAM Defendants.

2    Here with is Emily Kaller, my partner.

3        PAM did not rig any bids and denies any involvement

4    in any purported conspiracy.  PAM was not indicted by the

5    government, has never been prosecuted by the government.  We

6    settled this case for the simple reason that it would cost

7    more to go to trial than it would to settle.  We denied doing

8    anything wrong and it's a settlement, like many others.  It's

9    done simply for economic expediency.  We support the

10   settlements.

11       THE COURT:  Thank you, counsel.  The Wolfson

12   Defendants.

13       MR. MYERS:  Thank you, your Honor.  Michael F. Myers,

14   the law firm OF Jacobs and Barbone on behalf of the Defendants

15   Joseph Wolfson, Richard Simon, Trustee, and Betty Simon,

16   Trustee, LLC.

17       The Wolfson Defendants do not object to the

18   settlement and do believe that it is fair and reasonable.  As

19   Mr. Zweig already represented to the Court, they were, in

20   fact, acquitted at trial, roughly in Newark, roughly a month

21   ago and our position remains the same.  We deny liability.

22   We settled this matter to avoid the costs that would have been

23   inevitable had it gone further.  And I join in all the

24   arguments previously made by counsel.

25       THE COURT:  Okay.  Thank you very much, counsel.

1            Did I inadvertently overlook any of the other

2    Defendants that are present today?  Mr. Hughes.

3            MR. HUGHES:  Your Honor, Bill Hughes for M.D. Sass.

4    This motion does not impact us.  Our settlement was already

5    previously been accepted.

6            THE COURT:  That's right.

7            So, having heard from defense counsel, let me now

8    move on and hear from the Objectors.

9            MR. WIEGAND:  Thank you, your Honor.

10           THE COURT:  And by way of a checklist for you,

11   because I prefer to give you my questions and let you proceed

12   uninterrupted, if I can.  My concern here is that, in your

13   opposition, you stated the Class's best recovery is $432

14   million over the Class period and that trebling this number

15   yields damages over $1.2 billion and that the Class would be

16   entitled to prejudgment interest from 1998 to 2009 to present.

17           Is it your position that the settlement award must be

18   close to the best possible recovery in order to be found

19   reasonable?

20           Secondly, if the plan of allocation were modified to

21   provide the Class members who take advantage of the discount

22   offer sustain a commensurate deduction on the amount of

23   settlement proceeds that they would otherwise get, would you

24   contend that the plan still gives preferential treatment to

25   those certain Class members?  Although, Plaintiff's counsel

1    does not believe that this is a necessary step and that those

2    costs are justifiable, would that fallback provision eradicate

3    your concerns about any preferential treatment?

4           And then lastly, Class Counsel has already described

5    the information it obtained from the investigations and from

6    Defendants' cooperation.  What additional information, if any,

7    do you believe is necessary to determine the strength of the

8    Class claims?

9           So with that as kind of the Court's concerns, I'd

10   like for you to go ahead and proceed with your objections.

11          MR. WIEGAND:  Thank you, your Honor.  Thomas Wiegand

12   of MoloLamken on behalf of Objectors.

13          Your Honor, there's no dispute but that the Objectors

14   who we represent are members of the putative class, that's the

15   only relevant issue as to the Objectors.

16          Let's start with the issue of our concern that the

17   compensation is inadequate, as you termed that issue upfront.

18          Your Honor, the settling parties failed to meet their

19   burden to show that the proposed settlement, quote, falls

20   within a range of possible approval.  They need to make a

21   showing of that.  I take that quote from Judge Brody's

22   decision in the NFL case from January of 2014 where she was

23   faced with a situation your Honor may be familiar with where

24   she was told by a former federal judge who said I've spent

25   almost two months in the room with the parties for both sides

1  and this has been hotly contested, fiercely negotiated, and I

2  believe that it's fair, reasonable, and adequate.  That was

3  not enough for the judge.  The judge said, I need to see

4  evidence.  It's not enough for a court to hear that there are

5  honorable members of the bar who believe something is fair.

