# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE: NEW JERSEY TAX SALES CERTIFICATES ANTITRUST LITIGATION | Master Docket<br><br>No. 3:12-CV-01893-MAS-TJB |

## OBJECTION TO FINAL APPROVAL OF THE CLASS SETTLEMENTS BY OBJECTOR ARLENE M. DAVIES

Dennis J. Drasco
LUM, DRASCO & POSITAN, LLC
103 Eisenhower Pkwy.
Roseland, NJ 07068
(973) 228-6770 (telephone)
(973) 403-9021 (facsimile)
ddrasco@lumlaw.com

Hays Gorey, Jr.
GEYERGOREY, LLP
1220 L St., NW, Ste. 100
Washington, DC 20005
(202) 644-8732 (telephone)
hays.gorey@geyergorey.com

Steven F. Molo
Thomas J. Wiegand
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com

*Attorneys for Objector Arlene M. Davies*

## INTRODUCTION

Arlene Davies (the "Objector") objects to and opposes final approval of the twenty settlements in this case.  ***Fifteen*** defendants in this civil antitrust case have admitted to fixing prices at tax lien auctions, pleading guilty in criminal enforcement actions by the Department of Justice.  Another Defendant's former employee was criminally convicted at trial.  The complaint in this case alleges that this conspiracy lasted 11 years and involved $100-$200 million in tax liens auctioned each year.  But class counsel seeks approval for settlements which would yield only $9,585,000 in compensation for the class from all Defendants.

The proposed settlements cannot be approved for four reasons.  *First*, the compensation to the class is unfair and inadequate – a minute fraction of the total damages to the class from Defendants' 11-year, multimillion dollar criminal conspiracy.  *Second*, the settlements provide preferential treatment to some class members at the expense of others.  All class members are eligible to receive monetary payments, but those with outstanding liens are additionally entitled to discounts on redeeming their liens.  *Third*, the settlement negotiations lack the objective indicia of vigorous negotiation required by law.  In particular, class representatives may have had little input into the negotiations and Class Counsel took no formal discovery.  *Fourth*, Class Counsel fails to substantiate the fairness of the settlements under the standards of this Circuit.

This Court should deny final approval.

## BACKGROUND

## I.    Defendants Conspired To Fix New Jersey Tax Lien Auctions

This is a straightforward case of price fixing.  Defendants conspired to rig New Jersey municipal tax lien auctions.  Dkt. No. 320 ¶¶110, 268.  In New Jersey, property owners pay property taxes and sewer and water charges to municipalities.  *Id*. ¶2.  When a property owner fails to pay, the municipality obtains a lien on the property.  *Id*.  Municipalities auction these

liens to the public.  *Id.*  Winning bidders pay the municipality the amount of the outstanding tax lien.  *Id.* ¶3.  In return, winning bidders receive Tax Sale Certificates ("TSCs"), which entitle them to collect on the lien and charge penalties and interest.  *Id.* ¶¶3-4.  Holders of Tax Sale Certificates also have the right to foreclose on a property under certain conditions.  *Id* ¶¶4, 93.

Tax Sale Certificates are sold in "reverse auctions."  Participants bid on the interest rate that they would charge to the property owner on the outstanding lien.  Dkt. No. 320 ¶¶92-93.  Bidding starts at a statutory maximum of 18% and participants bid down the rate.  *Id.* ¶96.  "[H]onest competition among bidders in a truly competitive market should drive down the winning bid far below 18%, and often as low as 0%."  *Id.*  If bidding reaches 0% interest, participants then may offer a "premium" – a payment to the municipality for the right to purchase the Certificate.  *Id.*

According to Class Counsel's First Amended Complaint, Defendants conspired to fix the auctions for Tax Sale Certificates from January 1, 1998 to February 2009 (defined as the "Class Period," *id.* ¶1), in New Jersey.  Dkt. No. 320 ¶267.  Before each auction, municipalities circulate a list of liens to be sold.  *Id.* ¶103.  Defendants allocated those liens among themselves.  *Id.* ¶102.  When one lien was allocated to a particular Defendant, all other Defendants refrained from bidding on that lien.  *Id.*  Through this conspiracy, Defendants artificially inflated the interest rate at which liens sold.  *Id.* ¶¶104, 109.  Many sold with a single bid at the statutory maximum interest rate of 18%.  *Id.*  Class members were thus forced to pay artificially high interest rates on their liens.  *Id.* ¶1.  The conspiracy was far-reaching.  The First Amended Complaint alleges "Defendants entered into an overarching and statewide conspiracy to ensure that TSCs auctioned in New Jersey carried as high an interest rate as possible."  *Id.* ¶100.  Defendants rigged auctions "throughout New Jersey during the Class Period."  *Id.* ¶¶1, 100.

