**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

IN RE: NEW JERSEY TAX SALES
CERTIFICATES,

                                    CIVIL ACTION NUMBER:
JEANNE VAN DUZER LANG BOYER, et
al

        Plaintiffs,             3:12-cv-01893-MAS-TJB

        -vs-

                                  FAIRNESS HEARING
ROBERT W. STEIN, et al,

        Defendants.

       Clarkson S. Fisher United States Courthouse
       402 East State Street
       Trenton, New Jersey 08608
       April 25, 2016

**B E F O R E**:        HONORABLE MICHAEL A. SHIPP
                   UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S**:

LITE, DEPALMA, GREENBERG, LLC
BY:  BRUCE D. GREENBERG, ESQUIRE
Attorneys for the Class Plaintiffs.

HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
BY:  JASON A. ZWEIG, ESQUIRE
Attorneys for the Class Plaintiffs.

LUM, DRASCO & POSITAN, ESQS.
BY:  DENNIS J. DRASCO, ESQ.
Attorneys for the Objector, Arlene Davies.

      Certified as True and Correct as required by Title 28,
U.S.C., Section 753
     /S/ Cathy J. Ford, CCR, CRR, RPR

1  **A P P E A R A N C E S**

2  MOLOLAMKEN, LLP
   BY: THOMAS WIEGAND, ESQUIRE
3  For the Objector, Arlene Davies.

4  BROWN, MOSKOWITZ & KALLEN, ESQUIRES
   BY:  SHALOM STONE, ESQUIRE
5  Attorneys for the Defendants, Phoenix Funding and Caiola.

6  GIBSON DUNN, ESQUIRES
   BY:  D. JARRETT ARP, ESQUIRE
7  Attorneys for the Defendants, Robert Rothman.

8  STEVEN JANOVE, ESQUIRE
   Attorney for the Farber Defendants.
9
   MORGAN LEWIS, ESQUIRES
10 BY:  STEVEN REED, ESQUIRE
   Attorneys for the Crusader Defendants.
11
   COOPER LEVENSON, ESQUIRES
12 BY:  WILLIAM J. HUGHES, JR.
   Attorneys for the M.D. SASS Defendants.
13
   COVINGTON & BURLING, ESQS.
14 BY: JONATHAN COHEN, ESQUIRE
   Attorneys for the Plymouth Park Tax Services.
15
   GOLDBERG MACKLER LAW FIRM
16 BY:  KEITH BONCHI, ESQUIRE
   Attorneys for the Defendants May and DelVecchio.
17
   GREENBAUM, ROWE, SMITH & DAVIS, ESQUIRES
18 BY:  EMILY KALLER, ESQUIRE
   Attorneys for the Defendants PAM and Carabellese.
19
   DILWORTH PAXSON, LLP
20 BY:  JAY KAGAN, ESQUIRE
   Attorneys for the Defendants, Crestar Capital & CCTS Capital.
21
   MASELLI WARREN, P.C.
22 BY:  PERRY S. WARREN, ESQUIRE
   Attorneys for the Defendants, Plymouth Park Tax Service.
23

24

25

*United States District Court*
*Trenton, New Jersey*

```
 1              THE DEPUTY COURT CLERK:  All rise.

 2              (Open court begins at 10:07 a.m.)

 3              THE COURT:  Please be seated.  Good morning, counsel.

 4              COUNSELS:  Good morning, your Honor.

 5              THE COURT:  We are here today in the matter of a

 6    fairness hearing for in re: New Jersey Tax Sales Certificates,

 7    Docket Number 12-1893.

 8              May I have appearances of counsel, please.

 9              MR. GREENBERG:  Good morning, your Honor.  Bruce

10    Greenberg, Lite, DePalma, Greenberg in Newark on behalf of the

11    Plaintiffs and the Class.

12              THE COURT:  Good morning.

13              MR. ZWEIG:  Good morning, your Honor.  Jason Zweig

14    from Hagens Berman on behalf of the Class Plaintiffs.

15              MR. PIZZIRUSSO:  Good morning, your Honor.  James

16    Pizzirusso, counsel on behalf of the Class Plaintiffs.

17              THE COURT:  Good morning.

18              MR. DRASCO:  Good morning, your Honor.  Dennis J.

19    Drasco, Lum, Drasco and Positan for the Objector Arlene

20    Davies.  And as I did at the preliminary hearing, I'd like to

21    introduce to the Court, Tom Wiegand and Hays Gorey, who will

22    be arguing this morning.

23              MR. WIEGAND:  Thank you, your Honor.  Good morning.

24              THE COURT:  Good morning to you.

25              MR. STONE:  Shalom Stone, Brown, Moskowitz and Kallen
```

1    for the Defendants Phoenix and Caiola.

2              THE COURT:  Good morning.

3              MR. ARP:  Good morning, your Honor.  Jarrett Arp of

4    the Gibson Dunn firm for Defendant Robert Rothman.

5              THE COURT:  Good morning to you as well.

6              MR. JANOVE:  Good morning, your Honor.  Steven Janove

7    on behalf of the Farber Defendants.

8              THE COURT:  Good morning.

9              MR. REED:  Good morning, your Honor.  Steve Reed from

10   Morgan Lewis representing the Crusader Defendants.

11             THE COURT:  Good morning.

12             MR. HUGHES:  Good morning, your Honor.  William J.

13   Hughes, Jr. of Cooper Levenson on behalf of the M.D. Sass

14   Defendants.

15             MR. BONCHI:  Good morning, your Honor.  Keith Bonchi,

16   Goldberg Mackler law firm, on behalf of the May Defendants and

17   the DelVecchio Defendants.

18             MS. KALLER:  Good morning, your Honor.  Emily Kaller

19   Greenbaum, Rowe, Smith and Davis on behalf of PAM Defendants

20   and Pat Carabellese.

21             MR. WARREN:  Good morning, your Honor.  I'm Perry

22   Warren from Maselli Warren, local counsel for Plymouth Park

23   Tax Services, LLC.

24             THE COURT:  Good morning.

25             MR. COHEN:  Good morning, your Honor.  Jonathan Cohen

1    Covington and Burling also for Plymouth Park.

2            THE COURT:  Anyone else?

3            MR. KAGAN:  Good morning, your Honor.  Jay Kagan

4    Dilworth Paxson for Crestar Defendants.

5            THE COURT:  So, with all the appearances being on the

6    record, having received the Plaintiffs' motion for a final

7    approval of all class settlements, final certification of the

8    settlement class, final approval of the plan of allocation and

9    for attorney fees and reimbursement of expenses, the Court at

10   this time is prepared to conduct a fairness hearing.

11           So, with that, by way of background, the named

12   Plaintiffs allege that Defendants engaged in a conspiracy to

13   unlawfully manipulate the interest rates associated with the

14   Tax Sale Certificates and public auctions in New Jersey from

15   August 13, 2013 to October 30, 2015.

16           The Court granted preliminary approval for 20

17   separate settlements with Defendants in this action totaling

18   $9,585,000 in cash, plus interest and discounts, for those

19   class members who are still subject to a Tax Sale Certificate.

20           Furthermore, by order dated October 30th, 2015, the

21   Court approved class notice and the notice of plan.  In

22   accordance with the Court's orders, the claims administrator

23   completed sending notice to class members on January 13, 2016.

24   Class members had until March 14, 2016 to opt out.

25           The Court received a motion for final approval of the

1  settlement on February 16, 2016.  The Court received two

2  objections to the settlement, four individuals, two of whom

3  the Zahns or Mrs. Zahn had the same lien, opted out of the

4  Class; the Court received responses from Plaintiffs to the

5  objections of Ms. Arlene Davies; and then a fairness hearing

6  was set for today.

7          So, with respect to today's fairness hearing, the

8  Court will hear from class counsel for Plaintiffs on class

9  certification, the fairness of the settlement, the plan of

10 allocation and class counsel's motions for attorney fees and

11 costs.  Thereafter, the Court will hear objections and related

12 statements.

13         Class counsel, when you give your presentation to the

14 Court, I'd like for you to address why this Court should:  1,

15 certify the class; 2, approve the proposed settlements in the

16 case and overrule the objections submitted to the Court; 3,

17 approve the plan of allocation; 4, grant attorney fees and

18 costs and; 5, grant any incentive awards to the named

19 Plaintiffs.

20         So, with that, counsel, you want to proceed.  Mr.

21 Zweig.

22         MR. ZWEIG:  Good morning, again, your Honor.  Good to

23 see you again.

24         THE COURT:  Also counsel, just so that we are clear

25 for the record, can you please make sure you state your name

1   before you speak at all times, there is so many counsel here

2   today, we want to make sure our court reporter isn't driven

3   crazy trying to figure out who's who.

4        MR. ZWEIG:  Understood.  Jason Zweig for the class

5   Plaintiffs.

6        As your Honor noted, we are here today on final

7   approval of the 20 different settlement agreements with 21

8   different defendant groups that provide 9.585 million in

9   compensation, plus interest.

10       In addition, for those who are still the subject of

11  lien owned by the Defendants, those property owners will

12  receive up to 15 percent in discounts off of the amount that

13  they owe.  We think those are -- it's a very good result here

14  for the class, and I'm going to explain to you why that's so.

15       As I go through the various reasons why these are

16  great settlements for the class, I'm going to address some of

17  the objections that have been made by Mr. and Mrs. Davies, not

18  because I think that they have any merit whatsoever, just in

19  terms of the presentation I think it would go better as I

20  address the fairness of the settlements if I take on some of

21  the arguments that they raise.  But certainly, we don't think

22  they have any merit.  Most importantly, we don't believe they

23  have any standing whatsoever to be here.

24       So, I will address the standing issue after I address

25  the fairness of the settlements.  In addition, I would note

1   that the Court is certainly well within its right, although

2   the Court has acknowledged it wants to hear from the Objectors

3   not to even have them speak today.  They didn't file pursuant

4   to the Court's order a notice of intent to appear, unlike some

5   other class members, but certainly it's within the Court's

6   discretion to hear from them if they want.

7          As the Court is aware, settlements in this circuit

8   and in this district are governed by the eight -- nine factors

9   in the *Girsh v. Jepson* case.  The first factor is complexity,

10  expense, and likely duration of the litigation.

11         At first blush, to some, who are not familiar with

12  the facts of the case, this might seem like an easy case.  You

13  have 15 guilty pleas.  And in addition, you have what I'll

14  call the widow and orphan aspect of this case, which is that

15  unfortunately this case involves people's homes, to some

16  extent, being foreclosed on because we're talking about

17  property tax liens.  And under New Jersey State law, those who

18  buy property tax liens can, if the lien goes unpaid, foreclose

19  on a New Jersey property owner's property to get the monies

20  that they paid for that lien.  And unfortunately, that does

21  create a situation where some people may lose their homes.

22         I've talked to dozens and dozens and dozens of class

23  members over the last three years who have called me and asked

24  me what they can do about the foreclosure of their home with

25  regards to the conduct at issue in this case.  And as I told

1  each one of them, unfortunately, there is not much I can do

2  vis-à-vis this case.  This case is about one aspect only of

3  the property tax lien; and, that is, the interest rate

4  associated with the lien.  Nobody conspired to have people not

5  pay their property taxes.  Unfortunately, for whatever

6  reasons, certain people couldn't and a property tax lien

7  arose.  But the only wrongdoing here relates to the interest

8  rate associated with that lien.  And so, often times people

9  look at this case and they say again, there are 15 guilty

10  pleas, people are losing their homes but one needs to focus on

11  the issues of this particular litigation.

12       And this particular litigation is complex.  This is

13  an antitrust class action which, by definition, and numerous

14  courts have held, are complex cases.  Here, there were over

15  5,600 property tax lien auctions that took place during the

16  class period.

17       And with respect to each one of those, because this

18  is an antitrust class action, Plaintiffs would be required to

19  prove two things:  1, which of those 5,600 liens were the

20  subject of the conspiracy; and 2, even if you can establish

21  that a particular lien was the subject of a conspiracy, in

22  order to prove damages we're going to be required to show what

23  that lien would have sold for in the absence of a conspiracy,

24  what interest rate would that lien have sold for if there was

25  no conspiracy.  Those are two very difficult tasks.

1          Just to try and establish on damages what the liens

2    would have sold for, absent the conspiracy, just as an

3    example, one would have to create a database of all of the tax

4    liens sold during the class period, what those liens were sold

5    for, how many bids were put in with respect to each of those

6    liens.

7          And while some of the Defendants may have some of

8    that data, there were a whole host of liens purchased by

9    non-defendants that would also have to be obtained.  And not

10   only that, we'd have to go back to before the period, 1998,

11   and get that data because we'd have to show what the -- a

12   market free of collusion would look like.

13         We'd also have to look at the data after the class

14   period to see what a market free of collusion would look like

15   in order to establish what our damages would be.  And that is

16   to say the least, a monumental task.  A task that the

17   Objectors, of course, have the benefit of completely

18   disregarding because they haven't been litigating this case.

19   But that is a task which would easily cost millions of dollars

20   in expert fees and data costs.

21         We face sophisticated defense counsel, some of which

22   are here today who will mount a vigorous defense.  This case

23   has already lasted three years.  And surely would have lasted

24   years longer.

25         I would like to -- I'd be remiss if I didn't thank

1    the Court, as well as Judge Bongiovanni in shepherding this

2    case to where it is today, including hosting settlement

3    conferences.  I think all of those things have helped pushed

4    this case in an expeditious fashion, so thank you for that,

5    your Honor.

6          The second factor under *Jepson*, reaction of the class

7    to the settlement.  We sent out 93,000 plus postcards, notice

8    postcards to potential members of the class.  That number is

9    in the administrator affidavit that was filed by Gilardi on

10   April 11, I believe it was.  And as the Court has noted, we

11   had an overwhelmingly positive response from the class.  We

12   had only three opt outs and two objections.  One of which was

13   by an Objector who lacks standing.  And from -- even before we

14   were appointed for class counsel has told us that they would

15   fight us every step of the way.  So, we think that's

16   incredibly positive response from the class.  There's

17   virtually no settlement today, class settlement where

18   Objectors don't appear.  There is a whole industry of

19   Objectors.  And so the fact that there's only this one fatally

20   flawed Objector, we think is an overwhelmingly positive

21   response from the class.

22         The next factor, your Honor, stage of the proceedings

23   and the amount of discovery completed.  And this factor really

24   is meant to inquire into what counsel's -- Class Counsel's

25   level of knowledge was in reaching the settlement so that the

```
 1   Court can evaluate what information it had before it, before

 2   them, to understand whether the settlements were good

 3   settlements or not.

 4        Some courts have approved settlements where counsel

 5   have spent as little as 37 hours on a class settlement.  We

 6   cite the case, Gutworth, at Page 17 of our moving brief, where

 7   this District approved a class settlement where Class Counsel

 8   spent as little as 37 hours.  Here, we obviously spent much

 9   more than that.  As we detailed in our declaration, we put in

10   more than 7,000 hours and had a full appreciation of the

11   strengths, the weaknesses, and the size of our claims.

12        The Objectors contend that the settlement is not fair

13   since there was no formal discovery taken.  As the Third

14   Circuit recently held, and we put it into the Court, the Third

15   Circuit's recent opinion on the NFL Concussions litigation

16   where the Third Circuit expressly declined to adopt a rule

17   where formal discovery needs to take place with regards to

18   class settlements, completely rejecting the Objectors'

19   position on this issue.

20        THE COURT:  Wasn't that because there was so much

21   information already in the public domain, unlike what we have

22   here?

23        MR. ZWEIG:  That was one piece of it.  I would say,

24   your Honor, I would respectfully disagree.  Well, there wasn't

25   a ton of information here in the public domain, but there was
```

1    information in the public domain and there was information

2    that we received from the Defendants.

3         So, if you look at our joint declaration that we put

4    in in support of our motion, we talked about all of the

5    criminal proceedings that have been -- have gone on.

6         Specifically, we cite to the fact that in each one

7    of -- I think it's each one of those.  There is a delineation

8    of the amount of liens that were at issue with respect to that

9    particular criminal defendant.  And in almost every case we

10   received in settlement as much as the liens that were at issue

11   in those criminal proceedings.  And that's just -- not only

12   the interest but the principal.  So the amount of the

13   settlement almost equaled as much as the liens that were at

14   issue with respect to each of those criminal defendants.

15        Furthermore, except for the Crusader Defendants whose

16   fine was $2 million payable over five years, all of the

17   individual defendants were being fined somewhere between 10

18   and $20,000.  Now that fine is supposed to roughly reflect the

19   harm that these people inflicted.  And we recovered multiples

20   of that.  In many cases, 10 times the amount that the

21   government got in criminal fines.  So that's all in the public

22   record.

23        Furthermore, what we've put into the public record in

24   terms of our joint declaration is that with respect to these

25   settlements, we also received financial information from the

1   settling defendants which set out their financial condition,

2   the amount of liens, again, corroborating the figures that

3   were in the criminal papers that were filed publically,

4   corroborating those figures, in terms of how many liens were

5   affected by their conduct.  And we also received almost

6   30,000 pages of documents from the Defendants, including the

7   documents that would be the core of our proof in any

8   litigation which are the bid books.  We took the bid books and

9   we compared certain bid books across the Defendants to try and

10  come up with, for example, the 50 auctions that we identified

11  in our amended complaint.

12       So there was some information in the public domain,

13  as I said.  We also received a significant amount of

14  information.  And the fact that we recovered in settlement

15  multiples of what the criminal fines were in this case -- and

16  I think there was even a sentencing on Friday before Judge

17  Wigenton of Mr. Collins who was fined $20,000, which is

18  consistent with all of the other fines that have taken place

19  so far.

20       THE COURT:  Isn't it also part of Ms. Davies'

21  arguments, I believe, that these bid books were never made

22  available to the Court or to the other side?  So when we start

23  talking about what's been made available, only you have had

24  access to the bid books; is that correct?  Doesn't that

25  distinguish this from the NFL case altogether?

1          MR. ZWEIG:  No.  I would say no, your Honor.  It is

2   correct that certainly we had the bid books and they were not

3   produced to the Objectors, but that's because they haven't

4   made a credible argument that these settlements are flawed in

5   any way.  And the law is quite clear that unless they do so,

6   they're not entitled to them.  Otherwise, it's just simply a

7   fishing expedition for Objectors to get into.

8          Furthermore, this is a different case than the NFL

9   case.  There, you're talking about a much more complicated

10  case.  In fact, I even have some clients in that case, where

11  you have a billion dollar settlement.  You have complicated

12  issues of causation: general and specific causation.  You have

13  complicated issues of class certification in terms of these

14  being personal injury type cases.  It's going to require more

15  information than this case.

16         So, yes, it is true that the Objectors don't have the

17  bid books, but that's because they haven't made a showing that

18  they're entitled to see them.  And we believe the public

19  record is sufficient to satisfy the record that these

20  settlements are fair.

21         In particular, all of the pleadings and papers and

22  each of the criminal proceedings that have taken place here

23  with respect to the Defendants who have pled guilty.

24         The fourth factor under *Jepson*, risk of establishing

25  liability.  The risks of establishing class-wide and statewide

1    liability here are extremely high.

2         Again, while there are individuals who have pled

3    guilty, it is very unclear what utility those guilty pleas

4    will have here.  Those guilty pleas, while it is true that

5    guilty pleas in general can be used as *prima facie* evidence of

6    liability in a civil antitrust case, the guilty pleas here are

7    extremely vague.  They don't say specifically what auctions

8    were rigged.  They make vague statements about their being --

9    that the defendant participated in a conspiracy to rig bids at

10   certain auctions with respect to certain liens throughout New

11   Jersey during a certain period of time.  It's not clear how

12   useful those would be in any -- they certainly would have some

13   utility, of course.  But it's not clear that they -- they

14   certainly wouldn't have the slam dunk effect that I think the

15   Objectors think that they would.

16        Although, there were 50 Defendants who have pled

17   guilty, we named -- I'm sorry, there were 15 Defendants who

18   have pled guilty, we named 50 Defendants.  That's 35

19   Defendants that we'd have to prove were part of the conspiracy

20   who had no criminal exposure and will not be indicted.  Some

21   of the Defendants that we named, like, Mr. Wolfson, Joseph

22   Wolfson, for example, were indicted.  There were wiretaps that

23   were done with Mr. Wolfson and some of the cooperating

24   criminal Defendants at which they apparently were conspiring

25   as part of this conspiracy.  Those tapes were played at Mr.

1   Wolfson's criminal trial.  And even though, there were these

2   tapes and recorded conversations, Mr. Wolfson was acquitted in

3   full.  These are difficult cases.  One needn't look further

4   than the case of Mr. and Mrs. Davies themselves.  There's not

5   a person on the face of the earth that believes that they were

6   wronged by this conspiracy more than Mr. and Mrs. Davies.

7   They tried to prove their claim for over three years.  They

8   went to trial -- and we'll get into that in a little bit --

9   and they lost.  They presented evidence and they lost.  They

10  were unable to prove their case.

11          And again, there isn't a single person on the face of

12  this earth that believes that their lien was subject to the

13  conspiracy more than Mr. and Mrs. Davies.  The fact is these

14  antitrust claims are complex.

15          In particular, the claims in this case, where you're

16  dealing with 5,600 auctions, each of which has combinations of

17  different defendants, some of which are in some cases are

18  non-defendants.  They're difficult, difficult cases to

19  establish liability on a class-wide basis.

20          The risk of establishing damages is the fifth factor.

21  Even if the -- assuming liability was certain.  And, of

22  course, we believe it is not, it still leaves open the

23  question of damages.  I'd like to refer the Court to a

24  criminal prosecution that took place in Madison County

25  Illinois back in 2013.  In that case, there was a tax lien

1  system similar to the system that exists here in New Jersey

2  where there are tax liens auctioned off and investors purchase

3  those tax liens, the bidding, I believe, starts at the same

4  interest rate, 18 percent, and is bid down.  There was a

5  similar conspiracy including some of the tax officials.

6         The treasurer of Madison County was indicted and pled

7  guilty to participating in this conspiracy.  During the

8  sentencing phase of this individual's criminal proceedings,

9  the government put in a memorandum -- and it's a public

10 record.  And the case, by the way, your Honor is *U.S. v.*

11 *Bathon*, B-A-T-H-O-N, and that's case 13 CR 30025 in the

12 Southern District of Illinois, Federal Court, and the pleading

13 that I'm referring to is at ECF Number 19.  In that case the

14 government said, we need to prove what the -- to try to get to

15 a restitution figure in terms of the harm that was inflicted

16 by this defendant, we need to try to understand what the liens

17 would have sold at had there been no conspiracy.

18        The government spoke to the defendant.  The

19 government had an economist look at this.  And basically they

20 said, it is not possible to come up with that figure in cases

21 like this.  It's simply not possible.  And so they didn't come

22 up with a figure because they couldn't.

23        Now, without tooting our own horn, your Honor, we

24 think we are pretty skilled and we'd be able to come up with a

25 system in which we'd be able to calculate damages but suffice

1    it to say it's no easy task.  It's a task that is very, very

2    complicated.  The Department of Justice has very, very able

3    lawyers.  They couldn't do it in that particular case.

4         Now, the Objectors here claim that these settlement

5    amounts are just simply too low because this case is so easy.

6    They take our allegations in our complaint and they basically

7    assume that they're established facts.  They assume -- and I

8    wish it were that simple, if complaints were established facts

9    then most of us would have a much easier job on our hands.

10   But, in fact, as your Honor knows, allegations in our

11   complaint are just that, they're allegations and they must be

12   proven.

13        Nonetheless, the Objectors state that the complaint

14   says that every year there are about $200 million of tax liens

15   sold each year.  And that the interest rate on those, they

16   assume, is 18 percent, on every single one of those liens;

17   therefore, the single damages for each year is $36 million.

18   And if you take that number and multiply it by the amount of

19   years subject to the conspiracy, by 10, you come up with a

20   figure of about $400 million.  We only got $9.585 million.

21   These settlement amounts are just too low.  But you can't --

22   you can't do it that way.

23        First of all, we know that even liens that are sold

24   at 18 percent interest rate that's the rate that the auction

25   begins at.  There are numerous cases where there is an

1   18 percent lien sold that wasn't the subject of a conspiracy.

2        There are numerous liens that were sold at somewhere

3   between zero and 18 percent.  And so, then there are liens

4   that are sold at zero percent interest rate where the person

5   that is subject to the lien might be someone that does have

6   the means to satisfy the lien in due time and the investor

7   thinks it's a particularly attractive investment so they

8   decide to bid at zero percent interest rate.

9        In other words, that class member can have no injury

10  because there is no affected interest rate and they bid zero

11  percent and get the lien.  And so, in those -- so you have all

12  of those scenarios.  So you can't simply say that every lien

13  went off at 18 percent and, therefore, damages are $36 million

14  a year.  That's not reality.  That's not what happened here.

15       Furthermore, your Honor, we know that there are a

16  number of investors out there that aren't defendants in this

17  case.  What do you do with those liens?  That $200 million

18  figure includes people who weren't part of this conspiracy.