6  The Court needs evidence.  You have received no evidence.

7          You need to -- to be able to consider, as Judge Brody

8  put it, quote, the Plaintiff's expected recovery balanced

9  against the value of the settlement offer.  There is no way

10  that you have to assess that.

11          The Girsh factors, which you would face at the final

12  approval hearing, but you need to be looking forward to those.

13  And one of those talks about, what is the best possible

14  recovery?

15          The reason that we discuss the best possible recovery

16  is because it's a Girsh factor and there have been courts on

17  preliminary approval, Judge Brody cites to them in her NFL

18  decision, that have said, There is no way we can now, as the

19  Court, determine that this is within a possible range of

20  approval.  We just have no idea.

21          So, your Honor, what is the best possible recovery.

22  I can start there.  The Plaintiffs plead in their amended

23  complaint that the value of the tax liens themselves that are

24  auctioned on an annual basis is 100 to $2 million.  Based on

25  the evidence that came through at the recent criminal trial

1    relating to tax liens, it appears that the amount is actually

2    greater than $200 million.  We got M.D. Sass itself saying the

3    number is 75 to $100 million per year that it purchases in tax

4    liens.  It is one of three big players.  Right there, even if

5    it's $75 million, that's $225 million.  We've been given no

6    evidence by the settling parties as to what that number truly

7    is.  They know it with certainty how much they've purchased

8    every year.  They still haven't told you that.  I have no way

9    to know other than to take what I can find in the public

10   record.  It looks like it's over $200 million a year.  But

11   even if it's just 200, what does 18 percent interest on that

12   number look like?  Well, that's $200 million every year for 11

13   years.  That's $2.2 billion in tax liens auctioned off and

14   purchased by the Defendants during the Class period.

15           18 percent of that number, if you assume that the

16   lien is held for just a single year before it is redeemed, the

17   period may be well longer, again, I put that supposition into

18   our objection, you have not heard any evidence that one year

19   is an overestimate of how long this is held.  So that's

20   18 percent that's been earned on those tax liens.  That's

21   where the $432 million comes from.  It's very simple.  Nobody

22   has explained why that's wrong.  It causes me concern to think

23   that the number must be higher because you're receiving no

24   facts.

25           Now, if that number is $430 million a year, that's

1   $1.2 billion trebled, which this Court is entitled to consider

2   at this stage of a preliminary approval hearing and that just

3   doesn't make sense compared to a $9.6 million total settlement

4   when there are 15 guilty pleas and an additional finding at

5   trial of a guilty against another individual.  We have 16

6   findings of guilt that will be entered into evidence at a

7   civil trial.  That looks pretty good.  Why would we be

8   settling at less than 1 percent, best possible recovery, when

9   we have 16 findings of guilt.  People admitting to fixing the

10  rates at these auctions.  It just doesn't add up.  And the

11  lack of any facts, even after we asked for them, causes me

12  greater concern.

13         Your Honor, the indicators -- the reason that we went

14  into in our brief that there are indicators to cause you

15  concern is to note for you that there have been courts who

16  previously have said, Here are the kinds of things that cause

17  us reason to pause before we approve settlements even at a

18  preliminarily basis.  One of them is that the settlement

19  amount was achieved at the same time as class certification

20  was agreed to.  There is concern that the settling parties are

21  glossing over some issues and bringing the amount down.

22         The Court needs to use that just as an additional

23  concern to increase your desire to see actual facts, actual

24  numbers.

25         Another indicator, your Honor, is that there has been

 1   no discovery.  GM Trucks, a Third Circuit case, calls that a,

 2   quote, red flag that there is concern here.

 3        Your Honor, the Class representatives are not

 4   involved in the settlement process.  Yet another red flag.

 5   Counsel said that Mr. Davies, the son of Arlene Davies, who is

 6   an Objector here, the son did show up at a hearing at some

 7   point in time.  But the fact that he's not an Objector is not

 8   relevant.  Ms. Davies is an Objector, and she has sworn in an

 9   affidavit, placed it into the record, no one has filed

10   anything to counter it, and Ms. Davies stated that while she

11   was a Class representative, before she was kicked out of that

12   position, nobody told her anything about the settlements prior

13   to them having been finally agreed.  She was not kept informed

14   during the process.  She was concerned about that.  She asked

15   them, I need to be kept informed.  She was not even after her

16   initial concern, she was not kept informed.