## II.    Criminal and Civil Litigation Against the Co-Conspirators

Starting in 2009, the United States Department of Justice began investigating the conspiracy.  Dkt. No. 320 ¶148.  To date, 15 individuals and entities have pleaded guilty to conspiring to rig auctions.  *See* Dkt. No. 437-1 at 7.  One, James Jeffers, was found guilty at trial.  *See* Dkt. No. 422-1; Dkt. No. 423 at 1.  Four individuals or entities were acquitted at that same trial.  *Id.*

Property owners whose liens had been sold to Defendants filed civil actions starting in March 2012.  Dkt. No. 266-1 at 5.  On June 11, 2012, the cases were consolidated before this Court.  Dkt. No. 55.  On October 22, 2012, this Court appointed Hausfeld, LLP and Hagens Berman Sobol Shapiro, LLP as interim class counsel, and Lite DePalma Greenberg, LLC, as interim liaison counsel.  Dkt. No. 109.

On January 6, 2014, Class Counsel filed the First Amended Consolidated Complaint, the operative complaint in this case.  Dkt. No. 320.  Certain Defendants moved to dismiss, but on October 31, 2014, the Court denied dismissal of Plaintiffs' antitrust claims.  Dkt. No. 375 at 2.  This Court found that "Plaintiffs [had] set forth sufficient allegations in support of the existence of a ***statewide conspiracy***."  Dkt No. 374 at 13 (emphasis added).  In particular, this Court found "Plaintiffs' specific allegations regarding each Moving Defendants' participation ***in a multitude of individual collusive auctions***" to be "critical to establishing the overarching, statewide conspiracy."  *Id.* at 14 (emphasis added).  Class Counsel took no formal discovery in this case.  Dkt. No. 436 at 45:20-21.

## III.    Class Counsels' Settlements with Defendants

Before and after this Court denied the motion to dismiss, Class Counsel negotiated settlements with Defendants.  Dkt. No. 399-1 at 1.  From January 2013 through March 27, 2015, Class Counsel negotiated and moved for preliminary approval of 20 settlements.  *Id.*  The Court

granted preliminary approval of each of those settlements.  Dkt. Nos. 276 at 4-5; 277 at 4; 376 at 1; 394; 426 at 1.

Class Counsel did not keep at least some of the Class Representatives informed during these negotiations.  Dkt. No. 402-1 ¶4.  Indeed, the *only* update that at least some of the class representatives received was when a settlement had been reached.  *Id*.  And after the settlements were reached, some class representatives did not even understand the basics of how the settlements would work, thinking that they would divide the settlement amounts amongst themselves without sharing the distribution with the class.  *Id*. ¶5.

Now, Class Counsel has filed notice they intend to seek final approval of the settlements.  *See* Dkt. Nos. 437-439.  The settlements cover "[a]ll persons who owned real property in the State of New Jersey who had a Tax Sale Certificate issued with respect to their property that was purchased by a Defendant during the Class Period [January 1, 1998 to February 28, 2009] at a public auction in the State of New Jersey at an interest rate above zero percent."  Dkt. No. 437-1 at 6.  In other words, the settlements, by their own terms, cover a statewide conspiracy involving any tax lien for which a class member could have suffered damage because his or her lien was sold above zero percent interest.  *Id*.  All told, Defendants will pay less than $10 million into the settlement funds.  *Id*. at 7-8.  All but two Defendants also have agreed to offer discounts on redeeming outstanding liens.[1]

## IV.    Objector's Opposition to Preliminary Approval

Objector filed an opposition to Class Counsels' motion for preliminary approval of the last six settlements in the case.  *See* Dkt. No. 402.  Objector argued, among other things, that

---

[1] Defendant Rothman agreed to a 10% discount on accrued interest only.  *See* Dkt. No. 437-1 at 7.  Defendants Stein and Xethalis assert they have no outstanding TSCs.  *Id*.  Defendants Collins and May and the Butler and Farber Defendants agreed to discounts of 10%.  *Id*.  Defendant Pisciotta agreed to a discount of 12%.  *Id*.  The other Defendants agreed to discounts of 15%.  *Id*.

relative to the damages that arise from the allegations in the First Amended Consolidated Complaint, the settlements' meager recovery was far outside the range of reason. *See id*. at 9. Objector also identified impermissible conflicts of interest between those who had unredeemed liens and those who had already redeemed their liens. *See* Dkt. No. 402 at 11.  And Objector raised serious questions about whether the class was adequately represented, given that Class Counsel took no formal discovery before settling and because of evidence that at least some class representatives were left in the dark regarding settlement negotiations and were deeply confused about how much they would personally recover. *See id*. at 14.