19       And while the Defendants here may comprise a

20  significant portion of that $200 million figure, assuming

21  that's even the correct figure, there are significant numbers

22  of those who aren't defendants, whose liens can't be part --

23  and aren't part of our damages model.

24       Settlement, your Honor, avoids having to reach these

25  very, very difficult issues.  Six, your Honor, risk of

1    maintaining a class action through trial.

2         The Defendants here have made it very clear from the

3    outset in virtually every filing that they've made before the

4    Court that a class cannot be certified here; and there's no

5    question that would have been -- they would have mounted a

6    vigorous defense, class certification defense here.

7         The Objectors have not made a single -- devoted a

8    single sentence in any of the filings they made to the Court

9    about class certification.  And that's not surprising because

10   they recognize that that is a huge issue here.

11        Furthermore, and with no disrespect to them, I don't

12   believe they've ever been involved in certifying a class

13   before.  It's possible I'm wrong on that, but it's certainly

14   not their main practice area.  We do this day in and day out.

15        And given some of the recent Supreme Court

16   announcements, it's not an easy task, even on a

17   straightforward case.  This is not that case.  So, that is a

18   huge risk that we face going forward here.

19        The ability of the Defendants to withstand a greater

20   judgment is the seventh factor.  And in that case, your Honor,

21   there were a number of Defendants here who did not have the

22   financial means to withstand a significant judgment.

23        In our declaration we put in sworn statements about

24   the financial information that was provided to us by these --

25   certain of these Defendants.  It's all in the papers.  I don't

1    feel the need, unless your Honor were to wanted me to, to go

2    through specifically which ones those were but it's all in our

3    joint declaration.

4           And with respect to many of the Defendants, we had

5    serious concerns about their ability to withstand a judgement

6    of any kind, let alone a significant judgment.

7           One Defendant, Mr. Mastellone, who we settled with

8    after we had an all-day mediation session with Bruce

9    Goldstein, who the Court appointed as a mediator.  We

10   presented our case to him and we reached the settlement that

11   we had reached, that defendant had to take out a home equity

12   lien of credit to pay the settlement amount.  So, many of

13   these Defendants are not from -- possess significant financial

14   means to satisfy a settlement.

15          Some of the Defendants can withstand a greater

16   judgment, but that is, as the Third Circuit noted in the NFL

17   case, that is true in any class action, that does not mean

18   more monies should be extracted from them.

19          For example, Crestar, who the Objectors keep saying,

20   and point to the Wolfson trial where there was some testimony

21   about the fact that they had 50 million in capital, that

22   defendant was in the conspiracy for three months.  There was

23   no dispute about that.  You're simply not going to be able to

24   get a recovery from that defendant simply because they have

25   some capital when the facts are that they've only been in it

1    for three months.

2           So, next, your Honor, the range of reasonableness of

3    the settlement fund.  I think I've gone through many of the

4    reasons why we think the settlements are fair.  And in terms

5    of the fairness of the settlements, I'd like to end that

6    section -- this part of my argument with the following quote

7    from the Third Circuit in the NFL case; and this is at -- this

8    is the National Football League Players' Concussion Injury

9    Litigation, the cite 2016 WL-1552205.  And the following

10   quotes begins at Page 25, Star 25 of the opinion.  "In the

11   end, this settlement was the bargain struck by the parties

12   negotiating amid the fog of litigation.  If we were drawing up

13   a settlement ourselves, we may want different terms or more

14   compensation for a certain condition.  But our role as judges

15   is to review the settlement reached by the parties for its

16   fairness, adequacy, and reasonableness.  And when exercising

17   that role, we must 'guard against demanding too large a

18   settlement based on our view of the merits of the litigation;

19   after all, settlement is a compromise, a yielding of the

20   highest hopes in exchange for certainty and resolution.'"

21          Next, your Honor, settlement class certification.

22   This Court has on four separate occasions found that the

23   settlement class proposed here meets the requirements for

24   class certification.  The law, of course, as your Honor knows,

25   the requirements for settlement classes are more lenient than

1    those for a litigation class.  After all, that is the whole

2    purpose of a settlement to avoid some of those issues in terms

3    of litigating a class.

4         We've detailed at Pages 25 to 32 of our moving brief,

5    ECF Number 437-1, why those class requirement certifications

6    are met.  And I would note that there have not been any

7    objections by anybody to the class -- settlement class being

8    certified.

9         So, unless the Court had additional, specific

10   questions, I think we're going to rest on our papers with

11   regards to the settlement class certification.

12        The notice we believe satisfied due process.  Your

13   Honor found that the notice program that was in fact done here

14   satisfied due process.  There have been no objections to the

15   notice program or the notice that was issued.

16        And again, I would -- unless the Court had any

17   specific questions it wanted addressed on the notice, we'd

18   rest on our papers and the pleadings from the claims

19   administrator on that issue.

20        The plan of allocation is the next issue I'd like to

21   address.  At Page 34 of our moving brief and in our reply

22   brief, we set forth the standard that the Court is to utilize

23   when evaluating a plan of distribution.

24        Namely, that standard is that it be like the

25   settlement itself: fair, reasonable, and adequate.  We believe

1    the plan here is just that.  The distribution of the cash

2    portion of the settlement fund will be based on the --

3    essentially the interest rate that a -- and the principle that

4    exists with respect to a class members' lien.

5            So, somebody who has a $100 lien at 18 percent

6    interest is likely going to get more than someone who has a

7    $50 lien at 10 percent interest because the relative harm that

8    would have been inflicted on that person is greater.  The

9    interest rate was greater and, therefore, they would be

10   entitled to a greater portion of the settlement proceeds.

11   That is essentially how the cash portion of the settlement is

12   distributed.  It's meant to try and fairly estimate the

13   relative harm vis-à-vis the other class members that a

14   particular class member had and give them that portion, their

15   relative portion, or pro rata portion of the settlement

16   proceeds.  Of course then, there's the issue of the discount

17   offers, that those who continue to have a lien outstanding

18   would be entitled to receive under various settlements.

19           We've cited the case in our papers, your Honor, about

20   how a court -- or how a settlement, a plan of distribution can

21   provide for different modes of compensation within a class

22   depending on the harm inflicted on certain people within the

23   class.  There is no hard and fast rule, that everyone has to

24   be subject to the same distribution metric.

25           Plans of distribution or allocation can be tailored

1    to the specific needs of the case and can provide differing

2    levels of compensation to differing members of the class based

3    on the harm that was inflicted on them.  And that's what we

4    tried to do here.

5         Those who will receive a discount offer, by

6    definition, still have a lien outstanding on their property.

7    That lien is still accruing interest.  So, but through no

8    fault of their own, the people who have already paid their

9    lien have no more recurring interest.  That lien has been

10   extinguished.  And they did pay an artificially inflated

11   premium in terms of the interest rate on that lien, but unlike

12   those where a lien is still outstanding and interest continues

13   to accrue, they don't have the same issue that those who still

14   have a lien outstanding are subject to.

15        And I would note, there are some defendants that, you

16   know, for whatever reason, and I'm not in this business, just

17   have the motto that they don't want to foreclose on people,

18   they just want to keep paying the subsequent years taxes.  So,

19   it could be that these people continue to in perpetuity have

20   this interest rate accrued.

21        And so, that is what we tried to do with the plan of

22   distribution, to help those people who are subject to

23   additional harm than those who have already paid their liens

24   are not.

25        There was an objection filed by -- at ECF 453 by a --

1    I think it's Ms. Jerilean Roberts to the plan of allocation.

2         Candidly, your Honor, it's not entirely clear

3    specifically what her concerns were.  At best I can tell, her

4    question was whether the plan of allocation would take into

5    account subsequent interest for the life of the certificate.

6    And I think that's a quote directly from her pleading.  I

7    think the answer -- if that is the question, I think the

8    answer is, No, that's not really what the plan of allocation

9    is intended to do.

10         The plan of allocation is simply intended to provide

11   a fair metric to distribute this pod of settlement proceeds to

12   people.  And we thought the easiest way to administer that

13   would be simply to take the principal amount on the initial

14   lien that someone had on their property as well as the

15   interest rate; and when you start looking at -- and that

16   should proximate the relative harm that that person had

17   relative to other class members.

18         And so, I think the answer to her question is, No,

19   but that's certainly not really the method or the purpose of

20   the plan of distribution or the settlement proceeds.

21         I think, obviously, Mr. and Mrs. Davies have posed

22   some objections to the -- a single objection to the plan of

23   allocation.  I think I've addressed it.

24         I would also note, for the record, your Honor, that

25   we've put in on our joint reply declaration in support -- in

1   further support of our motion for final approval,

2   certifications from each of the four named Plaintiffs who

3   attested to the fact they were apprised of these settlements

4   as they were being negotiated; that they were apprised of the

5   fact that there would be this differing level of relief for

6   class members based on whether or not their lien was still

7   outstanding; and each one of the named Plaintiffs attested to

8   the fact that they had no objection to that aspect of the

9   settlement.

10          Your Honor, I'd like now to go to the -- unless the

11  Court has any other questions with regards to fairness and

12  adequacy of the settlements, I'd like to address what I think

13  is a very important issue, which is, the Davies' lack of

14  standing to object to these settlements.

15          And it's an important issue because of the fact that

16  these settlements provide for relief to those who still have

17  liens outstanding.  And we think that the Objectors shouldn't

18  even be here.  And even after this, we hope that the Objectors

19  don't further delay these proceedings by continuing to advance

20  the objections that they're advancing.

21          And so, we're requesting that the Court specifically

22  rule on the Davies' lack of standing and strike their

23  objection for lack of standing.  And the reason is, as we

24  detailed in our papers, they don't have a claim here.

25          If they filed a case in federal court on their own,

1   outside of this class action, they -- I don't even think the

2   Objectors can say that case could proceed.  It would be

3   dismissed outright.  And the reason is, they've already

4   compromised in its entirety their claim that they have in this

5   case.

6          Mr. and Mrs. Davies, for whatever reason, failed to

7   pay the property taxes on their property.  A lien arose on

8   that property by operation of law.  That lien happened to be

9   bought by one of the Defendants in our case, one of the SASS

10  Defendants.  And after years of Mrs. Davies being unable to

11  pay her property taxes, in 2011, SASS filed a foreclosure case

12  in state court against Mrs. Davies to foreclose on her

13  property for failure to pay her property taxes based on a lien

14  the SASS Defendants acquired.  There was nothing illegal about

15  that.  Although, it's unfortunate, they had every right under

16  the law to file that foreclosure case.

17         In state court, Davies, who was the Defendant, since

18  it was foreclosure case, filed an answer and counterclaim and

19  defenses.  And in that document -- and we've attached it to

20  our joint reply declaration, she asserted that her, as a

21  defense, her lien was subject to a bid-rigging conspiracy.

22         In addition, she filed a counterclaim in that

23  document, an affirmative claim against SASS.  And in that

24  counterclaim, she asserted treble damages.  She asserted the

25  bid-rigging conspiracy that is at issue in this class action.

1   She asserted that she was seeking attorney's fees.  She

2   asserted the claim was brought under the New Jersey Code, the

3   New Jersey statute.  And all of those things are consistent

4   with a State New Jersey antitrust claim: New Jersey Code,

5   treble damages, attorney's fees, declaratory relief.

6   Although, she didn't use the magic words "antitrust case," it

7   was a pro se pleading; she did the best she could, it was an

8   antitrust case.  It was an antitrust claim that she brought.

9        The case went on for several years.  She was able to

10  have counsel for about two out of those three years.  Mr.

11  Perle, who is one of the plaintiff's counsel here.  In fact,

12  when Mr. Perle came on, he was able to enjoin SASS from

13  proceeding in the foreclosure case while this case was

14  pending.

15       At some point in early 2014, with the Davies

16  continuing to try to press their claim, both in state court

17  and also in this case, SASS filed a motion, a motion to elect

18  her remedies.  Simply that she couldn't -- she couldn't have

19  two bites at the apple.  Either she proceeds on the

20  counterclaim on the bid-rigging conspiracy in state court or

21  she proceeds here in this case.  But it's not fair to them to

22  subject them to double recovery and have her -- have the

23  opportunity to litigate on both fronts.

24       Judge Batten, in her state court case, issued an

25  order.  His order said that she's required to file a written

1    election of her remedies, either proceed in state court on

2    this claim or proceed in this court before your Honor, but not

3    on both fronts.  She never filed as far as we can tell that

4    written election, but she showed up on May 14 of 2014 and

5    tried the claim.  She tried that counterclaim.  She questioned

6    witnesses.  She presented her son, Mr. Davies, as one of her

7    witnesses.  She presented documents in evidence.  And as Judge

8    Batten noted, although, unfortunate in the case -- and her

9    story is unfortunate.  Unfortunately, she did not present any

10   evidence that the lien on her property, the lien for which she

11   is arguing she has standing here, that there was any damage;

12   that there was any conspiracy that existed in terms of SASS

13   acquiring that lien.  She couldn't prove it.

14          He then dismissed that counterclaim and the defense

15   based on the bid-rigging conspiracy with prejudice.

16          Now, under the law that claim is gone.  If they --

17   again, if they brought that claim here before your Honor

18   today, it would be dismissed under issue preclusion.

19          We cite a case in our papers, *Untracht v. West Jersey*

20   *Health Systems*, 803 F.Supp 978, from this district in 1992,

21   which has the identical facts.  In that case a doctor brought

22   a state antitrust claim and other claims against a hospital

23   who had terminated him.  Those claims ultimately were tried

24   and dismissed with prejudice.  Thereafter, he filed a case in

25   federal court, here in this district, and brought a federal

```
 1  antitrust claim because in the state court, he was unable to

 2  bring that federal claim since the federal claim is

 3  exclusively within the jurisdiction of this Court.

 4          And the Court said, Although, it won't apply claim

 5  preclusion to this plaintiff because he couldn't bring that

 6  claim in state court because of exclusive jurisdiction, in

 7  this court under issue preclusion that claim would be barred.

 8  He's already litigated those issues in state court and those

 9  issues he no longer is able to litigate those issues and

10  dismiss the federal antitrust claim with prejudice.  It's

11  exactly on all fours with the situation here.  They fully

12  compromised their claim, and they don't have standing under

13  issue preclusion to be part of the class.

14          We've cited cases where courts have not allowed

15  certain individuals to participate in class settlements where

16  they have previously compromised their claims.  We've cited

17  those in our papers.

18          For example, *Burka v. NYC Transit Authority*, Page 4

19  of our reply brief.  And so, we don't believe the Court should

20  permit this objection and should strike the objection on

21  standing grounds as their claim here is barred under issue

22  preclusion.

23          Now, Davies makes the argument that because after

24  Judge Batten issued his order dismissing with prejudice the

25  defenses and counterclaims in the state court proceeding and
```

1    then a third-party came in and paid off the lien of Davies

2    that there was never a final judgment and, therefore, issue

3    preclusion can't apply.  That's not correct.

4         We cite in our papers, including in the *Untracht*

5    case, that the doctorate of issue preclusion and a judgement

6    on the merits is more pliant than requiring a formal written

7    judgment.  If the issue was actually litigated and finally

8    determined, then that's enough for issue preclusion.  You

9    don't need to have a formal written judgment entered.  And

10   there's no question here -- again, and we put in the entire

11   transcript from her trial, that her claim was litigated and

12   lost.

13        In addition, your Honor, in addition to the issue

14   preclusion barring her claim, she also does not have standing

15   because she has not been aggrieved.  She was adjudicated not

16   to have her lien subject to the conspiracy and, therefore, has

17   no damage.

18        They argue, Well, we do fall within the class

19   definition that exists in this case and that's all that's

20   required, that's simply incorrect.  As we put in our reply

21   papers, you need more than just meeting the criteria of class

22   definition.  If you don't have a compensable injury.  And they

23   don't with regards to the claims in this case any longer, then

24   she's not a proper class member.  You need more than just

25   meeting the class definition.

```
 1              In addition -- and we cite the Air Cargo case, she

 2   has not made a claim -- she has not filed a proof of claim in

 3   this case.  Under the law, she has no standing to be here.  By

 4   definition, if you're not going to participate in the

 5   settlement, you shouldn't be allowed to complain about it.

 6   And she has not filed a proof of claim.  At least as of

 7   Friday, a few days ago, she has still not filed a proof of

 8   claim.  The law is clear.  If you don't file a proof of claim,

 9   you can't be heard to complain about the settlements.

10              Finally, your,Honor, it's not even clear that she has

11   or ever will have any damage in terms of paying, actually

12   paying an artificially inflated rate.  As I said earlier,

13   after she lost her trial in state court, a third-party, the

14   Pennsylvania State Employees Credit Union came in and paid her

15   lien in its entirety with their own funds.  It's quite

16   possible that they still have to pay the Pennsylvania, the

17   bank those funds.  And in that sense maybe they would have

18   paid the artificially inflated rate, but they've put nothing

19   in the record that conclusively establishes that.

20              Furthermore, what was most troubling to us that they

21   tried to hide all of this from the Court.  They didn't say

22   anything about any of this until we shown the light on them

23   and forced them to come forward.  And it's no wonder because

24   these facts clearly establish their lack of standing.

25              They make other arguments in their objection.  They
```

1    argue that the settlements cannot be fair because the named

2    Plaintiffs weren't kept apprised of the settlements and that

3    we kept people in the dark.  Well, we've put in, again, I

4    refer to the certifications that we've put in from each of the

5    named Plaintiffs.  I think we have two of them here today, Mr.

6    and Mrs. Schmidt, who said that the things that Davies are

7    saying are just not true; that we kept them informed of the

8    settlements; that they're generally pleased with the way the

9    litigation has progressed and that whatever Davies has said

10   that they said is simply not true.  That's in our reply

11   declaration.  We have certifications from each of the named

12   Plaintiffs.

13          So their argument that these settlements lack

14   fairness or reasonableness because the named Plaintiffs were

15   not informed, it's just simply wrong, and we've rebutted that

16   contention.

17          Next, your Honor, I'd like to move to our motion for

18   attorney's fees, expenses, and incentive payments to the named

19   Plaintiffs.  As your Honor saw in the papers, we've made a fee

20   request of 30 percent or $2,875,000.  When we put in our

21   papers, we indicated that at that point, collectively,

22   plaintiff's counsel had put in about 7,109 hours of work on

23   the case and that amounted to total time of $3.75 million.  Of

24   course, since the time we filed our papers, we have since put

25   in additional work.  And of course there will be additional

1  work going forward.  As of now we put in additional work of

2  about $150,000.  So, just using the figures as of

3  January 31st, 2016, we were requesting only 75 percent of the

4  time that we put in in the case.  In other words we're taking

5  a little bit of a hair cut, if you will, should the Court

6  award us the fees that we've requested.  And of course that

7  hair cut will get even bigger as we go forward.  I'm reluctant

8  to talk about hair cuts given my situation.

9           THE COURT:  We all are, counsel.

10          MR. ZWEIG:  I would note, your Honor, there has been

11  no objection to the fee request by anybody, including Mr. and

12  Mrs. Davies.  And so we think it's a reasonable request under

13  the circumstances of this case, the amount of work that we've

14  put into the case.  We are not seeking any fees on the

15  discounts that are being offered to the members of the class.

16  It's possible that those will -- we just don't know how well

17  received those will be because they haven't taken place yet.

18  And hopefully, they are well received and hopefully we can

19  provide some relief to those who could use it and try and get

20  the lien off of their property at a discount, but we just

21  don't know how that will work out and so we are limiting our

22  request just to the cash component of the settlement that

23  we've recovered.

24          We've asked the Court that we be permitted to

25  distribute those attorney's fees amongst plaintiff's counsel

1   based on the work that they've performed.  We've put that in

2   the proposed order, if your Honor would allow us to do that.

3           On the reimbursement of our expenses, I would note

4   also no objection has been paid.  They're very reasonable in

5   our view.  We've requested reimbursement of $83,000 and

6   change.  The largest of those expenses were for a vendor lien

7   source which helped us put together some of the notice

8   database.  That cost about $40,000.  Tax preparation fees are

9   another significant expense and an expense we're going to have

10  going forward.  Those we've already spent $17,000 in

11  accounting fees.  I will say that we have tried to minimize

12  our expenses as much as we could.  In fact, we've gotten some

13  of the Defendants to help cover the cost of the database from

14  lien source by contributing I think about $30,000 towards that

15  which obviously we're not seeking in terms of reimbursement.

16  In addition, on the tax preparation fees, we've actually were

17  able to get the escrow agent to kick in some of that money to

18  help us defray the costs of the tax preparation fees.  I think

19  the first year they gave us about three or $4,000, and they're

20  going to give us another couple thousand dollars this year.

21  So, where we can, we certainly are trying to keep our costs

22  down and recover whatever costs we can.  Of course, the

23  $83,000 reimbursement request is not inclusive of whatever the

24  Court administrator fee -- the class notice and claim

25  administrator fees will be.  At an appropriate time, we will

1    provide the Court with that information and get whatever

2    approvals or seek whatever approvals that we need to with

3    respect to paying the claims administrator.

4    Finally, your Honor, we've asked for $3,500 in

5    incentive payments per named Plaintiff or a total of 14,000

6    for the four named Plaintiffs that we have.  We detail at

7    Pages 34 through 36 of our moving brief, ECF 438-1, the legal

8    authority supporting our request.  We note there has been no

9    opposition to that request, and we would note these awards are

10   modest relative to other awards that we discuss in our papers

11   which 10, 20, $30,000.  We think $3,500 is a number that

12   fairly compensates the named Plaintiffs for their

13   participation, for their oversight of this case, and we would

14   request that the Court order and award the $3,500 incentive

15   payments for each of the named Plaintiffs.

16   With that, your Honor, unless the Court has any

17   questions, I'm going to step aside.  Thank you, your Honor.

18   THE COURT:  Thank you very much, Mr. Zweig.

19   It's the Court's understanding that only two

20   individuals, Ms. Arlene Davies and Ms. Jerilean Roberts, have

21   filed objections to the settlement.  In addition, Ms.

22   Christine Sweeney has a statement regarding the underlying

23   action that she would like to present.

24   As to the initial matter, the Court recognizes that

25   there is a dispute as to whether Ms. Davies has standing to

1    object to the settlement.

2            For the purpose of this hearing, the Court will

3    reserve on a decision on the issue of Ms. Davies' standing

4    and will hear all objections.

5            Counsel, at this time, I guess let me say this, in

6    addressing the standing issue, I'm going to put that aside.

7            With respect to anyone else that is here to voice an

8    objection to the settlement and wishes to approach, just rise

9    and the Court will acknowledge as to whether or not you could

10   be heard.

11           Is there anyone else in the Court who wishes to be

12   heard?  Please stand and state your name.

13           MR. DAVIES:  My name is Robert Davies, your Honor.

14   Respectfully, I am Arlene's son.  And I've been referred to as

15   Mr. Davies --

16           THE COURT:  As Mr. and Mrs.

17           MR. DAVIES:  It's my dad and mom's place.  And I just

18   very simply want to say that what was said by my mother and

19   submitted is true.  And there was only -- there was a number

20   of issues that regarding the date and damages that are readily

21   available on the public record.  I'm not going to frankly

22   dignify some of the insults that have been hurled in class

23   counsel's submissions before the Court.  But my mother was

24   represented by class counsel who has submitted a $300,000 bill

25   as part of their case.  When she asks questions about where is

1   the data?  Where is the economics?  They dropped her as a lead

2   plaintiff.  And she was okay to be a lead plaintiff and her

3   standing was fine when it suited class counsel's purpose.  And

4   she was let go and left to defend herself, an 89-year old

5   woman, two days, only two days before Vinay Jisani, SASS's

6   executive vice president pled guilty.  There has been no

7   discovery in this case.  That's all I have, your Honor.

8        THE COURT:  Thank you.  At this time, for those who

9   wanted to be heard, I'll hear from you.  I don't care the

10  order.  Ms. Sweeney.  You can speak from the podium.

11       MS. SWEENEY:  Your Honor and fellow settlement Class

12  Plaintiffs, my name is Christine Sweeney.  My now deceased

13  husband, William Sweeney, and I owned properties at 666, 668,

14  672, 674 and 678 South Broad Street, Trenton.  These

15  properties compromise a restaurant, a bar, seven apartments, a

16  warehouse, a potential retail space and a parking lot.

17       We purchased the properties on March 21st, 1980 under

18  JFD Incorporated.  On May 11, 2011, these properties were

19  sold.  When Bill died on September 22, 2009, we had owned

20  these properties for almost 30 years.  Our pride and joy was

21  our restaurant Sweeney Saloon.  It was a popular Irish pub

22  dedicated to upholding Irish American culture with weekly

23  entertainment.  We featured well-known east coast Irish bands

24  and singers which our customer base enthusiastically

25  supported.  We always remained at the same address throughout

1  the decades, building a quality reputation as a local venue.