17        Then, your Honor, Ms. Davies recites in her brief

18   affidavit that at a hearing that she attended - this is her

19   not her son swearing to this - she sat at lunch with the other

20   named Plaintiffs in the case.  None of the other named

21   Plaintiffs had been involved.  They told her that.  So the

22   evidence is that none of the named representatives were

23   involved in the negotiating process.  We say that only because

24   it is another concern, another red flag, to cause this Court

25   to look even deeper than it otherwise might.  The fact that

1   there are no facts for this Court to look into is the concern.

2        Your Honor, so I've discussed why the $1.2 billion

3   causes us great concern given the size of the settlement,

4   there is some discussion of individual defendants, again, I

5   will start with the fact that counsel stating a belief at the

6   podium is not evidence, but even taking what counsel said at

7   face value, I have some great concerns.

8        First, of course, all defendants as your Honor

9   recognized, and it's ruled in on your ruling on the motion to

10  dismiss, are jointly and severally liable for the harm done by

11  the price fixing conspiracy that's been admitted to here.

12       There is discussion that Crestar was only involved

13  for the last three months, but an admission that Crestar

14  $15 million.  There is no discussion, even during that three

15  months, how much money was made by the conspiracy, all the

16  Defendants in the conspiracy during that three-month period.

17  Crestar was allowed to settle for $80,000.  It just doesn't

18  make sense.  You got $50 million in this one fund.  We don't

19  know how much Crestar has in total.  There is no evidence of

20  that.  We do not know the financial wherewithal of Crestar.

21  That causes me great concern.

22       I'll use another example, your Honor.  Bank Atlantic

23  settled for $400,000.  Certainly no discussion of the

24  financial wherewithal of Bank Atlantic.  There is sufficient

25  facts pled in the amended complaint as to Bank Atlantic.  It

1   wanted to have a case dismissed.  It could not.  There has

2   been no evaluation of what does the case look like against

3   Bank Atlantic.  I can't tell you because it hasn't been

4   disclosed or I could have evaluated it for you.  My point to

5   you is, you haven't been told either.  And that just doesn't

6   make sense.  How can you make a decision on this motion?

7          The PAM Defendants.  There is no mention of the

8   exposure of the PAM Defendants.  There is no mention of what

9   are the facts that caused the PAM Defendants' risk.  Why did

10  the motion to dismiss not be granted.  Right, there are facts

11  to support a case against the PAM Defendants.  Nobody has

12  valuating that.  The only people who know those facts are all

13  saying, Don't worry about it.  We rather not tell you the

14  facts, but you don't need to worry yourself about that.  We've

15  looked at it and we believe that this is okay.  The PAM

16  Defendants may well have much, much more money than that.  We

17  just don't know.  They're jointly and severally liable to the

18  extent that they are found liable at trial.

19         Your Honor, let me turn then to the two other

20  arguments I want to address.  First is the preferential

21  treatment for some Class members.  Nobody has stated that

22  that's not happening here so everyone seems in agreement

23  that's the case.

24         The Class Counsel had stated in their initial memo

25  supporting the motion for preliminary approval that that

1   benefit, the ability to receive a 15 percent discount likely

2   exceeds the monetary award from a settlement.  So even if one

3   were to say that we would count whatever the 15 percent

4   discount is towards the monetary settlement and then try to

5   iron it out, it appears that its greater than the monetary

6   settlement that other people in the Class would receive.

7   That's all that I can say on that topic because, again, there

8   is no evidence, there are no numbers, there are no facts that

9   allow you or me to evaluate that issue.  But clearly one

10  cannot treat a certain segment of the class differently than

11  the rest of the class.

12          Then, finally, your Honor as to class notice --

13          THE COURT:  Before you go on, if it does not exceed,

14  do you believe that that's a fair way to handle that

15  particular issue?