## V.      The Preliminary Approval Hearing

This Court held a preliminary approval hearing to consider the last six settlements and Objector's opposition on October 29, 2015.  *See* Dkt. No. 436.  At the hearing, Class Counsel relied heavily on Defendants' "bid books" – ledgers in which some conspirators recorded which liens were allocated as part of the collusive agreements – to argue that few auctions were rigged. *Id*. at 19:24-20:4.  Class Counsel argued (contrary to the allegations in their First Amended Consolidated Complaint) that these bid books showed that the scope of the conspiracy was relatively small, thereby justifying the small settlement amounts.  *Id*. at 28:3-6.  But Class Counsel has neither produced the bid books nor attached them to any pleading.  Dkt. No. 442 at 3.  Class Counsel also defended the minute recovery by claiming some Defendants lacked the financial resources to pay more.  *See* Dkt. No. 436 at 22:24-23:1, 24:12-14.  But again Class Counsel produced no evidence to support those claims.

Class Counsel also speculated there was no intra-class conflict because class members with outstanding liens had greater damages than those without outstanding liens, and were thus entitled to greater recovery.  Dkt. No. 436 at 18:4-10.  Again, Class Counsel produced no evidence to support this speculation.  Dkt. No. 442 at 3.  And when this Court asked whether the

5

combined total value of the settlements of all Defendants, including discounts on outstanding liens, could simply be apportioned according to each Class Member's damages, Class Counsel was "not opposed to it," and did not explain why a proportional payout for all Class Members would not be fair.  *Id*. at 48:3.

Citing the "lowered" standard for reviewing the fairness of proposed settlements at the preliminary approval stage, the Court granted preliminary approval to the last six settlements. Dkt. No. 436 at 51:9-20.

## VI.    Background on the Objector

Objector Arlene Davies is a 90-year-old former tax examiner who owns a home in West Cape May, New Jersey.  Dkt. No. 113 ¶19.  Her property was subject to a tax lien of $4,776.69 relating to unpaid 2007 taxes.  Defendant Sass Municipal Finance Partners V, LLC ("Sass") purchased her lien at a public auction on December 3, 2008.  *Id.*; *see* Ex. A.  Sass purchased the lien at the 18% statutory maximum.  *Id.*; *see* Ex. A.  Ms. Davies was a named representative plaintiff in this action, Dkt. No. 113 ¶¶19-20; Dkt. No. 266-1 at 20, but Interim Class Counsel withdrew from representing her.  Dkt. No. 364.  Ms. Davies' son, Bob Davies, has a power of attorney to act on her behalf and has done so in the course of this litigation.  Ex. B.

## <u>ARGUMENT</u>

Final approval of the settlements and class certification should be denied.  This Court has a "fiduciary responsibility, as the guardian of the rights of the absentee class members."  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) ("Rule 23(e) places a duty on district courts to safeguard the interests of class members.").  That responsibility arises because, in class actions, class counsel have "the incentive . . . , in complicity with the defendant's counsel, to sell out the class by agreeing with the defendant to recommend that the judge approve a settlement involving a meager recovery for

6

the class but generous compensation for the lawyers." *Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) (denying approval of settlement in part because of conflicts of interest). Accordingly, this Court must give "intense judicial scrutiny of [the] proposed class action settlements." *Id*. at 721.

## I.      The Settlement Is Unfair, Unreasonable, and Inadequate

A class action settlement cannot be approved unless it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e).  A court must "be even more scrupulous than usual" in approving settlements, like these, that are negotiated before class certification.  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 805, 818 (3d Cir. 1995) ("*GM Trucks*") (disapproving a settlement where the case "simply settled too quickly with too little development on the merits").  Under those circumstances, the parties must "make a higher showing of fairness to sustain the[] settlement[]."  *Id*. at 805.