2  When we purchased the property in 1980, it was 101 years old.

3  It was a strong link to the City of Trenton's history.  We

4  continued its proud standing by financially contributing to

5  the city's economy in providing revenue to our restaurant and

6  bar and affordable housing for our residences.  Bill managed

7  our business single handedly.  As a landlord, he oversaw

8  apartment rentals and their upkeep.  He also handled

9  operations at every level from hiring employees, to ordering

10  supplies, to helping man the bar, preparing every meal for our

11  lunch and dinner customers.  His prime responsibility was

12  managing all financial aspects of the business.

13       I always maintained a separate career and did not

14  actively participate in the business's financial aspects.  In

15  this way I was able to provide for our personal finances with

16  our health insurance.

17       Following Bill's death, I discovered documents that

18  revealed our business began having financial problems

19  beginning in 1994.  Taxes were not paid on time that resulted

20  in liens.  Several Defendants named in this class action

21  settlement lawsuit purchased these liens.  They were Crusader

22  Lien Services, Robert A. DelVecchio and Mooring Tax Asset

23  Group, LLC.  This brings me to the reason why I'm standing

24  here before you.

25       On September 22, 2009, my husband committed suicide

1   because of the unending struggle with the business over deeply

2   financial issues.  Bill went missing on the afternoon of

3   September 22nd.  The Hamilton Township Police found his body

4   the next day.  The medical cause of death was insulin

5   poisoning.  Along with two bottles of his oral diabetes

6   medication, Bill injected more than 10 syringes of insulin

7   into his body.  This was not a lone act of suicide.  I believe

8   Bill had an accomplice sitting aside him in the front seat of

9   the car.  That accomplice just as surely pulled the plunger on

10  each syringe just as Bill did causing his death.  I believe

11  that accomplice is Mooring Tax Asset Group.

12      Although, Bill's actual death occurred on

13  September 22, 2009, the cause of his death started years

14  earlier when Mooring's representatives began their repeated

15  and continuous harassment and threats of foreclosure if we

16  didn't pay an initial 1,000, and then 2,000 monthly, in

17  addition to paying the original lien of $150,000.

18      I just recently found a document from Mooring billing

19  our business these amounts.  These were not to pay down

20  Mooring's lien but rather to pay Mooring so that, and I quote,

21  we could keep the business.  Bill signed these agreements just

22  three months before he died.  The documents stated that many

23  telephone conversations and in-person visits occurred between

24  Bill and Mooring.  A couple weeks prior to September 22nd, the

25  day Bill died, we put the business up for sale.  Marlex Home

1  Improvement, Mario Ornandez offered to buy it.  When Bill did

2  not return home on September 23rd, I called our realtor, Ann

3  LeBate.  I said, I would accept the offer on Bill's behalf.  I

4  told Ann that if Bill was that tormented over the business, I

5  didn't want him to suffer any more.

6      Then Ann said something that makes my stomach churn

7  to this day.  She told me that Bill was going to kill himself.

8  She learned the shocking news directly from numerous

9  individuals associated with the liens and the sale of the

10  property.  But no one, not a single person, relayed that

11  information to me or anyone who could have stopped or would

12  have stopped Bill from ending his life.  After reading the

13  online Q and A for this class action settlement, I realized

14  that these Defendants compounded the harassments and threats

15  with the legal transactions and maneuvering in these public

16  sale auctions by inflating the interest rates imposed on the

17  property owners.  I think the increased costs to satisfy these

18  liens were not only unjustly imposed, but also created

19  unbearable stress and hardship for property owners.  And in

20  our case, led to my husband's death.

21      My point, these companies purchased the liens knowing

22  that the property owners did not have the money to pay them.

23  My husband did not have to die.  Bill lived with depression

24  every minute of every day because he knew he could never repay

25  the liens, plus the additional monies owed and that were

1    inflated by the high interest rates owed on them.  I have so

2    many questions.  Beginning why were these companies allowed to

3    manage these illegal transactions without the State of New

4    Jersey or the courts doing some kind of monitoring?  Here's

5    another question.  Is a person's life worth less than a

6    building?  A piece of land?  A home?  A business?  I am sure

7    that my husband was not the only victim who may have committed

8    suicide over these threatening liens.  The remaining family

9    members, like me, are left to struggle to make sense of the

10   Defendants' atrocious illegal transactions.  It has been six

11   years, seven months and three days since Bill's death.  Since

12   then, my life is like living in a big black hole, week after

13   week, month after month, year after year.  I go through the

14   motions.  I breathe, but I don't live.  I just exist.  I miss

15   Bill so much that it hurts me beyond hurt.  My dreams of

16   growing old with my one true love are shattered.  After 41

17   years of marriage, when he took his life, he took mine too.  I

18   believe that Robert DelVecchio and Mooring Tax Asset Group

19   killed my husband with their illegal tactics, harassments, and

20   threats of foreclosure.  It was just as they pulled each

21   plunger gushing insulin through his veins, killing him.  My

22   husband was a good, decent person and did not deserve to die

23   over a piece of property.

24          In closing today, I came here to tell you about the

25   heartless tactics used by some of the named Defendants in this

1    antitrust litigation.  There is no denying the taxes should

2    have been paid, but Bill did not have the money to pay them.

3    The continual threats and harassments by these lienholders

4    didn't help pay them.  It only reenforced Bill's depression,

5    in committing him to escape from these greedy lienholders.  I

6    am seeking changes in the monitoring of these tax sale

7    auctions and the methods that are used by the Defendants

8    against the property owners.  Absolutely no one, no one,

9    should have to kill themselves over some bricks and concrete,

10   no one.  Thank you.

11           THE COURT:  Thank you, Ms. Sweeney.

12           Who's next?  Who wants to be heard on the Objectors'

13   side?  Anyone else?  Okay, Counsel.

14           MR. WIEGAND:  Good morning, your Honor.  You do not

15   have the information that you need.

16           THE COURT:  State your name for the record and for

17   the court reporter.

18           MR. WIEGAND:  I apologize.  Tom Wiegand of MoloLamken

19   on behalf of the Objector Arlene Davies.

20           If it please the Court, you do not have the

21   information you need, your Honor, to assess the proposed

22   settlement.  And what information you do have tells us that

23   the settlement is not adequate.

24           I'm here on behalf of Arlene Davies.  Ms. Davies is

25   seated in the courtroom here.  I am also here, your Honor, to

1   speak on behalf of all absent class members who are similarly

2   situated on whose behalf you have a fiduciary duty to make

3   sure that this settlement is fair, reasonable, and adequate.

4        Your Honor, you have no information as to the class

5   size.  You have no information as to the specific dollar value

6   of the liens that were purchased during the class period by

7   these Defendants.  We do not know what is the interest that

8   was earned from the illegally obtained liens.  We do not know

9   what profits these Defendants took through their conspiracy as

10  would be shown in their profit and loss statements.

11       Further, your Honor, there's the question of the

12  second separate payment to certain class members who have

13  outstanding liens.  Certainly that is easily obtained and

14  known information.  We do not know how many outstanding liens

15  are subject to this 15 percent redemption.  We just don't know

16  how many.  We don't know of the value.  We have no idea how

17  much that money potentially is.  It might be a small fraction

18  of the nine and a half million dollar settlement amount.  It

19  might be five times the nine and a half million dollar

20  settlement amount.  We have no idea.  You have no idea.

21       So, your Honor, what I was left to do was to look at

22  the Class Plaintiffs own allegations which counsel recounted

23  accurately, which is that it's $200 million purchased in tax

24  liens each year.  We made an assumption based on some market

25  evidence that a year of interest might be about right, but

1    we're guessing.  We don't know.  They know the exact number

2    how many years each of these liens was outstanding, whether

3    larger liens were outstanding longer, we just don't know.  But

4    if you assume the 18 percent that they allege in the first

5    amended complaint for a year, then that's 18 percent of

6    $200 million every year, that's $36 million for an 11-year

7    class conspiracy, that's $400 million.  The math is

8    undeniable.  They haven't given you no evidence countered to

9    that.

10         Counsel did argue, I quote, numerous liens sold at

11   less than 18 percent.  I don't know if that's 100.  I don't

12   know if that's 100,000.  I have no idea.  You have no idea.

13         So, on the *Girsh* factor of looking at what's the best

14   scenario of this case, it's a $400 million case.  Depending on

15   the evidence -- and here we've got 15 guilty pleas.  It could

16   be trebled.  That's $1.2 billion.  But we're looking at nine

17   and a half million dollars.  Now, your Honor, we could be

18   looking at $95 million.  We could be looking at $950,000.  You

19   could take a zero added or take a zero off, you still don't

20   have the information you need to assess whether or not this

21   settlement is fair, reasonable, and adequate.  It is simply

22   absent.

23         At the preliminary fairness hearing we were told that

24   information would be submitted.  It would have to be

25   submitted.  And your Honor approved the preliminary -- you

1   approved the settlement preliminarily because that issue needs

2   to be addressed at the final fairness hearing.  But it has not

3   been addressed.

4           Now, your Honor, what counsel also said and put in

5   their papers is that they have been bid books.  Now again, as

6   you pointed out, no one has been provided those bid books.

7   Neither you, nor Objectors, nor anybody else who might assess

8   them.  What I want to point out is that in their joint

9   declaration they make the point that they received those bid

10  books prior to filing their first amended complaint.

11          Paragraph 89 of the joint declaration submitted in

12  support of their final fairness submission in mid February of

13  this year states that they received the bid books.

14          Then in Paragraph 92, they state that based on the

15  information that they had accumulated to that time, which

16  included the bid books, they filed a first amended complaint.

17  Their first amended complaint is what we Objectors have relied

18  upon in assessing the value of this case.

19          Your Honor, the first amended complaint is also what

20  you relied upon when ruling in response to the motion to

21  dismiss that the Plaintiffs have established, quote, the

22  overarching statewide conspiracy.  Plaintiffs' factual detail

23  in their first amended complaint that they've submitted

24  consistent with their duties before the Court and their

25  ethical obligations supported a statewide conspiracy of

1   $200 million per year.  This is after the bid books.  So the

2   only evidence that we have is that the bid books actually

3   support the valuation of this case at $400 million.

4          Now, your Honor, Plaintiffs have offered two other

5   justifications for the settlement.  First, let me address the

6   criminal fines.  They point out that $2,055,000 has been

7   assessed in criminal fines.

8          First, your Honor, these are fines.  These are not

9   damages estimates.  In fact, the papers that they submit

10  expressly say so.  The papers state that because there is

11  civil proceedings, it is presumed that any recoveries for

12  damage amounts would be gathered there.  And, for example,

13  your Honor, Docket 439, Exhibit 10, Paragraph 12, as to one of

14  the defendants in this case.

15         Further, your Honor, if you look at the $2,055,000

16  that is in the chart, in their filing, it shows that most of

17  the Defendants' criminal fines have not yet been determined.

18         In fact, the Crestar Defendants' criminal fine was

19  $2 million which exceeds the settlement in the civil case of

20  $1.65 million.

21         The SASS Defendants, who have settled, agreed to pay

22  $3.4 million in settling this case.  Their criminal fine has

23  not been determined.  So even if a criminal fine were somehow

24  representative or an indicator of civil damages, the

25  $2,055,000 is very misleading.

1          Indeed, your Honor, the SASS Defendants, we know

2    themselves purchased between 75 and $100 million of the

3    $200 million market every year.  That is shown from the

4    criminal trial that occurred last year, and it is submitted to

5    this Court on Docket 423 on Page 2.

6          The second justification that has been offered, your

7    Honor, was the NFL decision issued by the Third Circuit just a

8    week ago.  Your Honor, the NFL case is very different.  What

9    the Class Plaintiffs have presented here is not close.

10          There, your Honor, Judge Brody was presented with no

11    evidence justifying a settlement value.  Now, there is a

12    settlement value of $765 million at the time.  Very, very

13    different than the $9.5 million in this case.  And yet, Judge

14    Brody *sua sponte* refused even a preliminary approval of that

15    settlement amount because it was not supported with data.  She

16    couldn't determine whether it would be fair, reasonable, and

17    adequate.  She knew it by looking at the attachments and, she

18    said, Can't do it.  Dismissed it without prejudice.

19          Your Honor, that motion that she dismissed *sua*

20    *sponte*, without prejudice, was supported by an affidavit from

21    a former federal district court judge who had in good faith

22    attended months of mediations.  He had been the mediator.  He

23    was appointed by the court.  He said that he believed that the

24    negotiations occurred in good faith; that counsel on all sides

25    represented themselves well; that they fought hard and this

1   was a fair settlement in terms of the process that resulted in

2   it.

3          Your Honor, that's much more evidence than you've

4   been given.  You've been given essentially the same type

5   statements, but by counsel who are involved in the matter.

6   You do not have the statements of a federal district court

7   judge who sat through them.  And yet, of course, Judge Brody

8   realized even that was not sufficient; you need actual data.

9          So what happened in the NFL case is that Judge Brody

10  asked for actuarial data.  She received over 600 pages of

11  actuarial data.  We knew the number of people who were

12  involved in that case.  We knew what diseases.  How many

13  people would get them.  What those would cost, et cetera.

14  There was detailed evidence provided.

15         As the Third Circuit also realized there are medical

16  affidavits.  Judge Brody had and relied on 22 expert

17  affidavits from doctors.  There was on certain issues much

18  information and evidence provided to Judge Brody.  And before

19  she had it, she was not going to accept that settlement.

20         Even after the final fairness hearing, your Honor,

21  Judge Brody realized, among other problems with the

22  settlement, that there is a group that was disenfranchised:

23  the NFL Europe players.  They were getting a full release, but

24  they were getting no compensation.  She realized that was not

25  fair.  You had a subset of the class getting something

1    different than the rest of the class received.  And she asked

2    before making a determination on the final fairness whether

3    the settling parties would agree to include NFL Europe, among

4    other issues that she found particular problems with, and only

5    after they agreed to do that, did Judge Brody approve the

6    settlement in that case.

7         Your Honor, the NFL case is very, very different.  We

8    have no data here.  We have self-serving claims from counsel,

9    which we know from the *GM Trucks* decision, a court cannot rely

10   on.  We know that anyway, but if we needed precedent, the

11   Third Circuit has said it.

12        Your Honor, briefly assessing other *Girsh* factors,

13   the Plaintiffs have failed to account for the fact that there

14   are criminal pleas.  What they have said is, Well, criminal

15   pleas does not make it a slam dunk.  But they have not

16   incorporated the fact that the criminal pleas are going to

17   make the civil case significantly different than the cases

18   that they cite.  A criminal plea is going to make a big

19   difference in cross-examining certain witnesses.  It is going

20   to make a difference in how the jury is going to see the

21   damage estimates.  The cases they rely on are not cases in

22   which criminal pleas have been filed.  Indeed, the criminal

23   pleas make a higher chance of prevailing at trial.  These are

24   all factors that point in certain directions that criminal

25   pleas weigh against the settlement.

 1          Your Honor, the lack of discovery and lack of any
 2   evidence from the informal discovery should make this Court
 3   weary.  Perhaps, the NFL decision from the Third Circuit is,
 4   while it refuses to adopt a distinction between formal and
 5   informal, perhaps, if that's what Plaintiffs are arguing, the
 6   point that the NFL court made was that much evidence had been
 7   submitted to the Court.  Here, even if some informal discovery
 8   occurred, we have no idea what it is.  It has not been shown
 9   to anyone.  If it was helpful to the cause, one would expect
10   we would have seen it.  It has been hidden.  There is no
11   evidence as to what a reasonable settlement is here.  None.
12          Your Honor, on the interclass conflict.  So all class
13   members get a pro rata share, everybody.  If you got a current
14   outstanding lien or not.  But, if you have a current
15   outstanding lien, you also get a second settlement payment.
16   That in itself is unfair, nor is it a reflection of some
17   people deserve it more than others.  If somebody had -- we'll
18   use the example $100 tax lien at 18 percent and they redeemed
19   it two years ago, they only get the pro rata share, even
20   though they might have spent 10 or 12 years of paying
21   18 percent on that tax lien.  Whereas, someone who still has
22   that tax lien, if they didn't redeem it two years ago, well,
23   now they get 15 percent of the entire amount which we're not
24   allowed to do the calculation, but it sounds like many, many
25   times what a pro rata share is going to be.  It's 15 percent

1  of the actual tax paid.  It's 15 percent of the interest that

2  is accumulated.  It is 15 percent of the entire amount owing.

3  That is a much larger settlement.  Again, it defies

4  calculation because we have no data from which to calculate

5  it.  But to suggest that one portion of the class gets a

6  second payment that nobody else gets is not fair.

7         You had yourself asked at the preliminary fairness

8  hearing.  Well, couldn't we just lump those together and give

9  everybody a pro rata sheet?  You could look at how long each

10 person had to pay interest on their initial liens.  Some

11 people paid two months; some people paid six years; some

12 people still have the lien outstanding.  You can simply make

13 it pro rata according to those payments.  There is a way to do

14 it.  And we had simply find out what is the current

15 outstanding value of all the liens, multiply that by

16 15 percent, add that to the settlement amount, and divvy it

17 up.  That might resolve that.  But what we have now, we know

18 does not work.  There is a clear interclass conflict.

19        Your Honor, I'll touch briefly on the standing issue.

20 We've made it very clear in the letter that we submitted to

21 the Court, the main point here is that Ms. Davies is a member

22 of the class as defined.  If they believe they have a defense

23 as to her claim, they believe they have defenses as to all the

24 claims.  They think they have reasons why they should prevail

25 on all these claims.  What they're doing with a class

1    settlement is buying their piece and getting a release.

2         The only thing Ms. Davies needs to do to establish

3    her standing has been done, which is to submit evidence that

4    she purchased a tax lien from one of the Defendants during the

5    class period.  In fact, her tax lien was purchased at

6    18 percent at public auction in December of 2008.

7         Now, as to whether she has elected not to participate

8    in this case, through the state court case, we know that is

9    not true.  What the state court judge there issued, and has

10   ordered, was a statement that unless she files a letter

11   stating that she wished to pursue her claims against SASS in

12   the state court case, she would be deemed to have chosen to

13   pursue those through the federal case.  That's this federal

14   case, your Honor.  It is undisputed that there never was any

15   written election by Ms. Davies to pursue those claims in the

16   state court case.  Then a hearing came up one day and Ms.

17   Davies attended.  She had no lawyer with her.

18        The judge asked her if she was ready to proceed?  She

19   said, No.  She had no lawyer.  That's not electing to proceed

20   in the state court case.

21        The Court expressly asked, Have you submitted a

22   written statement electing to pursue your claims in this case?

23   She said, No, she has not.  By the Court's own order she is

24   deemed to pursue those claims here.  Nevertheless, when she

25   said she did not want to proceed, she was asked, Well, tell me

1    about those claims?  Well, she did.

2        Now, counsel is arguing that because that happened to

3    Ms. Davies that she has elected to pursue her claims in that

4    case, it's not true.  She never made that election.

5        Further, your Honor, there was no class in this case

6    that have been certified so there's nothing to opt out from.

7    She cannot be deemed to have opted out from this class.

8        Your Honor, there is no claim preclusion.  That's the

9    point of the *Nanavati* case.  And from the reply of class

10   counsel I believe they are no longer arguing the claim

11   preclusion applies.  They seemed to have agreed with that.

12   The remaining argument that they have is that they believe

13   issue preclusion should apply despite what I have just said

14   about the state court judge and Ms. Davies not having ever

15   submitted a written election pursuing the state court case.

16       Your Honor, there is no issue preclusion.  The

17   *Untracht* case that's been cited to you talks about a final

18   determination that did rely on the earlier hearing regarding

19   antitrust claims.  In this case, it's undisputed that the

20   final judgment in the state court case was that it was

21   dismissed because the tax liens had been redeemed.  That was

22   it.  That was the basis of the final determination.

23       The determination at the May 14th hearing, which was

24   determined because they didn't -- Ms. Davies did not have all

25   the documents.  The Court was impressed with some of the

1    documents and some of the information that she had, but SASS

2    had a lawyer there and he was able to have certain objections

3    sustained so not much evidence came in.  At the end of that

4    hearing, your Honor, the state court judge told Ms. Davies, I

5    encourage you to get a lawyer.  You can come and ask for this

6    to be reconsidered.  You have other rights.  You could appeal.

7    And by the way, you have at least two months until this will

8    be docketed anyway, so you have time to get a lawyer.  I

9    encourage you to do that.  This is not a final determination.

10   And less than two months after that, your Honor, is when the

11   final determination issued based on the redemption, not based

12   on any hearing regarding Ms. Davies.  Based solely on the

13   redemption.

14          The law, your Honor, is that the final determination,

15   the final order in the case needs to have followed on the

16   hearing that they were trying to apply if issue preclusion is

17   going to apply.  The May 14th hearing needs to have been,

18   quote, essential to the final adjudication.  It wasn't.  It

19   was irrelevant to the final adjudication.

20          Further, your Honor, we have submitted evidence.  It

21   is in the record.  Ms. Davies does owe the money to the Credit

22   Union.  There is a credit union that had her mortgage lien.

23   And so the Credit Union, rather than have the property

24   foreclosed upon, also acquired the lien from SASS.  And it was

25   that redemption that ended the case.  But without a doubt as

1    to the issue of damages, Ms. Davies still owes that entire

2    amount that had to be paid to SASS in order to avoid the

3    foreclosure.

4           Your Honor, if you have no questions.  Thank you.

5           THE COURT:  There is no objections to the fees and

6    costs, correct?

7           MR. WIEGAND:  That's correct, we have no objections.

8           THE COURT:  Anything on reply, Counsel?

9           MR. ZWEIG:  Thank you, your Honor.

10          Jason Zweig, again, for the Class Plaintiffs.  I'll

11   try to keep it relatively brief.

12          First, to address something that Mr. Davies had said

13   which was incorrect, he said that she was dropped as a named

14   plaintiff because she had asked for some data.  That's just

15   not correct.  We've put in our reply declaration the extensive

16   history of communications between Class Counsel and Mr. and

17   Mrs. Davies including the numerous telephone conversations in

18   which we provided them with information and the strengths and

19   weaknesses of the case, the reason why she was not included as

20   a named plaintiff, as we put, again, extensively in our joint

21   reply declaration is that, we said, if you disagree with

22   everything that we're doing, which she did, and he did, Mr.

23   Davies, then we didn't think it made a lot of sense for you to

24   continue as a named plaintiff.  So that was -- that was the

25   reason why they were not a named plaintiff in the amended

 1    complaint, not because she had asked for the data.

 2         With regards to Ms. Sweeney's comments, obviously,

 3    it's a tragic story.  I've heard from a number of class

 4    members throughout our time in this case who also have

 5    difficult stories.  This is, in my view, a very tough

 6    situation, the tax lien business.  You're dealing with real

 7    people and homes; and it's tough.  And again, I've heard

 8    numerous conversations from a number of class members over the

 9    years.  But unfortunately, the situation is that the law is

10    what it is at the moment.  And the law is in the State of New

11    Jersey, on the books in New Jersey, that investors can come

12    and purchase these tax liens regardless of the property

13    owners' circumstance.  And so, as tragic as these stories are,

14    and they are, make no mistake about it, that's an issue that

15    needs to be addressed with the New Jersey Legislature, not

16    this case.  This case is about the rigging of interest rates.

17    And so I urge Ms. Sweeney especially to -- and we'd be happy

18    to assist her, to talk to the New Jersey Legislature of

19    whether any adjustments to the laws can be made that might

20    assist property owners more than currently exist today.

21         With regards to some of the things Mr. Wiegand said.

22    He said, we don't know how much liens are at issue in this

23    case.  As I said, in my remarks, and as we put in our

24    declaration, in fact, I'm going to grab it if -- your Honor.

25         THE COURT:  Sure.

1      MR. ZWEIG:  As I said in my opening remarks, your

2  Honor, in our joint declaration, which is ECF Number 439, we

3  include a number of cases the amount of liens that were the

4  subject of the conspiracy based on the criminal pleadings that

5  were -- that arrived in the public domain.  And if you look at

6  Paragraph 28, we talk about the Mercer Defendants, in the

7  Mercer criminal plea documents.  There is a stipulation that

8  there was $211,000 worth of liens that were the subject of the

9  conspiracy that the Mercer Defendants conspired on.  That's

10  the entire value of the lien with interest.  We got from the

11  Mercer Defendants $250,000.  Our settlement relates only to

12  interest.

13      With regards to Remick, Paragraph 30, it talks about

14  how there were $330,000 worth of liens that Remick conspired

15  on during the class period.  I think our settlement with

16  Remick was $130,000.

17      Mastellone, Paragraph 32, of our joint declaration,

18  there was $166,000 of liens that he conspired on during the

19  class period.  We got, I believe it's $125,000 from Mr.

20  Mastellone.  He's the gentleman that had to take out a home

21  equity line of credit to pay the settlement that he agreed to.

22      Mr. DelVecchio, Paragraph 34, there is $320,000 worth

23  of liens that he conspired on.  We got I believe it's 135,000

24  from him.

25      So, the contention and the notion that there's no

1    data in the record is just simply false.  No matter how many

2    times Mr. Wiegand says it, isn't going to make it true.

3         Mr. Wiegand said that the bid books we had in our

4    possession prior to filing our amended complaint and,

5    therefore -- and we still allege there was 100 to 200 million

6    in liens sold every year and, therefore, that must be all a

7    part of the conspiracy.  But the complaint says what it says.