16          MR. WIEGAND:  Then, in essence, that would be the

17  same as saying everybody just gets a settlement amount of --

18  of X percent of their tax lien.  It makes no sense to me to

19  say if you have a current lien, you could redeem it and we'll

20  count that against your monetary award, otherwise, you get a

21  monetary award.  In that case, what we should do is add the

22  value of all of those redemptions, times 15 percent, to the

23  monetary award and split it up.  The reason I say that is,

24  assume that everybody who has a tax lien redeems it, what I'm

25  saying would be the economic equivalence.  The problem is that

1   the people who have tax liens only get that 15 percent

2   discount if they redeem within 45 days.  I don't know the

3   ability of people to redeem within 45 days, but I'm guessing

4   there are many people whose liens still exist who have a

5   problem getting that done within 45 days or maybe they would

6   have done it already.

7           THE COURT:  So, then, does your concern shift and

8   become a timing issue and not a fairness issue?

9           MR. WIEGAND:  If you're asking me -- my concern as to

10  the settlement that has been proposed is that it's not fair

11  equally to everybody within the group.  As to what I think the

12  proper fix should be, I think we should not make the fix

13  contingent on whether or not somebody redeems an ongoing tax

14  lien.  What we should do is determine the value of 15 percent

15  of the existing tax lien, add that to the settlement amount,

16  and then split it up evenly among everybody.  That's what I

17  believe we should do.  Because I don't want that 15 percent

18  contingent on whether or not somebody can come up with the

19  money within 45 days.

20          THE COURT:  Proceed.

21          MR. WIEGAND:  Then, finally, your Honor, simply as to

22  class notice, our point -- today we've received further

23  information that they've gone to many of the Defendants, and

24  it's still not clear how many of the Defendants, Third Circuit

25  precedent, Supreme Court precedent is very clear, *Eisen v.*

1   *Carlisle* in the Third Circuit, the case was *Larson v. ATT*.

2   It's not about burden.  If the Defendants can't come up with

3   the addresses, they need to come up with the addresses.  Now,

4   we found out that 85 percent of the people apparently have had

5   their addresses located but that the others haven't been

6   located because it's not -- that counsel decided it wasn't

7   worth going through -  I wrote it down to get it correct - a

8   few boxes.  We don't think going through a few boxes was

9   justifiable.  That's clearly contrary to what the Third

10  Circuit has said in *Larson*.  So the point simply being on

11  notice, we believe that all the Defendants have to go through

12  the materials to come up with the addresses.  And if counsel

13  then represents, everyone has done it, all addresses have been

14  obtained from Defendants then that would do it.  But that's

15  our only point on notice.

16          I believe I've answered your question on, Do we think

17  we need to be close to $1.2 billion.  I don't think the Class

18  is entitled to $1.2 billion but that is clearly the measure

19  one uses to access whether or not $9 million looks about

20  right.  It exposes $9 million as an unsupportable number.  And

21  in light of no facts to counter that, it causes greater

22  concern.

23          Then, finally, your Honor, as to cooperation, what

24  additional information is necessary, there is still no

25  information that we have as to how strong of a case does the

1    Plaintiff Class have against any of these Defendants.  None.

2    So I don't know what additional cooperation was necessary,

3    because there's been no showing to you, or to me, or to anyone

4    else in the public, or the Class, as to what the case actually

5    looks like.  Thank you.

6        THE COURT:  Mr. Zweig, do you want to reply?  And

7    because the objecting counsel also had specific issues with

8    some of the individual Defendants Crestar and PAM and I think

9    you referenced Bank Atlantic, I'm also going to invite Defense

10   counsel, if you want to reply as well to speak and be heard.

11       Mr. Zweig.

12       MR. ZWEIG:  Thank you, your Honor.  I'd be remiss

13   to -- Mr. Wiegand said that there is no dispute that Mr.

14   Davies and the Zahns are part of the Class.  I don't think we

15   need to delve into that today.  I think there are some people

16   that would dispute that.  My interest is more to focus on the

17   merits of the objections that they raised, but I did want to

18   put that into the record that that might be disputed at some

19   point by certain parties here.