In assessing whether a settlement is fair, reasonable, and adequate, Courts in the Third Circuit consider the following factors: (1) the stage of the proceedings and the amount of discovery; (2) the ability of the Defendants to withstand a greater judgment; (3) the reaction of the class; (4) the risks of establishing liability and damages; (5) the reasonableness of the settlement in light of the best possible recovery and the attendant risks of litigation; (6) the likelihood of maintaining class status throughout the litigation; and (7) the complexity, expense, and likely duration of the litigation.  *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975); *In re Cendant Corp. Litig*., 264 F.3d 201, 232 (3d Cir. 2001) (applying *Girsh* factors).  Those factors require rejection of the settlements here.

## A.   The Settlements Are Unreasonable in Light of the Best Possible Recovery and the Attendant Risks of Litigation

To begin, Class Counsel failed to meet their burden to justify the reasonableness of the settlements to either the Court or the class.  Courts must "insist[] that the parties present evidence that would enable . . . possible outcomes to be estimated, so that the court can at least come up with a 'ballpark valuation.' "  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quotation marks omitted) (vacating approval of settlement where the district court "did not attempt to quantify the value of plaintiff's case or even the overall value of the settlement offer to class members.").  Class Counsel does not even attempt to present evidence from which a "ballpark valuation" from which the class's damages can be calculated.  Their papers contain only bald assertions that the settlements are adequate.  Dkt. No. 437-1 at 2 (the "settlements are eminently fair, reasonable, and adequate"), 14 ("the Court should find [the settlements] fair, reasonable, and adequate"), 23 (the settlements are "well within the range of reasonableness").  Neither in their motions for preliminary approval, nor their arguments at the preliminary approval hearings, nor now in their final approval papers, have Class Counsel ever provided any estimate of the size of the class, the scope of the conspiracy, the damages caused by the conspiracy, or the best possible recovery in the case.  The Court thus has no basis on which to grant approval other than Class Counsels' say-so.  The law requires more.

What little data there are in the moving papers show that Class Counsel failed to obtain a reasonable amount of compensation for the class in the proposed settlements.  Despite the existence of a "statewide conspiracy" to fix prices in a market worth hundreds of millions of dollars per year, and despite fifteen Defendants pleading guilty or being convicted at trial, Class Counsel obtained less than $10 million for the class.  Dkt. No. 437-1 at 1.  In this case, "the monetary value of the settlement fund is simply too low."  *Schwartz v. Dallas Cowboys Football*

*Club, Ltd.*, 157 F. Supp. 2d 561, 574 (E.D. Pa. 2001) (rejecting settlement where monetary compensation to class was inadequate relative to the claims class members gave up).

Allegations from the First Amended Consolidated Complaint – largely omitted from the papers in support of final approval – show that the settlements are inadequate. The scope of the conspiracy was vast. New Jersey municipalities auction "approximately $100-$200 million in delinquent tax obligations every year." Dkt. No. 320 ¶95. It is reasonable to infer that Defendants fixed the auctions of many of these liens. Defendants engaged in a "***statewide*** conspiracy" over an 11-year period. *Id*. ¶100. Defendants fixed auctions "throughout New Jersey" to keep "interest rates on tax liens artificially high." *Id*. Moreover, "the largest Defendants attended most, if not all, auctions in New Jersey during the Class Period." *Id*. ¶110. Defendants "together account for the vast amount of TSCs purchased in New Jersey" over this period. *Id*. ¶6.

In the absence of the conspiracy, interest rates would have been far lower. According to the First Amended Consolidated Complaint, in a competitive market, winning bids should be "far below 18%." Dkt. No. 320 ¶96. Indeed, they *were* low prior to the conspiracy. *Id*. ¶101. In fact, because Tax Sale Certificate holders are entitled to pay future taxes on the property, and collect interest thereon at a statutory rate, the auctions can result in rates "often as low as 0%" on the face value of the lien. *Id*. ¶96. Yet, because of the collusion, liens were auctioned at inflated rates, "often at 18%." *Id*. ¶109.

The class's best possible recovery is accordingly large. One year's interest at 18% on $200 million of Tax Sale Certificates amounts to $36 million annually. That is almost ***$400 million*** over the Class Period. Trebling this number yields damages over $1.2 billion. On top of

that, the class would be entitled to prejudgment interest from 1998-2009 to present.[2]  *See* 15 U.S.C. § 15(a).