8    It says that this is a 100 to $200 million a year of tax liens

9    auctioned off every year.  It doesn't say all of those were

10   conspired on.  You're not going to find that anywhere in the

11   complaint.  We never make that allegation.  We never make the

12   allegation that the entirety of the interest rate is the

13   subject of the conspiracy on every single lien.  That doesn't

14   exist anywhere in the complaint because we didn't allege that.

15        So, the fact that we had the bid books prior to

16   filing -- preparing and filing our amended complaint doesn't

17   change anything.

18        Mr. Wiegand misspoke on a number of occasions.  He

19   said the SASS Defendants were -- you know, pled guilty and

20   that they're likely to, I don't recall exactly what he said,

21   but that they hadn't pled guilty and been sentenced yet.

22   That's a misstatement.  The SASS Corporate defendants have not

23   been criminally charged and will not be criminally charged as

24   the investigation is over.  There have been two employees of

25   SASS who were, who have pled guilty, Mr. Jessani and Mr.

1    Hruby.  They haven't been sentenced yet.  I don't know what

2    their fines will be or their sentence will be, but the SASS

3    defendants have not been charged and will not be charged.

4         Furthermore, the notion that the criminal fines are

5    irrelevant here is also not true.  As your Honor may know

6    under the Mandatory Victim Restitution Act, 18 U.S.C. 3663,

7    the Court is obligated to impose restitution upon defendants

8    if damage to a victim can be determined.  I, of course, talked

9    to you about the case, *U.S. v. Bathon*, where it could not be

10   determined.  And it would be a difficult task here as well.

11        It's interesting how Mr. Wiegand, who was one of the

12   Objectors counsel in the NFL case, talks about all of the

13   discovery that -- or the documents that the Court had before

14   it to evaluate the settlement.  In fact, despite all of the

15   stuff that it had before it, it still wasn't enough for Mr.

16   Wiegand.  He still continued to say, there wasn't enough

17   discovery.  And that's going to continue to be the case here

18   no matter how much is in the record in terms of this case.

19        In terms of the *Girsh* factor about the information

20   that Class Counsel had before it, it's not a matter a

21   formulaic answer in terms of how much discovery is necessary.

22   The touchstone of that factor is, did Class Counsel have

23   enough before it, as I said earlier, to properly evaluate the

24   strengths and weakness of the case.  Not only did we have all

25   of the information, I've already talked about in the public

1    record.  As I said earlier, the Defendants produced to us

2    financial information and information about the liens that

3    they conspired on and also that they didn't conspire on.  And

4    we also went through, as your Honor knows, as probably still

5    hopefully is moved on from it, but there was a lot of paper

6    exchange between the parties on the motions to dismiss.  We

7    had two rounds of motions to dismiss.  We had dozens and

8    dozens of conversations with settling Defendants.  We had a

9    full appreciation of the strengths and weaknesses of our case.

10   All three firms acting as Class Counsel have collectively,

11   among them, hundreds of years of experience in litigating

12   antitrust cases, that's not to say that therefore whatever we

13   say goes.  But needless to say, based on the information we

14   had against the backdrop of our experience, we fully believed

15   we understood the strengths and weaknesses of this case and

16   believed that the settlements we achieved are, in fact, more

17   than fair, reasonable, and adequate.

18          Mr. Wiegand also misrepresented the state court

19   record with regards to Mrs. Davies and her trial.  As we said,

20   it is true that she did not make a written election in terms

21   of Judge Batten's order requiring her to make a written

22   election of her remedies but she did show up at trial.  She

23   never said she didn't want to go forward.  And I don't need to

24   belabor the point.  As I said we put in the full transcript.

25   And the Court has it in the record.  And I will tell the Court

1   where to find it.  I apologize, your Honor.  I should have had

2   it handy.

3          The full transcript can be found at ECF 460-2

4   beginning at Page 59 of 200.  But if you look on Pages 4 to 6,

5   at the beginning of the proceedings, the judge talks to Mrs.

6   Davies about whether she wants to go forward with the case and

7   at no time did she ever say, No.  Again, that's in the record.

8          I will say also that Judge Batten ordered her to

9   retain new counsel.  She consulted with Objector's counsel.

10  For whatever reason the Objector's counsel decided not to

11  represent her in that case and left her to fend for herself.

12  And she ultimately did not, for whatever reason, choose to

13  retain new counsel in that case.

14         Your Honor, I've been handed a note that says, with

15  regards to my representation about MD SASS, while it is true

16  that they have not been charged, I suspect this is probably

17  from Mr. Hughes, that it cannot be represented that they know

18  the state of the investigation and whether or not they will be

19  charged in the future.  Certainly, based on my conversations

20  with people that are in the know and based on the statute of

21  limitations and other things, we think it's a very good

22  possibility that they will not be charged.  I can certainly

23  say that.

24         Finally, your Honor, the issue about Mrs.  Davies'

25  lien having been paid by a third-party.  Mr. Wiegand said that

1   they put in the record that there is no question that she

2   ultimately owes those funds.  We don't agree with that.  Your

3   Honor can look at the letter that they put in.  The only thing

4   they put in on that, again, after we've brought all this to

5   light, I'm not sure why they concealed all this information

6   from the parties, but it doesn't -- it's very vague as to

7   whether or not they need to pay the whole amount.  And because

8   it's vague, it's not clear whether they ever will have to pay

9   the full amount and, therefore, standing is too attenuated.

10  We don't know if they ever will suffer the damage.  And so,

11  again, another reason that they lack standing.

12          Your Honor, I think with that, I'd like, unless the

13  Court has any further questions, I'm done with my remarks,

14  thank you.

15          THE COURT:  Thank you so much, Mr. Zweig.

16          Counsel, at this time the Court would like to thank

17  all of you as well as those Objectors who individually

18  spoke --

19          MR. WIEGAND:  Your Honor, can I say one more thing?

20          THE COURT:  Counsel, they get the last word.  Is it

21  going to be in opposition of something that was just raised or

22  is it something new?

23          MR. WIEGAND:  Absolutely.  It will be very brief.

24  Thank you.

25          Your Honor, just as one example of the lack of

1  understanding as to the size of the conspiracy, if you look at

2  Paragraph 36 of the joint declaration, this is Mr. Jessani's

3  plea agreement.  Mr. Jessani is a senior executive of MD SASS,

4  the company that we've been talking about, the company that

5  paid the $3.4 million in settlement.  And Paragraph 36 states

6  that, according to Jessani's plea agreement, the volume of

7  liens that Jessani conspired on was more than $10 million.  We

8  have no idea how much more.  What was adduced at the criminal

9  trial and that we put into the record, I already gave the

10  cite, was that 75 to $100 million per year was purchased by MD

11  SASS.  Mr. Jessani on behalf of MD SASS would have been the

12  primary person doing that.  It was well more than $10 million

13  apparently.

14        And then your Honor, as to the fact that that amount

15  is not an estimation of actual damages, I refer the Court

16  again to Exhibit 10 to that declaration, Docket 439,

17  Exhibit 10, Paragraph 12, in which it states, That this is not

18  meant to be a recovery of actual damages.  Thank you, your

19  Honor.

20        THE COURT:  With that, Counsel, the Court will take

21  arguments as well as the papers submitted under advisement and

22  issue a decision.

23        I don't believe there is a need to do any

24  supplemental memoranda or anything additional.  Am I correct,

25  Counsel?  There's nothing raised today that we need to do any

1    further briefing on?

2              MR. ZWEIG:  Not from our perspective, your Honor.

3              THE COURT:  With that, Counsel, that's all we have

4    for today.  Thank you very much.  Have a great day.

5              THE DEPUTY COURT CLERK:  All rise.

6              (Court concludes at 12:00 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.65** [1] - 49:20
**$10** [2] - 66:4, 66:9
**$100** [4] - 25:5, 50:2, 53:18, 66:7
**$125,000** [1] - 60:17
**$130,000** [1] - 60:14
**$150,000** [2] - 36:2, 42:17
**$166,000** [1] - 60:16
**$17,000** [1] - 37:10
**$2,055,000** [3] - 49:6, 49:15, 49:25
**$2,875,000** [1] - 35:20
**$20,000** [2] - 13:18, 14:17
**$200** [8] - 19:14, 20:17, 20:20, 46:23, 47:6, 49:1, 50:3, 61:6
**$211,000** [1] - 60:6
**$250,000** [1] - 60:9
**$3,500** [3] - 38:4, 38:11, 38:14
**$3.75** [1] - 35:23
**$30,000** [2] - 37:14, 38:11
**$300,000** [1] - 39:24
**$320,000** [1] - 60:20
**$330,000** [1] - 60:12
**$36** [3] - 19:17, 20:13, 47:6
**$4,000** [1] - 37:19
**$40,000** [1] - 37:8
**$400** [4] - 19:20, 47:7, 47:14, 49:3
**$50** [1] - 25:7
**$765** [1] - 50:12
**$83,000** [2] - 37:5, 37:23
**$9,585,000** [1] - 5:18
**$9.585** [1] - 19:20
**$95** [1] - 47:18
**$950,000** [1] - 47:18

## '

**'guard** [1] - 23:17

## /

**/S** [1] - 1:20

## 0

**08608** [1] - 1:9

## 1

**1** [2] - 6:14, 9:19
**1,000** [1] - 42:16
**1.2** [1] - 47:16
**10** [10] - 13:17, 13:20, 19:19, 25:7, 38:11, 42:6, 49:13, 53:20, 66:13, 66:14

## 100

**100** [3] - 47:11, 61:3, 61:6
**100,000** [1] - 47:12
**101** [1] - 41:2
**10:07** [1] - 3:2
**11** [2] - 11:10, 40:18
**11-year** [1] - 47:6
**12** [3] - 49:13, 53:20, 66:14
**12-1893** [1] - 3:7
**12:00** [1] - 67:3
**13** [3] - 5:15, 5:23, 18:11
**135,000** [1] - 60:21
**14** [2] - 5:24, 31:4
**14,000** [1] - 38:5
**14th** [2] - 56:22, 57:16
**15** [11] - 7:12, 8:13, 9:9, 16:17, 46:15, 47:15, 53:23, 53:25, 54:1, 54:2, 54:15
**16** [1] - 6:1
**17** [1] - 12:6
**18** [14] - 18:4, 19:16, 19:24, 20:1, 20:3, 20:13, 25:5, 47:4, 47:5, 47:11, 53:18, 53:21, 55:6, 62:4
**19** [1] - 18:13
**1980** [2] - 40:17, 41:2
**1992** [1] - 31:20
**1994** [1] - 41:19
**1998** [1] - 10:10

## 2

**2** [5] - 6:15, 9:20, 13:16, 49:19, 50:5
**2,000** [1] - 42:16
**20** [3] - 5:16, 7:7, 38:11
**200** [2] - 61:3, 64:1
**2008** [1] - 55:6
**2009** [3] - 40:19, 41:25, 42:13
**2011** [2] - 29:11, 40:18
**2013** [2] - 5:15, 17:25
**2014** [2] - 30:15, 31:4
**2015** [2] - 5:15, 5:20
**2016** [5] - 5:23, 5:24, 6:1, 23:9, 36:3
**21** [1] - 7:7
**21st** [1] - 40:17
**22** [4] - 40:19, 41:25, 42:13, 51:16
**22nd** [2] - 42:3, 42:24
**23rd** [1] - 43:2
**25** [3] - 23:10, 24:4
**28** [2] - 1:19, 60:4

## 3

**3** [1] - 6:16
**3.4** [2] - 49:22, 66:2
**30** [4] - 5:15, 35:20, 40:20, 60:11
**30,000** [1] - 14:6

## 30025

**30025** [1] - 18:11
**30th** [1] - 5:20
**31st** [1] - 36:3
**32** [2] - 24:4, 60:15
**34** [3] - 24:21, 38:7, 60:20
**35** [1] - 16:18
**36** [3] - 38:7, 65:24, 66:2
**3663** [1] - 62:4
**37** [2] - 12:5, 12:8

## 4

**4** [3] - 6:17, 32:18, 64:1
**402** [1] - 1:9
**41** [1] - 44:16
**423** [1] - 50:5
**437-1** [1] - 24:5
**438-1** [1] - 38:7
**439** [3] - 49:13, 59:25, 66:13
**453** [1] - 26:25
**460-2** [1] - 63:25

## 5

**5** [1] - 6:18
**5,600** [3] - 9:15, 9:19, 17:16
**50** [4] - 14:10, 16:16, 16:18, 22:21
**59** [1] - 64:1

## 6

**6** [1] - 64:1
**600** [1] - 51:10
**666** [1] - 40:13
**668** [1] - 40:13
**672** [1] - 40:14
**674** [1] - 40:14
**678** [1] - 40:14

## 7

**7,000** [1] - 12:10
**7,109** [1] - 35:22
**75** [3] - 36:3, 50:2, 66:7
**753** [1] - 1:19

## 8

**803** [1] - 31:20
**89** [1] - 48:11
**89-year** [1] - 40:4

## 9

**9.5** [1] - 50:13
**9.585** [1] - 7:8
**92** [1] - 48:14
**93,000** [1] - 11:7
**978** [1] - 31:20

## A

**a.m** [1] - 3:2
**ability** [2] - 21:19, 22:5
**able** [10] - 18:24, 18:25, 19:2, 22:23, 30:9, 30:12, 32:9, 37:17, 41:15, 57:1
**absence** [1] - 9:23
**absent** [3] - 10:2, 46:1, 47:22
**absolutely** [2] - 45:8, 65:20
**accept** [2] - 43:3, 51:19
**access** [1] - 14:24
**accomplice** [3] - 42:8, 42:9, 42:11
**accordance** [1] - 5:22
**according** [2] - 54:12, 66:3
**account** [2] - 27:5, 52:13
**accounting** [1] - 37:11
**accrue** [1] - 26:13
**accrued** [1] - 26:20
**accruing** [1] - 26:7
**accumulated** [2] - 48:15, 54:2
**accurately** [1] - 46:23
**achieved** [1] - 63:14
**acknowledge** [1] - 39:9
**acknowledged** [1] - 8:2
**acquired** [2] - 29:14, 57:23
**acquiring** [1] - 31:13
**acquitted** [1] - 17:2
**act** [1] - 42:7
**Act** [1] - 62:4
**acting** [1] - 63:8
**action** [10] - 5:17, 9:13, 9:18, 21:1, 22:17, 29:1, 29:25, 38:23, 41:20, 43:13
**ACTION** [1] - 1:4
**actively** [1] - 41:14
**actual** [5] - 42:12, 51:8, 54:1, 66:12, 66:15
**actuarial** [2] - 51:10, 51:11
**add** [1] - 54:15
**added** [1] - 47:19
**addition** [10] - 7:10, 7:25, 8:13, 29:22, 33:13, 34:1, 37:16, 38:21, 42:17
**additional** [7] - 24:9, 26:23, 35:25, 36:1, 43:25, 66:21
**address** [10] - 6:14, 7:16, 7:20, 7:24, 24:21, 28:12, 40:25, 49:5, 58:10
**addressed** [5] - 24:17, 27:23, 48:2, 48:3, 59:13
**addressing** [1] - 39:6
**adduced** [1] - 66:5
**adequacy** [2] - 23:16, 28:12
**adequate** [6] - 24:25, 45:23, 46:3, 47:21, 50:17, 63:15
**adjudicated** [1] - 33:15

**adjudication** [2] - 57:17, 57:18
**adjustments** [1] - 59:17
**administer** [1] - 27:12
**administrator** [6] - 5:22, 11:9, 24:19, 37:24, 37:25, 38:3
**adopt** [2] - 12:16, 53:4
**advance** [1] - 28:19
**advancing** [1] - 28:20
**advisement** [1] - 66:18
**affected** [2] - 14:5, 20:10
**affidavit** [2] - 11:9, 50:20
**affidavits** [2] - 51:16, 51:17
**affordable** [1] - 41:6
**afternoon** [1] - 42:2
**agent** [1] - 37:17
**aggrieved** [1] - 33:15
**ago** [4] - 34:7, 50:8, 53:19, 53:22
**agree** [2] - 52:3, 64:24
**agreed** [4] - 49:21, 52:5, 56:10, 60:19
**agreement** [2] - 65:25, 66:3
**agreements** [2] - 7:7, 42:21
**Air** [1] - 34:1
**all-day** [1] - 22:8
**allegation** [2] - 61:9, 61:10
**allegations** [4] - 19:6, 19:10, 19:11, 46:22
**allege** [4] - 5:12, 47:4, 61:3, 61:12
**allocation** [10] - 5:8, 6:10, 6:17, 24:20, 25:25, 27:1, 27:4, 27:8, 27:10, 27:23
**allow** [1] - 37:2
**allowed** [4] - 32:14, 34:5, 44:2, 53:24
**almost** [4] - 13:9, 13:13, 14:5, 40:20
**alone** [1] - 22:6
**altogether** [1] - 14:25
**amended** [10] - 14:11, 47:5, 48:10, 48:16, 48:17, 48:19, 48:23, 58:23, 61:2, 61:14
**American** [1] - 40:22
**amid** [1] - 23:12
**amount** [22] - 7:12, 11:23, 13:8, 13:12, 13:20, 14:2, 14:13, 19:18, 22:12, 27:13, 36:13, 46:18, 46:20, 50:15, 53:23, 54:2, 54:15, 57:25, 60:1, 65:4, 65:6, 66:11
**amounted** [1] - 35:23
**amounts** [4] - 19:5, 19:21, 42:19, 49:12
**Ann** [3] - 43:2, 43:4, 43:6
**announcements** [1] - 21:16
**answer** [5] - 27:7, 27:8, 27:18, 29:18, 62:19

**antitrust** [14] - 9:13, 9:18, 16:6, 17:14, 30:4, 30:6, 30:8, 31:22, 32:1, 32:10, 45:1, 56:18, 63:10
**anyway** [1] - 57:7
**apartment** [1] - 41:8
**apartments** [1] - 40:15
**apologize** [2] - 45:18, 63:24
**appeal** [1] - 57:5
**appear** [2] - 8:4, 11:18
**appearances** [2] - 3:8, 5:5
**APPEARANCES** [1] - 2:1
**apple** [1] - 30:19
**applies** [1] - 56:10
**apply** [5] - 32:4, 33:3, 56:12, 57:15, 57:16
**appointed** [3] - 11:14, 22:9, 50:23
**appreciation** [2] - 12:10, 63:7
**apprised** [2] - 28:3, 28:4, 35:2
**approach** [1] - 39:8
**appropriate** [1] - 37:25
**approval** [7] - 5:7, 5:8, 5:16, 5:25, 7:7, 28:1, 50:14
**approvals** [1] - 38:2
**approve** [3] - 6:15, 6:17, 52:5
**approved** [5] - 5:21, 12:4, 12:7, 47:25, 48:1
**April** [1] - 11:10
**area** [1] - 21:14
**argue** [2] - 33:18, 35:1, 47:10
**arguing** [5] - 3:22, 31:11, 53:5, 55:25, 56:9
**argument** [5] - 15:4, 23:6, 32:23, 35:13, 56:11
**arguments** [4] - 7:21, 14:21, 34:25, 66:18
**Arlene** [5] - 3:19, 6:5, 38:20, 45:19, 45:24
**Arlene's** [1] - 39:14
**arose** [2] - 9:7, 29:7
**ARP** [1] - 4:3
**Arp** [1] - 4:3
**arrived** [1] - 60:3
**artificially** [3] - 26:10, 34:12, 34:18
**aside** [3] - 38:17, 39:6, 42:8
**aspect** [3] - 8:14, 9:2, 28:8
**aspects** [2] - 41:12, 41:14
**asserted** [5] - 29:20, 29:24, 30:1, 30:2
**assess** [3] - 45:21, 47:20, 48:7
**assessed** [1] - 49:7
**assessing** [2] - 48:18, 52:12
**Asset** [3] - 41:22, 42:11, 44:18

**assist** [2] - 59:16, 59:18
**associated** [4] - 5:13, 9:4, 9:8, 43:9
**assume** [4] - 19:7, 19:16, 47:4
**assuming** [2] - 17:21, 20:20
**assumption** [1] - 46:24
**atrocious** [1] - 44:10
**attached** [1] - 29:19
**attachments** [1] - 50:17
**attended** [2] - 50:22, 55:17
**attenuated** [1] - 65:6
**attested** [2] - 28:3, 28:7
**attorney** [3] - 5:9, 6:10, 6:17
**attorney's** [4] - 30:1, 30:5, 35:18, 36:25
**ATTORNEY1** [1] - 1:14
**ATTORNEY2** [1] - 1:16
**Attorneys** [2] - 1:15, 1:17
**attractive** [1] - 20:7
**auction** [2] - 19:24, 55:6
**auctioned** [2] - 18:2, 61:7
**auctions** [8] - 5:14, 9:15, 14:10, 16:7, 16:10, 17:16, 43:16, 45:7
**August** [1] - 5:15
**Authority** [1] - 32:18
**authority** [1] - 38:8
**available** [3] - 14:22, 14:23, 39:21
**avoid** [2] - 24:2, 58:1
**avoids** [1] - 20:24
**award** [2] - 36:6, 38:14
**awards** [3] - 6:18, 38:9, 38:10
**aware** [1] - 8:7

## B

**backdrop** [1] - 63:12
**background** [1] - 5:11
**bands** [1] - 40:23
**bank** [1] - 34:17
**bar** [3] - 40:15, 41:6, 41:10
**bargain** [1] - 23:11
**barred** [2] - 32:7, 32:21
**barring** [1] - 33:14
**base** [1] - 40:24
**based** [16] - 23:18, 25:2, 26:2, 28:6, 29:13, 31:15, 37:1, 46:24, 48:14, 57:10, 57:11, 60:2, 63:11, 64:16, 64:17
**basis** [2] - 17:19, 56:21
**Bathon** [1] - 62:7
**bathon** [1] - 18:11
**BATHON** [1] - 18:11
**Batten** [4] - 30:24, 31:8, 32:24, 64:5

**Batten's** [1] - 63:19
**began** [2] - 41:18, 42:14
**beginning** [4] - 41:19, 44:2, 64:1, 64:2
**begins** [3] - 3:2, 19:25, 23:10
**behalf** [13] - 3:10, 3:14, 3:16, 4:7, 4:13, 4:16, 4:19, 43:3, 45:19, 45:24, 46:1, 46:2, 66:8
**belabor** [1] - 63:22
**believes** [2] - 17:5, 17:12
**benefit** [1] - 10:17
**Berman** [1] - 3:14
**best** [3] - 27:3, 30:7, 47:13
**better** [1] - 7:19
**between** [7] - 13:17, 20:3, 42:23, 50:2, 53:4, 58:14, 63:4
**beyond** [1] - 44:15
**bid** [23] - 14:8, 14:9, 14:21, 14:24, 15:2, 15:17, 18:4, 20:8, 20:10, 29:21, 29:25, 30:20, 31:15, 48:5, 48:6, 48:9, 48:13, 48:16, 49:1, 49:2, 61:1, 61:13
**bid-rigging** [4] - 29:21, 29:25, 30:20, 31:15
**bidding** [1] - 18:3
**bids** [2] - 10:5, 16:9
**big** [2] - 44:12, 52:18
**bigger** [1] - 36:7
**bill** [4] - 39:24, 41:6, 42:2, 42:21
**Bill** [13] - 40:19, 42:6, 42:8, 42:10, 42:24, 42:25, 43:1, 43:4, 43:7, 43:12, 43:23, 44:15, 45:2
**Bill's** [5] - 41:17, 42:12, 43:3, 44:11, 45:4
**billing** [1] - 42:18
**billion** [2] - 15:11, 47:16
**bit** [2] - 17:8, 36:5
**bites** [1] - 30:19
**black** [1] - 44:12
**blush** [1] - 8:11
**body** [2] - 42:3, 42:7
**BONCHI** [1] - 4:15
**Bonchi** [1] - 4:15
**Bongiovanni** [1] - 11:1
**books** [17] - 14:8, 14:9, 14:21, 14:24, 15:2, 15:17, 48:5, 48:6, 48:10, 48:13, 48:16, 49:1, 49:2, 59:9, 61:1, 61:13
**bottles** [1] - 42:5
**bought** [1] - 29:9
**breathe** [1] - 44:14
**bricks** [1] - 45:9
**brief** [8] - 12:6, 24:4, 24:21, 24:22, 32:19, 38:7, 58:9,

65:20
**briefing** [1] - 66:23
**briefly** [2] - 52:12, 54:19
**bring** [2] - 32:2, 32:5
**brings** [1] - 41:23
**Broad** [1] - 40:14
**Brody** [8] - 50:10, 50:14, 51:7, 51:9, 51:16, 51:18, 51:21, 52:5
**brought** [6] - 30:2, 30:8, 31:17, 31:21, 31:25, 65:1
**Brown** [1] - 3:25
**Bruce** [2] - 3:9, 22:8
**building** [2] - 41:1, 44:6
**Burka** [1] - 32:18
**Burling** [1] - 5:1
**business** [11] - 26:16, 41:7, 41:12, 41:18, 42:1, 42:19, 42:21, 42:25, 43:4, 44:6, 59:4
**business's** [1] - 41:14
**buy** [2] - 8:18, 43:1
**buying** [1] - 55:1
**BY** [2] - 1:14, 1:16