20       Facts are difficulties things.  And Mr. Wiegand still

21   did not answer your question as to how he believes you can

22   simply take the entire value of all of the liens sold during

23   the period and use that as a benchmark for damages.  He then

24   assumes, which is incorrect, that all of those liens were sold

25   at 18 percent.  In fact, many liens are sold at zero percent.

1   Those aren't even part of the Class.  They couldn't be because

2   if somebody fixed an interest rate at zero percent which again

3   is the only component in this case.  Obviously, if someone

4   suffered antitrust injury because their interest rate was --

5   the interest rate is the only thing that's part of this case

6   and it was at zero percent.  And there were many liens sold at

7   zero percent, liens that belonged to property owners who, for

8   whatever reason, didn't pay their taxes but have the financial

9   means to do so, might be a particularly attractive purchase

10  for somebody and they may very well be willing to bid that

11  lien down to zero percent, because they also receive year-end

12  penalties and all kinds of other charges associated with the

13  lien when that lien redeems.  And somebody who has the ability

14  to do so would be a particularly attractive investment for

15  such a person even at zero percent.

16          So the fact that Mr. Wiegand and the Objectors

17  continue to rely on, not even the best case scenario.  It

18  wouldn't be possible to even prove $432 million of damages.

19  That has nothing to do with the interest that was (a) part of

20  those liens; and (b) part of the liens that were part of this

21  conspiracy.

22          He also assumes again that every single auction in

23  the State of New Jersey throughout the Class period was

24  rigged.  And although there have been 15 defendants or 16 --

25  15 or 16 that have pled guilty, they have not pled guilty to

1    colluding on every auction in the State of New Jersey.  Each

2    of the criminal informations and plea agreements for each one

3    of those defendants that have pled state that they are guilty

4    of conspiring with regards to certain tax lien auctions during

5    certain periods of time.  They do not stand for the

6    proposition that all tax liens were rigged in the State of New

7    Jersey during the relevant period of time.  And, in fact,

8    based on the facts that we know in talking to the people that

9    would be witnesses, and would testify at trial, we know that a

10   small fraction of the auctions in New Jersey were rigged.  In

11   fact, we know based on the -- again, focusing on the

12   settlements that we have before us today in Mr. Mastellone's

13   case, $116,000 of liens that were rigged.  We got $115,000 in

14   settlement.  The actual interest associated with those

15   $116,000, as I said earlier, is much smaller.  So we greatly

16   exceeded the amount of damage that he caused as a result of

17   his behavior in this case.  And the same is true of other

18   defendants that have pled guilty.

19        He says, Mr. Wiegand said, taking no discovery is a

20   red flag.  I think I've talked about the -- although, it's not

21   formal discovery, the information we used from the cooperating

22   defendants to base our decisions and judgments on accepting

23   certain settlement amounts.  And as we point out in our

24   papers, the law is quite clear, settlements negotiated at

25   arms' length between experienced counsel are entitled to an

1    initial presumption of fairness.  So we think we are entitled

2    to that presumption.  We are experienced counsel.  We litigate

3    class actions all the time.  That's all we do.  I don't know

4    if any of the Objectors' counsel have ever tried to get a

5    Class certified particularly in the Third Circuit, it's become

6    quite difficult.  Mr. Reed can speak to my firm several times

7    in that regard and it's not an easy endeavor, particularly in

8    a case like this.

9         So we think based on the amounts at issue that we've

10   already said, these settlements are quite fair.  Mr. Wiegand

11   also seems to suggest that we need to prove our case, every

12   aspect, and come forward with all of this, quote, evidence at

13   preliminary approval.  Again, this is preliminary approval.

14   We're not at final approval.  And in preliminary approval, the

15   standard is much lower.

16        Do the settlements, are they obviously deficient?  If

17   they're not, then preliminarily approval generally is

18   warranted.  We don't think these settlements are obviously

19   deficient for all the reasons I've said.

20        THE COURT:  Counsel, can you fast forward and talk to

21   me about this adjustment.  Mr. Wiegand seems to believe that

22   the adjustment that has been proffered might in fact exceed

23   the amount that could be recovered by the Class members?