The $9.59 million cash value of the settlements is a tiny fraction of the damages—2.3% of potential damages, and just 0.8% of treble damages.  That is far below typical recoveries.  *See e.g.*, *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 633 (E.D. Pa. 2004) (approving settlements amounting to 55% of damages within limitations period); *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006) (approving settlement totaling 18% of treble damages recovery and 55% of single damages recovery); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144 (E.D. Pa. 2000) (approving settlement totaling 17% of potential damages); *Mehling v. N.Y. Life Ins. Co.*, 248 F.R.D. 455, 462 (E.D. Pa. 2008) (approving settlement representing 20% of best possible recovery "if all theories of recovery and damages were accepted by the Court").

The settlements are especially low in light of the strength of Plaintiffs' case.  Most Defendants have already admitted to violating the Sherman Act by pleading guilty to criminal antitrust charges, and one was convicted of Sherman Act violations at trial.  Dkt. No. 320 ¶8; Dkt. No. 423 at 1-2.  Those facts would be strong evidence of liability at trial.  *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 701 (M.D. Pa. 2008) (conclusion of criminal investigation without issuance of indictments decreased probability of establishing liability and damages).  The First Amended Complaint includes 50 examples of

---

[2] This Court may, but is not required to consider treble damages in evaluating the fairness of the settlement.  *See, e.g.*, *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J. 2006) (calculating value of settlement as 18% of treble damages and 55% of single damages); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 324 (3d Cir. 2011) (noting that "disagreement exists in the case law as to whether the reasonableness of a settlement amount should be evaluated by comparison to the potential single damages of a class or the trebled damages" and leaving the choice to the District Court's discretion).

auctions rigged by Defendants during the class period.  Dkt. No. 320 ¶¶ 113-213.  Plaintiffs have already prevailed against motions to dismiss their Sherman Act claims.  Dkt. No. 375 at 2. Plaintiffs thus had a strong likelihood of success on the merits.

Class Counsel has offered only two justifications for the settlements' failure to recover any substantial portion of the class's damages.  Neither has merit.  At the preliminary approval hearing, Class Counsel asserted that, based on their review of the "bid books," they concluded that "not even close to all of the auctions in New Jersey were rigged."  Dkt. No. 436 at 20:2-3. But, even putting aside the imprecision of this assertion, Class Counsel have refused to permit Objector to view these bid books, have not provided them in any filing, and have not explained how their description of the bid books can be squared with the allegations in their Complaint or the scope of the settlement class.  The First Amended Complaint properly pleaded an "overarching and statewide" conspiracy involving "Defendants [who] attended most, if not all, auctions in New Jersey during the Class Period"  and who "account[ed] for the vast amount of TSCs purchased in New Jersey" over this period.  Dkt. No. 320 ¶¶ 6, 100, 110.  The Class likewise covers all tax lien auctions in New Jersey over that time period.  Dkt. No. 426 at 1. Indeed, this Court denied Defendants' motion to dismiss because the First Amended Complaint "includes a vast amount of alleged facts in support of a statewide conspiracy."  Dkt. No. 374 at 16.  This Court further noted that because of the scope of the conspiracy, even auctions from which particular Defendants were *absent* could have been impacted by the conspiracy, because those absences could be the result of an understanding between the Defendants.  *Id*. at 14.  Class Counsels' *post hoc* assertion that the bid books justify the settlements' enormous discount relative to the best possible recovery are unsupported and incompatible with their allegations of a statewide conspiracy.

Class Counsel also suggests that Objector's calculation of possible damages is overly large because it includes the principal component as well as the interest component of the liens. *See* Dkt. No. 431-1 at 9.  Not so.  Objector has never taken the position that the liens' "principal was unlawful in any way." *Id.*  Objector's calculation of damages is based solely on the difference between 18% maximum interest rate (which, according to the First Amended Complaint "often" prevailed in auctions, Dkt. No. 320 ¶ 109) and the 0% interest rate (which, according to the First Amended Complaint, would have prevailed in the absence of collusion, Dkt. No. 320 ¶ 96).  *See supra* p. 9.  Moreover, even if the First Amended Complaint's allegations prove to be too strong, even small increases in interest rates caused by Defendants' conspiracy could have caused large damages given the huge volume of liens sold in New Jersey and the length of the class period.