## C

**Caiola** [1] - 4:1
**calculate** [2] - 18:25, 54:4
**calculation** [2] - 53:24, 54:4
**candidly** [1] - 27:2
**cannot** [5] - 21:4, 35:1, 52:9, 56:6, 64:14
**capital** [2] - 22:21, 22:25
**car** [1] - 42:9
**Carabellese** [1] - 4:20
**care** [1] - 40:9
**career** [1] - 41:13
**Cargo** [1] - 34:1
**case** [121] - 1:5, 6:16, 8:9, 8:12, 8:14, 8:15, 8:25, 9:2, 9:9, 10:18, 10:22, 11:2, 11:4, 12:6, 13:9, 14:15, 14:25, 15:8, 15:9, 15:10, 15:15, 16:6, 17:4, 17:10, 17:15, 17:25, 18:10, 18:11, 18:13, 19:3, 19:5, 20:17, 21:17, 21:20, 22:10, 22:17, 23:7, 25:19, 26:1, 28:25, 29:2, 29:5, 29:9, 29:11, 29:16, 29:18, 30:6, 30:8, 30:9, 30:13, 30:17, 30:21, 30:24, 31:8, 31:19, 31:21, 31:24, 33:5, 33:19, 33:23, 34:1, 34:3, 35:23, 36:4, 36:13, 36:14, 38:13, 39:25, 40:7, 43:20, 47:14, 48:18, 49:3, 49:14, 49:19, 49:22, 50:8, 50:13, 51:9, 51:12, 52:6, 52:7, 52:17, 55:8,

55:12, 55:13, 55:16, 55:19, 55:21, 56:2, 56:4, 56:8, 56:14, 56:16, 56:18, 56:19, 57:14, 57:24, 58:17, 59:2, 59:14, 59:21, 62:7, 62:10, 62:15, 62:16, 62:22, 63:7, 63:13, 64:3, 64:8, 64:10
**cases** [14] - 9:14, 13:20, 15:14, 17:3, 17:17, 17:18, 18:20, 19:25, 32:14, 52:17, 52:21, 60:1, 63:10
**cash** [4] - 5:18, 25:1, 25:11, 36:22
**Cathy** [1] - 1:20
**causation** [2] - 15:12
**causing** [1] - 42:10
**CCR** [1] - 1:20
**certain** [15] - 9:6, 14:9, 16:10, 16:11, 17:21, 21:25, 23:14, 25:22, 32:15, 46:12, 51:17, 52:19, 52:24, 57:1
**certainly** [12] - 7:21, 8:1, 8:5, 15:2, 16:12, 16:14, 21:13, 27:19, 37:21, 46:13, 64:16, 64:19
**certainty** [1] - 23:20
**certificate** [1] - 27:5
**Certificate** [1] - 1:19
**Certificates** [2] - 3:6, 5:14
**certification** [8] - 5:7, 6:9, 15:13, 21:6, 21:9, 23:21, 23:24, 24:11
**certifications** [4] - 24:5, 28:2, 35:4, 35:11
**Certified** [1] - 1:19
**certified** [3] - 21:4, 24:8, 56:5
**certify** [1] - 6:15
**certifying** [1] - 21:12
**cetera** [1] - 51:13
**chance** [1] - 52:23
**change** [2] - 37:6, 61:15
**changes** [1] - 45:6
**charged** [7] - 61:21, 62:1, 64:13, 64:16, 64:19
**chart** [1] - 49:16
**choose** [1] - 64:9
**chosen** [1] - 55:12
**Christine** [2] - 38:22, 40:12
**churn** [1] - 43:6
**circuit** [1] - 8:7
**Circuit** [8] - 12:14, 12:16, 22:16, 23:7, 50:7, 51:15, 52:11, 53:3
**Circuit's** [1] - 12:15
**circumstance** [1] - 59:11
**circumstances** [1] - 36:13
**cite** [8] - 12:6, 13:6, 23:9, 31:19, 33:4, 34:1, 52:18, 66:7
**cited** [4] - 25:19, 32:14,

32:16, 56:16
**City** [1] - 41:3
**city's** [1] - 41:5
**civil** [5] - 16:6, 49:11, 49:19, 49:24, 52:17
**CIVIL** [1] - 1:4
**claim** [34] - 17:7, 19:4, 28:24, 29:4, 29:23, 30:2, 30:4, 30:8, 30:16, 31:2, 31:5, 31:16, 31:17, 31:22, 32:1, 32:2, 32:4, 32:6, 32:7, 32:10, 32:12, 32:21, 33:11, 33:14, 34:2, 34:6, 34:8, 37:24, 54:23, 56:7, 56:9
**claims** [20] - 5:22, 12:11, 17:14, 17:15, 24:18, 31:22, 31:23, 32:16, 33:23, 38:3, 52:8, 54:24, 54:25, 55:11, 55:15, 55:21, 55:23, 55:25, 56:2, 56:18
**Clarkson** [1] - 1:8
**Class** [14] - 3:11, 3:14, 3:16, 6:4, 11:24, 12:7, 40:11, 46:22, 50:9, 58:8, 58:14, 62:18, 62:20, 63:8
**class** [92] - 5:7, 5:8, 5:19, 5:21, 5:23, 5:24, 6:8, 6:10, 6:13, 6:15, 7:4, 7:14, 7:16, 8:5, 8:22, 9:13, 9:16, 9:18, 10:4, 10:13, 11:6, 11:8, 11:11, 11:14, 11:16, 11:17, 11:21, 12:5, 12:7, 12:18, 15:13, 15:25, 17:19, 20:9, 21:1, 21:4, 21:6, 21:9, 21:12, 22:17, 23:21, 23:23, 23:24, 24:1, 24:3, 24:5, 24:7, 24:11, 25:4, 25:13, 25:14, 25:21, 25:23, 26:2, 27:17, 28:6, 29:1, 29:25, 32:13, 32:15, 33:18, 33:21, 33:24, 33:25, 36:15, 37:24, 39:22, 39:24, 40:3, 41:20, 43:13, 46:1, 46:4, 46:6, 46:12, 47:7, 51:25, 52:1, 53:12, 54:5, 54:22, 54:25, 55:5, 56:4, 56:6, 56:8, 59:1, 59:6, 60:13, 60:17
**class-wide** [2] - 15:25, 17:19
**classes** [1] - 23:25
**clear** [11] - 6:24, 15:5, 16:11, 16:13, 21:2, 27:2, 34:8, 34:10, 54:17, 54:20, 65:5
**clearly** [1] - 34:24
**CLERK** [2] - 3:1, 67:2
**clients** [1] - 15:10
**close** [1] - 50:9
**closing** [1] - 44:24
**coast** [1] - 40:23
**Code** [2] - 30:2, 30:4
**COHEN** [1] - 4:25

**Cohen** [1] - 4:25
**collectively** [2] - 35:21, 63:8
**Collins** [1] - 14:17
**collusion** [2] - 10:12, 10:14
**combinations** [1] - 17:16
**comments** [1] - 58:25
**committed** [2] - 41:25, 44:7
**committing** [1] - 45:5
**communications** [1] - 58:14
**companies** [2] - 43:21, 44:2
**company** [2] - 66:1
**compared** [1] - 14:9
**compensable** [1] - 33:22
**compensates** [1] - 38:12
**compensation** [5] - 7:9, 23:14, 25:21, 26:2, 51:24
**complain** [2] - 34:5, 34:9
**complaint** [16] - 14:11, 19:6, 19:11, 19:13, 47:5, 48:10, 48:16, 48:17, 48:19, 48:23, 58:24, 61:2, 61:5, 61:9, 61:12, 61:14
**complaints** [1] - 19:8
**completed** [2] - 5:23, 11:23
**completely** [2] - 10:17, 12:18
**complex** [3] - 9:12, 9:14, 17:14
**complexity** [1] - 8:10
**complicated** [4] - 15:9, 15:11, 15:13, 19:2
**component** [1] - 36:22
**compounded** [1] - 43:14
**comprise** [1] - 20:19
**compromise** [2] - 23:19, 40:15
**compromised** [3] - 29:4, 32:12, 32:16
**concealed** [1] - 65:2
**concerns** [2] - 22:5, 27:3
**concludes** [1] - 67:3
**conclusively** [1] - 34:19
**concrete** [1] - 45:9
**Concussion** [1] - 23:8
**Concussions** [1] - 12:15
**condition** [2] - 14:1, 23:14
**conduct** [3] - 5:10, 8:25, 14:5
**conferences** [1] - 11:3
**conflict** [2] - 53:12, 54:18
**consistent** [3] - 14:18, 30:3, 48:24
**conspiracy** [33] - 5:12, 9:20, 9:21, 9:23, 9:25, 10:2, 16:9, 16:19, 16:25, 17:6, 17:13, 18:5, 18:7, 18:17, 19:19, 20:1, 20:18, 22:22, 29:21, 29:25, 30:20, 31:12, 31:15, 33:16, 46:9, 47:7, 48:22, 48:25, 60:2, 60:7, 61:5, 61:11, 65:23

**conspire** [1] - 63:1
**conspired** [8] - 9:14, 60:7, 60:12, 60:16, 60:21, 61:8, 63:1, 66:4
**conspiring** [1] - 16:24
**consulted** [1] - 64:6
**cont'd** [1] - 2:1
**contend** [1] - 12:12
**contention** [2] - 35:16, 60:23
**continual** [1] - 45:3
**continue** [4] - 25:17, 26:19, 58:22, 62:15
**continued** [2] - 41:4, 62:14
**continues** [1] - 26:12
**continuing** [2] - 28:19, 30:16
**continuous** [1] - 42:15
**contributing** [2] - 37:14, 41:4
**conversations** [6] - 17:2, 42:23, 58:15, 59:6, 63:6, 64:16
**Cooper** [1] - 4:13
**cooperating** [1] - 16:23
**core** [1] - 14:7
**Corporate** [1] - 61:20
**Correct** [1] - 1:19
**correct** [8] - 14:24, 15:2, 20:21, 33:3, 58:4, 58:5, 58:13, 66:21
**corroborating** [2] - 14:2, 14:4
**cost** [4] - 10:19, 37:8, 37:13, 51:13
**costs** [8] - 6:11, 6:18, 10:20, 37:18, 37:21, 37:22, 43:17, 58:4
**Counsel** [10] - 12:7, 45:13, 58:6, 58:14, 62:18, 62:20, 63:8, 66:17, 66:22, 66:25
**counsel** [34] - 3:3, 3:8, 3:16, 4:22, 6:8, 6:13, 6:20, 6:24, 7:1, 10:21, 11:14, 12:4, 30:10, 30:11, 35:22, 36:9, 36:25, 39:5, 39:24, 46:22, 47:10, 48:4, 50:24, 51:5, 52:8, 55:25, 56:9, 62:10, 64:6, 64:7, 64:10, 65:13, 65:17
**counsel's** [4] - 6:10, 11:24, 39:23, 40:3
**Counsel's** [1] - 11:24
**COUNSELS** [1] - 3:4
**counterclaim** [6] - 29:18, 29:22, 29:24, 30:20, 31:5, 31:14
**counterclaims** [1] - 32:25
**countered** [1] - 47:8
**County** [2] - 17:24, 18:6
**couple** [2] - 37:20, 42:24
**course** [11] - 10:17, 16:13, 17:22, 23:24, 25:16, 35:24,

35:25, 36:6, 37:22, 51:7, 62:6
**COURT** [31] - 1:1, 3:1, 3:3, 3:5, 3:12, 3:17, 3:24, 4:2, 4:5, 4:8, 4:11, 4:24, 5:2, 5:5, 6:24, 12:20, 14:20, 36:9, 38:18, 39:16, 40:8, 45:11, 45:16, 58:3, 58:6, 59:23, 65:12, 65:17, 66:17, 66:25, 67:2
**Court** [64] - 3:21, 5:9, 5:16, 5:21, 5:25, 6:1, 6:4, 6:8, 6:11, 6:14, 6:16, 8:1, 8:2, 8:7, 11:1, 11:10, 12:1, 12:14, 14:22, 17:23, 18:12, 21:4, 21:8, 21:15, 22:9, 23:22, 24:9, 24:16, 24:22, 28:11, 28:21, 32:3, 32:4, 32:19, 34:21, 36:5, 36:24, 37:24, 38:1, 38:14, 38:16, 38:24, 39:2, 39:9, 39:11, 39:23, 45:20, 48:24, 50:5, 53:2, 53:7, 54:21, 55:20, 56:24, 62:5, 62:11, 63:23, 65:10, 65:13, 66:12, 66:17, 67:3
**court** [34] - 3:2, 7:2, 25:20, 28:25, 29:12, 29:17, 30:16, 30:20, 30:24, 31:1, 31:2, 31:25, 32:1, 32:6, 32:7, 32:8, 32:25, 34:13, 45:17, 50:21, 50:23, 51:6, 52:9, 53:6, 55:8, 55:9, 55:12, 55:16, 55:19, 56:13, 56:14, 56:19, 57:3, 63:16
**Court's** [5] - 5:22, 8:4, 8:5, 38:19, 55:22
**Courthouse** [1] - 1:8
**courtroom** [1] - 45:25
**courts** [4] - 9:14, 12:4, 32:14, 44:4
**cover** [1] - 37:13
**Covington** [1] - 5:1
**CR** [1] - 18:11
**crazy** [1] - 7:3
**create** [2] - 8:21, 10:3
**created** [1] - 43:18
**credible** [1] - 15:4
**Credit** [3] - 34:14, 57:20, 57:22
**credit** [3] - 22:12, 57:21, 60:19
**Crestar** [3] - 5:4, 22:19, 49:18
**criminal** [31] - 13:5, 13:9, 13:11, 13:14, 13:21, 14:3, 14:15, 15:22, 16:20, 16:24, 17:1, 17:24, 18:8, 49:6, 49:7, 49:17, 49:18, 49:22, 49:23, 50:4, 52:14, 52:16,

52:18, 52:22, 52:24, 60:2, 60:5, 62:2, 66:5
**criminally** [2] - 61:21
**criteria** [1] - 33:21
**cross** [1] - 52:19
**cross-examining** [1] - 52:19
**CRR** [1] - 1:20
**Crusader** [3] - 4:10, 13:15, 41:21
**culture** [1] - 40:22
**current** [3] - 53:13, 53:14, 54:14
**customer** [1] - 40:24
**customers** [1] - 41:11
**cut** [2] - 36:5, 36:7
**cuts** [1] - 36:8

# D

**dad** [1] - 39:17
**damage** [7] - 31:11, 33:17, 34:11, 49:12, 52:21, 62:6, 65:7
**damages** [17] - 9:22, 10:1, 10:15, 17:20, 17:23, 18:25, 19:17, 20:13, 20:23, 29:24, 30:5, 39:20, 49:9, 49:24, 57:25, 66:12, 66:15
**dark** [1] - 35:3
**data** [14] - 10:8, 10:11, 10:13, 10:20, 40:1, 50:15, 51:8, 51:10, 51:11, 52:8, 54:4, 58:12, 58:24, 60:24
**database** [3] - 10:3, 37:8, 37:13
**date** [1] - 39:20
**DATE** [1] - 1:10
**dated** [1] - 5:20
**Davies** [41] - 3:20, 6:5, 7:17, 17:4, 17:6, 17:13, 27:21, 29:6, 29:10, 29:12, 29:17, 30:15, 31:6, 32:23, 33:1, 35:6, 35:9, 36:12, 38:20, 38:25, 39:13, 39:15, 45:19, 45:24, 54:21, 55:2, 55:15, 55:16, 56:1, 56:13, 56:23, 57:3, 57:11, 57:20, 57:25, 58:10, 58:15, 58:21, 63:17, 64:3
**DAVIES** [2] - 39:13, 39:17
**Davies'** [5] - 14:20, 28:13, 28:22, 39:3, 64:21
**Davis** [1] - 4:19
**days** [4] - 34:7, 40:5, 44:11
**dealing** [2] - 17:16, 59:4
**death** [7] - 41:17, 42:4, 42:10, 42:12, 42:13, 43:20, 44:11
**decades** [1] - 41:1
**deceased** [1] - 40:12

**December** [1] - 55:6
**decent** [1] - 44:22
**decide** [1] - 20:8
**decided** [1] - 64:7
**decision** [5] - 39:3, 50:7, 52:9, 53:3, 66:19
**declaration** [17] - 12:9, 13:3, 13:24, 21:23, 22:3, 27:25, 29:20, 35:11, 48:9, 48:11, 58:13, 58:19, 59:22, 59:25, 60:15, 65:24, 66:13
**declaratory** [1] - 30:5
**declined** [1] - 12:16
**dedicated** [1] - 40:22
**deemed** [3] - 55:12, 55:23, 56:6
**deeply** [1] - 42:1
**defend** [1] - 40:4
**Defendant** [3] - 4:4, 22:7, 29:17
**defendant** [8] - 7:8, 13:9, 16:9, 18:16, 18:18, 22:11, 22:22, 22:24
**DEFENDANTS** [1] - 1:6
**defendants** [13] - 10:9, 13:14, 13:17, 14:1, 17:17, 17:18, 20:16, 20:22, 26:15, 49:14, 61:20, 62:1, 62:5
**Defendants** [52] - 1:7, 1:17, 4:1, 4:7, 4:10, 4:14, 4:16, 4:17, 4:19, 5:4, 5:12, 5:17, 7:11, 10:7, 13:2, 13:15, 14:6, 14:9, 15:23, 16:16, 16:17, 16:18, 16:19, 16:21, 16:24, 20:19, 21:2, 21:19, 21:21, 21:25, 22:4, 22:13, 22:15, 29:9, 29:10, 29:14, 37:13, 41:20, 43:14, 44:25, 45:7, 46:7, 46:9, 49:21, 50:1, 55:4, 60:4, 60:7, 60:9, 61:17, 62:24, 63:6
**Defendants'** [3] - 44:10, 49:17, 49:18
**defense** [7] - 10:21, 10:22, 21:6, 29:21, 31:14, 54:22
**defenses** [3] - 29:19, 32:25, 54:23
**defies** [1] - 54:3
**defined** [1] - 54:22
**definition** [6] - 9:13, 26:6, 33:19, 33:22, 33:25, 34:4
**defray** [1] - 37:18
**delay** [1] - 28:19
**delineation** [1] - 13:7
**DelVecchio** [4] - 4:17, 41:22, 44:18, 60:20
**demanding** [1] - 23:17
**Dennis** [1] - 3:18
**denying** [1] - 45:1
**DePalma** [1] - 3:10

**Department** [1] - 19:2
**depression** [2] - 43:23, 45:4
**DEPUTY** [2] - 3:1, 67:2
**deserve** [2] - 44:22, 53:17
**despite** [2] - 56:12, 62:12
**detail** [2] - 38:6, 48:22
**detailed** [4] - 12:9, 24:4, 28:24, 51:14
**determination** [7] - 52:2, 56:17, 56:21, 56:22, 57:8, 57:10, 57:13
**determine** [1] - 50:16
**determined** [6] - 33:8, 49:17, 49:23, 56:23, 62:6, 62:8
**devoted** [1] - 21:7
**diabetes** [1] - 42:5
**die** [2] - 43:23, 44:22
**died** [3] - 40:19, 42:22, 42:25
**difference** [2] - 52:19, 52:20
**different** [11] - 7:7, 7:8, 15:8, 17:17, 23:13, 25:21, 50:8, 50:13, 52:1, 52:7, 52:17
**differing** [3] - 26:1, 26:2, 28:5
**difficult** [7] - 9:25, 17:3, 17:18, 20:25, 59:3, 62:8
**dignify** [1] - 39:22
**Dilworth** [1] - 5:4
**dinner** [1] - 41:11
**directions** [1] - 52:24
**directly** [2] - 27:6, 43:8
**disagree** [2] - 12:24, 58:19
**discount** [3] - 25:16, 26:5, 36:20
**discounts** [3] - 5:18, 7:12, 36:15
**discovered** [1] - 41:17
**discovery** [10] - 11:23, 12:13, 12:17, 40:7, 53:1, 53:2, 53:7, 62:11, 62:15, 62:19
**discretion** [1] - 8:6
**discuss** [1] - 38:10
**diseases** [1] - 51:12
**disenfranchised** [1] - 51:22
**dismiss** [4] - 32:10, 48:21, 63:4, 63:5
**dismissed** [7] - 29:3, 31:14, 31:18, 31:24, 50:18, 50:19, 56:20
**dismissing** [1] - 32:24
**dispute** [2] - 22:23, 38:25
**disregarding** [1] - 10:18
**disrespect** [1] - 21:11
**distinction** [1] - 53:4
**distinguish** [1] - 14:25
**distribute** [2] - 27:11, 36:25
**distributed** [1] - 25:12
**distribution** [7] - 24:23, 25:1,

25:20, 25:24, 25:25, 26:22, 27:20
**district** [5] - 8:8, 31:20, 31:25, 50:21, 51:6
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 12:7, 18:12
**divvy** [1] - 54:16
**Docket** [4] - 3:7, 49:13, 50:5, 66:13
**docketed** [1] - 57:7
**doctor** [1] - 31:21
**doctorate** [1] - 33:5
**doctors** [1] - 51:17
**document** [3] - 29:19, 29:23, 42:18
**documents** [9] - 14:6, 14:7, 31:7, 41:17, 42:22, 56:24, 56:25, 60:5, 62:11
**dollar** [4] - 15:11, 46:5, 46:18, 46:19
**dollars** [3] - 10:19, 37:20, 47:17
**domain** [5] - 12:21, 12:25, 13:1, 14:12, 60:3
**done** [4] - 16:23, 24:13, 55:3, 65:10
**double** [1] - 30:22
**doubt** [1] - 57:24
**down** [3] - 18:4, 37:22, 42:19
**dozens** [3] - 8:22, 63:5, 63:6
**DRASCO** [1] - 3:18
**Drasco** [2] - 3:19
**drawing** [1] - 23:12
**dreams** [1] - 44:15
**driven** [1] - 7:2
**dropped** [2] - 40:1, 58:11
**due** [3] - 20:6, 24:12, 24:14
**dunk** [2] - 16:14, 52:15
**Dunn** [1] - 4:4
**duration** [1] - 8:10
**during** [9] - 9:15, 10:4, 16:11, 18:7, 46:6, 55:4, 60:13, 60:16
**duties** [1] - 48:24
**duty** [1] - 46:2

## E

**early** [1] - 30:15
**earned** [1] - 46:8
**earth** [2] - 17:5, 17:12
**easier** [1] - 19:9
**easiest** [1] - 27:12
**easily** [2] - 10:19, 46:13
**east** [1] - 40:23
**East** [1] - 1:9
**easy** [4] - 8:12, 19:1, 19:5, 21:16
**ECF** [6] - 18:13, 24:5, 26:25, 38:7, 59:25, 63:25

**economics** [1] - 40:1
**economist** [1] - 18:19
**economy** [1] - 41:5
**effect** [1] - 16:14
**eight** [1] - 8:8
**either** [2] - 30:19, 31:1
**elect** [1] - 30:17
**elected** [2] - 55:7, 56:1
**electing** [2] - 55:19, 55:21
**election** [7] - 31:1, 31:4, 55:15, 56:3, 56:14, 63:18, 63:20
**Emily** [1] - 4:18
**Employees** [1] - 34:14
**employees** [2] - 41:9, 61:22
**encourage** [2] - 57:4, 57:8
**end** [3] - 23:5, 23:11, 57:2
**ended** [1] - 57:24
**ending** [1] - 43:12
**engaged** [1] - 5:12
**enjoin** [1] - 30:12
**entered** [1] - 33:9
**entertainment** [1] - 40:23
**enthusiastically** [1] - 40:24
**entire** [5] - 33:10, 53:23, 54:2, 57:25, 60:8
**entirely** [1] - 27:2
**entirety** [3] - 29:4, 34:15, 61:10
**entitled** [4] - 15:6, 15:18, 25:10, 25:18
**equaled** [1] - 13:13
**equity** [2] - 22:11, 60:19
**escape** [1] - 45:5
**escrow** [1] - 37:17
**especially** [1] - 59:15
**ESQUIRE** [2] - 1:14, 1:16
**essential** [1] - 57:17
**essentially** [3] - 25:3, 25:11, 51:4
**establish** [6] - 9:20, 10:1, 10:15, 17:19, 34:24, 55:2
**established** [3] - 19:7, 19:8, 48:21
**establishes** [1] - 34:19
**establishing** [3] - 15:24, 15:25, 17:20
**estimate** [1] - 25:12
**estimates** [2] - 49:9, 52:21
**estimation** [1] - 66:12
**et** [1] - 51:13
**ethical** [1] - 48:25
**Europe** [2] - 51:23, 52:3
**evaluate** [3] - 12:1, 62:12, 62:21
**evaluating** [1] - 24:23
**evidence** [18] - 16:5, 17:9, 31:7, 31:10, 46:25, 47:8, 47:15, 49:2, 50:11, 51:3,