24        MR. ZWEIG:  Yes.  In theory, that is possible.  It's

25   also quite possible that those people, through no fault of

1  their own or no fault of those people who already paid, are

2  continuing to have their lien grow and grow and grow and so

3  they will, in theory, have more damage because their lien

4  continues to grow.  And so it's often, not often the case, but

5  it does happen where you have people that are situated

6  differently in a plan of distribution, they're treated

7  differently.  And we think those people probably should be

8  treated differently because they, as a result of the fact

9  their lien is still out there, interest and penalties continue

10 to accrue, probably do deserve a little bit more than those

11 who didn't, who already paid.  So, I would say, with regards

12 to whether they will get more, it's possible they will.  It's

13 hard to say.  You'd have to look at each individual case.  But

14 certainly possible.  And we think that's probably okay because

15 of the fact that they have suffered more just by the mere fact

16 that their lien continues to sit out there.

17       THE COURT:  What's your position on the proposition

18 offered by Mr. Wiegand that they should kind of be thrown into

19 a pot and distributed amongst the entire Class?

20       MR. ZWEIG:  Well, as I understood what he suggested,

21 he suggested you basically take 15 percent -- so let's, not to

22 pick on Mr. Kagan, I just happen to see him sitting there, but

23 let's say you take Crestar, the liens that they continue to

24 hold that were purchased during the Class period, you

25 calculate all of those liens, let's just say it's a million

 1  dollars of liens, you then take 15 percent of that, so

 2  $150,000, and Crestar then puts another $150,000 in the

 3  settlement pool, that's -- I'm not opposed to it.  You'd have

 4  to talk to the Defendants about that.  I think part of the

 5  reason why they were willing to agree to this is because they

 6  then don't have to go out of pocket to pay additional monies.

 7  This is something that they can sort of discount, you know,

 8  just accept a lesser amount rather than have to go out of

 9  pocket and pay more money.  But I think that's more of a

10  question that you'd have to ask each Defendant.  I think these

11  settlements were negotiated as they were.  Those were the

12  terms that the Defendants were willing to agree to based on

13  the nature of this case, and I certainly think the discounts

14  are fair.  If there was some other way to do it, I'm not

15  opposed to it, but at the same time I think these settlements

16  are fair and this is what we agreed to.

17          As to the timing component, again, that was a term

18  that was agreed to.  It was back and forth.  They wanted a

19  shorter period, we wanted a longer period.  This was our

20  compromise.  I would say I have gotten some calls from people

21  who want to know what the timing is because they want to take

22  advantage of these.  As I said, they are tied to final

23  approval.  So we think there are people who are out there that

24  will take advantage of these.  I can't tell you how many

25  people, but there are people out there and they are waiting

1  until the day they can do that.  Right now they can't because

2  the agreement provide at final approval.

3       Mr. Wiegand said, you know, we made the revelation

4  today that we got data from other defendants in terms of the

5  names and addresses of the Class.  That's just not true.

6  That's not true.

7       In Paragraph 37 of my declaration, I list all of the

8  defendants from whom we got data, they just didn't read it, or

9  chose to ignore it.

10       I think that's all I have, your Honor, unless you

11  have anything else.

12       THE COURT:  I do not.

13       MR. ZWEIG:  Thank you.

14       THE COURT:  Counsel, it is 11:30.  I'm going to take

15  a short recess.  I need to kind of digest some of the oral

16  argument in connection with the submissions, after which, I'll

17  come back and issue my decision.

18       It's 11:30.  Why don't we say we'll resume at

19  12 o'clock.

20       THE DEPUTY COURT CLERK:  All rise.

21       (Recess at 11:29 a.m.)

22       THE DEPUTY COURT CLERK:  All rise.

23       (Open court begins at 12:20 p.m.)

24       THE COURT:  Please be seated.  We are back on the

25  record in the matter of in re: New Jersey Tax Sale

1    Certificates, Docket Number 12-1893.

2           Counsel, I want to thank you all for your arguments

3    today.  They were very helpful and instructive.  In fact, what

4    I wanted to do during this recess was to go back and look at

5    some of your submissions in light of many of the oral

6    arguments that kind of went in directions that I had not

7    anticipated.  But having done that, I'm confident and ready to

8    put the decision on the record.