## B.   The Absence of Discovery Weighs Against Final Approval

Class Counsel admitted at the preliminary approval hearing that they took no formal discovery in this case.  Dkt. No. 436 at 45:20-21.  That failure weighs strongly against approval in light of the minute compensation that Class Counsel accepted in the settlements. "[A]chiev[ing] the settlement after little or no discovery . . . raise[s] a red flag." *GM Trucks*, 55 F.3d at 806.  When counsel submit a settlement for preliminary approval when "no formal discovery was conducted whatsoever . . . it is questionable whether class counsel could have negotiated in [the class's] best interests." *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307, 308 (3d Cir. 2005) (rejecting settlement and remanding to establish a "more developed record").

Without discovery, Class Counsel had no basis to discount the substantial class-wide damages here.  The First Amended Consolidated Complaint pleads an 11-year "overarching and statewide" conspiracy to fix prices in a market worth hundreds of millions of dollars each year. Dkt. No. 320 ¶¶ 95, 100.  Yet, Class Counsel settled for a scintilla of the damages caused to that

market.  Though Class Counsel now assert that, in the course of negotiations, they discussed with Defendants "the economic harm that each defendant allegedly inflicted, the amount of commerce in which each defendant engaged, and the financial condition of each defendant," their motion for final approval contains no supporting detail regarding these numbers.  Dkt. No. 437-1 at 6.  This Court should not "place such dispositive weight on the parties' self-serving remarks."  *GM Trucks*, 55 F.3d at 804.  Without discovery, there is no indication that Class Counsel adequately assessed the economic harm to the class.

Merits discovery would be particularly helpful here, because the First Amended Consolidated Complaint alleges fraudulent concealment.  This evidence is critical to establishing liability beyond the four-year statute of limitations in the Sherman Act.  *See* 15 U.S.C. §15b.  And Defendants are likely the only source of this evidence.  Investigation of Defendants' internal documents could yield crucial evidence of concerted efforts to conceal the conspiracy over its 11-year history.  Yet Class Counsel settled this case without taking a single deposition and without formally requesting a single document.[3]

### C.    Other Factors Do Not Support Final Approval

The other *Girsh* factors cannot tip the balance in favor of approval given the plainly inadequate recovery of the settlements.

---

[3] Objector sought limited discovery focused on aspects of the proposed settlement from the settling parties.  That discovery was refused by the settling parties and, after the requested information was not provided with Class Counsel's filing in support of final approval, Objector sought this Court's order that the limited discovery be provided.  Dkt. No. 442.  The Court denied that request on March 10, 2016, without prejudice.  Dkt. No. 447.  But the Court stated that Objector may renew her request after filing an objection.  *Id.* at 2.  Objector intends to renew her request for discovery and believes that if that discovery is timely provided it will be beneficial to the Court and the class in preparation for this Court's fairness hearing.

1.     *Complexity, Expense, and Likely Duration of the Litigation*

Class Counsel argues that the complexity, expense, and likely duration of litigation weigh in favor of settlement.   *See* Dkt. No. 437-1 at 14.   They note that "[a]bsent a settlement, defendants would surely have opposed class certification and moved for summary judgment on the merits.  They would also have needed to engage in lengthy fact and expert discovery."  *Id.* at 14-15.   Settlement would no doubt save litigation expenses, but that is true of *every settlement*. Class Counsel offers nothing to suggest that *this settlement* would be particularly complex or lengthy relative to other class actions.   Moreover, the fact that further litigation would involve "lengthy fact and expert discovery" weighs against final approval.   Fact and expert discovery would only be necessary because Class Counsel have failed to conduct any. Consequently, Class Counsel have not provided the class and the Court with the information that would be produced in such discovery, such as basic facts about the size of the affected market, the scope of the conspiracy, or the effect of the conspiracy on interest rates in New Jersey tax lien auctions.   Class Counsel's failure to produce these basic facts should not be used to justify final approval.