51:14, 51:18, 53:2, 53:6, 53:11, 55:3, 57:2, 57:19
**exact** [1] - 47:1
**exactly** [2] - 32:11, 61:18
**examining** [1] - 52:19
**example** [8] - 10:3, 14:10, 16:22, 22:19, 32:18, 49:12, 53:18, 65:22
**exceeds** [1] - 49:19
**except** [1] - 13:15
**exchange** [2] - 23:20, 63:4
**exclusive** [1] - 32:6
**exclusively** [1] - 32:3
**executive** [2] - 40:6, 65:25
**exercising** [1] - 23:16
**Exhibit** [3] - 49:13, 66:13, 66:14
**exist** [3] - 44:14, 59:18, 61:12
**existed** [1] - 31:12
**exists** [3] - 18:1, 25:4, 33:19
**expect** [1] - 53:9
**expedition** [1] - 15:7
**expeditious** [1] - 11:4
**expense** [3] - 8:10, 37:9
**expenses** [5] - 5:9, 35:18, 37:3, 37:6, 37:12
**experience** [2] - 63:9, 63:12
**expert** [2] - 10:20, 51:16
**explain** [1] - 7:14
**exposure** [1] - 16:20
**expressly** [3] - 12:16, 49:10, 55:20
**extensive** [1] - 58:13
**extensively** [1] - 58:18
**extent** [1] - 8:16
**extinguished** [1] - 26:10
**extracted** [1] - 22:18
**extremely** [2] - 16:1, 16:7

## F

**F.Supp** [1] - 31:20
**face** [4] - 10:21, 17:5, 17:11, 21:18
**facie** [1] - 16:5
**fact** [24] - 11:19, 13:6, 14:14, 15:10, 17:13, 19:10, 22:21, 24:13, 28:3, 28:5, 28:8, 28:15, 30:11, 37:12, 49:9, 49:18, 52:13, 52:16, 55:5, 59:22, 61:13, 62:12, 63:14, 66:11
**factor** [10] - 8:9, 11:6, 11:22, 11:23, 15:24, 17:20, 21:20, 41:13, 62:17, 62:20
**factors** [3] - 8:9, 52:12, 52:24
**facts** [6] - 8:12, 19:7, 19:8, 22:25, 31:21, 34:24
**factual** [1] - 48:22

**failed** [2] - 29:6, 52:13
**failure** [1] - 29:13
**fair** [14] - 12:12, 15:20, 23:4, 24:25, 27:11, 30:21, 35:1, 46:3, 47:21, 50:16, 51:1, 51:25, 54:6, 63:15
**fairly** [2] - 25:12, 38:12
**fairness** [17] - 3:6, 5:10, 6:5, 6:7, 6:9, 7:20, 7:25, 23:5, 23:16, 28:11, 35:14, 47:23, 48:2, 48:12, 51:20, 52:2, 54:7
**faith** [2] - 50:21, 50:24
**fall** [1] - 33:18
**false** [1] - 60:24
**familiar** [1] - 8:11
**family** [1] - 44:8
**far** [2] - 14:19, 31:3
**Farber** [1] - 4:7
**fashion** [1] - 11:4
**fast** [1] - 25:23
**fatally** [1] - 11:19
**fault** [1] - 26:8
**featured** [1] - 40:23
**February** [2] - 6:1, 48:12
**Federal** [1] - 18:12
**federal** [10] - 28:25, 31:25, 32:2, 32:10, 50:21, 51:6, 55:13
**fee** [3] - 35:19, 36:11, 37:24
**fees** [16] - 5:9, 6:10, 6:17, 10:20, 30:1, 30:5, 35:18, 36:6, 36:14, 36:25, 37:8, 37:11, 37:16, 37:18, 37:25, 58:3
**fellow** [1] - 40:11
**fend** [1] - 64:8
**few** [1] - 34:7
**fiduciary** [1] - 46:2
**fifth** [1] - 17:20
**fight** [1] - 11:15
**figure** [8] - 7:3, 18:15, 18:20, 18:22, 19:20, 20:18, 20:20, 20:21
**figures** [3] - 14:2, 14:4, 36:2
**file** [4] - 8:3, 29:16, 30:25, 34:8
**filed** [17] - 11:9, 14:3, 26:25, 28:25, 29:11, 29:19, 29:22, 30:17, 31:3, 31:24, 34:2, 34:6, 34:7, 35:24, 38:21, 48:16, 52:22
**files** [1] - 55:10
**filing** [6] - 21:3, 48:10, 49:16, 61:2, 61:14
**filings** [1] - 21:8
**final** [20] - 5:6, 5:7, 5:8, 5:25, 7:6, 28:1, 33:2, 48:2, 48:12, 51:20, 52:2, 56:16, 56:19, 56:21, 57:8, 57:10,

57:13, 57:14, 57:17, 57:18
**finally** [4] - 33:7, 34:10, 38:4, 64:21
**finances** [1] - 41:15
**financial** [10] - 13:25, 14:1, 21:22, 21:24, 22:13, 41:12, 41:14, 41:18, 42:2, 62:25
**financially** [1] - 41:4
**fine** [6] - 13:16, 13:18, 40:3, 49:18, 49:22, 49:23
**fined** [2] - 13:17, 14:17
**fines** [9] - 13:21, 14:15, 14:18, 49:6, 49:7, 49:8, 49:17, 61:25, 62:2
**firm** [2] - 4:4, 4:16
**FIRM1** [1] - 1:14
**FIRM2** [1] - 1:16
**firms** [1] - 63:8
**first** [13] - 8:9, 8:11, 19:23, 37:19, 47:4, 48:10, 48:16, 48:17, 48:19, 48:23, 49:5, 49:8, 58:10
**Fisher** [1] - 1:8
**fishing** [1] - 15:7
**five** [2] - 13:16, 46:19
**flawed** [2] - 11:20, 15:4
**focus** [1] - 9:10
**fog** [1] - 23:12
**followed** [1] - 57:14
**following** [3] - 23:6, 23:9, 41:17
**Football** [1] - 23:8
**FOR** [1] - 1:1
**forced** [1] - 34:23
**Ford** [1] - 1:20
**foreclose** [3] - 8:18, 26:17, 29:12
**foreclosed** [2] - 8:16, 57:22
**foreclosure** [8] - 8:24, 29:11, 29:16, 29:18, 30:13, 42:15, 44:20, 58:1
**formal** [2] - 12:13, 12:17, 33:6, 33:9, 53:4
**former** [1] - 50:21
**formulaic** [1] - 62:19
**forth** [1] - 24:22
**forward** [7] - 21:18, 34:23, 36:1, 36:7, 37:10, 63:21, 64:3
**fought** [1] - 50:25
**four** [4] - 6:2, 23:22, 28:2, 38:6
**fours** [1] - 32:11
**fourth** [1] - 15:24
**fraction** [1] - 46:17
**frankly** [1] - 39:21
**free** [2] - 10:12, 10:14
**Friday** [2] - 14:16, 34:7
**front** [1] - 42:8

**fronts** [2] - 30:23, 31:3
**full** [7] - 12:10, 17:3, 51:23, 63:7, 63:22, 63:25, 65:6
**fully** [2] - 32:11, 63:12
**fund** [2] - 23:3, 25:2
**funds** [3] - 34:15, 34:17, 64:24
**furthermore** [8] - 5:20, 13:15, 13:23, 15:8, 20:15, 21:11, 34:20, 62:2
**future** [1] - 64:16

# G

**gathered** [1] - 49:12
**general** [2] - 15:12, 16:5
**generally** [1] - 35:8
**gentleman** [1] - 60:18
**Gibson** [1] - 4:4
**Gilardi** [1] - 11:9
**Girsh** [4] - 8:9, 47:13, 52:12, 62:17
**given** [5] - 21:15, 36:8, 47:8, 51:4
**GM** [1] - 52:9
**Goldberg** [1] - 4:16
**Goldstein** [1] - 22:9
**Gorey** [1] - 3:21
**governed** [1] - 8:8
**government** [5] - 13:21, 18:9, 18:14, 18:18, 18:19
**grab** [1] - 59:22
**grant** [2] - 6:17, 6:18
**granted** [1] - 5:16
**great** [2] - 7:16, 67:1
**greater** [5] - 21:19, 22:15, 25:8, 25:9, 25:10
**greedy** [1] - 45:5
**Greenbaum** [1] - 4:19
**GREENBERG** [1] - 3:9
**Greenberg** [2] - 3:10
**grounds** [1] - 32:21
**Group** [3] - 41:23, 42:11, 44:18
**group** [1] - 51:22
**groups** [1] - 7:8
**growing** [1] - 44:16
**guess** [1] - 39:5
**guessing** [1] - 47:1
**guilty** [16] - 8:13, 9:9, 15:23, 16:3, 16:4, 16:5, 16:6, 16:17, 16:18, 18:7, 40:6, 47:15, 61:17, 61:19, 61:23
**gushing** [1] - 44:21
**Gutworth** [1] - 12:6

# H

**Hagens** [1] - 3:14
**hair** [3] - 36:5, 36:7, 36:8

**half** [3] - 46:18, 46:19, 47:17
**Hamilton** [1] - 42:3
**handed** [1] - 64:11
**handedly** [1] - 41:7
**handled** [1] - 41:8
**hands** [1] - 19:9
**handy** [1] - 63:25
**happy** [1] - 59:15
**harassment** [1] - 42:15
**harassments** [3] - 43:14, 44:19, 45:3
**hard** [2] - 25:23, 50:25
**hardship** [1] - 43:19
**harm** [8] - 13:19, 18:15, 25:7, 25:13, 25:22, 26:3, 26:23, 27:16
**Hays** [1] - 3:21
**Health** [1] - 31:20
**health** [1] - 41:16
**hear** [6] - 6:8, 6:11, 8:2, 8:6, 39:4, 40:9
**heard** [7] - 34:9, 39:10, 39:12, 40:9, 45:12, 59:1, 59:5
**hearing** [17] - 3:6, 3:20, 5:10, 6:5, 6:7, 39:2, 47:23, 48:2, 51:20, 54:7, 55:16, 56:17, 56:22, 57:3, 57:11, 57:15, 57:16
**heartless** [1] - 44:25
**held** [2] - 9:14, 12:14
**help** [4] - 26:22, 37:13, 37:18, 45:4
**helped** [2] - 11:3, 37:7
**helpful** [1] - 53:9
**helping** [1] - 41:10
**herself** [2] - 40:4, 64:8
**hidden** [1] - 53:10
**hide** [1] - 34:21
**high** [2] - 16:1, 44:1
**higher** [1] - 52:23
**highest** [1] - 23:20
**himself** [1] - 43:7
**hiring** [1] - 41:9
**history** [2] - 41:3, 58:14
**hole** [1] - 44:12
**home** [5] - 8:24, 22:11, 43:2, 44:6, 60:18
**Home** [1] - 42:25
**homes** [4] - 8:15, 8:21, 9:10, 59:5
**Honor** [100] - 3:4, 3:9, 3:13, 3:15, 3:18, 3:23, 4:3, 4:6, 4:9, 4:12, 4:15, 4:18, 4:21, 4:25, 5:3, 6:22, 7:6, 11:5, 11:22, 12:24, 15:1, 18:10, 18:23, 19:10, 20:15, 20:24, 20:25, 21:20, 22:1, 23:2, 23:21, 23:24, 24:13, 25:19, 27:2, 27:24, 28:10, 31:2,

31:17, 33:13, 35:17, 35:19,
36:10, 37:2, 38:4, 38:16,
38:17, 39:13, 40:7, 40:11,
45:14, 45:21, 45:25, 46:4,
46:11, 46:21, 47:17, 47:25,
48:4, 48:19, 49:4, 49:8,
49:13, 49:15, 50:1, 50:7,
50:8, 50:10, 50:19, 51:3,
51:20, 52:7, 52:12, 53:1,
53:12, 54:19, 55:14, 56:4,
56:7, 56:15, 57:3, 57:9,
57:13, 57:19, 58:2, 58:7,
59:22, 59:25, 62:3, 63:2,
63:24, 64:11, 64:21, 64:25,
65:9, 65:16, 65:22, 66:11,
66:16, 66:24
**hope** [1] - 28:18
**hopefully** [3] - 36:18, 63:3
**hopes** [1] - 23:20
**horn** [1] - 18:23
**hospital** [1] - 18:12
**host** [1] - 10:8
**hosting** [1] - 11:2
**hours** [4] - 12:5, 12:8, 12:10,
35:22
**housing** [1] - 41:6
**Hruby** [1] - 61:24
**huge** [2] - 21:10, 21:18
**HUGHES** [1] - 4:12
**Hughes** [1] - 64:14
**hughes** [1] - 4:13
**hundreds** [1] - 63:9
**hurled** [1] - 39:22
**hurt** [1] - 44:15
**hurts** [1] - 44:15
**husband** [6] - 40:13, 41:25,
43:23, 44:7, 44:19, 44:22
**husband's** [1] - 43:20

**I**

**idea** [7] - 46:16, 46:20,
47:12, 53:8, 66:5
**identical** [1] - 31:21
**identified** [1] - 14:10
**illegal** [4] - 29:14, 44:3,
44:10, 44:19
**illegally** [1] - 46:8
**Illinois** [2] - 17:25, 18:12
**important** [2] - 28:13, 28:15
**importantly** [1] - 7:22
**impose** [1] - 62:5
**imposed** [2] - 43:16, 43:18
**impressed** [1] - 56:24
**Improvement** [1] - 43:1
**in-person** [1] - 42:23
**incentive** [4] - 6:18, 35:18,
38:5, 38:14
**include** [2] - 52:3, 60:1
**included** [2] - 48:16, 58:17

**includes** [1] - 20:18
**including** [6] - 11:2, 14:6,
18:5, 33:4, 36:11, 58:15
**inclusive** [1] - 37:23
**incorporated** [1] - 40:18
**incorporated** [1] - 52:16
**incorrect** [2] - 33:20, 58:11
**increased** [1] - 43:17
**incredibly** [1] - 11:16
**indeed** [2] - 50:1, 52:22
**indicated** [1] - 35:21
**indicator** [1] - 49:24
**indicted** [3] - 16:20, 16:22,
18:6
**individual** [1] - 13:17
**individual's** [1] - 18:6
**individually** [1] - 65:14
**individuals** [5] - 6:2, 16:2,
32:15, 38:20, 43:9
**industry** [1] - 11:18
**inflated** [4] - 26:10, 34:12,
34:18, 44:1
**inflating** [1] - 43:16
**inflicted** [5] - 13:19, 18:15,
25:8, 25:22, 26:3
**informal** [3] - 53:2, 53:5,
53:7
**information** [30] - 12:1,
12:21, 12:25, 13:1, 13:25,
14:12, 14:14, 15:15, 21:24,
38:1, 43:11, 45:15, 45:21,
45:22, 46:4, 46:5, 46:14,
47:20, 47:24, 48:15, 51:18,
56:25, 58:16, 62:17, 62:23,
62:25, 63:11, 65:2
**informed** [2] - 35:7, 35:15
**initial** [4] - 27:13, 38:24,
42:16, 54:10
**injected** [1] - 42:6
**injury** [3] - 15:14, 20:9, 33:22
**Injury** [1] - 23:8
**inquire** [1] - 11:24
**insulin** [3] - 42:4, 42:6, 44:21
**insults** [1] - 39:22
**insurance** [1] - 41:16
**intended** [2] - 27:9, 27:10
**intent** [1] - 8:4
**interclass** [1] - 53:12, 54:17
**interest** [34] - 5:13, 5:18, 7:9,
9:3, 9:7, 9:24, 13:12, 18:4,
19:15, 19:24, 20:4, 20:8,
20:10, 25:3, 25:6, 25:7,
25:9, 26:7, 26:9, 26:11,
26:12, 26:20, 27:5, 27:15,
43:16, 44:1, 46:7, 46:25,
54:1, 54:10, 59:14, 60:8,
60:10, 61:10
**interesting** [1] - 62:9
**introduce** [1] - 3:21
**investigation** [2] - 61:22,

64:15
**investment** [1] - 20:7
**investor** [1] - 20:6
**investors** [3] - 18:2, 20:16,
59:9
**involved** [3] - 21:12, 51:5,
51:12
**involves** [1] - 8:15
**Irish** [3] - 40:21, 40:22, 40:23
**irrelevant** [2] - 57:18, 62:3
**issue** [35] - 7:24, 8:25, 12:19,
13:8, 13:10, 13:14, 21:10,
24:19, 24:20, 25:16, 26:13,
28:13, 28:15, 29:25, 31:18,
32:7, 32:13, 32:21, 33:2,
33:5, 33:7, 33:8, 33:13,
39:3, 39:6, 48:1, 54:19,
56:12, 56:15, 57:15, 57:25,
59:12, 59:20, 64:21, 66:19
**issued** [6] - 24:15, 30:24,
32:24, 50:7, 55:9, 57:10
**issues** [12] - 9:11, 15:12,
15:13, 20:25, 24:2, 32:8,
32:9, 39:20, 42:2, 51:17,
52:4
**itself** [2] - 24:25, 53:16

**J**

**James** [1] - 3:15
**JANOVE** [1] - 4:6
**Janove** [1] - 4:6
**January** [2] - 5:23, 36:3
**Jarrett** [1] - 4:3
**Jason** [3] - 3:13, 7:4, 58:8
**Jay** [1] - 5:3
**Jepson** [3] - 8:9, 11:6, 15:24
**Jerilean** [2] - 27:1, 38:20
**JERSEY** [1] - 1:1
**Jersey** [17] - 1:9, 3:6, 5:14,
8:17, 8:19, 16:11, 18:1,
30:2, 30:3, 30:4, 31:19,
44:4, 59:9, 59:13, 59:16
**Jessani** [4] - 61:23, 65:25,
66:4, 66:8
**Jessani's** [2] - 65:24, 66:3
**JFD** [1] - 40:18
**Jisani** [1] - 40:5
**job** [1] - 19:9
**joint** [11] - 13:3, 13:24, 22:3,
27:25, 29:20, 48:8, 48:11,
58:18, 59:25, 60:15, 65:24
**Jonathan** [1] - 4:25
**Joseph** [1] - 16:21
**joy** [1] - 40:20
**Jr** [1] - 4:13
**judge** [7] - 50:21, 51:7, 55:9,
55:17, 56:13, 57:3, 64:2
**Judge** [15] - 11:1, 14:16,
30:24, 31:7, 32:24, 50:10,

50:13, 51:7, 51:9, 51:16,
51:18, 51:21, 52:5, 63:19,
64:5
**judgement** [2] - 22:5, 33:5
**judges** [1] - 23:14
**judgment** [8] - 21:20, 21:22,
22:6, 22:16, 33:2, 33:7,
33:9, 56:19
**jurisdiction** [2] - 32:3, 32:6
**jury** [1] - 52:20
**Justice** [1] - 19:2
**justification** [1] - 50:6
**justifications** [1] - 49:5
**justifying** [1] - 50:11

**K**

**KAGAN** [1] - 5:3
**Kagan** [1] - 5:3
**Kallen** [1] - 3:25
**KALLER** [1] - 4:18
**Kaller** [1] - 4:18
**keep** [5] - 22:19, 26:18,
37:21, 42:21, 58:9
**Keith** [1] - 4:15
**kept** [3] - 35:2, 35:3, 35:7
**kick** [1] - 37:17
**kill** [2] - 43:7, 45:9
**killed** [1] - 44:19
**killing** [1] - 44:21
**kind** [2] - 22:6, 44:4
**knowing** [1] - 43:21
**knowledge** [1] - 11:25
**known** [2] - 40:23, 46:14
**knows** [3] - 19:10, 23:24,
63:2

**L**

**lack** [9] - 28:13, 28:22, 28:23,
34:24, 35:13, 53:1, 65:8,
65:22
**lacks** [1] - 11:13
**land** [1] - 44:6
**landlord** [1] - 41:7
**large** [1] - 23:17
**larger** [2] - 47:3, 54:3
**largest** [1] - 37:6
**last** [3] - 8:23, 50:4, 65:17
**lasted** [2] - 10:23
**law** [12] - 4:16, 8:17, 15:5,
23:24, 29:8, 29:16, 31:16,
34:3, 34:8, 57:13, 59:7,
59:8
**laws** [1] - 59:17
**lawsuit** [1] - 41:21
**lawyer** [5] - 55:17, 55:18,
57:1, 57:4, 57:7
**lawyers** [1] - 19:3
**lead** [2] - 40:1, 40:2

**League** [1] - 23:8
**learned** [1] - 43:8
**least** [3] - 10:16, 34:6, 57:6
**leaves** [1] - 17:22
**LeBate** [1] - 43:3
**led** [1] - 43:20
**left** [4] - 40:4, 44:9, 46:21, 64:8
**legal** [2] - 38:7, 43:15
**Legislature** [2] - 59:13, 59:16
**lenient** [1] - 23:25
**less** [3] - 44:5, 47:11, 57:9
**letter** [3] - 54:20, 55:10, 64:25
**level** [3] - 11:25, 28:5, 41:9
**levels** [1] - 26:2
**Levenson** [1] - 4:13
**Lewis** [1] - 4:10
**liability** [5] - 15:25, 16:1, 16:6, 17:19, 17:21
**lien** [62] - 6:3, 7:11, 8:18, 8:20, 9:3, 9:4, 9:6, 9:8, 9:15, 9:21, 9:23, 9:24, 17:12, 17:25, 20:1, 20:5, 20:6, 20:11, 20:12, 22:12, 25:4, 25:5, 25:7, 25:17, 26:6, 26:7, 26:9, 26:11, 26:12, 26:14, 27:14, 28:6, 29:7, 29:8, 29:13, 29:21, 31:10, 31:13, 33:1, 33:16, 34:15, 36:20, 37:6, 37:14, 42:17, 42:20, 53:14, 53:15, 53:18, 53:21, 53:22, 54:11, 55:4, 55:5, 57:21, 57:23, 59:4, 60:8, 61:11, 64:22
**Lien** [1] - 41:22
**lienholders** [2] - 45:3, 45:5
**liens** [55] - 8:17, 8:18, 9:19, 10:1, 10:4, 10:6, 10:8, 13:8, 13:10, 13:13, 14:2, 14:4, 16:10, 18:2, 18:3, 18:16, 19:14, 19:16, 19:23, 20:2, 20:3, 20:17, 20:22, 26:23, 28:17, 41:20, 41:21, 43:9, 43:18, 43:21, 43:25, 44:8, 46:6, 46:8, 46:13, 46:14, 46:24, 47:2, 47:3, 47:10, 54:10, 54:14, 56:20, 59:10, 59:20, 60:1, 60:6, 60:12, 60:16, 60:21, 61:4, 61:6, 62:25, 66:4
**life** [5] - 27:5, 43:12, 44:5, 44:12, 44:17
**light** [2] - 34:22, 65:2
**likely** [3] - 8:10, 25:6, 61:18
**limitations** [1] - 64:18
**limiting** [1] - 36:21
**line** [1] - 60:19
**link** [1] - 41:3

**Lite** [1] - 3:10
**litigate** [2] - 30:23, 32:9
**litigated** [3] - 32:8, 33:7, 33:11
**litigating** [3] - 10:18, 24:3, 63:9
**litigation** [10] - 8:10, 9:11, 9:12, 12:15, 14:8, 23:12, 23:18, 24:1, 35:9, 45:1
**Litigation** [1] - 23:9
**live** [1] - 44:14
**lived** [1] - 43:23
**living** [1] - 44:12
**LLC** [2] - 4:23, 41:23
**local** [2] - 4:22, 41:1
**lone** [1] - 42:7
**look** [14] - 9:9, 10:12, 10:13, 10:14, 13:3, 17:3, 18:19, 46:21, 49:15, 54:9, 60:3, 64:1, 64:25, 65:23
**looking** [6] - 27:15, 47:13, 47:16, 47:18, 50:17
**lose** [1] - 8:21
**losing** [1] - 9:10
**loss** [1] - 46:10
**lost** [4] - 17:9, 33:12, 34:13
**love** [1] - 44:16
**low** [2] - 19:5, 19:21
**Lum** [1] - 3:19
**lump** [1] - 54:8
**lunch** [1] - 41:11

## M

**M.D** [1] - 4:13
**Mackler** [1] - 4:16
**Madison** [2] - 17:24, 18:6
**magic** [1] - 30:6
**main** [2] - 21:14, 54:21
**maintained** [1] - 41:13
**maintaining** [1] - 21:1
**man** [1] - 41:10
**manage** [1] - 44:3
**managed** [1] - 41:6
**managing** [1] - 41:12
**Mandatory** [1] - 62:4
**maneuvering** [1] - 43:15
**manipulate** [1] - 5:13
**March** [2] - 5:24, 40:17
**Mario** [1] - 43:1
**market** [4] - 10:12, 10:14, 46:24, 50:3
**Marlex** [1] - 42:25
**marriage** [1] - 44:17
**Maselli** [1] - 4:22
**Mastellone** [3] - 22:7, 60:15, 60:18
**math** [1] - 47:7
**matter** [6] - 3:5, 38:24, 51:5,