9           I'm not going to state citations in my reading of my

10   decision now, but if you order the transcript, they will

11   appear in the transcript.

12          Under Federal Rule of Civil Procedure 23(e), the

13   settlement of a class action requires court approval, which

14   may issue only "on finding that [the settlement] is fair,

15   reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  Review

16   of a proposed class action settlement typically proceeds in

17   two stages.  At the first stage, the parties submit the

18   proposed settlement to the court, which must make "a

19   preliminary fairness evaluation.  Manual for Complex

20   Litigation (Fourth) § 21.632 (2004).  If the proposed

21   settlement is preliminarily acceptable, the court then directs

22   that notice be provided to all Class members who would be

23   bound by the proposed settlement in order to afford them an

24   opportunity to be heard on, object to, and opt out of the

25   settlement.  See Fed. R. Civ. P. 23(c)(3), (e)(1), (e)(5); *see*

1   *also Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 120 (8th

2   Cir. 1975)("[D]ue process requires that notice of a proposed

3   settlement be given to the class.").  At the second stage,

4   after Class members are notified of the settlement, the court

5   holds a formal fairness hearing where Class members may object

6   to the settlement.  See Fed. R. Civ. P. 23(e)(1)(B).  If the

7   court concludes that the settlement is "fair, reasonable, and

8   adequate," the settlement is given final approval.

9        At this time, Plaintiffs request only that I grant

10  preliminary approval.  At the preliminary approval stage, the

11  bar to meet the "fair, reasonable, and adequate" standard is

12  lowered, and the court is required to determine whether "the

13  proposed settlement discloses grounds to doubt its fairness or

14  other obvious deficiencies such as unduly preferential

15  treatment of class representatives or segments of the class,

16  or excessive compensation of attorneys, and whether it appears

17  to fall within the range of possible approval."  *Thomas v. NCO*

18  *Fin. Sys.,* No. 00-5118, 2002 WL 1773035, at *5 (E.D.Pa. July

19  31, 2002)(Waldman, J.)(citing *In re Prudential Sec. Inc. Ltd.*

20  *P'ships Litig.,* 163 F.R.D. 200, 209 (S.D.N.Y. 1995)).  A

21  preliminary fairness assessment is "not to be turned into a

22  trial or rehearsal for trial on the merits," as "it is the

23  very uncertainty of outcome in litigation and avoidance of

24  wasteful and expensive litigation that induce consensual

25  settlements.  *In re Sulzer Hip Prosthesis and Knee Pros*, 2001

1    WL 1842315.

2          This examination is generally "made on the basis of

3    information already known, supplemented as necessary by

4    briefs, motions, or informal presentations by the parties."

5    Manual for Complex Litigation (Fourth) at § 21.632.  The

6    purpose of this examination is in part to detect defects in

7    the settlement that would risk making "notice to the class,

8    with its attendant expenses, and a hearing... futile

9    gestures."  Alba Conte & Herbert Newberg, Newberg on Class

10   Actions § 11:25 (4th ed. 2002).

11         Having reviewed the proposed settlement and all other

12   pleadings, motion papers, documents, and arguments set forth

13   on the record, this Court finds that the settlements are

14   worthy of preliminary approval, subject to any objections

15   certainly that the Court will consider after the appropriate

16   notice is sent out.  The Court finds that the parties have

17   been involved in good faith negotiations, the proponents of

18   the settlements are experienced attorneys who are well versed

19   in this type of litigation, the proposed settlement class

20   meets the requirements under Rules 23(a) and 23(b)(3) for

21   certification for settlement purposes.  The proposed Class (a)

22   is so numerous that joinder of all members of the Class is

23   impracticable; (b) there are questions of law and/or fact that

24   are common to the Class; (c) the named Plaintiffs' claims are

25   typical of the claims of the other Class Members; (d) the

1    named Plaintiffs will fairly and adequately protect the Class

2    Member's interests; and (e) this class action is the superior

3    method for efficiently adjudicating the claims asserted.