2.     *Defendants' Ability To Withstand a Greater Judgment*

Class Counsel argues that the "inability of a number of defendants to withstand a greater judgment also supports final approval."  Dkt. No. 437-1 at 22.   Their argument ignores the black letter law that "[c]ivil conspirators are jointly liable for the underlying wrong and resulting damages."  *Banco Popular N. Am. v. Gandi*, 876 A.2d 253, 263, 184 N.J. 161, 178 (N.J. 2005). The relevant inquiry is the financial condition of the Defendants as a whole, regardless of whether certain Defendants may be unable to pay a greater judgment.   Class Counsel presented no evidence to suggest that the larger corporate Defendants would be unable to pay a larger judgment if they were held jointly-and-severally liable, nor is the assertion that "a number of

14

defendants [could not] withstand a greater judgment[,]" Dkt. No. 437-1 at 22, shown to be objectively accurate.  Indeed, it is clear that some of the corporate Defendants have significant resources.  Defendant M.D. Sass, which had two employees plead guilty to price fixing, is a large investment firm that is reported to have $8.5 billion of assets under management.  *See* Ex. C.  Moreover, the criminal proceedings in *United States v. Wolfson*, Criminal Action No. 13-0748 (D.N.J.), revealed that the Crestar Defendants, which had two employees plead guilty, were backed by $50 million in capital.  *See* Dkt. 423 at 2.

3.    *Risks of Failing To Establish Liability or Damages*

Class Counsel argue that final approval should be granted because the "potential difficulties and risks associated with proving liability" and the "substantial challenges in proving damages."  *See* Dkt. No. 437-1 at 19, 20-21.  Yet again, Class Counsel attempt to justify the weaknesses of the settlement with risks intrinsic to *any* litigation.  Establishing liability would be risky, they assert, because "[t]hough some defendants pled guilty, many others, including virtually all of the largest defendants, did not."  *Id.* at 19.  But the fact that ***fifteen*** Defendants pleaded guilty, or were convicted, makes the risk of establishing liability far lower than in a typical class action.  Guilty pleas and criminal convictions are powerful evidence of liability.  *See, e.g.*, *In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d at 701.

Class Counsel also assert that "it is certainly possible that, in the unavoidable 'battle of experts,' a jury might have disagreed with plaintiffs' position."  Dkt. No. 437-1 at 21.  Again, that is true for all litigation, and does not support final approval.  Class Counsels' reliance on *In re Cendant Corp.* is inapposite.  That was a case involving "complex accounting issues" where Plaintiffs' expert had developed a damages calculation that was "complex and hard to follow."  *In re Cendant Corp. Litig.*, 264 F.3d at 233, 239.  Unlike *In re Cendant Corp.* which involved "complex accounting issues," this is a straightforward case of price fixing.  Class Counsels' First

15

Amended Complaint laid out a straightforward calculation of damages.  Dkt. No. 320 ¶ 128.

Class Counsel have provided no reason why the calculation of the class's damages has suddenly

become more complex.  Class Counsel cannot rely on the purely speculative complexity of

hypothetical expert testimony to justify the settlement.

## II.    The Settlement Provides Inequitable and Discriminatory Distribution of Benefits Among Class Members

Rule 23 demands that "the representative parties will fairly and adequately protect the

interests of the class."  Fed. R. Civ. P. 23(a)(4).  When assessing adequacy of representation

under Rule 23(a)(4), "a judge must focus on the settlement's distribution terms (or those sought)

to detect situations where some class members' interests diverge from those of others in the

class."  *GM Trucks*, 55 F.3d at 797.  Settlements that provide preferential treatment to a subset of

the class cannot be approved.  *See* Manual for Complex Litigation § 21.632 (4th ed. 2004)

(concerns such as "unduly preferential treatment of . . . segments of the class" might require

parties to renegotiate to remove "obstacles to court approval").

The proposed settlements differentiate between class members who have already paid

Defendants to redeem their Tax Sale Certificates and those who have not.  The settlements

provide two kinds of compensation.  First, Defendants agreed to pay $9.59 million into separate

funds – one fund for each settlement.  Dkt. No. 437-1 at 7-8.  Second, most Defendants agreed to

offer 10-15% discounts off the redemption amount for class members who have yet to redeem

their Tax Sale Certificates.  *Id.*  Class members with outstanding Tax Sale Certificates will

benefit both from the redemption discount and the monetary award, while class members without

outstanding Tax Sales Certificates can only receive the monetary award.  Dkt. No. 437-1 at 2.

The settlements do not compensate for this inequity by, for example, giving those without

outstanding Certificates a larger monetary award.  Thus, class members with unredeemed Tax Sale Certificates will get a better deal than other class members.