60:24, 62:16, 62:18
**MD** [4] - 64:12, 65:25, 66:7, 66:8
**meal** [1] - 41:10
**mean** [1] - 22:17
**means** [3] - 20:6, 21:22, 22:14
**meant** [3] - 11:24, 25:12, 66:15
**mediation** [1] - 22:8
**mediations** [1] - 50:22
**mediator** [2] - 22:9, 50:22
**medical** [2] - 42:4, 51:15
**medication** [1] - 42:6
**meeting** [3] - 33:21, 33:25
**meets** [1] - 23:23
**member** [4] - 20:9, 25:14, 33:24, 54:21
**members** [17] - 5:19, 5:23, 5:24, 8:5, 8:23, 11:8, 25:13, 26:2, 27:17, 28:6, 36:15, 44:9, 46:1, 46:12, 53:13, 59:2, 59:6
**members'** [1] - 25:4
**memoranda** [1] - 66:21
**memorandum** [1] - 18:9
**Mercer** [4] - 60:4, 60:5, 60:7, 60:9
**merit** [2] - 7:18, 7:22
**merits** [2] - 23:18, 33:6
**met** [1] - 24:6
**method** [1] - 27:19
**methods** [1] - 45:7
**metric** [2] - 25:24, 27:11
**mid** [1] - 48:12
**might** [9] - 8:12, 20:5, 46:17, 46:19, 46:25, 48:7, 53:20, 54:16, 59:17
**million** [35] - 7:8, 13:16, 19:14, 19:17, 19:20, 20:13, 20:17, 20:20, 22:21, 35:23, 46:18, 46:19, 46:23, 47:6, 47:7, 47:14, 47:17, 47:18, 49:1, 49:3, 49:19, 49:20, 49:22, 50:2, 50:3, 50:12, 50:13, 61:3, 61:6, 66:2, 66:4, 66:7, 66:9
**millions** [1] - 10:19
**mine** [1] - 44:17
**minimize** [1] - 37:11
**minute** [1] - 43:24
**misleading** [1] - 49:25
**misrepresented** [1] - 63:16
**miss** [1] - 44:14
**missing** [1] - 42:2
**misspoke** [1] - 61:16
**misstatement** [1] - 61:20
**mistake** [1] - 59:12
**model** [1] - 20:23
**modes** [1] - 25:21

**modest** [1] - 38:10
**MoloLamken** [1] - 45:18
**mom's** [1] - 39:17
**moment** [1] - 59:8
**money** [5] - 37:17, 43:22, 45:2, 46:17, 57:20
**monies** [3] - 8:19, 22:18, 43:25
**monitoring** [2] - 44:4, 45:6
**month** [2] - 44:13
**monthly** [1] - 42:16
**months** [8] - 22:22, 23:1, 42:22, 44:11, 50:22, 54:10, 57:6, 57:9
**monumental** [1] - 10:16
**Mooring** [6] - 41:22, 42:11, 42:18, 42:20, 42:24, 44:18
**Mooring's** [2] - 42:14, 42:20
**Morgan** [1] - 4:10
**morning** [27] - 3:3, 3:4, 3:9, 3:12, 3:13, 3:15, 3:17, 3:18, 3:22, 3:23, 3:24, 4:2, 4:3, 4:5, 4:6, 4:8, 4:9, 4:11, 4:12, 4:15, 4:18, 4:21, 4:24, 4:25, 5:3, 6:22, 45:14
**mortgage** [1] - 57:21
**Moskowitz** [1] - 3:25
**most** [4] - 7:22, 19:9, 34:20, 49:16
**mother** [2] - 39:18, 39:23
**motion** [9] - 5:6, 5:25, 13:4, 28:1, 30:17, 35:17, 48:20, 50:19
**motions** [4] - 6:10, 44:14, 63:4, 63:5
**motto** [1] - 26:17
**mount** [1] - 10:22
**mounted** [1] - 21:5
**move** [1] - 35:17
**moved** [1] - 63:3
**moving** [4] - 12:6, 24:4, 24:21, 38:7
**MR** [29] - 3:9, 3:13, 3:15, 3:18, 3:23, 3:25, 4:3, 4:6, 4:9, 4:12, 4:15, 4:21, 4:25, 5:3, 6:22, 7:4, 12:23, 15:1, 36:10, 39:13, 39:17, 45:14, 45:18, 58:5, 58:7, 59:24, 65:16, 65:20, 66:24
**MS** [2] - 4:18, 40:11
**multiples** [1] - 13:19, 14:15
**multiply** [2] - 19:18, 54:15
**must** [3] - 19:11, 23:17, 61:4

## N

**name** [5] - 6:25, 39:12, 39:13, 40:12, 45:16
**named** [22] - 5:11, 6:18, 16:17, 16:18, 16:21, 28:2,

28:7, 35:1, 35:5, 35:11, 35:14, 35:18, 38:5, 38:6, 38:12, 38:15, 41:20, 44:25, 58:11, 58:18, 58:22, 58:23
**namely** [1] - 24:24
**Nanavati** [1] - 56:8
**National** [1] - 23:8
**necessary** [1] - 62:19
**need** [15] - 18:14, 18:16, 22:1, 33:9, 33:21, 33:24, 38:2, 45:15, 45:21, 47:20, 51:8, 63:21, 65:4, 66:20, 66:22
**needed** [1] - 52:10
**needless** [1] - 63:11
**needn't** [1] - 17:3
**needs** [8] - 9:10, 12:17, 26:1, 48:1, 55:2, 57:14, 57:16, 59:13
**negotiated** [1] - 28:4
**negotiating** [1] - 23:12
**negotiations** [1] - 50:24
**never** [9] - 14:21, 31:3, 33:2, 43:24, 55:14, 56:2, 61:9, 63:21
**nevertheless** [1] - 55:23
**NEW** [1] - 1:1
**new** [3] - 64:6, 64:10, 65:19
**New** [16] - 1:9, 3:6, 5:14, 8:17, 8:19, 16:10, 18:1, 30:2, 30:3, 30:4, 44:3, 59:8, 59:9, 59:13, 59:16
**Newark** [1] - 3:10
**news** [1] - 43:8
**next** [7] - 11:22, 23:2, 23:21, 24:20, 35:17, 42:4, 45:12
**NFL** [14] - 12:15, 14:25, 15:8, 22:16, 23:7, 50:7, 50:8, 51:9, 51:23, 52:3, 52:7, 53:3, 53:6, 62:10
**nine** [4] - 8:8, 46:18, 46:19, 47:16
**nobody** [2] - 9:4, 54:6
**non** [2] - 10:9, 17:18
**non-defendants** [2] - 10:9, 17:18
**none** [1] - 53:11
**nonetheless** [1] - 19:13
**note** [9] - 7:25, 24:6, 26:15, 27:24, 36:10, 37:3, 38:8, 38:9, 64:11
**noted** [4] - 7:6, 11:10, 22:16, 31:8
**nothing** [4] - 29:14, 34:18, 56:5, 66:22
**notice** [12] - 5:21, 5:23, 8:4, 11:7, 24:12, 24:13, 24:15, 24:17, 37:7, 37:24
**notion** [2] - 60:23, 62:2
**NUMBER** [1] - 1:4

**Number** [4] - 3:7, 18:13, 24:5, 59:25
**number** [13] - 1:5, 11:8, 19:18, 20:16, 21:21, 38:11, 39:19, 47:1, 51:11, 59:1, 59:6, 60:1, 61:16
**numbers** [1] - 20:21
**numerous** [7] - 9:13, 19:25, 20:2, 43:8, 47:10, 58:15, 59:6
**NYC** [1] - 32:18

# O

**object** [2] - 28:14, 39:1
**objection** [10] - 26:25, 27:22, 28:8, 28:23, 32:20, 34:25, 36:11, 37:4, 39:8
**objections** [15] - 6:2, 6:5, 6:11, 6:16, 7:17, 11:12, 24:7, 24:14, 27:22, 28:20, 38:21, 39:4, 57:1, 58:3, 58:5
**Objector** [4] - 3:19, 11:13, 11:20, 45:19
**Objector's** [2] - 64:6, 64:7
**Objectors** [20] - 8:2, 10:17, 11:18, 11:19, 12:12, 15:3, 15:7, 15:16, 16:15, 19:4, 19:13, 21:7, 22:19, 28:17, 28:18, 29:2, 48:7, 48:17, 62:10, 65:14
**Objectors'** [2] - 12:18, 45:12
**obligated** [1] - 62:5
**obligations** [1] - 48:25
**obtained** [3] - 10:9, 46:8, 46:13
**obviously** [4] - 12:8, 27:21, 37:15, 58:25
**occasions** [2] - 23:22, 61:16
**occurred** [5] - 42:12, 42:23, 50:4, 50:24, 53:8
**October** [2] - 5:15, 5:20
**OF** [1] - 1:1
**offer** [2] - 26:5, 43:3
**offered** [4] - 36:15, 43:1, 49:4, 50:6
**offers** [1] - 25:17
**officials** [1] - 18:5
**often** [1] - 9:8
**old** [3] - 40:4, 41:2, 44:16
**one** [32] - 9:1, 9:2, 9:10, 9:17, 10:3, 11:12, 11:19, 12:23, 13:6, 13:7, 17:3, 19:16, 22:7, 28:7, 29:9, 30:11, 31:6, 43:10, 44:16, 45:8, 45:10, 48:6, 49:13, 53:9, 54:5, 55:4, 55:16, 62:9, 65:16, 65:22
**ones** [1] - 22:2

**online** [1] - 43:13
**open** [1] - 17:22
**Open** [1] - 3:2
**opening** [1] - 59:24
**operation** [1] - 29:8
**operations** [1] - 41:9
**opinion** [2] - 12:15, 23:10
**opportunity** [1] - 30:23
**opposition** [2] - 38:9, 65:18
**opt** [3] - 5:24, 11:12, 56:5
**opted** [2] - 6:3, 56:6
**oral** [1] - 42:5
**order** [14] - 5:20, 8:4, 9:22, 10:15, 30:25, 32:24, 37:2, 38:14, 40:10, 55:22, 57:14, 58:1, 63:19
**ordered** [2] - 55:10, 64:5
**ordering** [1] - 41:9
**orders** [1] - 5:22
**original** [1] - 42:17
**Ornadez** [1] - 43:1
**orphan** [1] - 8:14
**otherwise** [1] - 15:6
**ourselves** [1] - 23:13
**outright** [1] - 29:3
**outs** [1] - 11:12
**outset** [1] - 21:3
**outside** [1] - 29:1
**outstanding** [14] - 25:17, 26:6, 26:12, 26:14, 28:7, 28:17, 46:13, 46:14, 47:2, 47:3, 53:14, 53:15, 54:12, 54:14
**overarching** [1] - 48:22
**overrule** [1] - 6:16
**oversaw** [1] - 41:7
**oversight** [1] - 38:13
**overwhelmingly** [2] - 11:11, 11:20
**owe** [2] - 7:13, 57:20
**owed** [2] - 43:25, 44:1
**owes** [2] - 57:25, 64:24
**owing** [1] - 54:2
**own** [6] - 18:23, 26:8, 28:25, 34:15, 46:22, 55:22
**owned** [3] - 7:11, 40:13, 40:19
**owner's** [1] - 8:19
**owners** [6] - 7:11, 43:17, 43:19, 43:22, 45:8, 59:18
**owners'** [1] - 59:11

# P

**p.m** [1] - 67:3
**Page** [6] - 12:6, 23:10, 24:21, 32:18, 50:5, 64:1
**Pages** [3] - 24:4, 38:7, 64:1
**pages** [2] - 14:6, 51:10

**paid** [15] - 8:20, 26:8, 26:23, 33:1, 34:14, 34:18, 37:4, 41:19, 45:2, 54:1, 54:10, 54:11, 58:1, 64:22, 66:2
**PAM** [1] - 4:19
**paper** [1] - 63:3
**papers** [19] - 14:3, 15:21, 21:25, 24:10, 24:18, 25:19, 28:24, 31:19, 32:17, 33:4, 33:21, 35:19, 35:21, 35:24, 38:10, 48:5, 49:9, 49:10, 66:18
**Paragraph** [10] - 48:11, 48:14, 49:13, 60:4, 60:11, 60:15, 60:20, 65:24, 66:2, 66:14
**Park** [2] - 4:22, 5:1
**parking** [1] - 40:16
**part** [10] - 14:20, 16:19, 16:25, 20:18, 20:22, 20:23, 23:6, 32:13, 39:25, 61:5
**participate** [4] - 32:15, 34:4, 41:14, 55:7
**participated** [1] - 16:9
**participating** [1] - 18:7
**participation** [1] - 38:13
**particular** [9] - 9:11, 9:12, 9:21, 13:9, 15:21, 17:15, 19:3, 25:14, 52:4
**particularly** [1] - 20:7
**parties** [5] - 23:11, 23:15, 52:3, 63:4, 65:3
**party** [3] - 33:1, 34:13, 64:22
**Pat** [1] - 4:20
**Paxson** [1] - 5:4
**pay** [18] - 9:5, 22:12, 26:10, 29:7, 29:11, 29:13, 34:16, 42:16, 42:19, 42:20, 43:22, 45:2, 45:4, 49:21, 54:9, 60:19, 65:4, 65:5
**payable** [1] - 13:16
**paying** [6] - 26:18, 34:11, 34:12, 38:3, 42:17, 53:20
**payment** [2] - 46:12, 53:15, 54:6
**payments** [4] - 35:18, 38:5, 38:15, 54:13
**pending** [1] - 30:14
**Pennsylvania** [2] - 34:14, 34:16
**people** [22] - 8:21, 9:4, 9:6, 9:8, 9:10, 13:19, 20:18, 25:22, 26:8, 26:17, 26:19, 26:22, 27:12, 35:3, 51:11, 51:13, 53:17, 54:10, 54:11, 59:5, 64:17
**people's** [1] - 8:15
**per** [3] - 38:5, 49:1, 66:7
**percent** [26] - 7:12, 18:4, 19:16, 19:24, 20:1, 20:3,

20:4, 20:8, 20:11, 20:13, 25:5, 25:7, 35:20, 36:3, 46:15, 47:4, 47:5, 47:11, 53:18, 53:21, 53:23, 53:25, 54:1, 54:2, 54:15, 55:6
**performed** [1] - 37:1
**perhaps** [2] - 53:3, 53:5
**period** [9] - 9:16, 10:4, 10:10, 10:14, 16:11, 46:6, 55:5, 60:13, 60:17
**Perle** [2] - 30:11, 30:12
**permit** [1] - 32:20
**permitted** [1] - 36:24
**perpetuity** [1] - 26:19
**Perry** [1] - 4:21
**person** [10] - 17:5, 17:11, 20:4, 25:8, 27:16, 42:23, 43:10, 44:22, 54:9, 66:9
**person's** [1] - 44:5
**personal** [2] - 15:14, 41:15
**perspective** [1] - 66:24
**phase** [1] - 18:8
**Phoenix** [1] - 4:1
**piece** [4] - 12:23, 44:6, 44:23, 55:1
**PIZZIRUSSO** [1] - 3:15
**Pizzirusso** [1] - 3:16
**place** [7] - 9:15, 12:17, 14:18, 15:22, 17:24, 36:17, 39:17
**plaintiff** [7] - 32:5, 40:2, 58:12, 58:18, 58:22, 58:23
**Plaintiff** [1] - 38:5
**PLAINTIFF** [1] - 1:3
**plaintiff's** [3] - 30:11, 35:22, 36:25
**Plaintiffs** [29] - 1:4, 1:15, 3:11, 3:14, 3:16, 5:12, 6:4, 6:8, 6:19, 7:5, 9:18, 28:2, 28:7, 35:2, 35:5, 35:12, 35:14, 35:19, 38:6, 38:12, 38:15, 40:12, 46:22, 48:21, 49:4, 50:9, 52:13, 53:5, 58:8
**Plaintiffs'** [2] - 5:6, 48:22
**plan** [15] - 5:8, 5:21, 6:9, 6:17, 24:20, 24:23, 25:1, 25:20, 26:21, 27:1, 27:4, 27:8, 27:10, 27:20, 27:22
**plans** [1] - 25:25
**played** [1] - 16:25
**players** [1] - 51:23
**Players'** [1] - 23:8
**plea** [4] - 52:18, 60:5, 65:25, 66:3
**pleading** [3] - 18:12, 27:6, 30:7
**pleadings** [3] - 15:21, 24:18, 60:2
**pleas** [13] - 8:13, 9:10, 16:3,

16:4, 16:5, 16:6, 47:15, 52:14, 52:15, 52:16, 52:22, 52:23, 52:25
**pleased** [1] - 35:8
**pled** [9] - 15:23, 16:2, 16:16, 16:18, 18:6, 40:6, 61:17, 61:19, 61:23
**pliant** [1] - 33:6
**plunger** [2] - 42:9, 44:21
**plus** [4] - 5:18, 7:9, 11:7, 43:25
**Plymouth** [2] - 4:22, 5:1
**pod** [1] - 27:11
**podium** [1] - 40:10
**point** [12] - 22:20, 30:15, 35:21, 43:21, 48:8, 48:9, 49:6, 52:24, 53:6, 54:21, 56:8, 63:22
**pointed** [1] - 48:6
**poisoning** [1] - 42:5
**Police** [1] - 42:3
**popular** [1] - 40:21
**portion** [8] - 20:20, 25:2, 25:10, 25:11, 25:14, 25:15, 54:5
**posed** [1] - 27:21
**Positan** [1] - 3:19
**position** [1] - 27:21
**positive** [3] - 11:11, 11:16, 11:20
**possess** [1] - 22:13
**possession** [1] - 61:2
**possibility** [1] - 64:19
**possible** [5] - 18:20, 18:21, 21:13, 34:16, 36:16
**postcards** [2] - 11:7, 11:8
**potential** [2] - 11:8, 40:16
**potentially** [1] - 46:17
**practice** [1] - 21:14
**precedent** [1] - 52:10
**preclusion** [14] - 31:18, 32:5, 32:7, 32:13, 32:22, 33:3, 33:5, 33:8, 33:14, 56:7, 56:10, 56:12, 56:15, 57:15
**prejudice** [6] - 31:15, 31:24, 32:10, 32:24, 50:18, 50:20
**preliminarily** [1] - 48:1
**preliminary** [5] - 3:20, 5:16, 47:23, 47:25, 50:14, 54:7
**premium** [1] - 26:11
**preparation** [3] - 37:8, 37:16, 37:18
**prepared** [1] - 5:10
**preparing** [2] - 41:10, 61:14
**present** [2] - 31:9, 38:23
**presentation** [2] - 6:13, 7:19
**presented** [6] - 17:9, 22:10, 31:6, 31:7, 50:9, 50:10
**president** [1] - 40:6
**press** [1] - 30:16

**presumed** [1] - 49:11
**pretty** [1] - 18:24
**prevail** [1] - 54:24
**prevailing** [1] - 52:23
**previously** [1] - 32:16
**pride** [1] - 40:20
**prima** [1] - 16:5
**primary** [1] - 66:9
**prime** [1] - 41:11
**principal** [2] - 13:12, 27:13
**principle** [1] - 25:3
**pro** [7] - 25:15, 30:7, 53:13, 53:19, 53:25, 54:8, 54:12
**problems** [3] - 41:18, 51:21, 52:4
**proceed** [7] - 6:20, 29:2, 31:1, 31:2, 55:18, 55:19, 55:24
**proceeding** [2] - 30:13, 32:25
**proceedings** [8] - 11:22, 13:5, 13:11, 15:22, 18:8, 28:19, 49:11, 64:2
**proceeds** [6] - 25:10, 25:16, 27:11, 27:20, 30:19, 30:21
**process** [3] - 24:12, 24:14, 51:1
**produced** [2] - 15:3, 62:24
**profit** [1] - 46:10
**profits** [1] - 46:9
**program** [2] - 24:13, 24:15
**progressed** [1] - 35:9
**proof** [5] - 14:7, 34:2, 34:6, 34:7, 34:8
**proper** [1] - 33:24
**properly** [1] - 62:21
**properties** [5] - 40:13, 40:15, 40:17, 40:18, 40:20
**property** [29] - 7:11, 8:17, 8:18, 8:19, 9:3, 9:5, 9:6, 9:15, 26:6, 27:14, 29:7, 29:8, 29:11, 29:13, 31:10, 36:20, 41:2, 43:10, 43:17, 43:19, 43:22, 44:23, 45:8, 57:22, 59:10, 59:18
**proposed** [4] - 6:15, 23:23, 37:2, 45:21
**prosecution** [1] - 17:24
**proud** [1] - 41:4
**prove** [7] - 9:19, 9:22, 16:19, 17:7, 17:10, 18:14, 31:13
**proven** [1] - 19:12
**provide** [6] - 7:8, 25:21, 26:1, 27:10, 28:16, 36:19, 38:1, 41:15
**provided** [5] - 21:24, 48:6, 51:14, 51:18, 58:16
**providing** [1] - 41:5
**proximate** [1] - 27:16
**pub** [1] - 40:21

**public** [14] - 5:14, 12:21, 12:25, 13:1, 13:21, 13:23, 14:12, 15:18, 18:9, 39:21, 43:15, 55:6, 60:3, 62:23
**publically** [1] - 14:3
**pulled** [2] - 42:9, 44:20
**purchase** [2] - 18:2, 59:10
**purchased** [11] - 10:8, 40:17, 41:2, 41:21, 43:21, 46:6, 46:23, 50:2, 55:4, 55:5, 66:7
**purpose** [4] - 24:2, 27:19, 39:2, 40:3
**pursuant** [1] - 8:3
**pursue** [6] - 55:11, 55:12, 55:15, 55:21, 55:23, 56:2
**pursuing** [1] - 56:14
**pushed** [1] - 11:3
**put** [32] - 10:5, 12:9, 12:14, 13:3, 13:23, 18:9, 21:23, 27:25, 33:10, 33:20, 34:18, 35:3, 35:4, 35:20, 35:22, 35:24, 36:1, 36:4, 36:14, 37:1, 37:7, 39:6, 42:25, 48:4, 58:13, 58:18, 59:21, 63:22, 64:23, 64:25, 65:1, 66:6

## Q

**quality** [1] - 41:1
**questioned** [1] - 31:5
**questions** [8] - 24:10, 24:17, 28:11, 38:17, 39:25, 44:2, 58:2, 65:10
**quite** [2] - 15:5, 34:15
**quote** [6] - 23:6, 27:6, 42:20, 47:10, 48:21, 57:17
**quotes** [1] - 23:10

## R

**raise** [1] - 7:21
**raised** [2] - 65:18, 66:22
**range** [1] - 23:2
**rata** [6] - 25:15, 53:13, 53:19, 53:25, 54:9, 54:12
**rate** [18] - 9:3, 9:8, 9:24, 18:4, 19:15, 19:24, 20:4, 20:8, 20:10, 25:3, 25:9, 26:11, 26:20, 27:15, 34:12, 34:18, 61:10
**rates** [4] - 5:13, 43:16, 44:1, 59:14
**rather** [2] - 42:20, 57:22
**re** [1] - 3:6
**reach** [1] - 20:24
**reached** [3] - 22:10, 22:11, 23:15
**reaching** [1] - 11:25

**reaction** [1] - 11:6
**readily** [1] - 39:20
**reading** [1] - 43:12
**ready** [1] - 55:18
**real** [1] - 59:4
**reality** [1] - 20:14
**realized** [5] - 43:13, 51:8, 51:15, 51:21, 51:24
**really** [3] - 11:23, 27:8, 27:19
**realtor** [1] - 43:2
**reason** [10] - 26:16, 28:23, 29:3, 29:6, 41:23, 58:17, 58:23, 64:7, 64:9, 65:8
**reasonable** [8] - 24:25, 36:12, 37:4, 46:3, 47:21, 50:16, 53:11, 63:15
**reasonableness** [3] - 23:2, 23:16, 35:14
**reasons** [4] - 7:15, 9:6, 23:4, 54:24
**rebutted** [1] - 35:15
**receive** [3] - 7:12, 25:18, 26:5
**received** [15] - 5:6, 5:25, 6:1, 6:4, 13:2, 13:10, 13:25, 14:5, 14:13, 36:17, 36:18, 48:9, 48:13, 51:10, 52:1
**recent** [2] - 12:15, 21:15
**recently** [2] - 12:14, 42:18
**recognize** [1] - 21:10
**recognizes** [1] - 38:24
**reconsidered** [1] - 57:5
**record** [20] - 5:6, 6:25, 13:22, 13:23, 15:19, 18:10, 27:24, 34:19, 39:21, 45:16, 57:20, 60:24, 62:16, 62:24, 63:17, 63:23, 64:4, 64:23, 66:6
**recorded** [1] - 17:2
**recounted** [1] - 46:22
**recover** [1] - 37:22
**recovered** [3] - 13:19, 14:14, 36:23
**recoveries** [1] - 49:11
**recovery** [3] - 22:24, 30:22, 66:15
**recurring** [1] - 26:9
**redeem** [1] - 53:22
**redeemed** [2] - 53:18, 56:20
**redemption** [4] - 46:15, 57:10, 57:12, 57:24
**REED** [1] - 4:9
**Reed** [1] - 4:9
**reenforced** [1] - 45:4
**refer** [3] - 17:23, 35:4, 66:12
**referred** [1] - 39:14
**referring** [1] - 18:13
**reflect** [1] - 13:18
**reflection** [1] - 53:16
**refused** [1] - 50:14