4          In addition, I have reviewed the settlement

5    agreements and supporting documents.  I do not find anything

6    that's obviously deficient nor do I find anything that

7    suggests that any Plaintiff would be unfavorably treated

8    whether it's a named Plaintiff or member of the proposed

9    Class.  As outlined by counsel on the record, the proposed

10   settlement appears to be reasonable and adequate to the Class

11   Members in light of the complexity, expense, and duration of

12   this litigation and the risks involved with going to trial and

13   demonstrating liability and damages.

14         Although the Objectors assert that the compensation

15   is inadequate, a range of reasonableness may encompass a vast

16   economic spread.  McLaughlin on Class Actions: Law and

17   Practice § 6:7 (11th ed. 2014).  Courts have found that there

18   is no reason, in theory, why a satisfactory settlement could

19   not amount to a hundredth or even a thousandth of a single

20   percent of the potential recovery.  *In re Ionosphere Clubs,*

21   *Inc.*, 156 B.R. 414, 417 (S.D.N.Y. 1993), judgment aff'd, 17

22   F.3d 600 (2d Cir. 1994)("there is no reason, at least in

23   theory, why a satisfactory settlement could not amount to a

24   hundredth or even a thousandth part of a single percent of the

25   potential recovery.")  In addition, with respect to the

1    Objectors' contention that the settlement provides

2    preferential treatment, Plaintiffs' counsel has asserted that

3    this is due to Class Members suffering slightly different

4    harms.  Furthermore, while Objectors contend that the

5    settlements do not indicate arms' length negotiation because

6    there has been no formal discovery, the Court finds that

7    Plaintiffs have obtained information through Defendants'

8    cooperation that has assisted them in evaluating the strength

9    of the claims.  Finally, Class Counsel has explained the

10   challenges in obtaining class certification and in proving the

11   complex antitrust claims at issue. (*Id.* at 4.)  Class Counsel

12   also noted that several of the Defendants involved in these

13   settlements were recently found not guilty in the criminal

14   case that is based on the same conduct at issue here.  October

15   8, 2015 Letter from Class Counsel, ECF No. 422.

16          For these reasons, the Court finds that the

17   preliminary approval of the settlement is warranted.

18          With respect to the notice and plan of distribution,

19   I find that Class Counsel has exercised reasonable efforts to

20   identify members of the proposed class.  These efforts include

21   utilizing a competitive bidding process to select settlement

22   notice and claims administrator and using an outside vendor to

23   gather data and information on the property liens that were

24   sold at municipal auctions in all 566 New Jersey

25   municipalities during the Class Period.

1        In addition, I find that the proposed notice plan

2   which employs direct mail notice, where mailing address

3   information is available, and other forms of notice to

4   supplement direct mail notice, such as a website, satisfies

5   the notice requirements of Rules 23(c)(2)(B) and 23(e)(1) of

6   the Federal Rules of Civil Procedure.

7        Based on these findings, I preliminarily approve this

8   settlement.  There will be a fairness hearing on this

9   settlement at a later date at which time the objections raised

10  in opposition to this motion as well as any other objections

11  to the settlement may be raised with the Court.

12       With respect to scheduling, the Court has reviewed

13  the Plaintiffs' proposed schedule for dissemination and

14  related events and approves this schedule.  An Order giving

15  preliminary approval to the proposed settlement, notice plan,

16  and schedule will issue later today.

17       In addition to moving for preliminary approval of the

18  settlement, notice and plan of distribution, Plaintiffs also

19  request the appointment of Interim Class Counsel as Settlement

20  Counsel and the appointment of Interim Liaison Counsel as

21  Liaison Counsel.  This request is unopposed.  Accordingly,

22  finding that the same reason that the Court relied upon in

23  making these interim appointments are applicable now, the

24  Court appoints the Interim Class Counsel as Settlement Class

25  Counsel and Interim Liaison Counsel as Liaison Counsel.

1          With that, counsel, that is all that I have on this

2    matter for today.  I thank you for your patience.  It's been

3    quite a morning, about two and a half hours, but I think we

4    accomplished what we came here to accomplish.  Thank you very

5    much and have a great day.

6          COUNSELS:  Thank you, your Honor.

7          THE DEPUTY COURT CLERK:  All rise.

8          (Court concludes at 12:27 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25