By Class Counsel's own account, this is a substantial difference.  Class Counsel assert that "the discounts, if accepted by the Settlement Class Members, will result in relief that likely exceeds a Settlement Class Member's single damages on his, her, or its antitrust claim."  Dkt. No. 399-1 at 8.  There is no justification for providing this substantial benefit to only those class members who happen to still have an outstanding Tax Sale Certificate.  Indeed, favoring class members with outstanding Tax Sale Certificates is especially inequitable.  Tax Sale Certificates are often redeemed when a home is sold in foreclosure.  Dkt. No. 320 ¶ 256.  Class members without outstanding Tax Sale Certificates are thus more likely to be those whose homes were foreclosed on.

## III.    The Settlement Lacks Legally Required Indicia of an Arm's-Length Bargain

Because class counsel and defendants have strong incentives to collude in crafting a settlement, *see, e.g., GM Trucks*, 55 F.3d at 787-89, a proposed settlement must arise from an arm's-length negotiation to receive approval.  Class Counsel claim in their papers that the settlements "resulted from protracted arm's-length negotiations."  Dkt. No. 437-1 at 2.  The facts suggest otherwise.  Class Counsel apparently did not involve some of the class representatives in the negotiations and some of the class representatives appear not to have understood the mechanics of class actions.

The lack of involvement by the class representatives suggests that the settlement negotiations were not truly arm's-length.  "[T]he mere fact that negotiations transpired does not tend to prove that the class's interests were pursued."  *GM Trucks*, 55 F.3d at 814.  Objector Arlene Davies was at one time a named class representative.  According to Ms. Davies' declaration, at least some class representatives were kept in the dark during settlement

negotiations.  Dkt. No. 402, Ex. A, ¶4.  Ms. Davies also states that Class Counsel did not even inform her of settlements reached with individual Defendants until after they were concluded and filed with the Court, much less keep her informed of progress during settlement negotiations.  *Id*. Further, after negotiations were concluded, Ms. Davies observed that class representatives expressed fundamental misunderstandings of how the settlements worked, believing that they personally would divide the settlement amounts.  *Id*. ¶5.  Although Ms. Davies was not a class representative when all of the proposed settlements were reached, Class Counsel have offered no reason to suggest that these discussions proceeded differently.

The negotiation of the proposed settlements thus lacks important indicia of arm's-length bargaining.  Without the input and direction of ***all*** class representatives, there is no "basis on which to conclude that counsel adequately developed the claims before deciding to settle."  *GM Trucks*, 55 F.3d at 814.  As outsiders at the bargaining table, some class representatives could not opine whether the bargain Class Counsel struck was good or bad for the class.  Likewise, Class Counsel negotiated the settlements without input from at least some of their clients – the class representatives who are supposed to be proxies for the class.  Under the circumstances, the proposed settlements cannot be approved.

To hold otherwise would vitiate one of the core requirements of Rule 23: adequacy.  Rule 23 provides that "[o]ne or more members of a class may sue . . . as representative parties on behalf of all members ***only if*** . . . the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a) (emphasis added).  The adequacy requirement provides assurance "that the negotiations satisfactorily vindicated the interests of all the absentees."  *GM Trucks*, 55 F.3d at 797.  It is impossible for the class representatives to have adequately vindicated the interests of absentee class members when at least some of the

representatives were not advised of the terms Class Counsel had negotiated to settle several of the cases until after the settlements were concluded and misunderstood their role as class representatives inasmuch as they believed they were to share in the settlement only with the other named plaintiffs rather than with the absent class members that they represented.

## **<u>CONCLUSION</u>**

Final approval and class certification should be denied.

Dated: March 14, 2016

Respectfully submitted,

*/s/ Dennis J. Drasco*

Steven F. Molo
Thomas J. Wiegand
MOLOLAMKEN LLP
540 Madison Ave.
New York, NY 10022
(212) 607-8160 (telephone)
(212) 607-8161 (facsimile)
smolo@mololamken.com
twiegand@mololamken.com

Hays Gorey, Jr.
GEYERGOREY, LLP
1220 L St., NW, Ste. 100
Washington, DC 20005
(202) 644-8732 (telephone)
hays.gorey@geyergorey.com

Dennis J. Drasco
LUM, DRASCO & POSITAN, LLC
103 Eisenhower Pkwy.
Roseland, NJ 07068
(973) 228-6770 (telephone)
(973) 403-9021 (facsimile)
ddrasco@lumlaw.com

*Attorneys for Objector Arlene M. Davies*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2016, I caused the foregoing objection and opposition to motion for preliminary approval to be filed with the United States District Court for the District of New Jersey via the Court's CM/ECF system, which will provide electronic notice to all counsel and parties.

/s/ Dennis J. Drasco