**refuses** [1] - 53:4
**regarding** [4] - 38:22, 39:20, 56:17, 57:11
**regardless** [1] - 59:10
**regards** [10] - 8:25, 12:17, 24:11, 28:11, 33:23, 58:25, 59:19, 60:11, 63:17, 64:12
**reimbursement** [5] - 5:9, 37:3, 37:5, 37:15, 37:23
**rejecting** [1] - 12:18
**related** [1] - 6:11
**relates** [2] - 9:7, 60:9
**relative** [6] - 25:7, 25:13, 25:15, 27:16, 27:17, 38:10
**relatively** [1] - 58:9
**relayed** [1] - 43:10
**release** [2] - 51:23, 55:1
**relied** [3] - 48:17, 48:20, 51:16
**relief** [4] - 28:5, 28:16, 30:5, 36:19
**reluctant** [1] - 36:7
**rely** [3] - 52:9, 52:21, 56:17
**remained** [1] - 40:25
**remaining** [2] - 44:8, 56:11
**remarks** [3] - 59:21, 59:24, 65:10
**remedies** [3] - 30:18, 31:1, 63:20
**Remick** [3] - 60:11, 60:12, 60:14
**remiss** [1] - 10:25
**rentals** [1] - 41:8
**repay** [1] - 43:24
**repeated** [1] - 42:14
**reply** [10] - 24:21, 27:25, 29:20, 32:19, 33:20, 35:10, 56:8, 58:6, 58:13, 58:19
**reporter** [2] - 7:2, 45:17
**represent** [1] - 64:8
**representation** [1] - 64:12
**representative** [1] - 49:24
**representatives** [1] - 42:14
**represented** [3] - 39:24, 50:25, 64:14
**representing** [1] - 4:10
**reputation** [1] - 41:1
**request** [8] - 35:20, 36:11, 36:12, 36:22, 37:23, 38:8, 38:9, 38:14
**requested** [2] - 36:6, 37:5
**requesting** [2] - 28:21, 36:3
**require** [1] - 15:14
**required** [5] - 1:19, 9:18, 9:22, 30:25, 33:20
**requirement** [1] - 24:5
**requirements** [2] - 23:23, 23:25
**requiring** [2] - 33:6, 63:19

**reserve** [1] - 39:3
**residences** [1] - 41:6
**resolution** [1] - 23:20
**resolve** [1] - 54:16
**respect** [12] - 6:7, 9:17, 10:5, 13:8, 13:14, 13:24, 15:23, 16:10, 22:4, 25:4, 38:3, 39:7
**respectfully** [2] - 12:24, 39:14
**response** [4] - 11:11, 11:16, 11:21, 48:20
**responses** [1] - 6:4
**responsibility** [1] - 41:11
**rest** [3] - 24:10, 24:18, 52:1
**restaurant** [3] - 40:15, 40:21, 41:5
**restitution** [2] - 18:15, 62:5
**Restitution** [1] - 62:4
**result** [1] - 7:13
**resulted** [2] - 41:19, 51:1
**retail** [1] - 40:16
**retain** [2] - 64:6, 64:10
**return** [1] - 43:2
**revealed** [1] - 41:18
**revenue** [1] - 41:5
**review** [1] - 23:15
**rig** [1] - 16:9
**rigged** [1] - 16:8
**rigging** [5] - 29:21, 29:25, 30:20, 31:15, 59:14
**rights** [1] - 57:5
**rise** [3] - 3:1, 39:8, 67:2
**risk** [5] - 15:24, 17:20, 20:25, 21:18
**risks** [1] - 15:25
**Robert** [4] - 4:4, 39:13, 41:22, 44:18
**Roberts** [2] - 27:1, 38:20
**role** [2] - 23:14, 23:17
**Rothman** [1] - 4:4
**roughly** [1] - 13:18
**rounds** [1] - 63:5
**Rowe** [1] - 4:19
**RPR** [1] - 1:20
**rule** [3] - 12:16, 25:23, 28:22
**ruling** [1] - 48:20

**S**

**sale** [4] - 42:25, 43:9, 43:16, 45:6
**Sale** [2] - 5:14, 5:19
**Sales** [1] - 3:6
**Saloon** [1] - 40:21
**SASS** [21] - 29:9, 29:11, 29:14, 29:23, 30:12, 30:17, 31:12, 49:21, 50:1, 55:11, 56:25, 57:23, 58:1, 61:17, 61:20, 61:23, 61:25, 64:12,

65:25, 66:8
**Sass** [1] - 4:13
**SASS's** [1] - 40:5
**sat** [1] - 51:7
**satisfied** [2] - 24:12, 24:14
**satisfy** [4] - 15:19, 20:6, 22:14, 43:17
**saw** [1] - 35:19
**scenario** [1] - 47:14
**scenarios** [1] - 20:12
**Schmidt** [1] - 35:6
**se** [1] - 30:7
**seat** [1] - 42:8
**seated** [2] - 3:3, 45:25
**second** [5] - 11:6, 46:12, 50:6, 53:15, 54:6
**Section** [1] - 1:19
**section** [1] - 23:6
**see** [4] - 6:23, 10:14, 15:18, 52:20
**seek** [1] - 38:2
**seeking** [4] - 30:1, 36:14, 37:15, 45:6
**seem** [1] - 8:12
**self** [1] - 52:8
**self-serving** [1] - 52:8
**sending** [1] - 5:23
**senior** [1] - 65:25
**sense** [3] - 34:17, 44:9, 58:21
**sent** [1] - 11:7
**sentence** [2] - 21:8, 61:25
**sentenced** [2] - 61:19, 61:24
**sentencing** [2] - 14:16, 18:8
**separate** [4] - 5:17, 23:22, 41:13, 46:12
**September** [6] - 40:19, 41:25, 42:3, 42:13, 42:24, 43:2
**serious** [1] - 22:5
**Services** [2] - 4:23, 41:22
**serving** [1] - 52:8
**session** [1] - 22:8
**set** [3] - 6:6, 14:1, 24:22
**settled** [2] - 22:7, 49:21
**settlement** [80] - 5:8, 6:1, 6:2, 6:9, 7:7, 11:2, 11:7, 11:17, 11:25, 12:5, 12:7, 12:12, 13:10, 13:13, 14:14, 15:11, 19:4, 19:21, 20:24, 22:10, 22:12, 22:14, 23:3, 23:11, 23:13, 23:15, 23:18, 23:19, 23:21, 23:23, 23:25, 24:2, 24:7, 24:11, 24:25, 25:2, 25:10, 25:11, 25:15, 25:20, 27:11, 27:20, 28:9, 34:5, 36:22, 38:21, 39:1, 39:8, 40:11, 41:21, 43:13, 45:22, 45:23, 46:3, 46:18, 46:20, 47:21, 48:1, 49:5,

49:19, 50:11, 50:12, 50:15,
51:1, 51:19, 51:22, 52:3,
52:6, 52:25, 53:11, 53:15,
54:3, 54:15, 55:1, 60:9,
60:13, 60:19, 62:12, 66:2
**settlements** [28] - 5:7, 5:17,
6:15, 7:16, 7:20, 7:25, 8:7,
12:2, 12:3, 12:4, 12:18,
13:25, 15:4, 15:20, 23:4,
23:5, 25:18, 28:3, 28:12,
28:14, 28:16, 32:15, 34:9,
35:1, 35:2, 35:8, 35:13,
63:14
**settling** [3] - 14:1, 49:22,
63:6
**seven** [2] - 40:15, 44:11
**seventh** [1] - 21:20
**several** [2] - 30:9, 41:20
**Shalom** [1] - 3:25
**share** [3] - 53:13, 53:19,
53:25
**shattered** [1] - 44:16
**sheet** [1] - 54:9
**shepherding** [1] - 11:1
**shocking** [1] - 43:8
**show** [3] - 9:22, 10:11, 63:20
**showed** [1] - 31:4
**showing** [1] - 15:17
**shown** [4] - 34:22, 46:10,
50:3, 53:8
**shows** [1] - 49:16
**side** [2] - 14:22, 45:13
**sides** [1] - 50:24
**signed** [1] - 42:21
**significant** [7] - 14:13, 20:20,
20:21, 21:22, 22:6, 22:13,
37:9
**significantly** [1] - 52:17
**similar** [2] - 18:1, 18:5
**similarly** [1] - 46:1
**simple** [1] - 19:8
**simply** [17] - 15:6, 18:21,
19:5, 20:12, 22:23, 22:24,
27:10, 27:13, 30:18, 33:20,
35:10, 35:15, 39:18, 47:21,
54:12, 54:13, 60:24
**singers** [1] - 40:24
**single** [9] - 17:11, 19:16,
19:17, 21:7, 21:8, 27:22,
41:7, 43:10, 61:11
**sitting** [1] - 42:8
**situated** [1] - 46:2
**situation** [5] - 8:21, 32:11,
36:8, 59:4, 59:7
**six** [3] - 20:25, 44:10, 54:11
**size** [3] - 12:11, 46:5, 65:23
**skilled** [1] - 18:24
**slam** [2] - 16:14, 52:15
**small** [1] - 46:17
**Smith** [1] - 4:19

**sold** [14] - 9:23, 9:24, 10:2,
10:4, 18:17, 19:15, 19:23,
20:1, 20:2, 20:4, 40:19,
47:10, 61:4
**solely** [1] - 57:11
**someone** [4] - 20:5, 25:6,
27:14, 53:21
**somewhere** [2] - 13:17, 20:2
**son** [2] - 31:6, 39:14
**sophisticated** [1] - 10:21
**sorry** [1] - 16:17
**sounds** [1] - 53:24
**source** [2] - 37:7, 37:14
**South** [1] - 40:14
**Southern** [1] - 18:12
**space** [1] - 40:16
**SPEAKER1** [1] - 1:11
**specific** [5] - 15:12, 24:9,
24:17, 26:1, 46:5
**specifically** [5] - 13:6, 16:7,
22:2, 27:3, 28:21
**spent** [5] - 12:5, 12:8, 37:10,
53:20
**sponte** [2] - 50:14, 50:20
**stage** [1] - 11:22
**stand** [1] - 39:12
**standard** [2] - 24:22, 24:24
**standing** [22] - 7:23, 7:24,
11:13, 28:14, 28:22, 28:23,
31:11, 32:12, 32:21, 33:14,
34:3, 34:24, 38:25, 39:3,
39:6, 40:3, 41:4, 41:23,
54:19, 55:3, 65:6, 65:8
**Star** [1] - 23:10
**start** [2] - 14:22, 27:15
**started** [1] - 42:13
**starts** [1] - 18:3
**state** [29] - 6:25, 19:13,
29:12, 29:17, 30:16, 30:20,
30:24, 31:1, 31:22, 32:1,
32:6, 32:8, 32:25, 34:13,
39:12, 45:16, 48:14, 49:10,
55:8, 55:9, 55:11, 55:15,
55:19, 56:13, 56:14, 56:19,
57:3, 63:16, 64:15
**State** [6] - 1:9, 8:17, 30:4,
34:14, 44:3, 59:8
**statement** [3] - 38:22, 55:10,
55:21
**statements** [6] - 6:12, 16:8,
21:23, 46:10, 51:5, 51:6
**STATES** [1] - 1:1
**states** [3] - 48:13, 66:2,
66:14
**States** [1] - 1:8
**statewide** [3] - 15:25, 48:22,
48:25
**stating** [1] - 55:10
**statute** [2] - 30:3, 64:17
**step** [2] - 11:15, 38:17

**Steve** [1] - 4:9
**Steven** [1] - 4:6
**still** [19] - 5:19, 7:10, 17:22,
26:6, 26:7, 26:12, 26:13,
28:6, 28:16, 34:7, 34:16,
47:19, 53:21, 54:11, 57:25,
61:3, 62:13, 62:14, 63:2
**stipulation** [1] - 60:5
**stomach** [1] - 43:6
**STONE** [1] - 3:25
**Stone** [1] - 3:25
**stopped** [2] - 43:11, 43:12
**stories** [2] - 59:3, 59:11
**story** [2] - 31:9, 59:1
**straightforward** [1] - 21:17
**Street** [2] - 1:9, 40:14
**strengths** [5] - 12:11, 58:16,
62:22, 63:7, 63:13
**stress** [1] - 43:19
**strike** [2] - 28:22, 32:20
**strong** [1] - 41:3
**struck** [1] - 23:11
**struggle** [2] - 42:1, 44:9
**stuff** [1] - 62:13
**sua** [2] - 50:14, 50:19
**subject** [18] - 5:19, 7:10,
9:20, 9:21, 17:12, 19:19,
20:1, 20:5, 25:24, 26:14,
26:22, 29:21, 30:22, 33:16,
46:15, 60:2, 60:6, 61:11
**submission** [1] - 48:12
**submissions** [1] - 39:23
**submit** [2] - 49:9, 55:3
**submitted** [14] - 6:16, 39:19,
39:24, 47:24, 47:25, 48:11,
48:23, 50:4, 53:7, 54:20,
55:20, 56:14, 57:19, 66:18
**subsequent** [2] - 26:18, 27:5
**subset** [1] - 51:25
**suffer** [2] - 43:5, 65:7
**suffice** [1] - 18:25
**sufficient** [2] - 15:19, 51:8
**suggest** [1] - 54:5
**suicide** [3] - 41:25, 42:7,
44:8
**suited** [1] - 40:3
**supplemental** [1] - 66:21
**supplies** [1] - 41:10
**support** [5] - 13:4, 27:25,
28:1, 48:12, 49:3
**supported** [4] - 40:25, 48:25,
50:15, 50:20
**supporting** [1] - 38:8
**supposed** [1] - 13:18
**Supreme** [1] - 21:15
**surely** [2] - 10:23, 42:9
**surprising** [1] - 21:9
**suspect** [1] - 64:13
**sustained** [1] - 57:2

**Sweeney** [7] - 38:22, 40:10,
40:12, 40:13, 40:21, 45:11,
59:15
**SWEENEY** [1] - 40:11
**Sweeney's** [1] - 58:25
**sworn** [1] - 21:23
**syringe** [1] - 42:10
**syringes** [1] - 42:6
**system** [3] - 18:1, 18:25
**Systems** [1] - 31:20

## T

**tactics** [2] - 44:19, 44:25
**tailored** [1] - 25:25
**talks** [4] - 56:16, 60:11,
62:10, 64:2
**tapes** [2] - 16:25, 17:2
**task** [7] - 10:16, 10:19, 19:1,
21:16, 62:8
**tasks** [1] - 9:25
**Tax** [7] - 3:6, 4:23, 5:14,
5:19, 41:22, 42:11, 44:18
**tax** [26] - 8:17, 8:18, 9:3, 9:6,
9:15, 10:3, 17:25, 18:2,
18:3, 18:5, 19:14, 37:8,
37:16, 37:18, 45:6, 46:23,
53:18, 53:21, 53:22, 54:1,
55:4, 55:5, 56:20, 59:4,
59:10, 61:6
**taxes** [7] - 9:5, 26:18, 29:7,
29:11, 29:13, 41:19, 45:1
**telephone** [2] - 42:23, 58:15
**terminated** [1] - 31:23
**terms** [17] - 7:19, 13:24,
14:4, 15:13, 18:15, 23:4,
23:13, 24:2, 26:11, 31:12,
34:11, 37:15, 51:1, 62:16,
62:17, 62:19, 63:18
**testimony** [1] - 22:20
**THE** [31] - 1:1, 3:1, 3:3, 3:5,
3:12, 3:17, 3:24, 4:2, 4:5,
4:8, 4:11, 4:24, 5:2, 5:5,
6:24, 12:20, 14:20, 36:9,
38:18, 39:16, 40:8, 45:11,
45:16, 58:3, 58:6, 59:23,
65:12, 65:17, 66:17, 66:25,
67:2
**themselves** [4] - 17:4, 45:9,
50:2, 50:25
**thereafter** [9] - 6:11, 31:24
**therefore** [9] - 19:17, 20:13,
25:9, 33:2, 33:16, 61:3,
61:4, 63:10, 65:6
**they've** [7] - 21:3, 21:12,
22:25, 29:3, 34:18, 37:1,
48:23
**thinks** [1] - 20:7
**Third** [9] - 12:13, 12:14,
12:16, 22:16, 23:7, 50:7,

51:15, 52:11, 53:3

**third** [3] - 33:1, 34:13, 64:22

**third-party** [3] - 33:1, 34:13, 64:22

**thousand** [1] - 37:20

**threatening** [1] - 44:8

**threats** [4] - 42:15, 43:14, 44:20, 45:3

**three** [11] - 8:23, 10:23, 11:12, 17:7, 22:22, 23:1, 30:10, 37:19, 42:22, 44:11, 63:8

**throughout** [3] - 16:10, 40:25, 59:2

**Title** [1] - 1:19

**today** [14] - 3:5, 6:6, 7:2, 7:6, 8:3, 10:22, 11:2, 11:17, 31:18, 35:5, 44:24, 59:18, 66:22, 67:1

**today's** [1] - 6:7

**together** [2] - 37:7, 54:8

**Tom** [2] - 3:21, 45:18

**ton** [1] - 12:25

**took** [6] - 9:15, 14:8, 17:24, 44:17, 46:9

**tooting** [1] - 18:23

**tormented** [1] - 43:4

**total** [2] - 35:23, 38:5

**totaling** [1] - 5:17

**touch** [1] - 54:19

**touchstone** [1] - 62:20

**tough** [2] - 59:3, 59:5

**towards** [1] - 37:14

**Township** [1] - 42:3

**tragic** [2] - 59:1, 59:11

**transactions** [3] - 43:15, 44:3, 44:10

**transcript** [3] - 33:11, 63:22, 63:25

**Transit** [1] - 32:18

**treasurer** [1] - 18:6

**treble** [2] - 29:24, 30:5

**trebled** [1] - 47:16

**Trenton** [2] - 1:9, 40:14

**Trenton's** [1] - 41:3

**trial** [11] - 17:1, 17:8, 21:1, 22:20, 33:11, 34:13, 50:4, 52:23, 63:17, 63:20, 66:6

**tried** [8] - 17:7, 26:4, 26:21, 31:5, 31:23, 34:21, 37:11

**troubling** [1] - 34:20

**Trucks** [1] - 52:9

**True** [1] - 1:19

**true** [13] - 15:16, 16:4, 22:17, 35:7, 35:10, 39:19, 44:16, 55:9, 56:2, 60:25, 62:3, 63:18, 64:12

**try** [8] - 10:1, 14:9, 18:14, 18:16, 25:12, 30:16, 36:19, 58:9

**trying** [3] - 7:3, 37:21, 57:15

**two** [20] - 6:1, 6:2, 9:19, 9:25, 11:12, 30:10, 30:19, 35:5, 38:19, 40:5, 42:5, 49:4, 53:19, 53:22, 54:10, 57:6, 57:9, 61:22, 63:5

**type** [2] - 15:14, 51:4

## U

**U.S** [2] - 18:10, 62:7

**U.S.C** [2] - 1:19, 62:4

**ultimately** [3] - 31:23, 64:9, 64:24

**unable** [3] - 17:10, 29:10, 32:1

**unbearable** [1] - 43:19

**unclear** [1] - 16:3

**undeniable** [1] - 47:8

**under** [16] - 8:17, 11:6, 15:24, 25:18, 29:15, 30:2, 31:16, 31:18, 32:7, 32:12, 32:21, 34:3, 36:12, 40:17, 62:4, 66:18

**underlying** [1] - 38:22

**understood** [2] - 7:4, 63:13

**undisputed** [2] - 55:14, 56:18

**unending** [1] - 42:1

**unfair** [1] - 53:16

**unfortunate** [3] - 29:15, 31:8, 31:9

**unfortunately** [6] - 8:15, 8:20, 9:1, 9:5, 31:9, 59:7

**union** [1] - 57:21

**Union** [3] - 34:14, 57:21, 57:22

**UNITED** [1] - 1:1

**United** [1] - 1:8

**unjustly** [1] - 43:18

**unlawfully** [1] - 5:13

**unless** [8] - 15:5, 22:1, 24:9, 24:16, 28:10, 38:16, 55:10, 65:9

**unlike** [3] - 8:4, 12:21, 26:11

**unpaid** [1] - 8:18

**Untracht** [3] - 31:19, 33:4, 56:16

**up** [12] - 7:12, 14:10, 18:20, 18:22, 18:24, 19:19, 23:12, 31:4, 42:25, 54:16, 55:16, 63:20

**upholding** [1] - 40:22

**upkeep** [1] - 41:8

**urge** [1] - 59:15

**useful** [1] - 16:12

**utility** [2] - 16:3, 16:13

**utilize** [1] - 24:22

## V

**vague** [4] - 16:7, 16:8, 65:3, 65:5

**valuation** [1] - 49:3

**value** [7] - 46:5, 46:16, 48:10, 50:11, 50:12, 54:14, 60:8

**various** [2] - 7:15, 25:18

**veins** [1] - 44:21

**vendor** [1] - 37:6

**venue** [1] - 41:1

**vice** [1] - 40:6

**Victim** [1] - 62:4

**victim** [2] - 44:7, 62:6

**view** [3] - 23:18, 37:5, 59:3

**vigorous** [1] - 10:22, 21:6

**Vinay** [1] - 40:5

**virtually** [2] - 11:17, 21:3

**vis-à-vis** [2] - 9:2, 25:13

**visits** [1] - 42:23

**voice** [1] - 39:7

**volume** [1] - 66:3

**vs** [1] - 1:5

## W

**wants** [3] - 8:2, 45:12, 64:3

**warehouse** [1] - 40:16

**WARREN** [1] - 4:21

**Warren** [1] - 4:22

**ways** [1] - 52:10

**weakness** [1] - 62:22

**weaknesses** [4] - 12:11, 58:17, 63:7, 63:13

**weary** [1] - 53:3

**week** [3] - 44:12, 44:13, 50:8

**weekly** [1] - 40:22

**weeks** [1] - 42:24

**weigh** [1] - 52:25

**well-known** [1] - 40:23

**west** [1] - 31:19

**whatsoever** [2] - 7:18, 7:23

**whereas** [1] - 53:21

**whole** [4] - 10:8, 11:18, 24:1, 65:4

**wide** [2] - 15:25, 17:19

**widow** [1] - 8:14

**Wiegand** [10] - 3:21, 45:18, 59:19, 60:25, 61:1, 61:16, 62:9, 62:14, 63:16, 64:22

**WIEGAND** [6] - 3:23, 45:14, 45:18, 58:5, 65:16, 65:20

**Wigenton** [1] - 14:17

**William** [2] - 4:12, 40:13

**wiretaps** [1] - 16:22

**wish** [1] - 19:8

**wished** [1] - 55:11

**wishes** [2] - 39:8, 39:11

**withstand** [4] - 21:19, 21:22, 22:5, 22:15

**witnesses** [3] - 31:6, 31:7, 52:19

**WL-1552205** [1] - 23:9

**Wolfson** [5] - 16:21, 16:22, 16:23, 17:2, 22:20

**Wolfson's** [1] - 17:1

**woman** [1] - 40:5

**wonder** [1] - 34:23

**word** [1] - 65:17

**words** [3] - 20:9, 30:6, 36:4

**worth** [4] - 44:5, 60:6, 60:12, 60:20

**written** [9] - 30:25, 31:4, 33:6, 33:9, 55:14, 55:21, 56:14, 63:18, 63:19

**wrongdoing** [1] - 9:7

**wronged** [1] - 17:6

## Y

**year** [20] - 19:14, 19:15, 19:17, 20:14, 37:19, 37:20, 44:13, 46:24, 46:25, 47:5, 47:6, 48:13, 49:1, 50:3, 50:4, 61:4, 61:6, 61:7, 66:7

**years** [22] - 8:23, 10:23, 10:24, 13:16, 17:7, 19:19, 26:18, 29:10, 30:9, 30:10, 40:20, 41:2, 42:13, 44:11, 44:17, 47:2, 53:19, 53:20, 53:22, 54:11, 59:7, 63:9

**yielding** [1] - 23:19

**your,Honor** [1] - 34:10

**yourself** [1] - 54:7

## Z

**Zahn** [1] - 6:3

**Zahns** [1] - 6:3

**zero** [6] - 20:3, 20:4, 20:8, 20:10, 47:19

**ZWEIG** [9] - 3:13, 6:22, 7:4, 12:23, 15:1, 36:10, 58:7, 59:24, 66:24

**Zweig** [6] - 3:13, 6:21, 7:4, 38:18, 58:8, 65:12